The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1
           IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA

2
               ATLANTA DIVISION

3
UNITED STATES OF AMERICA,      :
                         :

4
vs.                      :  DOCKET NUMBER
                         :  1:17-CR-0224-1

5
ALLEN J. PENDERGRASS,       :
                         :  ATLANTA, GEORGIA

6
       DEFENDANT.        :  NOVEMBER 30, 2021

7

8
     **TRANSCRIPT OF JURY TRIAL - VOLUME I OF IV PROCEEDINGS**

9
        **BEFORE THE HONORABLE AMY TOTENBERG**

10
        **UNITED STATES SENIOR DISTRICT JUDGE**

11

12
APPEARANCES OF COUNSEL:

13
     **FOR THE GOVERNMENT:**

14
     JEFFREY A. BROWN
     TRACIA M. KING

15
     UNITED STATES ATTORNEY'S OFFICE

16

17
     **FOR THE DEFENDANT:**

18
     SARALIENE DURRETT
     SARALIENE SMITH DURRETT, LLC

19
     SYDNEY R. STRICKLAND

20
     STRICKLAND WEBSTER, LLC

21
   *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*
             *TRANSCRIPT PRODUCED BY:*

22

23
*OFFICIAL COURT REPORTER:*      *SHANNON R. WELCH, RMR, CRR*
                         *2394 UNITED STATES COURTHOUSE*

24
                         *75 TED TURNER DRIVE, SOUTHWEST*
                         *ATLANTA, GEORGIA  30303*

25
                         *(404) 215-1383*

<u>**I N D E X   T O   P R O C E E D I N G S**</u>

                                              <u>**PAGE**</u>

OPENING STATEMENT

    by Ms. King                                  12
    by Ms. Strickland                            17

<u>**THE GOVERNMENT'S CASE**</u>

<u>**WITNESS**</u>                                       <u>**PAGE**</u>

DOUGLAS RICKS

    Direct Examination
     By Mr. Brown                               22
    Cross-Examination
     By Ms. Durrett                             49
    Redirect Examination
     By Mr. Brown                               74
    Voir Dire Examination
     By Ms. Durrett                             80

GORDON GIFFIN

    Direct Examination
     By Ms. King                                88
    Cross-Examination
     By Ms. Strickland                          92

FREDRICK ASHLEY

    Direct Examination
     By Ms. King                                94
    Cross-Examination
     By Ms. Strickland                          98

MELVIN L. WALLER

    Direct Examination
     By Ms. King                               100
    Cross-Examination
     By Ms. Strickland                         103


                                     (...cont'd....)

1    (...cont'd...)

2    **WITNESS**                                    **PAGE**

3    JAMES H. BONE

4        Direct Examination
            By Ms. King                              115
5
     SONIA TOSON
6
         Direct Examination
7            By Mr. Brown                            120

8    RONALD BOWERS

9        Direct Examination
            By Ms. King                              125
10       Cross-Examination
            By Ms. Durrett                           148
11
     ERIC FITCHPATRIC
12
         Direct Examination
13           By Mr. Brown                            162
         Cross-Examination
14           By Ms. Durrett                          195
         Redirect Examination
15           By Mr. Brown                            212

16                                    *   *   *

17   CERTIFICATE                                     217

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2    (Atlanta, Fulton County, Georgia; November 30, 2021.)

 3             THE COURT:  Counsel, would you remind me what page of

 4    the brief the sentence at issue was in.

 5             MS. DURRETT:  I think it is on Page 3, but I don't

 6    remember.

 7             MR. BROWN:  It is Document 73, Page 3, the bottom of

 8    the first paragraph.

 9             THE COURT:  Who will be your first witness today?

10             MR. BROWN:  Investigator Ricks with the Atlanta

11    Police Department.

12             THE COURT:  Remind me:  Is this what we were going to

13    talk about first thing in the morning, or was it something

14    else?

15             MS. DURRETT:  No.  That is what I would like to talk

16    about, Your Honor.

17             THE COURT:  I'm not prepared for you to be arguing

18    this in the opening statement.  I mean, this is sort of a

19    delicate matter.

20             I think that the defendant's proposal is too

21    complicated and takes the gist of what a jury might -- a juror

22    might take out of it.  But I understand their desire for some

23    context.

24             And I need to think a little bit more about how it

25    can be introduced.
```

```
 1              MS. DURRETT:  Your Honor --

 2              THE COURT:  That is why I asked who was the first

 3     witness.

 4              MS. DURRETT:  And right, Your Honor.  What we would

 5     like to do is be able to talk about it in opening.  I

 6     understand the Court's ruling that that might not be possible.

 7              THE COURT:  You know, there is no, frankly -- I mean,

 8     there are other ways that you could do that rather than the

 9     Government's admission.  I mean, you can do the reality -- if

10     this is true, indeed, which you believe it is -- and apparently

11     the Government believes it is -- is that it was Mr. -- as you

12     will see the evidence shows, that it was Co-defendant

13     McQueen -- Mr. McQueen, who you are going to see, not

14     Mr. Pendergrass, who signed and sent the forged documents.

15              MS. DURRETT:  That is fine, Your Honor.  We would

16     just like to be heard at a later time about the stipulation.

17              THE COURT:  I haven't put it aside.  I just think it

18     is a little more complicated.  And I don't want to walk into a

19     muck.  And I looked at it this morning again.  And then I

20     looked at Mr. Brown's proposal.

21              And it is just a little messy.  I have got to think a

22     little more creatively than I have.

23              MS. DURRETT:  Thank you, Your Honor.

24              Then I have one other issue.

25              THE COURT:  Yes.
```

1        MS. DURRETT:  I just realized the Government has a

2   notebook.  I don't know if they plan to enter it into evidence.

3   It says physical binder.

4        THE COURT:  Yes, I have the -- you mean the notebook

5   of documents?

6        MS. DURRETT:  It is a physical notebook that I guess

7   they are saying they seized from Mr. Pendergrass.  I don't know

8   what their intention is with that.  I just wanted to object to

9   it before they tried to offer it with Officer Ricks or

10  anything.

11       It has got papers stuffed in it.  It is not listed on

12  the summary of items that were seized from his office.  So I

13  would just object.

14       And I didn't want to get into a big thing with the

15  jury, but I also didn't want them to be offering it without me

16  saying that I object.

17       THE COURT:  Are you planning to do that?

18       MR. BROWN:  Yes, Judge.  But I'm not going to publish

19  it.  But he is the officer that was there at the scene.

20       This is a notebook that was seized from

21  Mr. Pendergrass' office that has his name on it.  It has

22  another piece of exhibit that is going to be admitted during

23  the trial.

24       So I'm not going to publish it.  If she objects to

25  certain particular documents in there, we can hash it out

```
 1    later.
 2              THE COURT:  Is this the actual document?
 3              MR. BROWN:  This is the actual notebook.
 4              THE COURT:  And you never saw it before?
 5              MS. DURRETT:  I have never seen it, and it is not
 6    listed on the list of items that were seized from that office.
 7    So if they are suggesting it was seized there, it is certainly
 8    not listed there.
 9              MR. BROWN:  There are photographs of multiple
10    binders.  I have -- actually, Your Honor, I have all of the
11    evidence that was seized from the defendant's office.
12              So it is relevant.  It has his name on it.  It has
13    relevant documents inside.  I'm not going to publish the
14    contents.  If she objects to particular documents inside, we
15    can hash that out later.
16              But the appropriate witness for this to be admitted
17    through is Investigator Ricks because he and his officers --
18              THE COURT:  Are you planning to offer it as an
19    exhibit?
20              MR. BROWN:  Yes, I am, Judge.
21              THE COURT:  But it wasn't listed on the exhibit list?
22              MS. DURRETT:  No.  It is not listed in the list of
23    items that were seized from that office.  It is not listed
24    there.  So now they are saying, hey, guess what?  Here is a
25    notebook we seized from the office.  It says Allen Pendergrass,
```

1    CEO, on the front.

2           It is not listed in the items that were taken from

3    the office.

4           MR. BROWN:  Your Honor, defense counsel came over I

5    think a year or two ago and looked at every -- looked at all of

6    the documents.  This was included in there.

7           There is a lot.  Every particular piece of notebook

8    is not listed in there.  The officer should be able to lay a

9    proper foundation that this particular notebook was recovered

10   from the scene.

11          If she wants to challenge the weight of that

12   evidence, she can do that.  But I don't think it goes -- if he

13   lays the proper foundation that this particular document was

14   seized, it could come in because it is relevant.

15          THE COURT:  Who prepared the list of documents that

16   were seized?

17          MR. BROWN:  I'm not sure what list she's referring

18   to, Your Honor.

19          What list are you referring to?

20          MS. DURRETT:  I'm referring to a list that came -- I

21   guess it must have been -- maybe it was Ricks who said what

22   computers were taken, what documents were taken.  And it was

23   provided to us with their police reports.

24          THE COURT:  You can cross-examine him about that.

25          MS. DURRETT:  That is fine, Your Honor.

1          But I do have one other issue, which is now they are

2     telling us that Officer Ricks has memory problems.  I don't

3     know where that is headed.

4          But, you know, I'll be curious to see if he actually

5     remembers that notebook if they are telling us that he had a

6     stroke and he now has memory problems.

7          THE COURT:  Well, you can question him --

8          MS. DURRETT:  That is fine.  Thank you.

9          THE COURT:  -- about how -- and how -- did he compile

10    a list?  Did somebody else compile the list?

11          And I think you can illuminate this to your

12    satisfaction.

13          MS. DURRETT:  Thank you, Your Honor.

14          THE COURT:  Is there anything else?

15          MR. BROWN:  Not from the Government, Judge.

16          THE COURT:  Anything?

17          MS. DURRETT:  We just need our paralegal.

18          THE COURT:  Did we get the other jurors here -- the

19    two missing ones?

20          COURTROOM DEPUTY CLERK:  Let me check.

21          **(There was a brief pause in the proceedings.)**

22          THE COURT:  I just want to say to counsel this:

23    While I'm not prepared to allow the defense counsel to proceed

24    with the stipulation at this point, I think partially because I

25    am allowing evidence that the Government wanted to introduce, I

```
1    am -- and that was part of the reasoning argument here from

2    defense counsel that I have to fashion some way that it can be

3    introduced.  It is just not fair otherwise.

4               MR. BROWN:  Okay.  I mean --

5               THE COURT:  And we'll work on it some more.

6               MR. BROWN:  Okay.  All right.

7               MS. DURRETT:  Thank you, Your Honor.

8               COURTROOM DEPUTY CLERK:  Everybody is here.  I told

9    Ken to step in, and we will bring them in.

10                   (There was a brief pause in the proceedings.)

11              THE COURT:  These are replacement exhibits from the

12   Government.

13              MR. BROWN:  Your Honor, 19 and 28.

14              THE COURT:  Is your witness ready though when the

15   jury comes in?

16              MR. BROWN:  Yes, Judge.  Do you want me to bring him

17   now?

18              THE COURT:  Yeah, we could bring him in now.

19              COURTROOM DEPUTY CLERK:  Mr. Brown?

20              MR. BROWN:  Yes.

21              COURTROOM DEPUTY CLERK:  If you would give me a

22   heads-up when we are going to have the wheelchair witness.

23              MR. BROWN:  Okay.  He will be here today.  But I will

24   give you a heads-up.

25              COURTROOM DEPUTY CLERK:  So I can operate this before
```

```
1    he comes in.
2              MR. BROWN:  Will do.
3                   (There was a brief pause in the proceedings.)
4              THE COURT:  Forget it.  We have opening statements.
5              COURTROOM DEPUTY CLERK:  Ready for the jury to come
6    in?
7              THE COURT:  Yes, I am.
8                   (The jury entered the courtroom at 9:48 A.M.)
9              THE COURT:  Good morning.
10             JURY PANEL:  Good morning.
11             THE COURT:  See, I promised you more intimacy.
12             All right.  So we're going to begin with opening
13   statements, at this time, of counsel.  Please remember that
14   opening statements are not -- are counsel's statements of what
15   they expect the evidence to show in the case and some
16   orientation about the case and their respective positions.
17             But that is not actual evidence.  It is just to give
18   you an outline, most of all, of what you can expect from their
19   respective positions and presentations here.
20             And I think we're ready to begin at this time.  Thank
21   you very much.
22             Who is going to be giving the Government's opening
23   statement?
24             Thank you very much, Ms. King.
25                        OPENING STATEMENT
```

1          MS. KING:  Good morning.  Again, my name is Tracia

2    King, and I represent the United States.  And you are here

3    today to hear a case, the United States v. Mr. Allen

4    Pendergrass.

5          What you are going to hear is that Allen Pendergrass

6    operated two companies, Asset Financial Recovery, Incorporated,

7    and Guishard Wilburn & Shorts, LLC.  These companies provided

8    asset recovery services that located unclaimed funds held by

9    local and state government agencies.

10         The asset recovery companies worked in this manner:

11   Mr. Pendergrass and others who worked for him obtained from

12   state and local agencies lists of unclaimed funds that included

13   the names of individuals and businesses to whom the money was

14   owed.

15         After receiving the lists, Mr. Pendergrass' employees

16   located the individuals and businesses to notify them about the

17   money.  For a fee, the companies offered to collect the money

18   on their behalf.  Interested persons would sign a limited power

19   of attorney which was a document that authorized

20   Mr. Pendergrass' company to contact the state and local agency

21   and request the unclaimed funds on their behalf.

22         If the agency paid the unclaimed funds,

23   Mr. Pendergrass' company would send the funds to the rightful

24   owner after deducting the fee for services rendered.

25         But this, however, is not how things always operated

```
 1    in Mr. Pendergrass' businesses.  Mr. Pendergrass and his

 2    employee, Terrell McQueen, aided and abetted by each other,

 3    misused these unclaimed funds lists by submitting fraudulent

 4    requests for funds on behalf of businesses and individuals who

 5    never requested their service.  And in some instances they

 6    never knew the government agency owed them money.

 7          They executed this scheme to defraud through the two

 8    companies, Asset Financial Recovery, Incorporated, and Guishard

 9    Wilburn & Shorts, LLC.  The fraudulent claims were submitted

10    and letters sent to the City of Atlanta.  The letters included

11    a forged power -- limited power of attorney falsely

12    representing that Mr. Pendergrass' companies were authorized to

13    collect these funds.

14          As a result of these fraudulent representations, the

15    City of Atlanta mailed checks to the company, which was

16    subsequently deposited into bank accounts opened and controlled

17    by Mr. Pendergrass.  The funds were never sent to their

18    rightful owners.

19          This is the case you are here to decide.  You are

20    going to hear from the co-defendant in this case, Mr. Terrell

21    McQueen.  You are going to learn that Mr. McQueen has pleaded

22    guilty to one count of aggravated identity theft as a result of

23    one of the forged documents that was submitted to the City of

24    Atlanta.  You are also going to hear that he is testifying

25    pursuant to a cooperation agreement with the Government.
```

1          Mr. McQueen is going to tell you that in 2013 he

2    worked for Mr. Pendergrass.  Mr. Pendergrass was in charge and

3    was involved in what went on in his businesses.  Mr. McQueen

4    and Mr. Pendergrass worked essentially hand in hand to carry

5    out this fraud scheme.  You will learn with respect to these

6    claims listed in the indictment Mr. McQueen was the person who

7    signed and submitted the letters -- the letters to the City of

8    Atlanta from Asset Financial Recovery, Incorporated, that

9    fraudulently requested the unclaimed funds.  Those letters

10   included forged limited powers of attorney.

11          But Mr. McQueen did not act alone.  You are going to

12   hear that Mr. Pendergrass was involved in identifying the

13   unclaimed funds to pursue.  Mr. McQueen and Mr. Pendergrass

14   both signed some of the forged limited powers of attorney

15   documents.  One would sign the name of the person owed the

16   unclaimed funds, and the other person would sign the notary's

17   name.

18          Mr. McQueen will explain this was done to make the

19   forged limited powers of attorney appear more authentic by

20   presenting it in a way so that anyone who reviewed the document

21   would be able to tell that two different people signed the

22   form.

23          You are also going to hear that during this fraud

24   scheme Mr. McQueen did, in fact, receive one of these unclaimed

25   checks -- one of these checks for unclaimed funds.  And he

1    ended up depositing the check.  And as a result, Mr. McQueen

2    ended up owing money to the bank after he spent some of the

3    funds before the money was reclaimed by the city.

4           Mr. Pendergrass and Mr. McQueen worked together to

5    find a solution for Mr. McQueen's woes.  Mr. McQueen and

6    Mr. Pendergrass worked together to fraudulently -- to obtain

7    fraudulently additional unclaimed funds in an effort to help

8    Mr. McQueen repay his debt to the bank.

9           Now, with respect to the indictment, the evidence

10   will show that Mr. McQueen, aided and abetted by

11   Mr. Pendergrass, signed and submitted letters to the City of

12   Atlanta from Asset Financial Recovery that fraudulently

13   requested unclaimed funds for companies and individuals

14   including Johnson, Coleman & Stephenson, LLC, which is

15   referenced in Count 1 of the indictment; Georgia Municipal

16   Association, which is referenced in Count 2 of the indictment;

17   Long Weinberg Ansley & Wheeler referenced in Count 3 of the

18   indictment; James H. Bone, trustee, referenced in Count 4 of

19   the indictment; and the Actor's Express, which is referenced in

20   Count 5 of the indictment.

21          The letters submitted by Mr. McQueen included forged

22   limited power of attorneys.  You are going to hear from some of

23   these victims whose signature was forged on those documents.

24   They are going to tell you they never hired this company to

25   collect unclaimed funds on their behalf.  They never signed the

1    documents.

2           As a result of the fraudulent request, the City of

3    Atlanta mailed unclaimed proceeds for these five businesses to

4    Asset Financial Recovery at P.O. Box 1809, Fayetteville,

5    Georgia, 30214.

6           The P.O. Box was controlled by Mr. Pendergrass.  Four

7    of the five checks mailed by the City of Atlanta were deposited

8    into a Wells Fargo business bank account opened and controlled

9    by Mr. Pendergrass.

10          Now, with respect to the forged limited power of

11   attorneys, you are also going to hear that in addition to the

12   forged signature the documents contained a fraudulent notary

13   seal.  In addition to Mr. McQueen's testimony, you are going to

14   hear from Eric Fitchpatric, who was also an employee working

15   for Mr. Pendergrass during this same time.

16          Mr. Fitchpatric is going to tell you that he is the

17   person who lifted notary seals from documents and sent them to

18   Mr. Pendergrass at Mr. Pendergrass' request.  You are also

19   going to see evidence where he did just that.

20          Now, as previously stated, the fraud scheme involved

21   the submission of fraudulent claims through at least two of the

22   companies operated by Mr. Pendergrass.

23          The second company, as I previously mentioned, was

24   Guishard Wilburn & Shorts, LLC.  You are going to see that

25   during this time frame the City of Atlanta not only received

1    letters from Asset Financial Recovery they also received

2    letters from Guishard Wilburn & Shorts.

3          The letters, like Asset Financial Recovery, made

4    fraudulent requests for unclaimed funds on behalf of businesses

5    that never authorized the company to do so.  Those letters you

6    will hear were signed by Mr. Pendergrass.  They likewise

7    included a forged limited power of attorney.  Those letters

8    also directed the same -- the City of Atlanta to send the

9    unclaimed funds to the same P.O. Box where the other checks

10   were mailed.

11         In short, Allen Pendergrass aided and abetted the

12   commission of mail fraud, money laundering, and aggravated

13   identity theft through two companies he operated in order to

14   obtain unclaimed funds from the City of Atlanta.

15         At the end of the trial, the Government will have

16   another opportunity to speak to you.  And at that time, the

17   Government will ask you to return a verdict that speaks the

18   truth.  We will ask you to return a verdict of guilty.

19                     OPENING STATEMENT

20         MS. STRICKLAND:  Good morning.  Trials are about

21   questions.  They always involve the same questions.  Was a

22   crime committed?  And if so, who did it?

23         In this case, the answer to those questions is quite

24   simple.  The evidence will show that Terrell McQueen committed

25   the fraud at issue in this indictment.

1           How do we know it is that simple?  Well, the

2     Government just said it.  And the evidence will show that

3     Terrell McQueen has admitted to it.  The specific counts in

4     this indictment involve incidents where co-defendant, Terrell

5     McQueen, not Allen Pendergrass, signed and sent the forged

6     documents.

7           You will hear evidence about the following incidents:

8     On April 5th, 2013, a check payable to Johnson Coleman &

9     Stephenson, care of Asset Financial Recovery, was sent by the

10    City of Atlanta.  Then on May 13, 2013, a check payable to

11    Asset Financial Recovery, care of Georgia Municipal

12    Association, was sent by the City of Atlanta.  On the same day,

13    a check payable to Asset Financial Recovery, care of Long

14    Weinberg Ansley & Wheeler, was sent by the City of Atlanta.

15          THE COURT:  Counsel, would you just speak a little

16    louder.  Thank you.

17          MS. STRICKLAND:  Sure.

18          Also on May 13, 2013, a check payable to Asset

19    Financial Recovery, in the care of James H. Bone, was sent by

20    the City of Atlanta.  And, finally, on May 13, 2013, a check

21    payable to Asset Financial Recovery, care of Actor's Express,

22    was sent by the City of Atlanta.

23          Now, these incidents form the basis for nine of the

24    ten counts in this indictment.  The evidence will show that

25    someone committed fraud to cause these checks to be sent.  And

1    right off the bat, we know that the evidence will show that

2    Terrell McQueen, not Allen Pendergrass, signed and sent the

3    forged documents in these counts.

4           Now, as Ms. King told you, Allen Pendergrass was in

5    the asset collection business.  He found lost or unclaimed

6    funds owed to people and returned them in exchange for a

7    percentage of those funds.  His business would get a list of

8    people or organizations that places like the City of Atlanta

9    owed money to, whether it is for overpaid taxes or a double

10   paid water bill, whatever reason.

11          They would get that list, and the business would

12   contact people on that list and ask them if they wanted the

13   business to recover those funds in exchange for a portion.  And

14   Allen Pendergrass did that for years.

15          And at some point, he started working with Terrell

16   McQueen.  We expect Terrell McQueen to take the witness stand

17   and tell you that he did work with Allen Pendergrass.  We

18   expect him to tell you that sometime in 2012 Allen asked him if

19   he could land a big account.  The law firm Holland & Knight was

20   owed a lot of money by the City of Atlanta.  And Terrell

21   McQueen will tell you that Allen told him, I'll give you

22   $150,000 if you can land the Holland & Knight account.

23          And Terrell McQueen wanted that money.  So we expect

24   him to tell you that he did try to land that account.  He

25   called Holland & Knight.  He even went to their place of

business.  But Holland & Knight wasn't interested.  He couldn't

land the account.

So Terrell McQueen took matters into his own hands.

He forged some documents.  He sent them to the City of Atlanta.

And, voilà, he got the funds owed to Holland & Knight.  This

was a pretty easy way for Terrell McQueen to make money.  So

easy that in the months following, he continued to sign and

send the forged documents in these counts.  But we aren't here

to find out whether Terrell McQueen has committed crimes.  We

know he has.  He has admitted to it.  We are here to talk about

Allen Pendergrass.

We expect Terrell McQueen to come take the stand and

lay the blame for his fraud on Allen Pendergrass.  We expect

him to say, I did it, but Allen Pendergrass told me to do it,

or, he helped me do it.

And why is he doing that?  The evidence will show

that Terrell McQueen made a deal with the Government.  He made

a deal with these prosecutors.  And you will hear all about

that later.

One other thing:  You are going to hear a lot of talk

about incidents that are not what is alleged in this

indictment.  At the end of this case, you are going to be asked

to determine only whether Allen Pendergrass is guilty or not

guilty of the specific counts in this indictment.

As jurors, you bring into the courtroom your common

1    sense.  And when you hear about acts that are not in this

2    indictment, it is perfectly acceptable for you to use that

3    common sense and ask whether those acts are part of the fraud

4    at issue in this case.

5              When someone is talking about acts not charged in

6    this indictment, it is okay for you to ask why you are being

7    presented with this information and whether or how it fits in.

8    It is okay for you to ask what is behind the curtain, just like

9    you might wonder what is really going on if a magician waved a

10   shiny gold coin in his right hand to distract you from what is

11   happening in the left.  It is a sleight of hand.  And we might

12   spend a good bit of time in this trial on those other acts.

13   But the judge will tell you that what is in the indictment is

14   what you are here to decide.

15             We are here because there are real questions about

16   these charges, the ones in the left hand, the ones in the

17   indictment.  So if you feel yourself being pulled to the gold

18   coin in the right hand, we want you to remember what you are

19   here for.

20             Trials are about questions.  We know the answer to

21   the obvious question.  Terrell McQueen signed and sent the

22   forged documents in this indictment.  But we have questions

23   about the investigation in this case and about the allegations

24   that Terrell McQueen has made against our client.

25             And at the end of this, we expect that you will have

1  questions too.  And those questions will lead you to a not

2  guilty verdict.

3  **THE GOVERNMENT'S CASE.**

4        MR. BROWN:  Your Honor, the Government calls

5  Investigator Ricks with the Atlanta Police Department.

6        COURTROOM DEPUTY CLERK:  Please raise your right

7  hand.

8                    **(Witness sworn)**

9        COURTROOM DEPUTY CLERK:  Please have a seat.  If you

10  would, loudly and clearly please state your name and spell your

11  last name for the record.

12        THE WITNESS:  My name is Douglas Ricks.  Ricks is

13  spelled R-I-C-K-S.

14     Whereupon,

15                    DOUGLAS RICKS,

16     after having been first duly sworn, testified as follows:

17                    DIRECT EXAMINATION

18  BY MR. BROWN:

19  Q.   Good morning, Investigator Ricks.

20  A.   Good morning.

21  Q.   Where are you currently employed?

22  A.   I'm not employed any more.  I'm retired.

23  Q.   Where did you retire from?

24  A.   The City of Atlanta's Police Department.

25  Q.   And about how long did you work with the City of Atlanta

1   Police Department?

2   **A.**   A total of 25 years.

3   **Q.**   When you retired, what was your title?

4   **A.**   Investigator.

5   **Q.**   What kind of cases did you investigate at the last point

6   of your career?

7   **A.**   I was a major fraud investigator.

8   **Q.**   And the jury doesn't know what major fraud is.

9        Can you kind of tell us what kind of cases you worked on

10  as an investigator with the major fraud unit?

11  **A.**   The major fraud unit with the City of Atlanta's Police

12  Department handles any and all fraud cases of $10,000 or more

13  in losses.  The cases that are less than $10,000 would be

14  handled by an investigator out in the zone, which is a general

15  area where the officers worked.  But those which are more than

16  $10,000 were assigned to us, and we were located over at the

17  headquarters building.

18  **Q.**   Now, I think you testified that you have retired; correct?

19  **A.**   Yes.

20  **Q.**   And can you tell us why you retired?

21  **A.**   I had a stroke while I was on duty.

22  **Q.**   And did you have that stroke approximately January 2017?

23  **A.**   I did.

24  **Q.**   What were the effects of the stroke on you?

25  **A.**   I have weakness in my left arm, my left leg, and I have

1    temporal -- short-term memory loss, as well as I have a little

2    bit of issues with controlling my emotions, meaning that if

3    something kind of upsets me I may cry.  I won't be able to hold

4    it in as much as normal people.  A little more emotional.

5    **Q.**    And, in fact, were you not featured in a billboard by

6    Grady Hospital saying Grady Hospital saved your life because

7    they treated you when you had your stroke?

8    **A.**    Yes, I was.

9    **Q.**    Was that billboard on 85 on the connector?

10   **A.**    Yes.

11   **Q.**    So I want to take you back to 2013.  Were you employed

12   with the City of Atlanta as an investigator in the major fraud

13   division at that point in time?

14   **A.**    I was.

15   **Q.**    And did you begin an investigation of Asset Financial

16   Recovery, Allen Pendergrass, and Terrell McQueen related to

17   funds stolen from the City of Atlanta?

18   **A.**    Yes.

19   **Q.**    Can you tell the jury how you became involved in this

20   particular investigation?

21   **A.**    The major fraud unit received the information from

22   Investigator Coleman and a second investigator assigned to the

23   city courthouse -- yeah, the courthouse stating that money had

24   been --

25           MS. DURRETT:  Objection, Your Honor.  I'm going to

1    object on hearsay.

2           MR. BROWN:  Your Honor, the officer is testifying not

3    for the truth of the matter but to explain his conduct as to

4    what he did next in his investigation, Your Honor.

5           THE COURT:  All right.

6    **Q.   (BY MR. BROWN)**  You can continue, Investigator Ricks.

7    **A.**   We had received information of a possible fraud against

8    the City of Atlanta, and I was asked to investigate it.  Myself

9    and Sergeant Cooper went over to the City of Atlanta's law

10   department -- not law department -- I'm sorry -- financial

11   department.  And we spoke with Ms. Linda Guy.  And she advised

12   us that there were possible thefts from the City of Atlanta.

13   **Q.**   So based on this report from the City of Atlanta and the

14   finance department, did you conduct any interviews or what did

15   you do to further your investigation to find out in fact if

16   funds were stolen and who actually stole the funds?  What did

17   you do next?  Explain your conduct.

18   **A.**   Ms. Linda Guy gave me some information on some checks that

19   were allegedly forged and stolen from the City of Atlanta.  And

20   it had the name of a business of Asset Financial Recovery on

21   it.

22          And once I saw the name of that business, I went and

23   checked on the Georgia -- the state -- I'm sorry -- what is it

24   called?  I checked it out to make sure that it was a legal

25   business.  I apologize for not remembering the name of the

1    department.

2    **Q.**   That is fine.  If you forget something -- did you prepare

3    a report detailing your investigation that was conducted back

4    in 2013?

5    **A.**   I did.

6    **Q.**   All right.  If I ask you any question or if defense

7    counsel asks you any question and if looking at your report

8    will refresh your memory, you are allowed to do that.  Okay?

9    **A.**   Thank you.

10   **Q.**   In addition to checking -- checking from the state about

11   the business Asset Financial Recovery, did you do an

12   investigation of a P.O. Box that was associated with where

13   these checks were being mailed?

14   **A.**   I did.  The P.O. Box was -- the P.O. Box number was given

15   to me.  I think it was 1809 in Fayetteville, Georgia.  I

16   contacted the postal service to find out who that box belonged

17   to and was it an actual box.

18           MS. DURRETT:  Objection, Your Honor, to hearsay about

19   who the box belongs to.

20           THE COURT:  All right.  Ladies and gentlemen, I'm

21   going to allow him to -- the witness to describe what he did,

22   but you are not to accept this information as basically

23   something that actually has been verified.  It is simply that

24   is what he learned, but that doesn't mean it is true.

25   **Q.**   **(BY MR. BROWN)**   All right.  So, Investigator Ricks, we

1   left off with you talking about contacting the postal inspector

2   about the P.O. Box 1809; is that correct?

3   **A.**   Correct.

4   **Q.**   Did you do that?

5   **A.**   I did.

6   **Q.**   All right.  During the course of your investigation, did

7   you receive an application related to P.O. Box 1809 and who

8   actually opened that P.O. Box?

9   **A.**   I did.

10          MR. BROWN:  All right.  Your Honor, may I approach

11  the witness?

12          THE COURT:  Yes.

13          MS. DURRETT:  Your Honor, I think we have talked

14  about this exhibit.  I object to it.  It has hearsay.  It has

15  got double hearsay.

16          MR. BROWN:  Exhibit Number 14, Your Honor.

17          THE COURT:  Counsel, would you approach?

18              **(A bench conference ensued, as follows:)**

19          MS. DURRETT:  This is the subject of -- we filed a

20  notice of intent to object because we talked about this at the

21  pretrial conference.  And the Court had said, you know,

22  sometimes there are medical documents that have written words

23  on them.  So then I filed that notice of intent where I said,

24  look, the rules say even medical documents can't be admitted,

25  if there is not another exception, if it is not fully

1    purposeful for medical treatment or something like that.

2          So the writing itself is hearsay.  And there is no

3    exception that would cure that.

4          MS. KING:  Your Honor, the Government's response is

5    that the document -- that the document is admissible.  To the

6    extent that defendant is claiming the document contains double

7    hearsay, we would argue that the information -- the written

8    portion of the information is admissible under Federal Rules of

9    Evidence 801(d)(2) as statements by a party opponent, that the

10   document is signed by Allen Pendergrass, and has above the

11   signature a certification that the information is true and

12   correct.

13         So even if a postal employee completed the top part,

14   he saw the document adopting the veracity of the information

15   contained within it.  And, Your Honor, even if this copy is

16   fake, the postal employee also obtained an identification

17   document from Mr. Pendergrass and recorded it on the form

18   itself.

19         So we would contend that the double hearsay objection

20   is satisfied by 801(d)(2).

21         Your Honor, in addition -- with respect to the

22   business record certification itself, to the extent the

23   argument is that the person who completed it does not have

24   personal knowledge of how this particular form was executed

25   because she was not a party to the execution of this form, we

1    would argue that is not what the law requires.

2           The law requires that the person who completes the

3    business records certification have knowledge about the

4    processes and how the documents are generated and stored.  And

5    that is what the report would satisfy.

6           MS. DURRETT:  Just that the last thing we noted was

7    that -- and the Court took this up before -- how we got the

8    document in discovery is my understanding that it was seized at

9    this office and then somehow they got a person to notarize it.

10   And so we had an objection because they didn't come together as

11   far as being produced.  We don't have a record of how the

12   document was actually sent to the U.S. Postal Service and how

13   it was certified by them because when we got the document it

14   was by itself.  And then we got these later certifications.

15          THE COURT:  So when she -- when this was signed, they

16   didn't attach the document?

17          MS. DURRETT:  They did now in November of 2021.

18          THE COURT:  They attached something that it came from

19   their records?

20          MS. KING:  That's correct, Your Honor.

21          THE COURT:  Is there a question of whether this is

22   his signature -- your client's signature?

23          MS. DURRETT:  Yeah.  I think there is a question

24   about that.

25          THE COURT:  All right.  I'm going to allow it.

| | |
|---|---|
| 1 | **(The bench conference was thereby concluded.)** |
| 2 | **Q.   (BY MR. BROWN)**  So, Investigator Ricks, we left off with |
| 3 | you talking about your investigation relating to P.O. Box 1809; |
| 4 | is that correct? |
| 5 | **A.**   Yes. |
| 6 | **Q.**   I'm going to show you what has been marked as Government's |
| 7 | Exhibit 14. |
| 8 |      Do you recognize that document? |
| 9 | **A.**   I do. |
| 10 | **Q.**   What is that document? |
| 11 | **A.**   It is a copy of the original document that was sent to me |
| 12 | from the postal service. |
| 13 |      MR. BROWN:  All right.  At this time, Your Honor, the |
| 14 | Government would move to admit Government's Exhibit Number 14 |
| 15 | into evidence. |
| 16 |      THE COURT:  It is admitted.  And the defense counsel |
| 17 | can later on cross-examine any issues about the document. |
| 18 |      MS. DURRETT:  Thank you, Your Honor. |
| 19 |      MR. BROWN:  Your Honor, can we publish Exhibit |
| 20 | Number 14, please? |
| 21 |      THE COURT:  Yes. |
| 22 | **Q.   (BY MR. BROWN)**  Can we enlarge the top portion of the |
| 23 | exhibit, please? |
| 24 |      Okay.  So, Investigator Ricks, can you just let the |
| 25 | jury -- talk to the jury and tell them about what are we |

1  looking at here and how did this aid your investigation as to

2  who was receiving these fraudulent checks from the City of

3  Atlanta?

4  **A.**   This is an application for the use of P.O. Box 1809, and

5  it has the address and phone number and email address on it of

6  the user, as well as the name of the organization.

7  **Q.**   So what is it -- and, Number 2, can you read what it says

8  name of business organization -- which name is listed there?

9  **A.**   It says Guishard Wilburn & Shorts.

10  **Q.**   Then Number 3, it says name of person applying.  What is

11  the name listed there?

12  **A.**   Pendergrass, Allen.

13  **Q.**   Okay.  Then if we can just enlarge the middle portion of

14  the document, please.

15      All right.  And do you see an email address there?  Can

16  you read that email address?

17  **A.**   It appears to be pendergrassallen@gmail.com.

18  **Q.**   Okay.  And then Box Number 8 -- it may be hard to read on

19  your copy.  But what does Box Number 8 list there as relating

20  to identifying the person applying for the box?

21  **A.**   It says valid driver's license state or nondriver's

22  license ID card.

23  **Q.**   Okay.

24  **A.**   And that box is checked off.

25  **Q.**   And is there a driver's license number listed at the

1   bottom besides photo ID number?

2   **A.**   There is.

3   **Q.**   All right.  Then it says nonphoto ID number.  Does that

4   appear to be some kind of Georgia insurance card or number?

5   **A.**   It does.

6   **Q.**   And then can we enlarge the bottom portion of Exhibit 14,

7   please?

8        And what is the date -- do you see an application date

9   there, Investigator Ricks, at the bottom of the page where it

10  says application date?

11  **A.**   Application date, 8/13/12.

12  **Q.**   And then is there a signature there?  Can you read the

13  name of that signature there?

14  **A.**   Allen Pendergrass.

15  **Q.**   All right.  So we can take the exhibit down.

16       Investigator Ricks, you can turn your attention back to

17  questioning.

18       So based on that particular document and finding out who

19  applied for the box being Allen Pendergrass, how did that

20  further your investigation to identifying who was involved and

21  the extent of the fraud committed on the City of Atlanta?

22  **A.**   It gave me the name of a possible suspect, and it gave me

23  a lead as to where to start my investigation.

24  **Q.**   All right.  And besides Mr. Pendergrass at this time, had

25  you learned any other names associated you were investigating

1    about their potential involvement with the fraud?

2    **A.**    Yes.

3    **Q.**    What were those names?

4    **A.**    Terrell McQueen, Deidre Barber, and the third gentleman --

5    I would have to see my report to remember his name.  I don't

6    want to misspeak and call the wrong name.

7    **Q.**    If you want to look at your report -- would looking at

8    your report refresh your memory?

9    **A.**    It would.

10   **Q.**    All right.  Take a look at your report.  And when your

11   memory is refreshed, look back at me, please.

12            MR. BROWN:  Could I approach the witness, Your Honor?

13            THE COURT:  Yes.

14            MR. BROWN:  And, Your Honor, may I approach freely,

15   or should I ask every time?

16            THE COURT:  No.  You may approach freely.

17   **A.**    The names were Deidre Barber, Allen Pendergrass, and

18   Nathan Pendergrass.

19   **Q.**    **(BY MR. BROWN)**  Also Mr. McQueen; is that correct?

20   **A.**    I'm sorry.  Also Mr. Terrell McQueen.

21   **Q.**    All right.  In addition to locating the P.O. Box, did you

22   have a chance to contact Wells Fargo about whether they

23   captured who may be depositing these checks that were stolen

24   from the City of Atlanta?

25   **A.**    I did.

**Q.**   Do you recall who you contacted?

**A.**   Investigator Ron Bower {sic}.

**Q.**   And was Investigator Bowers able to assist you in your investigation?

**A.**   Yes.

**Q.**   How did he assist you?

**A.**   Investigator Bower told me that one of the checks had been cashed here in Georgia.  Another check had been -- had not been cashed yet.  And he also provided me with images of the person who cashed the checks.

**Q.**   All right.

**A.**   And a driver's license number -- a name and driver's license number of the person who cashed the checks.

**Q.**   And based on that, did you actually view the photographs?

**A.**   I did.

**Q.**   And did that further your investigation as to who was involved?

**A.**   Yes.

**Q.**   How did it further your investigation?

**A.**   I took the image that he gave me as well as the driver's license number.  I ran the driver's license number and came up with a picture.  And the picture was a picture of Mr. Allen Pendergrass.  I compared that picture to the photo that Investigator Bowers gave me and saw that it appears to be the same person who was on the driver's license that had cashed the

1   check.

2   Q.   In addition to the P.O. Box and bank still images, did you

3   have a chance to conduct any surveillance of the location where

4   this business was located?

5   A.   I did.

6   Q.   Investigator Ricks, I'm showing you what has been marked

7   as Government's Exhibit Number 18.

8        Can you take a look at those photographs and let me know

9   when you are ready to answer additional questions?

10  A.   (The witness complies.)

11       I'm sorry it is taking so long.  It is quite a number of

12  pages.

13  Q.   Take your time.  I know it is a large number of pages

14  there.

15  A.   Okay.

16  Q.   So do you recognize what has been marked as Government's

17  Exhibit Number 18?

18  A.   I do.

19  Q.   And how are you able to recognize the documents contained

20  in Exhibit Number 18?

21  A.   These are pictures that were taken, some by me and some by

22  other members of the major fraud unit, of surveillance and of

23  the arrest warrant execution.

24  Q.   And do the photographs fairly and accurately depict the

25  subject matter therein on the dates in question?

1    **A.**    It does.

2    **Q.**    Have the photographs been altered or any deletions made?

3    **A.**    The only thing different on these photographs is here at

4    the bottom.  There is a yellow sticker that says Government's

5    Exhibit 18.  That is not from me putting it on there.  But

6    everything else is what I did.

7              MR. BROWN:  All right.  At this time, Your Honor, the

8    Government would offer Exhibit Number 18 into evidence.

9              MS. DURRETT:  No objection, Your Honor.

10             THE COURT:  It is admitted.

11             MR. BROWN:  And permission to publish Exhibit

12   Number 18, Page 1, please?

13             THE COURT:  Permitted.

14   **Q.**    **(BY MR. BROWN)**  Investigator Ricks, can you just tell the

15   jury what we're looking at on this first page of Exhibit 18?

16   **A.**    That is the front of the building where we executed the

17   search warrant.  That is a picture that I took of doing my

18   initial surveillance of the location.

19   **Q.**    All right.  So let's talk about your initial surveillance

20   of the location.

21        Why did you conduct initial surveillance of this

22   particular location?

23   **A.**    Investigator Bowers gave me the address of 4854 Old

24   National Highway -- I think that is the correct number -- Old

25   National Highway as the address that was listed for

1  Mr. Pendergrass, as well as it was listed on the -- I'm sorry.

2  No, it wasn't.  I don't want to misspeak.

3      Investigator Bowers gave me that information.  And I

4  started my investigation by going there to that location to see

5  what was at that location.

6  **Q.**   All right.  And is this a photograph of the front of that

7  building there?

8  **A.**   It is.

9  **Q.**   During the course of your surveillance, did you also go

10  inside the building and observe the name Asset Financial

11  Recovery as an office within this building?

12  **A.**   I did.  But not on that date.  It was on a second date of

13  me going to that location.

14  **Q.**   Okay.  And in addition to actually looking at the actual

15  building itself, did you also photograph a vehicle or vehicles

16  parked in front of that building location?

17  **A.**   I did.

18  **Q.**   All right.  So permission -- please publish Government's

19  Exhibit Number 18, Page 5, please.

20      What are we looking at here, Investigator Ricks?

21  **A.**   That is the rear end of a silverish-gray Mercedes.

22  **Q.**   Why did you -- why did you take a picture of this, or why

23  was this taken by the Atlanta Police Department?

24  **A.**   While I was at the location, I was trying to see if any of

25  the vehicles at that building registered to any of the people

1   that were listed on the postal inspector's information,

2   Mr. Nathan Pendergrass, Deidre Barber, or Allen Pendergrass.

3        So I called in to Val -- Valerie Bracley, who was still at

4   the office.  And I asked her to run that tag number for me.

5   And when she ran that tag number, that vehicle came back

6   registered to Mr. Allen Pendergrass.

7   **Q.**   Either that day or a subsequent time later, did you

8   actually go inside the building and look at the building and

9   see Asset Financial Recovery there?

10  **A.**   I did.

11  **Q.**   So after you verified the location, verified individuals

12  that you were investigating, what was your next step to

13  determine who else was involved in the scope of the fraud that

14  you were investigating?

15  **A.**   I contacted other banks to let them know that I had checks

16  and to see if anyone were victims.  So I started also reaching

17  out to the victims -- the alleged victims.

18  **Q.**   All right.  During your investigation of the actual

19  victims, what did you find?

20  **A.**   I talked to about five of the victims, and some of them

21  told -- well, all of them told me that they had no idea how

22  their identity had gotten stolen.  And some of them told me

23  that they had had vehicles broken into and possibly that is how

24  someone may have gotten their information.  They had said that

25  someone may have gotten their business card.  And they had no

```
 1   idea how their information had gotten out and their identities
 2   had gotten stolen.
 3        I listed in my police report which individuals said what.
 4   Q.   Okay.  All right.  Based on that investigation, speaking
 5   with victims, I guess you verified that a fraud had taken
 6   place; is that correct?
 7   A.   That's correct.
 8   Q.   At some point in your investigation, did you obtain a
 9   search warrant to search the office of Asset Financial
10   Recovery?
11   A.   I did.  After going there on a second occasion, myself and
12   Sergeant Cooper went inside the building to make sure that this
13   was the correct location.  Once we entered into the hallway
14   just inside the front door of the building, under the awning
15   that you saw on the left-hand side was a glass case probably
16   about the size of -- about half the size of this partition in
17   front of me and it had the office numbers on it.  And it listed
18   Asset Financial Recovery was Office Number 161.
19        That is the way I verified that that office was in that
20   building.  And I went back and prepared a search warrant for
21   that location.
22   Q.   Okay.  So on September 19, 2013, did you and other law
23   enforcement officers participate in the search warrant of the
24   office?
25   A.   We did.
```

1    **Q.**   And what other agencies assisted you during the search of

2    the actual office?

3    **A.**   United States Postal Inspector, Georgia State University

4    Police Department, and College Park Police Department, as well

5    as the major fraud unit.

6    **Q.**   Were you present during the execution of the search

7    warrant?

8    **A.**   I was.

9    **Q.**   So, Investigator Ricks, during the actual execution of the

10   the search warrant, did you and other law enforcement agencies

11   seize a large number of documents, paper documents and binders,

12   related to the asset recovery business going on within that

13   office location?

14   **A.**   Yes, we did.

15   **Q.**   And did you and other officers seize that evidence and put

16   it into evidence with the Atlanta Police Department initially?

17   **A.**   Yes, we did.

18   **Q.**   And in addition to that, before actually seizing evidence,

19   did you and/or officers with the Atlanta Police Department take

20   photographs of the actual scene before you actually recovered

21   the documents?

22   **A.**   Yes, we did.  We took photos of the documents and the

23   place where they were sitting as we came into the building -- I

24   mean, into the building for the search warrant.

25   **Q.**   Okay.  I want to have you take a look at Government's

1    Exhibits 1 through 6.  Just take your time and flip through

2    each one of those folders and look at the contents therein.

3    **A.**    (The witness complies.)

4         Okay.

5    **Q.**    Have you had a chance to look at Government's Exhibit 1

6    through 6, Investigator Ricks?

7    **A.**    Yes.

8    **Q.**    Do you recognize these exhibits?

9    **A.**    I do.

10   **Q.**    What do you recognize these exhibits to be?

11   **A.**    These are copies of documents recovered in the search and

12   arrest warrant -- well, in the search warrant.

13   **Q.**    How do you recognize these documents to be those you

14   recovered during the search warrant?

15   **A.**    I'll go to Number 1.

16   **Q.**    Don't show it to the witnesses.  You can just look at it

17   yourself.  We can't show it to the jury rather until it is

18   admitted.

19   **A.**    Okay.

20   **Q.**    So you can look at it yourself.  Don't show it to them.

21   **A.**    Your question again, please?

22   **Q.**    Yes.  How do you recognize these exhibits -- these

23   documents to be those you recovered during the search warrant?

24   **A.**    These are the documents that we recovered from the search

25   warrant that we had made copies of as well, and they are

1    also -- these are copies of the documents.  The originals were

2    given to you in boxes.

3         And a couple of weeks ago -- about a week and a half ago,

4    we looked through those boxes and we located the actual

5    originals.  But these are actually copies, and the originals

6    were in the boxes still.

7    **Q.**   All right.  Are these exhibits in the same or

8    substantially same condition as when they were recovered during

9    the actual search?

10   **A.**   Yes.  Like I said before, with the first picture, the only

11   thing that is different is at the bottom it has a seal on it

12   that says Government's Exhibit 1.

13   **Q.**   Does it also have another number?

14   **A.**   Yes.  It has a number on the bottom that says -- on this

15   one that I'm looking at says Box 4001966.  That is showing

16   which box that this item came out.  It came out of Box

17   Number 4, and I would assume that those other numbers are

18   exactly which document it is.

19   **Q.**   Those numbers at the bottom are not numbers that were

20   there when you seized them from the actual execution?

21   **A.**   That's correct.  They were not there.

22        MR. BROWN:  At this time, the Government would move

23   to admit Exhibits Number 1 through 6 into evidence, Your Honor.

24        MS. DURRETT:  No objection, Your Honor.

25        THE COURT:  Admitted.

1           MR. BROWN:  Thank you.

2    **Q.   (BY MR. BROWN)**  Before we get to those exhibits

3    themselves, Investigator Ricks, I want to go back and I want to

4    just show you what has already been admitted into evidence as

5    Exhibit Number 18.  Can we go to Page 24, please?

6         So what are we looking at, Investigator Ricks, once it

7    comes on the screen?

8              MR. BROWN:  Page 2018-24, the exhibit you already had

9    up.

10   **Q.   (BY MR. BROWN)**  So can you describe what we are looking at

11   here, Investigator Ricks?

12   **A.**   That is inside the office where we executed the search

13   warrant.  That is one of the desks inside the office.

14   **Q.**   And you testified earlier that this was in execution of a

15   search warrant as well as an arrest warrant?

16   **A.**   Yes.

17   **Q.**   So who was arrested by the Atlanta Police Department on

18   this date.

19   **A.**   Mr. Allen Pendergrass and Mr. Terrell McQueen.

20   **Q.**   All right.  Were there other individuals inside of the

21   office?

22   **A.**   Yes.

23   **Q.**   Was this just like a regular workday so they were in there

24   working when you guys came in?

25   **A.**   That's correct, yes.

1    Q.   And I think you already testified that you boxed up the

2    actual contents of the office?

3    A.   Yes.

4    Q.   And took them back to APD evidence; is that correct?

5    A.   That's correct, yes.

6    Q.   And I can direct your attention to the back of the room.

7    But you see boxes there on the right and box there on the left.

8         Are those the boxes -- are those the contents of the

9    search warrant that were boxed up?

10   A.   They are.

11   Q.   Investigator Ricks, I want to show you what has been

12   marked as Government's Exhibits 7, 9, 11, 12, 13, 15 through

13   17, and Exhibit Number 29.

14   A.   Okay.

15   Q.   Once you finish looking at them, just look back at me and

16   I'll ask you some questions about those documents.  Okay?

17   A.   Okay.  Okay.

18   Q.   All right.  So, Investigator Ricks, do you recognize these

19   exhibits?

20   A.   I do.

21   Q.   What do you recognize these exhibits to be?

22   A.   These are more documents taken during the search warrant.

23            MS. DURRETT:  Your Honor?

24            THE COURT:  I'm sorry?

25            MS. DURRETT:  Before he goes on, I'm just going to

1   say that we have an objection to Exhibit 9.  I think it is

2   subject to a prior ruling by the Court, so I would ask that

3   Mr. Ricks not testify about it.

4           THE COURT:  I'm sorry?

5           MR. BROWN:  She's referring to Exhibit Number 9, Your

6   Honor.

7           THE COURT:  All right.

8           MS. DURRETT:  And also 10.  But I don't think he said

9   10.

10           MR. BROWN:  I did not say 10.

11           THE COURT:  Why don't we just not get to 9 and 10

12   right now and let me take a look.  Please avoid 9 and 10 right

13   now.

14           MR. BROWN:  I'm not going to ask him questions about

15   it, Judge.

16           THE COURT:  All right.

17           MR. BROWN:  I'm not going to publish those exhibits,

18   Judge.

19           THE COURT:  All right.

20   **Q.   (BY MR. BROWN)**  So I left off:  What do you recognize

21   these exhibits to be, Investigator Ricks?

22   **A.**   These are documents taken in the search warrant.

23   **Q.**   And how do you recognize these documents to be those that

24   were recovered during the actual search warrant?

25   **A.**   They are some of the documents that we looked for of the

1    originals in the boxes that you have in the back of the

2    courtroom.

3    **Q.**   All right.  Now, are these exhibits in the same or

4    substantially same condition as when they were recovered during

5    the search?

6    **A.**   Yes, with the exception of, like I said, the yellow

7    sticker on the bottom that says which exhibit it is and the

8    number on it that shows which box it came from.

9    **Q.**   Thank you.

10         MR. BROWN:  At this time, Your Honor, the Government

11   would move to admit Exhibit 7, 9, 11, 12, 13, 15, 16, 17, and

12   Exhibit 29.

13         The Government is not going to publish any exhibits

14   that the Court made a ruling about.  But this is the witness we

15   would admit them through, Your Honor.  We can pull those back

16   if you change your ruling.

17         MS. DURRETT:  Your Honor, we object to at least

18   Exhibit 9.  I'm still looking at the others.

19         THE COURT:  I'm going to hold back on your -- on the

20   admission of Exhibits 9 and 10.

21         MR. BROWN:  I didn't move for 10 at this time, Judge.

22   But I understand.

23         So are you going to reserve ruling on 9, Your Honor?

24         MS. DURRETT:  Your Honor, I'm still looking at the

25   other exhibits for just a second.

```
 1                    THE COURT:  All right.

 2                    MS. DURRETT:  We would object to 29, Your Honor, as

 3      well based on hearsay.

 4                    THE COURT:  You would object to 29 and did you say

 5      something else?  I didn't hear the last part of your sentence.

 6                    MS. DURRETT:  I objected to 9 for the reasons

 7      previously stated, and I object to 29 based on hearsay.

 8                    THE COURT:  I would need 29 to be explained to me.

 9      So let's just hold back on 29 as well.

10                    When we take a break, you can explain that to me.

11      All right?

12                    MR. BROWN:  All right.  Thank you, Judge.

13                    But the other exhibits are admitted, Your Honor,

14      other than 9?

15                    THE COURT:  9, 10, and 29 --

16                    MR. BROWN:  Thank you, Your Honor.

17                    THE COURT:  -- are excepted, as an E-X-C-E-P-T-E-D.

18                    MR. BROWN:  Yes.

19      Q.   (BY MR. BROWN)  So, Investigator Ricks, after you executed

20      the search warrant and seized the documents, you already

21      testified that Mr. Pendergrass and Mr. McQueen were arrested;

22      is that correct?

23      A.   Yes.

24      Q.   And after that date, was your investigation turned over to

25      a federal law enforcement agency?
```

1  **A.**    Yes.  The postal inspector, the postal service.

2  **Q.**    Why was the investigation turned over to the United States

3  Postal Inspection Service?

4  **A.**    Because during my investigation, I learned that one of the

5  post office boxes that was registered under the name of

6  Mr. Allen Pendergrass was also being investigated for other

7  fraud -- possible frauds.

8  **Q.**    Let me stop there.  So you turned it over to the federal

9  investigators for them to do a more expansive investigation; is

10  that fair?

11  **A.**    That's correct.

12  **Q.**    And along with the actual exhibits that were seized, were

13  those also turned over to the United States Postal Inspection

14  Service?

15  **A.**    Yes.

16  **Q.**    What was your involvement in this investigation after it

17  was turned over to the United States Postal Inspection Service?

18  **A.**    Well, my involvement was to make sure that they got all of

19  the evidence, the computers that were seized, the documents and

20  everything that was taken from the office.  And any type of

21  follow-up that they needed me to do as well as far as coming to

22  their office and helping them go through the boxes and identify

23  a lot of the documents.  We had thousands of documents that we

24  recovered.  They asked me to come to their office, and we went

25  through the boxes.

1   **Q.**   And was it that the postal inspection service decided to

2   take over the case because they believed it could involve other

3   states outside of your jurisdiction?

4   **A.**   That's correct.  During the --

5   **Q.**   Let me stop you there.  The judge made a ruling about

6   something.  I don't want to cross that.  So let me just stop

7   you right there.  I think that's sufficient for my purposes.

8   **A.**   Okay.

9            MR. BROWN:  Your Honor, could I just have one second,

10  Your Honor?

11           I just want to verify that the exhibits have been

12  admitted through this witness, and I'll turn the witness over.

13                    **(There was a brief pause in the proceedings.)**

14           MR. BROWN:  Your Honor, that's all I have for this

15  witness.

16                        CROSS-EXAMINATION

17  BY MS. DURRETT:

18  **Q.**   Yes.  Hi, Officer Ricks.

19  **A.**   Good morning.

20  **Q.**   I'm Saraliene Durrett.  I'm the attorney for Allen

21  Pendergrass in this case, and I have a few questions for you.

22           But I know you talked about having some memory issues.  If

23  there is any question at all about your memory, you are welcome

24  to refer to your report.  Just let me know if that is something

25  you need to do.

1  **A.**   Thank you.

2  **Q.**   I'm going to grab a few more exhibits.  Just a second.

3              **(There was a brief pause in the proceedings.)**

4  **Q.   (BY MS. DURRETT)**  So I'm going to, I think, start --

5         MS. DURRETT:  I might ask the Government to help me

6  out if I could see your Exhibit 18.

7         MR. BROWN:  Sure.

8         MS. DURRETT:  If you guys wouldn't mind putting that

9  up for me.

10        MR. BROWN:  We'd be glad to.

11 **Q.   (BY MS. DURRETT)**  Yes.  Exhibit 18 -- you talked about how

12 you were involved in the search that took place at the

13 headquarters for Asset Financial Recovery?

14 **A.**   Yes, ma'am.

15 **Q.**   Do you remember that?

16       And you showed a few of the pictures.  And I wanted to --

17 I'm going to have to count it out because they are not

18 numbered.

19       The first one is, I think, Number 14 -- Page 14, I think.

20 It would be 15.

21       Who is that person?

22 **A.**   I think his name -- his last name is Fitchpatric.

23 **Q.**   Is that another person who was present during the search

24 of the office?

25 **A.**   Yes.  There were two other people present, Mr. Fitchpatric

1    and another gentleman.  I'm sorry I don't recall his name.  But

2    neither of them were arrested on that date.

3    **Q.**   Okay.  Was he ever arrested in connection with this case?

4    **A.**   I'm not sure.  I have no idea.

5    **Q.**   Did you personally have any involvement with arresting

6    him?

7    **A.**   No, ma'am.

8    **Q.**   Okay.  On that day -- and that was back in August of 2013?

9    **A.**   Yes, ma'am.  That's when we executed the search warrant.

10   **Q.**   Okay.  On that day in August 2013, did you talk with him

11   about this case?

12   **A.**   I asked him what was he doing at the location, why was he

13   there.

14   **Q.**   And at that point in time, did he admit fraud to you?

15   **A.**   No, ma'am.

16   **Q.**   Okay.  Because if he had, that would have surely been in

17   the report you wrote?

18   **A.**   And he probably would have been arrested.

19   **Q.**   Okay.

20   **A.**   But definitely detained but probably arrested.

21   **Q.**   So he -- you -- you told me you asked him what he was

22   doing there.

23        What else did he say?

24   **A.**   He said that he was a computer programmer and he

25   programmed some type of documents for Mr. Pendergrass's

1    company.

2    **Q.**   Okay.  And wasn't arrested that day?

3    **A.**   No.

4    **Q.**   And didn't admit any fraud that day?

5    **A.**   Not to me, no, ma'am.

6    **Q.**   Do you know if anybody else interviewed him?

7    **A.**   Not to my knowledge.

8    **Q.**   If someone else had interviewed him that day, would that

9    have been included in your report?

10   **A.**   Yes, ma'am.  I was the lead detective.  If someone else

11   would have interviewed him, they would have come to me and told

12   me what, if anything, he had said.

13   **Q.**   Okay.  Great.  I think that is Page 15.  And then we're

14   going to go --

15        There's lots of computers there; right?

16   **A.**   Yes, ma'am.

17   **Q.**   Computers, printers?  Things like that?  I mean, it is

18   office equipment?

19   **A.**   Yes.

20        MS. DURRETT:  Oh, boy.  I forgot to count.

21        MR. BROWN:  Look at the bottom right.  You can look

22   at the number.

23        MS. DURRETT:  Okay.

24        THE COURT:  Counsel, would you just -- both of you

25   just turn around and make sure that there is no one who is a

1    witness present.

2            MS. DURRETT:  I don't believe so.

3    **Q.   (BY MS. DURRETT)**  So I'm trying to hurry for you.  This is

4    going to be, I think, Number 48.

5            MS. JOHNSON:  What number did you say?

6            MS. DURRETT:  48.

7    **Q.   (BY MS. DURRETT)**  What are we looking at here?

8    **A.**   Those are time cards that were on the wall inside the

9    office when we executed the search warrant.

10   **Q.**   Okay.  What are the dates that are listed on the time

11   cards?

12   **A.**   I can see the card on the left -- top left it was looks

13   like August 5th, August 6th, August 7th, 8th, 9th, and signed

14   by Deidre Barber.  And the one on the right is signed by Ashley

15   Pendergrass.  The dates are August 5th, 6th, 7th, 8th, and 9th.

16   **Q.**   Okay.  And the next exhibit is 49.  Can we see 49?

17           What are we looking at here?

18   **A.**   That is another time card.

19   **Q.**   Okay.  And can you read the name at the top?

20   **A.**   As best I can see -- I don't know if that -- what that

21   first letter is.  But the second letter looks like R-E-Y.  It

22   may be Trey or J-R-E-Y.  I'm sorry.

23   **Q.**   What about Joey?  Do you think it could be Joey?

24   **A.**   I don't know if that second letter is an O.  But I

25   wouldn't dispute it.  If you tell me that, I wouldn't dispute

54

1    it.

2    **Q.**   That's okay.  So also on this one, what are the dates of

3    the time card?

4    **A.**   August 19, 20, 21, 23, 22, and 23.

5    **Q.**   And then we're going to be looking at -- Exhibit 50 and 51

6    look like similar things.  I think that is 50.  And then 50 --

7    you can see the date on there?  I think August --

8    **A.**   August 9 -- on the one that has Ashley on the top,

9    August 19, 19, 23, 23.  And the one that you said may be Joey

10   just shows -- I can see August.  And on one of them, I can see

11   a two.

12   **Q.**   Okay.  And then if you look at Exhibit Number -- oh, my

13   gosh -- 56, I think.

14             MS. JOHNSON:  56?

15             MS. DURRETT:  I'm sorry.  How about 54 first?  54.

16             MS. JOHNSON:  54?  Okay.

17   **Q.**   **(BY MS. DURRETT)**   Is that the time clock?

18   **A.**   Yes, it is.

19   **Q.**   Is that where somebody would punch in there?

20   **A.**   Yes.

21   **Q.**   And that is what we're seeing those printouts on the

22   printed time cards -- that machine would presumably produce

23   those printouts?

24   **A.**   I don't want to presume.  I think they may have come

25   there.  But I don't want to presume.

1  **Q.**   That's fine.

2       Do you understand that to be a time machine -- a time

3  clock?

4  **A.**   Yes, ma'am.  Yes, ma'am.

5  **Q.**   Thank you.  All right.  And then if you look at, I think

6  it is, Exhibit 60, who is that person?

7  **A.**   That is Terrell McQueen.

8  **Q.**   So he is the co-defendant in this case?

9  **A.**   Yes, ma'am.

10 **Q.**   Now, was he arrested this day?

11 **A.**   Yes, ma'am.

12 **Q.**   Okay.  And did you interview him on this day?

13 **A.**   I asked him did he want to make any statements.  Both he

14 and Mr. Pendergrass told me they wanted to speak with their

15 attorney.  So I did not ask them any other questions.

16 **Q.**   All right.  And so do you know if anybody else interviewed

17 Mr. McQueen that day?

18 **A.**   No.  No one should have interviewed him.  After he was

19 asked did he want to make any statements and he asked for an

20 attorney, we don't say anything else to them, other than, you

21 know, maybe your name.  Nothing that would --

22 **Q.**   Then Mr. McQueen and Mr. Pendergrass were transported to

23 Fulton County Jail?

24 **A.**   They were transported back to my office prior to going to

25 the jail.

1    Q.    What happened at your office?

2    A.    We had them sitting in the holding room until the

3    transport wagon -- the van came and took them to the jail.

4    Q.    Okay.  And were they together?

5    A.    No, ma'am.

6    Q.    Okay.  Were they transported together?

7    A.    Yes, ma'am.

8    Q.    Okay.  So in the same vehicle?

9    A.    Yes, ma'am.

10   Q.    Okay.  And then they went to the Fulton County Jail?

11   A.    Yes, ma'am.

12   Q.    Now, were they prosecuted in Fulton County?

13   A.    No, ma'am.

14   Q.    Okay.  And so pretty quickly you figured out this was

15   going to be a federal case?

16   A.    Yes, ma'am.

17   Q.    And things got transferred over here; right?

18   A.    That's correct.

19   Q.    Let me ask you:  Have you ever testified in this case

20   before -- in any proceeding in this case -- in this federal

21   case?

22   A.    I don't recall.  Maybe a motions hearing.  But I don't

23   recall it has been so long.

24         This case happened -- what? -- more than eight years ago?

25   Q.    Yeah.

1    **A.**   So -- and I'm sorry.

2         I don't recall.  I have been down to the courthouse

3    numerous times to speak with attorneys concerning this case.

4    And I have spoken with IRS and postal service.

5         But as far as actually testifying, I don't recall.

6    **Q.**   Okay.  Thank you.

7         Now, in connection with your investigation, some reports

8    were generated about that day, about the things that were

9    seized from the office, the things that happened while you were

10   there.

11        And you were the lead investigator; right?

12   **A.**   Yes, ma'am.

13   **Q.**   Okay.  So I have -- I don't know if there is a defense

14   exhibit up there.  Do we have another one?

15        Well, before I get off the Government's exhibit, since I

16   have it right in front of me, you testified about Exhibits 1

17   through 5.  Do you remember that?

18        Do you have a Government's exhibit book up there with you

19   or no?

20   **A.**   The attorney took them.  I have Exhibits 7 through 29.

21   **Q.**   Okay.  While the Government was talking to you on direct,

22   they admitted Exhibits 1 through 5, which were letters that

23   were located in the office when you did the search warrant.

24        Do you remember talking about that?

25   **A.**   Yes, ma'am.

1    **Q.**    Can we see Exhibit Number 1?

2            COURTROOM DEPUTY CLERK:  Who's got it?  You or the

3    Government?  You do?

4            MS. DURRETT:  I'm sorry.

5            MS. JOHNSON:  You've got to put me on.

6            MS. DURRETT:  Okay.

7    **Q.**    **(BY MS. DURRETT)**  So this was one of the exhibits that you

8    spoke with the Government about, and I just want to draw your

9    attention.

10       It looks like it is a letter to the City of Atlanta;

11   correct?

12   **A.**    Yes.

13       Could you make it larger, please?

14           MS. DURRETT:  Can we make it larger?

15           MS. JOHNSON:  Which area?  The whole thing?

16           MS. DURRETT:  Just the top part right now.

17           MS. JOHNSON:  Okay.

18           MS. DURRETT:  I'm sorry to make you do so much.

19           MS. JOHNSON:  No.  That is okay.

20           You say just the top part; right?

21           MS. DURRETT:  Just the -- you know, the date with the

22   address there so we can see who it is addressed to.

23   **Q.**    **(BY MS. DURRETT)**  So it is a letter to Teresa Booker at

24   the City of Atlanta; correct?

25   **A.**    Yes.

1    Q.   And then can we see the signature at the bottom -- the

2    name and signature?

3         And it is signed here by Terrell McQueen, president, Asset

4    Financial Recovery; correct?

5    A.   Yes, ma'am.

6    Q.   Okay.  Let me also ask you about -- I don't know what the

7    number would be.  But it is part of Exhibit Number 4.  It is

8    Page 4 -- Page 4 of Exhibit 4.  I'm sorry.  Page 4 of

9    Exhibit 1.

10        It is easier for me to do with paper.  I'm happy to hand

11   you the paper.

12             MS. JOHNSON:  Exhibit 1?

13             MS. DURRETT:  Exhibit 1, Page 4.  Sorry.

14             THE WITNESS:  Okay.

15   Q.   (BY MS. DURRETT)  We talked a little bit about this.  I

16   don't know if you can see it.

17        Do you know what this document is?

18   A.   As best I can see it -- like I said, it is real small.

19   Q.   Can you enlarge the top a little bit?

20   A.   Yes, please.  Thank you.

21        It is a document that we recovered during the execution of

22   the search warrant.

23   Q.   Okay.  And it has the name here Weissman, Nowack, Curry &

24   Wilco.

25        Is that one of the people who were supposed to receive

1  money from the City of Atlanta -- one of the businesses?

2  **A.**   One of the victims, yes.

3  **Q.**   And then we have the name Shawn McQueen under that.  Is

4  that Terrell McQueen?  Do you know?

5  **A.**   I don't know.

6  **Q.**   Okay.  That is fine.

7       And then it has the check or the amount of $8000 listed

8  there; right?

9  **A.**   That's correct.

10 **Q.**   So this looks like it is some sort of internal document

11 that is listing out the people who may be owed money by the

12 City of Atlanta.

13      Would you agree with me on that?

14 **A.**   I would have to read more of the document.  Just based on

15 that here, I can't say.

16 **Q.**   Can you read that?

17 **A.**   Yes, ma'am.  I'm reading it.

18      Okay.

19 **Q.**   So if you look in the upper right-hand corner here, it

20 says company contact and it has a name there Seth Weissman,

21 phone number, fax number, modified by Shawn McQueen and a date.

22      Do you see that?

23 **A.**   Yes, I do.

24 **Q.**   So you may not know the specifics of it, but it is a

25 document that has some information about one of the businesses

1   that is due money from the City of Atlanta; is that right?

2   **A.**   Yes, ma'am.

3   **Q.**   Okay.  And it looks like at least someone is able to

4   modify this?

5   **A.**   Yes, ma'am.

6   **Q.**   Okay.  Then I'm going to turn your attention to Exhibit

7   Number 2, the first page.  And, again, if you could zoom in on

8   the address line so we can see who the letter is going to.

9        THE COURT:  I'm sorry.  The last document was

10  Exhibit 4?

11       MS. DURRETT:  It was Page 4 of Exhibit 1.

12       THE COURT:  Okay.  Thank you.

13  **Q.**   **(BY MS. DURRETT)**  So now we're on Exhibit 2.  And, again,

14  this looks like it is a letter to the City of Atlanta Finance

15  Department.

16       Is that correct?

17  **A.**   That's correct.

18  **Q.**   Okay.  Could we zoom in on the signature line?

19       It looks like it is signed here by Terrell McQueen,

20  president, Asset Financial Recovery, Inc.?

21  **A.**   Yes.

22  **Q.**   Would you agree with me on that?

23  **A.**   Yes.

24  **Q.**   I'm not going to belabor the point here.  But Exhibits 3,

25  4, and 5 -- I'm sure the jury will hear a lot about these

1    later.  I'm going to hand them to you just for a second just to

2    confirm it is the same pattern, letter to the City of Atlanta,

3    sent by Terrell McQueen.

4        Okay?

5    **A.**   Okay.

6        I'm almost done.

7    **Q.**   Take your time.

8    **A.**   Okay.

9    **Q.**   So can we confirm that it is the same pattern in all five

10   of those letters?  Letter to the City of Atlanta, signed by

11   Terrell McQueen from Asset Financial Recovery?

12   **A.**   Yes, ma'am.

13   **Q.**   Okay.  I'm going to come retrieve them from you.

14       Is that okay?

15   **A.**   Okay.

16   **Q.**   Thank you.

17       All right.  So now I want you to take a look at what I

18   think is Exhibit 3, Page 6.

19       Okay.  So does this look like that same type of form we

20   saw before where someone is recording information about the

21   business that might be due money from the City of Atlanta?

22   **A.**   It does.

23   **Q.**   Okay.  And can we zoom in on the top, just kind of the

24   name -- yeah, the top half maybe.  Yeah, that is good right

25   there.

1          And who is this one about?  What business is this about?

2   A.   Georgia Municipal Association.

3   Q.   And the owner here is Atlanta -- Allen Pendergrass?

4   A.   Yes.

5   Q.   Okay.  And then it is -- again, there is a check and an

6   amount and then the City of Atlanta; right?

7   A.   Yes.

8   Q.   Okay.  Then can we zoom in on the bottom -- maybe the

9   bottom third where we can get that handwriting -- yeah, I want

10  to get that handwriting.

11         And someone has written -- what did they write there?

12  A.   Appears to say call back Wednesday.

13  Q.   So there is -- again, these are the documents that you

14  seized from the office that you searched; right?

15  A.   Yes.

16  Q.   So someone had written call back Wednesday; right?

17  A.   Yes.

18  Q.   It appears that someone is making phone calls related to

19  this particular account; correct?

20  A.   It appears that, yes.

21  Q.   Okay.  Then --

22              THE COURT:  Can you again just tell me which

23  document -- I mean, the exhibit and what page number --

24              MS. DURRETT:  Yes, Your Honor.

25              THE COURT:  -- so I can follow that?

1           MS. DURRETT:  I believe I'm on Exhibit 4, Page 4.

2    The Government has, you know, bigger numbers at the bottom on

3    these.

4           THE COURT:  Okay.  Very good.

5           MS. DURRETT:  4, Page 4, if we could look at that.

6    **Q.   (BY MS. DURRETT)**  Is this the same type of document where

7    it records someone who is due money by the City of Atlanta and

8    then information about that.

9    **A.**   Yes.

10   **Q.**   Okay.  And it is a document that was seized in the office

11   when you searched it?

12   **A.**   Yes.

13   **Q.**   Okay.  And then is there some handwriting on here?

14   **A.**   There is.

15   **Q.**   Can you read out that handwriting?

16   **A.**   It appears to say Sidney F. Wheeler, Ben L. -- I guess

17   that is Weinberg, M. Carey Long, Karen T. Wheeler, 999

18   Peachtree Street, Northeast, Atlanta, Georgia, 30309.

19   **Q.**   Okay.  And, again, if we could zoom in on kind of the

20   middle third of the document.

21          It says modified by Allen Pendergrass.  Do you see that?

22   **A.**   Yes.

23   **Q.**   Now, the next page is actually, I guess, the back of that

24   document or the next page.  It is Document Exhibit 4, Page 5.

25          Can we zoom in on the top third or so?  That is good.

1    That is good.  Just the top part is fine.

2         What I want you to look at is up in that left-hand corner.

3    What does that say?

4    **A.**   It appears to say Z-O-H-O, the letters C-R-M, clients,

5    leads, details.  And under that, it has notes for this client,

6    leads, and I can't remember -- I mean, I'm sorry.  I can't make

7    out what it says.  The next writing I see it says letter sent

8    to Karen Clay, 12/14/12, Allen Pendergrass.

9    **Q.**   Okay.  You can stop there.

10        And then just to refresh everybody's memory, back on

11   Exhibit 4, Page 4, there is a contact person.

12        Can we look at Exhibit 4, Page 4, the right-hand side at

13   the top where it says contact person.  Yeah.  Right there.

14   Thank you.

15        Who is the contact person?

16   **A.**   It says client lead owner, Allen Pendergrass, company Long

17   Weinberg Ansley, company contact, Karen S. Clay, phone

18   number --

19   **Q.**   That is good.

20        So what I wanted to just refresh our memory about is that

21   the contact person for this business is Karen Clay and the

22   notes on the other side say that Allen Pendergrass sent a

23   letter to Karen Clay; is that correct?

24   **A.**   Yes.  And on this side, it says that he is the client

25   leads owner.

1  **Q.**   Thank you.

2       Now, I do have a question about Exhibit 5.  So Exhibit 5,

3  Page 3.

4       Is this a copy of James Bone's -- it looks like a business

5  card?

6  **A.**   Yes, ma'am.

7  **Q.**   Okay.  And then I guess if you look at Page 5 -- I'm

8  sorry -- Exhibit 5, Page 5, it looks like someone made a bunch

9  of copies of that?

10 **A.**   Yes.

11 **Q.**   And do you have -- I'm going to ask you a little bit about

12 an inventory that was done.

13      But do you have any knowledge of where these documents

14 were found -- where this copy of these business cards was found

15 inside the business?

16 **A.**   Where exactly they were found?

17 **Q.**   Yeah.

18 **A.**   Exact location, no, I don't.

19 **Q.**   Okay.  And there is -- I think you did a diagram of the

20 business; right?

21 **A.**   Yes.

22 **Q.**   People were sitting here?  People were sitting here?  That

23 is probably if I look hard enough -- it might not be.  I have

24 it.

25      And you did that to kind of lay out where property was

1   found, where computers were found, and things like that?

2   **A.**    Yes.  When we execute a search warrant -- I will use this

3   room as an example if I may -- we'll enter through that door.

4   And I'll look around the room.  And I'll just take out a

5   notepad, and I'll sketch a big square of this room -- I'm sorry

6   -- like a big rectangle.

7       And I'll list that there are about eight chairs on this

8   corner, there is a desk up here.  And, you know, I might list

9   that side as Section A, this side over here in the corner

10  Section B, where the Judge is maybe C.  That may be D.

11      So anything that we recover -- if I recover something over

12  there, I would say this was recovered in the center of Section

13  A.  This was recovered in the center of Section J or wherever.

14      So just later on when I go back and do my reports, I can

15  go back and see exactly how the room looked.  So I would do a

16  rough-hand sketch of it.  Then when we get back to the office,

17  we may do a little bit more -- I won't say a better.  I guess I

18  would say -- use the word a better sketch of it with, you know,

19  color and what not with the computer.

20      It is all to preserve exactly where the evidence was, what

21  we found.

22  **Q.**    I'll try to make that a little bit easier.  I'm going to

23  hand you -- I'm going to go ahead and mark this as Exhibit 33

24  just so it is easier for everybody.

25      So I'm just going to ask you if you can take a look and

1    see if you can recognize what this is.

2    **A.**    Yes.  This is a computer-generated copy of, like I just

3    explained, how we viewed the room -- the room and the office

4    area that we executed the search warrant.

5    **Q.**    And did you make that, or did you have a hand in helping

6    make that?

7    **A.**    Myself or either Investigator Kenneth Stapler made this.

8    **Q.**    Is it accurate, to your knowledge --

9    **A.**    Yes, ma'am.

10   **Q.**    -- with the layout?

11   **A.**    Yes, ma'am.

12          MS. DURRETT:  Your Honor, I would move to admit

13   Defendant's Exhibit 33.

14          MR. BROWN:  No objection, Judge.

15          THE COURT:  Okay.  It is admitted.

16          MS. DURRETT:  Stephen, could you put this up?

17          THE COURT:  Does the Government have it?

18          MS. DURRETT:  I'm sorry?

19          THE COURT:  Does the Government have it?

20          MS. DURRETT:  They do.  I don't know what your number

21   is.

22          Do you know what number it is?

23          MR. BROWN:  I don't, but that is fine.

24          MS. DURRETT:  I don't have the ability to put it up.

25          MR. BROWN:  Yes, you do.  You can use the document

1    scanner.

2              **(There was a brief pause in the proceedings.)**

3    **Q.   (BY MS. DURRETT)**  So just kind of give us the lay of the

4    land, if you can.

5    **A.**   Okay.  Can you raise it up from the bottom?  Raise it up a

6    little higher.  That's good.

7              COURTROOM DEPUTY CLERK:  It's auto focus.

8    **A.**   I just want you to be able to get that yellow part.

9    Exactly, that is good.

10   **Q.   (BY MS. DURRETT)**  All right.

11   **A.**   If you see in the lower left-hand corner, that yellow

12   arrow, that will be the front door entrance to the room.  We

13   entered into that door.  And directly in front of us that

14   table -- that left box that you see with an A on it, that is a

15   table.  B is a table as well.  C is a table.  D is a table.  E

16   and F are tables that were connected.

17        When we entered in, we walked straight into the room

18   through the bottom where you see the yellow arrow pointing in.

19   And we asked everybody to remain still.  And we noticed the

20   suspect sitting in the room.

21        Do you want me to tell you where they were?

22   **Q.**   If you want to, sure.

23   **A.**   Mr. Pendergrass was sitting at table, if I get it right,

24   B.  Mr. McQueen was sitting at table A.  The other two

25   gentlemen were sitting at table F and E working on computers.

1          When we went in, we secured everybody.  Then we moved

2     on -- can you drop it down a little bit so we can see the

3     second room?  Yeah, exactly.

4          We moved on to the second room.  That is a door, G, where

5     we entered in.  We didn't know if anyone was in there.  So we

6     went in to secure that room.  Where you see G1, G2, and the

7     bookshelf, those are desks where we recovered more documents

8     that were taken in the search warrant.

9     **Q.**   Okay.  And I'm going -- thank you.  Can you take that --

10    or I can take it down.

11         I'm going to show you an exhibit labeled Defendant's

12    Exhibit 22C and ask you if you recognize that.

13    **A.**   I do.

14    **Q.**   Okay.  What is that?

15    **A.**   This is a copy of an inventory that I did on all of the

16    computers that we seized during the search warrant.

17    **Q.**   Okay.  You made that?

18    **A.**   Let me see.  Myself or Kenny.  The way I can tell whether

19    Kenny did it or I did it, I'm a very poor typer.  And there

20    would be lots of typos.  I type with these two fingers.  So if

21    there are typos or some things that should be capitalized, kind

22    of indented, I may have done it.

23         I see where there are some indentions.  So either myself

24    or Kenny did it.  I'm a very poor typer.

25              MS. DURRETT:  Your Honor, I would move to admit

Defendant's Exhibit 22C.

THE COURT:  Any objections?

MR. BROWN:  No objection, Judge.

THE COURT:  It is admitted.

**Q.   (BY MS. DURRETT)**  Let me see if I can put it back up here. This is the list.  Can you see that?

These are the computers, right, that were seized?  Is that right?

Can you -- you don't need to read out the name of each computer.  But like, for instance, the Dell desktop, what room was that found in?

**A.**   The Dell desktop was found in the front room.

**Q.**   Okay.  B; right?

**A.**   Yes.

**Q.**   Okay.  And the --

**A.**   That is -- the letter B stands for which desk it was found on.

**Q.**   Great.  Okay.  Thank you.

So then MacBook Pro laptop -- and there are two of those. But the first one, which has the serial number that starts with CO2JW, that was also found in room B; right?

**A.**   In the front room on desk B.

**Q.**   Then there is Compaq computer that is found in room C or -- I'm sorry -- on desk C?

**A.**   Correct.

1    **Q.**   And then there is a MacBook Pro that starts with W810 and

2    that was found on desk D?

3    **A.**   Correct.

4    **Q.**   Okay.  Then there is a printer.  What is the NTI?  There

5    is another computer on desk E; right?

6    **A.**   Uh-huh (affirmative).

7    **Q.**   An HP laptop on desk F?

8    **A.**   Yes.

9    **Q.**   And iMac keyboard and mouse on desk F?

10   **A.**   Yes.

11   **Q.**   Compaq computer on desk G?

12   **A.**   Yes.

13   **Q.**   And a Dell -- is that a printer too?

14   **A.**   Dell Optiplex?  I think it is a printer, yes.

15   **Q.**   That is in room or desk G?

16   **A.**   On desk G.  Both where you see G are the back room.

17   **Q.**   So there's -- what I guess I want to ask you about is

18   there's two MacBook Pros that are taken when you guys do the

19   seizure; correct?

20   **A.**   Yes.

21   **Q.**   Okay.  I'm going to show you what is marked as Defendant's

22   Exhibit 22D and ask if you recognize that.

23   **A.**   I don't recognize this.  I think this might be my first

24   time seeing this.

25       This appears to be something from the United States Postal

1   Service.  It appears to be some type of chain of evidence where

2   they gave computers to their forensic laboratory.  But I have

3   never seen this before.

4   **Q.**   Okay.  That is fine.  We'll ask someone else about it.

5   Thank you.

6   **A.**   Uh-huh (affirmative).

7          MS. DURRETT:  If I could just have one minute, I may

8   be finishing up.

9          THE WITNESS:  No problem.

10         **(There was a brief pause in the proceedings.)**

11  **Q.**   **(BY MS. DURRETT)**  Oh, I guess I do have a question

12  about -- you talked about watching some surveillance video from

13  a bank.

14       Do you remember that?

15  **A.**   Some still photos, yes.

16  **Q.**   Still photos.  And you said Mr. Pendergrass was there and

17  he cashed a check?

18  **A.**   Yes.

19  **Q.**   Okay.  But he didn't actually cash the check; right?  He

20  was depositing the check; is that correct?

21  **A.**   That's correct.

22  **Q.**   He didn't trade the check for money at the bank?

23  **A.**   He deposited the check into the bank.

24  **Q.**   Right.  Okay.

25  **A.**   Then shortly afterwards, checks were written off of the

1  account from Mr. Pendergrass to Mr. McQueen and Ms. Deidre

2  Barber in excess of $10,000 each.

3  **Q.**  Okay.

4       MS. DURRETT:  Your Honor, I don't have any further

5  questions.

6                      REDIRECT EXAMINATION

7  BY MR. BROWN:

8  **Q.**  Investigator Ricks, I want to just show you a few

9  exhibits.

10       MR. BROWN:  Could we put up Exhibit Number 7 that has

11  already been admitted into evidence, please?

12       MS. JOHNSON:  7 you say?

13       MR. BROWN:  Government's Exhibit Number 7.

14  **Q.**  **(BY MR. BROWN)**  All right.  So, Investigator Ricks, what

15  company is this from at the top?

16  **A.**  Guishard Wilburn & Shorts.

17  **Q.**  Okay.  And below that, who was it addressed to?

18  **A.**  City of Atlanta -- I'm sorry -- City of Fort Collins.

19  **Q.**  And at the bottom, whose signature appears above Allen

20  Pendergrass?

21  **A.**  Allen Pendergrass's signature is above his name, and he's

22  listed himself as vice president.

23  **Q.**  Okay.  Could we put up Exhibit Number 11, please.  Could

24  we just --

25       Investigator Ricks, at the top again, is that Guishard

1    Wilburn & Shorts?

2    **A.**    It is.

3    **Q.**    And who was this letter addressed to?

4    **A.**    City of Atlanta's Department of Finance.

5    **Q.**    Okay.  And which P.O. Box was the check directed to be

6    mailed to?

7    **A.**    It was directed to be mailed to Box 1809.

8    **Q.**    All right.  Is that the P.O. Box that you already

9    associated with Mr. Pendergrass through the application?

10   **A.**    It is.

11   **Q.**    Then who signed at the bottom of this letter?

12   **A.**    Allen Pendergrass.

13   **Q.**    Could we put up Exhibit Number 13, which has already been

14   admitted into evidence.

15        And, Investigator Ricks, again who was this letter

16   addressed to?

17   **A.**    It was addressed to the City of Atlanta's Finance

18   Department.

19   **Q.**    And who signed this letter?

20   **A.**    Mr. Allen Pendergrass.

21        MR. BROWN:  Your Honor, at this time --

22   **Q.    (BY MR. BROWN)**  I want to show you what's been marked as

23   Exhibit Number 30.

24        MS. DURRETT:  Your Honor, I'm going to object as

25   outside the scope of recross.

```
 1              THE COURT:  It does seem to be.

 2              MR. BROWN:  Your Honor, could we approach?

 3              THE COURT:  I have let you go this far.  But I don't

 4   really --

 5              MR. BROWN:  This is an exhibit that we discussed

 6   earlier that she objected to before the start of the trial.

 7              THE COURT:  But why are we having it at this point on

 8   redirect?

 9              MR. BROWN:  Because I didn't want to admit it because

10   you had an issue about it.  So this is the witness who we need

11   to admit it through.

12              THE COURT:  Why didn't you do it in your direct

13   examination?

14              MR. BROWN:  I neglected to do it, Your Honor.  It was

15   an oversight based on the previous objection to this exhibit.

16              MS. DURRETT:  We object, Your Honor.

17              THE COURT:  Ladies and gentlemen, let's take a short

18   break, go to the bathroom, and we'll get you back in a few

19   minutes.  Okay?

20              (The jury exited the courtroom at 11:45 A.M.)

21              THE COURT:  Officer, could you just take -- you are

22   no longer an officer.  Excuse me.

23              But go ahead and just take a -- step outside the

24   courtroom.

25              THE WITNESS:  I'll go to the restroom, if you don't
```

1      mind.

2              THE COURT:  Okay.  That is fine.

3              Don't go far after that though.  Okay?

4              THE WITNESS:  Yes, ma'am.

5                  **(The witness exited the courtroom.)**

6              THE COURT:  All right.  Everyone makes mistakes, and

7      I understand that.  But why is it necessary?

8              I mean, having listened to this, why is it necessary,

9      given the concerns as well?

10             MR. BROWN:  I mean, the reason why -- this was seized

11     during the execution of the search warrant.  It lists

12     Mr. Pendergrass as the CEO.  And also contained in here is

13     another exhibit that has already been admitted into evidence as

14     relating to the City of Fort Collins.

15             So it is just -- the same foundation he laid for the

16     other exhibits that have already been admitted would be the

17     same foundation to admit this, Your Honor.

18             THE COURT:  Could I have it?

19             MR. BROWN:  Yes.

20             THE COURT:  Thank you.

21             You know, I'm just having some real problems with

22     this because you have got the documents in.  I have been told

23     that this witness has memory issues.  I have -- counsel has

24     never seen this document before today.  I mean, she has seen

25     individual documents, but she had never seen the notebook

1   before.

2          MR. BROWN:  That is not true, Your Honor.  Counsel

3   came to my office, and I allowed her to look through all the

4   boxes of evidence in which that document was contained.  There

5   are literally 20 or 30 binders like that.  But she had access

6   to this.  I am in no way trying to hide the ball.

7          THE COURT:  I'm not saying that you were trying to

8   hide the ball.

9          MR. BROWN:  I'm sorry.  And I wasn't suggesting you

10  were, Your Honor.

11         In addition to that, that book has been scanned.  And

12  those -- all documents contained in that book, including the

13  front cover, Your Honor, have been provided in discovery.  So

14  she has every single page there.

15         THE COURT:  But aren't the documents already in

16  evidence?

17         MR. BROWN:  Only one document in that is in evidence,

18  Your Honor.  And that relates to Tousa Homes.

19         The point I'm trying to make with the admission of

20  that notebook itself is it further connects Allen Pendergrass

21  to the fraud.  It is a document that was recovered during the

22  search warrant.  It is relevant.

23         And I would just like to take two minutes to admit it

24  into evidence, Your Honor, based on the same foundation he laid

25  for all the other exhibits and were admitted without objection.

```
1          MS. DURRETT:  I'll just note:  I think, one, it is
2    cumulative; but, two, yes, I do not want to pretend that I did
3    not come to their office and look at exhibits about a year ago
4    or so.
5          But the point is:  I can't tell what has been added
6    into that document.  There are loose papers in there.  And no,
7    I don't have a specific memory of that particular binder, and I
8    saw it today for the first time knowing that it was going to be
9    admitted at trial.
10         And so I just think we can't -- and this guy, who has
11   some memory issues, isn't going to be able to affirmatively say
12   yes, this is exactly what it was like when I seized it.  These
13   are all the papers that were in it when I seized it.
14         And, again, I'll note:  It is not on their inventory
15   that was created.  And my guess is he is going to say he
16   doesn't remember creating the inventory.
17         THE COURT:  Why don't we just have Mr. Ricks in
18   without the jury for a moment, and you can cross-examine him
19   about it.
20         MS. DURRETT:  Thank you, Your Honor.
21         MR. BROWN:  Could you get Investigator Ricks, please.
22         THE COURT:  Do you want me to hand him the notebook?
23         MS. DURRETT:  I'm sorry.  I thought the Government
24   was going to talk to him.
25         THE COURT:  No.  I mean, I'm really giving you the
```

1    opportunity to cross-examine him.

2              MS. DURRETT:  Thank you, Your Honor.

3                        VOIR DIRE EXAMINATION

4    BY MS. DURRETT:

5    **Q.**   Officer Ricks, are you familiar with Government's

6    Exhibit 30?

7    **A.**   Yes.

8    **Q.**   Okay.  How are you familiar with it?

9    **A.**   That is a book that was recovered in the search warrant.

10   **Q.**   Okay.  And what is in it?

11   **A.**   Documents that were found in the search warrant.

12   **Q.**   When was the last time you looked at it?

13   **A.**   About a week and a half ago.

14   **Q.**   Okay.  And when you had that chance to look at it about a

15   week and a half ago, did you look at all the documents that

16   were in there?

17   **A.**   I scanned through them, yes.

18   **Q.**   Prior to a week and a half ago, when was the last time you

19   saw it?

20   **A.**   Months.

21   **Q.**   Okay.  And --

22             THE COURT:  When you say months, you are talking

23   about a year, two years?

24             THE WITNESS:  No, ma'am.  I would say -- we got ready

25   for this trial, and then it was reset.  So whenever would have

1    been the last time it was almost ready to go on trial.  I would

2    be close to saying maybe probably about six months, eight

3    months, I would think.

4    **Q.   (BY MS. DURRETT)**  Okay.  And is this a document -- this

5    was seized at the office the day that you did the arrest of

6    Mr. Pendergrass?

7    **A.**   Yes.

8    **Q.**   Okay.

9    **A.**   It was in one of those boxes.  We seized it and placed it

10   in one of those boxes, yes.

11   **Q.**   Which box was it in?

12   **A.**   I would have listed, I would say --

13   **Q.**   Okay.  I have a list.  This is Defendant's Exhibit 22G.

14   **A.**   I want to say that was in box A.  But I don't want to

15   be -- I don't see on here specifically where it was recovered.

16        There is a possibility that it could have been on the

17   shelf in some of the documents that has already been entered

18   into evidence.  There is a shelf.  And it could have been on

19   that shelf.  Or it could have been on one of the desks.  I'm

20   not sure exactly where it was.

21   **Q.**   Did you create that inventory?

22   **A.**   This one?  Either myself or Investigator Stapler.  But I

23   would attest to it being fairly accurate, yes.

24   **Q.**   And the point of doing an inventory is so that we know

25   what items were taken from the business; correct?

1   **A.**   That's correct.

2   **Q.**   But this notebook is not listed on the inventory; correct?

3   **A.**   Not that I see.

4          MS. DURRETT:  Okay.  No further questions.

5          MR. BROWN:  Your Honor, my argument is that he has

6   laid a proper foundation for this document.

7          THE COURT:  Are you going to ask any questions?

8          MR. BROWN:  No.

9          THE COURT:  All right.  Let's excuse this witness.

10         MR. BROWN:  Okay.  You can step down.

11                **(The witness exited the courtroom)**

12         MR. BROWN:  My only argument is that what defense

13  counsel is raising goes to the actual -- the weight of the

14  evidence but not the admissibility.  If she wants to argue

15  somehow that APD or the Government planted this notebook in

16  there, she is free to make that argument.

17         But he has laid a sufficient foundation.  The same

18  foundation he laid for the defense exhibits and the

19  Government's previous exhibits about him recognizing this as

20  being from the -- coming from the actual scene, he's laid a

21  sufficient foundation for it to come in, Your Honor.

22         She is free to argue what weight the jury should

23  accord to that document like she can for any exhibit that has

24  been admitted.

25         MS. DURRETT:  Your Honor, I would just say as far as

1    the other exhibits and us not objecting there is a way for us

2    to verify those other exhibits.  We also saw them from the City

3    of Atlanta.

4            These are exhibits where there are papers stuck in

5    there.  There are various folders with loose papers.  I just

6    think there is no way to know that that is actually in the

7    condition it was in.  He doesn't have it on his inventory.  So

8    there's no way for us to know that it is actually in its same

9    condition.

10           THE COURT:  Could I have the document again -- the

11   notebook?

12           MR. BROWN:  Yes.

13           THE COURT:  Ms. Durrett, when was the first time you

14   noticed that this -- that Government's Exhibit 30 was on the

15   Government's list?

16           MS. DURRETT:  This morning.

17           THE COURT:  This morning?

18           MS. DURRETT:  Yeah.  I asked -- as soon as I came in

19   and I looked through it, I said, hey, what is this binder?

20   What is this binder?  Then Ms. King said, oh, Mr. Brown will

21   get it.

22           THE COURT:  You didn't have an exhibit list before?

23           MS. DURRETT:  I did not.

24           MR. BROWN:  Your Honor, if I could just add,

25   Government's Exhibit 7, which is already in evidence, is inside

1    of that folder.

2          THE COURT:  Well, there's no question that there are

3    lots of documents that are inside.

4          MS. DURRETT:  It is cumulative.

5          THE COURT:  I'm not going to allow it.  I think at

6    this juncture after hearing the testimony and considering the

7    whole thing, you have gotten lots of things in.  But it is true

8    that, you know, anyone could have -- and that doesn't mean they

9    did it nefariously -- but when they picked this up stuck things

10   in.

11         It is peculiar that it is not on the list.

12         MR. BROWN:  It is on the list.  It is listed as

13   Government's Exhibit 30.

14         THE COURT:  No.  I didn't mean that.  On the list of

15   items that got picked up.

16         It doesn't mean that there is anything wrong with

17   that.  It could have just been human error.  But the problem

18   is -- I mean, I just -- is there some document here that you

19   need him to identify?

20         It is really the fact that you want the collection as

21   it is and that she doesn't know -- isn't that what you want?

22         MR. BROWN:  No.  No.  The reason I want it in, Your

23   Honor, is the front page says Asset Financial Recovery, Allen

24   Pendergrass, CEO.  And Exhibit Number 7, which is already in

25   evidence, is actually within that document.

1          So it is just showing that, you know, if you have a

2   notebook with your name on it in your office, it is likely your

3   notebook.  So it is just -- it is not cumulative.  I can --

4          THE COURT:  All right.  If that is what you want --

5   if that is what you want --

6          MR. BROWN:  That's it.  There's 30 notebooks.  I

7   didn't introduce all of them.  I just want to introduce this

8   one.

9          MS. DURRETT:  Your Honor, I can have the front page

10  made in about 30 seconds that say this is Allen Pendergrass's

11  notebook.

12          And, believe me, if they had seen a notebook when

13  they were raiding Asset Financial Recovery that said Allen

14  Pendergrass, CEO, Asset Financial Recovery, they would have

15  included it on their inventory.

16          MR. BROWN:  If the Judge is concerned about other

17  documents in there, I can remove everything out of there and

18  just the Tousa Homes can stay and that's it, Judge.  I don't

19  need all those other documents.  I'm not going to even go over

20  --

21          THE COURT:  I'm not going to allow it.

22          MR. BROWN:  What did you say?  You are not going to

23  allow it?

24          THE COURT:  No.

25          MS. DURRETT:  Thank you, Your Honor.

```
 1              MR. BROWN:  Okay.  Thanks, Judge.

 2              Your Honor, that's all I have for this witness if you

 3    are not going to allow it.

 4              I think my co-counsel needs a bathroom break.

 5              THE COURT:  Do you want to continue or -- I never

 6    gave them a break.  But I have now since we have been arguing

 7    about this.  So we can continue for another half hour.  That is

 8    fine.

 9              Who is your next witness?

10              MR. BROWN:  Gordon Giffin.

11              THE COURT:  And he is here?

12              MR. BROWN:  Can counsel --

13              THE COURT:  Of course.  No matter what, she can.

14              MS. KING:  I need to check to confirm whether he is

15    here, Your Honor.

16              THE COURT:  All right.  Confirm that he is here.

17              Tell me how long the witness will be.

18              MR. BROWN:  Mr. Giffin should be short.  Or we can go

19    with Ron Bowers who may be a little bit longer.  He is the

20    Wells Fargo investigator.

21              THE COURT:  Either one.  Whatever you want.  That is

22    fine.

23              MS. DURRETT:  Thank you.

24              **(A brief break was taken.)**

25              THE COURT:  Have a seat.  Counsel, just for the
```

1  record, my thoughts about the last evidentiary dispute as it

2  arose was really that ultimately that this -- the notebook was

3  not on the original -- was not on the original inventory list

4  prepared by the officers.  And it could have ended up anywhere

5  within the stacks and not been with other documents.

6           But just simply the combination of circumstances made

7  me feel uncomfortable with the reliability of the documents as

8  assembled.  And therefore I have decided that it shouldn't be

9  admitted.

10           And let's have the jury in now.

11           MR. BROWN:  Thank you.

12           MS. DURRETT:  Thank you, Your Honor.

13           THE COURT:  Good afternoon.  How are you?

14           THE WITNESS:  I'm very well.

15           **(The jury entered the courtroom at 12:15 P.M.)**

16           THE COURT:  Go ahead.

17           Counsel, is this your next witness?  Call your next

18  witness officially.

19           MS. KING:  Yes, Your Honor.  The Government calls

20  Gordon Giffin.

21           COURTROOM DEPUTY CLERK:  Please stand and raise your

22  right hand.

23           **(Witness sworn)**

24           COURTROOM DEPUTY CLERK:  Please have a seat.  You can

25  remove your mask.

```
 1              Loudly and clearly state your name and spell your
 2    last name for the record, please.
 3              THE WITNESS:  My name is Gordon Giffin, G-I-F-F-I-N.
 4         Whereupon,
 5                        GORDON GIFFIN,
 6         after having been first duly sworn, testified as follows:
 7                        DIRECT EXAMINATION
 8    BY MS. KING:
 9    Q.   I was about to say good morning.  I had to take another
10    look at the time.
11         Good afternoon, Mr. Giffin.  How are you?
12    A.   Good afternoon.  Fine.  Thank you.
13    Q.   Mr. Giffin, what is your current employment?
14    A.   I am a lawyer with the law firm of Dentons.
15    Q.   And what kind of law do you practice?
16    A.   International transactional and trade dispute.
17              MS. KING:  Your Honor, may I inquire if the jurors
18    can hear him okay?
19    Q.   (BY MS. KING)  And how long have you been with your firm?
20    A.   Well, if you count the predecessor firm, since 1986.
21    Q.   And where do you practice?  In which city or state do you
22    practice?
23    A.   Atlanta.
24    Q.   And have you heard of a company called Hemisphere,
25    Incorporated?
```

1  **A.**   Yes.

2  **Q.**   How is it you have heard of that company?

3  **A.**   Well, in the early 2000s -- I would say 2003 -- I had

4  served as United States Ambassador in Canada.  And I returned

5  to Atlanta to resume law practice.  And the Metro Atlanta

6  Chamber asked me to chair their international development

7  committee, which I agreed to do.

8         And in that role, we decided to pursue the headquarters of

9  a hemispheric organization where at that time for trade

10 purposes a concept of the Summit of the Americas had been

11 created where all of the countries of the hemisphere would meet

12 and work on enhancing harmonized trade.

13        So we decided that Atlanta would pursue the headquarters

14 of the Summit of the Americas, and we created a nonprofit

15 corporation called Hemisphere, Inc., to house the efforts to

16 pursue that headquarters.

17 **Q.**   And do you recall being interviewed regarding some funds

18 that were obtained from the City of Atlanta that was owed to

19 Hemisphere, Incorporated?

20 **A.**   Yes, I recall being interviewed about that.

21        MS. KING:  And if we could show Government's

22 Exhibit 13.

23 **Q.**   **(BY MS. KING)**  I'm showing you Government's Exhibit 13, a

24 letter to the City of Atlanta from Guishard Wilburn & Shorts,

25 LLC.

1      Did you at any time -- did you at that point in time --

2   the letter is dated October 31st, 2012.  Did you hire this

3   company to collect funds on behalf of Hemisphere, Incorporated?

4   **A.**   No.

5   **Q.**   If we can turn to Page 2 of 13.  Yes.  Page 2 of 13.  And

6   the first page of the document actually was signed by -- had

7   the signature of the name of Allen Pendergrass.

8      Did you authorize a person by the name of Allen

9   Pendergrass to send that letter that was on Page 1 of

10  Exhibit 13?

11  **A.**   No.

12  **Q.**   Now, Page 2 is a letter of authorization to recover funds,

13  which is a limited power of attorney.

14     Do you see in the middle of a document a signature in the

15  name of Gordon Giffin?

16  **A.**   I do.

17  **Q.**   Is that your name?

18  **A.**   It is my name.

19  **Q.**   Did you sign this letter of authorization to recover

20  funds?

21  **A.**   No.

22  **Q.**   And, in fact, were you asked to check your calendar for

23  that time period?

24  **A.**   Yes.

25  **Q.**   And what, if anything, did you determine about your

1    location on the date this document was signed?

2    **A.**    I was in Montreal, Canada.

3    **Q.**    And for the record, the document is showing that it was

4    signed before a notary on October 22nd, 2012.

5         And you were where?

6    **A.**    Montreal, Canada.

7             MS. KING:  Your Honor, may I approach the witness?

8             THE COURT:  Yes.

9    **Q.**    **(BY MS. KING)**  I'm going to hand you -- I have handed you

10   what has been marked as Government's Exhibit 26.

11        Will you turn to Page 16 of the document, which has been

12   tabbed.

13   **A.**    (The witness complies.)

14   **Q.**    On Page 16, do you see a document called articles of

15   incorporation?

16   **A.**    Yes.

17   **Q.**    And without going into the content of the actual document,

18   did you -- did you participate in the incorporation of the

19   document that is listed on Page 16 of Government's Exhibit 26?

20   **A.**    Well, I had nothing -- I had nothing to do with this

21   document.

22            MS. STRICKLAND:  Your Honor, we would object.  It is

23   not admitted.

24            MS. KING:  He is not speaking about the contents.  I

25   just asked whether or not he had anything to do with the

1  document.  That is all.  He is not going into the contents.

2  **A.**   I had nothing to do with the document.

3         MS. STRICKLAND:  He is commenting on it, and it is

4  not admitted.  So we would object.

5         THE COURT:  All right.  Overruled.

6         Don't go further.

7         MS. KING:  I'm sorry?

8         THE COURT:  Don't go further.

9         MS. KING:  Oh, I'm done.

10        THE COURT:  All right.

11 **Q.   (BY MS. KING)**  I'm sorry.  What was your answer?  You

12 said --

13 **A.**   I had nothing to do with this document.

14        THE COURT:  Is this document in evidence?

15        MS. KING:  It is not.  It is going to be introduced

16 through another witness.  I just wanted him to look at the one

17 page.  And that is as far as I'm going.  And then once it is

18 admitted, we will publish it to the jury.

19        THE COURT:  All right.

20        MS. KING:  Actually those are all the questions I

21 have of this witness.

22        THE COURT:  Thank you.

23                       CROSS-EXAMINATION

24 BY MS. STRICKLAND:

25 **Q.**   Mr. Giffin, I'm Sydney Strickland.  I represent

1  Mr. Pendergrass.

2          MS. STRICKLAND:  Would you mind please putting

3  Government's 13 back up.

4  **Q.   (BY MS. STRICKLAND)**  Mr. Giffin, I believe Ms. King asked

5  you whether Allen Pendergrass' signature appears on this

6  document.

7          Do you recall that?

8  **A.**   If Allen Pendergrass appears on that document?

9  **Q.**   If his -- I believe Ms. King asked whether Allen

10  Pendergrass signed that document.

11          Do you recall that?

12          Let me ask you this:  Do you see Allen Pendergrass' name

13  on this document?

14  **A.**   I do.

15  **Q.**   Do you know whether Allen Pendergrass signed that

16  document?

17  **A.**   I don't.

18  **Q.**   You don't know?  Okay.

19          MS. STRICKLAND:  That's all the questions I have,

20  Your Honor.

21          THE COURT:  Thank you.

22          May this witness be excused?

23          MS. KING:  Yes, Your Honor.

24          THE COURT:  Thanks very much for coming.  Good to see

25  you.

```
 1                    THE WITNESS:  Thank you.
 2               MS. KING:  We call Freddie Ashley.
 3               THE COURT:  Is this a longer witness?
 4               MS. KING:  He is a short witness as well.
 5               THE COURT:  He's a short witness?
 6               MS. KING:  Very short.
 7               THE COURT:  So we're going to get through the short
 8     witnesses and let you have some lunch.
 9               MS. KING:  I don't know how much you want to go after
10     that, but the next witness is just as short.
11               THE COURT:  Well, let's see how short this is.
12               COURTROOM DEPUTY CLERK:  Do you need this to remain?
13               Please raise your right hand.
14                    (Witness sworn)
15               COURTROOM DEPUTY CLERK:  Thank you.  Please have a
16     seat.
17               Loudly and clearly state your name and spell your
18     last name for the record.
19               THE WITNESS:  Fredrick Ashley.  Last name,
20     A-S-H-L-E-Y.
21          Whereupon,
22                         FREDRICK ASHLEY,
23          after having been first duly sworn, testified as follows:
24                         DIRECT EXAMINATION
25     BY MS. KING:
```

1   **Q.**   Mr. Ashley, where are you employed?

2   **A.**   Actor's Express.

3   **Q.**   And how long have you been employed with Actor's Express?

4   **A.**   Just over 14 years.  This past July 9 was my 14th

5   anniversary.

6   **Q.**   What is your present position?

7   **A.**   I'm the artistic director.

8   **Q.**   And what do you do as the artistic director?

9   **A.**   I select the plays we are going to produce.  I oversee the

10   creative teams who are bringing the plays into production.  I

11   direct some of the productions as well, oversee budgets.

12       I work with the managing director who is the sort of

13   business counterpart to my being the artistic guy.  And we're

14   both sort of running the theater and managing day-to-day

15   operations as well.

16   **Q.**   And do you recall being interviewed regarding some funds

17   that were obtained from the City of Atlanta in the name of

18   Actor's Express?

19   **A.**   Yes, I do recall.

20   **Q.**   And have you heard of a company called Asset Financial

21   Recovery, Incorporated?

22   **A.**   Yes.

23   **Q.**   How is it you have heard of that company?

24   **A.**   We received letters and notifications from them letting us

25   know that there were unclaimed funds from the City of Atlanta

1   that we were entitled to.

2   **Q.**   And upon receiving that letter, what, if anything, did you

3   do?

4   **A.**   Well, I think I ignored the first one.  But I did contact

5   the city and ask if we were actually entitled to this money.  I

6   knew where it was coming from because we had been denied part

7   of a grant because of the lateness of a final report on the

8   grant.  So we couldn't have the money disbursed to us.

9       And when I confirmed with the city, hey, I have got this

10  thing from this asset recovery company.  I just wanted to go

11  over we're not entitled to this; right?  They said, yes, you

12  are not entitled to it.

13      So we didn't -- we just started throwing away the letters

14  when we kept receiving them.

15  **Q.**   And so you never at any point hired Asset Financial

16  Recovery to collect the funds on behalf of Actor's Express?

17  **A.**   No.

18          MS. KING:  Could we show Government's

19  Exhibit Number 6.

20  **Q.   (BY MS. KING)**   There is a monitor right there beside you

21  if it is easier for you to see.

22      I'm showing you what has been marked as Government's

23  Exhibit Number 6.

24      Is this a copy of the letter that your company actually --

25  I'm sorry.  This letter is signed by Mr. Terrell McQueen.

1        Did you at any time hire Mr. McQueen or this company to

2   obtain the funds from the City of Atlanta?

3   **A.**    No.

4   **Q.**    And the amount that is listed in the letter is $11,000; is

5   that correct?

6   **A.**    Correct.

7   **Q.**    And if we can go to Page 2 of the document.  So Page 2 of

8   the document is a limited power of attorney.

9        Do you see a signature in the body of it in the name of

10  Freddie Ashley?

11  **A.**    I do.

12  **Q.**    Is that your signature?

13  **A.**    No.

14  **Q.**    Did you sign this document?

15  **A.**    I did not.

16  **Q.**    Did you authorize anyone to sign this document on your

17  behalf?

18  **A.**    No.

19  **Q.**    And if we can turn to Page 6.

20       Are you able to see the business cards?  It is a little

21  hard to see.

22  **A.**    Yeah.  I can barely make them out.  But I can tell that

23  they are stars and names and stuff on it and writing.

24  **Q.**    Are these copies of the business cards that you would have

25  used at that time?

1    **A.**    No.

2    **Q.**    And if we could turn to Page 8 of the document.

3         Did you authorize anyone to collect this check on behalf

4    of Actor's Express?

5    **A.**    No.

6              MS. KING:   No further questions.

7                            CROSS-EXAMINATION

8    BY MS. STRICKLAND:

9    **Q.**    Hi, Mr. Ashley.   I'm Sydney Strickland.   I represent

10   Mr. Pendergrass.   I just have a couple of questions for you.

11        I believe you said that you were contacted about funds

12   owed to Actor's Express by the City of Atlanta; is that

13   correct?

14   **A.**    I was not contacted by the City of Atlanta.   I was

15   contacted by the recovery firm.

16   **Q.**    Okay.   So a recovery firm contacted you about funds owed

17   by the City of Atlanta?

18   **A.**    Correct.

19   **Q.**    So -- and this company -- did you say it was Asset

20   Financial?

21   **A.**    Yes.   That is right.

22   **Q.**    Okay.   And so that company wanted to obtain those funds

23   for you; is that right?

24   **A.**    Correct.

25   **Q.**    Okay.   I just wanted you to take a look --

1          MS. STRICKLAND:  Would you mind putting up

2    Government's Exhibit 6 again.

3    **Q.   (BY MS. STRICKLAND)**  Mr. Ashley, can you see that?

4    **A.**   Yes.

5    **Q.**   And can you see at the bottom where it says thank you and

6    there is a signature and below that -- what does that signature

7    line say?

8    **A.**   It says Terrell McQueen, president, Asset Financial

9    Recovery, Incorporated.

10          MS. STRICKLAND:  Okay.  Thank you.

11          All right.  Thank you.

12          THE WITNESS:  Thank you.

13          MS. KING:  No redirect.

14          THE COURT:  May this witness be excused?

15          MS. KING:  Yes, Your Honor.

16          THE COURT:  Thank you very much.  You are excused.

17          Who is your next witness?

18          MS. KING:  You want to go?

19          THE COURT:  I think we can, if it is like this

20    amount, yes.

21          MS. KING:  Okay.  The next witness is Melvin Walker

22    {sic}.

23          COURTROOM DEPUTY CLERK:  If you would, please stand

24    and face me.  Raise your right hand.

25          **(Witness sworn)**

```
 1              COURTROOM DEPUTY CLERK:  Thank you.  Please have a
 2    seat.  You can remove your mask.
 3              Loudly and clearly state your name and please spell
 4    your last name for the record.
 5              THE WITNESS:  My name is Melvin L. Waller.  Spell my
 6    last name?  W-A-L-L-E-R.
 7       Whereupon,
 8                        MELVIN L. WALLER,
 9       after having been first duly sworn, testified as follows:
10                        DIRECT EXAMINATION
11    BY MS. KING:
12    Q.   Good afternoon, Mr. Waller.  Mr. Waller, are you retired?
13    A.   Yes.
14    Q.   And from where are you retired?
15    A.   Atlanta Police Department.
16    Q.   And how long were you with the Atlanta Police Department?
17    A.   About 30 years.
18    Q.   And what was your position at the time of retirement?
19    A.   I was a street officer.  A sergeant in zone three.
20    Q.   And are you familiar with an organization called the
21    Atlanta Quarterback Club?
22    A.   Yes.
23    Q.   And how is it you are familiar with that organization?
24    A.   I worked all sports, basketball, baseball, softball,
25    volleyball.  Everything that we had, I worked it.
```

1    **Q.**    So can you explain what is the Atlanta Quarterback Club?

2    **A.**    It is an organization of officials, young men, old men,

3    who like to do sports, referee, umpiring, what have you.  And

4    it is about 50 or 60 guys.  Some people prefer to do baseball.

5    Some people prefer to do softball.  So we moved around to

6    different sports.

7    **Q.**    You said that it is an organization of officials.  So

8    these are the referees and the umpires at the different games?

9    **A.**    Correct.

10   **Q.**    And at what level are these games?

11   **A.**    We did recreational ball, and we also did sub varsity and

12   varsity games.

13   **Q.**    Is this at the high school level or the college level or

14   both?

15   **A.**    High school level mostly.  Yeah.

16   **Q.**    Okay.  And did you have any positions at any point while

17   you were with the Atlanta Quarterback Club?

18   **A.**    I was elected treasurer.

19   **Q.**    Do you happen to recall about how long ago that was?

20   **A.**    Wow.

21   **Q.**    So let me --

22   **A.**    I don't know.  I'm sorry.

23   **Q.**    Oh, no.  That is -- so let me direct your attention to

24   2013.

25          Did you hire a company to collect money from the City of

1    Atlanta that was owed to the Atlanta Quarterback Club?

2    **A.**   I did not have that authority.

3         MS. KING:   Could we show Government's

4    Exhibit Number 11.

5    **Q.**   **(BY MS. KING)**   And Government's Exhibit Number 11, Page 1,

6    is a letter to the City of Atlanta from the company Guishard

7    Wilburn & Shorts.

8         So just that we're clear, did you hire this company to

9    receive funds on behalf of the Atlanta Quarterback Club?

10   **A.**   Again, I didn't have the authority to do that.  No, I did

11   not.

12   **Q.**   And if we could turn to Page 2 of the document.  I'm

13   showing you what is a limited power of attorney.

14        Do you see in the middle of the document there is a

15   signature in the name Melvin Waller?

16   **A.**   I see it.  I'm trying to figure out who wrote it.

17   **Q.**   To be clear, you did not sign it?

18   **A.**   I did not write it, no.

19   **Q.**   Did you authorize anyone to sign this document?

20   **A.**   No, ma'am, I did not.

21   **Q.**   And if we could go to Page 3 of the document.

22   **A.**   Okay.

23   **Q.**   And Page 3 is a copy of a business card.

24   **A.**   Okay.

25   **Q.**   Is this a business card you would have used at that time?

1    **A.**    No, ma'am, it is not.

2    **Q.**    Have you ever seen this card before, other than when the

3    Government showed it to you?

4    **A.**    No, I have not.

5            MS. KING:  No further questions.

6                        CROSS-EXAMINATION

7    BY MS. STRICKLAND:

8    **Q.**    All right.  Mr. Waller?

9    **A.**    Yes, ma'am.

10   **Q.**    My name is Sydney Strickland.  I represent Allen

11   Pendergrass.

12       I would like to show you a couple of documents and have

13   you tell me whether you recognize them.

14   **A.**    Okay.

15            MS. STRICKLAND:  May I approach, Your Honor?

16            THE COURT:  Yes.

17   **Q.**    **(BY MS. STRICKLAND)**  If you would, just take a minute to

18   look at those.

19   **A.**    Okay.

20   **Q.**    And do you recognize those?

21   **A.**    No.

22   **Q.**    Okay.  If you are finished, would you mind if I have them

23   back.

24       You are sure you don't recognize those?

25   **A.**    I'm sure.

1   **Q.**   Okay.  Thank you.

2           THE COURT:  I'm sorry.  What were the documents?

3           MS. STRICKLAND:  These are marked as Defendant's 7C

4   and 7D.

5           THE COURT:  All right.  So you are not admitting

6   them?

7           MS. STRICKLAND:  No, Your Honor, not right now.

8   **Q.**   **(BY MS. STRICKLAND)**  Mr. Waller, were you aware that a man

9   named Terrell McQueen obtained a business license in the name

10  of the Quarterback Club?

11  **A.**   No, I'm not aware.

12  **Q.**   And were you aware that a man named Terrell McQueen

13  obtained a taxpayer identification number for the Atlanta

14  Quarterback Club?

15  **A.**   No, I'm not aware.

16  **Q.**   Okay.  And, Mr. Waller, would you mind taking a look

17  again --

18          MS. STRICKLAND:  Would you mind putting up

19  Government's Exhibit 11 again.

20  **A.**   Okay.

21  **Q.**   **(BY MS. STRICKLAND)**  All right.  Mr. Waller, do you see at

22  the bottom left where it says Allen Pendergrass, vice

23  president?

24  **A.**   Yes, ma'am.

25  **Q.**   And do you see there appears to be a signature above that?

1   **A.**   Yes, ma'am.

2   **Q.**   Do you know whether Allen Pendergrass signed that

3   document?

4   **A.**   I don't even know who Allen Pendergrass is.  No, I don't.

5           MS. STRICKLAND:  Okay.  Thank you, Mr. Waller.  That

6   is all I have.

7           THE WITNESS:  I don't even know who he is.

8           THE COURT:  May this witness be excused?

9           MS. KING:  Yes, Your Honor.

10          THE COURT:  All right.

11          THE WITNESS:  I'm through?

12          THE COURT:  Thank you very much.

13          All right.  Ladies and gentlemen, we're going to take

14  a lunch break now.  We'll see you in an hour.

15          Let me just tell you about the schedule of the day,

16  which is a little bit upside down.  But we have a sort of

17  preliminary proceeding we have to have in this matter

18  approximately at 4:00.

19          We're going to try to finish whatever we're doing at

20  that point.  But -- so we're going to let you out early today.

21  But that means that we're not going to stop.  So once we get

22  back, we're going to just go straightforwardly.

23          So let's really start promptly at quarter of 2:00.

24  Take care of anything you need to do and be ready to go.  And

25  we'll go through 4:00 or 4:15, something like that.

```
 1            All right.  Remember, don't discuss the testimony
 2   between yourselves.  And have a good lunch.  Poke your head
 3   outside.  It is a nice day.  And it will refresh you.
 4            Thank you.
 5            COURTROOM SECURITY OFFICER:  All rise.
 6            (The jury exited the courtroom at 12:44 P.M.)
 7            THE COURT:  All right.  Let's let the jury get out of
 8   here for those who are going out to lunch.  So just wait for a
 9   minute before you exit the courtroom.
10            MS. DURRETT:  Your Honor, I have two issues.  One I
11   raised with Mr. Brown already, and I don't think he would mind
12   me telling you.  I know the Court has said in one of its orders
13   that if the Government was going to admit evidence about the
14   Colorado conviction that they should do that toward the end of
15   their case.
16            THE COURT:  Right.
17            MS. DURRETT:  Officer Ricks was listed as a witness
18   in that case and had some involvement, I think, in the
19   investigation of that.
20            So if the Court determines that it is appropriate for
21   that evidence to come in, we would like the opportunity to at
22   least be able to recall Mr. Ricks about the Colorado case.  And
23   I mentioned that to Mr. Brown.  He said he understood, but he
24   didn't make any agreement.
25            THE COURT:  All right.
```

1          MS. DURRETT:  If the Court is going to permit that, I

2     would like him to continue under subpoena.

3          THE COURT:  Well, I think let's continue him under

4     subpoena.  And then when Mr. Brown is back in the room, I'll

5     hear from him.  Let's -- I mean, let's make sure that he

6     doesn't in any event leave town.

7          MS. DURRETT:  Thank you, Your Honor.

8          And then I had some questions about the bank records,

9     which I think will be maybe admitted this afternoon.  We don't

10    have a problem with the business record certification for those

11    records because it actually has the Bates numbers in it and it

12    shows what they are.

13         What we do have a problem with is many of the

14    exhibits have a fingerprint stamp on it as if someone had to do

15    a fingerprint when they deposited the check or when they wrote

16    the check.  And we have a question about that.

17         We would like either for those documents to be

18    removed from there or just not go back with the jury or not

19    discussed because we don't want to make it sound like the bank

20    was doing some extra security procedure for Mr. Pendergrass'

21    account.

22         THE COURT:  Do you know anything about the

23    fingerprint?

24         MS. KING:  So, you know, it is my understanding

25    that -- and I can hand up because she flagged the documents.

1              It is my understanding that when you cash a check at

2    a bank other than your bank that the bank you are at may

3    require you to submit your fingerprint as an extra level of, I

4    guess, security to be able to identify the person cashing the

5    check.

6              I would ask the Court to overrule the defendant's

7    objections because the fingerprints -- I understand what she is

8    saying that it might look suspicious or what have you.

9              But I don't think that what has happened here is

10   really outside of the norm.  If you cash a check at a bank

11   other than your own, you are likely going to be asked to

12   provide some other level of identification, which could include

13   a fingerprint.

14             The fingerprint is non-testimonial.  There is no

15   *Crawford* issue.  Otherwise, you know, the business --

16             THE COURT:  How would the bank know that that -- how

17   would the bank use that as security?  I mean, they don't have

18   people's fingerprints, do they?

19             MS. KING:  Security in the sense of being able to

20   identify the person who cashed the check at their bank in the

21   event there is some issue with respect to the funds.  It is

22   just a way that they can additionally identify the person.

23   That is my understanding based on Mr. Bowers, who is the

24   Government's witness.

25             THE COURT:  All right.  Why don't we just find out

1  before you introduce these -- I mean, you can ask him -- ask

2  him to explain that.

3          MS. KING:  Okay.

4          THE COURT:  Then that is fine.  Then you can

5  introduce them.  If we have to separate them -- but we don't

6  need to do that from the start.  But let's just try to get that

7  clear.

8          MS. DURRETT:  Thank you, Your Honor.

9          MS. KING:  All right.

10          THE COURT:  Okay.  Thank you.

11          All right.  I'll see you -- go ahead and take them.

12          MS. DURRETT:  Can we leave our stuff here, Harry?

13          COURTROOM DEPUTY CLERK:  Yes.  The courtroom will be

14  locked during lunch.

15              **(A lunch break was taken.)**

16          MR. BROWN:  Judge, three things.

17          One, I disclosed to defense counsel already:  I saw

18  the alternate juror walking around outside.  He had two strands

19  of toilet paper hanging out of the bottom of his pants to the

20  floor.  I figured I couldn't leave him like that.  So I just

21  told him, sir, you have some toilet paper hanging from your

22  pants.

23          I disclosed that to defense counsel just to make sure

24  we're all clear on interaction with jurors.  So I hope I didn't

25  cross the line, but I --

```
1              COURTROOM DEPUTY CLERK:  I saw that on the camera and

2    heard you speak.  But I didn't realize it was you.  I didn't

3    know who it was that said something, but the interaction was

4    just momentarily.

5              MR. BROWN:  And he just thanked me and said he

6    appreciated me for letting him know.  So I just wanted to

7    disclose that, Your Honor.

8              MS. DURRETT:  We're glad that he told him.

9              MR. BROWN:  So the second thing is, Your Honor, Mr.

10   James Bone is coming to testify.  His wife just informed me

11   outside of the courtroom that as recent as last week, maybe

12   even yesterday, someone has been calling her saying their name

13   was Mr. Pendergrass claiming they were from the FBI trying to

14   speak to James Bone.

15             She said they called numerous times.  It made her

16   nervous.  She took her phone off the hook at some point so the

17   calls would stop.  She did not allow the person to speak to

18   Mr. Bone.  She said it was a male's voice.

19             I think it is relevant.  We would like to call her to

20   testify to that point.  Obviously she can't say it is him.

21   Someone was saying the name Mr. Pendergrass.  She only put two

22   and two together when she was looking at the subpoena that we

23   gave her and said, Mr. Brown, I want to let you know that

24   someone has been calling me repeatedly nonstop saying they are

25   from the FBI trying to talk to Mr. Bone and they identified
```

1    themself as Mr. Pendergrass.

2         So I wanted to bring it to the Court's attention to

3    see what the Court's thoughts were on those things.

4         MS. DURRETT:  Well, Your Honor, I can definitely say

5    that no one under my direction or on our defense team has been

6    reaching out to Mr. Bone.  We have not done that.

7         But I would also want to know what the phone number

8    is, that -- they are saying the phone number keeps calling

9    them.  What is that phone number?  Because it is definitely not

10   my investigator.  It is not us.  It is not Mr. Pendergrass.  I

11   don't believe it is Mr. Pendergrass.  So I want to know the

12   phone number.

13        MR. BROWN:  Your Honor, I just spoke with her.  She

14   does not have the phone number.  She just told me this today.

15   If I had known about it earlier, I would have advised the Court

16   and defense counsel.

17        I just had my investigator speak with her.  So maybe

18   he can get the information.  She is elderly as well.  So I'm

19   sure she didn't memorize the telephone number, Your Honor.  It

20   was at her home.  But I think it is relevant, and that is why I

21   wanted to bring it to the Court's attention.

22        THE COURT:  Yeah.  Well, I think we have to at least

23   have the telephone number to have it -- I mean, I think it is

24   so potentially prejudicial that -- and I know -- and I gather

25   Mr. Pendergrass has relatives.

```
 1              No, you don't have any relatives that --

 2         MS. DURRETT:  He does, Your Honor.

 3         THE COURT:  I'm not saying that they acted under his

 4    supervision or that they did anything or that he did anything.

 5    But I think we ought to know what the telephone number is.

 6         MS. DURRETT:  I agree, Your Honor.

 7         MR. BROWN:  And I agree with you, Judge.  I'll ask

 8    the investigator to inquire.  But I would just say --

 9         THE COURT:  I know she may not know.  But then we'll

10    have her back another day.

11         MR. BROWN:  All right.  That is fine.

12         I think defense counsel said she had something.

13         MS. DURRETT:  I do, Your Honor.  And so I know I put

14    this on the record at the pretrial conference.  We have

15    received very little Jencks.  I don't know if there is Jencks

16    out there.

17         THE COURT:  I'm sorry.  You received very little

18    Jencks?

19         MS. DURRETT:  Jencks.  But if there is, we may have

20    to take a break to read it or review it if there is any other

21    Jencks.

22         But Mr. Ricks -- I asked if he testified, and he

23    wasn't sure.  So if he testified at the grand jury, we would

24    want that.  I don't know if he did.

25         MR. BROWN:  He did not.
```

1          MS. DURRETT:  Okay.  Thank you.

2          THE COURT:  Is there anything else you think you are

3    likely missing?

4          MS. DURRETT:  I don't know what is out there.

5          THE COURT:  What Jencks materials have you provided?

6          MR. BROWN:  I provided everything that I have, Your

7    Honor.  There is no additional Jencks.  If there is, I will

8    provide it.  But there is no additional Jencks.

9          If she thinks -- is there some Jencks you are looking

10   for that you don't have?

11         MS. DURRETT:  Well, it occurs to me that you -- at

12   the pretrial conference the Government said they met with

13   Mr. McQueen on multiple occasions.  We have received one

14   memorandum of his interview back in 2018.

15         So if there are other memorandums or notes or other

16   things related to interviewing Mr. McQueen on multiple

17   occasions, we would like those.

18         MR. BROWN:  I do not believe there are any additional

19   reports.  If there are, we will turn them over.  But during

20   pretrial meetings, we do not take notes, Your Honor, unless it

21   is something that is significant.

22         And I turned over -- defense counsel will acknowledge

23   that during the pretrial interview Mr. Pendergrass --

24   Mr. McQueen stated something that was incorrect.  I alerted

25   defense counsel via email of his statements that he told a

1    falsehood to me.  And I disclosed that.

2            So there are no additional reports or Jencks as

3    relates to Mr. McQueen that the Government has at this time,

4    Judge.

5            THE COURT:  There is nothing that has been recorded

6    in the last few weeks?  Because I have gotten Jencks materials

7    for interviews in other cases --

8            MR. BROWN:  Right.

9            THE COURT:  -- from basically the pretrial

10   preparation.

11           MR. BROWN:  Sure.  Before he testifies, I will verify

12   that.  If there is anything, we'll turn it over before he

13   testifies, Judge.

14           THE COURT:  Okay.

15           MS. DURRETT:  Thank you, Your Honor.

16           MS. KING:  Your Honor, before we start, do you mind

17   if I ask Mr. Bone a few questions to make sure he can hear me?

18           THE COURT:  Sure.

19           MS. KING:  Mr. Bone, are you able to hear me okay?

20   Do I need to speak louder?

21           THE WITNESS:  I'm a tad bit hard of hearing.

22                **(There was a brief pause in the proceedings.)**

23           MS. KING:  So if I speak up really, really loud, does

24   that help?

25           THE WITNESS:  That is better.

```
 1            MS. KING:  Okay.

 2            COURTROOM DEPUTY CLERK:  Ready for the jury, Judge?

 3            THE COURT:  Yes.

 4                 (The jury entered the courtroom at 2:05 P.M.)

 5            MS. KING:  Your Honor, the Government calls James

 6    Bone.

 7            COURTROOM DEPUTY CLERK:  Mr. Bone, if you would

 8    please raise your right hand.

 9                 (Witness sworn)

10            COURTROOM DEPUTY CLERK:  You can drop your mask while

11    you are testifying.

12            Please loudly and clearly state your name and spell

13    your last name for the record.

14            THE WITNESS:  Bone, B-O-N-E.  James H.

15         Whereupon,

16                      JAMES H. BONE,

17         after having been first duly sworn, testified as follows:

18                      DIRECT EXAMINATION

19    BY MS. KING:

20    Q.   Good afternoon, Mr. Bone.  Are you able to hear me, or do

21    I need to speak louder?

22    A.   Right now we're okay.

23    Q.   Okay.  You let me know if at any time you need me to speak

24    up.

25    A.   Thank you.
```

116

1    **Q.**   So, Mr. Bone, are you retired?

2    **A.**   I'm sorry?

3    **Q.**   Are you retired?

4    **A.**   Retired?

5    **Q.**   Yes.

6    **A.**   Yes, I am.

7    **Q.**   And what kind of work did you do?

8    **A.**   Well, for the last 17 years, I was a standing Chapter 13

9    trustee for the Northern District of Georgia.

10   **Q.**   And do you recall being interviewed by law enforcement

11   agents about some funds paid by the City of Atlanta?

12   **A.**   I do.

13          MS. KING:  If we can show Government's Exhibit 5.

14   **A.**   I'm sorry?

15   **Q.**   **(BY MS. KING)**  I'm asking my assistant to pull up

16   Exhibit 5.

17   **A.**   Okay.

18   **Q.**   Mr. Bone, there is a screen that is right there next to

19   you.  So when it pops up, hopefully you'll be able to see it

20   right there next to you to your left -- to your right.

21   **A.**   Yes.  I see that.

22   **Q.**   Now, this document is from Asset Financial Recovery to the

23   City of Atlanta requesting funds made payable to you as

24   trustee.

25          Did you hire Asset Financial Recovery to make this request

1    from the City of Atlanta on your behalf?

2    **A.**    I did not.

3    **Q.**    And the document is signed by a person named Terrell

4    McQueen.

5         Did you authorize him to make this request?

6    **A.**    I did not.

7    **Q.**    If we can go to Page 2.

8         Mr. Bone, Page 2 is a limited power of attorney.  In the

9    middle of the document, there is a signature in the name James

10   Bone -- James H. Bone.

11        Did you sign that document?

12   **A.**    I did not.

13   **Q.**    Did you authorize anyone to sign this document in your

14   name?

15   **A.**    I did not.

16   **Q.**    Can we go to Page 6?

17        Mr. Bone, this appears to be a printout of business cards.

18   Do you know whether or not those are the business cards you

19   used at that time?

20   **A.**    They are not.

21   **Q.**    And if we can go to Page 10 of the document.

22        Mr. Bone, did you authorize anyone to receive this check

23   from the City of Atlanta on your behalf?

24   **A.**    I did not.

25             MS. KING:  Those are all the questions I have for

1    this witness, Your Honor.

2         MS. STRICKLAND:  No questions, Your Honor.

3         THE COURT:  This witness is excused.  Thank you, sir,

4    for coming.

5         MS. KING:  Your Honor, the Government calls Ron

6    Bowers.

7         MS. DURRETT:  I think there was an issue that we

8    talked about before the break.

9         THE COURT:  I'm sorry?

10        MS. DURRETT:  There was an issue that we talked about

11   before the break regarding this.

12        THE COURT:  Do you want to come up here and remind

13   me?

14                  **(A bench conference ensued, as follows:)**

15        MS. DURRETT:  The issue was about the bank records

16   and the fingerprints.  And so I assume that that is this

17   witness who is going to talk about that.  And we don't know if

18   you want him to be able to talk about that.  We haven't heard

19   anything about that.

20        THE COURT:  What I said about that is they should try

21   to get him -- have him explain the fingerprints.  And then we

22   can stop if there is something in particular.

23        MS. DURRETT:  Okay.

24        THE COURT:  Are you wanting to have the jury excused

25   and you can ask him a question about that?

1          MS. DURRETT:  I mean, did you talk to him?  What did

2    he say?

3          MS. KING:  He said that when you cash a check at your

4    non- -- at a bank other than the bank you bank with that they

5    sometimes will have you put your fingerprint on there as a way

6    to be able to identify you in the future if there is some

7    issue.  It is just an extra --

8          THE COURT:  It is routine?

9          MS. KING:  It is routine that is done when you bank

10   at a bank other than your bank.

11         MS. DURRETT:  Okay.  I think it gets us into a

12   problem because did someone do some fingerprint analysis in

13   this case, or is someone going to come in and talk about what

14   the fingerprint means?

15         THE COURT:  Well, if he explains this -- if he

16   explains what the banks do, then I think that is something

17   separate -- I mean, what the practice is -- it deals with at

18   least the first level of your concern.  Because you were

19   worried it was casting basically doubt on him because they were

20   just targeting him.

21         MS. KING:  But that is not --

22         THE COURT:  That is not what the testimony is going

23   to be.

24         MS. DURRETT:  Okay.  Thank you, Your Honor.

25              **(The bench conference was thereby concluded.)**

1          MR. BROWN:  Your Honor, the Government is calling

2     Sonia Toson to the stand.  We're calling a witness out of

3     order.  So that is our next witness.  She is on the stand ready

4     to be sworn, Judge.

5          COURTROOM DEPUTY CLERK:  Please raise your right

6     hand.

7                    **(Witness sworn)**

8          COURTROOM DEPUTY CLERK:  Thank you.  Please have a

9     seat.  Loudly and clearly state your name and spell your last

10    name for the record, please.

11         THE WITNESS:  My name is Sonia Toson.  Last name,

12    T-O-S, as in Sam, O-N, as in Nancy.

13       Whereupon,

14                         SONIA TOSON,

15       after having been first duly sworn, testified as follows:

16                      DIRECT EXAMINATION

17    BY MR. BROWN:

18    **Q.**   Ms. Toson, if you feel comfortable, you are allowed to

19    remove your mask while speaking.

20         Where are you employed?

21    **A.**   Kennesaw State University.

22    **Q.**   And what is your title there?

23    **A.**   I am our interim vice president and chief diversity

24    officer.

25         COURT REPORTER:  I'm sorry?  I can't hear you.  Could

1   you repeat.

2               **(There was a brief pause in the proceedings.)**

3   **A.**   Interim vice president and chief diversity officer at

4   Kennesaw State University.

5   **Q.**   **(BY MR. BROWN)**   And previously did you work as an attorney

6   at a law firm that you and others founded?

7   **A.**   I did.

8   **Q.**   What was the name of that firm?

9   **A.**   Johnson Coleman & Stephenson, LLC.

10  **Q.**   What were the approximate dates you worked at the law firm

11  or the law firm was in operation?

12  **A.**   I worked at the law firm approximately October 2002 to

13  October 2007.  The law firm was in operation for some time

14  thereafter.

15  **Q.**   Okay.  What kind of practice did you have at the law firm?

16  **A.**   Primarily transactional consisting of mostly real estate.

17  **Q.**   Do you have many dealings with the City of Atlanta?

18  **A.**   Yes.

19  **Q.**   What were the nature of your dealings with the City of

20  Atlanta?

21  **A.**   At the time, City of Atlanta was maintaining water service

22  for the city.  So often in the course of a transaction, we

23  would need to remit funds to the City of Atlanta to pay a water

24  bill, things of that nature.

25  **Q.**   So do you recall hiring the firm Asset Financial Recovery,

1    Inc., to obtain funds held by the City of Atlanta related to

2    your firm?

3    **A.**    I do not.

4    **Q.**    Do you recall being interviewed by law enforcement about

5    the recovery of these funds -- recovery of these funds rather?

6    **A.**    Yes.

7    **Q.**    So I want to show you what has already been admitted into

8    evidence as Government's Exhibit Number 2.

9             MR. BROWN:  Can we just publish that on the screen,

10   please, Mary?

11   **Q.    (BY MR. BROWN)**  If could you look at your screen,

12   Ms. Toson.

13   **A.**    Thank you.

14   **Q.**    Just speak loud because the court reporter will tell you

15   to speak up, like she does to me often.

16        So just looking at that Exhibit Number 2, is that the name

17   of your law firm there in the middle Johnson Coleman &

18   Stephenson, LLC?

19   **A.**    Yes.

20   **Q.**    And, again, you have already testified you did not hire

21   this firm Asset Financial Recovery, Inc., to recover funds from

22   the City of Atlanta?

23   **A.**    Correct.

24   **Q.**    And are you familiar with the P.O. Box, P.O. Box 1809?  Is

25   that something related to your law firm?

1   **A.**   I am not familiar.  That is not an address or P.O. Box we

2   ever used.

3            MR. BROWN:  Can we publish Page 2 of Exhibit 2?

4   **Q.   (BY MR. BROWN)**  Ms. Toson, I want to direct you to the

5   line that says signature Coleman and the signature and the

6   printed name.

7            Is that your name listed by print name?

8   **A.**   It was my former name, yes.

9   **Q.**   And did you sign this form as Sonia Johnson?

10  **A.**   I did not.

11  **Q.**   Did you authorize anybody to sign this form on your

12  behalf?

13  **A.**   I did not.

14           MR. BROWN:  Could we publish Exhibit 2, Page 3 --

15  just the next page.

16  **Q.   (BY MR. BROWN)**  If you look in the top left-hand corner,

17  Ms. Toson, do you recognize that as being a business card used

18  by you when you were employed with the firm?

19  **A.**   It has the same font as our business cards.  It is missing

20  our logo, and the number is incorrect.

21           MR. BROWN:  Okay.  Mary, can you enlarge that,

22  please?

23  **A.**   The email address is also incorrect.

24  **Q.   (BY MR. BROWN)**  So you already testified that the font is

25  correct but the email address is incorrect; is that correct?

1    **A.**   Correct.  The email address and the phone number are

2    incorrect.

3    **Q.**   What about the address?

4    **A.**   The address was the first address we had from -- at the

5    firm from 2002 to approximately 2004.  From 2004 on, we had a

6    different address.

7         MR. BROWN:  Okay.  Can we publish Page 4 of the

8    exhibit, Mary?

9    **Q.    (BY MR. BROWN)**  Ms. Toson, did you or your law firm

10   receive this check from the City of Atlanta?

11   **A.**   No, sir.

12   **Q.**   Were you aware why the City of Atlanta was holding funds

13   in the name of your law firm at the time?

14   **A.**   No, sir.

15   **Q.**   Have you inquired from the City of Atlanta to try to find

16   out if, in fact, your firm was due $8000?

17   **A.**   We are in the process of doing that now.

18        MR. BROWN:  Could we just publish Page 1 again of

19   this exhibit.

20   **Q.    (BY MR. BROWN)**  I just want to direct your attention to

21   the bottom where it says Terrell McQueen, president, Asset

22   Financial Recovery.

23        Are you familiar with a Terrell McQueen?

24   **A.**   No.

25   **Q.**   During this time frame, were you or someone in your firm

1   contacted by a Terrell McQueen that you can recall?

2   **A.**   Not that I can recall and not to my knowledge.  I have

3   inquired of my former partners.

4          MR. BROWN:  That is all I have, Judge.  Thank you.

5          MS. STRICKLAND:  No questions for this witness, Your

6   Honor.

7          THE COURT:  All right.  May the witness be excused?

8          MR. BROWN:  Yes, Your Honor.

9          THE COURT:  Thank you very much.

10         MR. BROWN:  The Government would call Ron Bowers with

11  Wells Fargo as our next witness, Judge.

12         COURTROOM DEPUTY CLERK:  If you would, please raise

13  your right hand.

14                       **(Witness sworn)**

15         COURTROOM DEPUTY CLERK:  Please have a seat.  Loudly

16  and clearly state your full name and spell your last name for

17  the record.

18         THE WITNESS:  My name is Ronald Bowers, B-O-W-E-R-S.

19      Whereupon,

20                       RONALD BOWERS,

21      after having been first duly sworn, testified as follows:

22                     DIRECT EXAMINATION

23  BY MS. KING:

24  **Q.**   Good afternoon, Mr. Bowers.  Where are you employed?

25  **A.**   Wells Fargo Bank.

1   Q.   And how long have you been employed with the bank?

2   A.   Ten years.

3   Q.   And what is your position?

4   A.   I'm a fraud investigator with Wells Fargo.

5   Q.   And do you hold any other positions?

6   A.   I have a title of vice president.

7   Q.   And what are your duties?

8   A.   My duties are to investigate crimes that are fraud against

9   our customers and the bank, as well as do court testimony,

10  testify to bank records, those types of things.

11  Q.   And when you say do court testimony, you testify as

12  custodian of records?

13  A.   I do testify as to custodian of records.

14  Q.   And have you testified before?

15  A.   Yes, I have.

16  Q.   Directing your attention back to 2013, do you recall

17  receiving a request from the Atlanta Police Department

18  regarding images associated with this matter?

19  A.   Yes, ma'am.

20  Q.   And were you able to find the requested images?

21  A.   Yes, ma'am, I was.

22  Q.   And what information did you receive from the Atlanta

23  Police Department that aided you in your efforts to locate

24  these images?

25  A.   I believe they gave me the account numbers and the checks

1    that they were looking for.

2    **Q.**   And upon receiving the account number and the check

3    information -- you said copies of the checks?

4    **A.**   Copies of the checks, yes.

5    **Q.**   What did you do with that information?

6    **A.**   I looked at -- I looked up -- because they were asking if

7    we had video, I looked up to see if we had video.  Went through

8    the process I go through where I go in and I find what we call

9    a CEJ and use the CEJ to locate the video for the transaction.

10           THE COURT:  I think you are talking pretty quickly,

11   frankly --

12           THE WITNESS:  I'm sorry.

13           THE COURT:  -- for any of us to understand at the

14   moment.  So roll back for a second.

15           All right.  I understood that you were -- let me see

16   where I thought it started -- when you started saying I

17   looked -- what did you do with the information about the

18   checks?  And then you started saying I looked at, and then

19   there was a lot of information.

20           THE WITNESS:  When I get information or I get a

21   request from a law enforcement person, I have a process I go

22   through where I go into the mainframe computer and we look for

23   what is known as a CEJ.  That is a cash electronic journal.

24           And we pull the CEJ because the CEJ is everything

25   that happens within a branch.  And it gives us the information

1    we need to find videos, such as date, time, location.  If there

2    is a check involved, it will have a check number, dollar

3    amount, that type of thing.

4    **Q.   (BY MS. KING)**  And your voice faded off, and so I missed

5    the very last part.

6    **A.**   I'm sorry.  The cash electronic journal has date, time,

7    location.  If there is a check involved, there is a check

8    number.  If there is cash involved, it tells us there is cash.

9    So whatever the transaction was within the branch, it tells us

10   what it was.

11   **Q.**   So the CEJ is capturing information about the transaction

12   at the time of the transaction?

13   **A.**   That's correct.

14   **Q.**   And the CEJ captures the branch location where the

15   transaction occurred?

16   **A.**   Correct.

17   **Q.**   The date of the transaction?

18   **A.**   Correct.

19   **Q.**   The transaction time?

20   **A.**   Times, yes.

21   **Q.**   Does it provide information about the teller?

22   **A.**   It does have the teller identification on there.

23   **Q.**   Does the CEJ capture the account number that was involved

24   in the transaction?

25   **A.**   It captures -- if there is a check, it will capture the

1    account number that the check went into.  It will also capture

2    the account number that is on the check.

3    **Q.**    And you indicated that that was where you started your

4    process?

5    **A.**    Correct.

6    **Q.**    And after you obtained information from the CEJ regarding

7    the checks that you were provided -- the copies of the checks

8    you were provided, what did you do next?

9    **A.**    I pulled video to see what video was available to be

10   pulled for these transactions.

11   **Q.**    And so how did the CEJ information help you to identify

12   the video?

13   **A.**    It gives me the date, time, and location where it

14   occurred.  And I use that date, time, and location to go into

15   the video to see -- to look at the transactions that are

16   occurring at that time.

17   **Q.**    Okay.

18            MS. KING:  May I approach, Your Honor?

19            THE COURT:  Yes.

20   **Q.**    **(BY MS. KING)**   I'm showing you Government's Exhibits 19A,

21   19B, 19C, and 19D.

22            So starting with Government's Exhibit 19A and 19C, will

23   you take a look at those.

24   **A.**    (The witness complies.)  Yes, ma'am.

25   **Q.**    And do you recognize Government's Exhibit 19A and 19C?

**A.**   Yes, ma'am.

**Q.**   And what are they?

**A.**   They are the CEJ.

**Q.**   Is that the printout of the CEJ?

**A.**   That is the printout of the CEJ, yes, ma'am.

**Q.**   And who printed that information?

**A.**   I did.

**Q.**   Is that the CEJ printout for the checks you received from the City of Atlanta in this matter?

**A.**   It is.

**Q.**   And is that a true and accurate copy of the CEJ information that you printed out?

**A.**   It is.

**Q.**   And does Government's Exhibits 19A and 19C also contain the deposit slips and the checks that were provided?

**A.**   Yes.

**Q.**   And, again, those two records as a whole, are they a true and accurate copy of what you obtained --

**A.**   Yes.

**Q.**   -- as a result of the request that was made of you?

**A.**   Uh-huh (affirmative).

          MS. KING:  Your Honor, at this time, the Government moves to introduce into evidence Government's Exhibits 19A and 19C.

          MS. DURRETT:  I have no objection, Your Honor.

```
1              THE COURT:  All right.  They are admitted.
2              MS. KING:  If we can publish Government's
3    Exhibit 19A.
4    Q.  (BY MS. KING)  So can you explain to us -- let me back up.
5         Where on this document will we find the account number
6    that was involved in the transaction?
7    A.   At the top left.  It is highlighted in green.
8    Q.   And what is the account number?
9    A.   8892553556.
10   Q.   And you indicated that the document contains information
11   about the location where the transaction occurred?
12   A.   Correct.
13   Q.   And where is that information located?
14   A.   If you look two lines below that, it says AU/BR.  And that
15   five digit code will -- I have a program I look it up in, and
16   it tells me where it is.
17   Q.   And where was that location?
18   A.   Old National in College Park.
19   Q.   And what was the date of the transaction in Government's
20   Exhibit 19A?
21   A.   May the 15th of 2013.
22             THE COURT:  I'm sorry.  Which one are you looking at
23   at this point?  Is it the second block of print on the fourth
24   line?
25             MS. KING:  For the date, Your Honor?
```

1           THE COURT:  Yes.

2           THE WITNESS:  The date is straight across, ma'am.

3  Right beside the account number, it will have the word bank and

4  then date on the top line.

5           THE COURT:  Yeah.  I see it.

6           I thought you were referring to something else.

7  Okay.

8  **Q.   (BY MS. KING)**  And based on this CEJ, was this a deposit

9  that was made?

10 **A.**   Yes, ma'am.

11 **Q.**   And was information about the specific transaction

12 captured on this CEJ?

13 **A.**   Yes, it was.

14 **Q.**   Specifically, was information captured about the check

15 that was deposited?

16 **A.**   Yes, ma'am.

17 **Q.**   Where on the CEJ will we find that information?

18 **A.**   Down toward the bottom, it is highlighted in yellow.

19 **Q.**   If we can enlarge that part.

20 **A.**   It is a serial number, which actually most people call

21 that a check number; the dollar amount of the check; the

22 routing number or ABA number; and then the account number.

23 **Q.**   And so the serial number, that is the check number that is

24 listed or printed on the check that was deposited?

25 **A.**   Yes.

1   **Q.**   And the routing number and the account number, is that the

2   information that is printed at the bottom of the check that was

3   deposited?

4   **A.**   Yes.

5           MS. KING:  Are we able to do a side by side of 19-1

6   and 19-3?

7           MS. JOHNSON:  Yes.

8           MS. KING:  Are you able to enlarge the check a little

9   bit?

10          MS. JOHNSON:  What's that?

11          MS. KING:  Are you able to enlarge the check so we

12   can --

13          MS. JOHNSON:  Of course.

14          MS. KING:  I wanted to see the other document.  I'm

15   sorry.  So --

16          MS. JOHNSON:  It is taking it across the screen.

17          MS. KING:  Okay.  That is fine.  I think we will be

18   fine.

19   **Q.**   **(BY MS. KING)**  So, Mr. Bowers, looking at Page 3 of

20   Government's Exhibit 19A, is this the check that was deposited

21   based on the information that is contained in the CEJ?

22   **A.**   Yes, ma'am.

23   **Q.**   And looking at Page 3 of the document, can you identify

24   where the check number is located?

25   **A.**   Yes, ma'am.  It is in the top right-hand corner.  And it

1   is also in the bottom line.

2   **Q.**   And the top right-hand corner where it says check number?

3   **A.**   Correct.

4   **Q.**   And when you say the bottom -- did you say the bottom?

5   **A.**   The bottom left.  There's three sets of numbers across.

6   The first number is the -- is a check number.  The middle

7   number is the routing number, and the third number is an

8   account number.

9   **Q.**   Okay.  And who is that check payable to?

10  **A.**   It is payable to Asset Financial Recovery, Incorporated,

11  care of Long Weinberg Ansley & Wheeler.

12          MS. KING:  If we could go to Document 19C.  And,

13  actually, can you do a side by side with 19C, Pages 1 and 2?

14  **Q.**   **(BY MS. KING)**  Mr. Bowers, we're looking at Government's

15  Exhibit 19C.

16          Based on the CEJ records, what is the date of the

17  transaction for this -- what is the date for this transaction?

18  **A.**   It is June the 20th of 2013.

19  **Q.**   And what account number of Wells Fargo was involved in

20  this transaction?

21  **A.**   The account number was 8892553556.

22  **Q.**   And based on this CEJ, was this another deposit?

23  **A.**   It was.

24  **Q.**   And did the CEJ capture the branch location where this

25  occurred?

1   **A.**   It did.

2   **Q.**   And where was that?

3   **A.**   In College Park.

4   **Q.**   And what information does the CEJ reveal about what was

5   deposited?

6   **A.**   It was several checks.

7   **Q.**   Let's start with the bottom of Page 19C, 1.

8        Okay.  Does the CEJ indicate one of the checks that was

9   deposited?

10  **A.**   It does.

11  **Q.**   And does it provide the serial number for the check or the

12  check number, as you call it?

13  **A.**   It does.

14  **Q.**   And what was the amount of the check?

15  **A.**   $76,636.28.

16  **Q.**   And did the CEJ capture the routing number and the account

17  number that is listed on the check?

18  **A.**   It did.

19  **Q.**   And turning to Page 2 of the document, was there a second

20  check that was deposited?

21  **A.**   Yes, ma'am.

22  **Q.**   And was the serial number captured for that one?

23  **A.**   It was.

24  **Q.**   What was the amount of that check?

25  **A.**   $14,875.67.

1    **Q.**   And also on Page 2, does it indicate that there were two

2    more checks that were deposited?

3    **A.**   It does.

4    **Q.**   And like with the others, were the serial numbers for each

5    of those checks captured?

6    **A.**   They were.

7    **Q.**   And were the amounts of the check captured?

8    **A.**   They were.

9    **Q.**   And were the serial number -- excuse me -- the routing

10   number and account numbers listed on those checks captured?

11   **A.**   They were.

12   **Q.**   And if we could go to Page 3.

13          THE COURT:  Could we go back to the other page?  I

14   mean, I may be being blind.  But somebody might be as well.

15          MS. KING:  Put up the two documents.

16          THE COURT:  The one that he was identifying the sums

17   on, I just wanted somebody to circle or highlight the document

18   where the money is.

19          MS. KING:  If you will do 19C, 1 and 2.

20          I'm sorry, Judge.  I didn't hear the last part of

21   what you said.

22          THE COURT:  Are you able to highlight where the money

23   is identified on the screen?

24          MS. KING:  I don't know that.

25          THE COURT:  Can he put a finger on the screen?

1    Because we can usually do it that way.

2              MS. KING:  Can we do that?

3              THE COURT:  Yeah.

4              MS. KING:  Let's go back, yeah, 19-1 and -- yes.

5    So --

6              THE COURT:  So the amount -- let's see on the page

7    that is 19-12, I see the serial number are 220565, and the

8    amount of the check, the $76,000 one, is right next to it; is

9    that right?

10             It just simply doesn't have any dollar amount or it

11   doesn't have a dollar sign or anything else; is that right?

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  Okay.  That is all.  That is what I was

14   trying to get at.

15   **Q.   (BY MS. KING)**  Okay.  And it is the same for the checks

16   that were deposited and listed on Page 2 of this document; is

17   that correct?

18   **A.**   That's correct.

19   **Q.**   So on the same line where we see the serial number right

20   beside it is the amount of the check?

21   **A.**   Correct.

22   **Q.**   And then right beside that is the routing number printed

23   on the check?

24   **A.**   Correct.

25   **Q.**   Then right beside that is the account number on the check?

138

1   **A.**   Yes, ma'am.  Correct.

2          MS. KING:  All right.  If we can go to Page 4 of the

3   document.  Can you also pull up the next page as well?

4   **Q.**   **(BY MS. KING)**  Now, based on 19C, Pages 1 and 2, starting

5   with Page 4, is this a copy of one of the checks that was

6   deposited on June 20th, 2013?

7   **A.**   Yes, ma'am.

8   **Q.**   And, again, how are you able to tell?

9   **A.**   It matches the serial number, the amount, the routing

10  number, and the account number.

11  **Q.**   So let's do this.  Starting with the first image, which is

12  Page 4, what is the check number that is listed on the check

13  that is displayed?

14  **A.**   2220565.

15  **Q.**   And who was the check payable to?

16  **A.**   Asset Financial Recovery, Incorporated, care of Georgia

17  Municipal Association.

18  **Q.**   And at the bottom of the check, does it contain the check

19  serial number, the routing number, and the account number that

20  is depicted in the CEJ?

21  **A.**   It does.

22  **Q.**   And on Page 5 of the document, what is the check number

23  that is listed on the check that is displayed?

24  **A.**   It is 2220566.

25  **Q.**   And who is the check payable to?

1  **A.**   Asset Financial Recovery, Incorporated, care of James

2  S. -- excuse me -- James H. Bone, trustee.

3  **Q.**   And does that check also contain the routing number and

4  the account number that is depicted in the CEJ?

5  **A.**   It does.

6  **Q.**   And I'm showing you Page 6 of the document, which is a

7  check that is depicted in this image.

8      What is the check number that is displayed in this image?

9  **A.**   Page 6 did you say?

10 **Q.**   It is also displayed on your screen over there as well.

11 **A.**   It is 2220564.

12 **Q.**   And is that the serial number that is reflected in the CEJ

13 for one of the checks that were deposited in this transaction?

14 **A.**   It is.

15 **Q.**   And who is the check made payable to?

16 **A.**   Asset Financial Recovery, Incorporated, care of Actor's

17 Express.

18 **Q.**   And does this check also contain the routing number and

19 the account number that was printed on the check as captured by

20 the CEJ?

21 **A.**   It does.

22 **Q.**   I'm showing you Page 7 of Government's Exhibit 19C, which

23 is depicting a check.

24      What is the check number that is depicted in this image?

25 **A.**   2222126.

1   Q.   And is that the serial number associated with one of the

2   deposits in the transaction reflected in the CEJ for June 20,

3   2013?

4   A.   It is.

5   Q.   And who is the check made payable to?

6   A.   Asset Financial Recovery, Incorporated, care of Michael

7   Burandt.  I don't know how you pronounce that.

8   Q.   And does this check also reflect the account number and

9   routing number associated with the check that was deposited as

10   reflected in the CEJ?

11   A.   It does.

12   Q.   Now, based on Government's Exhibits 19A and C, were you

13   able to find surveillance images associated with these

14   transactions?

15   A.   I was.

16   Q.   Okay.  If you will, take a look at Government's

17   Exhibits 19B and 19D.

18   A.   Yes, ma'am.

19   Q.   Okay.  And starting with Government's Exhibits 19B, what

20   is it?

21   A.   It is a still image of a transaction at the College Park

22   branch.

23   Q.   Is this the still image from the bank transaction on

24   May 15, 2013, as reflected in Government's Exhibit 19A?

25   A.   It is.

1   **Q.**   And Government's Exhibit 19D, what is Government's

2   Exhibit 19D?

3   **A.**   It is a still image of a transaction that occurred on June

4   the 20th of 2013, at the College Park branch.

5   **Q.**   And are these images of the transaction that is reflected

6   in the CEJ that is Government's Exhibit 19C?

7   **A.**   They are.

8   **Q.**   And what system did the bank use to capture these images?

9   **A.**   This system is called MARCH, M-A-R-C-H, like the month.

10   **Q.**   I'm sorry.  I missed the last part.

11   **A.**   It is M-A-R-C-H, MARCH, like the month.

12   **Q.**   And who actually obtained these images that are contained

13   in Government's Exhibits 19B and D?

14   **A.**   I did.

15   **Q.**   And these images, were they captured at the time of the

16   transactions as reflected in Government's Exhibits 19A and C?

17   **A.**   Yes.

18   **Q.**   And were the images captured -- and was it the bank's

19   regular practice to record these images of these transactions

20   as they took place?

21   **A.**   It was.

22   **Q.**   And is it the bank's regular course of business to

23   maintain these surveillance images?

24   **A.**   It is.

25   **Q.**   And are Government's Exhibits 19B and D a true and

1   accurate copy of the images you obtained as part of this

2   matter?

3   **A.**   They are.

4        MS. KING:  Your Honor, at this time I introduce into

5   evidence Government's Exhibits 19B and D.

6        MS. DURRETT:  No objection, Your Honor.

7        THE COURT:  All right.  Go ahead.

8        MS. KING:  If we can display -- I'm sorry, Your

9   Honor.

10        THE COURT:  Admitted.

11        MS. KING:  If we can display Government's

12   Exhibit 19B.

13   **Q.**   **(BY MS. KING)**  And what information is captured on this

14   exhibit that helps you determine that this is the image

15   associated with the transaction in Government's Exhibit 19A?

16   **A.**   The AU or the branch number --

17        MS. KING:  If we could enlarge that top part.

18   **A.**   -- along with the date and the time.

19   **Q.**   **(BY MS. KING)**  And the AU number you indicated is the

20   branch location?

21   **A.**   It is the location, yes, ma'am.

22   **Q.**   And then you said also the date and the time?

23   **A.**   Yes, ma'am.

24   **Q.**   And do you know at about what point in the transaction

25   this occurred -- this image was taken?

1   **A.**   Say it one more time, ma'am.

2   **Q.**   Do you know about what point in the transaction this image

3   was taken?

4   **A.**   This would be at the beginning of the transaction.

5   **Q.**   And if we can go to the next page.  And what are we

6   looking at in Government's Exhibit 19B, Page 2?

7   **A.**   That is a blowup of the first image.

8   **Q.**   And who enlarged that image?

9   **A.**   I don't -- I don't remember, ma'am.  I don't know if it

10   was me or not.  I can't recall.

11   **Q.**   But you've had an opportunity to review this, and this is

12   a true and accurate copy of the image you did record?

13   **A.**   It is.  It is the same image.  It is just larger.

14   **Q.**   And then -- if we could go to the next page.

15        And what are we looking at in this image?

16   **A.**   This is the same transaction, ma'am.  It is just a couple

17   of minutes later into the transaction.

18   **Q.**   Okay.  And then the next page?  This is just another

19   enlarged image of what we just saw?

20   **A.**   Yes, ma'am, it is.

21        MS. KING:  If we can go to Government's Exhibit 19D

22   and if we can enlarge the top part.

23   **Q.**   **(BY MS. KING)**  And, again, Mr. Bowers, what information is

24   contained in Government's Exhibit 19D that associates this

25   image with one of the transactions in this case?

1    **A.**    The date, the time, and the location.

2    **Q.**    And what is the location?

3    **A.**    College Park -- Old National branch in College Park.

4    **Q.**    What is the date of the transaction?

5    **A.**    June the 20th of 2013.

6    **Q.**    And so is this an image of the transaction that occurred

7    on June 20th, 2013, as reflected in Government's Exhibit 19C?

8    **A.**    Yes, ma'am.

9    **Q.**    What is depicted in this image?

10   **A.**    Someone standing at the teller line conducting a

11   transaction.

12   **Q.**    And we can go to the next page.  Is this a closeup of the

13   image we saw?

14   **A.**    Yes, ma'am.

15            MS. KING:  Your Honor, may I approach?

16            THE COURT:  Yes.

17   **Q.    (BY MS. KING)**  The account number that was involved -- the

18   Wells Fargo account number that was involved in the

19   transactions depicted in Government's Exhibit 19A and 19C --

20   are the account numbers the same?

21   **A.**    They are.

22   **Q.**    Okay.  And I handed you Government's Exhibit 20.  If you

23   will take a look at that.

24   **A.**    Yes, ma'am.

25   **Q.**    Are those the bank records that are associated with the

1   account number that was involved in the transactions in

2   Government's Exhibit 19A and 19C?

3   **A.**   Yes, ma'am.

4   **Q.**   And if you will, can you read the last four digits of the

5   account number in Government's Exhibit 20?

6   **A.**   The last four digits are 3556.

7   **Q.**   Let me ask you this:  With respect to the bank records and

8   Wells Fargo practice, are there times when Wells Fargo may

9   request a person making a deposit or cashing a check to provide

10  a fingerprint?

11  **A.**   Yes, ma'am.

12  **Q.**   Can you explain what the circumstances are that that would

13  happen?

14  **A.**   It has changed from 2013 to now.  But typically what it

15  is:  There is a policy and whatever the policy happens to be at

16  that snapshot in time.  And so if I write you a check off of my

17  account and you walk in there and that check is over a certain

18  dollar amount, they are going to get your fingerprint as you

19  negotiate that check because it is written off of my account.

20  It is not me doing it.  It is you doing it.  It is just another

21  form of ID.

22  **Q.**   So the fingerprint is just a form of ID?

23  **A.**   It is just a form of ID.  It is a policy where we -- there

24  is actually a written policy about when we do it or when we

25  don't do it.

1    **Q.**   Now, you indicated that the policy changed.

2        In 2013, would it have been the policy to provide the

3    fingerprint as a form of ID?

4    **A.**   It would be.  We would fingerprint -- actually we would

5    fingerprint more in 2013 than we do now.

6    **Q.**   And I believe I asked you this.  Government's Exhibit 20,

7    are those the bank records that are associated with the account

8    that is involved in the transactions in this case?

9    **A.**   Yes, ma'am.

10            MS. KING:  Your Honor, at this time I move to

11   introduce into evidence Government's Exhibit 20.

12            MS. DURRETT:  No objection, Your Honor.

13            THE COURT:  Admitted.

14            MS. KING:  And if we can display Page 1.  And can we

15   highlight the bottom part?

16   **Q.**   **(BY MS. KING)**  What is the name of the customer who is

17   listed on the account?

18   **A.**   This is a business account.  So the business name is Asset

19   Financial Recovery, Incorporated.

20   **Q.**   And then is there a customer two that is listed on the

21   account?

22   **A.**   Yes, ma'am.  It is Allen Pendergrass.

23   **Q.**   Does it indicate what Allen Pendergrass' relationship is

24   to the account?

25   **A.**   He is the -- let me double-check one piece of paper here.

1    He appears to be the sole signer on the account or the owner,

2    as we call it.

3    **Q.**    And -- I'm sorry?

4    **A.**    He is the owner of the account.

5    **Q.**    He is the owner of the account?

6    **A.**    Yes.

7    **Q.**    Did you say something else?

8    **A.**    I said -- yes, ma'am.  He appears to be the signer on the

9    account, the person who owns it or the authorized signer on the

10   account.

11   **Q.**    Was he the sole signer?

12   **A.**    He appears to be the sole signer.

13   **Q.**    And I'm showing you Page 2 of the document.  What is the

14   business address that is listed on Page 2?

15   **A.**    The business address is 4854 Old National Highway, Suite

16   161, in College Park, Georgia.

17   **Q.**    And what date was the account opened?

18   **A.**    May the 8th of 2013.

19   **Q.**    May the 8th, 2013?

20   **A.**    Yes, ma'am.

21   **Q.**    Go to the next page.  And this page is -- what do we --

22   what is depicted on this page?

23   **A.**    This page just gives the personal identifiers of the

24   owner.

25   **Q.**    And the next page.  And what is depicted on this page?

1    A.    That is the last and maybe the next to last page where we

2    capture the signature.

3    Q.    The signature of the person who opened the account?

4    A.    Who opened the account, yes, ma'am.

5    Q.    And you indicated this is the person who is the sole

6    signer of the account?

7    A.    Correct.

8              MS. KING:   Those are all the questions I have of this

9    witness.

10                         CROSS-EXAMINATION

11   BY MS. DURRETT:

12   Q.    Good afternoon, Investigator Bowers.

13   A.    Hello, ma'am.

14   Q.    I'm Saraliene Durrett, and I represent Mr. Pendergrass in

15   this case.  I don't have that many questions for you.  Just a

16   few.

17         Okay.  So you are the person who pulled those still shots

18   from the surveillance?

19   A.    Correct.

20   Q.    I know you had a different name for them.  But basically

21   they are just the surveillance pictures?

22   A.    Correct.

23   Q.    And those are -- let me just --

24              MS. DURRETT:   Can I ask the Government's help in

25   pulling up those surveillance pictures again, which I think are

1    19B?  Can you pull up 19B, to start with?

2         MS. JOHNSON:  Okay.

3    **Q.  (BY MS. DURRETT)**  Okay.  And this is the time I think you

4    said -- does this one show the time?

5    **A.**  Yes, ma'am.

6    **Q.**  What time is it?

7    **A.**  12:14.

8    **Q.**  So it is like midday or something?

9    **A.**  Yes, ma'am.

10   **Q.**  Open for business; right?

11   **A.**  Yes, ma'am.

12   **Q.**  And the person in the picture is not wearing a face mask

13   or sunglasses or a hat or anything like that?

14   **A.**  Correct.  They are not.

15   **Q.**  Just walked right in and deposited the checks?

16   **A.**  Correct.

17   **Q.**  And I know -- that is the same -- all of those are related

18   to that image in 19B; right?

19   **A.**  Yes, ma'am.

20   **Q.**  They are the same day, same person?

21   **A.**  Right.

22   **Q.**  At any point in any of those images, was the person

23   covering his face or wearing glasses or doing something to

24   obstruct the view of himself?

25   **A.**  No, ma'am.

1    Q.    Okay.  And then I know you talked also about the specific

2    transactions.

3         When this person brought the check in, did he trade it for

4    cash or did he deposit it into the account?

5    A.    It appears to be a straight deposit, ma'am.

6    Q.    Well, okay.  And then as far as 19D goes --

7         MS. DURRETT:  Could you put that one up, please.

8    Q.    **(BY MS. DURRETT)**  And this is a different day; right?

9    A.    Yes.

10   Q.    It is on June 20th, 2013?

11   A.    Yes, ma'am.

12   Q.    Again, what time does it happen?

13   A.    3:30.

14   Q.    That is like in the afternoon?

15   A.    Correct.

16   Q.    Open for business?

17   A.    Yes, ma'am.

18   Q.    Okay.  And in this one, there are two people depicted;

19   right?

20   A.    There is, yes, ma'am.

21   Q.    There is like a somewhat shorter one and then a taller one

22   in an orange shirt; right?

23   A.    Yes.

24   Q.    I want you to focus because I'm going to tell you that is

25   my client, Mr. Pendergrass; right?

1    **A.**    Yes, ma'am.

2    **Q.**    He is the one in the white hat; right?

3    **A.**    Yes, ma'am.

4    **Q.**    Okay.  At any point in any of these pictures in 19D, does

5    he do anything to obstruct his face?

6    **A.**    No, ma'am.

7    **Q.**    Does he put sunglasses on, a hat, anything like that?

8    **A.**    No, ma'am.

9    **Q.**    Just walks right into the bank?

10   **A.**    Correct.

11   **Q.**    And he's with this other guy?

12   **A.**    Yes, ma'am.

13   **Q.**    Okay.  And I want to ask you about -- it looks like they

14   are talking to each other in some of the pictures?

15   **A.**    Yes, ma'am.

16   **Q.**    So they are together?

17   **A.**    It does.  It does appear they are together.

18   **Q.**    And then -- oh, in that transaction, it is more than one

19   check that day; right?

20   **A.**    Yes, ma'am, there was.

21   **Q.**    How many checks was it?

22   **A.**    I believe it was four.

23   **Q.**    Okay.  When he brought those four checks into the bank,

24   did he trade them for cash or did he deposit them into the

25   bank?

1    **A.**    They were deposits.

2    **Q.**    Okay.  And then as far as the checks go, the checks

3    themselves -- I'll just have you look at an example.

4              MS. DURRETT:  If we could look at Page 19-16 -- I'm

5    sorry.  Exhibit 19, Page 16.  Is that what it is?  It says

6    19-16 at the bottom.  It is -- it is Page 4.

7              MS. KING:  Page 4.

8              MS. JOHNSON:  19B?

9              MS. DURRETT:  19C.

10             MS. KING:  19C, Page 4.

11             MS. DURRETT:  Yes.

12   **Q.    (BY MS. DURRETT)**  So what I want to focus your attention

13   on is the bottom.

14             MS. DURRETT:  If you could make the bottom part

15   bigger -- the back of the check.

16   **Q.    (BY MS. DURRETT)**  So it looks like someone signed the back

17   of the check; right?

18   **A.**    Yes, ma'am.

19   **Q.**    And it looks like the name there is Allen Pendergrass;

20   correct?

21   **A.**    It appears to be the same signature on the signature card,

22   yes, ma'am.

23   **Q.**    And that is the person who is the owner of the account;

24   right?

25   **A.**    Correct.

1    Q.    Nobody used a fake name to deposit it?

2    A.    No, ma'am.

3    Q.    Then I'm just going to ask you:  As far as the other

4    checks -- we can flip through them if we need to.

5          But did anybody sign a different name than Allen

6    Pendergrass?

7    A.    No, ma'am.

8    Q.    They were all signed under that name?

9    A.    Correct.

10   Q.    All right.  Then I have a question about -- I know you --

11   Exhibit 20 is a big stack of bank records; right?

12   A.    Yes, ma'am.

13   Q.    Okay.  Do you still have those?

14   A.    I do.

15   Q.    I just wanted to ask you a question kind of about the

16   banking process.

17         So if we look at Exhibit 20 -- and it says 28 at the

18   bottom.

19              MS. DURRETT:  Would that be Page 8?

20   A.    Page 20-8?

21   Q.    **(BY MS. DURRETT)**  That is not the one.  Let's see.  It

22   says 20-28.  So at the bottom, I'm looking for the one that

23   says 20-8.

24         Okay.  It has been -- in my copy it is not blacked out.

25   That is fine for our purposes.

154

```
 1          But what I wanted to ask you about is this -- I don't know
 2    if -- can you see the back of the check?
 3    A.   I can.
 4    Q.   What I wanted to ask you about is there is a signature
 5    here and then there is something written below it.
 6          What is that?  What is the purpose of that?
 7    A.   That is -- I would have to pull the CEJ, but it appears to
 8    be the account number it went into.
 9    Q.   What do you mean by that?  Is that an account at Wells
10    Fargo?
11    A.   I don't -- I don't know if this check was actually
12    processed at Wells Fargo because I don't have enough
13    information on it.  But it looks like it was at a bank, and
14    they put the account number on the bottom when they deposited
15    their check.
16    Q.   So someone signed it, and then they wrote A-C-C-T number
17    and then some number?
18    A.   Correct.
19    Q.   Okay.  And is that a practice at your bank, or do you make
20    people do that when they are depositing?
21    A.   We don't make them do that.  Some do that.  Some don't.
22    Especially when they do ATM or mobile deposits, it is more
23    common.
24    Q.   And then I would ask the same like for Exhibit 20-29 --
25    and it is the same question.  It looks like somebody signed it?
```

155

1    **A.**    Yes, ma'am.

2    **Q.**    And then there is an account.  What would your

3    understanding of that be?

4    **A.**    It appears it was a deposit.  And in this case, it would

5    have been at Regions Bank.

6    **Q.**    So you can tell that it is from Regions because of the

7    back?

8    **A.**    Because the back of it, yes, ma'am.

9    **Q.**    Okay.  Great.  But that is not a practice at your bank?

10   **A.**    Where we sign it and have them put the account number?

11   **Q.**    Yes.

12   **A.**    Sometimes we do.  It is just -- it is not mandatory.  But

13   some people do it because it is the way they were taught.

14   **Q.**    Okay.  Then I have another one.  It is 20-57.  So that

15   would be Exhibit 20, I think Page 56.

16       I have the exact same question for you.  There is a

17   signature, and then there is something written at the bottom

18   that starts with C-H number.

19       Does that mean anything to you?

20   **A.**    Unless it is checking account, I don't know what it would

21   be.

22            MS. DURRETT:  Okay.  Well, I have no further

23   questions for you.  Thanks.

24            MS. KING:  No redirect.

25            THE COURT:  May this witness be excused?

1          MS. KING:  Yes, Your Honor.

2          THE COURT:  Thank you very much.

3          THE WITNESS:  Thank you, Your Honor.

4          Do I leave these here?

5          MR. BROWN:  You can leave it there.  We'll get it.

6          Your Honor, the next witness involves an exhibit that

7     defense counsel objected to previously.

8          So do you want to address that before we call the

9     witness, or do you want to address it during my direct

10    examination?

11         THE COURT:  Why don't we take just a two-minute

12    break?  We'll let everyone stand up since we've had a lot of

13    documents presented.  And go and just leave -- if you would,

14    leave the courtroom for just a few minutes.  I'll discuss that

15    with them.  And you can stretch, including me.

16              **(The jury exited the courtroom at 3:13 P.M.)**

17         THE COURT:  All right.

18         MR. BROWN:  So, Judge, the Government is calling Eric

19    Fitchpatric next.  Government's Exhibit Number 29 was admitted

20    through Investigator Ricks.  Defense counsel -- you reserved

21    ruling on admitting that into evidence.  It is an email from

22    Eric Fitchpatric to Allen Pendergrass.

23         THE COURT:  Identified this particular 29?

24         MR. BROWN:  Yes.

25         MS. DURRETT:  Your Honor, I just objected to it as

1      based on hearsay based on the information contained in it.

2             THE COURT:  Not based on whether it was an authentic

3      document?

4             MS. DURRETT:  Well, I mean, I assume that if

5      Mr. Fitchpatric is going to testify about it, he is going to

6      say it is an authentic document.  I think he can authenticate a

7      document.

8             MR. BROWN:  My thing is, Judge, this document has

9      already been admitted into evidence.  It was seized at the

10     search warrant.  You admitted all of them in except for two.

11            I wasn't clear on her objection to this particular

12     exhibit.  I don't know if it is hearsay.  But this is -- it is

13     not hearsay because this is an email from Mr. Fitchpatric to

14     Allen Pendergrass.

15            I don't have the case law at my fingertips.  But

16     according to Eleventh Circuit case law, an email to a defendant

17     in a case -- you can have a response to that to put it in

18     context.  So this is an email to the defendant in this case.

19     It should come in as substantive evidence.

20            And I just want to address that before I call the

21     witness in, Your Honor.

22            MS. DURRETT:  Your Honor, this document has not been

23     admitted.  I objected to this document being admitted.  So if

24     it was admitted, I didn't know that.

25            MR. BROWN:  Excuse me.  Not admitted.  It was

1   admitted with exception -- with defense counsel exception, Your

2   Honor.  But the foundation laid -- Investigator Ricks laid a

3   foundation for this being a document that he recovered during

4   the execution of the search warrant.  She did not take issue

5   with that when it was admitted for that purpose -- when it was

6   offered for that purpose, Your Honor.

7            THE COURT:  You are not saying it was admitted at

8   that time?

9            MS. DURRETT:  It is not.

10           MR. BROWN:  Maybe I'm inartful in my wording it,

11   Judge.  What I'm saying is I offered this evidence into -- I

12   offered this exhibit into evidence through Investigator Ricks

13   as being documents he seized pursuant to the search warrant.

14           And what I'm arguing is -- so therefore it should be

15   admitted on that basis alone.  That is all I was trying to

16   clear up.  Because I wasn't sure of her objection -- what

17   objection she had to the actual exhibit, Judge.

18           MS. DURRETT:  Your Honor, I don't think that the idea

19   that the exhibit was seized somewhere cures the hearsay in the

20   exhibit, which is the problem.  It has statements in it that

21   are out-of-court statements that the Government is seeking to

22   offer for the truth of the matter asserted, namely that

23   Mr. Fitchpatric sent this -- I don't know -- forged notary to

24   Mr. Pendergrass.  It is hearsay.

25           THE COURT:  Well, why can't he basically explain what

1      he did?

2              MS. DURRETT:  That would be fine without the exhibit.

3      Right?

4              THE COURT:  But he can explain what he did.  Then you

5      wouldn't object to the document?

6              MS. DURRETT:  No.  I object to the document because

7      the document contains hearsay.

8              MR. BROWN:  Is there a case supporting this?  Judge,

9      this is not a hearsay document.

10             THE COURT:  I don't understand.  If Mr. Fitchpatric

11     sent it --

12             MS. DURRETT:  They are trying to offer the fact that

13     this is a notary from Georgia Ann Bradley for the truth of the

14     matter asserted, that Eric Fitchpatric sent this to

15     Mr. Pendergrass.  They want you to accept this as substantive

16     evidence, Your Honor.  It is an out-of-court statement not by

17     the declarant when he is testifying.  And they are offering it

18     for the truth of the matter.

19             THE COURT:  I'm -- I am having trouble understanding

20     your position.  So if we had -- if they were offering this

21     independent of Mr. Fitchpatric, I would have a lot of troubles

22     with it.  And I wasn't going to let it in just on its own.

23             But if Mr. Fitchpatric is identifying the document he

24     sent --

25             MS. DURRETT:  Right, Your Honor.  But is he going to

```
 1    say -- the problem is it is the Georgia Ann Bradley notary --
 2    this is the part that they are wanting to offer --
 3              THE COURT:  I understand that.  But I mean,
 4    Mr. Fitchpatric is going to either say I sent this, I
 5    originated this, or -- I mean, was there another portion of
 6    this email that you saw?
 7              MS. DURRETT:  This is the first time --
 8              THE COURT:  I mean, is this the complete email?
 9              MS. DURRETT:  This is the first time I have seen it.
10              MR. BROWN:  Your Honor, this exhibit has been
11    provided in discovery years ago.  Maybe it is the first time
12    she has looked at it.  But she has had it for years.
13              THE COURT:  But let me ask the question to you:  Is
14    this a complete email or a page from the email?
15              MR. BROWN:  This is the -- my understanding is this
16    is a complete email, Judge.  This is the email that they
17    recovered from the search warrant.  So this is not from a
18    computer.  This was found in paper documents.
19              And this is the only email that the Government has.
20    So I don't have a second page to this.  It is not indicated --
21    it says one of one at the bottom, Your Honor.  I do not see a
22    second page.  This is this email.
23              THE COURT:  I mean, it is one thing if -- since I
24    don't really know what this is, it is a little bit troublesome
25    to me.  But it looks like it is Mr. Fitchpatric sending it to
```

1    Mr. Pendergrass.  If it is not, that's something else.

2           So I'm going to let him come in and tell the jury

3    whether he sent this or not.  If he didn't send it, then I may

4    stop us at that point and excuse the jury.

5           MR. BROWN:  Okay, Judge.  All right.

6           MS. DURRETT:  We object, Your Honor.  Thank you.

7           MR. BROWN:  Could you get Mr. Fitchpatric, please.

8           Do you want to wait for the jury to come out, or

9    should I bring him on out?

10          THE COURT:  You can bring him in.

11                 **(The jury entered the courtroom at 3:22 P.M.)**

12          MR. BROWN:  The Government calls Eric Fitchpatric to

13   the stand.

14          COURTROOM DEPUTY CLERK:  Please raise your right

15   hand.

16                      **(Witness sworn)**

17          COURTROOM DEPUTY CLERK:  Please have a seat.  You can

18   remove your mask.

19          Please state your name and spell your last name for

20   the record.

21          THE WITNESS:  My name is Eric Fitchpatric.  My last

22   name is spelled F-I-T-C-H-P-A-T-R-I-C.

23      Whereupon,

24                      ERIC FITCHPATRIC,

25      after having been first duly sworn, testified as follows:

```
 1                        DIRECT EXAMINATION

 2   BY MR. BROWN:

 3   Q.    Good afternoon, Mr. Fitchpatric.

 4   A.    Good afternoon.

 5   Q.    So I think I told you this outside the courtroom.

 6   Nodding -- there is a court reporter here.  She is taking down

 7   everything, all my ums, uhs, vocal fillers.  So she can't

 8   really get a nod.

 9         So if you can have a verbal response to my questions and a

10   verbal response to defense counsel's questions, that would help

11   the court reporter get a really good record of what is going

12   on.

13         Can you do that for me?

14   A.    Yes.

15   Q.    How old are you?

16   A.    54.

17   Q.    And what is the highest level of education you have

18   attained?

19   A.    I completed 14.  Associate's degree.

20   Q.    What did you get your associate's degree in?

21   A.    Art Institute of Atlanta.

22   Q.    For a particular study of what?

23   A.    Visual communications.

24   Q.    And what kind of work are you currently employed in?

25   A.    Right now, I am what you call a production artist, graphic
```

1    designer.

2    **Q.**   As a part of your work, are you working with computers?

3    **A.**   Yes, I am.

4    **Q.**   Have you previously worked for the defendant in this case,

5    Allen Pendergrass?

6    **A.**   No, I haven't.  Not previously, no.

7    **Q.**   Previous to today, did you previously work with Allen

8    Pendergrass?

9    **A.**   Yes, I have worked with him.

10   **Q.**   So let me clear that up.  Maybe I asked it inartfully.  So

11   I'll ask it a third time.

12       Did you previously work with the defendant,

13   Mr. Pendergrass, in his business?

14   **A.**   Yes.

15   **Q.**   What was the name of that business?

16   **A.**   Asset Financial Recovery.

17   **Q.**   Did the business use any other names that you are aware

18   of?

19   **A.**   I think so, yes.

20   **Q.**   Can you tell the jury other names that you recall the

21   business using while you were there?

22       If you can't, you can't.

23   **A.**   No, I can't.

24   **Q.**   All right.  What type of business was Asset Financial

25   Recovery based on your understanding?

1   **A.**   They would look for money for people who had money from

2   the Government.

3   **Q.**   And how did you come to be employed at Asset Financial

4   Recovery?  Who hired you?

5   **A.**   Allen Pendergrass.

6   **Q.**   And do you see Mr. Pendergrass in the courtroom today?

7   **A.**   Yes, I do.

8   **Q.**   Can you please point to him and describe an article of

9   clothing or describe what he appears -- what he looks like?

10   **A.**   He is right there with the face mask on in the mustache.

11        MR. BROWN:  All right.  Let the record reflect that

12   the witness has identified the defendant, Allen Pendergrass.

13   **Q.**   **(BY MR. BROWN)**   Why did Mr. Pendergrass hire you to work

14   at his business?

15   **A.**   To build websites.

16   **Q.**   Did you do that?

17   **A.**   Yes, I did.

18   **Q.**   What was the nature of your relationship with

19   Mr. Pendergrass?  Were you friends, employer/employee?

20   Describe the nature of the relationship.

21   **A.**   I was employed by him.

22   **Q.**   Had you ever been to his home?

23   **A.**   Yes, I have.

24   **Q.**   Been out to eat with him?

25   **A.**   Yes, I have.

1   **Q.**   Did you take any vacations with him?

2   **A.**   No.

3   **Q.**   Approximately how much were you paid when you worked for

4   Mr. Pendergrass?

5   **A.**   $300 a week.

6   **Q.**   And who negotiated that salary?

7   **A.**   I did.

8   **Q.**   Who did you negotiate with?

9   **A.**   Allen.

10   **Q.**   When you say Allen, you are referring to Allen

11   Pendergrass?

12   **A.**   Yes, Allen Pendergrass.

13   **Q.**   Who paid you?

14   **A.**   Allen Pendergrass.

15   **Q.**   How did Mr. Pendergrass pay you?

16   **A.**   He paid me with a check.

17   **Q.**   What type of checks did Mr. Pendergrass pay you with?

18   Meaning, were they checks that he wrote out?  Were they printed

19   on a computer?  How were these checks given to you?

20   **A.**   They were printed out.

21   **Q.**   How do you know they were printed out?

22   **A.**   Because I would see it in the machine when he printed it

23   out.

24   **Q.**   So would you be present in the office and actually see

25   Mr. Pendergrass printing out checks to pay you?

1    **A.**    Yes.

2    **Q.**    Would he sign those checks?

3    **A.**    Yes.

4    **Q.**    Describe the office -- where was -- do you recall where

5    the office was located?

6    **A.**    It was located on Old National Road.

7    **Q.**    Is that in College Park?

8    **A.**    Yes.

9    **Q.**    Approximately how long do you recall working there?

10   **A.**    Maybe about six or seven months.

11   **Q.**    How did you come to be employed there?  How did you find

12   out about the job?  How did you interview?  How did that

13   process work?

14   **A.**    When I was working with his websites, he wanted me to work

15   in the office more often.

16   **Q.**    All right.  So let me back up.  So you are describing --

17   when you are doing this website work, were you doing it out of

18   your home or were you working in the office?

19   **A.**    I started off working at my home.

20   **Q.**    And do you recall what year approximately this was?

21   **A.**    No, I can't.

22   **Q.**    Would showing you a check you received for payment from

23   Mr. Pendergrass -- would that refresh your memory as to what

24   year you worked for Mr. Pendergrass?

25   **A.**    Yes, it will.

```
 1                MR. BROWN:  Can we pull up Exhibit Number 20?  Has
 2    that already been admitted into evidence?
 3                MS. JOHNSON:  20, yes.
 4                MR. BROWN:  Can we pull up 20, Page 43, please?  Can
 5    you highlight the top portion of just the check at this time
 6    please?
 7    Q.   (BY MR. BROWN)  What are we looking at here,
 8    Mr. Fitchpatric?  Can you see your screen?
 9    A.   Yes, I can.
10    Q.   Can you describe for the jury what we're looking at?
11    A.   We're looking at a check.
12    Q.   Who is the check paid to?
13    A.   Me, Eric Fitchpatric.
14    Q.   Who is the check from?
15    A.   Allen Pendergrass.
16    Q.   All right.  What year is listed on the check?
17    A.   2013.
18    Q.   So would that check refresh your recollection as to when
19    you worked for Mr. Pendergrass?
20    A.   Yes, it does.
21    Q.   So would it be in 2013?
22    A.   Yes.
23    Q.   Based on this check, can you tell us whether you were
24    working in the office or working at home based on any markings
25    or the memo line on the check?
```

1   **A.**   I was working in the office.

2   **Q.**   How do you know that?

3   **A.**   Because that is when he would give me a regular check

4   every week.

5   **Q.**   Did Mr. Pendergrass also pay you in cash?

6   **A.**   Never.

7   **Q.**   Why not?

8   **A.**   I don't know.

9   **Q.**   Did you ever ask for cash?

10  **A.**   No.

11  **Q.**   All right.  Tell me who else was working in the office at

12  the time you were working there.  Can you name some other

13  individuals that were working there with you at the same time

14  you are working there?

15  **A.**   Terrell.

16  **Q.**   All right.  Do you know Terrell's last name?

17       What about McQueen?  Does that ring a bell?

18  **A.**   Terrell McQueen, yes.

19  **Q.**   What did you call Terrell McQueen?  Did you call him by a

20  different name perhaps?

21  **A.**   Shawn.

22  **Q.**   Who else do you recall working there that you would see in

23  the office?

24  **A.**   Joey.

25  **Q.**   What did Joey do?

1    **A.**   I don't know.

2    **Q.**   Did Ashley Pendergrass work there when you were there?

3    **A.**   Yes.

4    **Q.**   Who is Ashley Pendergrass in relation to Mr. Pendergrass?

5    **A.**   His daughter.

6    **Q.**   And what was Ashley -- what did Ashley do in the office,

7    as best you can recall?

8    **A.**   I don't know.

9    **Q.**   Deidre Barber?  Do you know who Deidre Barber is?

10   **A.**   Yes, I do.

11   **Q.**   Did she work in the office around the time you did?

12   **A.**   Yes.

13   **Q.**   What did Ms. Barber do there?

14   **A.**   I don't know.

15   **Q.**   What was the relation between Ms. Barber and Mr.

16   Pendergrass to your knowledge?

17   **A.**   Ex-lovers.

18   **Q.**   I couldn't hear you.

19   **A.**   Ex-lovers.

20   **Q.**   Did you say ex-lovers?

21   **A.**   Yes.

22   **Q.**   What about Nathan Pendergrass?  Does that name ring a

23   bell?

24   **A.**   Yes.

25   **Q.**   Did you see Nathan Pendergrass in the office?

1   **A.**   Seldom.

2   **Q.**   And who is Nathan Pendergrass in relation to Allen

3   Pendergrass?

4   **A.**   His son.

5   **Q.**   Is there anyone else that you recall working in the office

6   that you would see on a regular basis while you were working in

7   the office?

8   **A.**   No.

9   **Q.**   You have already testified that a part of your job was

10  building websites; is that correct?

11  **A.**   Yes.

12  **Q.**   How many websites did you build?

13  **A.**   Perhaps four.

14  **Q.**   Do you know the name of the companies associated with the

15  websites?

16  **A.**   One was Asset Financial Recovery, and the other one was

17  Attorney -- I'm not exactly sure, but I can't remember the

18  other two.

19  **Q.**   So you said approximately four?

20  **A.**   Yes.

21  **Q.**   One being for Financial -- Asset Financial Recovery; is

22  that right?

23  **A.**   Yes.

24  **Q.**   One for another website starting with the word attorney?

25  **A.**   Yes.

1    **Q.**    Who told you to build the website?

2    **A.**    Allen.

3    **Q.**    Who did you report to when you worked in the office?

4    **A.**    Allen.

5    **Q.**    You nodded your head a little bit.  Was there someone else

6    you reported to as well?  You kind of --

7    **A.**    No.  It was Allen.

8    **Q.**    What was -- you already testified that Terrell McQueen

9    worked there; correct?

10   **A.**    Yes.

11   **Q.**    What was Terrell McQueen's role in the office?

12   **A.**    I just saw him on the phone.  I don't know.

13   **Q.**    All right.  So what was your knowledge about what was

14   going on in the office?

15          You said at this point you are building websites.  What

16   kind of business is Mr. Pendergrass engaged in that he is

17   employing you and paying you money to build websites?

18   **A.**    He is recovering money from the government to people who

19   didn't claim the money.

20   **Q.**    How did you know this?

21   **A.**    Because that is what he told me.

22   **Q.**    I want to show you what has been marked as Government's

23   Exhibit Number 29.  Just take a look at it.  I'm going to ask

24   you some questions.

25          All right.  So you can look back at me if you are finished

1    looking at it.  Whenever you are finished looking at it, just

2    look back at me.

3    **A.**   Okay.

4    **Q.**   Did there come a point in your employment there that you

5    did other things besides just building websites?

6    **A.**   Yes.

7    **Q.**   What did you do?

8    **A.**   I built electronic forms.

9    **Q.**   What is that?  Explain that.

10   **A.**   It is like you create a PDF, and it is fillable forms.  So

11   they submit it out to potential clients.  What they do is fill

12   it out and send it back to them through, I guess, email or

13   whatever.  I'm not exactly sure what they did with it after

14   that.

15   **Q.**   What else did you do besides websites and PDF fillable

16   forms?  Is that what you testified to?  A fillable form?

17   **A.**   Yes.

18   **Q.**   What else besides those two items did you work on while

19   you were employed there?

20   **A.**   I worked on forms that were not fillable forms.  But they

21   were -- I guess the client filled them out themselves too as

22   well.

23   **Q.**   Okay.  So did you create the verbiage in the document?

24   What did you do?

25   **A.**   I didn't create the verbiage in those documents.

1  **Q.**  So what did you do as a computer technician with documents
2  that -- what did you do with those documents?

3  **A.**  Could you explain.

4  **Q.**  Yeah.  Maybe I'm asking an inartful question.

5      So websites, a PDF fillable form, and you described a
6  third, I guess, task or job that you had while employed by
7  Mr. Pendergrass.

8      Can you describe that third task?  I didn't understand
9  what you were saying.

10     Something about documents?  Can you explain that?

11 **A.**  I did the notaries.

12 **Q.**  The notaries.  Let me stop you there.

13     Mr. Fitchpatric, did you want to come and testify today?

14 **A.**  Yes, sir.

15 **Q.**  Did you willingly knock on the Government's door and say,
16 Government, I want to come and testify?  Or did we have to find
17 you?

18 **A.**  You had to find me.

19 **Q.**  Okay.  Did you understand that agents were looking for you
20 to serve you a subpoena?

21 **A.**  Yes.

22 **Q.**  Did you readily just go down and get the subpoena and say
23 you are ready to come to court?  Describe the process.

24 **A.**  No.  Y'all called me several times.

25 **Q.**  Did you immediately call them back?

174

| | |
|---|---|
| 1 | **A.**   No.  I hung up. |
| 2 | **Q.**   Why did you hang up? |
| 3 | **A.**   Because I didn't want to get involved. |
| 4 | **Q.**   Why not? |
| 5 | **A.**   Because I just didn't want to get involved with it. |
| 6 | **Q.**   All right.  I understand that. |
| 7 | So at some point, was Mr. Pendergrass a friend of yours? |
| 8 | **A.**   He was a friend, yes. |
| 9 | **Q.**   So if I hear you correctly, you did not want to come down |
| 10 | and testify today against Mr. Pendergrass; is that fair? |
| 11 | **A.**   Yes, sir. |
| 12 | **Q.**   Why? |
| 13 | **A.**   He is a good person. |
| 14 | **Q.**   He is a good person, and you didn't want to come down here |
| 15 | and testify; is that right? |
| 16 | **A.**   Yes. |
| 17 | **Q.**   All right.  Then I just want you to tell the truth.  You |
| 18 | look like you are getting a little bit emotional. |
| 19 | Are you okay? |
| 20 | **A.**   Yeah.  I'm okay. |
| 21 | **Q.**   Mr. Pendergrass you would consider a friend or an |
| 22 | associate, someone that you knew for a long period of time; is |
| 23 | that fair? |
| 24 | **A.**   I didn't know him that long.  But -- |
| 25 | **Q.**   All right.  So we left off talking about -- you said I did |

1    notaries.

2        Can you explain to the jury -- not to me.  You can look at

3    them and explain it.

4        What do you mean by you did notaries?  What does that

5    mean?

6    **A.**   Well, they would give me a notary to manipulate.

7    **Q.**   You said they would give me a notary to manipulate.  Who

8    is they?

9    **A.**   Allen Pendergrass.

10   **Q.**   Now, they implies two.  So there has to be a second

11   person.  Who is they?

12       Am I correct when you say they gave me forms -- so to my

13   understanding, that means more than one person; is that fair?

14   **A.**   Yes.

15   **Q.**   All right.  Who was the second person that would tell you

16   to work with these notaries?

17   **A.**   Terrell.

18   **Q.**   All right.  So you mean Terrell McQueen?

19   **A.**   Yes.

20   **Q.**   Did anyone else task you with working with notaries?

21   **A.**   No.

22   **Q.**   Now, explain for the jury.  What did you do -- what was

23   asked of you to do with these notaries?  What was asked of you

24   by Mr. McQueen and Mr. Pendergrass?

25   **A.**   Change the dates.

1    **Q.**    Excuse me?

2    **A.**    Change the dates.

3    **Q.**    Would you also use a photoshopping program in your

4    dealings with the notary?

5              MS. DURRETT:  Your Honor, I'm going to object to

6    leading at this point.

7              THE COURT:  Sustained.

8    **Q.    (BY MR. BROWN)**  What kind of programs would you use in

9    dealing -- in using the notaries?

10   **A.**    Photoshop.

11   **Q.**    Where did you obtain the notaries to photoshop?

12   **A.**    They were given to me.

13   **Q.**    Who gave them to you?

14   **A.**    Allen Pendergrass.

15   **Q.**    What about Mr. McQueen?  Did he also give you some as

16   well?

17   **A.**    I don't know.

18   **Q.**    In addition to photoshopping notaries, did you also --

19   what else did you photoshop?

20   **A.**    Signatures.

21   **Q.**    Who told you to photoshop signatures?

22   **A.**    Allen.

23   **Q.**    Why did he ask you to photoshop signatures?

24   **A.**    I don't know.

25   **Q.**    Did you ask any questions of Mr. Pendergrass as to why you

1   were photoshopping notaries and signatures?

2   **A.**   No.

3   **Q.**   Why not?

4   **A.**   Because he would get irritated if I asked any questions.

5   **Q.**   You said he.  Who is he?

6   **A.**   Allen Pendergrass.

7   **Q.**   And when you say irritated, describe the level of

8   irritation that you observed Mr. Pendergrass exert -- give to

9   you when you asked questions?

10  **A.**   He would raise his voice and yell at me and tell me to go

11  into my office.

12  **Q.**   So did you just do what you were told?

13  **A.**   Pretty much, yes.

14  **Q.**   The photoshopping of signatures and notaries, was this a

15  one-time thing or did you do this several times?

16  **A.**   Several times.

17  **Q.**   What did you do with the photoshop notaries?  What did you

18  do with them?

19  **A.**   Some of them I placed them on documents and some of them I

20  just gave it to them.

21  **Q.**   Who would you give the photoshopped notary to?  Who were

22  you giving it to?

23  **A.**   Allen Pendergrass.

24  **Q.**   All right.  How would you give the photoshopped notary to

25  Mr. Pendergrass?

1   **A.**   Through email.

2   **Q.**   So I have already shown you what has been marked as

3   Government's Exhibit Number 29.

4        Did you look at that document?

5   **A.**   Yes.

6   **Q.**   Do you recognize that document?

7   **A.**   No.

8   **Q.**   Is your email on that document?

9        MS. DURRETT:  Your Honor, I object.  He doesn't

10  recognize the document.

11       THE COURT:  Well, I think he can ask whether his

12  email is there.

13  **Q.**   **(BY MR. BROWN)**  Is your email on that document?

14  **A.**   Yes.

15  **Q.**   Who did you email?

16  **A.**   Allen Pendergrass.

17  **Q.**   Why?

18  **A.**   Because he requested it.

19  **Q.**   What did he request?

20  **A.**   The notary.

21  **Q.**   And was this a normal course of business?  You would email

22  Mr. Pendergrass notaries?

23  **A.**   Yes.

24  **Q.**   Where did you obtain the notary to copy?  Where did you

25  find that notary?

1    **A.**    It was given to me.

2    **Q.**    By who?

3    **A.**    Allen Pendergrass.

4    **Q.**    Did Mr. McQueen give you notaries at times to make copies

5    of or photoshop?

6    **A.**    I don't know.

7    **Q.**    Why don't you know?

8    **A.**    It has been a long time.

9    **Q.**    In dealing with the notaries and signatures, who did you

10   deal with the majority of the time on photoshopped signatures

11   and notaries?

12   **A.**    Allen Pendergrass.

13   **Q.**    Why?

14   **A.**    Because he requested it.

15   **Q.**    Was Mr. Pendergrass the boss?

16   **A.**    Yes.

17   **Q.**    Now, I can tell from your background and just speaking you

18   are an intelligent person.

19          You would agree with me on that; correct?

20   **A.**    Yes.

21   **Q.**    And at the time you were doing this, did this raise any

22   concerns about you photoshopping notary seals and photoshopping

23   signatures?

24   **A.**    Yes.

25   **Q.**    What kind of concerns did it raise with you?

1   A.   That this was wrong.

2   Q.   Did you voice those concerns to Mr. Pendergrass -- Allen

3   Pendergrass or to Mr. McQueen?

4   A.   No.

5   Q.   Why not?

6   A.   Because I was afraid they were going to take the computer.

7   Q.   Explain this.  You thought they were going to take your

8   computer?

9   A.   Yes.

10  Q.   What computer are you referring to?

11  A.   The laptop.

12  Q.   Who bought the laptop?

13  A.   They did.

14  Q.   Who is they?

15  A.   Allen and Terrell.

16  Q.   And why did they buy you a laptop computer?

17  A.   Because my apartment got broken into and my computers were

18  stolen.

19  Q.   So did you need this laptop to do your job with

20  Mr. Pendergrass and Mr. McQueen?

21  A.   Yes.

22  Q.   And did you need it for other jobs as well?

23  A.   Yes.

24  Q.   So let's back up a little bit.  I want to make sure I'm

25  clear on how you were paid.

1          How much were you paid approximately?

2     **A.**   $300 a week.

3     **Q.**   And who set that salary?

4     **A.**   I did.

5     **Q.**   Who did you negotiate with?

6     **A.**   Allen Pendergrass.

7     **Q.**   Can we also publish Exhibit Number 20, Page 44?  Can we

8     just highlight the top of this document, please?

9          Mr. Fitchpatric, what are we looking at here?

10    **A.**   Check.

11    **Q.**   Who is the check paid to?

12    **A.**   To me.

13    **Q.**   And who signed the check?

14    **A.**   Allen Pendergrass.

15    **Q.**   Can we enlarge the bottom portion of the back of the

16    check, please?

17         So did you receive this check?

18    **A.**   Yes.

19    **Q.**   How do you know that?

20    **A.**   Because I deposited it.

21    **Q.**   Is this your signature or your endorsement on the back of

22    the check?

23    **A.**   Yes, it is.

24    **Q.**   Could we publish Exhibit Number 54, please.  I'm sorry.

25    Page 54 of the current exhibit.

1        All right.  Mr. Fitchpatric, what is the date that this

2   check was related to?  For your work for what date?

3   **A.**   July.

4   **Q.**   July 2013?

5   **A.**   Yes.

6   **Q.**   And is this -- how much is this check for?

7   **A.**   300.

8   **Q.**   Was that about your weekly salary?

9   **A.**   Yes, it is.

10  **Q.**   Finally, can we publish exhibit -- same exhibit, Page 90?

11  Can we just highlight the bottom portion of this check?  Just

12  the top.  Just the top.

13       What is the date of this check, Mr. Fitchpatric?

14  **A.**   9/12/2013.

15  **Q.**   All right.  This check is for $200.  Do you know why this

16  check is less than your 300-dollar salary?

17  **A.**   No, I don't.

18  **Q.**   Okay.  Take down the exhibit, please.

19       Were you present when the Atlanta Police Department

20  executed a search warrant at Mr. Pendergrass's office?

21  **A.**   Yes.

22  **Q.**   What were you doing there that day?  Why were you there at

23  the office that day?

24  **A.**   I was there to work.

25  **Q.**   Could we just publish Government's Exhibit 18, Page 15,

1  please.

2      So is this a photo of you at the scene of the -- when that

3  search warrant was executed, Mr. Fitchpatric?

4  **A.**   Yes.

5  **Q.**   Can we publish Exhibit -- Page 60 of this same exhibit,

6  please?

7      Who is that?

8  **A.**   That is Terrell McQueen.

9  **Q.**   And can we also publish Page 59, just the previous page?

10     And who is that?

11 **A.**   That is Joey.

12 **Q.**   Is that you behind -- behind Mr. Joey?

13 **A.**   Yes.

14 **Q.**   Do you know Joey's legal name, by chance?  Full name?

15 **A.**   No, I don't.

16 **Q.**   What do you recall -- I think I asked you this before.

17 But I'm not sure -- what Joey did while he was in the office?

18     Did he work on computers?  Did he sign letters?  Do you

19 have any idea what he did?

20 **A.**   He worked on computers.

21 **Q.**   Do you know what he did on the computers?

22 **A.**   What I saw was spreadsheets.  That is it.

23 **Q.**   When you say spreadsheets, what do you mean?  Like Excel

24 spreadsheets?

25 **A.**   Yes, Excel.

1    **Q.**   Now, after this photograph was taken in September 2013,

2    did you continue to work for Mr. Pendergrass after the Atlanta

3    Police Department executed a search warrant there?

4    **A.**   No.

5    **Q.**   Why not?

6    **A.**   I didn't have a computer.

7    **Q.**   Were you arrested that day?

8    **A.**   No.

9    **Q.**   Have you been charged -- were you charged by the Atlanta

10   Police Department in this case?

11   **A.**   No.

12   **Q.**   Were you charged by my office, the United States

13   Attorney's Office, relating to your involvement with working

14   with Mr. McQueen and Mr. Pendergrass?

15   **A.**   No.

16   **Q.**   Do you recall talking with me and an agent on the

17   telephone two weeks ago?

18   **A.**   Yes.

19   **Q.**   Was the agent, Mr. Cooper, standing outside your residence

20   or at your home?

21   **A.**   Yes.

22   **Q.**   And were you speaking with me on speakerphone?  Did you

23   talk with me on the phone?

24   **A.**   Yes.

25   **Q.**   What did I tell you about whether you would be charged in

1   this matter or not?

2   **A.**   You said I wouldn't be charged.

3   **Q.**   Did I tell you that we were not investigating you?

4   **A.**   Yes.

5   **Q.**   The jury has already seen several checks in the amount of

6   $200, $300, I think one for $250.

7        Did you receive large lump sum payments from the work of

8   Mr. Pendergrass's business?

9   **A.**   No.

10  **Q.**   Why not?

11  **A.**   I just received what he paid me weekly.

12  **Q.**   Did you -- were you aware that Mr. Pendergrass's business

13  was receiving large value checks that were deposited into bank

14  accounts?

15  **A.**   I was, but I didn't know the amount.

16  **Q.**   Did you get a commission or a percentage of checks that

17  were deposited by Mr. Pendergrass or Mr. McQueen from the

18  business?

19  **A.**   No.

20  **Q.**   Why not?

21  **A.**   I don't know.

22  **Q.**   Did you ask for it?

23  **A.**   No.

24  **Q.**   Do you feel like you knew exactly what the company was

25  engaged in while you worked there?

1    **A.**   No, I didn't.

2    **Q.**   Were you privy to conversations between Mr. McQueen and

3    Mr. Pendergrass at all times?

4    **A.**   No.

5    **Q.**   Were you ever asked to step outside of a room while

6    Mr. McQueen and Mr. Pendergrass spoke?

7    **A.**   Yes.

8    **Q.**   Why were you asked to step outside the room?

9    **A.**   I don't know.

10   **Q.**   Was this on more than one occasion?

11   **A.**   Yes.

12   **Q.**   Do you have any idea why you could have been asked?  Maybe

13   you don't specifically --

14          MS. DURRETT:  Your Honor, I object to speculation at

15   this point.

16          THE COURT:  Sustained.

17   **Q.**   **(BY MR. BROWN)**  Did you ask Mr. Pendergrass what was

18   discussed between he and Mr. McQueen when you stepped out of

19   the room?

20   **A.**   No.

21   **Q.**   Why not?

22   **A.**   Because Allen would get upset if I asked any questions.

23   So I stopped asking questions.

24   **Q.**   When was the last time you spoke or communicated or met

25   with Allen Pendergrass?

1    **A.**    Maybe two months ago.

2    **Q.**    How did you come to be in contact with Mr. Pendergrass two

3    months ago?

4    **A.**    We had a drink.

5    **Q.**    Where did you have a drink?

6    **A.**    At Grown Folks, a bar.

7    **Q.**    Where is Grown Folks bar located?

8    **A.**    Old National.

9    **Q.**    Had you been to Grown Folks bar before?

10   **A.**    Yes.

11   **Q.**    Had you been to Grown Folks bar before with

12   Mr. Pendergrass?

13   **A.**    No.

14   **Q.**    With Mr. McQueen?

15   **A.**    No.

16   **Q.**    Did you contact Mr. Pendergrass or did he contact you to

17   arrange this meeting at Grown Folks bar?

18   **A.**    He contacted me.

19   **Q.**    How did Mr. Pendergrass contact you?

20   **A.**    Through a friend.

21   **Q.**    What is the friend's name?

22   **A.**    Hakim (phonetic).

23   **Q.**    What time of day did you meet with Mr. Pendergrass at

24   Grown Folks bar?

25   **A.**    It was at night.

1    **Q.**   Do you have any idea what time?

2    **A.**   I mean, 7:00.

3    **Q.**   Who was present at the meeting between you and

4    Mr. Pendergrass?

5    **A.**   Me, him, and Hakim.

6    **Q.**   Did Mr. Pendergrass tell you why he wanted to meet with

7    you?

8    **A.**   I guess he wanted to talk about the court -- the case.

9    **Q.**   What did Mr. Pendergrass tell you about the court case?

10   **A.**   He didn't tell me much.  He just gave me a piece of paper.

11   A document.

12   **Q.**   What document did he give you?

13   **A.**   To talk about -- it was about the Fifth Amendment.

14   **Q.**   All right.  Now, what is your understanding of the Fifth

15   Amendment?

16   **A.**   Don't testify in court.

17   **Q.**   So did Mr. Pendergrass tell you not to testify in court,

18   or did he give you a paper which said not to testify in court?

19   **A.**   No.  He just gave me the paper.  He didn't tell me.

20   **Q.**   Did you ask Mr. Pendergrass any questions about why he was

21   giving you a paper to plead the Fifth or not testify in court?

22   **A.**   No, I did not.

23           MS. DURRETT:  Objection, Your Honor.  I don't think

24   that is exactly what he testified.

25           MR. BROWN:  I'll withdraw the question.

1   **Q.    (BY MR. BROWN)**   What did --

2              THE COURT:   Ladies and gentlemen, you are directed to

3   understand that the question was withdrawn and to the extent

4   there was any answer to pay no attention to it.

5   **Q.    (BY MR. BROWN)**   What was your understanding of the paper

6   that Mr. Pendergrass gave you?

7   **A.**   The definition of the Fifth Amendment.

8   **Q.**   And what was your understanding of that definition?

9   **A.**   Not to testify.

10  **Q.**   Did you and Mr. Pendergrass discuss further your testimony

11  or not to testify at this court hearing?

12  **A.**   No.

13  **Q.**   Why not?

14  **A.**   I told him I didn't want to talk about it.

15  **Q.**   Why didn't you want to talk about it?

16  **A.**   Because I don't want to know anything.

17  **Q.**   You said you did not want to know anything?

18  **A.**   Right.  He had some documents that he wanted to provide

19  for me.  I told him I didn't want to look at it.

20  **Q.**   So how did your relationship -- before this meeting two or

21  three months ago, what kind of contact had you had with

22  Mr. Pendergrass about work or just catching up with him?  Can

23  you give the jury an understanding of how often you would speak

24  with Mr. Pendergrass?

25  **A.**   Very, very seldom.

1    Q.    And when you did speak with Mr. Pendergrass -- not talking

2    about the meeting two months ago -- what were you talking about

3    with Mr. Pendergrass?  What was the nature of your

4    conversations?

5    A.    Just current affairs.

6    Q.    Would you call Mr. Pendergrass, or would you contact Mr.

7    Pendergrass?  Or would he contact you?

8    A.    We would contact each other.  Actually we ran into each

9    other.  We wouldn't --

10   Q.    When do you recall running into Mr. Pendergrass?

11   A.    About maybe five months ago, six -- five or six months

12   ago.

13   Q.    What was the nature of your exchange during that run-in

14   five to six months ago?

15   A.    He was celebrating his girlfriend's birthday.

16   Q.    Were you invited to attend?

17   A.    No.  It was at Grown Folks.

18   Q.    You were there at Grown Folks?

19   A.    Yes.

20   Q.    So he was there at Grown Folks?

21   A.    Right.

22   Q.    You did not come together though; is that correct?

23   A.    No.  We bumped into each other.

24   Q.    What was your understanding of the nature of the

25   relationship between Mr. McQueen and Mr. Pendergrass?

1   **A.**   They were partners.

2   **Q.**   Why do you describe them as partners?

3   **A.**   Because they were always together.

4   **Q.**   Were you aware of any vacations that Mr. Pendergrass and

5   Mr. McQueen took?

6   **A.**   Yes.

7   **Q.**   Where did they go?

8   **A.**   Costa Rica.

9   **Q.**   Were you invited to go to Costa Rica?

10  **A.**   No.

11  **Q.**   Did you ask to go to Costa Rica?

12  **A.**   No.

13  **Q.**   Do you know who else went on the trip to Costa Rica with

14  Mr. Pendergrass and Mr. McQueen?

15  **A.**   Deidre.

16  **Q.**   Who is Deidre?

17  **A.**   She was the lady that worked in the office.

18  **Q.**   Would it be Deidre Barber?

19  **A.**   Yes.

20  **Q.**   Is this the one you described as an ex-lover of

21  Mr. Pendergrass?

22  **A.**   Yes.

23  **Q.**   Are you telling the truth about your involvement with

24  Asset Financial Recovery?

25  **A.**   Yes, I am.

1    **Q.**   Were you also friendly with Mr. McQueen when you worked

2    with him?

3    **A.**   Yes.

4    **Q.**   How would you describe the office environment?  Was it a

5    close-knit office?  Were people collegial, talking?  Describe

6    the office environment of Mr. Pendergrass's company.

7    **A.**   It was friendly for the most part.  I would say 80 percent

8    of the time it was friendly.

9    **Q.**   And then what about the 20 percent of the time?  Was it

10   not friendly at that point in time?

11   **A.**   You know, sometimes Allen would get upset, and people just

12   be quiet.

13   **Q.**   So I want to be clear:  Do you recognize Government's

14   Exhibit Number 29?

15         MS. DURRETT:  Objection, Your Honor.  He said he does

16   not recognize it.

17         THE COURT:  I think you have already questioned him

18   about 29.  You got some answers -- some things -- some ways --

19   things he responded, and sometimes he didn't, so -- but I think

20   it is redundant to go back to the same thing that you have

21   already examined the witness about.

22         MR. BROWN:  Sure, Judge.  I'll move on.

23         THE COURT:  Thank you.

24   **Q.**   **(BY MR. BROWN)**  Approximately how many emails do you

25   recall sending to Mr. Pendergrass relating to notaries or

1  copied signatures?

2  **A.**   Several.

3  **Q.**   Is several 10?  Is several 20?  Is several 30?  Is several

4  100?

5      Your several could be different than mine.  What do you

6  describe as several?

7  **A.**   Maybe 20.

8  **Q.**   Is that just notaries?  Would there be 20 notaries, emails

9  you sent to Mr. Pendergrass?

10  **A.**   Notaries and signatures.

11  **Q.**   All right.  So a combination of notaries and signatures

12  approximately 20; is that fair?

13  **A.**   Yes.

14  **Q.**   Could it be less than 20?

15  **A.**   No.

16  **Q.**   Could it be more than 20?

17  **A.**   It could be.

18  **Q.**   So at least 20 but possibly more; is that correct?

19  **A.**   Yes.

20  **Q.**   What about Mr. McQueen?  Your recollection of how many

21  copied notary seals or copied signatures you would have emailed

22  or hand-delivered to Mr. McQueen?

23  **A.**   It was all to Allen.

24  **Q.**   Excuse me?

25  **A.**   Everything was to Allen Pendergrass.

1   **Q.**   And why was everything to Allen Pendergrass?

2   **A.**   Because he owned the business.

3   **Q.**   You previously testified as to where you obtained the

4   notaries.

5        Where did you obtain the signatures that you copied?  Did

6   you get these from documents?  Where did you obtain the

7   documents to obtain the signatures?

8   **A.**   They were given to me.

9   **Q.**   Who were they given to you by?

10  **A.**   Allen.

11            MR. BROWN:  That's all I have for the witness, Judge.

12            THE COURT:  Counsel, we had this other matter we were

13  going to take up privately with a witness.

14            And are we going to -- what are Mark's technological

15  issues, Harry?

16            COURTROOM DEPUTY CLERK:  He has to go get the cart,

17  bring in here, and set it up.  It will take 10 to 15 minutes.

18            MR. BROWN:  Your Honor, if I may, I would like -- if

19  we can try to finish the witness, I would like to do that if we

20  have time, Your Honor.

21            THE COURT:  I don't know how we could -- I mean --

22            MS. DURRETT:  It is also my preference, Your Honor,

23  but I don't -- I mean, it is not going to be short.

24            THE COURT:  Then you would have to move your witness

25  to tomorrow.

```
 1            MR. BROWN:  Right.  I'll let Mr. Cohen know, Your
 2    Honor.
 3            THE COURT:  All right.  Then we'll continue.
 4            So much for getting your hopes high.  But maybe you
 5    will get to drive in a little later tomorrow.
 6            MR. BROWN:  Sorry, Judge.
 7                 (There was a brief pause in the proceedings.)
 8            THE COURT:  If anyone needs to use the restroom now,
 9    why don't we do that.  If anyone needs just to stand up, just
10    go ahead and stand up.
11                 (A brief break was taken at 4:04 P.M.)
12            THE COURT:  Have a seat.
13            MS. DURRETT:  Ready?
14            THE COURT:  Yes.
15                         CROSS-EXAMINATION
16    BY MS. DURRETT:
17    Q.   Hi, Mr. McQueen.  My name is Saraliene Durrett.
18    A.   My name is Fitchpatric.
19    Q.   I'm sorry.  Mr. Fitchpatric.  I have McQueen on my mind.
20         But, Mr. Fitchpatric, I am the attorney for Allen
21    Pendergrass.  Okay?  So I have a few questions for you.
22         First, I want to apologize for keeping you late and the
23    jury late.  I think people thought they were going to get out
24    early.  So I'm sorry to be the one who forced us over the line.
25    So I'll try to be quick if I can.
```

1      You talked about working with Allen at Asset Financial

2  Recovery back in 2013; right?

3  **A.**   Yes.

4  **Q.**   Do you know when you started working with him?

5  **A.**   Not exactly.  But maybe about -- about eight or nine

6  months.

7  **Q.**   You were there for about eight or nine months total?

8  **A.**   It wasn't a year, no.

9  **Q.**   And it was all during 2013, or was it some in 2012?

10  **A.**   It wasn't through the whole year 2013.

11  **Q.**   But did it start in 2012, or did it just go through 2013?

12  **A.**   I think it started in 2012.

13  **Q.**   Okay.  2012.  Okay.  And you knew -- I think you talked a

14  little bit about this.

15      But you knew that Allen's business was an asset recovery

16  business; right?

17  **A.**   Yes.

18  **Q.**   And that the idea was they would contact municipalities

19  and find out who hadn't claimed funds and they would contact

20  those people and try to collect the funds for them?

21  **A.**   Yes.

22  **Q.**   That is the nature of the business?

23  **A.**   Right.

24  **Q.**   Right.  I think the Government asked you did you know what

25  the business was.

1        But that was the business; right?

2   **A.**   Yes.

3   **Q.**   Okay.  Now, you talked about knowing Mr. Pendergrass.   I

4   think you said you had lunch with him and that you had been to

5   his house.

6        So you were friendly with him?

7   **A.**   Yes.

8   **Q.**   And you knew that his wife had passed away; right?

9   **A.**   Yes, I did.

10  **Q.**   You knew that she --

11  **A.**   It was later that I found out.

12  **Q.**   You found out later?

13  **A.**   Yes.

14  **Q.**   When did you find that out?

15  **A.**   A friend told -- a friend of his told me.

16  **Q.**   Okay.  And during that conversation with the friend, did

17  you also learn that Allen used to run the business with his

18  wife?

19  **A.**   No, I didn't.

20  **Q.**   Did you know that?

21  **A.**   No, I didn't.

22  **Q.**   You didn't know that?

23  **A.**   No, I didn't.

24  **Q.**   All right.  And you never met his wife?

25  **A.**   No.

1    Q.    Okay.  And then at some point after that, he started

2    working with Terrell McQueen; right?

3    A.    Yes.

4    Q.    Did Allen start working with Terrell before you came, or

5    did Terrell come after you did?

6    A.    He came after.

7    Q.    Okay.  So you started working with Allen doing websites,

8    it sounds like?

9    A.    Yes.

10   Q.    Then Terrell came along?

11   A.    Yes.

12   Q.    And you talked a little bit about who else worked in the

13   office.  I know you said you weren't sure what people like Joey

14   did in the office.

15        Have you ever heard the term skip tracing?  Do you know

16   what that means?

17   A.    No, I don't know what that is.

18   Q.    But you knew that they worked with spreadsheets of some

19   kind?

20   A.    Yes.

21   Q.    Did you punch a time clock?

22   A.    No.

23   Q.    So you just had a set fee that you got paid?

24   A.    Yes.

25   Q.    And would that change by the number of hours you worked or

1    you just -- you were on 300 a week, no matter what?

2    **A.**    Yeah.  It was 300, no matter what.

3    **Q.**    I'm sorry?

4    **A.**    300 a week, no matter what.

5    **Q.**    Okay.  All right.  And I know you talked about how it was

6    Allen's business but Terrell and Allen were partners.

7         Did you know the lease was in Terrell's name for that

8    business?

9    **A.**    No, I did not.

10   **Q.**    Okay.  You didn't know that?

11   **A.**    No, I didn't.

12   **Q.**    Okay.  And I know you have talked about working with Allen

13   on some things.  It seems like you weren't so clear on your

14   memory about working with Terrell on things; is that right?

15   **A.**    That is correct, yes.

16   **Q.**    So you don't remember what you did for Terrell?

17   **A.**    I didn't do too much for Terrell.

18   **Q.**    Okay.  So I want to talk with you a little bit about did

19   you know Terrell used the alias Dusty Fager to open a bank

20   account?

21   **A.**    No.

22   **Q.**    Okay.  Did you know that he used the alias Chris Carter to

23   open a bank account?

24   **A.**    No.

25   **Q.**    Did you know he used those aliases to contact businesses

1  to try to collect funds?

2  **A.**   No, I did not.

3  **Q.**   Okay.  No one -- the Government didn't tell you that when

4  they were interviewing you?

5  **A.**   No.

6  **Q.**   Did you know he sent out correspondence in those names?

7  Letters?

8  **A.**   No.

9  **Q.**   Did you know he sent out letters using those names with

10  different business names?

11  **A.**   No.

12  **Q.**   Okay.  You didn't have any idea he was doing that?

13  **A.**   No.

14  **Q.**   Okay.  Did you ever hear of a company called or a law firm

15  called Holland & Knight?

16  **A.**   No.

17  **Q.**   So did you ever hear about any asset recovery for them?

18  **A.**   No.

19  **Q.**   Did you know that Terrell wrote a letter on Holland &

20  Knight letterhead addressed to Allen that said Holland & Knight

21  had hired Asset Financial Recovery?  Did you know that?

22  **A.**   No.

23  **Q.**   Okay.  Did you know that Mr. McQueen used that letter to

24  collect funds from that firm?

25  **A.**   No.

1   **Q.**   Okay.  Have you ever heard of company called Pensacola Ice

2   Penguins?

3   **A.**   No.

4   **Q.**   Did you know that Terrell McQueen sent out letters to

5   Florida to get a check in the name of Pensacola Ice Penguins?

6   **A.**   No, I did not.

7   **Q.**   You didn't hear anything about that?

8   **A.**   No.

9   **Q.**   Okay.  Did you know that Mr. McQueen used the alias Gene

10   Bloom?

11   **A.**   No.

12   **Q.**   Okay.  Did you know that Mr. McQueen agreed or admitted

13   that he signed and sent the forged documents -- a lot of the

14   forged documents that we're talking about here?

15   **A.**   No.

16   **Q.**   Okay.  I'm going to ask you -- I know you talked about

17   sending -- I think you said you sent 20 emails to Allen or

18   about there; right?

19   **A.**   Yes.

20   **Q.**   Okay.  Those would contain -- according to you, they

21   contained fake notaries and signatures; correct?

22   **A.**   Yes.

23   **Q.**   Did the Government -- when they were interviewing you, did

24   they show you any emails from Allen to you asking for things

25   like that?

**A.**    No.

**Q.**    So there weren't emails like that; right?

**A.**    No.

**Q.**    There was just that email that you talked about?

**A.**    Yes.

**Q.**    Okay.  Do you remember the names of the notaries that you forged?

**A.**    No.

**Q.**    Do you remember the names of the letters or other documents that you forged?

**A.**    No.

**Q.**    Okay.  I think you saw your photo here from the day that Mr. Pendergrass was arrested; right?

**A.**    Yes.

**Q.**    So you were present in the office when that happened?

**A.**    Yes.

**Q.**    Okay.  Now -- and I assume that someone made you aware that there was a search going on and that they were seizing property at that time?  I mean, the police came in; right?

**A.**    In the office?

**Q.**    Yes.

**A.**    Yes.

**Q.**    Did the police talk to you that day about what was happening in the office?

**A.**    Briefly.

1   **Q.**   Did you speak with them?

2   **A.**   Yes.

3   **Q.**   Okay.  And what did you tell them?

4   **A.**   They asked me how did I know him --

5   **Q.**   Okay.

6   **A.**   -- and -- and how was I getting paid.

7   **Q.**   Okay.  And at that point in 2013 when the police came in,

8   did you tell them, I would forge documents for Mr. Pendergrass?

9   **A.**   No.

10  **Q.**   Okay.  So that was 2013; right?

11  **A.**   Yes.

12  **Q.**   Okay.  How many times have you met with the Government?

13  **A.**   I haven't other than today.

14  **Q.**   Other than today.

15      Okay.  You had a phone call; right?

16  **A.**   Yes.

17  **Q.**   Okay.  And I think you talked -- let me just be clear.

18  You were not arrested in 2013; right?

19  **A.**   No.

20  **Q.**   You were not arrested that day?

21      Did the police come and talk to you after that day?

22  **A.**   No.

23  **Q.**   Like a week later?  Month later?

24  **A.**   No.

25  **Q.**   Okay.  And so you didn't talk to the police any time in

1   2013?

2   **A.**   No.

3   **Q.**   You didn't talk to the police any time in 2014 about this?

4   **A.**   I think I talked to two detectives.  That is it.

5   **Q.**   Great.  Tell us what you said.  Tell us what that was

6   about.

7   **A.**   They were asking about documents.

8   **Q.**   Okay.  And who were the detectives that you talked to?

9   **A.**   I don't know their names.

10  **Q.**   Okay.  Do you know what agency they were from?

11  **A.**   I think one was from the post office.

12  **Q.**   Okay.

13  **A.**   That's all I can remember.

14  **Q.**   And did they show you documents?

15  **A.**   Yes.

16  **Q.**   Do you remember what documents they showed you?

17  **A.**   Yes.

18  **Q.**   What were they?

19  **A.**   They were documents that they would send out to people,

20  but I didn't have anything to do with those documents.

21  **Q.**   When you say that, can you tell me a little bit more about

22  what documents they sent out to people means?

23  **A.**   To tell them that they had money that was unclaimed.

24  **Q.**   So they showed you some letters about unclaimed funds?

25  **A.**   Yes.

1    Q.    Okay.  But you said, I don't have anything to do with

2    that?

3    A.    No.

4    Q.    And then did you talk to the police in 2015?

5    A.    No.

6    Q.    Did you talk to the police in 2016?

7    A.    No.

8    Q.    Did you talk to the police in 2017?

9    A.    No.

10   Q.    And that was the year this case was indicted.  Nobody

11   talked to you that year?

12   A.    No.

13   Q.    Did you talk to the police in 2018, '19, or '20?

14   A.    No.

15   Q.    And then we find out that about two weeks ago or so you

16   get a call from the Government that they want you to come and

17   testify; right?

18   A.    Yes.

19   Q.    Okay.  And during that conversation, they say you will not

20   be charged in connection with your testimony; is that right?

21   A.    Yes.

22   Q.    Okay.  So you had -- I don't know -- eight years, right,

23   between the time that Asset Financial Recovery was searched and

24   the time you are appearing here today to tell the police, hey

25   guess what, I forgot to tell you I forged documents for Allen

1   Pendergrass?  You had eight years to do that; is that right?

2   **A.**    Yes.

3   **Q.**    Okay.  But you did not do that until today?

4   **A.**    Yes.

5   **Q.**    Okay.  And that was after this prosecutor told you you are

6   not going to be prosecuted for this; is that right?

7   **A.**    Yes.

8   **Q.**    Okay.  Now, it is interesting because you talked a little

9   bit about how Mr. Pendergrass gave you a document that tells

10   you about the Fifth Amendment; right?

11   **A.**    Yes.

12   **Q.**    Okay.  And the Fifth Amendment is part of our

13   Constitution; right?  It is part of the Bill of Rights; right?

14   **A.**    Yes.

15   **Q.**    And that is something that protects all Americans;

16   correct?

17   **A.**    Yes.

18   **Q.**    Okay.  And the Fifth Amendment specifically says that you

19   don't have to testify if you think you might implicate yourself

20   in a crime; right?

21   **A.**    Yes.

22   **Q.**    Okay.  You can choose to testify or not to testify; right?

23   **A.**    Right.

24   **Q.**    Okay.  During your discussion with this prosecutor, did he

25   tell you, hey, guess what, you have a Fifth Amendment right not

```
1   to testify?

2   A.    No, he did not.

3   Q.    So he didn't tell you about the Bill of Rights, did he?

4   A.    No.

5   Q.    He didn't tell you how the Constitution protects you?

6   A.    Correct.

7   Q.    He said, I'm not going to charge you; right?

8   A.    Yes.

9   Q.    Okay.  Okay.  But so despite that conversation, what you

10  are telling us here today is that you definitely committed

11  crimes; is that correct?

12  A.    Yes.

13  Q.    You definitely committed forgery; right?

14  A.    Yes.

15  Q.    Okay.  But they are not prosecuting you?

16  A.    No.

17  Q.    Okay.  And after Mr. Pendergrass was arrested that day, he

18  was taken to jail.  Did you know that?

19  A.    Yes.

20  Q.    Okay.  You weren't; right?

21  A.    No.

22  Q.    You remained free?

23  A.    Yes.

24  Q.    Correct?  You've been free since 2013; right?

25  A.    Yes.
```

1   **Q.**   Okay.   Okay.   Just to be clear, I don't get to make

2   decisions about whether or not you get charged; right?

3   **A.**   No.

4   **Q.**   Do you know if I have that ability?

5   **A.**   I don't know that.

6   **Q.**   Okay.   The prosecutor does?

7   **A.**   Okay.

8   **Q.**   Well, do you think defense attorneys usually have the

9   ability to decide if someone gets charged with a crime?

10   **A.**   I don't know.

11   **Q.**   I'm sorry?

12   **A.**   I don't know that.

13   **Q.**   Okay.   But you know they can tell you that you won't?

14   **A.**   Yes, I guess.   Yes.

15   **Q.**   Now I want to talk with you a little bit about the

16   websites you said you worked on.

17        You said one of them was Asset Financial?

18   **A.**   Yes.

19   **Q.**   Okay.   When did you do that website?

20   **A.**   That was probably 2012 or '13.   I'm not exactly sure.

21   **Q.**   Okay.   And do you know when Terrell signed the lease for

22   Asset Financial Recovery?

23   **A.**   No, I don't.

24   **Q.**   Would it surprise you to learn that he signed it in 2011?

25        MR. BROWN:   Your Honor, I would object.   The witness

1  has already established he does not know anything about this

2  lease.

3  **Q.  (BY MS. DURRETT)**  Let's talk --

4  　　　　　THE COURT:  All right.  Sustained.

5  　　　　　Go ahead.

6  　　　　　MS. DURRETT:  Thank you, Your Honor.

7  **Q.  (BY MS. DURRETT)**  Let's talk about some of the websites.

8  Did you -- I'm going to show you -- did you ever make a website

9  for Recovery Capital Group?

10  **A.**  No.

11  **Q.**  Okay.  Have you ever heard of that company?

12  **A.**  No.

13  **Q.**  Did you ever make a website for Federal Recovery Service?

14  **A.**  No.

15  **Q.**  Have you ever heard of that company?

16  **A.**  No.

17  **Q.**  Did you know that Terrell McQueen was operating that

18  company?

19  　　　　　MR. BROWN:  Objection.  The defendant -- the witness

20  has already established he does not have any knowledge about

21  the companies in which the defense attorney is questioning him

22  about, Your Honor.

23  　　　　　MS. DURRETT:  I'll withdraw it, Your Honor.

24  　　　　　MR. BROWN:  He lacks knowledge.

25  　　　　　THE COURT:  All right.

```
 1              MS. DURRETT:  That's fine.
 2     Q.   (BY MS. DURRETT)  Did you ever make a website for Recovery
 3     Capital?
 4     A.   No.
 5     Q.   Okay.  Did you ever make a website for National Mutual
 6     Capital?
 7     A.   No.
 8     Q.   Did you ever make a website for Federal Asset Recovery?
 9     A.   No.
10     Q.   I'm going to show you -- I'm going to show you Exhibit 26
11     and ask if you recognize it.  Because I know you did some
12     forgeries you said.  So maybe you'll recognize this one.  Okay?
13          It is Exhibit Number 26.  Just let me know if you
14     recognize that.
15     A.   I don't recognize this.
16     Q.   Okay.  I'll take it back.  Thank you.
17          I think I've already asked you:  You didn't do a website
18     for Federal Recovery Service; right?
19     A.   No.
20     Q.   What about Attorney Recovery Systems?  Did you do a
21     website for them?
22     A.   Yes.
23     Q.   Okay.  Tell us about that.
24     A.   I just did the website.
25     Q.   Who asked you to do the website?
```

1   **A.**   Allen and Terrell.

2   **Q.**   Okay.  Tell us about that because -- well, go ahead.

3        Do you know anything else about it?

4   **A.**   No.

5   **Q.**   Did you know the business address for that was 3333

6   Piedmont Road?

7   **A.**   No.

8   **Q.**   Did you ever visit that business address?

9   **A.**   No.

10  **Q.**   Did you know that Mr. McQueen was sending out letters

11  under the name Gene Bloom in connection with Attorney Recovery

12  Systems?

13  **A.**   No.

14  **Q.**   Did you put Gene Bloom's name on the website?

15  **A.**   No.

16  **Q.**   Let me show you Exhibit 29 and see if you recognize that.

17  **A.**   What am I looking at?

18  **Q.**   Is it a document that you recognize or have seen before?

19  **A.**   No.

20  **Q.**   Did you know that Mr. McQueen was operating a business

21  called McQueen & Associates?

22        MR. BROWN:  Your Honor, I would object.

23  **A.**   No.

24        MR. BROWN:  The witness has testified he has no

25  knowledge of this business.

```
 1            THE COURT:  I don't know what the document is so --
 2            MS. DURRETT:  I'm just asking if he knows about the
 3    businesses that Mr. McQueen ran.
 4            THE COURT:  That is fine.  Go ahead.
 5            MS. DURRETT:  Thank you.
 6    Q.   (BY MS. DURRETT)  Did you know that Mr. McQueen operated a
 7    business called Terrell L. McQueen, LLC?
 8    A.   No.
 9    Q.   Did they ask you -- when they interviewed you, did they
10    ask you about Terrell?  Did they show you documents related to
11    Terrell or just Mr. Pendergrass?
12    A.   No.  They didn't show me anything.
13    Q.   They didn't show you anything at all?
14    A.   They showed me just this, but they didn't show me anything
15    about Terrell.
16            MS. DURRETT:  I don't have any other questions for
17    you.
18                      REDIRECT EXAMINATION
19    BY MR. BROWN:
20    Q.   Mr. Fitchpatric, did you copy notary seals before you met
21    Mr. Pendergrass?
22    A.   No.
23    Q.   Did you copy signatures before you met Mr. Pendergrass?
24    A.   No.
25    Q.   Have you forged or sent anyone else any notaries or
```

1   signatures after leaving the business --

2   **A.**   No.

3   **Q.**   -- of Mr. Pendergrass?

4   **A.**   No.

5           MR. BROWN:  That is all I have, Judge.  Thank you.

6           THE COURT:  All right.  Is this witness excused?

7           MS. DURRETT:  Yes.

8           MR. BROWN:  Yes, Your Honor.

9           THE COURT:  Is he subject to recall?

10          MS. DURRETT:  No, Your Honor.

11          MR. BROWN:  No.

12          THE COURT:  All right.  You are excused.  Please

13  don't discuss your testimony with anyone until the conclusion

14  of the trial.

15          THE WITNESS:  All right.

16          THE COURT:  Thank you.

17          Yes?

18          MR. BROWN:  I'm waiting on your direction, Judge.

19          THE COURT:  Well, we're not finished -- we'll talk

20  about this later.

21          But do you have another witness here?

22          MR. BROWN:  I do.  But the other witness is going to

23  cover matters in which you reserved ruling on, Judge.

24          THE COURT:  All right.  Well, so then we'll wait

25  until tomorrow.

214

```
 1            Ladies and gentlemen --
 2            I don't need to have this down.  If counsel would
 3     just come and talk with me for a second.  That is fine.
 4                (A discussion ensued off the record.)
 5            THE COURT:  Okay.  Ladies and gentlemen, I'm going to
 6     excuse you now.  And we're going to begin tomorrow.  Just be
 7     here at 9:30.  We're hoping we are going to resolve whatever we
 8     have to do tomorrow pretty quickly.  So we can't anticipate
 9     exactly how long it will take.  But please be here at 9:30.
10            Thank you very much for your patience and your
11     attention.  Have a good evening.
12                (The jury exited the courtroom at 4:38 P.M.)
13            MR. BROWN:  Judge, I was going to let you know about
14     scheduling.  The Government only has two additional witnesses.
15     So we expect to finish our direct before lunch tomorrow,
16     depending on how long the cross is of Mr. McQueen.  But we only
17     have two witnesses left, Judge.
18            THE COURT:  Great.  Thank you.
19            MS. DURRETT:  We'll have witnesses here tomorrow in
20     the afternoon.
21            THE COURT:  Okay.
22            MS. DURRETT:  Has the Court made a determination
23     about the stipulation issue?  I know there hasn't been time
24     but --
25            THE COURT:  Why don't I just talk to you about it
```

1    tomorrow morning first thing.

2              MS. DURRETT:  Thank you.

3              THE COURT:  Is there anything else?

4              MR. BROWN:  Not from the Government, Judge.

5              MS. DURRETT:  I guess the one other thing is the

6    conviction because the Court said you wanted the Government to

7    wait until later in their case.

8              THE COURT:  And when we finish everything else -- I

9    mean, you are going to just independently submit the

10   conviction; right?  Also we're going to wait until everything

11   is done --

12             MR. BROWN:  Correct.

13             THE COURT:  -- and I'm going to see where we're at?

14             MS. DURRETT:  Thank you, Your Honor.

15             THE COURT:  Annie, how are we doing on the jury

16   charges?

17             **(There was a brief pause in the proceedings.)**

18             THE COURT:  If you, in fact, finish the evidence

19   tomorrow, we'll try to talk to you about the verdict form at

20   least tomorrow.  And if I'm through with looking over the jury

21   charge, I'll give it to you or we'll send it to you later

22   tomorrow night and we'll discuss it on Thursday morning before

23   the jury comes in.

24             MS. DURRETT:  Okay.  And then would it --

25             THE COURT:  I mean, it really depends on how long you

1    think you are going to be tomorrow.  But I know you can't know

2    exactly.

3              MS. DURRETT:  Right.  But if we were finished

4    tomorrow, we would start openings on Thursday morning?

5              THE COURT:  Closings on --

6              MS. DURRETT:  I'm sorry.  Closings.

7              THE COURT:  Well, we might start it a little bit

8    later than first thing in the morning because we might still

9    have to hash some things out in the jury charge.

10             MS. DURRETT:  Thank you.

11             THE COURT:  If there are any requested -- are there

12   any redactions that will need to be made in the indictment?

13             MR. BROWN:  Not from the Government's perspective,

14   Judge.

15             MS. DURRETT:  I think they redacted the conviction

16   that is going to come in.  I can take a look tonight just to

17   make sure.

18             MR. BROWN:  Okay.  All right.

19                   **(The proceedings were thereby adjourned at 4:42**

20                   **P.M.)**

21

22

23

24

25

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 216 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the 3rd day of January, 2022.




_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT