The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION

 3   UNITED STATES OF AMERICA,          :
                                        :
 4   vs.                                :   DOCKET NUMBER
                                        :   1:17-CR-0224-1
 5   ALLEN J. PENDERGRASS,              :
                                        :   ATLANTA, GEORGIA
 6             DEFENDANT.                :   DECEMBER 1, 2021

 7

 8     TRANSCRIPT OF JURY TRIAL - VOLUME II OF IV PROCEEDINGS

 9           BEFORE THE HONORABLE AMY TOTENBERG

10           UNITED STATES SENIOR DISTRICT JUDGE

11

12   APPEARANCES OF COUNSEL:

13        FOR THE GOVERNMENT:

14        JEFFREY A. BROWN
          TRACIA M. KING
15        UNITED STATES ATTORNEY'S OFFICE

16
          FOR THE DEFENDANT:
17
          SARALIENE DURRETT
18        SARALIENE SMITH DURRETT, LLC

19        SYDNEY R. STRICKLAND
          STRICKLAND WEBSTER, LLC
20

21
        MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED
22                    TRANSCRIPT PRODUCED BY:

23   OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
                                     2394 UNITED STATES COURTHOUSE
24                                   75 TED TURNER DRIVE, SOUTHWEST
                                     ATLANTA, GEORGIA  30303
25                                   (404) 215-1383
```

```
 1                 I N D E X   T O   P R O C E E D I N G S

 2
                     THE GOVERNMENT'S CASE (CONTINUED)
 3
            WITNESS                                      PAGE
 4
      MICHAEL COHEN
 5
            Voir Dire Examination
 6              By Mr. Brown                               3
            Voir Dire Examination
 7              By Ms. Durrett                            12

 8    MICHAEL COHEN

 9          Direct Examination
                By Mr. Brown                             35
10          Cross-Examination
                By Ms. Durrett                           49
11
      TERRELL LASHAWN MCQUEEN
12
            Direct Examination
13              By Mr. Brown                             65

14                              *  *  *

15    CERTIFICATE                                       243

16

17

18

19

20

21

22

23

24

25
```

1          **P R O C E E D I N G S**

2    **(Atlanta, Fulton County, Georgia; December 1, 2021.)**

3    <u>**THE GOVERNMENT'S CASE (CONTINUED).**</u>

4              THE COURT:  Are you ready with your witness?

5              MR. BROWN:  Yes.  Mr. Cohen is here.

6                    **(Witness sworn)**

7              COURTROOM DEPUTY CLERK:  Thank you.  Have a seat.

8    Please grab a plastic bag out of the box.  Place it over the

9    mic.  Then you may remove your mask when you are speaking.

10             And if you would, state your name and spell your last

11   name for the record.

12             THE WITNESS:  State my name and what?

13             COURTROOM DEPUTY CLERK:  Excuse me?

14             THE WITNESS:  State my name and what?

15             COURTROOM DEPUTY CLERK:  Spell your last name for the

16   record.

17             THE WITNESS:  My name is Michael Cohen, C-O-H-E-N.

18       Whereupon,

19                    MICHAEL COHEN,

20       after having been first duly sworn, testified as follows:

21                    VOIR DIRE EXAMINATION

22   BY MR. BROWN:

23   **Q.**   What kind of work do you do?

24   **A.**   I'm an attorney.  I do landlord/tenant work.

25   **Q.**   How long have you been doing that kind of work?

1    **A.**   Since 1972.

2    **Q.**   So obviously you know why you are here in court today as

3    it relates to your dealings with Mr. Allen Pendergrass?

4    **A.**   I do.

5    **Q.**   Have you had a chance to look at Government's Exhibit

6    Number 29, which is an email dated March 6, 2013, from

7    mcohen@nsidelaw.com to Allen Pendergrass, which is

8    pendergrassallen@gmail.com?

9    **A.**   Yes.

10   **Q.**   And also an individual, E. Earvin?

11   **A.**   Yes.

12        COURT REPORTER:  I'm sorry.  I didn't get that.

13        MR. BROWN:  Earvin Magic Johnson.

14   **Q.**   **(BY MR. BROWN)**   Then do you see the second page of that

15   email which is a response from Allen Pendergrass to you at

16   mcohen@nsidelaw, N-S-I-D-E, law.com?

17   **A.**   I do.

18   **Q.**   All right.  Have you spoken with investigators over these

19   last few years about your dealings with Mr. Pendergrass?

20   **A.**   I did.

21   **Q.**   And based on your review of the email and your memory, do

22   you recall having dealings with Allen Pendergrass as it relates

23   to some funds from Harris County, Texas?

24   **A.**   Yes.

25   **Q.**   Can you just tell the Judge what your involvement was with

1  these funds from Harris County, Texas, and how you came to meet

2  Mr. Pendergrass?

3  **A.**   Well, I was assisting a friend of his or associate of his

4  with some Fair Debt Collection practice issues.

5  **Q.**   Let me stop you there.  So who was that associate of

6  Mr. Pendergrass who you were -- who you were assisting?

7  **A.**   Mr. Earvin.

8          THE COURT:  Mr. Who?

9          THE WITNESS:  Earvin, E-A-R-V-I-N.

10 **Q.**   **(BY MR. BROWN)**  And is that the same individual who is

11 copied on the email that we just referenced earlier?

12 **A.**   Yes.

13 **Q.**   So explain how you end up meeting -- did you actually meet

14 Mr. Pendergrass?

15 **A.**   Yes.

16 **Q.**   Where did you meet Mr. Pendergrass?

17 **A.**   In my office on Wieuca Road.

18 **Q.**   And what was the nature of that meeting?

19 **A.**   They had a -- he had a business plan where he would mine

20 data from counties to see if there were funds -- unclaimed

21 funds in their tax -- property tax departments.  And he said he

22 had some funds that were collected, and he wanted to know if I

23 would assist in being an escrow agent and possibly in the

24 future writing letters to other potential people who had -- who

25 had unclaimed funds in this county.

1   **Q.**   Now, you said he had a business.  Is he Mr. Pendergrass or

2   Mr. Earvin?

3   **A.**   Mr. Earvin I don't think had anything to do with it.  I

4   don't know what relationship he had with Mr. Pendergrass.  But

5   I dealt with Mr. Pendergrass on trying to understand how the

6   system worked.  And that is what I did.

7   **Q.**   Okay.

8           THE COURT:  So are you saying that Mr. Earvin had the

9   business?  Or you said I don't think he had anything to do with

10  it?

11          THE WITNESS:  I think it was just Mr. Pendergrass.

12          THE COURT:  Had the business?

13          THE WITNESS:  Yes, ma'am.  And the name of the

14  business was this Attorney Recovery.

15          THE COURT:  I'm sorry.  What did Mr. Earvin have to

16  do with anything?

17          THE WITNESS:  He introduced.

18          THE COURT:  He introduced you-all?

19          THE WITNESS:  To this potential client.

20          THE COURT:  All right.

21  **Q.   (BY MR. BROWN)**   So after the introduction, what were your

22  dealings with Mr. Pendergrass?  Did he eventually provide you

23  some checks?

24  **A.**   He did.  He provided me five or six checks that he wanted

25  me to deposit, and I did into a trust account.

1    Q.   Let me stop you there.  What was your understanding as to

2    why Mr. Pendergrass needed you or wanted you to deposit these

3    funds into a trust account?

4    A.   I think it was to make it more legitimate when I would

5    contact -- if I were to contact people in the future that might

6    have a claim to these funds coming from an attorney I think

7    might have been the reason.

8    Q.   So let me ask you:  So once you deposited these funds into

9    the trust account you created, what did you do with the funds?

10   A.   Well, first, I want to tell you that I called Harris

11   County, Texas -- the clerk out there and asked them about each

12   individual check to make sure they were legitimate.  The

13   numbers matched.  They were clear.  And as far as they knew,

14   everything was fine with those checks.  And so I then deposited

15   them into this trust account.

16   Q.   Did Mr. Pendergrass tell you how he obtained these checks

17   or whose behalf he was working on to get these checks from

18   Harris County?

19   A.   He showed me documents that it was -- the account was in

20   the name of Lee Family Trust.

21   Q.   All right.

22   A.   And the documents he showed me had what appeared, I think,

23   her name and the power of attorney.  And it was notarized.  And

24   that is how I believed that it was proper.

25   Q.   All right.  So did Mr. Pendergrass lead you to believe

1  that he had the authority of the Lee Family Trust to obtain

2  these checks from Harris County?

3  **A.**    Yes.

4  **Q.**    Now, tell us:  After you deposited the checks, did you

5  have a -- to learn -- have some concerns about whether

6  Mr. Pendergrass actually had the authority to negotiate these

7  checks?

8  **A.**    Yes, I had a concern.

9  **Q.**    Tell us about the concerns.

10  **A.**    Well, it hit me that there was a person that lived on my

11  street, a neighbor, who worked for this company, Attorney

12  Recovery.  So that's quite a coincidence.  So I can't remember

13  exactly what happened.  But I called my friend Tom Greenfield,

14  the neighbor, and said, I was happy to tell him I was doing

15  some work for his company.  And he said he didn't know anything

16  about any Georgia operations of Georgia -- of Attorney Recovery

17  except what he did.  It was a collection -- commercial

18  collection work.

19        And he may have come by my office and looked at the

20  document that purported to be from Attorney Recovery.  And he

21  said he doesn't know Mr. Pendergrass, never heard of him.  He

22  had been there with them for 20 years.  The signature was not

23  of the president, Mr. Bloom.  I then --

24            THE COURT:  I'm sorry.  What did you say about

25  Mr. Bloom?

1          THE WITNESS:  Mr. Bloom was the president of the

2   company.  And so my friend, Tom Greenfield, knew the president.

3   So I called the president, Mr. Bloom, and said -- he was upset.

4   He didn't know anything about this case.  He was concerned that

5   someone else was trying to collect money in his name.  And he

6   had -- he said I'm going to make a claim for those funds.

7          So now I've got two people wanting the money, and I

8   just held on to it.

9          MR. BROWN:  Your Honor, I could go through his whole

10  direct examination, but I want to be clear as to what the Court

11  wants to get to.

12         THE COURT:  Well, I'm just trying to -- I was trying

13  to understand what was this -- is this being offered as to the

14  concerns regarding the duplicate use of Attorney Recovery

15  Systems?  I'm trying to understand.

16         MR. BROWN:  Okay.  So we'll -- okay.  I'll let you

17  tell her, but I can proffer.

18  **Q.   (BY MR. BROWN)**  So did it come out -- let me show you what

19  is marked as Exhibit Number 9.  Just flip through that document

20  and tell me -- just take a look at it, and I'll ask you a few

21  questions.

22  **A.**   (The witness complies.)

23  **Q.**   So you testified earlier that as part of your dealings

24  with Mr. Pendergrass you received documents that indicate that

25  he had the authority to operate on behalf of Lee Family Trust;

1    is that right?

2    **A.**    Yes.

3    **Q.**    And based on your -- and he was operating under the

4    company Attorney Recovery System, Inc.?

5    **A.**    Yes.

6    **Q.**    And based on your discussions with your neighbor and

7    further due diligence, did you find out that that information

8    was false?

9    **A.**    Yes.

10   **Q.**    How did you find out that information was false?

11   **A.**    Well, I called the company that I thought I was dealing

12   with, and I tracked down the attorney for the Lee Family Trust

13   and spoke to him and sent him the paperwork that purported to

14   be her signature.  He said that wasn't hers.  She wasn't aware

15   of any money coming out or any claim to money.

16   **Q.**    All right.  And so kind of going back to Exhibit

17   Number 10, which is your -- the email dated March 6, 2013, in

18   that email are you explaining to Mr. Pendergrass that you are

19   going to sever the relationship because you have concerns of

20   fraud?

21   **A.**    Yes.

22   **Q.**    And the money that you had -- the checks you received from

23   Mr. Pendergrass, did you return that money to Mr. Pendergrass

24   or what did you do with those funds?

25   **A.**    I talked to the clerk again.  And then I think I spoke to

1    an investigator with that county, and they directed me to

2    return the funds, and I did that.

3    **Q.**   Okay.  So do you feel like you were deceived in this

4    business dealing with Mr. Pendergrass?

5    **A.**   Yes.

6    **Q.**   And when you communicated this email on March 6 to Mr. --

7    this email to Mr. Pendergrass, did he respond back saying that

8    he was revoking -- that he decided to cancel the power of

9    attorney on the second page of that email?

10   **A.**   Yes.

11   **Q.**   Okay.  Actually, if you look at Page 2 -- so

12   Mr. Pendergrass sends his email on March 1st, 2013, at 5:29.

13   And that email says, we spoke with Ms. Lee, and she decided to

14   cancel our power of attorney.  See attachment.  Please advise.

15       Then you respond five days later and say I'm responding to

16   you basically saying -- was he trying to get the money back

17   from you?

18   **A.**   Yes.

19   **Q.**   All right.  So you respond back and saying you think you

20   were deceived, there was fraud, and you did not return the

21   money to Mr. Pendergrass?

22   **A.**   Correct.

23           MR. BROWN:  All right.  So that's all I have, Judge.

24       Do you have any questions of the witness?

25           THE COURT:  No.  I just want to allow -- not at this

1   moment.  I just wanted to allow Ms. Durrett to question him.

2          MS. DURRETT:  Thank you, Your Honor.

3                     VOIR DIRE EXAMINATION

4   BY MS. DURRETT:

5   **Q.**   Good morning, Mr. Cohen.  How are you doing?

6   **A.**   Peachy.

7   **Q.**   I'm Saraliene Durrett.  I represent Mr. Pendergrass in

8   this case.  So I just want to ask you a few questions.

9          So you had a landlord/tenant business; is that right?

10  **A.**   I'm doing that now.  I did it 50 years ago.  I just got

11  back in it.

12  **Q.**   Okay.  So at the time that you met -- had these meetings,

13  what year was that that you had these meetings?

14  **A.**   I believe 2013.

15  **Q.**   Okay.  What kind of law were you doing then?

16  **A.**   I was helping collection agencies with claims by the

17  government for violations of the FDCPA.

18  **Q.**   And Mr. Earvin, he was just a businessman?

19  **A.**   Yeah.

20  **Q.**   And he had some FDCPA violations or something that he was

21  trying to work through?

22  **A.**   Yes, ma'am.

23  **Q.**   Okay.  And that was a retained client of yours?  I don't

24  need to know the business.  But he was coming to you for legal

25  advice?

1   **A.**   Right.  It was just to help him with a charge by the

2   people that prosecute FDCPA claims for collection violations.

3   **Q.**   Did Mr. Pendergrass come with Mr. Earvin to all of your

4   meetings with Mr. Earvin?

5   **A.**   No.  No.  He brought him once and introduced me.  I tried

6   to understand how this whole system worked, and it sounded like

7   a legitimate business --

8   **Q.**   And --

9   **A.**   -- enterprise.

10  **Q.**   Can you just describe Mr. Pendergrass?  Was there anything

11  that stuck out about his appearance or anything?

12  **A.**   No.  He was a very nice man.

13  **Q.**   What did he look like?

14  **A.**   He is Black, and that's almost all I remember.  It was

15  about almost nine years ago.

16  **Q.**   He was a Black guy?

17  **A.**   Nice Black guy.

18  **Q.**   Nice Black guy.  Okay.  Great.

19       So I want to talk with you about the agreement that you

20  came to then with Mr. Pendergrass.  So you -- and did you just

21  have the one face-to-face meeting with him?

22  **A.**   I don't recall.

23  **Q.**   Okay.  But at some point, did you come to an agreement

24  during that meeting that you were going to help him or was it

25  at a later time?

**A.**    I don't recall.

**Q.**    Okay.  Let me ask you this:  Do you have a file related to this?

**A.**    No.  I moved -- I moved, and there is a lot of things missing.

**Q.**    Okay.  So the answer may be the same to all of these questions then.

        Do you have copies of any notes that you took during the meeting?

**A.**    No.

**Q.**    Do you have copies of any letters you wrote to Mr. Pendergrass?

**A.**    Only the copy of the email.

**Q.**    Do you have any copies of any letters Mr. Pendergrass wrote to you?

**A.**    Only the response that I saw, the document.

**Q.**    Okay.  That is the only email or letter or anything?

**A.**    That I recall.  I don't know if I have many or few or none.

**Q.**    Do you have any time sheets related to the time you would have spent on this case?

**A.**    No.

**Q.**    Okay.  Do you have an engagement agreement that explains the responsibilities of the lawyer and client in this relationship?

1  **A.**   I referred -- there was one -- a reference to it in the

2  email, but I no longer have those documents.

3  **Q.**   So you don't have a document that was signed by -- I mean,

4  as attorneys, sometimes we make agreements with clients, and we

5  sign the document, and the client also signs the document.

6  **A.**   I agree.

7  **Q.**   Was that your practice?

8  **A.**   Yes.  But I can't tell you if I had one in this case or

9  not.  It was pretty loose.

10  **Q.**   Pretty loose?

11  **A.**   It was pretty loose.  The agreement was pretty loose.

12  **Q.**   So what was your understanding of how you were going to

13  get paid as a result of this agreement?

14  **A.**   This is just from memory.  I believe I was going to

15  receive $2500 for handling the checks and disbursing them and

16  writing to the people and assisting any way I could.

17       Then for the future, the idea was that if there was data

18  of other people that had money in this particular county that

19  was unclaimed I would be the person writing them to say, hey,

20  you've got some money here and here is how you can try to get

21  it.

22  **Q.**   Okay.  So you were going to get $500 per check or $2500

23  per month?

24  **A.**   $2500 total for handling.  That is just my recollection.

25  **Q.**   Okay.  And what did the $2500 cover?

1   **A.**   It covered all the time I was spending dealing with

2   Mr. Pendergrass, the depositing and negotiating of the checks,

3   and the disbursement -- eventually disbursement.

4   **Q.**   Okay.  Have you ever met a man named Terrell McQueen?

5   **A.**   Not that I recall.

6   **Q.**   Okay.  Have you ever met a man named Kwame Thomas

7   (phonetic)?

8   **A.**   No.

9   **Q.**   Did you have a secretary at the time that you had these

10   meetings?

11   **A.**   No.

12   **Q.**   So there was no one else besides you and Mr. Earvin and

13   Mr. Pendergrass present?

14   **A.**   Correct.

15   **Q.**   Do you have any voice mails or anything from

16   Mr. Pendergrass that you have saved?

17   **A.**   No.

18   **Q.**   Okay.  And there is no written fee agreement or written

19   engagement letter?

20   **A.**   There might have been one.  But I certainly don't have it

21   any more.

22   **Q.**   Now, you agreed to accept $168,000 in trust fund money

23   basically to put into your trust account without any sort of

24   written agreement in place?

25   **A.**   No.  There may be a written agreement in place.  I just

1    cannot provide it to you.

2    **Q.**   Okay.  And then when you -- I know you talked about how

3    you were trying to return the money and you were contacting

4    another attorney about it and then you contacted Harris County.

5        You were trying to get some money from that too; right?

6    **A.**   Well, I mean, I would have liked to have recovered some

7    money for something that I have done.  But it wasn't a -- I'm

8    really grateful that I returned the funds back to where it came

9    from because I think I would have been looked at as liable for

10   these funds.

11   **Q.**   Okay.  And at the time that you were talking about this

12   business, Attorney Recovery -- what is it called?  Attorney

13   Recovery Service?

14   **A.**   Yes, ma'am.

15   **Q.**   Did anyone provide any documents to you to show you

16   anything about that company?

17   **A.**   Well, I looked at the Secretary of State because I was

18   trying to determine this Bloom relationship.  And then the part

19   I'm grateful about is that my neighbor on the same street

20   worked for a company with the same name.

21       And that when he told me he didn't know the signature of

22   Bloom and he didn't know Mr. Pendergrass, that was a red flag

23   for me and I started investigating.  Because I did not want to

24   turn those monies over unless I knew they were legitimate and

25   going to the right place.  And I didn't care about the fee.

1   Q.   So when you had that meeting with Mr. Pendergrass and he

2   said, my business is Attorney Recovery System, did you at that

3   moment think, oh, that is my neighbor's business?

4   A.   I don't know when it hit me.  I just -- he was on my

5   street.  I have talked to him many times.  I knew he was in

6   commercial collection.  I don't know what made me think that

7   sounds really familiar.  It just didn't happen immediately.

8   Q.   Okay.  I'm going to show you what has been marked as

9   Defendant's Exhibit A and ask if anyone ever showed you this

10  document.

11  A.   I don't think I have ever seen it.  I don't know what it

12  is.

13  Q.   Okay.  Well, did anyone ever tell you that a person named

14  Terrell McQueen had either made or applied for a business

15  license for Attorney Recovery System?

16  A.   No.

17  Q.   Okay.  No one ever talked to you about that?

18  A.   I don't recall it.

19          THE COURT:  Yes?

20          MR. BROWN:  Your Honor, I don't -- it is not an

21  objection.  But, Your Honor, she's getting into an area that

22  she wants to get in front of the jury.  I don't know what the

23  Court's concerns were about this testimony.

24          The Government argued and I think you found in your

25  order that it is intrinsic.  I would just proffer to the Court

1    Mr. McQueen will testify about his dealings with

2    Mr. Pendergrass with this company, Attorney Recovery Systems,

3    and working to try to get these funds fraudulently.

4            So I don't want to waste the jury's time because they

5    are waiting on us, Your Honor.

6            THE COURT:  I agree.

7            MR. BROWN:  I want to make sure you are satisfied.

8            MS. DURRETT:  I agree, Your Honor.  But the problem

9    is we have a lot of evidence that it is Terrell McQueen's

10   business, not Mr. Pendergrass's business.  And so this idea

11   that he met with a Black man eight years ago and talked about

12   this -- I don't think it adds value here.

13           THE COURT:  Is there anything else that you need to

14   examine him about?

15           MS. DURRETT:  One moment.  Oh, yeah, I do want to

16   examine you about the name Gene Bloom.

17   Q.   **(BY MS. DURRETT)**  Have you ever met anyone named Gene

18   Bloom?  You have a neighbor; right?  Gene Bloom?

19   A.   Gene Bloom is out of state.  I have never met him in

20   person.

21   Q.   Okay.  What is your neighbor's name?

22   A.   Tom Greenfield.

23   Q.   Tom Greenfield.  How do you know Gene Bloom is out of

24   state?

25   A.   Well, I got that information from Mr. Greenfield who

1  worked for that company for over 20 years who saw the signature

2  of Gene Bloom and told me that wasn't Gene Bloom's signature.

3  He was unaware of any actions in Georgia like this for his

4  company.  And I went from there.

5  **Q.**   And you never met -- did you ever receive a phone call

6  from Gene Bloom?

7  **A.**   Oh, yes.

8  **Q.**   What was that phone call about?

9  **A.**   About what was occurring.  That someone using the name or

10  similar name to his company had me working to collect money on

11  taxes from -- you know, unclaimed taxes from Texas.

12  **Q.**   And did you ever see any documents to Harris County that

13  had Gene Bloom's name on them that were letters written to

14  Harris County?

15  **A.**   Well, I can't recall exactly.  But I have seen the

16  exhibits that have Gene Bloom's signature on it -- purportedly

17  to be his signature.

18  **Q.**   When did you see those exhibits?

19  **A.**   Well, I would like -- I don't want to guess.

20  **Q.**   Please don't.  So when --

21  **A.**   I believe that I saw them when I met with Mr. Pendergrass

22  because I wanted to see the documents he was using as authority

23  to take these funds from Harris County.

24  **Q.**   And did you see them again when you talked to the

25  Government?

1   **A.**   I saw them now for sure.

2   **Q.**   Okay.

3         THE COURT:  Can you wrap up?

4         MS. DURRETT:  Yes.

5   **Q.   (BY MS. DURRETT)**  Have you ever heard of a business

6   called -- let me make sure I know the right name -- Lionheart

7   Layer & Associates (phonetic)?

8   **A.**   Not that I recall.

9   **Q.**   Did you ever do any work for that business?

10  **A.**   I don't recall any name like that.

11        MS. DURRETT:  That's all I have.  Thank you.

12        MR. BROWN:  Nothing further from the Government,

13  Judge.  Just argument.

14        THE COURT:  You can be excused for a moment.  If you

15  wouldn't mind stepping outside.  Thank you.

16              **(The witness exited the courtroom.)**

17        THE COURT:  I'm going to be a minute here.

18              **(There was a brief pause in the proceedings.)**

19        THE COURT:  I'm just going to put out what my concern

20  about this witness' testimony is.  It is really a pretty strong

21  concern.

22        As far as I can recall, there were -- while asset --

23  Attorney Recovery System is mentioned in the -- as background

24  information in Paragraph 5 of the indictment, the whole sort of

25  part of the testimony of this witness that deals with -- that

1    he had -- that Mr. Pendergrass had made fraudulent

2    representations about the Attorney Recovery System and using

3    this vehicle that was his neighbor's is not -- is not, in fact,

4    the thrust of the indictment.

5           And it seems to me while there are things that he

6    says that are -- deals with that are relevant this whole

7    portion of it is a whole kind of other branch.

8           And I'm afraid -- I'm concerned that it is confusing.

9    The testimony on the other dimensions is cumulative and, of

10   course, about a different entity and I'm not -- cumulative and

11   not necessary.

12          You've got strong proof, as it is, in this case.  But

13   I mean, this is sort of like -- at this point it seems to me

14   we're throwing something -- part of his testimony deals with

15   this whole, you know, alleged allegation of fraudulent use of

16   the -- use of the Attorney Recovery System.  And it is just

17   sort of like throwing almost like mud at the wall or paint -- I

18   know that is the actual expression.  And it will take time.

19          And I don't think it is -- I think it is confusing

20   and cumulative and, frankly, not necessary to making out the

21   Government's case.

22          MR. BROWN:  May I respond, Judge?

23          THE COURT:  Yes.  That is why I started first.

24          MR. BROWN:  So I'll respond first with the law,

25   Judge, as you well read the law you cited in your order.  But

1    I'll just cite you another case.  It is *United States vs.*
2    *United States Infrastructure*, 576 F.3d 1195.  It is an Eleventh
3    Circuit case, 2009.
4         It states that exclusion of intrinsic evidence is an
5    extraordinary remedy that must be used sparingly.  The Court
6    has decided in your order that this evidence is not extrinsic.
7    It is intrinsic.  It is during the same time frame, the same
8    parties, the same conduct.
9         THE COURT:  Right.  But I did not realize -- when I
10   made that decision, I did not realize that a portion of the
11   testimony was going to involve Attorney -- the question of was
12   there fraudulent use of the Attorney Recovery System.  That was
13   absolutely not clear.  I do not view that as intrinsic.
14        MR. BROWN:  Okay.  Can I continue, Judge, briefly?
15        THE COURT:  Yes.
16        MR. BROWN:  I'm not going to belabor the point.  I'm
17   not going to argue with Your Honor.
18        THE COURT:  That's fine.
19        MR. BROWN:  I'm not here to do that, Judge.  But I
20   think Your Honor is getting caught up on the name.  And the
21   testimony will be from our next witness, Mr. McQueen, that they
22   used various names during this scheme.
23        So the name for the five counts in the indictment was
24   just one of many names they used during the same time frame to
25   do the same conduct.  It is not different conduct.  So I think

1    that Your Honor is thinking, well, it is a different name,

2    Government, so let's not even get into it.

3         But we're linking parties' conduct, similar letters.

4    It is everything the same time.  It is not cumulative because

5    we don't have a witness who will testify that they met Allen

6    Pendergrass, that they exchanged emails with Allen Pendergrass

7    about the very same conduct this -- it is a scheme, Judge.

8         So I think it is a mail fraud scheme.  You said it is

9    background.  It is not background.  What the Government alleges

10   here is a part of the scheme.  And the Government will present

11   evidence on that scheme.

12        So that is why we allege in our indictment not to

13   dirty up the defendant but to say it is a scheme, so that is

14   why we included that.  And this is -- conspiracy, like themes,

15   allows the Government to offer evidence that is intrinsic to

16   the scheme.

17        And the case law is very clear, Your Honor.  It says

18   your decision to exclude this evidence, which is intrinsic, is

19   an extraordinary remedy the Court should not use unless it

20   is -- and there is no argument -- at least compelling argument

21   this evidence is more prejudicial than probative.  It is very

22   probative.

23        So the only witness we will have next is Mr. McQueen,

24   who is a co-defendant, who will testify about this, if the

25   Court allows his testimony of Lee Family Trust.  And he will

1    testify, Your Honor, that he was working with Mr. Pendergrass

2    at the same time he was using Asset Financial Recovery to do

3    these frauds.

4            So I just didn't want the Court to believe that the

5    name somehow makes it a different scheme.  It is the same

6    scheme, Your Honor, the same time frame, the same parties, the

7    same exact conduct.  This is not different, Judge.

8            So I can provide the case to you that basically says

9    your decision to exclude intrinsic evidence is an extraordinary

10   remedy.

11           THE COURT:  I am perfectly aware of the general rule.

12   But I also know that a court is absolutely authorized if it

13   thinks that the evidence will be confusing or cumulative.  So

14   that's --

15           MR. BROWN:  Anything else you want to hear from me?

16   I'm trying to persuade you, Your Honor.

17           THE COURT:  I understand.

18           MR. BROWN:  I think it is important, but I don't want

19   to argue with you.  I really don't.

20           THE COURT:  That's fine.

21           MR. BROWN:  If there is additional evidence that I

22   could provide to you --

23           THE COURT:  Well, it may have been easier if you had,

24   frankly, put Mr. McQueen up first.  But --

25           MR. BROWN:  Well, I was trying to -- but I couldn't

1    do that because you did not want information on the Lee Family

2    Trust to come in until I think you wanted to talk to Mr. Cohen

3    first.

4            THE COURT:  Right.  But I didn't -- frankly, you have

5    not made a point of saying, oh, they are simply -- they are

6    also fraudulently using these different companies.  I mean,

7    that is -- that is his concern when he starts here.  That is

8    the thrust of his testimony is about the fraudulent use of

9    Attorney Recovery System.  Then we get at the tail end the

10   actual piece that is more relevant.

11           MR. BROWN:  Right.  I understand.  I just want to say

12   one thing, Your Honor.  Government's Exhibit Number 12 is

13   already in evidence.  It has been admitted.  And it is a

14   document.  If you look at that, it is the use of Attorney

15   Recovery Systems by the same Gene Bloom we heard Mr. Cohen

16   testify about.  This is already in evidence.

17           And what the Court -- what the Government wants to

18   argue is it is not cumulative testimony by Mr. Cohen talking

19   about the meeting with Mr. Pendergrass using this name.  And

20   Mr. McQueen is going to come into this court.  Your Honor, I'll

21   proffer his testimony that yes, he -- he and Mr. Pendergrass

22   fraudulently used this name to try to get money from Holland &

23   Knight, to try to get money from the Lee Family Trust.

24           And defense counsel has exhibits on this very same

25   evidence.  So I will just finish by concluding that it is

1    intrinsic.  And we would ask the Court to allow Mr. Cohen's

2    testimony as well as Mr. McQueen's testimony on this issue,

3    Your Honor.

4              Thank you.

5              THE COURT:  All right.

6              MS. DURRETT:  Your Honor, I'm not going to talk you

7    out of a decision I think is headed my way.  But I do want to

8    talk to you about something else.

9              THE COURT:  Well, I do have an open mind.  So let me

10   just say:  I absolutely hear what Mr. Brown has said, and I'm

11   glad he pointed me out to Exhibit 12 as well.

12             MS. DURRETT:  Well, I would like to talk to you a

13   little bit then about Holland & Knight.  Because the reason we

14   have exhibits related to Holland & Knight -- and that is the --

15   something that was done on Attorney Recovery Systems.  We have

16   those exhibits, and we intend to call an investigator from

17   SunTrust and our own investigator who will show that

18   Mr. McQueen used that name Gene Bloom on the Attorney Recovery

19   System's letterhead and sent -- not only sent Mr. -- or drafted

20   a letter to Mr. Pendergrass to suggest that Holland & Knight

21   had hired that firm but also opened a bank account to deposit

22   the Holland & Knight check -- his own personal bank account,

23   used that money to transfer to another bank account that he

24   opened, and then SunTrust started an investigation on him.

25             They contacted him.  He refused to talk to them.

1    They reported it to Clayton County Police.  And there is a full

2    police report written by the SunTrust investigator.

3    Mr. McQueen had to go to Clayton County, and he had to pay

4    restitution for that.  And that came out of his own personal

5    bank account.

6            So Mr. McQueen did the Holland & Knight thing.  He

7    did it.  He paid the restitution for it.  He was written up in

8    a police report about it.  He opened the bank accounts.  He

9    transferred the money.

10            So, you know, it is his scheme.  And I think that the

11   evidence we heard today bolsters that, that this is the guy who

12   is out doing that kind of thing under Attorney Recovery

13   Systems.

14            And so we think not only should Lee Family Trust be

15   out but also Holland & Knight because he did it.  I mean, it is

16   not Mr. Pendergrass.  And like I said, we have got the SunTrust

17   investigator and our own investigator who has the information

18   about how he was -- he avoided prosecution in Clayton County

19   strangely by paying restitution.  But he had a police report

20   and a court case.

21            THE COURT:  Well, I'm sure that the Government here

22   would probably still allege that, well, they worked together

23   about this and that is why they want this in.  And that in some

24   ways makes it more relevant that he has this witness.

25            MS. DURRETT:  But I don't -- Your Honor, I think what

1  we can show is that Mr. McQueen did the entirety of the Holland
2  & Knight issue.

3          THE COURT:  Then it becomes relevant.  You know, let
4  me just say:  If you want -- I'm going to actually allow it now
5  when I think about -- when I am hearing all of that.  If you
6  want -- you know, at some point you want me to say -- to give
7  an instruction about that the charge here is about the -- if
8  you want some sort of limiting instruction, you can propose it
9  and I will absolutely consider giving it --

10          MS. DURRETT:  Okay.

11          THE COURT:  -- and likely will give it.  But it has
12  to be a reasonable one.

13          And -- and if I think it is confusing as he is
14  testifying, I am going to tell the jury that the issue is --
15  the primary issue here basically relates to the similarity of
16  the funds -- of the funds, not the question of the use of the
17  funds.  Because that is what it is.

18          And, you know, I just was completely stunned when we
19  spent -- ended up spending time on did he have authority to do
20  this on the behalf of Attorney Recovery System because that
21  really has not been the thrust of the evidence.

22          I'm sorry.  I mean, I understand what you are saying
23  here with what you are planning to do.  I would have preferred
24  there be, in fact, a foundation for him getting into this if we
25  were going to do this.

1          But you are entitled to put on -- I'm not somebody
2    who will tell you -- and there are judges, I know, who will
3    tell you you can't go first.  I sat in a 1983 trial with one of
4    my former colleagues who just basically -- and the police
5    officers were called first by the plaintiff in the 1983 case.
6    And the judge, one of my former colleagues, said, you can't do
7    that, and made them completely reorder their witnesses.
8          If I thought this was that extreme, I would do that.
9    But -- but if you feel at some point that we need though --
10   counsel, if you think that I need to stop and give a limiting
11   instruction of some sort, you are absolutely -- I am -- I will
12   be open to that.
13         MS. DURRETT:  Your Honor, we have proposed a limiting
14   instruction.  It is in our instructions regarding the intrinsic
15   acts, and we would like the Court to give that.
16         THE COURT:  Now?
17         MS. DURRETT:  Yeah.  Before the evidence.
18         THE COURT:  Where is it?
19         MS. DURRETT:  I'll have to find it.
20         LAW CLERK BORING:  I have it.
21         THE COURT:  You have it?
22         MS. DURRETT:  And I don't know if the Court has
23   considered when they are going to give the stipulation.  We
24   have looked at that language.  We approve that language.  So we
25   think all of --

1            THE COURT:  Do you want to tell us about what --

2    Mr. Brown, about the Government's view about the limiting

3    instruction?

4            MR. BROWN:  Yes.  My view hasn't changed.

5            THE COURT:  I mean, not the limiting instruction.

6    The stipulation.

7            MR. BROWN:  The stipulation.  My view hasn't changed,

8    Your Honor.  I think that stipulation is improper.  What the

9    defense has asked you to do is turn into evidence what the

10   Government argued in their brief three years ago.

11           And the main point I want the Judge to understand is

12   it is not inconsistent.  So the whole thrust of her argument is

13   the reason why you need to bring this portion of the

14   Government's brief in, Doc. 73, 3rd Page, 1st paragraph, is

15   because it is inconsistent with the position the Government is

16   taking now.  And it is not.

17           And you'll hear from Mr. McQueen next who will

18   testify I signed, I sent them.  So nothing the Government is

19   saying is inconsistent.

20           So why does a court or defense counsel need to bring

21   in a line from the Government's brief when they are arguing

22   404(b)?  It is not evidence.  If you look closely at the

23   Court -- the defendant's citations, Your Honor, it is nothing

24   to do with this case.

25           It involves the Government taking inconsistent

1   positions in different trials involving different defendants

2   and not allowing -- there is some argument the Government

3   should not be able to argue in one case or one defendant he is

4   a minor player and then try another defendant and say that same

5   person is a major player.

6            But that is not what is happening here.  The

7   Government is not taking an inconsistent position.  Therefore

8   Your Honor does not even need to consider the stipulation.  And

9   I would ask the Court to -- once you hear Mr. McQueen's

10  testimony, you will see very clearly it is not inconsistent.

11           THE COURT:  We'll take it up more at lunchtime.

12           MS. DURRETT:  Could I just say one more thing about

13  it?

14           THE COURT:  Yes.

15           MS. DURRETT:  And the whole reason that we asked for

16  it is because it is the basis of their request to get these

17  five additional acts in.  It is their basis when they say we

18  have weak evidence against Mr. Pendergrass.  His intent is an

19  issue.  And we don't have enough evidence because Mr. McQueen

20  signed and sent all of the forged documents and they said not

21  Mr. Pendergrass.  So that is the basis of their argument for

22  getting these other things in.

23           THE COURT:  I understand.  All right.  I'm assuming

24  you would want to do this in your case anyway?  The

25  stipulation -- offer the stipulation?

```
 1            MS. DURRETT:  Well, I'm happy to have you offer it
 2    right now.
 3            THE COURT:  Well, I think it is his case.  So you
 4    can't do that.
 5            MS. DURRETT:  Thank you, Your Honor.  That is fine.
 6            THE COURT:  Is there something you wanted on the
 7    limiting instruction?
 8                  (A discussion ensued off the record.)
 9            THE COURT:  I think the instruction is fine, and I'll
10    give it -- on the intrinsic act instruction.
11            MS. DURRETT:  Thank you, Your Honor.
12            THE COURT:  Okay.
13            MS. DURRETT:  No.  It is the one that I proposed in
14    my filed jury instructions.
15            Is that the one you have?
16            THE COURT:  Yes.
17            MS. DURRETT:  Not an email?
18            THE COURT:  Right.
19            MS. DURRETT:  Document 229 at 14.
20            THE COURT:  It think it could be tailored you have
21    just heard or you will hear because --
22            MS. DURRETT:  Thank you, Your Honor.
23            THE COURT:  I mean, if you are wanting me to give the
24    instruction during the course of the trial, I want to do it --
25    just change the verb tense.
```

```
 1              MS. DURRETT:  Perfect.  Thank you, Your Honor.
 2              THE COURT:  All right.
 3              All right.  Are we ready for the jury to come back?
 4              MR. BROWN:  Yes.  I'm ready, Judge.
 5              Could we get Michael Cohen?
 6              THE COURT:  But what I was saying really was,
 7      Ms. Durrett, if you have -- if you think something else
 8      specifically needs correct -- a limiting instruction during the
 9      course of this testimony, you may offer that.
10              MS. DURRETT:  Thank you, Your Honor.
11              THE COURT:  Okay.
12              COURTROOM DEPUTY CLERK:  We don't need to re-swear
13      him, do we?
14              THE COURT:  I think we want to do it in front of the
15      jury.
16              COURTROOM DEPUTY CLERK:  We're going to re-swear.
17              MR. BROWN:  I was going to wait until you bring the
18      jury up.
19              THE COURT:  No.  Go ahead and bring him up now.
20              COURTROOM DEPUTY CLERK:  They are coming in now.
21      Here we go.
22              (The jury entered the courtroom at 10:36 A.M.)
23              MR. BROWN:  Your Honor, the Government calls Michael
24      Cohen to the stand.
25              THE COURT:  Members of the jury, before Mr. Cohen
```

1  begins, let me just say I regret that we have taken so much

2  time this morning dealing with a matter that we just sort of --

3  for the trial.  And, you know, there is a lot of moving pieces

4  in the trial and we try to figure out what -- what testimony

5  can come in properly and what cannot.  And sometimes it takes

6  longer than anticipated.  But my apologies to you.

7          Go ahead, Mr. Cohen.

8          COURTROOM DEPUTY CLERK:  If you would, please raise

9  your right hand.

10                    **(Witness sworn)**

11         COURTROOM DEPUTY CLERK:  Thank you.  Please have a

12  seat.

13         Loudly and clearly state your name and spell your

14  name for the record, please.

15         THE WITNESS:  Michael Cohen, C-O-H-E-N.

16     Whereupon,

17                    MICHAEL COHEN,

18     after having been first duly sworn, testified as follows:

19                    DIRECT EXAMINATION

20  BY MR. BROWN:

21  **Q.**   Good morning, Mr. Cohen.

22  **A.**   Hello.

23  **Q.**   How are you employed, sir?

24  **A.**   I am a self-employed attorney in Atlanta.

25  **Q.**   And how long have you been an attorney in Atlanta

1   approximately?

2   **A.**   45 years.

3   **Q.**   And what is the current nature of your practice?  What

4   kind of law do you practice?

5   **A.**   Landlord/tenant.  I represent landlords and tenants.

6   **Q.**   Now, in 2013, what kind of law were you practicing then?

7   **A.**   It was a general practice.  But I was helping some

8   collection agencies that was having -- they were having

9   complaints against the agency.  And I would help them with the

10  complaints that the government had.

11  **Q.**   All right.  In 2013, did you have an occasion to meet with

12  an Allen Pendergrass?

13  **A.**   I did.

14  **Q.**   Can you explain how you met with Allen Pendergrass?

15  **A.**   Well, one of my clients that I was helping with the

16  collection -- debt collection practice introduced me to

17  Mr. Pendergrass as a person that needed some help with some tax

18  collections.

19  **Q.**   All right.  And did you actually have a meeting with or

20  who was the person that introduced you to Mr. Pendergrass?

21  **A.**   His name was Mr. Earvin.

22  **Q.**   Mr. Earvin?

23  **A.**   Earvin.

24  **Q.**   And did you have a meeting with Mr. Earvin and Mr. Allen

25  Pendergrass?

1    **A.**    Yes.

2    **Q.**    Where did that meeting take place?

3    **A.**    At my office on West Wieuca in Atlanta.

4    **Q.**    And can you give an approximate year when this meeting

5    occurred?

6    **A.**    2013.

7    **Q.**    And during that meeting, what was the nature of how you

8    were going to assist Mr. Pendergrass and/or Mr. Earvin?

9    **A.**    Well, Mr. Pendergrass complained that he had a way to mine

10   data or extract information from county records of taxes.

11            THE COURT:  From county records?

12            THE WITNESS:  County.  Of county taxes that might be

13   unclaimed.  They were unclaimed taxes.  And the idea was that

14   they would notify the person that there is some unclaimed taxes

15   for you and this is how you can get it.

16   **Q.    (BY MR. BROWN)**  Okay.  Now, at that time, were you

17   familiar with that kind of business?

18   **A.**    No.

19   **Q.**    During the meeting, did Mr. Pendergrass ask you to perform

20   some acts related to checks that he had?

21   **A.**    Yes.

22   **Q.**    Can you explain what he asked you to do and the nature of

23   the checks?

24   **A.**    There were checks -- five or six checks from Harris

25   County, Texas, that he wanted me to deposit.  I was going to

1   deposit them into a trust account.  Then I would be the

2   disbursing agent for his company.

3   **Q.**   Now, what was your understanding as to how Mr. Pendergrass

4   obtained these five to six checks?

5   **A.**   He showed me documents that were signed by an individual

6   that was notarized that had to do with taxes and that person's

7   name or that entity's name.  And they looked legitimate to me.

8   **Q.**   All right.  Now, do you recall the name of the trust that

9   Mr. Pendergrass obtained these checks related to?

10  **A.**   I think it was Lee Family Trust.  I also called the clerk

11  out there to make sure the checks were legitimate named --

12  properly named and numbered.

13  **Q.**   So can you recall the approximate value -- the combined

14  value of these five to six checks?

15  **A.**   $160,000.  I really don't recall.  There's some notes in

16  here.  But I don't recall the total.  It was a lot of money.

17  **Q.**   Okay.  And what was your role going to be or how were you

18  going to be compensated for your work related to these checks?

19  **A.**   Well, I was going to handle the checks, deposit the

20  checks, disburse the checks, communicate with anybody that was

21  supposed to get them.  And in the future, the concept was that

22  I would write to individuals who might have money -- unclaimed

23  money in the county.  And I would be the person that would

24  write the letter, and that is how I was going to serve this

25  purpose.

1    **Q.**    So is that what Mr. Pendergrass told you?  That you guys

2    would maybe form a business to recover these unclaimed funds?

3    **A.**    Well, I don't know what role I would have as far as

4    joining a business.  I would be the attorney that would be the

5    face of the letter going out on the letterhead to legitimize

6    the operation.

7         If there were legitimate funds that were unclaimed and you

8    have a lawyer write, there is a better chance that someone

9    might open it and look at it.  That is the way I took it.

10   **Q.**    All right.  So you testified that you did some due

11   diligence and you called Harris County to verify that the

12   checks you received from Mr. Pendergrass were, in fact, issued

13   by Harris County, Texas?

14   **A.**    Yes.

15   **Q.**    And did they verify the checks were legitimate checks?

16   **A.**    Yes.

17   **Q.**    What was your understanding from Mr. Pendergrass as to how

18   he obtained these checks from Harris County, Texas?

19   **A.**    Well, he showed me some form letters that he used to

20   obtain the funds with -- I believe there was a power of

21   attorney and a signature by Ms. Lee or somebody -- the trustee.

22   And those were the documents he said that were used to obtain

23   the funds.

24   **Q.**    Now, do you recall the name of the company in which

25   Mr. Pendergrass was operating under at the time he was asking

1  you to negotiate these checks?

2  **A.**    Attorney Recovery.  It was either Attorney Recovery

3  Systems or Attorney Recovery System.  I don't recall the exact

4  name.

5  **Q.**    Okay.  I want to show you what has been marked as Exhibit

6  Number 9.  Flip through and let me know if you -- I want to ask

7  you a few questions about it.

8  **A.**    (The witness complies.)

9       Yes, sir.

10  **Q.**    Now, do you have a recollection of the actual name of the

11  company that Mr. Pendergrass was operating under at this time?

12  **A.**    I thought -- at this time?

13  **Q.**    Yeah, at the time that --

14  **A.**    I thought it was this Attorney Recovery.

15  **Q.**    Okay.  And what was the nature of the Lee Family Trust?

16  How was the Lee Family Trust involved with these checks?

17  **A.**    The Lee Family Trust supposedly are the ones that had

18  money that was unclaimed in Harris County, Texas.

19  **Q.**    Did you do any additional due diligence at this time to

20  verify that Mr. Pendergrass had the authority to claim these

21  funds under the Lee Family Trust?

22  **A.**    Other than the review of the documents?

23  **Q.**    Right.

24  **A.**    Well, I became concerned about it.  So I did some further

25  inquiry.  I remember --

41

**Q.**   Let me stop you.  You said you became concerned.

Why did you become concerned?

**A.**   Well, luckily, there was a person that I knew that lived on my street that worked for Attorney Recovery.  And I don't remember how -- I either called him or he came by and said I was so happy to be doing -- working for his company.  And he said, what work and what company?  And then we discussed the documents.

And he said when he looked at it that is not the name -- that is not the signature of the president and these documents don't look real to him.

**Q.**   All right.  So once you talked to your neighbor who basically said the documents given to you by Mr. Pendergrass did not look real, what did you do?

**A.**   I called the president of the company, Mr. Gene Bloom.

**Q.**   And did you discuss with Mr. Bloom whether these documents were, in fact, legitimate?

**A.**   I did.  I scanned them to him, and he affirmed that they were not his signature, that it was not -- they were not authorized.  And he was mad.

**Q.**   So with this knowledge, did you -- did you have the checks that Mr. Pendergrass provided to you?

**A.**   They were already deposited.  They were sitting in the bank in the trust account.

**Q.**   So what did you do with those funds when you had these

```
 1   concerns?
 2   A.   I was in communication with the sheriff's department or
 3   investigators in Harris County, Texas.  They confirmed -- they
 4   told me to return the funds back to Harris County, and I did.
 5   Q.   At some point, did Mr. Pendergrass try to obtain these
 6   funds back from you?
 7   A.   Yes.
 8   Q.   And how did he try to obtain these funds from you?
 9   A.   From what I recall, he asked for them.  He wanted the
10   money.
11   Q.   You testified you met with Mr. Pendergrass, I think you
12   said, at least one time.
13        Do you recall how many times you met with Allen
14   Pendergrass?
15   A.   No, I don't recall.
16   Q.   Well, this is about nine years ago from today?
17   A.   Yes.
18   Q.   All right.  So I have trouble remembering two weeks ago.
19   Let alone nine years.
20   A.   How about this morning?
21   Q.   Right.
22        So at least one meeting; is that fair?
23   A.   Oh, yes.
24   Q.   In your office?
25   A.   Yes.
```

1   Q.   So sitting here today, do you recall what Allen

2   Pendergrass looked like from that meeting?

3   A.   No.  I mean, if there were five people in a line, I might

4   be able to say that was him.  But I really don't recall.

5   Q.   What do you recall about Allen Pendergrass's appearance?

6   A.   He was a Black male.  He was introduced to me as Allen

7   Pendergrass.  We shook hands.  Hi, I'm Allen.  And there was

8   nothing distinguishing.  He was just very pleasant.

9   Q.   Do you recall anything about his height?  Was he tall?

10  Was he short?  Was he your height?  Any recollection?

11  A.   I really don't recall.  I remember he was sitting in my

12  office, so he sat part of the time.  And I really can't

13  remember.

14  Q.   Okay.  That is fair.

15       Did there come a point that you had email communications

16  with Allen Pendergrass about these 160-some-thousand dollars

17  that you had in your account?

18  A.   Yes.

19  Q.   So I want to show you what has been marked as Government's

20  Exhibit Number 10 and ask you to take a look at it.

21  A.   (The witness complies.)

22       Okay.

23  Q.   Now, do you recognize what has been marked as Government's

24  Exhibit Number 10?

25  A.   Yes.  That is an email from me dated March 6, 2013, to

1    Allen Pendergrass and E. Earvin.

2    **Q.**    Now, you testified earlier about a meeting you had with

3    Mr. Pendergrass and a person named E. Earvin?

4    **A.**    Correct.

5    **Q.**    Does that email of E. Earvin -- is that the associate or

6    person that you were speaking of that you met with with

7    Mr. Pendergrass?

8    **A.**    Yes.

9    **Q.**    And you had prior dealings with Mr. E. Earvin; is that

10   correct?

11   **A.**    I represented him in a matter -- a claim by the government

12   on some collection work that he was doing.

13   **Q.**    All right.  And what was Mr. E. Earvin's relationship to

14   the business deal you had with Mr. Pendergrass?

15   **A.**    I'm not sure.  He introduced me.  Everything else was an

16   assumption how they were connected.

17   **Q.**    Did you have any additional conversations with E. Earvin

18   about getting this money back to you -- getting this money back

19   to Mr. Pendergrass or Mr. Earvin?

20   **A.**    Yes.

21   **Q.**    All right.  Did you return the funds?

22   **A.**    Not to him.  Not to Mr. Pendergrass.

23   **Q.**    Why not?

24   **A.**    Because there was something that wasn't right about it.

25   If I gave the money to the wrong people, eventually someone was

1    going to want to know what I did with that money.

2    **Q.**   All right.  So I want to ask you to flip to the second

3    page of Exhibit Number 10.

4          Is that an email to you from Allen Pendergrass?

5    **A.**   Yes, sir.

6    **Q.**   And at that point in time -- what date is that email?

7    **A.**   March 1.

8    **Q.**   During that point in time, was Mr. Pendergrass trying to

9    get the money back from you?

10   **A.**   Yes.

11   **Q.**   And does your email on March 6 respond to

12   Mr. Pendergrass's email?

13   **A.**   Yes.

14   **Q.**   Do these emails appear to be true and accurate copies of

15   email communications you had with Allen Pendergrass in March of

16   2013?

17   **A.**   Yes.

18   **Q.**   Have there been any changes, alterations, or deletions

19   besides marking on the bottom of these pages from when they

20   actually were sent by you and received by you?

21   **A.**   No change.

22         MR. BROWN:  Your Honor, at this time the Government

23   would move to admit Government's Exhibit Number 10 into

24   evidence.

25         MS. DURRETT:  Your Honor, I think the second page is

 1   hearsay.  I would object to that.

 2              THE COURT:  I'm going to admit it.

 3              MS. DURRETT:  Thank you, Your Honor.

 4              MR. BROWN:  Thank you, Judge.

 5              Can we publish Exhibit Number 10 into evidence,

 6   please?  I mean, publish it.  Not admit it.

 7   **Q.   (BY MR. BROWN)**  So, Mr. Cohen, I'm going to direct -- you

 8   can look at your copy there or look at the screen next to you.

 9        But I just want to kind of walk through these emails so

10   the jury understands your dealings with Mr. Pendergrass.

11        All right.  So, Mr. Cohen, you testified previously

12   that -- we're looking at Exhibit 10, Page 1.

13        At the top mcohen@nsidelaw.com, is that your email

14   address?

15   **A.**   Yes, sir.

16   **Q.**   And below that is the name Allen Pendergrass at

17   pendergrassallen@gmail.com and then E. Earvin at

18   eearvin@ebssassociates.com.

19        Do you recognize those email addresses?

20   **A.**   Yes.

21   **Q.**   Now, can you describe for the jury as relates to why are

22   you sending this email to Mr. Pendergrass and Mr. Earvin?  Why

23   are you doing that?

24   **A.**   They wanted their money.  They demanded their money.  I'm

25   not saying they together.  But there was a demand for money

1   from me to be paid.

2   **Q.**   And you testified you were not going to return the money?

3   **A.**   Correct.

4   **Q.**   And does this email lay out your reasons for why you are

5   not going to return the money and your current concerns about

6   fraud related to Attorney Recovery Systems and the use of the

7   name Gene Bloom?

8   **A.**   Yes.

9   **Q.**   I want you to turn -- could we turn to Page 2 of this

10  exhibit, please.  So Page 2 is published.

11      And what are we looking at here, Mr. Cohen?  Can you just

12  describe to the jury kind of what we're looking at here and why

13  this email was sent to you?

14  **A.**   It was an email from Mr. Pendergrass telling me that

15  Ms. Lee decided to cancel the power of attorney that he had.

16  And he said see attachment.  But I didn't know what that was

17  other than a power of attorney cancellation.

18  **Q.**   Now, was that statement true based on your investigation

19  at this point in time?  That Ms. Lee was canceling -- that

20  Ms. Lee had authorized the power of attorney for

21  Mr. Pendergrass?

22  **A.**   That wasn't true.

23  **Q.**   Why wasn't that true?  How did you know that wasn't true?

24  **A.**   Well, I tracked down the attorney for the Lee Family Trust

25  and sent him all of the documents.  And he said he does

1    represent the Lee Family Trust.

2            MS. DURRETT:  Your Honor, I'm going to object to

3    hearsay.

4            THE COURT:  I think it is hearsay.

5            MR. BROWN:  My only response, Your Honor, is I'm not

6    offering it for the truth of the matter.  I'm offering it to

7    explain his conduct.

8            This explains why he sent the email and why he

9    decided not to return the funds to Mr. Pendergrass.  So I'm not

10   admitting it for the truth of what he said.

11           THE COURT:  All right.  Ladies and gentlemen, let me

12   be very clear with you:  I'm going to let the witness describe

13   the conversation.  But that doesn't mean that anything again

14   that he -- that this witness states that somebody else told him

15   is true.

16           It just means that he is saying -- explaining why he

17   took -- he took his own actions and I gather from his testimony

18   didn't want to return the money back to the individual he has

19   identified he was dealing with in Atlanta.

20   **Q.   (BY MR. BROWN)**  So you can tell the jury what this

21   attorney told you.  Just start from the beginning.

22       Who did you call, and what did you learn?

23   **A.**   His name is Tom Zabel.  He was an attorney that I found

24   after I spoke to the clerk.  I emailed him -- we were emailing

25   back and forth regarding this.

1          And he in an email and on the phone told me this was not

2     his client's signature, they had no knowledge of this money

3     coming out or trying to come out, and that it was a good idea

4     to return the money to the county.

5     Q.   So is it based in part on that conversation as to why you

6     did not return the funds to Mr. Pendergrass or Mr. Earvin and

7     instead you returned the funds to Harris County, Texas?

8     A.   Yes.

9               MR. BROWN:  That's all I have, Judge.  Thank you.

10                          CROSS-EXAMINATION

11    BY MS. DURRETT:

12    Q.   Do you still have the exhibits up there that the

13    Government asked you to look at?

14    A.   Let me take a look at them.  I almost took them home with

15    me.

16    Q.   Weren't there some letters?

17    A.   No, I don't have those.

18    Q.   What do you have up here?

19    A.   This is a copy of that same letter.

20    Q.   Does it have other documents related to this case?

21    A.   Attached to it?

22    Q.   Well, in that folder.

23              MR. BROWN:  I have the documents you are referring to

24    here.

25              MS. DURRETT:  Your Honor, I would just ask what the

1    witness is looking at -- what he has with him on the witness

2    stand.

3              THE COURT:  That is fine.

4    **A.**   I have a memorandum of that interview.

5    **Q.   (BY MS. DURRETT)**  With whom?

6    **A.**   With the Government back in 2017.

7    **Q.**   Can I have a look at it?

8    **A.**   If there is no objection from anybody.

9              THE COURT:  I think she is entitled to look at that.

10   **Q.   (BY MS. DURRETT)**  What else do you have there?

11   **A.**   I have emails from Mr. Zabel I mentioned that -- about

12   the -- about the fact that Ms. Lee, the trust, had nothing to

13   do with these funds.

14       Do you -- you can have them all.

15             THE COURT:  Could you just give her all the documents

16   you have up there?

17             THE WITNESS:  Okay.

18             THE COURT:  Thank you.

19             Do you need a minute to look at them?

20             MS. DURRETT:  Yes, please.

21             THE COURT:  If anyone needs to stand up, you are

22   welcome to.  If anyone needs to go to the restroom, you are

23   welcome to.

24   **Q.   (BY MS. DURRETT)**  I have had a chance to look.  I'm going

25   to hand you your folder back.  I kept one document I'm just

1  going to ask you about.

2  **A.**   Sure.

3  **Q.**   Okay.  The one I want to ask you about right off the bat

4  is -- it is just an email.  It is to -- I think you talked

5  about sending an email to an attorney who was the

6  representative of the Lee Family Trust?

7  **A.**   Tom Zabel?

8  **Q.**   Tom Zabel.

9       And in this email that you are sending to him, you

10  represent that your client is Attorney Recovery Systems; right?

11  **A.**   Yes.

12  **Q.**   And that you have a purported agreement showing Ms. Lee as

13  the trustee?

14  **A.**   Correct.

15  **Q.**   Okay.  What is that agreement?

16  **A.**   Well, I don't have it any more.  So whatever I had, I sent

17  him that document that purported to be the instrument used to

18  get these funds.

19  **Q.**   Okay.  But you don't have that any more?

20  **A.**   No.

21  **Q.**   Okay.  And I think we talked about -- I'm going to hand

22  this back because I don't want to forget to do it.

23       I've had a chance to talk to you previously about this;

24  right?  You and I have talked?

25  **A.**   Let me take one look at this.

1    **Q.**   Okay.  Sure.

2    **A.**   Okay.  Go ahead.  I'm sorry.

3    **Q.**   That's okay.  Okay.  There is a lot to unpack.

4         But you and I have had a chance to talk previously.  And I

5    think you told me that you had had one in-person meeting with

6    Mr. Pendergrass and Mr. Earvin; correct?

7    **A.**   At least one.

8    **Q.**   Well, is it one?

9    **A.**   I don't recall.

10   **Q.**   Okay.  So I think the Government said it was about nine

11   years ago.

12   **A.**   Yes.

13   **Q.**   Right?  And you don't have a file related to this case;

14   right?

15   **A.**   Well, I thought about that.  I have a lot of emails.  You

16   have seen a bunch of them.  So that was -- I don't have a hard

17   copy file any longer.

18   **Q.**   Okay.  But did you produce all of the emails that you had

19   related to the case?

20   **A.**   I'm not sure.  I went back and looked for my communication

21   with the attorney that was representing the Lee Family Trust,

22   and I think that was the only search thing I used.

23   **Q.**   Okay.  Did the Government ask you to produce all the

24   emails?

25   **A.**   I don't recall.

1    Q.    Okay.  You don't have any time records or anything of the

2    time you spent; right?

3    A.    No.

4    Q.    Okay.  You don't have a fee agreement that you signed with

5    Mr. Pendergrass, do you?

6    A.    I can't produce one.  It refers to an agreement in my

7    email to him telling him I am terminating the relationship.  So

8    it just refers to one.  So I'm assuming there was one.  I just

9    can't locate it.  I moved offices nine years ago.

10   Q.    You don't have an engagement letter; right?  Something --

11   A.    I don't have it here for you.  I don't recall if there was

12   one or not.

13   Q.    As you were preparing for your testimony, did you see an

14   engagement letter with Mr. Pendergrass or with the Lee Family

15   Trust?

16   A.    No.

17   Q.    Okay.  Would it have been your practice nine years ago to

18   have a client who is retaining you to sign an engagement

19   letter?

20   A.    Not always.

21   Q.    Okay.  And at that point in time -- I think now you said

22   you are doing landlord/tenant.  But back then you were doing

23   like helping people who had some violations or something and

24   you were helping them work through that?

25   A.    Yes.

```
 1   Q.   And that is how Mr. Earvin came to you?
 2   A.   Yes.
 3   Q.   Okay.  And Mr. Earvin had retained you as his lawyer to
 4   help with some of that other stuff?
 5   A.   Yes.
 6   Q.   And then he introduced you to Mr. Pendergrass?
 7   A.   Yes.
 8   Q.   And what you told us you can recall about Mr. Pendergrass
 9   is he was a nice Black man?
10   A.   Who introduced himself as Allen Pendergrass.
11   Q.   Okay.
12   A.   Yes.
13   Q.   Okay.  And you don't have any notes from the meetings;
14   right?
15   A.   No.
16   Q.   Okay.  And you -- the three of you were the only ones
17   present at that meeting?
18   A.   I believe that is correct.
19   Q.   Okay.  You don't have any, like, phone call logs or voice
20   mails?
21   A.   No.
22   Q.   Okay.  And so what you are saying is someone came to have
23   a meeting with you with another client and they produced
24   $160,000 worth of checks and asked you to help them by putting
25   them in your trust account?
```

1    **A.**    Yes.

2    **Q.**    Okay.  And at least as far as what this jury can see,

3    there is no written agreement about that?

4    **A.**    There is no written agreement that I have any longer, if

5    there was one.

6    **Q.**    Okay.  And how much -- what was your fee going to be?

7    **A.**    I believe it was $2500.

8          And do you want to know what that was for?

9    **Q.**    Sure.

10   **A.**    That was for handling this matter, advising him about the

11   matter, contacting the parties, writing the parties, disbursing

12   the funds.

13   **Q.**    Okay.  So it was this meeting where you are talking about

14   okay, this is how we should handle it, I'll put the checks in

15   my account, and then this is how we'll disburse it?  That is

16   what the money was for?  To give that advice?

17   **A.**    It was a general question-and-answer -- I was learning

18   about the business from Allen.  So I was trying to do

19   everything right.

20         I liked the concept of finding money for people, but I

21   just wanted to do it right.  And -- and that is the reason I

22   started digging into it a little bit more.

23   **Q.**    And it was your expectation then that you would do this in

24   the future?

25   **A.**    Yes.

1    Q.    Okay.  That this was going to be the beginning of

2    something where you would be able to deposit these checks and

3    disburse them?

4    A.    Yes.

5    Q.    And was it going to be 2500 each time?

6    A.    You know, it never got that far.  It was just a very --

7    more like hand-shaking and I look forward to working with you

8    kind of thing.

9         There may be a document.  It refers to a document.  But if

10   there is one, I don't have it any longer.

11   Q.    But I want to be clear:  They gave you the checks at that

12   meeting; is that right?

13   A.    You know, I don't remember when I got them.  I'm assuming

14   it was the first meeting.  I don't remember if there was a

15   second meeting where they came in and brought the checks.  I

16   just don't recall.

17   Q.    Okay.  But you knew the subject of your representation was

18   going to involve 160-or-so-thousand dollars?

19   A.    Yes.

20   Q.    Okay.  Now, I don't think the Government talked with you

21   about any specific letters, did they?  Did they show you any

22   letters that were sent to Harris County?

23        We haven't talked about those; right?

24        Okay.  I think this is -- let me make sure I have the

25   right exhibit number.  It is 10 -- it is Defendant's

```
 1    Exhibit 10E.
 2         I'm going to show it to you and just ask if you can look
 3    through it for me and see if you recognize it.
 4    A.   (The witness complies.)
 5              THE COURT:  10E?
 6              MS. DURRETT:  It is Defendant's 10E.
 7    Q.   (BY MS. DURRETT)  Do you have that one?
 8    A.   Okay.
 9    Q.   Do you recognize those?
10    A.   I do.
11    Q.   Okay.  And how do you recognize them?
12    A.   Well, this -- a few of these pages have signatures of Gene
13    Bloom, and that is the person that told me he didn't sign them.
14    Q.   Are those the letters that you saw at that meeting back
15    eight years ago?
16    A.   I don't recall.
17    Q.   But you recognize the letters?
18    A.   Yes.  I would like to think I would have seen something
19    like this before I would take the checks.
20              MS. DURRETT:  Your Honor, I would move to admit
21    Exhibit 10E.
22              MR. BROWN:  No objection, Judge.
23              THE COURT:  It is admitted.
24              MS. DURRETT:  Thank you, Your Honor.
25    Q.   (BY MS. DURRETT)  I'm going to go old school on you and
```

1    use this projector.

2            MS. DURRETT:  Your Honor, is it okay if I publish

3    this?

4            THE COURT:  Yes.

5    **Q.  (BY MS. DURRETT)**  All right.  So the first page of 10E --

6    I'll try to -- that appears to be a fax from Attorney Recovery

7    Systems to Harris County; right?

8    **A.**   That's what it appears to be.

9    **Q.**   And I think you testified Harris County is the county that

10   was holding the funds for the Lee family?  I mean, they were

11   the ones that owed the funds out; is that right?

12   **A.**   Harris County was holding the funds.

13   **Q.**   Okay.  They are the ones that ended up writing the checks;

14   is that right?

15   **A.**   Yes.

16   **Q.**   Okay.  So then the second page of the fax, if I can back

17   up, this just -- it looks like the -- well, you tell me what is

18   that.

19   **A.**   Well, it says request for replacement refund checks.

20   **Q.**   And then does it list several checks that are the --

21   several amounts, at least, that should be refunded?

22   **A.**   Yes.

23   **Q.**   Okay.  And, again, up at the -- toward the top, the

24   address is Lee Family Trust, care of Attorney Recovery Systems?

25   **A.**   Correct.

59

1    Q.    Now I'm going to show you the third page and what -- if

2    you can see it.  I can zoom in if you need to.

3          But what is this?

4    A.    Well, it is from Attorney Recovery Systems with an address

5    on Piedmont Road.

6    Q.    That is one thing I wanted to talk about.  So that

7    address -- now, I know you said that you know Gene Bloom or you

8    talked to Gene Bloom?

9    A.    I know a person that worked for him.

10   Q.    Okay.  And that is your neighbor?

11   A.    That is my neighbor.

12   Q.    Do you have an idea about where the office of the real

13   Attorney Recovery Systems is?

14   A.    I think it is New York.  But I'm just guessing.

15   Q.    Okay.  That is okay.

16         Did you have any reason to think it was on Piedmont Road

17   in Atlanta?

18   A.    No, I didn't have any reason to think it was there.

19   Q.    Okay.  And then when you look down at the bottom, it is

20   addressed to the Harris County Tax Assessor; right?

21   A.    Right.

22   Q.    And then it has, again, the information about the check

23   and how much money is owed?

24   A.    Right.

25   Q.    Okay.  And then at the bottom -- you have already talked

1    about this.  But who signed it?

2    **A.**   Gene R. Bloom, president.

3    **Q.**   Okay.  And I guess one other thing I'm going to point out

4    is:  There is another address there; right?  It is the address

5    where they want the check sent; right?

6    **A.**   I see it looks like a different address.

7    **Q.**   Yeah.  Well, is it the same as the address at the top?

8    **A.**   No.

9    **Q.**   Okay.  And then Page 4 is a -- it looks like a similar

10   letter.  And these were all together in that fax; right?

11   **A.**   Yes.

12   **Q.**   And same Attorney Recovery at the top with that Piedmont

13   Road?

14   **A.**   Right.

15   **Q.**   All right.  Again, we're sending it out to Harris County;

16   right?

17   **A.**   Yes.

18   **Q.**   All right.  And then who signed it?

19   **A.**   Bloom.

20   **Q.**   Gene Bloom.

21        All right.  We're at the top.  This is the third letter.

22   And, again, we have got that Piedmont Road address at the top;

23   is that correct?

24   **A.**   Yes.

25   **Q.**   All right.  Send out to Harris County?

```
 1   A.    Yes.

 2   Q.    A check amount listed there?

 3   A.    Correct.

 4   Q.    And who is it signed by?

 5   A.    Bloom.

 6   Q.    Gene Bloom.

 7         I'll just represent you are saying the real Gene Bloom

 8   didn't sign these?

 9   A.    Correct.

10   Q.    This is, I think, the fourth letter.  And I'm just going

11   to represent to you that it has got a similar pattern; right?

12   It has got the Piedmont Road at the top, the check amount, and

13   it is signed by Gene Bloom.

14         Do you have any reason to disagree with that?

15   A.    No.

16            MR. BROWN:  Your Honor, I'll stipulate that all the

17   letters have the one address at the top and the other.  I think

18   it is cumulative at this point.  But I'll stipulate to that,

19   Your Honor.

20            MS. DURRETT:  That is fine.

21   Q.    (BY MS. DURRETT)  I mean, there are five letters, and they

22   are all signed by Gene Bloom; right?  All returned to -- or all

23   with the letterhead at 3333 Piedmont Road; is that right?

24   A.    Correct.

25   Q.    I'll put it up there so you can see.
```

1      Okay.  And then connected to it there are these limited

2  power of attorney forms, and they are again on Attorney

3  Recovery Systems letterhead; correct?

4  **A.**   Correct.

5  **Q.**   Okay.  That is all I have about Exhibit 10E.

6      Have you ever heard of a person named Terrell McQueen?

7  **A.**   No, except for earlier today.

8  **Q.**   Okay.  Well, that is what I'm going to ask you about.

9      Would it surprise you to know that -- I'm going to show

10  you Exhibit 28A.

11      Have you ever seen -- well, I showed it to you earlier.

12      But have you ever seen that exhibit other than today?

13  **A.**   I don't recall ever seeing this.

14  **Q.**   Do you know who Terrell McQueen is?

15  **A.**   No.

16  **Q.**   During the business meeting that you had nine years ago,

17  did anyone ever show you a business license for Attorney

18  Recovery Systems?

19  **A.**   Not that I recall.

20  **Q.**   I'm sorry?

21  **A.**   Not that I recall.

22  **Q.**   Okay.  And you eventually returned the money to Harris

23  County; right?

24  **A.**   I did.

25  **Q.**   Okay.  So that money was never paid out to the people that

1    you met with on that day?

2    **A.**    Correct.

3    **Q.**    Okay.  Have you ever heard of a company called Lionheart

4    Layer?

5    **A.**    No, ma'am.

6    **Q.**    I think I'm saying it right.

7         You didn't ever do any business paperwork for Lionheart

8    Layer & Associates?

9    **A.**    I certainly don't recall it.

10   **Q.**    Okay.  All right.  Well, let me ask you:  Did the

11   Government ask you about that?

12   **A.**    Not that I recall.

13   **Q.**    I mean even in recent days.

14   **A.**    No.

15             MS. DURRETT:  Okay.  Thank you.  No further

16   questions.

17             MR. BROWN:  Nothing further, Judge.  The witness can

18   be excused.

19             THE COURT:  Yes.  Please don't discuss your testimony

20   with anyone else until the trial is over.

21             THE WITNESS:  Yes, ma'am.

22             Can I leave the building?

23             THE COURT:  Yes, you can leave the building.

24             THE WITNESS:  All right.  Thank you.

25             MR. BROWN:  Your Honor, the Government wants to call

1    Terrell McQueen to the stand.

2            THE COURT:  Why don't we wait until this witness

3    leaves.

4            MR. BROWN:  Yes, sure.

5            THE COURT:  Please don't have any interaction with

6    the witness coming in.  All right?

7            I want -- before he does come in, I wanted to give

8    the jury an instruction.

9            During the trial and in particular with our last

10   witness and several others, you have heard evidence of acts

11   allegedly done by the defendant, Mr. Pendergrass, in connection

12   with Tousa Homes, Quarterback Club, Weissman Nowack Curry &

13   Wilco, the Lee Family Trust most recently, and Holland & Knight

14   and Hemisphere, Inc.

15           These acts are not ones that are charged in the

16   indictment.  You have been provided this information because

17   the Government believes these acts are intrinsic to the charged

18   conduct.  That means that they are -- that they view them as

19   necessary to complete the story of the crimes they have charged

20   and which you have to actually make -- reach a verdict on.

21           I caution you that the defendant is on trial only for

22   the specific crimes charged in the indictment, not for any of

23   these collateral acts that are being introduced to you and

24   introduced into evidence.

25           You are here to determine from the evidence in this

1   case as a whole though whether the defendant is guilty or not

2   guilty of the specific crimes charged in the indictment that

3   were identified to you from the start, the ten offenses.

4           So this will be deemed relevant evidence, but it is

5   not -- these are not the crimes actually charged.  And you are

6   to be careful in understanding that and assessing the evidence

7   accordingly.

8           Thank you.

9           COURTROOM DEPUTY CLERK:  If you would, please raise

10  your right hand.

11                       **(Witness sworn)**

12          COURTROOM DEPUTY CLERK:  Please have a seat.  You can

13  remove your mask while you are on the stand.

14          Please state your full name and spell your last name

15  for the record.

16          THE WITNESS:  Okay.  Terrell LaShawn McQueen.  And

17  last name, M-C-Q-U-E-E-N.

18      Whereupon,

19                       TERRELL LASHAWN MCQUEEN,

20      after having been first duly sworn, testified as follows:

21                       DIRECT EXAMINATION

22  BY MR. BROWN:

23  **Q.**   Good morning, Mr. McQueen.

24  **A.**   Good morning.

25  **Q.**   How old are you?

1   **A.**   I'm 41.

2   **Q.**   What is the highest level of education you have completed?

3   **A.**   I have a bachelor's degree.

4   **Q.**   What do you have your degree in?

5   **A.**   Accounting.

6   **Q.**   Where did you obtain that degree?

7   **A.**   DeVry University.

8   **Q.**   And are you currently employed?

9   **A.**   No, I am not.

10  **Q.**   Are you on disability?

11  **A.**   Yes, I am.

12  **Q.**   Why are you on disability?

13  **A.**   Earlier this year, I went to the hospital and -- in

14  February or March.  I had a bone infection.  And I lost my

15  right leg -- lower left leg.

16  **Q.**   Do you suffer from any medical condition that affects your

17  memory?

18  **A.**   No, sir.

19  **Q.**   Now, I understand you are not currently employed because

20  you are on disability.

21       When you were employed, what kind of work did you do?

22  **A.**   I was previously in sales.

23  **Q.**   What kind of sales?

24  **A.**   Automotive sales.

25  **Q.**   Was that recently?  Last few years?

1    **A.**    I would say 2019, yes.

2    **Q.**    All right.  And prior to 2019, did you have -- did you do

3    any accounting-type work?

4    **A.**    No.

5    **Q.**    Did you work for a university?

6    **A.**    I did.

7    **Q.**    What university did you work for?

8    **A.**    I worked for Clark Atlanta University.

9    **Q.**    And how long have you worked -- did you work for Clark

10   Atlanta University?

11   **A.**    I believe six -- six or seven years from 2007 to 2013.

12   **Q.**    All right.  And what type of work did you do with Clark

13   Atlanta University?

14   **A.**    I was a staff accountant.

15   **Q.**    Staff what?

16   **A.**    Staff accountant.

17   **Q.**    Staff accountant?

18   **A.**    Yes, sir.

19   **Q.**    I think I previously asked you did you do accounting work.

20   Maybe I misspoke, but I think you stated no.

21        So was that -- it sounds like staff accountant is

22   accounting work.  Is that fair?

23   **A.**    Yes.  You said previously.  So before sales, it was

24   accounting work.

25   **Q.**    Okay.  Maybe I misspoke.  But you did work in accounting?

1    **A.**   I did, yes.

2    **Q.**   You did that for Clark Atlanta University?

3    **A.**   I did.

4    **Q.**   All right.  Do you know the defendant in this case, Allen

5    Pendergrass?

6    **A.**   Yes, I do.

7    **Q.**   How do you know Mr. Pendergrass?

8    **A.**   We worked together on several occasions.

9    **Q.**   Do you see Mr. Pendergrass in court?

10   **A.**   Yes, I do.

11   **Q.**   Can you please point to him and describe an article of

12   clothing that he is wearing?

13   **A.**   It looks like he has a suit on.  I don't know if that is

14   an olive color or gray color.

15   **Q.**   He is the African-American gentleman sitting at the

16   counsel table -- defense counsel table?

17   **A.**   Yes.

18          MR. BROWN:  Let the record reflect that the witness

19   has identified the defendant, Mr. Pendergrass.

20   **Q.**   **(BY MR. BROWN)**  So how did you come to work for Allen

21   Pendergrass?

22   **A.**   We first began working in '06.  I was working at a tax --

23   a tax firm.

24   **Q.**   Let me stop you there.  So you started working with

25   Mr. Pendergrass in 2006; correct?

69

**A.**   Yes.

**Q.**   And how did you even meet Mr. Pendergrass to come to work

for him?  How did that happen?  Explain that.

**A.**   I was working for an attorney -- tax attorney.  And one of

his clients saw me working with the tax attorney, and he

thought that we worked well together, and he suggested that he

had a friend that I would work well with as well.

**Q.**   So at that point, you and Mr. Pendergrass met and you

started working for him?

**A.**   We met -- we had a meeting.  And then we discussed working

and then the terms and the pay.  And then I left, and I worked

for him.  It was like December -- December of 2006.

**Q.**   All right.  So the time you worked for Mr. Pendergrass in

2006, were you still working for Clark Atlanta University?

**A.**   I hadn't worked for Clark Atlanta yet.

**Q.**   Okay.  So this is before Clark Atlanta?

**A.**   Yes.

**Q.**   And at the time, what was the nature of Mr. Pendergrass's

business that you were going to be working with him in?

**A.**   So I wanted to do some accounting work for him.  I was

still in school at the time.  And so I just wanted to do some

bookkeeping work.  And so that was the -- the set of terms that

I -- that we agreed upon to work -- to work for him.

**Q.**   And what kind of business was Mr. Pendergrass operating in

2006 such that it needed bookkeeping work?

1   **A.**   He -- Mr. Pendergrass claimed he had an asset recovery

2   business.   At that time, the term was new to me.   So I was new

3   to that business -- understanding the business.

4   **Q.**   All right.   You said Mr. Pendergrass claimed to have.   So

5   did he have an asset recovery business?   Why do you say he

6   claimed to have one?   Did he actually have a business?

7   **A.**   Yes, he had a business.   Yes.

8   **Q.**   Were there employees there?

9   **A.**   Yes, there was.

10   **Q.**   Were they engaged as far as your knowledge into the

11   recovery of assets?

12   **A.**   Yes.

13   **Q.**   At that time in 2006, what was your understanding of how

14   Mr. Pendergrass's business operated, if you had an

15   understanding at all?

16   **A.**   I didn't have a 100 percent understanding of the business.

17   I knew that they collected money.   But I was really focused on

18   just doing accounting work.

19   **Q.**   All right.   I'm not an accountant, and I know accounting

20   work can get kind of granular.   So I don't want you to give me

21   all the details.

22        But can you just tell the jury an overview of what kind of

23   accounting work were you doing?

24   **A.**   Just reconciling his books in Quickbooks.

25   **Q.**   And is this a part-time job or a full-time job?

1    **A.**    It was going to be a full-time job.

2    **Q.**    You said it was going to be a full-time job.  What do you

3    mean by that?

4    **A.**    Well, it was a full-time job.  I'm sorry.  I ended up

5    getting fired.  But --

6    **Q.**    All right.  So tell us about -- so how long had you worked

7    there?

8    **A.**    Maybe a month.

9    **Q.**    Why --

10   **A.**    Maybe a month and a half.

11   **Q.**    Why did you get fired?

12   **A.**    If I -- I got fired because I wasn't -- I didn't want to

13   do any selling on the asset recovery side.  And I felt like I

14   just wanted to do bookkeeping work.  And they were -- him and

15   his wife at the time were trying to get me to do the other

16   aspects of the business.

17   **Q.**    All right.  So did they fire you, or did you decide to

18   leave?  How did your separation -- how did it end?

19   **A.**    So I was told by his wife at the time that it wasn't going

20   to work out, so I was fired.  But they were going to write me

21   a -- a letter of recommendation to where my next place of

22   employment was going to be.

23   **Q.**    So did you get a letter of recommendation?

24   **A.**    I did not.

25   **Q.**    Why not?

1    **A.**    I was upset.

2    **Q.**    Why were you upset?

3    **A.**    Because I had left -- I had left the tax attorney,

4    something a little bit more stable, for him.  And it ruined a

5    relationship with that tax attorney because it was getting

6    close to tax season and he needed me.  And the money was

7    more -- he was paying me more, and I felt I needed to leave.

8    **Q.**    Did you express your dissatisfaction to Mr. Pendergrass or

9    his wife?

10    **A.**    No.

11    **Q.**    Why not?

12    **A.**    I just left.  When they let me go, I just left.

13    **Q.**    All right.  So that is 2006.  And approximately how many

14    months?  You said one month; is that correct?

15    **A.**    One or two months.  Somewhere around there.

16    **Q.**    All right.  So let's kind of fast forward since we're

17    still back in 2006.

18        Did there come a time later on that you got reacquainted

19    with Mr. Pendergrass?

20    **A.**    Yes.  Around -- we saw each other in a retail store in

21    2009.  And then in 2010, he had a small retail business out in

22    Jonesboro that he wanted me to do inventory for.

23    **Q.**    All right.  Let me stop you there.

24        So when you say a retail business, what is he selling?

25    What is he retailing?

73

1   **A.**   Just -- I believe it was cell phones.  Yeah.

2   **Q.**   All right.  So did you actually -- did you work and do any

3   inventory for Mr. Pendergrass in the cell phone business?

4   **A.**   Yes, I did some inventory there.  Yeah.

5   **Q.**   And approximately how long did that work last with

6   Mr. Pendergrass?

7   **A.**   I don't remember how long.  It wasn't long at all.

8   **Q.**   All right.  So this is 2009, 2010?

9   **A.**   This is probably 2010.

10  **Q.**   At this time, are you working with Clark Atlanta?

11  **A.**   Yes, I am.

12  **Q.**   So is your employment with Mr. Pendergrass a part-time

13  job?

14  **A.**   Yes.  It was some side work.

15  **Q.**   All right.  So at this time, what is the nature of the

16  relationship?  In 2009, 2010, what is the nature of your

17  relationship with Mr. Pendergrass?

18  **A.**   Well, when I met -- well, when we met at the store, he

19  told me his wife died.  And so we just kind of were hanging out

20  just talking.

21  **Q.**   Okay.  Now, are you and Mr. Pendergrass around the same

22  age?

23  **A.**   No.

24  **Q.**   So what is the age between you and Mr. Pendergrass

25  approximately?

```
 1   A.    He's probably 20, 25 years older than me.

 2   Q.    So you started hanging out with Mr. Pendergrass?

 3   A.    Yes.

 4   Q.    And what does hanging out mean?

 5   A.    Having drinks, playing pool.

 6   Q.    Are you still working for his cell phone business at this

 7   point in time or no?

 8   A.    No, I'm not.  I don't think -- the guy he had running the

 9   store, I don't -- he didn't trust him.  Mr. Pendergrass did not

10   trust him.  And so I ended up -- we were having too many

11   disputes or issues.  And so I ended up not staying around.

12   Q.    So that is 2010 you testified previously.

13         Does there come a time in the future you start working for

14   Mr. Pendergrass, I guess, a third time?

15   A.    Yes.  We started talking again in the -- the end of 2012.

16              THE COURT:  I'm sorry.  Would you just clarify in --

17   the period of time in 2010 you are talking about, were you

18   still working at Clark Atlanta?

19              THE WITNESS:  Yes -- yes, Your Honor.

20              THE COURT:  All right.

21   Q.    (BY MR. BROWN)  I think you testified this was part-time

22   work with Mr. Pendergrass; correct?

23   A.    Yes.

24   Q.    So during 2010 and up to 2012, are you maintaining contact

25   with Mr. Pendergrass?  Are you still hanging out doing things
```

1  friends would do together?

2  **A.**    Not as much.  We were friends.  I invited him -- I

3  remember inviting him to my wedding.  I had a wedding in June

4  of 2011.  I remember him showing up.  I was surprised that he

5  did show up.

6      But it wasn't like as frequent then.  And so that is what

7  I remember.

8  **Q.**    All right.  So let's go to 2012 when you start working for

9  Mr. Pendergrass again.

10      Explain how you met with him again.  And what was the

11  nature of the business such that he needed you to work for him?

12  **A.**    So I had a -- I took an FMLA at Clark because I was having

13  some medical issues going on.  And so we were just talking

14  about starting his business over I guess to try to get the

15  business back going to where he had it in 2006 when I first met

16  him.

17  **Q.**    Okay.  So did you approach Mr. Pendergrass and tell him,

18  hey, let's get the business back together?  Or how did it work?

19  Did he come to you?  Who approached who about starting the

20  business?

21  **A.**    I talked to him about the business.  And at first, he did

22  not -- he said the holders or the counties weren't paying as

23  much or business was slow.  And so he wasn't enthusiastic about

24  starting the business again.

25  **Q.**    What was your understanding in 2012?  Was Mr. Pendergrass

1   engaged in the business, or had his business completely

2   stopped?

3   **A.**   So I found out that he had moved offices, but -- or he was

4   no longer at the Fayetteville office, which was a -- he had a

5   big office.  Mr. Pendergrass had a big office building in

6   Fayetteville.  It was a two -- it was like two offices joined

7   together.  And he didn't have that any more.  So I was trying

8   to figure out what was going on.

9   **Q.**   All right.  So what did he tell you about what was going

10  on?  Was the business ongoing?  Or explain how the business

11  started.  What was going on?

12  **A.**   We were just talking about getting it started, and I

13  didn't know where his new business was at first.  We were just

14  meeting a lot at the house where he was living.

15  **Q.**   Okay.  So what month in 2012 did you and Mr. Pendergrass

16  actually start the business?

17  **A.**   So I believe we -- it was either -- it was sometime in

18  November or December.

19  **Q.**   And how did you start the business with Mr. Pendergrass?

20  Did you get an office space?  Did you get telephones?  Did you

21  get employees?  Explain how the business started for the jury.

22  **A.**   So he had already had a business, the Asset Financial

23  Recovery he told me about he had started.  And he said he

24  wasn't working on it.  And so we -- he was like, well, we can

25  work under this name and this business.  And so that is when I

1    learned about the new office space.

2    **Q.**   All right.  And where is this office space you are

3    referring to?

4    **A.**   The office space in College -- I believe College Park.

5    **Q.**   Okay.  And what was your role in the business?  What was

6    Mr. Pendergrass's role, and what was your role?  How would you

7    describe them?

8    **A.**   And so I was trying to understand if I remembered how the

9    business worked, what we were discussing how it worked.  And so

10   he had a list that he said nobody was working off of.  And so

11   he said we could start with that list.  So I started -- I

12   started working off of that list.

13   **Q.**   And when you say list, what are you referring to?

14   **A.**   So a holders' list.  A holders' list is a list of

15   unclaimed checks or uncashed checks that were from a county

16   such as -- a county or city municipality.  So like the City of

17   Atlanta or -- or the City of Dallas.

18   **Q.**   Did Mr. Pendergrass provide you this list?

19   **A.**   Yes.  That exclusive list, yes.

20           MR. BROWN:  May I approach the witness, Judge?

21           THE COURT:  Yes.

22   **Q.**   **(BY MR. BROWN)**  I'm going to show you what has been marked

23   as Government's Exhibit 32.  Take a look at that and tell me if

24   you recognize it.

25   **A.**   Yes.  This is the list that I began to work off of.

1    Q.    Take a look through it and make sure I didn't put a

2    picture of my kid in the back or something like that.

3    A.    The first page is an older list -- I mean, yeah, it is the

4    older list.  And it looks like the second page is an updated

5    newer list.

6    Q.    All right.  So just flip through the whole thing, and I'm

7    going to ask you some questions about it.

8    A.    (The witness complies.)

9          Okay.

10   Q.    So do you recognize what is marked as Government's

11   Exhibit Number 32?

12   A.    Yes.

13   Q.    And how do you recognize it?

14   A.    There are familiar names on the list.

15   Q.    Is that a copy of the list or lists that you received from

16   Mr. Pendergrass?

17   A.    Yes, it is.

18   Q.    Okay.  And is that the list you worked off of when you

19   were employed or one of the lists you worked off when you were

20   employed with Mr. Pendergrass?

21   A.    The first page is the second page I was -- I was assigned

22   with sending out Freedom of Information requests to different

23   holders throughout the U.S. to get updated lists.

24   Q.    So all the pages in Exhibit Number 32, are they lists that

25   you worked with at some point during your time with

1    Mr. Pendergrass?

2    **A.**   Yes.

3    **Q.**   Have there been any changes or alterations or deletions to

4    the lists that you can see?

5    **A.**   Not that I'm aware of.

6         MR. BROWN:  At this time, Your Honor, the Government

7    would move to admit Exhibit Number 32 into evidence.

8         MS. DURRETT:  I don't have an objection, Your Honor.

9         THE COURT:  It is admitted.

10        MR. BROWN:  Permission to publish?

11        THE COURT:  Yes.

12        MR. BROWN:  Harry, can I use this?

13   **Q.   (BY MR. BROWN)**  All right.  So I'm showing you what has

14   been marked as Government's Exhibit Number 32.

15        Can you just -- generally just describe -- we're not going

16   to go through all of this.  Can you just describe to the jury

17   what we're looking at and how you use a list like this to

18   obtain funds?

19   **A.**   So the list here -- what you would do is you first get the

20   list and then you would skip trace the list.  Skip tracing

21   means you would find all of the mailing information and contact

22   information, for instance, of a Holland & Knight or someone of

23   the YWCA of Greater Atlanta.

24        And then once you found the contact information, then you

25   would try to contact them or send them a letter saying that

1    there was some funds available for them.

2    **Q.**   So is that generally how the business should operate?

3    **A.**   Yes.

4    **Q.**   All right.  So once you contact the individual who is

5    actually owed the funds, what happens next?

6    **A.**   So usually there's some skepticism.  But once you contact

7    them, you would tell them how much the funds -- how much they

8    would have in the funds available.  And then once you get them

9    to sign, then you would -- you would collect on their behalf.

10   **Q.**   Okay.  So did you engage in that practice when you first

11   started working with Mr. Pendergrass?

12   **A.**   Yes, I did.

13   **Q.**   Were you successful in signing up individuals to reclaim

14   their money for them?

15   **A.**   Yes, I was.

16   **Q.**   All right.  And what was -- how were you paid as a result

17   of the funds that you recovered?  What was your fee?

18   **A.**   So me and Mr. Pendergrass agreed upon 33 percent of the

19   money collected.

20   **Q.**   And typically how much money would you -- out of that --

21   say if it is $10,000, how much would the actual client lawfully

22   get back and how much would you guys keep for your fee as the

23   firm recovering the money?

24   **A.**   So if they didn't negotiate it, we start at 33 percent.

25   Sometimes a client would try to negotiate down to 25 percent.

1   But the standard was 33 percent.

2   **Q.**   Out of that 33 percent, how much do you get as working for

3   Mr. Pendergrass?

4   **A.**   So if I closed that deal, then I would get the 33 percent.

5   **Q.**   Okay.  Would you get the entire 33 percent?

6   **A.**   Yes.

7   **Q.**   So at the time you were working in the business, is Mr.

8   Pendergrass also working in the business to recover funds?

9   **A.**   Yes.

10  **Q.**   All right.  Are you guys working together?  Are you

11  working independently?  Can you describe for the jury the

12  nature of how you were working to obtain these funds?

13  **A.**   Yes, we're working together.

14  **Q.**   All right.

15  **A.**   I would go -- I would go to his house in the morning and

16  pick him up, and we would go to -- we would run errands.  But

17  we would go to the office together.

18  **Q.**   Would you pick him up every morning?

19  **A.**   Yeah.  Pretty much.  Yes.

20  **Q.**   Did Mr. Pendergrass drive at this time?

21  **A.**   He had a car.  But yeah, he drove.

22  **Q.**   But it was your practice to pick him up most mornings?

23  **A.**   I would say most mornings, yes.

24  **Q.**   And what kind of car did Mr. Pendergrass drive in 2012,

25  2013?

1    **A.**    A Mercedes -- a gray or silver Mercedes.

2    **Q.**    All right.  So did there come a point as to -- instead of

3    lawfully obtaining the money from these different

4    municipalities that you started forging signatures and forging

5    names and power of attorneys to get the money?

6    **A.**    Yes, we did.

7    **Q.**    All right.  You said we did.

8          How did that start?  How did you start going from a

9    legitimate business to forging names and getting money you were

10   not entitled to?

11   **A.**    So the first couple of attempts I tried to close were

12   unsuccessful.  And we discussed because it was unsuccessful

13   that we thought that they didn't want the money.

14   **Q.**    What do you mean they didn't want the money?

15   **A.**    So first there is -- the Holland & Knight was pretty old.

16   It was from 2001.  And so we had discussions about them not

17   wanting the money.

18   **Q.**    You said we had discussions.  Who was we?

19   **A.**    Me and Mr. Pendergrass.

20   **Q.**    What were those discussions?

21   **A.**    So after my attempt of trying -- I called Holland &

22   Knight.  I actually went up to their office to try to talk to

23   someone to make the sale.  After those attempts, we discussed

24   trying -- trying to get the money from them.

25   **Q.**    Okay.  I want to publish what has already been admitted

1   into evidence as Government's Exhibit Number 12.  I'm going to

2   use the overhead.

3       So you just testified about Holland & Knight; is that

4   correct?

5   **A.**   Yes.

6   **Q.**   All right.  So look at your screen.  This is Government's

7   Exhibit Number 12.

8       What are we looking at here?  Describe what we are looking

9   at here.

10  **A.**   Okay.

11  **Q.**   You can look at the screen.

12  **A.**   Okay.  Yeah.

13  **Q.**   Sorry about that.  You have a screen right next to you.

14  So you can just turn there and look at it.

15  **A.**   So we're looking at a submission record to the City of

16  Atlanta.

17  **Q.**   Let's start at the top.  Attorney Recovery Systems, Inc.,

18  what is that company?

19  **A.**   That company was a company me and Mr. Pendergrass decided

20  to make up to try to obtain the funds from Holland & Knight.

21  **Q.**   Now, describe how did you and Mr. Pendergrass make up this

22  company.

23  **A.**   So we would search or being me and Mr. Pendergrass would

24  search the Georgia Secretary of State website -- can you hear

25  me?

1      We would search the website and look for defunct companies

2  and then make -- change a letter or two.

3  **Q.**   All right.  Is that what you did in this -- related to

4  Attorney Recovery Systems?

5  **A.**   Yes.  Because there was a company called -- a real company

6  called Attorney Recovery System with an S.  And so we just

7  took -- I just took off the S, or we decided -- me and

8  Mr. Pendergrass decided to take off the S and to form this

9  company.

10 **Q.**   Now, you said I just took off the S.  Did you -- in

11 addition to changing the name of the company that you used,

12 what about the address there?  What is that address?  Is that a

13 real company address?

14 **A.**   No, it is not.  It is a virtual address.

15 **Q.**   Who opened that virtual office?

16 **A.**   I opened the virtual office.

17 **Q.**   Okay.  Why did you open a virtual office?

18 **A.**   Because we -- me and Mr. Pendergrass had a discussion

19 about we -- we needed to have an office in Atlanta that looked

20 like it was in Atlanta.

21 **Q.**   So let's look -- so the amount of money is $359,000.  That

22 is a lot of money; correct?

23 **A.**   Yes, it is.

24 **Q.**   What was -- if you were to obtain this money, how would

25 this be money be divided?

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

**A.**   And so when we first discussed it, the split was that I
would -- he would give me 150,000 of the 359.

**Q.**   And then he would keep the rest?

**A.**   That's correct.

**Q.**   Why would he get a larger percentage than you?

**A.**   He had the information.

**Q.**   And what information is that?

**A.**   He had -- this was his list that he had obtained.  And as
I understood it, no one else had that list.

**Q.**   The name Gene R. Bloom, is that a real signature or is
that a forged signature?

**A.**   That is a forged signature.

**Q.**   Who forged that signature?

**A.**   I forged that signature.

**Q.**   Why did you forge the signature?

**A.**   We needed a name to use, and I believe that that name was
from the previous company that was -- that was dead on the
Georgia Secretary website.

**Q.**   I want to turn to Page 2 of the exhibit.  So what is this
document here?

**A.**   That is the limited power of attorney that is sent out
initially with the -- when you try to alert someone to sign
with you.

**Q.**   So Steve Cohen -- the real Steve Cohen didn't sign that;
correct?

1    **A.**   That's correct.

2    **Q.**   Who signed that?

3    **A.**   I signed that.

4    **Q.**   And then below that where the notary seal is there, the

5    writing looks different between the signature and there.

6          Who signed or who wrote Steve E. Cohen?

7    **A.**   That is Mr. Pendergrass's handwriting.

8    **Q.**   How are you able to recognize that?

9    **A.**   We were the only ones working on this -- on the Holland &

10   Knight.  No one else.

11   **Q.**   Were there other people in the office at this time that

12   were doing this kind of work with you guys?

13   **A.**   No.

14   **Q.**   Who is Deidre Barber?

15   **A.**   It was a former girlfriend of Mr. Pendergrass.

16   **Q.**   Did she work in the office eventually?

17   **A.**   She was with him, yes.

18   **Q.**   What do you mean with him?

19   **A.**   So some days she would be there.  Some days she wouldn't.

20   **Q.**   At the time, was Ms. Barber and Mr. Pendergrass -- were

21   they dating, to your understanding?

22   **A.**   To my knowledge, yes.

23   **Q.**   Is there a reason why you would sign one part of the page

24   and Mr. Pendergrass would sign the other?  Why would you do

25   that?

1    **A.**   To make it look more believable and not have the same

2    handwriting.

3    **Q.**   Let's talk about the notary at the bottom.  Is that a

4    legitimate notary that someone came to your office and

5    notarized the document?

6    **A.**   No, it is not.

7    **Q.**   Where did you obtain the notary from?

8    **A.**   That notary was obtained from Mr. Pendergrass.

9    **Q.**   Okay.  Where did Mr. Pendergrass obtain the notary?

10   **A.**   So from -- so at the time we did this document, we didn't

11   have his old database.  And so he had maybe old documents from

12   his computer that he had old seals and old notary seals from.

13   And so that's what -- that is where that came from.

14   **Q.**   How did you get the notary from the old or the real

15   document and put it on this fake document?

16   **A.**   So that was the job of Mr. Eric Fitchpatric.

17   **Q.**   Who hired Eric Fitchpatric to work at the firm?

18   **A.**   That was Mr. Pendergrass.

19   **Q.**   So it is safe to assume that this whole exhibit -- all

20   these signatures are fake; correct?

21   **A.**   Yes.  So if you put the seal and the -- the seal and the

22   signature, that is a lifted signature.  Someone didn't actually

23   sign that.  It was just photoshopped off and placed online.

24   **Q.**   How was that done?  How was the signature photoshopped?

25   **A.**   So through Photoshop, I believe you can just lift the

1    signature and the seal off of -- off the document and place it

2    on a new document.

3    **Q.**   And you testified that is also a job of Mr. Fitchpatric as

4    well?

5    **A.**   Yes.

6    **Q.**   And once Mr. Fitchpatric lifted the seal or the signature,

7    what did he do with it?  What happened next?

8    **A.**   We would have him talk about -- put the seal and the

9    signature on and place it to where it would look believable.

10   And so we would make test runs.  We would print out documents

11   and look at it to see if it looked authentic or not.

12   **Q.**   All right.  I want to ask you one question about Page 1.

13        Below Holland & Knight, care of Attorney Recovery System,

14   there is an address.  And I think you testified that was an

15   address you set up; correct?

16   **A.**   Yes, it is.

17   **Q.**   Was Mr. Pendergrass aware of the address being set up?

18   **A.**   Yes.

19   **Q.**   How was he aware?

20   **A.**   Because I didn't remember how to make a submission at

21   first.  And so he had to walk me through the steps on how to

22   make a submission to the City of Atlanta.  So we talked about

23   creating an address for -- because it was a large amount, we

24   wanted to distance ourselves from it.

25        And so we had to create an address -- we picked in Atlanta

1   in Buckhead because it was a nicer area and it was more

2   believable that way.

3   **Q.**   Okay.  I also have -- on Exhibit 12, Page 4, I have a copy

4   of -- it looks like a business card.

5       Can you explain that to the jury?

6   **A.**   Yeah.  And so when I actually went up there to go to

7   Holland & Knight, I received a business card.  And that is just

8   a copy of a formatted business card.

9       I actually had Eric change the name on the business card

10  and so -- the name and the address -- the -- okay.  The address

11  is the same one there.  But the name and credit and collections

12  manager was photoshopped.

13  **Q.**   Okay.  What about the phone numbers at the bottom?

14  **A.**   We left the phone -- the phone numbers were real.  We left

15  it so as to make it -- hide it in plain sight, for instance.

16  **Q.**   So in addition to the name Attorney Recovery System, Inc.,

17  are there other business names that you and Mr. Pendergrass

18  used to submit forged documents?

19  **A.**   Yes, there was.

20  **Q.**   Do you recall those names?

21  **A.**   One was Lee Family Trust.

22  **Q.**   Okay.

23  **A.**   And another one -- as I'm looking on here, Atlanta

24  Quarterback Club was another one.

25  **Q.**   All right.

**A.**    So I don't remember the other ones.

**Q.**    All right.  I'm going to show you what has already been admitted into evidence as Government's Exhibit Number 1.

Do you recognize this document?  Let me zoom out.

**A.**    Yes, I do.

**Q.**    How do you recognize this?

**A.**    It was one of the firms from the initial listing.

**Q.**    Okay.  So that company, Asset Financial Recovery, is that a company that you and Mr. Pendergrass used to obtain funds?

**A.**    Yes, it was.

**Q.**    That address -- where is that address at the top?

**A.**    That is Mr. Pendergrass's address.

**Q.**    All right.

**A.**    In College Park.

**Q.**    And do you recall this particular account, Weismann Novack & Curry?

**A.**    Yes, I do.

**Q.**    Did you sign the bottom as Terrell McQueen?

**A.**    Yes, I did.

**Q.**    Page 2 of Exhibit 1, is this a forged signature of Ashley Lanier?

**A.**    Yes, it is.

**Q.**    Who forged that signature?

**A.**    That is my signature.  That is my handwriting for the signature and the printed name.

1   **Q.**   Okay.  Do you recognize any handwriting at the bottom for

2   the notary public?

3   **A.**   That -- that is a lifted signature and a lifted seal.

4   **Q.**   What about the writing Georgia, Fulton, 31 May?

5   **A.**   I don't recall whose handwriting that is.

6   **Q.**   Did you create the business card?

7   **A.**   I did make that card, yes.

8   **Q.**   Can you describe what we're looking at here?

9       I don't know if you can see it.  It is kind of small.  If

10  you need me to enlarge it, please let me know.

11      Let's enlarge the top.  What is ZOHO CRM?

12  **A.**   So it is a customer relationship management database.  And

13  so once you receive a listing from a holder, for instance the

14  City of Atlanta, if it was in an Excel spreadsheet, you could

15  upload that Excel spreadsheet into that database.

16  **Q.**   Now, if you look in the middle of the page, it says

17  modified by Shawn McQueen.

18      Did you go by Shawn?

19  **A.**   Yes.  That is my middle name.

20  **Q.**   Do you know when it says modified -- is this a software

21  program that is on the computer, or was it online?  How does it

22  operate?

23  **A.**   Yes.  So it is in the cloud.  And so you can log on to it

24  anywhere.

25  **Q.**   Do different users have different log-ins, or how does a

1   log-in process work to your understanding?

2   **A.**   So you could have one user, and then you can assign

3   different users.

4   **Q.**   Do you recall how it was set up at the firm that you were

5   working at with Mr. Pendergrass?

6   **A.**   Yeah.  I don't remember using my name Shawn there.  So --

7   but I guess we did because it is there.

8        But if it was modified, it would say modified if you added

9   notes to it.  Or if you said called or updated customer or

10  something like that then, then it would say modified by the

11  person whose name it was under.

12  **Q.**   Let me show you what has been marked as Exhibit Number 2.

13       Do you recognize this document?

14  **A.**   Yes, I do.

15  **Q.**   All right.  Who was responsible for the Johnson Coleman &

16  Stephenson account?

17  **A.**   That is an account that me and Mr. Pendergrass decided to

18  try to take fraudulently.

19  **Q.**   When you say you guys decided to take it fraudulently,

20  were you working together on this?  Was he the lead?  Were you

21  the lead?  How did it work?  What was the arrangement, to your

22  understanding?

23  **A.**   So we always worked together.  Either someone would do --

24  either I would do the research or he would do the research on

25  the company to see if it was a company that was still in

1   business.

2       Or it would depend on how hard it was to try to locate the

3   person involved with the company.  So if it was someone

4   difficult, then we decided to use that company.

5   **Q.**   So Page 2 of Exhibit 2, Sonia Johnson and the writing

6   there, do you recognize any handwriting on this particular

7   document?

8   **A.**   Yes, I do.

9   **Q.**   Tell the jury what you recognize.

10  **A.**   I recognize my -- my signature and my handwriting is on

11  the signature and printed name.

12  **Q.**   All right.  So you signed the name Sonia Johnson?

13  **A.**   Yes.

14  **Q.**   And you printed the name Sonia Johnson?

15  **A.**   Yes, I did.

16  **Q.**   What about the writing on the bottom below that?

17  **A.**   That is my handwriting as well.

18  **Q.**   So on this particular -- do you recall -- what was the

19  fee -- how were you going to split this money from the City of

20  Atlanta?  $8000 -- who would get what?

21  **A.**   And so we -- it was still the same split.  33 percent of

22  the money that was obtained.  I received 33 percent, and he

23  would receive the rest.  Mr. Pendergrass would receive the

24  rest.

25  **Q.**   Okay.  Is --

1    A.    And I note that -- so if you notice in the beginning with

2    the Holland & Knight, we had -- the issue with the Holland &

3    Knight with the bank was we were both afraid to drop the check

4    into the bank.  Because when I opened the bank account up for

5    Holland & Knight, it didn't match the check.  The check said

6    LLLP.  I just opened up a regular account, a d/b/a, which was a

7    big red flag.  But I kind of sweet talked the lady into --

8    Q.    Let me stop you there.  You are getting into the area of

9    the money from Holland & Knight.  So we can discuss that now.

10   A.    Yeah.

11   Q.    Did you get the 359,000-dollar check from Holland &

12   Knight?

13   A.    Yeah.  And so yeah.  I was just -- okay.  Yes, we did.

14   Q.    Okay.  Did it come to a P.O. Box, or how did you get the

15   check?

16   A.    So that one did not because the -- it was -- I believe it

17   was missing the unit number or something like that.  But it got

18   returned.

19   Q.    So what happened when it was returned?

20   A.    So when it was returned, I talked to Ms. Booker, who was

21   an employee of the City of Atlanta at the time.  And I believe

22   she either sent it back out, or we tracked it down.  We went to

23   the post office to try to track down the check.  And we ran

24   into the mailman who had the check, and he actually asked us a

25   question.

95

```
1    Q.   Let me stop you there.  You keep saying we.
2         Was Mr. Pendergrass with you when you were tracking down
3    the mailman?
4    A.   Absolutely.  Yes, sir.
5    Q.   And you have a distinct recollection of this?
6    A.   Yes.
7    Q.   Where did it happen?
8    A.   I believe we were in -- we were in Atlanta.
9    Q.   Buckhead, Bankhead?
10   A.   I believe Atlanta -- Buckhead.
11   Q.   All right.  So did you get the check?
12   A.   We did.  He asked us a question of where it was from.  And
13   we knew where it was coming from.  And then he gave us the
14   check.
15   Q.   So what did you do with that check?
16   A.   We had the check.  I had opened up an account with PNC for
17   that check.
18   Q.   So you used your personal name, and you opened up an
19   account?
20   A.   Yes.
21   Q.   Did you open an account in the name of Holland & Knight
22   or --
23   A.   Yes.  It was just a d/b/a account.
24            THE COURT:  D/b/a?
25            THE WITNESS:  Doing business as account.
```

1    **Q.    (BY MR. BROWN)**   Was the check deposited into that account?

2    **A.**    Yes, it was.

3    **Q.**    What happened -- what happened after the check was

4    deposited?

5    **A.**    So the check was deposited into the account, and we were

6    waiting for it to clear.  And I ended up moving without

7    Mr. Pendergrass.  And I wrote myself a check for 40,000 at my

8    bank, SunTrust Bank.

9    **Q.**    So explain that.  You said moving without Mr. Pendergrass.

10   What do you mean by that?

11   **A.**    So we would make decisions together or at least talk about

12   them before we made decisions.  And I wasn't supposed to write

13   myself a check that large.  But I ended up doing it.  And I did

14   it without telling him that I did it.

15       And SunTrust, with the relationship that I had with them,

16   they ended up cashing the check.  And then I told him.

17   **Q.**    So you wrote a check for $40,000, and did you -- were you

18   able to deposit that check?

19   **A.**    Yeah, I deposited the check.  And then it cleared.  And

20   then I went to the bank in Riverdale, and I pulled out ten

21   grand.

22   **Q.**    All right.  So ultimately with this -- I want to show you

23   what has been marked as Government's Exhibit Number 43.

24       Take a look at this.  And tell me if you recognize it.

25   **A.**    Yes.

1   **Q.**   So what is it?

2   **A.**   My personal bank account --

3   **Q.**   All right.

4   **A.**   -- and the check that I wrote with the deposit slip.

5   **Q.**   So do those statements appear to be a true and accurate

6   copy of bank records from your account?

7   **A.**   Yes.

8   **Q.**   Any changes, alterations, deletions to these documents

9   that you can see?

10  **A.**   No.

11         MR. BROWN:  The Government would move to admit

12  Exhibit Number 43 into evidence, Judge.

13         MS. DURRETT:  One second, Your Honor.

14         I have no objection.

15         THE COURT:  All right.  It is admitted.

16  **Q.**   **(BY MR. BROWN)**   So this is, I think, Page 5 of Exhibit 43.

17         Is this a copy of the check you referred to earlier?

18  **A.**   Yes, it is.

19  **Q.**   Did you sign the name Holland & Knight TM?

20  **A.**   Yes, it is.  Yes, I did.

21  **Q.**   So I want to just kind of fast forward.  What happened

22  with this -- what happened with this check as relating to you

23  getting in some trouble?

24  **A.**   Okay.  So the reason why I jumped back from the other

25  document that we had previously discussed is because the

1   Holland & Knight did not match the account name.

2        And so that is the reason the bank had called -- had

3   called me or we had spoke to the bank at the office.  And they

4   were asking questions about the account.

5   **Q.**   Let me just stop you there.  So --

6   **A.**   Okay.

7   **Q.**   -- ultimately did you -- were you investigated for deposit

8   account fraud relating to depositing this check into your

9   account?

10  **A.**   Yes, I was.

11  **Q.**   What happened?

12  **A.**   So after I took the ten grand out, I gave Mr. Pendergrass

13  three grand.  And they ended up reversing the check that I

14  wrote -- the bad check that I wrote.  And then once I did

15  that --

16        THE COURT:  Let me just say.  We need to stop for a

17  moment for a juror.  So let's just hold, and we're going to

18  just wind back in a second.

19        All right.  If any of the jurors need to use the

20  facilities, you are welcome to go.  We're going to -- I just

21  want to make that possible.

22        MR. BROWN:  Your Honor, could I inquire how long you

23  want to go before we break for lunch?

24        THE COURT:  I wanted to know what was a good breaking

25  point.

1        MR. BROWN:  I mean, now is fine as well.  It is fine,

2   Judge.

3        THE COURT:  How much more do you have with this

4   witness?

5        MR. BROWN:  I have quite a bit with this witness,

6   Judge.

7        THE COURT:  Okay.  Let's try to go to 12:30 since we

8   began late.  And then we'll stop then.

9        MR. BROWN:  Okay.

10            **(A brief break was taken at 12:14 P.M.)**

11        MR. BROWN:  Your Honor, do we have everyone back?

12        COURTROOM SECURITY OFFICER:  Everyone is back.

13        MR. BROWN:  Can I continue, Judge?

14        THE COURT:  Yes.

15   **Q.   (BY MR. BROWN)** So, Mr. McQueen, we left off talking about

16   Holland & Knight and talking about you getting -- were you

17   eventually contacted by the police or the authorities related

18   to your attempt to fraudulently cash or fraudulently withdraw

19   funds from the Holland & Knight account?

20   **A.**   We were -- I was contacted by the City of Atlanta.  And

21   then also they had claimed that they had Holland & Knight down

22   in the office.  And so they wanted me and Mr. Pendergrass to

23   come down and try to straighten it out.

24   **Q.**   All right.  Did you guys go down there?

25   **A.**   No, we didn't.

```
 1   Q.   Why not?

 2   A.   We left it alone.

 3   Q.   All right.  Did there come a point where you owed SunTrust

 4   some money for the account -- for the money you withdrew from

 5   that 40,000-dollar check?

 6   A.   Yes.  I ended up owing 16 grand to SunTrust.

 7   Q.   Did you pay SunTrust?

 8   A.   I did.

 9   Q.   Why did you pay them?

10   A.   They were going to -- they were going to arrest me in

11   Clayton County.

12   Q.   All right.  Did you speak with an investigator with

13   Clayton County?

14   A.   No.  I ended up speaking to the bank representative.

15   Q.   All right.

16   A.   We had a court date in April or May.  And then I ended up

17   requesting more time.  And so the judge gave me more time to

18   try to pay it off.

19   Q.   Was Mr. Pendergrass aware that you were facing possible

20   prosecution related to the Holland & Knight money?

21   A.   Yes, he did.

22   Q.   How did he know that?

23   A.   Because we discussed it.  I told him.

24   Q.   When Mr. Pendergrass found that out, did he fire you?

25   A.   No, he did not.
```

1   **Q.**   Did he tell you you could no longer work for his company?

2   **A.**   No.

3   **Q.**   Why not?

4   **A.**   He actually came to me and said he had a solution.  He was

5   telling me to calm down because I was panicking.

6   **Q.**   And what was Mr. Pendergrass's solution?

7   **A.**   The solution was to -- there was some money owed in the

8   Harris County Tax Assessor, and that is where the Lee Family

9   Trust came up.

10  **Q.**   Okay.  Let's hold off on Lee Family Trust.  We'll get

11  there eventually.

12  **A.**   Okay.

13  **Q.**   I'll show you what has been marked as Exhibit Number 42.

14      Do you recognize that?

15  **A.**   Yes.

16  **Q.**   What is it?

17  **A.**   It looks like a -- a -- a request -- request receipt from

18  when you go on the IRS.gov and request a taxpayer

19  identification number.

20  **Q.**   And did you request a taxpayer identification number?

21  **A.**   Yes, I did.

22  **Q.**   All right.  Is that related to Holland & Knight?

23  **A.**   Yes.  I needed that to open up a bank account.

24          MR. BROWN:  Any objection to the admission of 42?

25          MS. DURRETT:  No.

```
 1              THE COURT:  It is admitted.
 2    Q.   (BY MR. BROWN)  So I'm publishing Exhibit Number 42.  So
 3    is this what you just described as something you requested from
 4    the IRS relating to the fraud you were perpetrating relating to
 5    Holland & Knight?
 6    A.   That is correct, yes.
 7    Q.   And you did this so you can steal the money; is that fair?
 8    A.   Yeah.  I was trying to get it exactly or something with an
 9    extension on there.  But I couldn't obtain it.  So that's the
10    best that I could do.
11    Q.   So ultimately you paid the money back to SunTrust;
12    correct?
13    A.   Yes.  In June.
14    Q.   So I'm showing you Exhibit Number 43.  That has already
15    been admitted into evidence.
16         Is this a copy of the check or some part of the cashier's
17    check that you paid back to SunTrust?
18    A.   That is, yes.
19    Q.   Where did you obtain the funds to pay back SunTrust?
20    A.   Through a set of checks that we fraudulently obtained from
21    the City of Atlanta.
22    Q.   I'm publishing what has already been admitted as Exhibit
23    Number 2.
24         P.O. Box 1809, did you open that P.O. Box?
25    A.   No.
```

1   **Q.**   Whose P.O. Box was that?

2   **A.**   That was Mr. Pendergrass's P.O. Box.

3   **Q.**   Did you have a key to the P.O. Box?

4   **A.**   No, I did not.

5   **Q.**   Why not?

6   **A.**   That was his P.O. Box.  I don't know how long he had the

7   P.O. Box.  But that was his P.O. Box.  So I didn't have a key.

8   **Q.**   Did Mr. Pendergrass have a key to any P.O. Box that you

9   opened for businesses that you were perpetrating a fraud on?

10  **A.**   No.

11  **Q.**   So how would you know -- for example, this 8000-dollar

12  check, how would you know it was mailed to the P.O. Box?

13  **A.**   Mr. -- me and Mr. Pendergrass would travel to the post

14  office.

15  **Q.**   All right.  I'm going to show you what has been -- it is

16  Exhibit 2, Page 4.

17       So what are we looking at here, Mr. McQueen?  Can you see

18  it?

19  **A.**   Yes.  Yes, I can.

20  **Q.**   What is this?

21  **A.**   That is a check we obtained from the City of Atlanta.

22  **Q.**   All right.  So was this check mailed to the P.O. Box 1809?

23  **A.**   Yes, it was.

24  **Q.**   Is this -- is this a mail postage meter showing it was

25  mailed on April 5th in, I believe, 2013?

```
 1              MS. DURRETT:  Your Honor, I object to the date.
 2   A.    That looks like the date.
 3              THE COURT:  I'm sorry.  Hold off.
 4              You object to the date?
 5              MS. DURRETT:  That's right, Your Honor.  The
 6   Government is suggesting a certain date, and I don't see that
 7   on the envelope that they have got there.
 8              MR. BROWN:  Your Honor, this exhibit is already in
 9   evidence.  So my testimony is not evidence, Your Honor.
10              MS. DURRETT:  I'm happy to leave the exhibit as it
11   is, Your Honor.  Thank you.
12              THE COURT:  All right.
13   Q.    (BY MR. BROWN)  Do you see the date --
14                    (Unintelligible cross-talk)
15              THE COURT:  -- date that is referenced by counsel.
16   Counsel's statement is not evidence.  Thank you.
17   Q.    (BY MR. BROWN)  Do you see the date on the check,
18   Mr. McQueen?
19   A.    Yes, I do.
20   Q.    What date is the check?
21   A.    It says 4/5/2013.
22   Q.    Okay.
23              MR. BROWN:  Harry, could we switch to the computer,
24   please?
25              COURTROOM DEPUTY CLERK:  There you go.
```

| | |
|---|---|
| 1 | MR. BROWN:  All right, Mary.  You are back on. |
| 2 | Could you put up exhibit number -- let me see.  Is |
| 3 | this in evidence already?  22 in evidence? |
| 4 | I don't think so.  Do you have 22 marked? |
| 5 | COURTROOM DEPUTY CLERK:  It should be right up there. |
| 6 | 22 is not in. |
| 7 | MR. BROWN:  Your Honor, the Government would move to |
| 8 | admit Government's Exhibit 22 into evidence. |
| 9 | THE COURT:  No objections? |
| 10 | MS. DURRETT:  No objection, Your Honor. |
| 11 | THE COURT:  It is admitted. |
| 12 | Q.   **(BY MR. BROWN)**  If we could publish Exhibit Number 22, |
| 13 | please. |
| 14 | Mr. Pendergrass -- Mr. McQueen, rather, do you recognize |
| 15 | this document? |
| 16 | **A.**   Yes, I do. |
| 17 | **Q.**   All right.  What is it? |
| 18 | **A.**   It is a document to open up a bank account. |
| 19 | **Q.**   All right.  Did you sign this document? |
| 20 | **A.**   Yes.  My signature is there. |
| 21 | **Q.**   Did you go with Mr. Pendergrass and Ms. Barber to open |
| 22 | this account? |
| 23 | **A.**   Yes, we did. |
| 24 | **Q.**   Why did you guys go together? |
| 25 | **A.**   We wanted to seem more as a company in the bank's eyes. |

1   And I knew somebody at the Bank of America or not knew him.

2   But somebody who I want to say I befriended.  But I knew him,

3   and he was a nice gentleman.  So we went to see him directly.

4   **Q.**   So you recall going to the bank with Mr. Pendergrass and

5   Ms. Barber to open this account?

6   **A.**   Yes.

7   **Q.**   Why did you open the account?  What was the purpose of

8   this account?

9   **A.**   So it was to -- after the Holland & Knight mistake, we

10  found out that it was easier to deposit checks that were in the

11  business name.  And so that was the reason.

12       And once we found -- we found out that the City of Atlanta

13  would cut checks in the name of the business name if you

14  requested it.

15  **Q.**   Were you a signer on this account?

16  **A.**   Yes.

17  **Q.**   Did you have a debit card for this account?

18  **A.**   No.

19  **Q.**   Did anyone else have a debit card for this account?

20  **A.**   Mr. Pendergrass controlled the account.

21  **Q.**   Why didn't you get a debit card?

22  **A.**   I didn't ask to have one.

23  **Q.**   Did Ms. Barber have a debit account for this card?

24  **A.**   Not to my knowledge.

25  **Q.**   Were funds that were fraudulently obtained from the City

1  of Atlanta deposited into this account?

2  **A.**    Yes, they were.

3  **Q.**    Let's pull up Exhibit Number 22.  Let's pull up Page

4  Number 24, please.

5      So, Mr. McQueen, is this a fraudulently obtained check

6  that was deposited into this Bank of America account that you

7  and Mr. Pendergrass and Ms. Barber controlled?

8  **A.**    Yes.  If you notice on the check, it has a different title

9  than the other check.

10  **Q.**    And the date on this check is different; correct?

11  **A.**    Yes.  It is 4/17.

12  **Q.**    Explain the difference between the check dated 4/5/13 and

13  the check dated 4/27/13.

14  **A.**    So once we found out that we could issue the check in our

15  company's name, Mr. Pendergrass and I rolled down to the City

16  of Atlanta requesting that they reissue the checks into our

17  name.  So we had to bring the checks back.

18  **Q.**    All right.  So the check we saw previously dated 4/5, that

19  was mailed to the P.O. Box; correct?

20  **A.**    That's correct.

21  **Q.**    How did you get this check here dated April 17, 2013?

22  **A.**    We had to resubmit.  Once we resubmitted, then it was sent

23  back to that P.O. Box.

24  **Q.**    So this check was also mailed to the P.O. Box?

25  **A.**    That's correct.

1   **Q.**   And you testified you did that because you couldn't

2   deposit the first check because it did not have care of Asset

3   Financial Recovery?

4   **A.**   Even though it had care of, we still couldn't -- it had to

5   be Asset Financial Recovery on the top line.  It couldn't be

6   care of.

7   **Q.**   All right.  Then going forward, did you and

8   Mr. Pendergrass correct that and make the checks the correct

9   way so you can get the money immediately?

10  **A.**   Yes.  That made it -- after the Holland & Knight incident,

11  that made it a lot easier.  And instead of opening fraudulent

12  bank accounts with a couple of -- I want to say another one,

13  the Atlanta Quarterback Club, I ended up opening the bank

14  account for that and Mr. Pendergrass made the submission for

15  that one.

16  **Q.**   All right.

17  **A.**   And so instead of doing that, which was more risky at the

18  time, it was just easier to get the check issued in the company

19  name.

20  **Q.**   Now, do you -- did you write checks off of this account

21  that is Exhibit Number 22?

22  **A.**   No.  Those -- all the checks were written from

23  Mr. Pendergrass to us.

24  **Q.**   But let's publish Page 25 of the same exhibit, please.

25          Do you recognize this check, Mr. McQueen?

1   **A.**   Yes, I do.

2   **Q.**   What is the Glenridge Drive Group?

3   **A.**   It was another company on this list.  Let's see.  Yeah.

4   It was another company on that priority list.

5   **Q.**   And were these funds lawfully obtained, or were they

6   fraudulently obtained?

7   **A.**   They were fraudulently obtained.

8   **Q.**   Who fraudulently obtained these funds?

9   **A.**   It was me and Mr. Pendergrass.

10  **Q.**   Let me show you what has been marked as Exhibit Number 36.

11  **A.**   Okay.

12  **Q.**   Did you have a chance to review the exhibit?

13  **A.**   Yes.

14  **Q.**   Do you recognize it?

15  **A.**   Yes, I do.

16  **Q.**   All right.  What is it?

17  **A.**   So it is a submission to obtain funds from the

18  Glenridge -- Glenridge Drive Group, and it has a cover page and

19  then the power of attorney page.

20  **Q.**   Okay.  And does that appear to be a true and accurate copy

21  of the letters and documents in connection with the Glenridge

22  Drive Group?

23  **A.**   Repeat the question.

24  **Q.**   Does what you are holding in your hand appear to be a true

25  and accurate copy of documents that you used when you were

1   working with Mr. Pendergrass's firm to obtain funds from the

2   Glenridge Drive Group?

3   **A.**   Yes.

4   **Q.**   Any changes, alterations, deletions that you can see to

5   those documents?

6   **A.**   Yes.  So it looked like Ms. Barber submitted for this one.

7   So I believe he let her have this.  So I didn't get any portion

8   of this.

9           MS. DURRETT:  Your Honor, I'll object to about what I

10   believe what happened to money.

11           THE COURT:  Why don't we just stop at this point

12   because I had a question about this and something else.  So why

13   don't we just stop.  And we can talk about it outside the

14   presence of the jury.

15           We'll see you at 1:30.  Thank you very much for your

16   patience and your attention.

17               **(The jury exited the courtroom at 12:31 P.M.)**

18           MR. BROWN:  You can sit down.

19           Does he need to step out, Judge?  Is he excused for

20   lunch as well?

21           THE COURT:  Yes.  I mean, unless you need to clarify

22   something.

23           MS. DURRETT:  No.

24           THE COURT:  Please don't discuss your testimony with

25   anyone else.  And please be sure to avoid any interface with

```
1    the jurors.  If they are in the bathroom and you need to use
2    it, please leave.  And you can use one on any other floor as
3    well as on the floor that the cafeteria is on.
4              MR. BROWN:  Judge, what time does he need to be back?
5              THE COURT:  1:30 we're going to start.
6              MR. BROWN:  So 1:30, Mr. McQueen.
7              THE WITNESS:  Okay.
8              MR. BROWN:  Leave that right there.  We'll get to it
9    when you get back.
10                  (The witness exited the courtroom.)
11             THE COURT:  Ms. Durrett, what was your concern?  When
12   I stopped, you were asking --
13             MS. DURRETT:  He --
14             MS. STRICKLAND:  He testified that he believed
15   something.
16             MS. DURRETT:  Oh, yeah.  He said what happened to the
17   money.  He said I believe he gave it to Ms. Barber.  And that
18   was my objection.  It was the speculation about where the money
19   went.
20             THE COURT:  All right.  Well, maybe when we get
21   back --
22             MR. BROWN:  Yes.
23             THE COURT:  -- you can clarify that.
24             I was a little bit confused about the Glenridge --
25   the two other things.  The Glenridge Drive Group -- I don't see
```

1    it being mentioned either in the indictment or in the

2    identification of entity -- of transactions that were -- that

3    were intrinsic but collateral.

4           MR. BROWN:  It wasn't noticed, Judge.  The bank

5    account that we admitted contains -- that is what I was trying

6    to tell you before.  The check that is charged was on the next

7    page from the Glenridge Drive Group.

8           So in order for it to be clear, I don't want defense

9    counsel to get up and say, what about the Glenridge Drive

10   Group?  Is this fraud?

11          It is so connected.  It is the same date.  These are

12   all City of Atlanta.  Same time frame.  These checks are

13   deposited at the same time.

14          So instead of waiting to get them on redirect, I want

15   to deal with these issues now.  They are in evidence.  It has

16   already been admitted, Your Honor.  So that is why I'm trying

17   to move along.  I don't want to spend too much time on it.

18          But it is related to the charged counts in the

19   indictment.  I mean, they are actually deposited at the same

20   time on the same day.  So it is just connected.

21          THE COURT:  Well, it is connected, but it wasn't

22   noticed.

23          MR. BROWN:  Right.  And so what I would say is I'm

24   not trying to pull a fast one on the Court.  But my

25   understanding of the law is intrinsic evidence does not have to

```
 1    be noticed.   404(b) evidence should be noticed.

 2            So obviously we're not going to mention a conviction.

 3    We're not going to mention anything else.  But this is

 4    intrinsic to the actual charged offense.  And therefore you are

 5    going to see a lot of this evidence overlapping in the bank

 6    accounts in particular, Judge.

 7            I can't -- it is part of the bank account records.

 8    So you will see these checks deposited altogether.  So that is

 9    what -- I mean, that is my explanation to the Court.

10            So I'm not trying to be slick.  It is just part of

11    the evidence, Your Honor.

12            MS. DURRETT:  Your Honor, I mean, I think we've

13    repeatedly stated our objection to all of the extra evidence.

14    And the Government has said they think it is intrinsic.  The

15    Court has agreed on some of it.  We object to it.

16            I know it is in there now.  So I have got to move for

17    a mistrial, I think, based on the fact that he went ahead and

18    did that.  But I mean, the Court knows my opinion about this.

19            All of this stuff is show stuff so that they can try

20    to convince the jury that Mr. Pendergrass is a bad person and

21    that they can convict him on charges that they should not have

22    charged the way they did and they regret now.

23            And so he said it.  I think there should be a

24    mistrial.  And we move on.

25            MR. BROWN:  So my response, Your Honor, is if you
```

1   look at Defendant's Exhibits 11, Defendant's Exhibit -- I don't

2   think her argument -- she is being disingenuous in her

3   argument.

4           11, 15, 17 -- these are all acts that weren't noticed

5   that she wants to admit before the Court.  They weren't

6   charged.  So how can you have it both ways?  How can you argue,

7   one, the Government is being unfair?  But then you want to come

8   in on cross and argue these same points and beat the Government

9   over the head with it?  That does not seem fair, Judge.

10          MS. DURRETT:  Your Honor, I have the opportunity to

11  impeach Mr. McQueen, who did a lot of other extra things.  And

12  he is going to admit that he did those things because the one

13  statement that I have for him, even though he met multiple

14  times with the Government, admits to multiple other frauds

15  separate from Mr. McQueen.

16          THE COURT:  Well, I understand that.  What else are

17  you planning to seek to admit beyond the Glenridge incident

18  that has not been identified for me?

19          MR. BROWN:  Defendant's 11, Defendant's 17.  What

20  else did the defense have?  Defendant's 6.  I think that is

21  already admitted.  Exhibit 1, Judge.  So that is already coming

22  in.

23          MS. DURRETT:  What was it?  11, 17, and 6?

24          MR. BROWN:  Yeah.  But 6 is already in.  That is

25  Government's Exhibit Number 1.  So not that one.

1          But as it relates to 11, yeah, 17, and --

2          THE COURT:  That's defendant's though?

3          MR. BROWN:  Yes.  Sorry.  Defendant's 11,

4    Defendant's 17, Defendant's 15.  I mean, so I don't know if the

5    Court -- I think the Court understands my argument.

6          THE COURT:  I do.  And I'm not going to grant a

7    mistrial on the basis of the Glenridge.  But I want to know

8    anything else.  I'm not going to -- I mean, it is -- I

9    understand what you are saying.  But it is -- why do we have --

10   bother having a notice of other -- of other transactions if --

11   which we have dealt a lot with if then you are going to just

12   suddenly introduce something else?

13         It seems like it is a funky dance step to me.

14         MR. BROWN:  Can I explain?

15         THE COURT:  Yes.

16         MR. BROWN:  It is not a funky dance step, Judge.  But

17   let me explain.

18         The reason why we noticed what we noticed is because

19   if you look at the motion we said, listen, we don't believe

20   this is 404(b).  We don't believe we even need to let the Court

21   know.  But to the extent, we want to put the Court on notice.

22         At the time that the Exhibit Number 22 comes in and

23   other bank records and many records being sought by defense, it

24   is these very same intrinsic acts that are in the record.

25         So I admitted 22.  If we go through Exhibit 22, it

1   has checks from Glenridge Group.  It has a check from Lydia

2   Walker.  It has a check from any number -- am I speaking too

3   fast?

4               COURT REPORTER:  Yes.

5               MR. BROWN:  So we can just go through it.  It is

6   right there, Your Honor.  So I don't see how I can avoid

7   talking about things that are in evidence.  Defense counsel did

8   not object to the exhibit coming in, Your Honor.  It is in.

9               So now I can't talk about it?

10              THE COURT:  I'm not going to disallow it.  I'm asking

11   you something else.

12              MR. BROWN:  Yes.

13              THE COURT:  What else is coming?

14              MR. BROWN:  The only thing I'm talking about is items

15   that are in the bank records, Judge.  I need to explain what

16   they are.

17              I cannot admit five checks that involve

18   Mr. Pendergrass and Mr. McQueen and not explain to the jury and

19   then have defense counsel come in and say, aha, the Government

20   didn't say anything about this, anything about that.  It makes

21   me feel like I'm not doing my job.

22              So I don't even know how to dance well.  I definitely

23   can't do a funky dance step, Judge.  So I'm not trying to do

24   that.  I'm merely trying to put the evidence in context with

25   the witness while I have him on direct because this evidence is

1  already in.

2         And just so Your Honor is clear --

3         THE COURT:  What else is in that you are saying -- I

4  mean, that you are saying -- I mean, you were introducing that

5  check.

6         MR. BROWN:  Right.

7         THE COURT:  She didn't object.

8         MR. BROWN:  She did not.

9         THE COURT:  So I'm not going to grant a mistrial.  I

10  mean, I noticed it.  But that is not my role.

11         MS. DURRETT:  Thank you, Your Honor.

12         THE COURT:  But I want to know what else.  You don't

13  have to tell me this moment.  I think we should take a lunch

14  break.  You should think about it and get things together and

15  have a list.  And we should be -- just come back here at 20

16  after and deal with it.

17         I didn't understand, I will say to you, the testimony

18  about the Holland & Knight check either.  Because this is, you

19  know, according to your records something like $250,000.  So he

20  says I paid them back with $16,000, that is what was due.

21         And I didn't understand that at all.  I mean, one or

22  the other of you can cross-examine him.

23         MR. BROWN:  Sure.  But I'll clear it up.  I mean, the

24  short answer is he deposited the money.  He withdrew the

25  40,000 -- he tried to deposit it really quickly, and the bank

1    grabbed the rest back before he could get it.

2          So the only thing he owed out of his pocket was

3    $16,000 before they could claw back all the money.  But that is

4    the answer, Judge.

5          THE COURT:  I think you ought to clarify that.

6          MR. BROWN:  Yes, I'll clarify that.

7          MS. DURRETT:  And, Your Honor, we would just ask that

8    the Glenridge Drive Group be added to our intrinsic

9    instruction.

10         THE COURT:  Okay.  I'll give another instruction at

11   the conclusion of his testimony.

12         MS. DURRETT:  Thank you.

13         THE COURT:  Do you want me to do it with the -- at

14   the conclusion -- right when we start?  I will be happy to do

15   that.

16         MS. DURRETT:  I do, Your Honor.

17         Again, I want that stipulation read, Your Honor,

18   because they went through and said Mr. Pendergrass signed some

19   of these documents.

20         THE COURT:  You can do it at an appropriate time, but

21   it is not part of -- if you -- if you decide that you are

22   trying to seek to introduce it at the time of your

23   cross-examination of this witness, you can.  Or you can do it

24   at the beginning of your case.

25         MS. DURRETT:  Thank you.

```
1              THE COURT:  But you cannot do it while just
2    interrupting.
3              MR. BROWN:  Just to be clear, the Court has ruled on
4    that?  You are going to allow her --
5              THE COURT:  Yes, I am.
6              MS. DURRETT:  And so, Your Honor, I'll just say:  I
7    do want to do it.  I'll do it right at the beginning when I
8    start to cross-examine him.
9              Do you want me to read it, or will you read it?
10             THE COURT:  No.  It is yours.
11             MS. DURRETT:  Thank you.
12             MR. BROWN:  All right.  Thank you, Judge.
13             Can we be excused until 1:20?
14             THE COURT:  Yes.  Thank you.
15             MS. DURRETT:  And, Your Honor, can I put it up on the
16   screen when I read it?
17             THE COURT:  As long as it is the right one.
18             MS. DURRETT:  The one you emailed us?
19             THE COURT:  Yes.
20             MS. DURRETT:  Thank you.
21             THE COURT:  Please don't put up the email.
22             MS. DURRETT:  I mean, I'm just going to cut the text.
23   Right?  Is that what you want?
24             THE COURT:  Yes.  Okay.
25                      (A lunch break was taken.)
```

```
 1            THE COURT:  So tell me where the exhibit number of
 2   the checks or other matters that you -- I mean, you went
 3   through some of the ones that the defendants which -- that you
 4   plan to go over, which sort of seems maybe like it is
 5   preemptive.
 6            MR. BROWN:  Right.
 7            THE COURT:  But you want to address it in the direct
 8   rather than in redirect.
 9            MR. BROWN:  Yes.
10            THE COURT:  And is there anything else?  Because
11   nothing else was new other than the one that I flagged.
12            MR. BROWN:  Yes, Judge.  I would just direct your
13   attention to the exhibit -- my exhibit list.
14            Did you get the addition starting with Exhibit
15   Number 31, Judge?  It should be stapled to your --
16            COURTROOM DEPUTY CLERK:  It was right there.  And I
17   put it behind -- well, I stapled it together.  31 starts on the
18   back.
19            THE COURT:  Okay.
20            MR. BROWN:  So the Court asked me to give you some
21   heads-up to where I'm going.  So Exhibit Number 34 is Roshaunta
22   Redmond.  I can't recall if that is a defense exhibit or not.
23   I believe it is.
24            But there is a check deposited from the City of
25   Atlanta into the account that is admitted into evidence.
```

1          THE COURT:  Is that one of yours?

2          MS. DURRETT:  It is one of ours because -- yep, it is

3    one of ours.

4          MR. BROWN:  So that is one of theirs.  Then the Fryer

5    law firm, Number 35, I believe is also a defense exhibit, Your

6    Honor, as well.

7          MS. DURRETT:  It is.

8          MR. BROWN:  We already talked about 36.

9          37, Lydia Walker.  I don't believe that is a defense

10   exhibit.  But we just admitted Exhibit Number 22 into evidence.

11   And there is a check -- a Lydia Walker check deposited with the

12   Sonia -- the check that was supposedly signed for the Johnson

13   law firm.  And --

14         THE COURT:  That is relating to the Johnson law firm

15   one?  Is that what you are saying?

16         MR. BROWN:  It is not related.  These checks were

17   deposited in the same account.  So the Johnson Coleman &

18   Stephenson law firm check that is a charged count in the

19   indictment, the next check after that is the Glenridge Group.

20   And then within that, two checks from that is a Lydia Walker

21   check.

22         So it is a check from the City of Atlanta.  I just

23   want to cover that to explain who is involved in that.  It is

24   deposited at the same time as the Johnson Coleman & Stephenson

25   check, Judge.

122

1            Greg Hickman, Your Honor, is a defense exhibit.  That

2     is Exhibit Number 38.

3            Exhibit 39 Michael Burandt is also a defense exhibit,

4     Your Honor.

5            41 is also a defense exhibit.

6            And that is all I plan to try to admit into evidence.

7     But there may be additional checks, Your Honor, within the bank

8     records themselves.  But that is my list, Your Honor.  And I

9     would only --

10           THE COURT:  What is the letter to the Escambia County

11    Tax Collector?

12           MR. BROWN:  That is a defense exhibit as well, Your

13    Honor --

14           THE COURT:  Okay.

15           MR. BROWN:  -- relating to the conduct done by

16    Mr. McQueen.

17           THE COURT:  Anything you want to say about the

18    Hickman or Walker checks?

19           MS. DURRETT:  There is, Your Honor.

20           So I want -- can I say a couple of things?  One is we

21    would object to Walker because obviously we're not on notice of

22    that.  We would object -- and the Government has suggested

23    somehow that we're going to use exhibits -- we provided them

24    because they have given us some notice in discovery about these

25    exhibits.  So we put them in our notebook in case we needed to

1   use them.

2          So the suggestion that that is a defense exhibit is

3   misleading because we certainly haven't moved to admit those

4   exhibits.  So we would argue -- you know, he can correct -- we

5   would like him to correct the Glenridge Drive issue, which is

6   he doesn't know where the money went.

7          THE COURT:  He said he is going to do that.

8          MR. BROWN:  Your Honor, I want you to know the

9   witness is here.

10          THE COURT:  I think he needs to leave.

11          MR. BROWN:  I was just going to let you know.  Sorry.

12          THE WITNESS:  They called me.  So I wasn't sure.

13          MR. BROWN:  I apologize.

14          THE COURT:  Yeah.  I think he thought you were just

15   going to be brought back there.

16          MR. BROWN:  Sorry about that.

17          So, Mr. McQueen, if you would wait outside the door.

18          THE WITNESS:  Okay.

19          THE COURT:  I'm sorry to add to your walking.

20          **(The witness exited the courtroom.)**

21          MS. DURRETT:  So we would argue that he should

22   correct the statement about the Glenridge Drive Group, that the

23   Government not be permitted to argue that in closing or send

24   those documents back because we didn't get notice about it.

25          Just because they are saying we have talked about it

1    doesn't mean that we were going to admit it or do anything with

2    it.  And I think the statement was misleading.

3            But particularly with Lydia Walker, that is not

4    something that we have as an exhibit or that we were on notice

5    about.

6            THE COURT:  You --

7            MS. DURRETT:  I'm sorry?

8            THE COURT:  You weren't provided it during discovery?

9            MS. DURRETT:  We were provided it, but there was

10   nothing in the bill of particulars about that or in the

11   indictment about that.  And it wasn't in the Government's

12   404(b) notice or intrinsic act notice.

13           THE COURT:  Did you think -- what was your response

14   to -- just more generally speaking to the contention that they

15   don't -- that they are not required to give you notice of

16   intrinsic evidence?

17           MS. DURRETT:  Well, I think that is why we had a

18   hearing on it and we filed several motions about it, Your

19   Honor.  I don't think --

20           THE COURT:  Well, I think that his explanation was in

21   case you don't think it is intrinsic evidence -- we're

22   basically having a safety valve for ourselves.  Consider it as

23   404(b).  We don't want to end up being in a position where we

24   don't get it considered.  So --

25           MS. DURRETT:  Again, I'll point the Court to the bill

1  of particulars in this case, which does not mention Walker or

2  Glenridge Drive or any of those other things, Hickman.

3          THE COURT:  Is there something in particular about

4  Lydia Walker's matter though -- the check that you -- that you

5  are concerned about?  Because you said in particular.

6          MS. DURRETT:  Just in particular that that was one I

7  hadn't heard of.  I had at least heard about some of the other

8  ones.  I'm not saying they didn't provide it in discovery.  But

9  there has been no prior discussion of that to my knowledge.

10          THE COURT:  What about the ones that he indicated

11  that you had marked?  Are you -- you weren't really planning to

12  introduce those?

13          MS. DURRETT:  Well, Your Honor, I had them ready in

14  case I needed to talk about them.  I don't mind if they talk

15  about the Fryer check and the Redmond check, if that is what

16  they want to do.

17          But like Greg Hickman, we weren't on notice about

18  that one.  The Michael Burandt --

19          THE COURT:  He says that you -- the Greg Hickman one

20  that you had indicated you might introduce, that they were on

21  your list.

22          MS. DURRETT:  I have exhibits, but I don't have to

23  introduce those exhibits.

24          THE COURT:  I understand you don't have to.  But --

25  all right.

```
 1              MR. BROWN:  Judge, could I say something?  I don't
 2    want to cut you off.
 3              THE COURT:  That's all right.
 4              MR. BROWN:  I just want to say I think counsel's
 5    argue is disingenuous.  She noticed exhibits, provided them to
 6    the Government.  Yes, she may not -- she doesn't have to
 7    introduce them.  But I think it is a pretty good indication
 8    when you give the Court and the Government your exhibit list
 9    with those exhibits in there that you could possibly mention
10    those.
11              So all the Government is doing, Your Honor, as you
12    indicated when you came on the bench, is really getting in
13    front of some of the issues that would lead the defense -- and
14    the defendant can't control the Government's introduction of
15    evidence.
16              So look at Exhibit Number 22, Judge.  It has already
17    been admitted into evidence.  22, Page 31 is a check from Lydia
18    Walker.  It is in evidence.  She didn't object to it.  So now
19    she is saying I can't argue about it but it is already in
20    evidence?
21              I mean, I think I should be able to put on my case
22    and put on the evidence that is even in evidence, Your Honor.
23    Page 22 --
24              THE COURT:  I'm sorry.  22?
25              MR. BROWN:  Exhibit 22 --
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1           THE COURT:  You told me that 37, which is Ms. Walker,

2   not -- and you are saying 22 is also?

3           MR. BROWN:  No.  I'm saying it is -- Government's

4   Exhibit Number 22, Page 31 is the check to Lydia Walker to

5   Asset Financial Recovery.  It is already in evidence.  This is

6   discovery that has been provided to defense counsel for several

7   years.  It is not a surprise.  It is in evidence, Your Honor.

8           And more importantly than that, this particular check

9   was deposited in the same very account that a check of

10  Ms. Sonia -- I mean, the Stephenson -- Johnson Stephenson

11  Coleman.  It is related, Judge.

12          THE COURT:  I'm going to allow the Walker matter.

13          MS. DURRETT:  Your Honor, I would just say:  Even

14  though the check is in the bank records, it doesn't mean that

15  someone has to testify about them.  I mean --

16          THE COURT:  Well, I think they are allowed to put on

17  their case in that way.

18          MS. DURRETT:  Thank you, Your Honor.

19          THE COURT:  But let me just say:  Are you-all

20  really -- is the Escambia County Tax Collector, which -- is

21  that something you wanted to introduce?

22          MS. DURRETT:  It is because Mr. McQueen did that on

23  his own.

24          THE COURT:  And the same thing as to Pensacola Ice

25  Pilots?  You are going to be introducing that?

```
1              MS. DURRETT:  Yes.

2              THE COURT:  I mean, I would give an instruction again

3    about their not -- making sure they understand that this is not

4    actually the charged conduct.

5              And you are also going to clarify at some point in

6    his direct examination the 250,000 -- this business about the

7    16,000 and $250,000?

8              MR. BROWN:  Yes.  I'll clear that up, Judge.

9              THE COURT:  Okay.  And if it was his personal

10   account, then I just want to make sure that they understand

11   that it is his personal account that he was dealing with.

12             MR. BROWN:  He testified to such, Your Honor.

13             THE COURT:  I know.  But if he goes back to it, I

14   want to make sure.

15             MR. BROWN:  We'll go over it again.

16             MS. DURRETT:  Thank you, Your Honor.

17             THE COURT:  Okay.

18             MS. DURRETT:  I provided the Court and the Government

19   with a copy of the stipulation that I would want to show.

20             THE COURT:  That is fine.

21                 (A discussion ensued off the record.)

22             THE COURT:  All right.  Do you want to get your

23   witness back?

24             MR. BROWN:  Yes, Judge.

25             THE COURT:  Have a seat.
```

```
 1              (The jury entered the courtroom at 1:40 P.M.)
 2          THE COURT:  Have a seat.
 3          MR. BROWN:  Can I continue, Judge?
 4          THE COURT:  Yes, you can.
 5   Q.   (BY MR. BROWN)  Mr. McQueen, you are still under oath.
 6        When we left off, we were discussing two things.  I want
 7   to back up just a little bit and see if we can clarify in
 8   relation to Holland & Knight.
 9        Can you explain for the jury how much money was deposited
10   from the Holland & Knight recovery effort into your account?
11          THE COURT:  By your account, meaning his personal
12   account?
13          MR. BROWN:  Right.  Or strike that question.  Let me
14   ask a better question.
15   Q.   (BY MR. BROWN)  Did you obtain the Holland & Knight check
16   from the City of Atlanta?
17   A.   Yes.
18   Q.   Did it come to a P.O. Box that you controlled?
19   A.   No, it did not.
20   Q.   Where was it delivered?
21   A.   That check wasn't delivered.
22   Q.   How did you obtain that check?
23   A.   We called to inquire about the check.
24   Q.   So let me stop you.  You explained meeting the post office
25   person to get that check; is that correct?
```

1   **A.**   Yes.

2   **Q.**   So once you obtained that check, what did you do with it?

3   **A.**   We had the check, and then we were trying to decide, me

4   and Mr. Pendergrass, on what bank we were going to deposit it

5   into because there was a couple of PNC locations.

6   **Q.**   And to which account did you deposit the check?

7   **A.**   I deposited that check into the PNC business account that

8   I opened.

9   **Q.**   And what was -- you opened the business account.  What was

10   the name of the account?

11   **A.**   Holland & Knight.

12   **Q.**   Was it a d/b/a?

13   **A.**   Yes, it was.

14   **Q.**   D/b/a Terrell McQueen?

15   **A.**   Yes.

16   **Q.**   Okay.

17         THE COURT:  D/b/a meaning doing business as?

18         THE WITNESS:  Yes.

19   **Q.**   **(BY MR. BROWN)**  And just explain in plain terms when the

20   check hit your account what happened.

21   **A.**   When the check hit the account, I got the receipt.  And we

22   waited for it to be cleared from the bank.

23   **Q.**   When you say we, who is we?

24   **A.**   Me and Mr. Pendergrass.

25   **Q.**   Did the check eventually clear?

1    **A.**    No, it did not.  But I remember writing myself that

2    40,000-dollar check.  And when that check cleared, I thought

3    everything was good -- good to go.

4    **Q.**    So it has already been admitted into evidence, Exhibit

5    Number 43, the 40,000-dollar check you are referring to is what

6    is published on the screen; is that correct?

7            THE COURT:  There is nothing on the screen.

8            MR. BROWN:  I'm sorry.  Harry, can you turn that on?

9    I apologize.

10           Moving too fast.

11   **Q.**    **(BY MR. BROWN)**  All right.  So is that the 40,000-dollar

12   check you are referring to?

13   **A.**    Yes, it is.

14   **Q.**    So you deposited the check from Holland & Knight into the

15   account, and then you wrote a check off of that account for

16   $40,000; is that right?

17   **A.**    That's correct.

18   **Q.**    And you deposited this check into which account?  The

19   check here, is this into your personal account?

20   **A.**    I deposited it into my SunTrust personal account.

21   **Q.**    So on Page 1, you deposit it into this account right here;

22   correct?

23   **A.**    Yes.

24   **Q.**    And then what happened after that -- after you did that

25   deposit?

**A.**   I thought that it would take a couple of days to clear.
But they ended up clearing it the next day.

**Q.**   So explain for the jury out of that $359,000 deposited
into that Holland & Knight d/b/a, doing business as, Terrell
McQueen account, how much of that you kept and how much of that
was actually taken back by the bank.  Explain that.

**A.**   Okay.  So once I figured -- well, once the check was
cleared, the 40,000, I thought everything was okay at the
business account.  And then I ended up just transferring some
money between accounts.  And I ended up taking ten grand out of
a SunTrust branch.

     And out of that ten grand, I gave Mr. Pendergrass 3 grand
and then I wrote him another check for 23 -- 23 grand.  Or I
don't remember the amount.

**Q.**   So after you made those transactions, did something happen
with the account such that the money was taken out of the
account?

**A.**   Yes.  And so PNC Bank and -- had called me and inquired
about the check.  And I don't remember the conversation.  But I
know it was about the check.  And then they told me to call
City of Atlanta to try to explain the check.

     And so I remember having the City of Atlanta on speaker,
and we were listening to them about the check.  And then they
wanted us to come -- they wanted me to come down to straighten
it out.  And they were claiming that Holland & Knight was down

1   at their office.

2   **Q.**   Let me stop you there.  You thought that was a ruse?  Did

3   you think you were going to get arrested?

4   **A.**   Yes.

5   **Q.**   Is that why you didn't go?

6   **A.**   Yeah.  We couldn't go.  Yeah.  No.

7   **Q.**   So when you are listening to the City of Atlanta on the

8   speakerphone, is Mr. Pendergrass with you?

9   **A.**   Yes.

10  **Q.**   So ultimately you were owed -- you owed SunTrust 16,000

11  approximate dollars out of that 360 because the other was

12  clawed back; is that right?

13  **A.**   When you say clawed --

14  **Q.**   I mean, they took it back.  You didn't get the money.

15  **A.**   Yeah.  So the money I spent -- the transaction -- after --

16  the ten grand I took out cash at SunTrust.  And then the other

17  was just general transactions from my personal card.

18  **Q.**   Okay.  So, again, this is Exhibit Number 43.  This is a

19  cashier's check for $16,452.59.

20      This is a cashier's check you used to pay back SunTrust

21  for the money you spent out of that $359,000 approximately; is

22  that correct?

23  **A.**   That's correct.

24  **Q.**   All right.  So when we broke for lunch, we were talking

25  about the Glenridge Group.

1          Do you recall that?

2    **A.**   Yes.

3    **Q.**   So let me approach you again.  Let me show you what has

4    been marked as Government's Exhibit 36.

5    **A.**   Yeah.  I have it here.

6    **Q.**   So do you recognize the exhibit?

7    **A.**   Yes.

8    **Q.**   How are you able to recognize the exhibit?

9    **A.**   It was one of the companies that we were -- me and

10   Mr. Pendergrass were trying to go for that the individual could

11   not be located.

12   **Q.**   All right.  So is Exhibit Number 36 a true and accurate

13   copy of records that you and Mr. Pendergrass kept in your

14   office relating to this account?

15   **A.**   Yes.

16   **Q.**   All right.  Have there been any changes or alterations or

17   deletions to the documents contained within Exhibit 36?

18   **A.**   Not to my knowledge.

19          THE COURT:  It is not really -- is it 36 is the

20   number, or is it 36 of some other number?

21          MR. BROWN:  No, Your Honor.  It is just 36.  It is

22   Government's Exhibit Number 36.

23          Your Honor, if you will recall this morning, I gave

24   you a packet of 31 through 44.  And they should be right up

25   there, Judge.

1    So at this time, the Government would move 36 into

2    evidence.

3    MS. DURRETT:  Your Honor, we object.  He said this

4    was a company he was going after, but he didn't sign this or it

5    doesn't look like it.  Maybe he did sign the letter.  But it is

6    not his name on the letter.

7    THE COURT:  You have actual personal familiarity with

8    this document, and did you sign it or not?

9    THE WITNESS:  So I didn't sign the cover page.  But

10   on the second page, I do recognize my handwriting.

11   THE COURT:  Which one is your handwriting on the

12   second page?

13   THE WITNESS:  Where it says acknowledgment of notary

14   public, the Georgia, Fulton, 1st April 2013, is my handwriting.

15   And it looks like -- the David C. Simpson looks like it is my

16   handwriting as well.

17   THE COURT:  What familiarity do you have with the

18   first page?

19   THE WITNESS:  The first page?

20   THE COURT:  Yeah.  You say you have familiarity with

21   this page -- the particular -- do you have the exhibit in front

22   of you?

23   THE WITNESS:  This here?  You are talking about this

24   page?

25   THE COURT:  I understand.  The one with the notary

```
 1   seal you are saying you have familiarity with this.  This looks

 2   like your signature?

 3           THE WITNESS:  Yes.  So the signature down at the

 4   bottom was lifted.

 5           THE COURT:  Right.  And you have a familiarity with

 6   that because you said it looks like your handwriting even

 7   though it is not your name; right?

 8           THE WITNESS:  Right, that is my handwriting below

 9   acknowledgment.

10           THE COURT:  And I'm asking you:  On the first page of

11   this exhibit, which you were also asked about -- not that page.

12   I mean, this one that looks like this?  Yeah.

13           THE WITNESS:  I'm sorry.  I can't see.

14           The cover page, yeah.

15           THE COURT:  What actual familiarity do you have with

16   this page, if any?

17           THE WITNESS:  So we were preparing this document, and

18   Mr. Pendergrass made the decision to give this to his

19   girlfriend.

20           THE COURT:  The letter?

21           MR. BROWN:  Your Honor, could I ask some questions?

22           THE COURT:  Yes.

23   Q.   (BY MR. BROWN)  Mr. McQueen, are you familiar with the

24   first page of Government's Exhibit Number 36?  Have you seen it

25   before?
```

1   **A.**   Yes.

2   **Q.**   All right.  Did you work on it with Mr. McQueen -- with

3   Mr. Pendergrass and with Ms. Deidre Barber?

4   **A.**   Yes.

5   **Q.**   Was this an account you were all working on together?

6   **A.**   Yes.

7           MR. BROWN:  He has laid a sufficient foundation, Your

8   Honor.

9           MS. DURRETT:  I don't object, Your Honor.

10          THE COURT:  What?

11          MS. DURRETT:  I don't object.

12          THE COURT:  All right.  Fine.

13          MR. BROWN:  Is it admitted, Judge?

14          THE COURT:  It is admitted.

15          MR. BROWN:  Thank you, Judge.

16  **Q.**   **(BY MR. BROWN)**  I am going to publish Exhibit Number 36.

17      Mr. McQueen, who is Deidre Barber?

18      I think we talked about her before.  But what was her

19  involvement in the business?

20  **A.**   She was supposed to do skip tracing, which is the process

21  of locating people.  And then she was supposed to mail letters

22  out from the holders once we got the information.

23  **Q.**   So as demonstrated in Exhibit Number 36, did she also work

24  with you and Mr. Pendergrass on recovering assets as well

25  sometimes?

1   **A.**   Yes.   Sometimes.   Yes.

2   **Q.**   So on Page 2 of the exhibit, I think you have already

3   described to the Judge but I want you to show the jury:   Who

4   signed David Simpson and who printed David Simpson as best you

5   can tell, if you can tell at all?

6   **A.**   I recognize this as Mr. Pendergrass's handwriting.

7   **Q.**   Which one?

8   **A.**   The David C. Simpson.

9   **Q.**   All right.   How can you --

10  **A.**   The signature.

11  **Q.**   All right.   How do you recognize that as Mr. Pendergrass's

12  handwriting?

13  **A.**   The way he writes his Ds and Cs and Ss are a particular

14  standard.

15  **Q.**   What about when it says print name do you recognize the

16  printing of the name there?   Whose handwriting is that?

17      Or if you can't recognize it, you can't recognize it.   It

18  is fine.

19  **A.**   I don't know his handwriting, but I know the way he signs.

20  **Q.**   And then below acknowledgment of notary public, Georgia,

21  Fulton, do you recognize who may have printed those words?

22  **A.**   Yeah.   That looks like my handwriting.

23  **Q.**   Exhibit Number 36, Page 3 is a business card.

24      You can look at the screen, Mr. McQueen.   It may be

25  faster.

1          Do you know who created this business card?

2     **A.**   Yes.  I created that business card.

3     **Q.**   Did you create a lot of the business cards that were used

4     for forged notaries and forged powers of attorneys?

5     **A.**   Yes, I did.

6     **Q.**   I'm putting up Exhibit Number 36.  It is hard to see.

7          Can you see that check, Mr. McQueen?

8     **A.**   Yes.

9     **Q.**   What is that check?

10    **A.**   It says Asset Financial Recovery, care of Glenridge Drive

11    Group.

12    **Q.**   As a part of the business that you and Mr. Pendergrass

13    were operating, did you keep records of checks when they came

14    in or who kept records of checks when they came in?

15    **A.**   Mr. Pendergrass.

16    **Q.**   How do you know that?

17    **A.**   There was a filing system.

18    **Q.**   All right.  Did you see with your own eyes Mr. Pendergrass

19    doing the filing system and filing this information?

20    **A.**   Yes.  There was white envelopes.  And in those envelopes,

21    there were like multicolored plastic folders.

22    **Q.**   Okay.  And was that the kind of system that

23    Mr. Pendergrass used to keep track of money -- the letters

24    going out and information coming back in to the business?

25    **A.**   Yeah.  When they were paid, yes.  He would make a copy of

1    everything and then store it in those folders.

2    Q.    And ultimately was this check deposited into an account at

3    Bank of America?

4    A.    Yes, it was.

5    Q.    And this is Exhibit Number 36 still on the screen.  Is

6    this another shot of ZOHO, of the system you guys used to keep

7    track of various accounts?

8    A.    Yes.

9    Q.    So if you look on the right of that where my finger is, it

10   says Shawn McQueen on 3/9/23 {sic}.  It says 1:14 A.M.

11       Is that -- do you work that late at night or morning,

12   rather?

13   A.    I may have made some notes on that and --

14   Q.    Then I'm looking at the bottom of the actual document.  It

15   says Allen Pendergrass, Thursday, March 21st, 2013.  It says

16   called and left message for David Simpson.

17       Do you know what those notes would indicate?

18   A.    Yeah.  It may indicate that he tried to reach David

19   Simpson.

20   Q.    And did you actually reach David Simpson?

21   A.    Not that I can recall, no.

22   Q.    And you have already testified this is not David Simpson's

23   signature; correct?

24   A.    That's correct.

25   Q.    This is a forged limited power of attorney?

1   **A.**   That's correct.

2   **Q.**   I want to publish what has already been admitted into

3   evidence as Government's Exhibit Number 22.

4        What are we looking at here, Mr. McQueen?

5   **A.**   It looks like the reissued check under Asset Financial

6   Recovery.

7   **Q.**   Does this document reflect that this check was deposited

8   into the Bank of America account?

9   **A.**   Yes.

10   **Q.**   How was the money disbursed?  For example, that $4900 that

11   you received into an account that both you, Ms. Barber, and

12   Mr. Pendergrass controlled, how was the money divided up?

13   **A.**   I don't know how he -- Mr. Pendergrass and Deidre divided

14   up this money.  I didn't receive any of this money.

15   **Q.**   Okay.  I'm showing you what has already been admitted as

16   Exhibit 22.  Before lunch, you testified relating to your

17   involvement with this account and going into the bank and

18   having the account open.

19        Is that correct?

20   **A.**   That's correct.

21   **Q.**   And do you know if this was the account in which the

22   Glenridge Drive Group check, as well as the check related to

23   the Stephenson Coleman & Johnson or the law firm check was

24   deposited into?

25   **A.**   Yes, it was.

1    **Q.**    Did you receive proceeds from the 8000-dollar check

2    related to Stephenson Coleman & Johnson?

3    **A.**    Yes.

4    **Q.**    Relating to this account, who was in charge of writing

5    checks out of this account based on your knowledge?

6    **A.**    Mr. Pendergrass was.

7    **Q.**    So I'm showing you a page from Exhibit Number 22, the same

8    account.

9       Do you recognize Lydia Walker?

10    **A.**    Yes, I do.

11    **Q.**    How do you recognize that check?

12    **A.**    That was another fraudulent account that we worked on.

13    **Q.**    And who is we?

14    **A.**    Me and Mr. Pendergrass.

15    **Q.**    I'm handing you what has been marked as Exhibit Number 27.

16    Please take a look at it.

17       When you are finished looking at it, please look back at

18    me and I'll ask you some questions.

19    **A.**    Okay.

20    **Q.**    Do you recognize the documents contained in Exhibit

21    Number 37?

22    **A.**    I do.

23    **Q.**    How do you recognize them?

24    **A.**    This was one of the individuals that was difficult to

25    find.

1  Q.    Who worked on this particular matter?

2  A.    We worked together in a group, me and Mr. Pendergrass and

3  Mr. Fitchpatric.

4  Q.    Do the documents contained in Exhibit Number 37 appear to

5  be true and accurate copies of documents on which you worked

6  while employed with Mr. Pendergrass?

7  A.    Yes.

8  Q.    Have there been any changes or alterations or deletions to

9  this document or these documents that you can see?

10 A.    No.

11        MR. BROWN:  The Government would move to admit 37

12 into evidence, Judge.

13        MS. DURRETT:  No objection, Your Honor.

14        THE COURT:  Admitted.

15 Q.    (BY MR. BROWN)  So, Mr. McQueen, I'll direct you to the

16 screen.

17        Who signed -- did you sign this document on the first page

18 of the exhibit?

19 A.    Yes, that is my signature on the first page.

20 Q.    You testified that Ms. Walker was difficult to track down.

21 Explain that.

22 A.    During the skip tracing process, there were multiple Lydia

23 Walkers.  And yeah, she was difficult to find.

24 Q.    All right.  Did you, in fact, locate Lydia Walker?

25 A.    No.

1    Q.    I want to show you Page 3 of the document.  Do you see

2    that ID?

3    A.    Yes.

4    Q.    What is this?

5    A.    So the ID was taken -- it was either from Mr.

6    Pendergrass's old database, or there were a couple of old

7    licenses within his office, and so this ID looks altered.

8    Q.    I know we can't see the face.

9          So did you, in fact, talk to Ms. Walker and locate her?

10   A.    No.

11   Q.    Do you know if Mr. Pendergrass or anyone else in your

12   office located Ms. Walker?

13   A.    No.

14   Q.    Looking at Page 2 of Exhibit Number 37, do you recognize

15   any handwriting on the bottom of this document?

16   A.    Yes.

17   Q.    Which handwriting do you recognize?

18   A.    So the acknowledgment of notary public, the Georgia,

19   Dekalb, 15th of April 2013, and the Lydia Walker written is my

20   handwriting.

21   Q.    Do you recognize the signature of the print name?

22   A.    No, I do not.

23   Q.    What about the signature for the notary?

24   A.    It looks like it was lifted.

25   Q.    And when you say lifted, what do you mean by lifted?

```
 1   A.   It was photoshopped.

 2   Q.   Is this photoshopped from documents -- legal documents?

 3          MS. DURRETT:  Objection, Your Honor.  He doesn't

 4   know.  He said it looks like it was lifted.

 5          THE COURT:  Be sure to --

 6          MR. BROWN:  I'll clean it up, Judge.

 7          THE COURT:  All right.

 8   Q.   (BY MR. BROWN)  Do you --

 9          THE COURT:  Sir, would you make sure that you testify

10   just based on your personal knowledge, not based on any

11   conjecture or supposition.

12          THE WITNESS:  Yes, Your Honor.

13   Q.   (BY MR. BROWN)  So, Mr. McQueen, if you don't know, just

14   say, I don't know.  It is a perfectly fine answer.

15   A.   Okay.

16   Q.   So do you know about the signature, either the notary, or

17   the notary seal itself -- do you know anything about the

18   signature and/or the notary?

19   A.   Yes.

20   Q.   What do you know?

21   A.   It was photoshopped.

22   Q.   How do you know that?

23   A.   Because I sent the information between myself or

24   Mr. Fitchpatric or Mr. Pendergrass on what notaries --

25          MS. DURRETT:  Your Honor, is he talking about this
```

1    specific document?

2              MR. BROWN:  Yes.

3              THE COURT:  That is the way I understand his

4    testimony.

5              MS. DURRETT:  Okay.

6    **Q.   (BY MR. BROWN)**  Continue.

7    **A.**   So we would -- we would work on talking about using

8    signatures or notaries that we did not see previously.

9    **Q.**   Why did you talk about that?  Why were you using notaries

10   you haven't seen previously?

11   **A.**   Because we didn't want -- we wanted it to look more

12   authentic.

13   **Q.**   Let's shift gears a little bit.

14        Could we publish Exhibit Number 3, please.  It has already

15   been admitted into evidence.

16        Mr. McQueen, do you recognize this document?

17   **A.**   Yes, I do.

18   **Q.**   So tell the jury how you became -- how you came to send

19   this letter to the City of Atlanta for the Georgia Municipal

20   Association.

21   **A.**   This was another name on the particular list that we were

22   looking at.  And me and Mr. Pendergrass was not sure on which

23   payees the City of Atlanta would pay out.

24        And so we submitted -- we made a submission of two or

25   three documents to see which one they would actually pay out.

1   Q.   Is this one of the documents you submitted?

2   A.   Yes, it was.

3   Q.   Is that your signature there above Terrell McQueen?

4   A.   Yes, it is.

5   Q.   All right.  Let's go to the second page, please, of this

6   exhibit.

7        Do you recognize this document, Mr. McQueen?

8   A.   Yes, I do.

9   Q.   What do you recognize about this document?

10  A.   I recognize the entire document.

11  Q.   All right.  So let's start with the signature of Lou

12  Comer.

13       Did Lou Comer sign that document?

14  A.   No, she did not.

15  Q.   How do you know?

16  A.   Because that signature was taken off of a signature of a

17  document on the internet.

18  Q.   Did you locate that document on the internet?

19  A.   I did.

20  Q.   Was Lou Comer someone employed by the Georgia Municipal

21  Association?

22  A.   Yes, she was.

23  Q.   And you searched information online; is that correct?

24  A.   That's correct.

25  Q.   What about the seal?  Where did you obtain the seal?

1    **A.**   I located the seal from a document that was on a previous

2    document online from the Georgia Municipal Association.

3    **Q.**   All right.  And do you recognize any of the handwriting

4    below acknowledgment of notary public?

5    **A.**   Yes.  The Georgia, Fulton, the April, and the Lou Comer is

6    my handwriting.

7    **Q.**   What about the Karen Michelle Smith, the signature of the

8    notary?

9    **A.**   That is her signature, but it is not her signature.  It is

10   another photocopy -- photoshopped signature and seal.

11   **Q.**   Okay.  Can we go to Page 3 of this exhibit, please?

12        Who created this card, Mr. McQueen?

13   **A.**   I created the card.

14   **Q.**   Why did you create these business cards?

15   **A.**   So if we submitted for -- Mr. Pendergrass told me if you

16   submitted for an individual, you would have to submit an ID or

17   some document showing that that individual was the individual

18   indeed.  If you submitted for a business, the only requirement

19   for a business was a business card.

20   **Q.**   Okay.  Can you explain the telephone number and the fax?

21   Are those real telephone numbers and the real fax number?

22   **A.**   I don't remember the fax number.  The phone number was a

23   recorded phone number.  So it wasn't a real phone number.

24   **Q.**   And why did you -- who obtained the phone number here?

25   **A.**   I bought a phone from -- a burner phone from Walmart.

1   Q.   Did Mr. Pendergrass have knowledge of you buying burner

2   phones from Walmart?

3   A.   Yes, he did.

4   Q.   How?

5   A.   We would usually go to Walmart to buy phones.

6   Q.   Would you buy more than one phone to use for different

7   recovery attempts?

8   A.   Yes.

9   Q.   Can we go to Page 7 -- actually Page 6 of this exhibit,

10  please?

11       Do you recognize this page, Mr. McQueen?

12  A.   Yes, I do.

13  Q.   All right.  So when it said modified Allen Pendergrass,

14  Thursday, February 7, 2013, at 5:37, is this automatically

15  calculated by the software or do you know how that information

16  is put there?

17  A.   It is calculated automatically by the software if you set

18  it up correctly.

19  Q.   Do you recognize the handwriting, call back Wednesday?

20  A.   Yes.  That is my handwriting.

21  Q.   So explain for the jury, if this is fraud, who are you

22  calling back.

23  A.   So initially I tried to collect from her.  And the time

24  was running out as far as my time to pay back that 16 grand

25  from SunTrust.  And so that was the largest account that was

1  left that I thought we could use.

2  **Q.**   Okay.  So it was your testimony that oftentimes you or

3  others in your office would try to attempt to contact a real

4  person?

5  **A.**   If it was an actual one, I tried to attempt to, yes.  If

6  we could find the individual, there was multiple attempts to

7  try, yes.

8  **Q.**   And then when did the decision come about to start

9  stealing the money?  How did that come about?

10  **A.**   I don't remember how it came about.  I know at some point

11  we thought -- me and Mr. Pendergrass -- that they probably

12  didn't want it or didn't believe us.

13  **Q.**   Could it also be that you just wanted the money?  Is that

14  a possibility?  That you just wanted to take the money?

15  **A.**   That is a possibility, yes.

16  **Q.**   You testified you needed the money; correct?

17  **A.**   I needed the money to pay back SunTrust, yes.

18  **Q.**   So can we go to Page 7 of this exhibit, please?

19      So what are we looking at here, Mr. McQueen?  Can you see

20  the bottom?

21          MR. BROWN:  Can you enlarge the bottom please, Mary?

22  **A.**   Yes.  It looks like the checks that come from the City of

23  Atlanta.

24  **Q.**   **(BY MR. BROWN)**   Okay.  And where were the checks mailed?

25  **A.**   To 1809.

1   **Q.**   To P.O. Box 1809?

2   **A.**   That's correct.

3   **Q.**   Do you know why it says return to sender?

4   **A.**   Yes, I do.

5   **Q.**   Explain that.

6   **A.**   With my relationship with Ms. Booker from the City of

7   Atlanta, I found out that the checks were returned to the City

8   of Atlanta.  The reason they were returned to the City of

9   Atlanta is because Mr. Pendergrass did not pay his post

10  office -- his post office rental box.

11  **Q.**   So what did you do?  The checks were mailed there;

12  correct?

13  **A.**   That's correct.

14  **Q.**   And then they were returned by the post office?

15  **A.**   Yes.

16  **Q.**   And then what did you do to try to obtain the checks?

17  **A.**   I requested to Ms. Booker to remail the checks out.

18  **Q.**   All right.  And was the check mailed out?

19  **A.**   Yes, it was.

20  **Q.**   So if you look at this in the top here, it says May 13.

21  Do you see that on the bottom of -- you see a four -- I guess I

22  can touch it.  Hold on.

23  **A.**   Yes, I see it.

24  **Q.**   Do you see that red dot?

25  **A.**   Yes.

1    Q.   All right.  Then can we go to the next page, please?

2         What are we looking at here, Mr. McQueen?

3    A.   That looks like a copy of the check.

4    Q.   Was a copy of the check kept in the records of the

5    business?

6    A.   Yes, it was.  So every check that got mailed to us

7    would -- Mr. Pendergrass would make a copy of that check and

8    all the documents and then -- and then put them on the shelf in

9    that white folder that I was talking about earlier.

10   Q.   All right.  And then at some point, was the check

11   deposited at the bank?

12   A.   Yes, it was.

13   Q.   All right.  Can we go to publish Exhibit Number 4, please?

14   It has already been admitted into evidence.

15        Can you describe what we're looking at here, Mr. McQueen?

16   A.   Yes.  This is a cover page for submission to the attorney

17   firm that -- Long Weinberg Ansley & Wheeler.

18   Q.   All right.  And who worked on this account?

19   A.   I worked on the account.

20   Q.   Did you sign this letter at the bottom above your name?

21   A.   I did.

22   Q.   Can we go to Page 2, please, of the same Exhibit 4?

23        Mr. McQueen, do you recognize this limited power of

24   attorney form?

25   A.   I do.

1    **Q.**   Do you recognize any signatures or writing on the actual

2    document?

3    **A.**   No, I don't -- well, except the bottom part.

4    **Q.**   All right.  Did Mr. Sidney F. Wheeler sign this document?

5    **A.**   No, he did not.

6    **Q.**   Did you or anybody from your company attempt to locate

7    Mr. Sidney Wheeler?

8    **A.**   No.

9    **Q.**   Why not?

10   **A.**   So this -- this firm was closed.  And it was difficult

11   finding the former partners.

12   **Q.**   So it is a law firm?

13   **A.**   Yes.

14   **Q.**   And to your knowledge, was Mr. Sidney F. Wheeler a lawyer

15   at the firm or the old firm?

16   **A.**   Yes.  Because his name was on the marquis.

17   **Q.**   Do you recognize the writing who signed his name or

18   printed the name?

19   **A.**   No, I do not.

20   **Q.**   What about below acknowledgment of notary public, Georgia,

21   Fulton?  Do you recognize any of that writing?

22   **A.**   No, I do not.

23   **Q.**   What about the bottom signature, Pat A. -- I can't make

24   that out.

25        Did the notaries notarize that document?

```
 1   A.     No.  That was another photo -- photoshopped document.

 2   Q.     Did Mr. Pendergrass have knowledge of this particular --

 3             MS. DURRETT:  Objection, Your Honor.  How does he

 4   know what Mr. Pendergrass has knowledge of?

 5             THE COURT:  Sustained.

 6   Q.     (BY MR. BROWN)  Did you work on this account while you

 7   worked with Mr. Pendergrass?

 8   A.     Yes.  So we discussed -- before all submissions after the

 9   SunTrust accident -- well, not accident but after that mess-up,

10   I wasn't -- well, I wasn't supposed to make any moves without

11   Mr. Pendergrass.  We would discuss everything before we

12   submitted them.

13        And so if we decided to submit something on a Tuesday, we

14   wouldn't submit it Tuesday.  We would wait a day to make sure

15   that everything in the document looked authentic.

16   Q.     Why would you do that?

17   A.     Just to make sure we didn't -- we could make sure we

18   didn't have any mistakes, instead of submitting it in a rush.

19        I wanted to submit this one because at this time I had the

20   16,000 to pay.  And I thought that I could use this one to pay

21   the 16,000 instead of getting to the higher one, the Georgia

22   Municipal one.

23        But Mr. Pendergrass assured me that we still had time to

24   pay the 16,000 off.

25   Q.     Because you were concerned -- you didn't want to go to
```

1    jail?

2    **A.**    I did not want to go to jail.

3    **Q.**    Let's go to the next page, Page 3, of this exhibit.

4         Do you recognize this business card?

5    **A.**    Yes.  I made that card.

6    **Q.**    Excuse me?

7    **A.**    I made that card.

8    **Q.**    Okay.  Could we go to Page 4.  Do you know anything about

9    the 1-800 number there or the cell number?  Are those actual --

10        MR. BROWN:  I'm sorry.  Could we go back, Mary?  I

11   apologize.

12        Go back to Exhibit 4, Page 3, please.

13   **Q.**    **(BY MR. BROWN)**  Do you need me to enlarge it, or can you

14   read it?

15   **A.**    I see it here.

16   **Q.**    So --

17   **A.**    So the 1-800 number -- I don't remember all the way.  It

18   was probably their old number.  And the 404 number was just one

19   of the cell -- burner cells that we purchased from Walmart.

20   **Q.**    Did Mr. Pendergrass have knowledge that you were making

21   business cards for these accounts?

22   **A.**    Yes.

23   **Q.**    How did he have knowledge of that?

24   **A.**    We sat in the office across from each other.

25   **Q.**    So using --

1   **A.**   And so I would make a card and then show him the card, and

2   then we would -- I would talk with Mr. Fitchpatric about

3   sending seals over, and Mr. Fitchpatric would adjust the seal

4   or adjust the signature to make it look more authentic.

5   **Q.**   Let me stop you there.

6   **A.**   Okay.

7   **Q.**   You testified that you and Mr. Pendergrass sat across from

8   one another; is that correct?

9   **A.**   Yes.

10  **Q.**   Can you use an object here in the courtroom to demonstrate

11  how far your desk was from Mr. Pendergrass's work station?

12  **A.**   So if I'm sitting -- my work station was facing this way.

13  And then there was another desk right here in the front.  It

14  was a very small office.

15      And so there was a TV up on the wall.  And then there was

16  a desk right in front of me.  And my desk was on this wall.

17  And Mr. Pendergrass's desk was -- it was one of the large like

18  old school executive desks maybe four or five feet away.

19  **Q.**   Okay.  Would Mr. Pendergrass or anyone in the office be

20  able to see your screen when you are making these business

21  cards?

22  **A.**   Yes.

23  **Q.**   Did you shield your screen in any way to hide what you

24  were doing?

25  **A.**   No.  We were always in discussion about it.

```
 1              MR. BROWN:  Let's go to Page 4 now, Mary.  Thank you.
 2    Q.   (BY MR. BROWN)  Mr. McQueen, do you recognize any of the
 3    writing -- the handwriting on the form?
 4    A.   Yes.  That is my handwriting there.
 5    Q.   So on the form when it says client leads owner at the
 6    top --
 7              MR. BROWN:  Mary, can you just enlarge the top,
 8    please -- the top third?
 9              MS. JOHNSON:  Right here?
10              MR. BROWN:  Yes, ma'am.
11    Q.   (BY MR. BROWN)  So, Mr. McQueen, when it says client
12    leads, Allen Pendergrass, does that mean anything for the
13    business?
14    A.   No, it doesn't.  It would mean -- it would mean something
15    to the business if you had eight or nine employees and you
16    needed to keep up with what they are working on when the
17    business is worked properly like a debt collection or in a
18    sales environment what deals you were working on and the
19    updates.
20         But you could print off this document and then make notes
21    on here, or you could make -- you could make notes in the
22    system just depending on who was logged in.
23    Q.   So in this particular account, just because it says Mr.
24    Pendergrass doesn't mean you didn't work on this account as
25    well; is that fair?
```

1   **A.**   That means I did work on it just because -- yeah.

2   **Q.**   So just because it has his name on there doesn't mean you

3   didn't work on the account?

4   **A.**   That's correct.  Yeah.

5   **Q.**   Can we go to Page 6 of this exhibit, please?

6        What are you looking at here, Mr. McQueen?

7   **A.**   We're looking at an issued check from the City of Atlanta

8   in the name of Asset Financial Recovery.

9   **Q.**   Would you go to Page 7 of the exhibit, please.

10        Do you recognize what this is, Mr. McQueen?

11   **A.**   It looks like a deposit slip.

12   **Q.**   All right.  So it appears that there were orderly records

13   kept of money that was recovered; is that fair?

14   **A.**   Yes.

15   **Q.**   Can we go to Page 8, please?

16        What is this a copy of, Mr. McQueen?

17   **A.**   It looks like a copy from -- the mailed copy from the City

18   of Atlanta.

19            MR. BROWN:  Mary, could you just enlarge the actual

20   postage -- first class postage meter on top.

21   **Q.**   **(BY MR. BROWN)**  So where was this check mailed?

22   **A.**   It was mailed to the P.O. Box 1809.

23   **Q.**   Do you see the date?  Is it May 13 and then it says to and

24   you can't read the year?

25   **A.**   Yeah.  I see it.

```
 1   Q.    What year was that?

 2   A.    2000 --

 3             MS. DURRETT:  Object, Your Honor.

 4   A.    2013.

 5             MS. DURRETT:  There is no date on it.

 6             THE COURT:  Well, do you know -- how do you know

 7   that?

 8             MR. BROWN:  Mr. McQueen, she is asking you a

 9   question.

10             THE COURT:  How did you know that?  That it was 2013?

11             THE WITNESS:  Because this is one of the checks we

12   submitted for in 2013.  I thought this was a check that I was

13   going to be able to pay back the 16 grand that I owed to

14   SunTrust.

15   Q.    (BY MR. BROWN)  What happened --

16             MR. BROWN:  So is the objection overruled, Judge?

17             THE COURT:  Yes.

18   Q.    (BY MR. BROWN)  Were you not able to use these funds?

19   A.    No, I wasn't.  I didn't have control of the bank account.

20   Q.    So explain what do you mean you didn't have control of the

21   account.

22   A.    This was in another account that was opened by

23   Mr. Pendergrass.  And so I told him -- Mr. Pendergrass knew

24   about my SunTrust situation.  And SunTrust gave me an

25   extension.  Because I went to court for them in May and they
```

1    gave me an extension to pay the money.

2    **Q.**   Let me stop you there.  Did you ask Mr. Pendergrass to

3    give you some of this money so you can pay your debt?

4    **A.**   Yes.

5    **Q.**   What was his response?

6    **A.**   No.

7    **Q.**   Did you ask him why?

8    **A.**   Yes.  He said we still have time.

9    **Q.**   Time for what?

10   **A.**   To pay back SunTrust.

11   **Q.**   Okay.

12   **A.**   After I told him I got the extension, I wanted to take

13   care of SunTrust because the judge told me if you don't have it

14   then you will be going to jail when you come back.  And so my

15   focus and my alert was I need to pay this back.

16   **Q.**   Can we go to Exhibit Number 5, please, which has already

17   been admitted into evidence?

18        Mr. McQueen, do you recognize Exhibit Number 5?

19   **A.**   Yes, I do.

20   **Q.**   What is Exhibit Number 5?

21   **A.**   It is Mr. James H. Bone, trustee.

22   **Q.**   Are you familiar with trying to obtain these funds?

23   **A.**   Yes, I am.

24   **Q.**   Were these funds lawfully obtained or stolen?

25   **A.**   They were stolen.  I remember talking to Mr. Bone about

1    these funds.  He said that they weren't his funds.

2    **Q.**   So you actually spoke with Mr. Bone?

3    **A.**   I did.

4    **Q.**   Let's go to Page 2 of Exhibit 5, the next page.

5         And Mr. McQueen, same question:  Do you recognize any of

6    the handwriting or printed words on this form?

7    **A.**   Yes.  The acknowledgment of notary public.

8    **Q.**   Whose handwriting is that?

9    **A.**   That is my handwriting.

10   **Q.**   Okay.  What about the signature of James H. Bone and the

11   printing under James H. Bone?  Do you recognize that writing?

12   **A.**   It is Mr. Pendergrass's handwriting.

13   **Q.**   Can you explain why there is different handwriting on this

14   document?

15   **A.**   Yes.  So we wanted to make it look more authentic instead

16   of having the same handwriting up and down the document.

17   **Q.**   Okay.  The notary seal, is that also fraudulent?

18   **A.**   Yes, it is.

19   **Q.**   What about the signature for the notary?  Is that

20   fraudulent as well?

21   **A.**   Yes.  That notary seal and the signature was

22   photocopied -- well, not photocopied.  Photoshopped.

23   **Q.**   Can we go to the next page, Page 3, of the same exhibit,

24   please?  It is hard to read.

25        Do you recall creating this card, Mr. McQueen?

1  **A.**    Yes.  I made the card.  I don't believe we got a phone for

2  that.  We just hid it in plain sight.

3         COURT REPORTER:  You don't believe -- I missed that

4  part.

5  **Q.   (BY MR. BROWN)**  Can you repeat the last part of your

6  testimony?

7  **A.**    We hid it in plain sight meaning we, me and

8  Mr. Pendergrass, listed the actual phone number of James Bone

9  on the business card.

10  **Q.**    Now, approximately how many business cards did you create

11  in the time you were working with Mr. Pendergrass -- fraudulent

12  business cards did you create?

13         I don't need an exact number.  Just approximately.

14         Is it 10?  Is it 20?  Is it 100?  Is it 1000?

15  **A.**    I don't know the number.  But for each of the fraudulent

16  submissions to the City of Atlanta, those are the cards that I

17  worked on.

18  **Q.**    Okay.  And was it your duty or responsibility as it

19  relates to most of the business cards that were created?

20  **A.**    Yes.

21  **Q.**    Why?

22  **A.**    They were easy to create.

23         MR. BROWN:  Can we go to Page 9 of Exhibit 5?  Can we

24  just enlarge the actual bottom portion of the mailing?

25  **Q.   (BY MR. BROWN)**  So, Mr. McQueen, where was this check

1    mailed?

2    **A.**    It was mailed to the P.O. Box.

3    **Q.**    And is the date May 13 at the top?

4    **A.**    Yes.

5    **Q.**    And is that in 2013?

6    **A.**    Yes, it is.

7    **Q.**    And can we just go to Page 10 of the exhibit, please?

8          What are we looking at here, Mr. McQueen?

9    **A.**    It looks like a copy of the actual check.

10   **Q.**    Can we publish Exhibit Number 6, which has already been

11   admitted into evidence?

12         Do you recognize this document, Mr. McQueen?

13   **A.**    Yes.

14   **Q.**    Explain to the jury, please.

15   **A.**    It is a cover document for Actor's Express in Atlanta.

16   **Q.**    And whose account was Actor's Express?

17   **A.**    It was my account.  And the reason it was my account was

18   we didn't know which submissions the City of Atlanta was going

19   to pay out.  And so we needed to submit in case the larger one

20   didn't -- if they were to deny the larger one, say, the Georgia

21   Municipal Association, then we needed something to add up to

22   that 16 grand.  And so that was next on the list.  The 14 grand

23   with James Bone and then the 11 grand with Actor's Express.

24   **Q.**    All right.  Can we go to Page 2 of the exhibit, please?

25         Mr. McQueen, do you recognize any handwriting or signature

1   on this page?

2   **A.**   Yes, I do.

3   **Q.**   Can you tell the jury what you recognize?

4   **A.**   Yeah.

5   **Q.**   You can actually point to it too.  I think it will work

6   for you too.

7   **A.**   Well, it is just not closer.  Can you give me a copy?

8          MR. BROWN:  Mary, can you zoom in on the bottom half

9   of the page, please, above the signature -- above that part?

10  Yeah.  There we go.

11         Thank you, Mary.

12  **Q.**   **(BY MR. BROWN)**  Does that help you, Mr. McQueen?

13  **A.**   Yes.  So the top signature for Freddie Ashley -- so I

14  talked to Mr. Ashley.  He didn't want the funds.  He didn't

15  believe -- he told me he didn't believe the funds were his.

16        And so like I previously said, we didn't know -- me and

17  Mr. Pendergrass didn't know which ones they were going to pay

18  out or not.  And so we needed to make multiple submissions to

19  see which money would come back so I could take care of

20  SunTrust.

21  **Q.**   Okay.  So the signature -- whose signature -- who signed

22  for Freddie Ashley?  Do you know?

23  **A.**   Yeah.  At the top, Freddie Ashley is Mr. Pendergrass's

24  signature.

25  **Q.**   What about below that?  Do you recognize the handwriting?

1  A.   So the Georgia and the Fulton is Mr. Pendergrass's

2  signature.  And the 30th April and then the Freddie Ashley is

3  my handwriting and then the Claudette is my signature down at

4  the bottom or Claudine.

5  Q.   What about the notary?  Is that a lifted notary as well?

6  A.   That's correct.  It is a lifted notary.

7  Q.   And you testified previously you did this, having two

8  signatures or two handwriting on the same page, to not appear

9  that the same person did it?

10 A.   Yes.

11 Q.   And did you -- can we go to the next page, please?

12     I know that is kind of hard to see.  But do you recall

13 creating a business card for this account as well?

14 A.   Yes, I do.  I made the card.

15         MR. BROWN:  Could we go to Page 4 of the exhibit,

16 please.  Could we just enlarge the top third maybe, please.

17 Q.   **(BY MR. BROWN)**  So, Mr. McQueen, do you see the top where

18 it says leads owner it has Shawn McQueen?

19 A.   Yes.

20 Q.   Does that entry mean you are the only person that was

21 associated with this account?

22 A.   No.  That just means my name was on the document -- I

23 mean, on this in the customer management system.

24 Q.   Was Mr. Pendergrass aware of the Actor's Express account?

25 A.   Yes, he was.

166

1           MR. BROWN:  Could we go to Page 7 of this exhibit,

2    please.  And can we enlarge the bottom half?

3           Thank you, Mary.

4    **Q.   (BY MR. BROWN)**  Mr. McQueen, does this show that this

5    check was mailed from the City of Atlanta to the P.O. Box 1809?

6    **A.**   Yes.  It was one of the checks that were sent back because

7    of the post office box being closed.

8    **Q.**   And do you see the date May 13 at the top?

9    **A.**   Yes, I do.

10   **Q.**   Is the year 2013 when that was mailed?

11   **A.**   That's correct.

12   **Q.**   Can we go to the final page, Page 8, of the exhibit,

13   please?

14         And what are we looking at here, Mr. McQueen?

15   **A.**   That was the check that I was sent from the City of

16   Atlanta.

17           MR. BROWN:  Okay.  Can we go to Page -- Exhibit 11,

18   please, Mary?  It has already been admitted into evidence.

19   **Q.   (BY MR. BROWN)**  Mr. McQueen, do you recognize this

20   document?

21   **A.**   Yes, I do.

22   **Q.**   So Guishard Wilburn & Shorts, at the top, LLC, what is

23   that company?

24   **A.**   That was a company Mr. Pendergrass was operating when I

25   first met him.

 1           MR. BROWN:  Mary, can you just enlarge the top third

 2    of the check -- I mean, this page, please?

 3    Q.   (BY MR. BROWN)  So is Guishard a company that you started,

 4    or was it started by Mr. Pendergrass?

 5    A.   No.  It was started by Mr. Pendergrass.

 6    Q.   And that P.O. Box 1809, is that the same P.O. Box in which

 7    many of these stolen checks were mailed?

 8    A.   Yes, it was.

 9           MR. BROWN:  Can we just enlarge the bottom portion --

10    bottom half of this letter, please, Mary?

11    Q.   (BY MR. BROWN)  Do you recognize the signature?

12    A.   Yes.  That is Mr. Pendergrass's signature.

13           MR. BROWN:  Can you back out, Mary?

14    Q.   (BY MR. BROWN)  Do you remember the Atlanta Quarterback

15    Club account?

16    A.   I do.

17    Q.   Did you work on this account?

18    A.   I did.

19    Q.   Who did you work with on the account?

20    A.   Who did I work on the account --

21    Q.   With.

22    A.   -- with?

23    Q.   Yes.

24    A.   Mr. Pendergrass.

25           MR. BROWN:  Could we go to Page 2 of this exhibit,

1    please.  Could we just enlarge everything below -- yeah.

2    Everything below that.

3    **Q.   (BY MR. BROWN)**  Is that a forged signature of Mr. Waller?

4    **A.**   Yes, it was.  I did the research.

5    **Q.**   When you say you did the research, what do you mean?

6    **A.**   So I attempted to contact them.  And I wasn't able to

7    contact them.

8         But I noticed that Mr. Waller was the treasury person on

9    their website.  So that is where I got his name from.  And that

10   is my handwriting where Mr. Waller is.

11   **Q.**   So when it says by colon X, did you sign that Melvin

12   Waller?

13   **A.**   Yes, that is mine.

14   **Q.**   Do you recognize any other writing on the bottom?

15   **A.**   So that is Mr. Pendergrass's handwriting under there.

16   This one we set up to submit through another company instead of

17   submitting through Asset Financial Recovery.

18   **Q.**   Why did you do that?

19   **A.**   To just change it up so it didn't look like we were

20   submitting everything under the other company.

21        Every so often, he said he would -- Mr. Pendergrass would

22   make submissions under the Guishard Wilburn & Shorts.

23   **Q.**   Could we go to Page 3 of this exhibit, please?

24        Did you create this card, Mr. McQueen?

25   **A.**   Yes, I did.

1   Q.   What about the phone number or the email?  Do you

2   recognize those?  And who created those?

3   A.   The phone number was the phone number from Atlanta

4   Quarterback Club.

5   Q.   What about the email address?

6   A.   The email I made up just to say a general Gmail account.

7        MR. BROWN:  Then could we just go to Page 5 of this

8   exhibit, please.  Could you just enlarge the top portion.

9   Q.   (BY MR. BROWN)  What is this showing us here?

10  A.   This is a copy of the check sent.

11       MR. BROWN:  Okay.  Could we just go back to Exhibit

12  Number 4, please.  Exhibit Number -- I'm sorry.  I misspoke.  I

13  wanted you to go back to 11 -- Page 4 of Exhibit 11.  Sorry.

14       MS. JOHNSON:  11.  Okay.

15       MR. BROWN:  Just the previous one we were on.  Just

16  enlarge that, please.

17  Q.   (BY MR. BROWN)  Mr. McQueen, do you recognize what this

18  is?

19  A.   Yes.  It is a deposit slip from the Bank of America.

20  Q.   Are you familiar with the account in which this check was

21  deposited?

22  A.   Yes, I am.

23  Q.   How are you familiar with that?

24  A.   The reason I'm familiar with it is because I opened up an

25  account with the Bank of America under the name Atlanta

1  Quarterback Club.

2  As I previously mentioned, that it was difficult to cash a

3  check from the Holland & Knight experience.  And so you either

4  had to open up an account under the business name to make it

5  look like it was your business, or you had to get a check

6  reissued under your business name.

7  This was before we knew that the City of Atlanta was

8  changing -- that they would write the checks under our name.

9  So that is why it is under Atlanta Quarterback Club.

10  MR. BROWN:  Mary, can you publish Exhibit Number 20,

11  which is already in evidence?  Can you just enlarge the top

12  half of that, please?

13  **Q.   (BY MR. BROWN)**  Mr. McQueen, are you familiar with the

14  business bank account ending in 3556?

15  MR. BROWN:  Can you go back, Mary, and do the bottom

16  as well so he can see that?  Just the bottom half.

17  **A.**   Yeah.  I'm familiar with that.  Mr. Pendergrass opened up

18  the Wells Fargo account.

19  **Q.   (BY MR. BROWN)**  Now, you testified earlier about an

20  account in which you did not have access.

21  Is this the account which you were speaking of?

22  **A.**   Yes, it was.

23  **Q.**   Why didn't you have access to this account when you had

24  access to the other account?

25  **A.**   We set up the Bank of America account.  We wanted to -- we

```
 1    wanted the Bank of America to look more as a corporation.  That
 2    is why me, Mr. Pendergrass, and Ms. Barber went down there to
 3    the bank, got dressed up, and everybody was there.  So we
 4    wanted to be legitimate or appear legitimate.  And --
 5  Q.   So let me stop you there.  So you have a distinct memory
 6    of dressing up?  Did you wear a suit?
 7  A.   Yes.
 8  Q.   Was Mr. Pendergrass wearing a suit?
 9  A.   Yes.
10  Q.   Was Ms. Barber in business attire, or was she dressed up
11    like a business person as well, or do you recall?
12  A.   I don't recall if she had on a business suit.  She may
13    be -- I remember us looking the part.
14  Q.   So then you testified about that Bank of America account
15    with Mr. Pendergrass and Ms. Barber.
16       Why were you not on this account as well?
17  A.   That business account got closed for -- I don't remember
18    the reason.  And to have more control on that account,
19    Mr. Pendergrass said he would just handle this account and
20    wouldn't no one else's name be on that account.
21  Q.   So for this particular account, did you have access to the
22    account?
23  A.   No, I did not.
24  Q.   Could you write checks on the account?
25  A.   No, I could not.
```

1   **Q.**   Did you have a debit card?

2   **A.**   No, I did not.

3   **Q.**   Could you go in the bank and withdraw money from this

4   account?

5   **A.**   No.

6   **Q.**   Did you attempt to go in the bank and withdraw money from

7   this account?

8   **A.**   No, I did not.

9           MR. BROWN:  So let's go to 20, Page Number 118 of

10  this exhibit.

11          MS. JOHNSON:  Did you say 118?

12          MR. BROWN:  I'm sorry.  118 of 20.  Page 118 of 20.

13  Can we just go to actually 119, the next page?

14  **Q.**   **(BY MR. BROWN)**  Mr. McQueen, we have already testified

15  about this check.

16      Is this a check related to the law firm that was

17  fraudulently obtained from the City of Atlanta?

18  **A.**   Yes, it was.

19  **Q.**   Was this -- was this check deposited into an account

20  controlled by Mr. Pendergrass?

21  **A.**   Yes, it was.

22  **Q.**   Now, did you have an occasion to go down to the bank with

23  Mr. Pendergrass when checks were being deposited?

24  **A.**   So yes.

25  **Q.**   Do you recall doing that?

1    **A.**   I recall going to the bank with him for the four deposits

2    that added up to the $106,000.

3    **Q.**   Why did you go to the bank with him that day?

4    **A.**   I went with him to make sure that -- I needed money at the

5    time.  And so he had wrote me a check.  And I wanted to make

6    sure that he was -- I needed to pay back SunTrust.  And so I

7    wanted to make sure that he wasn't going to do anything because

8    he had sole control of that account.

9    **Q.**   When you say he wasn't going to do anything, what do you

10   mean by that?

11   **A.**   He had other business ventures that he was involved with

12   that he would, I guess, invest money into.  I seen him --

13   Mr. Pendergrass on occasion --

14            MS. DURRETT:  Objection, Your Honor.

15            MR. BROWN:  Let me stop you there.

16            MS. DURRETT:  I don't know where this is headed.

17            MR. BROWN:  Let me just stop you there.  I'll ask you

18   another question, Mr. McQueen.

19            So speaking of the bank, let's publish Exhibit 19D,

20   please.  I meant D as in dog.  I didn't enunciate.  My fault?

21            MS. JOHNSON:  19D?

22            MR. BROWN:  Yeah, D.  D as in doll or David.

23            Can you just enlarge the bottom photograph, please?

24   **Q.**   **(BY MR. BROWN)**  All right.  So what are we looking at

25   here, Mr. McQueen?

1    **A.**    That is me and Mr. Pendergrass at the bank.

2    **Q.**    And you testified previously this is when you were

3    depositing -- Mr. Pendergrass was depositing those large value

4    checks from the City of Atlanta?

5    **A.**    Yes.

6             MR. BROWN:  And let's go to 19 -- Page 33 of that

7    same exhibit.

8             MS. JOHNSON:  You want 19D?

9             MR. BROWN:  I'm sorry.  It is actually -- it is 19D,

10   Page -- I don't know how you have it in there -- five maybe.

11            MS. JOHNSON:  Okay.

12            MR. BROWN:  I think it is five.

13   **Q.    (BY MR. BROWN)**  Is this a large view of another photograph

14   from that same day, Mr. McQueen?

15   **A.**    Yes.

16   **Q.**    And do you recall were you paid by Mr. Pendergrass after

17   this bank visit?

18   **A.**    I don't remember.

19        You mean that day?

20            MS. DURRETT:  Objection, Your Honor.  There is no

21   question pending.

22            THE COURT:  There is not a question pending.  If you

23   have a question yourself, Counsel, you may ask it.

24   **Q.    (BY MR. BROWN)**  Do you recall any trips you took with

25   Mr. Pendergrass in June 2013?

1    **A.**    Yes.

2    **Q.**    Where did you go?

3    **A.**    We went to Costa Rica.

4    **Q.**    And why did you go to Costa Rica?

5    **A.**    To have a good time.

6    **Q.**    All right.  Who went on the trip?

7    **A.**    Myself, Mr. Pendergrass, and Deidre Barber.

8    **Q.**    Do you recall who paid for the trip?

9    **A.**    Mr. Pendergrass and Ms. Barber went ahead of me.

10   **Q.**    Okay.  So that doesn't answer my question.  If you don't

11   recall, you can just say I don't recall.

12   **A.**    Yeah.  I don't recall.

13   **Q.**    That is fine.  Did anyone else go from the company besides

14   you, Mr. Pendergrass, and Ms. Barber?

15   **A.**    No.

16   **Q.**    Was it a business trip, a personal trip?  What was the

17   nature of the trip?

18   **A.**    It was a personal trip.

19            MR. BROWN:  Can you publish -- can you go to 20 --

20   Exhibit 20, Page 176, please, Mary?

21            MS. JOHNSON:  Of course.

22            MR. BROWN:  Can we enlarge -- let's start with the

23   bottom half of the page, please.

24   **Q.    (BY MR. BROWN)**  All right.  So, Mr. McQueen, I'm going to

25   direct your attention to the red dot.

1      Do you see that deposit on June 20 in the amount of

2  $106,879?

3  **A.**   Yes, I see.

4          MS. DURRETT:  Your Honor, I'm just going to object at

5  this point.  This is a witness who said he didn't have control

6  over this bank account or have any signing authority or

7  anything to do with this bank account.

8          So where are we going?

9          MR. BROWN:  Your Honor, this is evidence -- it is in

10  evidence.  He recognizes the deposit.  He was actually in the

11  bank with Mr. Pendergrass making the deposit.  So he can

12  certainly testify about the knowledge of the account.  He has

13  already established his knowledge of the account, Your Honor.

14          THE COURT:  I don't think he has that.  But he can --

15  if he is able to --

16          Sir, how do you know about that particular deposit?

17          THE WITNESS:  Those deposits was the deposits -- the

18  four deposits that came in from the City of Atlanta that

19  totaled that amount.  So the Georgia Municipal Association, the

20  Actor's Express, the Bone trustee, and there was the other one.

21  I forget the other one.

22  **Q.**   **(BY MR. BROWN)**  Mr. McQueen, were you present at the bank

23  when Mr. Pendergrass deposited those checks into the account?

24  **A.**   Yes, I was.

25  **Q.**   And in looking at the actual -- you testified that month

1  you, Mr. Pendergrass, and Ms. Barber went to Costa Rica;

2  correct?

3  **A.**   That's correct.

4  **Q.**   What part of Costa Rica did you go to?

5          THE COURT:  Would you take down the exhibit?

6          MR. BROWN:  I need the exhibit up.

7          THE COURT:  I don't think you can use it for this

8  purpose -- for that purpose -- this document for that purpose,

9  if it is not his document.

10          MR. BROWN:  Your Honor, it is in evidence.  I can use

11  it for any purpose.

12          THE COURT:  He does not have personal knowledge of

13  that document.  You have not established that.  You have

14  established -- if you can -- if you want to establish it in

15  some other way later on, you can.

16          But you can ask him about -- anything about the trip

17  to Costa Rica.  I'm not going to have you do that --

18          MR. BROWN:  Could I be heard?

19          THE COURT:  -- what you are suggesting.

20          Not with the jury present.  If this is so important

21  to you, then I'll excuse the jury.

22          MR. BROWN:  Could we take our afternoon break?

23          THE COURT:  Yes, they can.

24          COURTROOM SECURITY OFFICER:  All rise.

25          **(The jury exited the courtroom at 2:56 P.M.)**

| | |
|---|---|
| 1 | MR. BROWN:  Your Honor, can Mr. McQueen use the |
| 2 | restroom or take a break? |
| 3 | THE COURT:  Yes. |
| 4 | MR. BROWN:  You can step down, Mr. McQueen. |
| 5 | THE WITNESS:  Okay.  Thank you. |
| 6 | **(The witness exited the courtroom.)** |
| 7 | THE COURT:  I know it is a document in evidence. |
| 8 | What I don't understand is why you need that document that he |
| 9 | has no -- has indicated no personal knowledge of that document |
| 10 | itself.  It is not his account -- why you need that document in |
| 11 | front of the jury for him to explain anything that is on it. |
| 12 | You can ask him about the Costa Rica trip, et cetera, |
| 13 | because he was on it. |
| 14 | MR. BROWN:  Right.  So my understanding of the rules |
| 15 | of evidence is this document has already been admitted.  I can |
| 16 | use this document.  It is admitted for any purpose.  I could |
| 17 | have Joe Blow up there and put this document up and ask him |
| 18 | about this document.  Do you recognize the Hotel Morlena |
| 19 | (phonetic)?  Have you been there before?  Yes, I have been |
| 20 | there. |
| 21 | Okay.  Have you been to hotel -- because it is |
| 22 | admitted into evidence, Your Honor.  There is nothing |
| 23 | prohibiting me from using the document. |
| 24 | Now, if I ask him a question and he says I don't know |
| 25 | anything about that, then that is a different point.  I'll move |

1    on, Judge.  But if he says yes, I did go to the hotel there,

2    yes, I did go --

3              THE COURT:  You can ask him the same questions

4    without having all the funds up here.  I don't understand why

5    you need it in this way.

6              MR. BROWN:  Because it is -- I want to demonstrate

7    the $106,000 that they stole from the City of Atlanta while

8    working together.  They go on a trip, and they spend thousands

9    of dollars with doing that.

10             THE COURT:  You can do that otherwise.  All right.  I

11   have ruled.  Okay.

12             I feel like what you are doing is trying to actually

13   poison the evidence in a way by this.  You are trying to get

14   people to be fixated on the amounts.  That is fine if you --

15   this issue is not just about morality.

16             MR. BROWN:  Your Honor --

17             THE COURT:  But that is what you were -- you are

18   turning it into a morality play this way.

19             MR. BROWN:  No, Your Honor.

20             THE COURT:  No.  I mean, I have ruled.  That is it.

21   I don't want to spend more time on this.

22             MR. BROWN:  So you are saying, just so I can be

23   clear -- I don't want to overstep my bounds or step on the

24   Judge's toes or do something improper -- I can ask him about

25   it?  Your issue is having the exhibit up?

180

1        THE COURT:  My issue is having the exhibit up.

2        MR. BROWN:  He can have the exhibit and I can ask him

3    about it just so the jury doesn't see it?  Is that okay?

4        THE COURT:  No, it is not okay.

5        MR. BROWN:  It is admitted into evidence.  I don't

6    understand why I can't use the document.  You said you are

7    concerned with the jury -- somehow poisoning the jury.  I'm not

8    trying to do that.

9        THE COURT:  There is no way for him to have a

10   document in front of him -- I mean, if you want to refresh his

11   recollection of someplace he was at, do you know anything about

12   Key Largo -- there is no reason why you couldn't at the same

13   time say, did you spend time at the Key Largo San Jose?  Did

14   you spend time at the Hotel Dunn in San Jose?

15       But what we have attached to this is also various

16   expenditures at those places.  And I just don't think -- even

17   though they are not exorbitant, I don't think you need them.

18       MR. BROWN:  Okay.  I understand.  I'm not going to

19   argue.

20       Can I make one last issue and that is it?  It is not

21   about the expenses.  It is showing the relationship.  So that's

22   the whole point of this trial is to show how Mr. Pendergrass

23   and Mr. McQueen are related.  They are doing things together.

24       THE COURT:  I understand that, and I haven't

25   prohibited you from asking anything about this.  So you don't

1   need the document for it.  And I don't know why you have made a

2   big issue of it.

3           I could be wrong, but it is not -- this is not

4   material one way or the other when I haven't prohibited you in

5   any way from asking about the trip in San Jose that would show

6   their relationship.

7           So it just doesn't make sense to me that you have --

8           MR. BROWN:  I am done.

9           THE COURT:  I have ruled on it.

10          MR. BROWN:  I'm done.  Thank you, Judge.

11          THE COURT:  Okay.

12          MR. BROWN:  Thank you.  What time are we supposed to

13  be back, Judge?  Was that a 15-minute break?

14          THE COURT:  De facto at this point.

15          MR. BROWN:  All right.  Thank you, Judge.

16          THE COURT:  3:15.

17          By the way, let me just say one other thing, as long

18  you are irritated with me about this.  I think given the volume

19  of evidence that I have introduced -- that you have introduced

20  and I have let you introduce, I don't think that you need the

21  404(b) conviction.  And I'm not going to allow it in.

22          MR. BROWN:  Can I be heard on that later?  I know you

23  may -- can we just talk about it a little later, Judge?

24          I'm not going to obviously talk about it.  It will be

25  the last thing I'll introduce.

```
 1              I hear where you are coming from.  But can I at least
 2    address it to you later?
 3              THE COURT:  Yes.
 4              MR. BROWN:  All right.  Thank you, Judge.
 5                   (A brief break was taken at 3:02 P.M.)
 6              THE COURT:  Ready?
 7              MR. BROWN:  Ready, Judge.
 8                   (The jury entered the courtroom at 3:29 P.M.)
 9              MR. BROWN:  Can I continue, Judge?
10              THE COURT:  Yes, you may.
11    Q.   (BY MR. BROWN)  Mr. McQueen, when we left off before the
12    break, we were talking about your trip with Mr. Pendergrass and
13    Ms. Barber to Costa Rica.
14         Do you recall that testimony?
15    A.   Yes.  Yes, I do.
16    Q.   Do you recall which hotel you stayed at in Costa Rica with
17    Mr. Pendergrass and Ms. Barber?
18    A.   We stayed at the Dunn Inn.
19    Q.   The Dunn Inn?
20    A.   Yes, the Dunn Inn.
21    Q.   Do you recall any other hotels besides the Dunn Inn?
22    A.   As I stated previously before, they went before me.  So
23    there was another place they were at.  I don't know where they
24    stayed at there.  But when they met me there, we stayed at the
25    Dunn Inn.
```

1    Q.   Do you recall approximately how long the trip was -- how

2    long you stayed at the Dunn Inn with Mr. Pendergrass and

3    Ms. Barber?

4    A.   I believe it was a week.

5    Q.   And was the trip in celebration of how well the business

6    was going, or was business discussed during the trip?

7            MS. DURRETT:   I'm going to object to leading.

8            MR. BROWN:   I'll withdraw the question.

9    Q.   **(BY MR. BROWN)**   What did you discuss with Mr. Pendergrass,

10   while on the trip, if anything, about business?

11   A.   Just about the 16 grand that I still owed.

12   Q.   You seem kind of fixated on the $16,000.

13       Why are you so concerned about this $16,000?

14   A.   Because I knew with Clayton County what -- I remember what

15   the judge told me about that, and I didn't want to go to jail,

16   so it was first on my -- it was at the top of my list of

17   priorities to try to pay that money back.

18   Q.   All right.  So you already testified about the $106,000;

19   is that correct?

20   A.   What is that?  Yes.

21   Q.   You already testified about the $106,000 that was

22   deposited into the account?

23   A.   Yes.

24   Q.   Were you paid proceeds from that $106,000?

25   A.   Yes, I was.

```
 1              MR. BROWN:  Can we publish 20 -- Exhibit Number 8 --

 2   20, Page 8.

 3              MS. DURRETT:  Your Honor, I think we're going to have

 4   the same problem with the bank records.

 5              MR. BROWN:  Your Honor, these are just checks showing

 6   that he was paid from the proceeds, Judge.  It is not the hotel

 7   information.

 8              THE COURT:  Well, let me -- it is Exhibit 8?

 9              MR. BROWN:  Yes.  It is Exhibit Number 20, Judge,

10   Page 8.  It is actually on the screen now, Judge, if you want

11   to look.

12              THE COURT:  Well, I would like it not to be on the

13   screen.

14              MR. BROWN:  Can you take it down, Mary, please?

15              THE COURT:  That's fine.  You can show Page 8.

16              MR. BROWN:  Can you publish it, Mary?

17   Q.   (BY MR. BROWN)  What are we looking at here, Mr. McQueen?

18   A.   That is a check paid to me in the amount of three grand.

19   Q.   It says commissions.  Is it for a commission?

20   A.   No.

21   Q.   What is it for?

22   A.   It is for the checks that we submitted for my portion.  I

23   don't remember if this was part of the 106.  I think this one

24   was part of the 26.

25   Q.   Okay.  Now, who signed this check?
```

1   **A.**   Mr. Pendergrass.

2          MR. BROWN:  All right.  Can we publish Page 8 of this

3   same exhibit, please, Mary?

4          MS. JOHNSON:  Page 8 of 20?

5          MR. BROWN:  11.  I'm sorry.  We are already on 8.  11

6   of 20.

7   **Q.   (BY MR. BROWN)**  Same question regarding this exhibit,

8   Mr. McQueen.  This is a check two days -- a few days later in

9   the amount of $5062.

10         What is this payment for?

11  **A.**   This payment and the other payment was the 33 percent of

12  the 26.

13  **Q.**   All right.  Now -- okay.  And the 26,000 was the money

14  that was stolen from the law firm; is that correct?

15  **A.**   That's correct.

16         MR. BROWN:  Can we go to Page 19 of this exhibit,

17  please?  Can we just enlarge that top?

18         Just leave it.  That is fine.

19  **Q.   (BY MR. BROWN)**  Can you recognize this, Mr. McQueen?

20  **A.**   Yes.

21  **Q.**   What was this payment for, if you recall?

22  **A.**   I don't remember.

23  **Q.**   Okay.  That is fine.  Let's publish 22, please.

24         Mr. McQueen, what was the 500-dollar payment for?  Was

25  that a commission?  Was that a split?  Why would you get

```
 1   money -- a 500-dollar check?  Do you have any knowledge about
 2   that?
 3   A.   It was to just split up just so I would have --
 4   Mr. Pendergrass said so I would have some regular income coming
 5   in or make it look like I had regular income coming in.
 6              MR. BROWN:  All right.  Can you publish the next
 7   page, 23, of Exhibit 20?
 8   Q.   (BY MR. BROWN)  What about this payment, Mr. McQueen?
 9   A.   It looks like the same type of payment.
10              MR. BROWN:  Could we go to Page 25 of the same
11   exhibit, please.  Let's go to 28.  Sorry.  Wrong one.
12   Q.   (BY MR. BROWN)  Okay.  Do you recognize this payment for
13   the amount of $4000 on June 21st, 2013?
14   A.   Yes, I do.
15   Q.   What was this for?
16   A.   This was part -- this was my 33 percent of the 106.
17   Q.   All right.  I'm not great at math.  But $4000 is not
18   33 percent of $106,000; is that fair?
19   A.   Yes.
20   Q.   All right.  So why didn't you get the whole check at one
21   time?
22   A.   So me and Mr. Pendergrass had decided that it wasn't wise
23   to just cut one check for the 33 percent.  So we were going to
24   break it up.  I got this check for 4000, another check for
25   8000, another check for 9000.
```

1  Q.   And you said it wasn't wise.  What do you mean you guys

2  discussed it wasn't wise?  For what reason would you need to

3  break it up?

4     I don't understand.  Can you explain why you would need to

5  break it up?

6  A.   Just so we wouldn't alert the bank on anything.

7       MR. BROWN:  Okay.  Can you go to the next page, 29 of

8  Exhibit 20, please?

9  Q.   **(BY MR. BROWN)**  What about this payment on 6/26/2013 in

10  the amount of $8175?  Do you know what this is for?

11  A.   Yeah.  That was part of the 33 out of the 106.

12  Q.   Do you know how much Mr. Pendergrass received out of the

13  $106,000?

14  A.   He received the 67 percent.

15  Q.   So you would get 33 percent, and he would take the

16  67 percent?

17  A.   That's correct.

18  Q.   To your knowledge, were any of the rightful owners paid

19  out of that $106,000 approximately?

20  A.   Out of the legitimate deals that we did, yes.

21  Q.   All right.  What were the legitimate deals?

22  A.   The Fryer firm.  I don't have that list in front of me.

23  Roshaunta Redmond.  I think that is her last name.

24  Q.   Let's start with the Fryer firm.

25  A.   Yeah.  Do you have that list?

1  **Q.**   Tell us about the Fryer firm.  Whose account was it, and

2  how was it legitimate?

3  **A.**   The Fryer firm was an account that I was working on to try

4  to collect to let them know that they had money available out

5  there.  And so I convinced a woman there by the name of Kathryn

6  to -- after she talked to the owner she said it was okay.

7      They went ahead and signed the PDF -- I mean, not the PDF,

8  but the POA and emailed it back to me with a business card.

9  And we went ahead and collected on behalf of their account.

10 **Q.**   I want to show you what is marked as Exhibit Number 35.

11 Just take a look at that.  Look at me when you are finished

12 reviewing the documents.  And I'll ask you a few questions.

13 **A.**   Okay.

14 **Q.**   Have you had a chance to review the documents?  Just flip

15 all the way through and make sure.

16 **A.**   Yes.

17 **Q.**   Do you recognize the documents?

18 **A.**   Yes.

19 **Q.**   How do you recognize the documents?

20 **A.**   I submitted for this.  I closed the deal on it.  So I

21 submitted for the claim.

22 **Q.**   And do these documents fairly and accurately represent the

23 documents that you either created or compiled as part of the

24 Fryer law firm account?

25 **A.**   Yes.  This is the way it is supposed to be done.

1      MR. BROWN:  Your Honor, the Government would move to

2  admit Government's Exhibit 35 into evidence.

3      MS. DURRETT:  No objection, Your Honor.

4      THE COURT:  It is admitted.

5  **Q.   (BY MR. BROWN)**  Mr. McQueen, you left off -- your last

6  testimony was -- I'm publishing 35, which has been admitted.

7      MR. BROWN:  And, Harry, could you switch it back to

8  the document viewer, please.  Thank you.

9  **Q.   (BY MR. BROWN)**  All right.  So your last testimony was

10  this is how it is supposed to be done.

11      What do you mean by that?

12  **A.**   What I mean by it is supposed to be done is you are

13  supposed to call the client, discuss with them how much they

14  have, and convince them or sell them on collecting on their

15  behalf.  Then once you collect that money, then you reissue the

16  funds back to them.

17  **Q.**   All right.  So looking at this letter, did you sign above

18  your name Terrell McQueen on Page 1 of the Exhibit 35?

19  **A.**   Yes.

20  **Q.**   And explain what we're looking at here, Mr. McQueen.  Let

21  me make -- it is blurred.

22      Can you see that now, Mr. McQueen?

23  **A.**   Yes.  That is the returned fee agreement.  We sent it out

24  as 33 percent.  She returned it and cut it down to 25 percent.

25  I didn't have any objections to that.

1  **Q.**   Okay.  So is all of the writing on this form legitimate?

2  **A.**   Yes.

3  **Q.**   Was Mr. Pendergrass aware of your efforts to collect these

4  funds?

5  **A.**   Yes, he was.

6  **Q.**   So I'm looking at Page 3 of Exhibit 35.  Is that a

7  legitimate notary and signatures for Kathryn Semonsky Newman?

8  **A.**   Yes, it is.

9  **Q.**   That is the law firm's real card?  Did you submit it?

10  **A.**   Yes, it is.

11  **Q.**   And, again, is this the record you guys kept in the office

12  of receiving the actual envelope from the City of Atlanta?

13  **A.**   That's correct.

14  **Q.**   Is the next page a copy of the actual check that you guys

15  received from the City of Atlanta?

16  **A.**   That's correct.

17  **Q.**   Now, did this check need to be reissued, or were you able

18  to use this check?  Do you recall?

19  **A.**   I recall speaking with Mr. Pendergrass about issuing their

20  money back to them.  But I don't remember -- I don't remember

21  the check looking like that.

22  **Q.**   Okay.  Now, to your knowledge, did the Fryer law firm

23  receive their money from you and Mr. Pendergrass?

24  **A.**   Yes.  I told Mr. Pendergrass we needed to pay them, and we

25  paid them.

**Q.** You also testified about a Roshaunta Redmond?

**A.** Yes.

**Q.** Do you recall?

**A.** Yes.

**Q.** Can you describe for the jury that account and your efforts to collect funds on behalf of Ms. Redmond?

**A.** Yes.  Ms. Redmond was a customer on that list from earlier.  And I was able to contact her and find her either by phone or email and convinced her to sign.  I believe it was five grand that we recovered for her.  She came down to the office, and we cut her -- her portion back to her.

**Q.** I wanted to show you what has been marked as Exhibit Number 34.  Take a look at that.

**A.** (The witness complies.)

Okay.

**Q.** All right.  Do you recognize the documents contained in Exhibit Number 34?

**A.** Yes.

**Q.** How do you recognize them?

**A.** I submitted the claim to claim that.

**Q.** So you have personal knowledge of these documents?

**A.** Yes.  I closed that deal.

**Q.** Do the documents fairly and accurately depict the documents that you either created or compiled relating to the collection of funds on behalf of Roshaunta Laster or Roshaunta

 1   Redmond?

 2   **A.**   Yes.

 3            MR. BROWN:  The Government would move to admit 34

 4   into evidence, Judge.

 5            MS. DURRETT:  No objection, Your Honor.

 6            THE COURT:  It is admitted.

 7   **Q.**   **(BY MR. BROWN)**  Mr. Pendergrass -- Mr. McQueen, just tell

 8   me -- you said the amount -- was that amount correct?  $5250?

 9   **A.**   Yes.

10   **Q.**   All right.  Was that check like the other checks mailed to

11   the P.O. Box for Asset Financial Recovery, Inc.?

12        You can look at the screen, Mr. --

13   **A.**   Oh, okay.  Yes, it was.

14   **Q.**   Is this your signature at the bottom?

15   **A.**   Yes, it is.

16   **Q.**   To your knowledge, is this information here correct as

17   relating to completed by Ms. Redmond?

18   **A.**   Yes.  She emailed it to me.

19   **Q.**   And is this Exhibit Number 34 -- I think it is Page 5 --

20   the actual check that was mailed to the P.O. Box 1809?

21   **A.**   Yes, it is.

22   **Q.**   Then the last page of the exhibit, do you recognize what

23   we're looking at here, Mr. McQueen?

24   **A.**   Yes, I do.

25   **Q.**   What is that?

**A.**   That is a check written out to Ms. Redmond where she came

and visited the office.

**Q.**   All right.  Who signed that check?

**A.**   Mr. Pendergrass signed it.  I filled out the check amount.

**Q.**   So is that your writing on the check amount and the name?

**A.**   The pay and the amount and then client portion payment,

the date.  Yes, all of this.  And then -- yes, that is my

handwriting and then had Mr. Pendergrass sign it.

**Q.**   So can you explain for the jurors -- I mean, if you know

how to do it right, why did you and Mr. Pendergrass steal

money?

**A.**   So the intention was not to steal money.

**Q.**   Right.  I know what the intention was.  But the evidence

shows otherwise.

       So why did you do it?  Can you explain it to -- is it

explainable?  I just want to get your explanation.

**A.**   I didn't think that I had enough time or could close

enough deals to pay back that 16 grand from SunTrust.

**Q.**   Did you discuss this with Mr. Pendergrass about --

**A.**   Yes, I did.  And so that leads up to the Lee Family Trust

account, and so --

**Q.**   So stop before we get to that.  I'm going to -- we're

almost there -- almost there.

       Before we get to Lee Family Trust, are you familiar with

Tousa Homes?

**A.**     Tousa Homes?

**Q.**     Yes.

**A.**     Yes, I am.

**Q.**     And how are you familiar with that account?

**A.**     It is one of the accounts that I worked on for

Mr. Pendergrass.

          MS. DURRETT:  Your Honor, could I be heard on this?

          THE COURT:  Yes.

          MS. DURRETT:  Privately?

          THE COURT:  Okay.  How long will it take?

          MS. DURRETT:  A minute.

                    **(A bench conference ensued, as follows:)**

          MS. DURRETT:  This is related to the Colorado case,

and it is the count for which he was convicted.  And so if the

Court is not going to let in that conviction, I just don't

understand where we're going with this.  Because previously the

Government said, oh, we're going to call the victim from this

case and present evidence at the pretrial conference.  And the

Court said we're not doing that.

          And so -- but now we're not letting in the conviction

in.  What is happening?

          MR. BROWN:  Judge, this is 7.  It has already been

admitted into evidence.  This witness established he has

personal knowledge of this account.  He worked with

Mr. Pendergrass.  It is relevant evidence.  It is already in

1    evidence.  It is already there.

2          So he is allowed to talk about it because he has

3    personal knowledge of this account.  He worked with

4    Mr. Pendergrass on this account, Your Honor.

5          He is not going to talk about a conviction.  He is

6    just going to talk about his working and getting paid for this

7    money from Mr. Pendergrass along the lines of the other

8    evidence in this case.

9          It is relevant.  It is the same time period.  Your

10   Honor has already ruled that this evidence was intrinsic.  Your

11   Honor just withheld her judgment on the actual conviction under

12   404(b), Your Honor.

13         MS. DURRETT:  And at the pretrial conference, he said

14   we're going to call the victim.  You said no, there is going to

15   be no evidence.

16         MR. BROWN:  Right.  And I didn't call her because I

17   didn't want her to fly in from Florida when this witness can

18   establish it.  It is already in evidence.  It is here.  It has

19   been admitted into evidence, Judge.

20         THE COURT:  If it is already in evidence, I'm going

21   to allow it in.

22              **(The bench conference was thereby concluded.)**

23              **(A brief break was taken at 3:51 P.M.)**

24         THE COURT:  What is your --

25         MS. DURRETT:  Your Honor, I'm sorry.  I know that the

1   Government is not going to inquire about the conviction or

2   anything improper.

3           But what I wanted to make sure was that Mr. McQueen

4   has been admonished not to mention something like that.

5   Because I don't want something to slip out if he is asking him

6   about Colorado for him to say something inappropriate.

7           MR. BROWN:  Yes, Judge.  I can admonish him or you

8   can admonish him when he comes back in.  That is fine.

9           THE COURT:  All right.

10          All right.  Mr. McQueen is welcome back.

11          All I was going to say to you -- what was the next

12  document you wanted to --

13          MR. BROWN:  It is Exhibit Number 7.  It has already

14  been admitted, Judge.

15          THE COURT:  I know.  We discussed that.  I just don't

16  remember the number.

17          MS. DURRETT:  Could I ask one more thing?

18          I know the Government said it had two witnesses

19  today.  I don't know how many -- if that changed or if that is

20  the same.  But we have an investigator here that has been here

21  since 1:00.  I don't think we're going to get there, it doesn't

22  seem like.

23          THE COURT:  Well, if he closes his case, you can make

24  any motion and preserve argument on it --

25          MS. DURRETT:  Okay.

```
 1              THE COURT:  -- as well.  I mean, I know we have got

 2   to do all of those steps.  I don't want to foreclose you from

 3   making a motion.

 4              MS. DURRETT:  Right.  Okay.

 5              MR. BROWN:  Can I get Mr. McQueen?

 6              THE COURT:  Yes.

 7              Was your concern, Ms. Durrett, could you release your

 8   witness?

 9              MS. DURRETT:  To have her come back tomorrow.

10              THE COURT:  Have her come back tomorrow.

11              Do you have any idea how much longer you are going to

12   be?

13              MR. BROWN:  Probably at least half an hour.  Maybe a

14   little bit more, Judge.

15              THE COURT:  Yes.  You can let her go.

16              MS. DURRETT:  Thank you, Your Honor.

17              THE COURT:  All right.  Then you can be in touch

18   later about when you expect to call her.

19              MS. DURRETT:  I can check, Your Honor.  Thank you.

20              THE COURT:  All right.  Very good.

21              Mr. McQueen, I just want to advise you before we

22   begin the next part of the examination by your counsel

23   regarding a payee name of Tousa Homes.  I want to make sure

24   that you don't reference any Colorado legal proceedings or

25   anything that came out of the Colorado legal proceedings.
```

```
 1              We're just going to talk about this particular
 2   transaction, and that is it.
 3              THE WITNESS:  Okay.
 4              THE COURT:  All right.
 5              MR. BROWN:  Yes, Judge.  I don't think Mr. McQueen
 6   has any knowledge of that.
 7              THE COURT:  I know.  And I just want to make sure
 8   that everyone understands that is all I have authorized it for.
 9              MR. BROWN:  Yes, Judge.
10              MS. DURRETT:  Thank you, Your Honor.
11              THE COURT:  I think we're ready for everyone to come
12   back.
13                   (The jury entered the courtroom at 4:00 P.M.)
14              THE COURT:  Have a seat.
15              MR. BROWN:  Your Honor, may I proceed?
16              THE COURT:  Yes, you may.
17              MR. BROWN:  Mary, can you load Exhibit Number 7,
18   please?
19   Q.   (BY MR. BROWN)  Mr. McQueen, when we broke, I was asking
20   you about Tousa Homes or Tousa Homes, however you want to
21   pronounce it.
22        Are you familiar with the recovery related to this
23   particular account?
24   A.   I am.
25   Q.   What was your involvement in Tousa Homes?
```

1    **A.**   So when I was initially tasked with sending out

2    information to the holders, the information request, that is

3    when I received the list from them.

4    **Q.**   Okay.  So is it your testimony that you actually sent a

5    request out to Colorado to get a list back of money owed to

6    folks out of that jurisdiction?

7    **A.**   That's correct.

8    **Q.**   Who signed this document at the bottom?

9    **A.**   That's Mr. Pendergrass's signature.

10   **Q.**   Let's go to Page 2 of Exhibit 7, please.

11        Now, Mr. McQueen, was Tousa Homes a legitimate account or

12   were forged documents used?

13   **A.**   So those were forged documents used.  It was -- they were

14   part of a mortgage -- mortgage crash.  So that was a company

15   that no longer existed.

16   **Q.**   So did you do the research and find Tousa Homes?

17   **A.**   No, I did not.

18   **Q.**   So looking at this exhibit, can you identify any of the

19   writing or signatures?

20   **A.**   Yes, I can.

21        MS. DURRETT:  I would just ask if he was involved in

22   the making of this document or knows about it.  Because if he

23   is just speculating, I object.

24        THE COURT:  I think that is a fair question.

25        MR. BROWN:  All right.  And he said he recognized the

1    document, Your Honor.

2         THE COURT:  That is different than his being involved

3    with it.

4         MR. BROWN:  Okay.

5    **Q.   (BY MR. BROWN)**  Mr. McQueen?

6    **A.**   So I was involved with creating the document.  I did not

7    get paid any proceeds from this document.

8    **Q.**   So you were involved with the documents; correct?

9    **A.**   What is that?

10   **Q.**   Were you involved -- is your handwriting on these

11   documents?  Do you --

12   **A.**   Yes, I recognize my handwriting on this document.

13   **Q.**   So let's talk -- start with signature.  Do you recognize

14   who signed Solana Keever VP?

15   **A.**   Yes, that is Mr. Pendergrass's signature.

16   **Q.**   How do you know that?

17   **A.**   Because we created these documents together.

18   **Q.**   So when you say created together, you're in the same

19   office working on these documents?

20   **A.**   That's correct.

21   **Q.**   You are watching him?  He is watching you; is that

22   correct?

23   **A.**   That's correct.

24   **Q.**   Do you recognize any other handwriting on this document?

25   **A.**   Yes, I do.

```
1   Q.   Whose handwriting do you recognize?

2   A.   My handwriting below.

3   Q.   So point -- you can actually touch the screen, and it will

4   make a nice round dot.

5        Well, not that much touching.

6           MR. BROWN:  Can you clear that, Harry?

7   Q.   (BY MR. BROWN)  So if you go above -- can you just touch

8   next to your handwriting what you did?

9   A.   (The witness complies.)

10  Q.   So the bottom portion is your handwriting.  Above that the

11  signature is that of Mr. Pendergrass; is that correct?

12  A.   That's correct.

13  Q.   Let's go to Page 3 of exhibit -- this exhibit, Exhibit 7.

14       Who created the business card?

15  A.   I created the business card for him -- for

16  Mr. Pendergrass.

17  Q.   Let's go to Page 6 of this exhibit, please.

18       What are we looking at here, Mr. McQueen?

19  A.   We're looking at a printout from ZOHO, the customer

20  management system.

21          MR. BROWN:  Okay.  If you look -- can you highlight,

22  Mary, where it says notes for this holder?  It is probably

23  halfway down the page.

24  Q.   (BY MR. BROWN)  Do you recognize what these notes are for

25  and why these notes were created as a part of this ZOHO
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1   software?

2   **A.**   I don't remember why those notes were created.

3   **Q.**   That is fine.  Let's go to Page 7 of the same exhibit.

4        At the top, do you see your name Shawn McQueen?

5   **A.**   Yes.

6   **Q.**   And below that, do you see modified by Allen Pendergrass?

7   **A.**   Yes, I do.

8   **Q.**   Does this document reflect that both of you are working on

9   this account?

10  **A.**   No, it does not.

11  **Q.**   What does it reflect?

12  **A.**   That is just the way the system was set up.  I worked

13  on -- I helped him with the -- Mr. Pendergrass with the

14  document.  And that was it.  I didn't put any notes in the

15  system.  Mr. Pendergrass did all of the research for this

16  company.

17        MR. BROWN:  Can we go to Page 9, the next page, of

18  this exhibit?  Actually, let's go back to Page 3 for one minute

19  and just highlight the card, and then we'll go back to 9.

20        Can you enlarge that, please, Mary?

21  **Q.   (BY MR. BROWN)**   Now, Mr. McQueen, do you see that

22  telephone number (954) 218-1428?

23  **A.**   Yes.

24        MR. BROWN:  Let's go to Page 9 of this exhibit,

25  please.  Can you highlight the top half first?

1          Thank you, Mary.

2     **Q.   (BY MR. BROWN)**  So, Mr. McQueen, do you see the same

3     telephone number that was on the business card at the top (954)

4     218-1428?

5     **A.**   Yes, I do.

6     **Q.**   Can you explain for the jury what is this document?  What

7     is this about?

8     **A.**   So that document MAP Communications is a company that

9     would answer -- it is a phone answering service.  And so they

10    would give you a phone number.  And then if anyone called that

11    number, they would answer in the company name of your choice.

12    **Q.**   Now, why did you use this MAP Communications yourself with

13    other accounts?

14    **A.**   I don't remember, but I know there may have been a couple

15    of other companies.  I don't remember the names.

16    **Q.**   So looking at this document, did Mr. Pendergrass set this

17    up to have a voice mail for Tousa Homes based on what we're

18    looking at here?

19    **A.**   Yes.  Or an -- an active company.  A voice mail.  Or if

20    anyone from -- called to verify, then they would answer and

21    take a voice message.

22    **Q.**   So you already testified you created the business card;

23    correct?

24    **A.**   I did.

25    **Q.**   So would you have to contact Mr. Pendergrass to get this

1    telephone number to put it on the business card before it was

2    sent?

3    **A.**    Yeah.  This would have been part of the initial research

4    to -- you get everything lined up first before you start

5    submitting documents.  So your phone numbers, your email

6    addresses, your company names.  Or if you wanted it to sound

7    more legitimate or an active company, then you would find a

8    company like MAP Communications instead of just a phone number

9    that didn't have a live person picking up the phone.

10   **Q.**    All right.  So did you use this or was this used by

11   Mr. Pendergrass to steal the money to make it appear

12   legitimate?

13   **A.**    It was used by Mr. Pendergrass to make it look legitimate

14   because the company was closed.

15   **Q.**    Okay.  There is an email address

16   pendergrassallen@gmail.com.

17        Are you familiar with that email address?

18   **A.**    Yes, I am.

19   **Q.**    Whose email address is that?

20   **A.**    That is Mr. Pendergrass's email.

21        MR. BROWN:  Mary, can you just go back and highlight

22   the bottom portion of this document, please?

23   **Q.**    **(BY MR. BROWN)**  Can you see box eight right there,

24   Mr. McQueen?

25   **A.**    Yes.

1    Q.    All right.  Who signed that document?

2    A.    That is Mr. Pendergrass's signature and his printed name.

3    Q.    If you look at the bottom, it says answer phrase, thank

4    you for calling Tousa Homes or Tousa Homes.

5          Is that the message that would be there for the voice

6    mail?  Is that how that worked?

7    A.    That's correct.

8    Q.    If you look on the bottom, I see two email addresses.

9    A.    That's correct.

10   Q.    Tmcqueen@assetfinancialrecovery.com, whose email account

11   is that?

12   A.    That was my email when he had -- he had a database that we

13   were -- that he used to work with at a previous company.  The

14   internet guy disappeared and took that database.  So we had to

15   come up with a different name.  But that was for the company.

16   Yeah.

17   Q.    Thank you.  So we can take that exhibit down.

18         Mr. McQueen, are you familiar with Michael Burandt?  That

19   name, Michael Burandt?

20   A.    Yes, I am.

21   Q.    I want to show you what has been marked as Exhibit

22   Number 39.  Take a look at it, and I'm going to ask you some

23   questions.

24   A.    Okay.

25   Q.    So do you recognize that document?

1   **A.**   I do.

2   **Q.**   How are you able to recognize that document?

3   **A.**   It was a -- it was a legitimate claim that came in the

4   mail.

5   **Q.**   So explain that.  A legitimate claim that came in the

6   mail, explain that.

7   **A.**   So once the skip tracing is done, once you find the

8   individual and the correct address or the last known address,

9   you would send them a letter with power of attorney, the fee

10  agreement, and the welcome letter.

11       If they agreed with you, then they would send all of that

12  information back postage paid for us to collect on their

13  behalf.

14       This was -- I remember this coming in the mail.  So this

15  was one that was legitimate.

16  **Q.**   All right.  Do those documents found in Exhibit Number 39

17  fairly and accurately depict the documents that you are

18  familiar with from working with Mr. Pendergrass?

19  **A.**   Yes.

20  **Q.**   Have there been any changes, alterations, or deletions to

21  the documents contained within Exhibit 39?

22  **A.**   No.

23       MR. BROWN:  The Government would move to admit 39

24  into evidence, Your Honor.

25       MS. DURRETT:  No objection, Your Honor.

| | |
|---|---|
| 1 | THE COURT:  It is admitted. |
| 2 | MR. BROWN:  Harry, can you switch me back to the |
| 3 | overhead? |
| 4 | **Q.   (BY MR. BROWN)**  Mr. McQueen, I'll direct your attention to |
| 5 | the screen in front of you. |
| 6 | Is this another recovery from the City of Atlanta? |
| 7 | **A.**   Yes, it is. |
| 8 | **Q.**   And you previously testified Deidre Barber worked with you |
| 9 | and Mr. Pendergrass; is that correct? |
| 10 | **A.**   That's correct. |
| 11 | **Q.**   And your testimony is that the information here is -- |
| 12 | **A.**   That is all correct. |
| 13 | **Q.**   You testified that they would send their driver's license; |
| 14 | is that right? |
| 15 | **A.**   That's correct.  That is his driver's license. |
| 16 | **Q.**   Is this the agreement talking about how much money he |
| 17 | would get from you -- |
| 18 | **A.**   Yes. |
| 19 | **Q.**   -- if money was recovered? |
| 20 | **A.**   That's correct. |
| 21 | **Q.**   And is this the actual -- showing that the money -- the |
| 22 | check was sent to the P.O. Box 1809? |
| 23 | **A.**   That's correct.  Yes, it is. |
| 24 | **Q.**   Is this a copy of the actual check that was sent? |
| 25 | **A.**   Yes. |

1   **Q.**   Did Mr. Michael Burandt receive his money?

2   **A.**   No, he did not.

3   **Q.**   Why not?

4   **A.**   Because Mr. Pendergrass did not pay him.

5   **Q.**   So Mr. Burandt sent the information to you guys to get the

6   money; correct?

7   **A.**   That's correct.

8   **Q.**   Why wasn't he paid?

9   **A.**   Mr. Pendergrass stated to me that he wasn't in a rush to

10  receive his money and he stated to me also that we would pay

11  him later.

12  **Q.**   Do you know if Michael Burandt was ever paid?

13  **A.**   Not to my knowledge.

14  **Q.**   Now, did you have control over the account in which he

15  would have been paid out of?

16  **A.**   No, I did not.

17  **Q.**   So if Mr. Michael Burandt was paid, Mr. Pendergrass would

18  have to send him a check?

19  **A.**   That's correct.

20  **Q.**   I want to show you what has been marked as Exhibit

21  Number 38.  Take a look at that and let me know if you

22  recognize that document.

23  **A.**   I do.

24  **Q.**   All right.  What is that document?

25  **A.**   This document is a submission for a Mr. Greg Hickman.

1  **Q.**   How are you able to recognize the document?  How do you

2  recognize it?

3  **A.**   I remember working on this document with Mr. Pendergrass.

4  **Q.**   Does that document or the exhibits contained within that

5  document fairly and accurately depict the documents that you

6  worked on with Mr. Pendergrass while you worked at his company?

7  **A.**   Yes.

8  **Q.**   Have there been any changes, alterations, or deletions to

9  the documents?

10  **A.**   Yes.  So the power of attorney -- the print name is my

11  handwriting.  The signature is my handwriting, and the date is

12  my handwriting.

13  **Q.**   So is there anything on that document that has been

14  changed or altered from when you worked on it?

15  **A.**   No.  I don't know whose handwriting -- I don't recognize

16  the handwriting below it.

17  **Q.**   But you recognize your handwriting?

18  **A.**   I do recognize my handwriting, and the seal was a photo --

19  photocopied.

20          MR. BROWN:  Your Honor, at this time, the Government

21  would move to admit Exhibit Number --

22          THE COURT:  38?

23          It is 38, isn't it?

24          MR. BROWN:  -- 38 into evidence, Your Honor.

25          THE COURT:  Any objections?

| | |
|---|---|
| 1 | MS. DURRETT:  No objection, Your Honor. |
| 2 | THE COURT:  It is admitted. |
| 3 | **Q.** **(BY MR. BROWN)**  All right.  Who is Larry Pendergrass? |
| 4 | **A.**  It is Mr. Pendergrass's signature, but he didn't want to |
| 5 | use his first name. |
| 6 | **Q.**  Now, why would Mr. Pendergrass not want to use his first |
| 7 | name? |
| 8 | **A.**  I don't remember why. |
| 9 | **Q.**  But you recognize the signature of Larry Pendergrass to be |
| 10 | the same writing and signature used by Mr. Allen Pendergrass? |
| 11 | **A.**  That's correct. |
| 12 | **Q.**  I want to go to Page 2 of Exhibit Number 38.  Do you |
| 13 | recognize the writing at the bottom there? |
| 14 | I know it is kind of hard to see. |
| 15 | **A.**  Yes.  That is my handwriting. |
| 16 | **Q.**  So you signed this Greg Hickman and put the date here; is |
| 17 | that correct? |
| 18 | **A.**  That is -- yeah.  That is correct. |
| 19 | **Q.**  And then do you recognize your handwriting on this |
| 20 | particular document? |
| 21 | **A.**  Yes. |
| 22 | **Q.**  Can you point to your handwriting -- just right next to |
| 23 | what is your handwriting? |
| 24 | **A.**  (The witness complies.) |
| 25 | **Q.**  And do you recognize the handwriting below that? |

1    **A.**    No, I do not.

2    **Q.**    Do you know -- if you don't recognize that writing, would

3    other folks sign these documents again to show two different

4    people being associated with the document?

5    **A.**    Yes, they would.

6    **Q.**    Now, I know you can't see this.  Can you make it out?

7    What are we looking at here?  It is kind of hard to see.

8    **A.**    It is looks like an ID.

9    **Q.**    Now --

10   **A.**    But I don't think -- I don't think that is his ID.  I

11   don't remember.

12   **Q.**    Do you know if Greg Hickman was contacted at all in this

13   particular recovery attempt?

14   **A.**    No.

15   **Q.**    So if this is not Mr. Hickman's ID, would you know where

16   this ID came from?

17   **A.**    So --

18            MS. DURRETT:  I object to the form of the question.

19            MR. BROWN:  All right.  I'll strike that.

20   **Q.**    **(BY MR. BROWN)**  During the course of working with Mr.

21   Pendergrass, were fake IDs used to your knowledge?

22   **A.**    Yes.

23   **Q.**    Who obtained those fake IDs?

24   **A.**    Mr. Pendergrass already had three or four IDs in his desk

25   drawer.

1   **Q.**   How do you know that?

2   **A.**   Because I saw them there.

3   **Q.**   And what, if anything, would Mr. Pendergrass do with those

4   three or four IDs he had in his desk drawer?

5   **A.**   So we would use the IDs, for instance, to -- if we wanted

6   to submit a person, you could -- you could -- we would have

7   Mr. Fitchpatric change the name on the ID to fit the

8   description of the individual we were submitting for.

9   **Q.**   Do you recognize this handwriting down here?

10  **A.**   Yes.  Mr. Pendergrass's handwriting.

11  **Q.**   Then the last page, do you recognize this handwriting?

12  **A.**   Yes.  That is my handwriting.

13  **Q.**   Now, why would you write that name four times there on

14  that piece of paper?

15  **A.**   To try to get the motion of a legitimate signature.

16  **Q.**   So you are practicing here; is that fair?

17  **A.**   That's correct.

18  **Q.**   Do you recall whether any funds were recovered?

19  **A.**   No.

20  **Q.**   From Harris County?

21  **A.**   Not for Mr. Hickman.

22  **Q.**   So now let's talk about Lee Family Trust.  Did Lee Family

23  Trust also involve Harris County, Texas?

24  **A.**   Yes, it did.

25  **Q.**   So tell me about your involvement and knowledge of the Lee

1  Family Trust.

2  **A.**   So the Lee Family Trust came about from the SunTrust issue

3  in January.

4  **Q.**   So explain that.  You said it came about from that issue.

5  Explain -- what do you mean came about?

6  **A.**   So once I owed SunTrust the 16 grand, I wasn't sure how I

7  was going to repay those funds.  Mr. Pendergrass spoke to me

8  saying I already have it covered as far as trying to pay that.

9          THE COURT:  Move half an inch away from the mic

10  because there is a lot of static.

11          THE WITNESS:  Okay.  I'm sorry.

12          THE COURT:  You just want to be close enough without

13  being so close as to cause electric static on it.

14  **Q.   (BY MR. BROWN)**  So let's stop there.  I want to ask you a

15  question about -- we keep talking -- you keep talking about

16  this $16,000.

17      Less than about half an hour ago, I showed you three or

18  four checks in which you received in excess of approximately

19  $20,000.

20      Why didn't you use that money to pay off the SunTrust

21  account?

22  **A.**   I wanted to pay them back in its entirety, and I didn't

23  want to make a payment or the agreement wasn't a payment plan.

24  **Q.**   Right.  But the jury just saw -- and they will have with

25  them when they deliberate -- checks that you received in

1  June 2013 -- they have already -- you have already looked at

2  them, a check for 8000, a check for 4000, another check for

3  4000.

4       So we're getting close to -- you could have used that

5  money?

6  **A.**   I could have.

7  **Q.**   But you didn't?

8  **A.**   I did not.

9  **Q.**   So you chose not to?

10 **A.**   I was looking for the whole amount, yes.

11 **Q.**   Could it also be that you wanted to make more money?

12          MS. DURRETT:  Your Honor, I object on leading.

13          MR. BROWN:  I'll strike the question.

14 **Q.**   **(BY MR. BROWN)**  Let's talk about Lee Family Trust.

15          THE COURT:  I'm just a little confused.  Four,

16 eight -- you basically -- four checks -- just say what the

17 checks are.  The amounts were four --

18          MR. BROWN:  Well, I can go back to the exhibit,

19 Judge.  My memory is not --

20          THE COURT:  No.  That is all right.

21          MR. BROWN:  We looked at a lot of checks.

22          THE COURT:  Four, eight -- even if there were three

23 checks, yeah.

24          MR. BROWN:  Four.  Eight plus four is 12.  Another

25 four is 16.  And there are other checks.  I was trying to --

```
 1              THE COURT:  I got it.  All right.
 2    Q.  (BY MR. BROWN)  So Lee Family Trust, who initiated the
 3    recovery attempt related to Lee Family Trust?
 4    A.    Mr. Pendergrass brought to my attention that he already
 5    had it done.
 6    Q.    All right.  You are going to have to break this down.
 7    A.    So --
 8    Q.    Let me ask the question.  He indicated he already had it
 9    done?
10    A.    Yes.
11    Q.    What did he have done?
12    A.    The research on it, as far as trying to contact the
13    individual saying that they couldn't be contacted or that they
14    were very -- it was very difficult to contact them.
15    Q.    Okay.  I want to show you what has been marked as
16    Government's Exhibit Number 9.
17        Take a look at that, and I'll ask you some questions about
18    it.
19    A.    (The witness complies.)
20        Okay.
21    Q.    Have you had a chance to take a look at the documents?
22    A.    Yes.  I'm familiar with them.
23    Q.    How are you familiar with these?
24    A.    I helped create these documents.
25    Q.    Do those documents appear to be in the same or similar
```

1   condition in which you helped create these documents and held

2   them in your office?

3   **A.**   Yes.

4         MR. BROWN:  The Government would move to admit

5   Exhibit Number 9 into evidence, Judge.

6         MS. DURRETT:  Your Honor, I just have the question

7   about the first page.

8         Is that something that he helped create?

9         THE COURT:  Go ahead and ask that.

10  **Q.   (BY MR. BROWN)**  Are you familiar with the first page of

11  Exhibit Number 9?

12  **A.**   I'm familiar with it.  But I didn't create it.

13  **Q.**   And what is it?

14        MS. DURRETT:  I'm sorry.  Has it been admitted?

15        THE COURT:  No.  I mean, he is trying to basically

16  figure out --

17        How are you familiar with it?

18        THE WITNESS:  So we -- so when you are creating a

19  company, you have to create everything that looks like a

20  company:  So the phone number, the fax number, the email

21  address, the address.  So that is what this document looks

22  like.

23        THE COURT:  All right.  But did you work with this

24  specific document yourself?  Or is that just -- that is what

25  we're trying to find out.

1          THE WITNESS:  Did I work with it?

2          THE COURT:  Was this a document that -- you indicated

3    that you didn't draft this document.  It wasn't one that you

4    created.

5          THE WITNESS:  No.  This is just a printout of the

6    file.  So that is it.  So this document wasn't altered or

7    anything like that.

8          MR. BROWN:  Your Honor, if I may add some clarity.

9          THE COURT:  All right.  Go ahead.

10         MR. BROWN:  Can I admit it?  This is a document that

11   has already been tendered for entry into evidence by

12   Investigator Ricks as recovered from the actual office, Your

13   Honor.  He laid a sufficient foundation for entry.

14         You reserved on that because of concerns about Lee

15   Family Trust.  So I think that foundation has been established

16   with Investigator Ricks, Judge.

17         MS. DURRETT:  Well, we still object, Your Honor.  I

18   mean, we objected yesterday.  We object again today.

19         THE COURT:  All right.  I'll admit it.

20         MR. BROWN:  Thank you, Judge.

21   **Q.   (BY MR. BROWN)**  I showed you these documents, and you were

22   telling me about how Mr. Pendergrass had already done research

23   as related to the Lee Family Trust; is that correct?

24   **A.**   That's correct.

25   **Q.**   So I want to talk a little bit about this company,

1  Attorney Recovery System.

2      Are you familiar with this company?

3  **A.**   Yes, I am.

4  **Q.**   Is this the same company that was used with the Holland &

5  Knight account?

6  **A.**   Yes, it is.

7  **Q.**   And you have already testified you actually established

8  that actual address; correct?

9  **A.**   That's correct.

10  **Q.**   I want to direct your attention to the bottom of the

11  exhibit, Page 2.

12      Do you recognize handwriting on this document?

13  **A.**   Yes, I do.

14  **Q.**   And whose handwriting do you recognize?

15  **A.**   Do you want me to point to it or talk about it?

16  **Q.**   You can do both.

17  **A.**   Okay.

18      (The witness complies.)

19  **Q.**   Whose handwriting do you recognize?

20  **A.**   That is my handwriting all in green.  Then the signature

21  of Susan Camille Lee is Mr. Pendergrass's handwriting.

22  **Q.**   Once again, how do you know that that is Mr. Pendergrass's

23  signature?

24  **A.**   He has a particular way of writing his Ss, his capital

25  letters in cursive.  So the C and L.  But I was -- I was right

1   there when he signed it.

2   **Q.**   So you were present when he was signing these documents?

3   **A.**   That's correct.

4   **Q.**   Now, obviously since Mr. Pendergrass signed the document,

5   you guys did not get Ms. Camille Lee's permission to do that;

6   is that correct?

7   **A.**   That's correct.

8   **Q.**   This Page 3 of the same exhibit.

9         Do you know who Michael Cohen is?

10  **A.**   Yes.  He is an attorney here in Atlanta.

11  **Q.**   And was Mr. Cohen involved with the Lee Family Trust?

12  **A.**   He was involved, and then he pulled himself out.

13  **Q.**   So explain that.  What was your understanding about his

14  involvement and how he pulled himself out?

15  **A.**   So we -- there was another company that we were supposed

16  to collaborate on to create a debt company.  And we had several

17  meetings with several individuals.  I don't remember their

18  names.  And Mr. Cohen was the attorney of the other individual

19  that we met with.

20        And we were supposed to -- Mr. Cohen was -- had a trust

21  account where we were going to use the funds from the Lee

22  Family Trust to reissue the funds back to us and to create the

23  funds for the company.  So we were going to use his trust

24  account as a washing of money sort of to speak.

25  **Q.**   Let me stop you there.

1        Why did you need Mr. -- why did you think you needed

2   Mr. Cohen's account?

3   **A.**   I didn't think we needed Mr. Cohen's account.  Mr.

4   Pendergrass brought in Mr. Cohen to bring some type of distance

5   away from himself.

6   **Q.**   Okay.  Did you attend any meetings with Mr. Cohen that you

7   can recall?

8   **A.**   I believe one -- one meeting.  And then the next meeting

9   we were -- it was on the phone.  We didn't see him.

10  **Q.**   Who did you attend the meeting with, if anyone, with

11  Mr. Cohen?

12  **A.**   Mr. Pendergrass and then the associates with the other

13  company.  I don't remember their names.

14  **Q.**   How many times do you recall meeting with Mr. Cohen?

15  **A.**   Just that once.

16  **Q.**   So to your knowledge, did Mr. Cohen set up a trust

17  account?

18  **A.**   Mr. Cohen already had a trust account.

19  **Q.**   I want to publish Page 1 of Exhibit 9.

20       What are we looking at here, Mr. McQueen?  If you need me

21  to enlarge it, I can do that.

22  **A.**   It looks like the fax number for the Lee Family Trust

23  company me and Mr. Pendergrass created in Florida.

24  **Q.**   Okay.  Now, why did you create a company in Florida?

25  **A.**   Because that is where Ms. Lee's last known whereabouts

1    were.

2    **Q.**   All right.  Now, who created that company in Florida?

3    **A.**   I created that company in Florida.  It was a virtual

4    address company.

5    **Q.**   I want to show you what has been marked as Government's

6    Exhibit 44.  Take a look at that and let me know if you

7    recognize that document.

8    **A.**   Yes, I recognize it.

9    **Q.**   What is that document?

10   **A.**   This document is the -- it is a company we created in

11   Florida.

12   **Q.**   Now, you said we.  Is it you or we?  Who created the

13   company?

14   **A.**   I created the company.  But me and Mr. Pendergrass were in

15   agreement on the step -- on what we needed to do in order for

16   this to work.

17   **Q.**   So take a look at that document -- those documents and let

18   me know when you are finished, and I'll ask you a few

19   questions.

20            MR. BROWN:  Your Honor, the Government would move to

21   admit 44 into evidence.

22            THE COURT:  All right.  It is admitted.

23            MS. DURRETT:  I have no objection, Your Honor.  I'm

24   sorry.

25            THE COURT:  That's all right.  It is admitted.

1  **Q.    (BY MR. BROWN)**  So we'll go through this very quickly.

2       But, Mr. McQueen, you testified that you created this

3  company in Florida; is that correct?

4  **A.**    That's correct.

5  **Q.**    And why did you create the company?

6  **A.**    So me and Mr. Pendergrass discussed on creating the

7  company to make it look authentic.

8  **Q.**    So this is Page -- I think it is Page 4 of Exhibit

9  Number 44.  Is this your information here?  Your signature and

10  your name?

11  **A.**    Yes, that is my handwriting.  Yes.

12  **Q.**    Obviously this is you; correct?

13  **A.**    That's correct.

14  **Q.**    So after you create that company, does there come a time

15  that checks are received from Harris County, Texas?

16  **A.**    Yes.

17  **Q.**    All right.  Where -- who received those checks?

18  **A.**    I received those checks.

19  **Q.**    How did you receive those checks?

20  **A.**    I set up a P.O. Box in Buckhead off of Piedmont.

21  **Q.**    So this -- I'm going to show you what has already been

22  admitted as Defense Exhibit E.  So I'm looking at the top of

23  defense -- I think it is 10E actually.  Yeah.  10E.

24       So is that address at the top -- are you familiar with

25  that address?  3333 Piedmont Road, Suite 2050?

```
 1  A.    Yes.

 2  Q.    What is that address?

 3  A.    That address is the address we used -- well, I used or

 4  Mr. Pendergrass used for the Holland & Knight and for the Lee

 5  Family Trust.

 6        I don't know if it was still active at the time that we

 7  made this submission, but we still used it anyway.

 8  Q.    So you already testified you received those checks?

 9  A.    Yes.  But not at that address.

10  Q.    Which address did you receive those checks?

11  A.    There was a P.O. Box.

12  Q.    Is it right here?

13  A.    Yeah.

14  Q.    At the 5511104?

15  A.    Yes.  That is the -- yes, it is.

16  Q.    So that is the P.O. Box that you controlled; correct?

17  A.    That's correct.

18  Q.    Did Mr. Pendergrass have a key to that box?

19  A.    He did not.

20  Q.    And did you create that box yourself?

21  A.    I did.

22  Q.    All right.  Why did you create that box -- that P.O. Box?

23  A.    We needed a place for -- we needed -- so instead of

24  running into the issue we had with the City of Atlanta with the

25  Holland & Knight, which had just a couple of weeks ago before
```

224

1   this was submitted went down, we didn't want that issue.  So we

2   just decided just to create a regular P.O. Box, like a business

3   has a submission to send documents.

4   **Q.**   And these checks were approximately $168,000 worth of

5   checks; is that correct?

6   **A.**   It was 173, I believe.

7   **Q.**   My math is not that good.  But it is in evidence here in

8   10E.

9        Do these appear to be the dollar amounts of checks you

10  received?

11  **A.**   That's correct.

12  **Q.**   So when you received these checks from the P.O. Box, what

13  did you do with them?

14  **A.**   Gave them to Mr. Pendergrass.

15  **Q.**   Why did you give them to Mr. Pendergrass?  Why?

16  **A.**   He was running -- he was in control.

17  **Q.**   Well, you created the P.O. Box; correct?

18  **A.**   Yeah.

19  **Q.**   All right.  You did the virtual office in Florida;

20  correct?

21  **A.**   Yes.

22  **Q.**   All right.  So how was Mr. Pendergrass in control?

23  **A.**   He created -- he opened up a bank account -- a trust

24  account at Bank of America for Lee Family Trust.  And $5000 was

25  deposited into that account.

| | |
|---|---|
| 1 | **Q.**   Now, why did Mr. Pendergrass open that account when you |
| 2 | had Mr. Cohen to receive this money? |
| 3 | **A.**   We didn't have Mr. Cohen yet. |
| 4 | **Q.**   Okay. |
| 5 | **A.**   This is before Mr. Cohen. |
| 6 | **Q.**   And how do you know that Mr. Pendergrass created this |
| 7 | account? |
| 8 | **A.**   I went to the bank with him.  I wasn't inside with him.  I |
| 9 | was outside on the phone. |
| 10 |           MR. BROWN:  Your Honor, the Government would move to |
| 11 | admit Government's Exhibit 25 into evidence.  They are bank |
| 12 | records from the Lee Family Trust. |
| 13 |           MS. DURRETT:  Your Honor, we don't have an objection |
| 14 | to the admission because there is a certification.  But we do |
| 15 | have an objection to the same issue, which is this witness just |
| 16 | said he doesn't know anything about this account. |
| 17 |           THE COURT:  He doesn't know anything about the |
| 18 | account.  Maybe you need to be very narrow about what you are |
| 19 | going to ask. |
| 20 |           MR. BROWN:  Well, can I ask him about the account? |
| 21 |           THE COURT:  Well, you can try to establish a |
| 22 | foundation for his knowledge. |
| 23 |           MR. BROWN:  Okay, Judge. |
| 24 |           THE COURT:  If you jump into the materials that he -- |
| 25 | or if he says he hasn't -- doesn't have knowledge of it, that |

1    is a little bit of concern.  I think you've got to develop a

2    foundation of what his knowledge is.  But he has said he

3    doesn't have any.

4           MS. DURRETT:  Right.  I think I misspoke, Your Honor,

5    when I said I don't object.  I think he has to have some

6    knowledge to even accept it with the business records

7    certification.

8           MR. BROWN:  That is not true, Judge.

9           It is Exhibit Number 25, Judge.

10          THE COURT:  Yes.  I'm getting it.

11          MR. BROWN:  Your Honor, I would direct your attention

12   to 25, Page 95.

13          THE COURT:  Well, it starts with -- we're on Document

14   25; right?

15          MR. BROWN:  Yes.

16          THE COURT:  So the first page of it is Page 173.  So

17   are you talking about 195?

18          MR. BROWN:  So if you look at the -- it says 25-1.

19   Do you see that, Judge, at the bottom of the page center?

20          THE COURT:  Yes.

21          MR. BROWN:  If you use that number and you just go to

22   page number --

23          THE COURT:  25?

24          MR. BROWN:  No.  I think I said --

25          THE COURT:  95?

```
 1                MR. BROWN:  95, Judge.

 2                THE COURT:  Well, you can ask him about this page.

 3                MR. BROWN:  Okay.

 4                MS. DURRETT:  Has it been admitted?

 5                MR. BROWN:  You said -- I moved for admission.

 6                THE COURT:  You are objecting to it.  I'm just saying

 7      I'm not going to say that the whole exhibit can be.  But this

 8      page seems to reflect something that at least he can ask about

 9      before it is shown on the screen.  Then you can ask him about

10      it, and then we'll see.

11                MR. BROWN:  What I wanted to do, Judge, is offer --

12      so there is a business records certification saying it is --

13      lays authentic foundation.  So if this witness can establish

14      that it is relevant -- and I think he has already done that --

15      the whole record should come in.

16                But I understand your ruling.  So can I show him this

17      page that has been admitted?

18                MS. DURRETT:  I don't think it has been admitted, and

19      I object.

20                MR. BROWN:  All right.  I move for the admission of

21      Government's Exhibit 25, Your Honor --

22                MS. DURRETT:  And I object.

23                MR. BROWN:  -- based on the business records

24      certification, the relevancy established by this witness.

25                He has established that he was outside when the
```

1    account was opened.  He was working with Mr. Pendergrass to

2    open the account, to negotiate these funds.  He gave $168,000

3    worth checks to Mr. Pendergrass.  He has laid sufficient

4    knowledge about this account, Your Honor.

5              So I would ask for the Court to allow 25 to be

6    admitted into evidence, and then I'll go from there, Judge.

7              THE COURT:  I'm just dealing with this page at this

8    moment, frankly.  It is a quarter of 5:00.  I'm just -- you

9    know, I'm just looking at this -- I mean, obviously this page

10   has been certified.  So I think he can testify as to the

11   specific check you directed my attention to.  And I will

12   consider everything else later.

13             MR. BROWN:  Thank you, Judge.

14             MS. DURRETT:  Thank you, Your Honor.

15             MR. BROWN:  So can I publish it?

16             THE COURT:  No.  I want him to verify that he knows

17   something about this particular page.

18             MR. BROWN:  Sorry, Judge.

19             THE COURT:  25-95.

20   **Q.   (BY MR. BROWN)**  Take a look at it, Mr. McQueen.  Do you

21   recognize that?

22   **A.**   I don't remember receiving this check.

23   **Q.**   Is your signature on the back of that check?

24   **A.**   Yes, it is.

25   **Q.**   So did you sign it?

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

| | |
|---|---|
| 1 | **A.**   I did. |
| 2 | **Q.**   Did someone else sign your name? |
| 3 | **A.**   No. |
| 4 | **Q.**   Did you receive money from Lee Family Trust? |
| 5 | **A.**   Yes. |
| 6 | THE COURT:  You can publish it. |
| 7 | MR. BROWN:  Thank you, Judge. |
| 8 | **Q.   (BY MR. BROWN)**   Now, Mr. McQueen, I think you just |
| 9 | testified you don't remember receiving this check; is that |
| 10 | correct? |
| 11 | **A.**   That's correct. |
| 12 | **Q.**   Did you receive a number of checks from Mr. Pendergrass? |
| 13 | From the time you worked for him, how many checks did you |
| 14 | receive from him approximately?  More than 10? |
| 15 | **A.**   More than 10.  Maybe less than 30. |
| 16 | **Q.**   Okay.  Is this your signature on the back of this check? |
| 17 | Did you sign that? |
| 18 | **A.**   Yes. |
| 19 | **Q.**   So you did receive the check; correct? |
| 20 | **A.**   I did, yes. |
| 21 | **Q.**   And did this check come from the Lee Family Trust? |
| 22 | **A.**   Yes, it did. |
| 23 | **Q.**   And who signed the check? |
| 24 | **A.**   Mr. Pendergrass. |
| 25 | **Q.**   Is that your home address on this check, Mr. McQueen -- |

230

1    **A.**   Yes.  Well, it was at the time, yes.

2    **Q.**   -- at the time?  Now, why would you receive money from the

3    Lee Family Trust?

4    **A.**   I don't remember the reason why I would have received that

5    low of an amount.

6    **Q.**   Should you have received more than $250 from this account?

7    **A.**   Yes.  That was the plan.

8    **Q.**   You testified that approximately $5000 were deposited in

9    this account; is that correct?

10   **A.**   That's correct.

11   **Q.**   How do you know that?

12   **A.**   I was at the bank when he opened the account.

13   **Q.**   And that $5000 approximately, where did it come from?

14   **A.**   It came from the 173 that we got from the P.O. Box in

15   Atlanta.

16   **Q.**   And where was that 5000 check from?  Who issued the check?

17   **A.**   Harris County issued that check.

18   **Q.**   And why did they issue that check?

19   **A.**   Because we made the submission for the 5000 and the 60 and

20   the 20 and the other ones.

21   **Q.**   Okay.  I'm going to show you what is marked as -- it is

22   not in evidence yet -- 25-66.  25-66.

23       Take a look at this, Mr. McQueen.  Tell me if you

24   recognize it.

25   **A.**   Yes.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1   **Q.**   What is it?

2   **A.**   It is a check for 5,184.83.

3   **Q.**   Is that a copy of the exact check you gave to

4   Mr. Pendergrass?

5   **A.**   Yes.

6           MR. BROWN:  Your Honor, permission to publish or

7   admit first and then publish it?

8           THE COURT:  Is there any objection?

9           MS. DURRETT:  I don't object to it, Your Honor.

10          THE COURT:  All right.

11  **Q.**   **(BY MR. BROWN)**  So you testified that this is a check in

12  the amount of $5184; is that correct?

13  **A.**   Yes.

14  **Q.**   Is this a check that you actually received in your P.O.

15  Box that you controlled?

16  **A.**   Yes, it was.

17  **Q.**   Okay.  Do you -- did you give all the checks to

18  Mr. Pendergrass or just this one check?

19  **A.**   No.  I gave all of them to him.

20  **Q.**   Why was this check just deposited into the account, if you

21  know?

22  **A.**   Mr. Pendergrass did not want what happened at SunTrust and

23  PNC to happen with this Bank of America check.  So he was going

24  to sprinkle or drop the checks in the Bank of America check

25  periodically so it wouldn't make -- it wouldn't raise any red

1   flags.

2   **Q.**   Mr. McQueen, did you have any control over the Lee Family

3   Trust Bank of America account?

4   **A.**   No, I did not.

5   **Q.**   Did you have signing authority?

6   **A.**   No, I did not.

7   **Q.**   Did you have a debit card?

8   **A.**   No, I did not.

9   **Q.**   Who controlled that account?

10  **A.**   Mr. Pendergrass controlled that account.

11          MR. BROWN:  Your Honor, I have about probably half an

12  hour more to go with him.  I don't know if you want to break

13  for the day or we want to keep going.

14          THE COURT:  Are you at the end of the subject matter?

15          MR. BROWN:  I can stop here, yes, Judge.

16          THE COURT:  All right.  Ladies and gentlemen, then

17  we'll continue tomorrow and hopefully begin on time.  I don't

18  have anything I have to deal with them first on.  So I think

19  we'll be able to.

20          But I want to just -- to make sure that you are not

21  sitting for too long, I want to chat with counsel about our

22  schedule a little bit.  If you would just hang out for a minute

23  or two in the jury room, then I'll get -- once we figure this

24  out, I'll get Mr. Martin to come back and tell you for sure

25  that it is 9:30 rather than later.  Thank you very much.

```
 1              (The jury exited the courtroom at 4:50 P.M.)

 2              THE COURT:  Sir, you're going to be excused for this

 3    afternoon.  But please don't discuss your testimony with anyone

 4    whatsoever, and we'll see you tomorrow morning.  And counsel

 5    will tell you exactly -- I don't know whether you want to keep

 6    him on hold.

 7              MR. BROWN:  Your Honor, his attorney is here.  I'll

 8    let Jeff Ertel know, Judge.

 9              THE COURT:  Mr. Ertel, I'm not quite sure.  So maybe

10    you want to have your client -- him sit outside, and then you

11    can chat with him about the time.  Because I'm not sure when

12    we're going to start exactly.  I wanted to talk to them.  It

13    will just be a minute or two.

14              MR. ERTEL:  Don't chat with them about anything?

15              THE COURT:  Just about the fact -- no.  I want him to

16    know when we are beginning -- we'll need him tomorrow.  And I

17    won't know until I get to talk to counsel for a few minutes.

18              MR. BROWN:  I'll let you know what time.  I will come

19    out and tell you.

20              THE COURT:  You may step down.

21              (The witness exited the courtroom.)

22              THE COURT:  I'm just trying to -- we're going to try

23    to send you the draft of the jury charge later tonight.  And

24    so, you know, I hate to keep the jury waiting at lunchtime.  It

25    doesn't look like we're going -- it looks like we'll finish
```

234

```
 1   tomorrow.  But I don't think that we're going to finish in time
 2   for -- it seems likely for closing arguments.
 3            But if you think -- or for us -- you know, I'm just
 4   thinking the time is short.  But I don't know how long your
 5   cross-examination will be.
 6            MS. DURRETT:  If it is half as long as the
 7   Government's, it is going to be a long one.  So I don't know.
 8            THE COURT:  Yeah.
 9            All right.  So it seems more sensible to me to just
10   start at 9:30 rather than having them come in late and go as
11   long as we need to and then have the conversation about the
12   jury instructions.  Okay?
13            MR. BROWN:  I think so, Judge.
14            MS. DURRETT:  So if we finish, would we do closings
15   tomorrow?
16            THE COURT:  No.  We have got to do the jury
17   instructions.  I don't want to be -- anything that can go wrong
18   with even the production of the jury instructions can go wrong.
19   And, you know, I really like to get counsel also to help me in
20   proofing in some ways because we always miss something.
21            MR. BROWN:  Judge, may I give you just a little
22   bit -- I have one more witness, Judge, after Mr. McQueen.  The
23   last witness is a case agent who reviewed the financial
24   documents.
25            So I figured I would front this issue.  There seems
```

1    to be an objection about these bank records.

2         THE COURT:  All right.  Just one second.

3         You let them know about 9:30.

4         Go ahead.

5         MR. BROWN:  I have tried many fraud trials.  I have

6    an investigator who has reviewed these records and will testify

7    about his review and analysis.  I provided defense counsel two

8    summary charts so as to not go through a tedious review of

9    these records.  It is relevant to show how the money was

10   spent -- the fraudulent funds were spent.

11        And that is what the Government will do with this

12   witness so the jury can understand how the money came in and

13   how it was spent.

14        And I expect that shouldn't take too long, Your

15   Honor, but I want to let you know.  And I don't expect any

16   additional objections to the records.

17        I think I spoke with Ms. Durrett, and she is going to

18   allow the records to come in.

19        So I'm just a little confused what the issue is with

20   me looking at them with Mr. McQueen when he --

21        THE COURT:  You mean we're talking about the records

22   we just have been discussing?

23        MR. BROWN:  Right.  Yes.  Because he has intimate

24   knowledge of the actual records himself.  But that is

25   nonetheless.  I just want to give you a heads-up where we are

1   going, Judge.

2          MS. DURRETT:  I mean, I agree with that, Your Honor.

3   I do think it is inappropriate for Mr. McQueen to be going

4   through the bank records and talking about them.

5          But I assume that the investigator will say that was

6   part of his investigation was looking at the bank records.  And

7   they do have a certification.  So we would not object to them

8   coming in.

9          MR. BROWN:  So then my last point -- I'm not going to

10  beat a dead horse.  I'm not -- I'm not going to use Mr. McQueen

11  for that.  But there are particular checks, like I showed some

12  of them before, to come in.

13         So I showed you one from this exhibit.  So the

14  Government's position would be that Exhibit 25 should come in

15  and he should be able to review evidence that is relevant to

16  him, like the check I just showed that he actually gave to

17  Mr. Pendergrass to deposit into the account.  That is relevant.

18         I just want to show the connection between the two

19  and how the money flowed.  And I think that is relevant for

20  this witness to do that.  And I just want to put that out

21  there, especially if the evidence is coming in anyway.  It has

22  already been -- it is going to be admitted without objection,

23  Judge.

24         MS. DURRETT:  Your Honor, I do object to that of him

25  going through -- he has said what I know about the bank account

237

```
1    is I was outside when the bank account was opened.  And so then
2    Mr. Brown is, like, well, let's go through the records then and
3    have you tell us about the records.
4              He doesn't know about the bank records.  He may have
5    received checks, and he can testify about that if he wants to
6    show him his individual checks.
7              But the idea that this guy who stood outside the bank
8    when the bank account was opened can now tell us he knows about
9    the records --
10             THE COURT:  Well, there are other ways he could know
11   about the records.  But I -- but he hasn't professed to such
12   knowledge.
13             MR. BROWN:  Understood, Judge.  I understand where
14   you are coming from.  I respect --
15             THE COURT:  If there is a check that he has knowledge
16   of or a document that is within this, that is okay.
17             MR. BROWN:  Okay.  Thank you, Judge.
18             THE COURT:  All right.
19             MR. BROWN:  Has 25 been admitted yet?  I want to make
20   sure I am clear.
21             THE COURT:  No.  No, it has not been admitted yet.
22   Just the one part of it that you had him testify about.
23             MR. BROWN:  For the sake of clarity, can I admit it
24   because she's not going to object?  I'm not going to talk with
25   this witness about it.
```

```
 1              THE COURT:  I didn't hear that she wasn't going to
 2   object.
 3              MS. DURRETT:  Right.
 4              Is there an agent who is coming?  If they are
 5   admitted through the agent, I don't have an objection.
 6              MR. BROWN:  Thank you, Your Honor.
 7              MS. DURRETT:  I know things will go as long as they
 8   go.  I'm back to wondering about when my witnesses should be
 9   here because I know we have Mr. McQueen starting at 9:30.
10              THE COURT:  It doesn't seem like your witnesses --
11              MS. DURRETT:  Probably 1:00?
12              THE COURT:  -- will be reached until the afternoon.
13   You still have to factor lunch in.
14              MS. DURRETT:  Thank you, Your Honor.
15              THE COURT:  So -- and your examination of all of
16   these people.  So it doesn't seem very likely.
17              MS. DURRETT:  Yeah.  Thank you, Your Honor.
18              THE COURT:  If you -- but I would like to sort of get
19   this 404(b) issue behind me so -- because we have lots of other
20   issues in front of us.
21              So you asked to be heard, and I was going to give you
22   an opportunity to be heard.
23              MR. BROWN:  Now or later?
24              THE COURT:  Now.  Because I want to deal with it.
25   We'll have so many other --
```

1          MR. BROWN:  I know.  Right.  Well, I see where this

2     is going.

3          But thank you, Judge, for giving me the opportunity

4     to be heard.  I appreciate it.

5                **(There was a brief pause in the proceedings.)**

6          MR. BROWN:  So the Government believes that the

7     evidence is necessary and is relevant, Your Honor.  The

8     Government withdrew and did not object to the other conviction

9     from Ohio coming in because I think it is a different kind of

10    case.

11         But this case -- we're, in fact, talking about Tousa

12    Homes.  It has already been admitted into evidence relating to

13    Mr. Pendergrass's involvement with Tousa Homes.

14         The defense argument is clear as related:  He lacked

15    the knowledge, the intent involved with these kind of crimes.

16    The evidence, I think, is clear.  The case law is on the

17    Government's side on the admission.

18         Always the Court has wide discretion.  The case law

19    is on the Government's side of this kind of 404(b) coming in.

20    It matches up in time, parties, scope, conduct.  It lines up on

21    every particular way the Court would judge whether this

22    evidence should come in.

23         So therefore -- and I don't think it is more

24    prejudicial than probative.  It is probative.  Why is it

25    probative?  Because it establishes the very knowledge and

1    intent he is denying.

2            Your Honor, I mean, this case is -- I have cited the

3    case law in my brief.  And I can cite 20 more cases where the

4    Eleventh Circuit will affirm the use of a 404(b) in this

5    particular kind of case.  It is directly on point.

6            This is what the 404(b) rule was meant for, Your

7    Honor, and I think you should allow the Government to use it.

8    I can cite you many more cases if you want some that will show

9    that the Eleventh Circuit will affirm this kind of use of

10   404(b).

11           THE COURT:  The 404(b) in this context is really a

12   judgment -- a judgment call.  It is not like I'm worried

13   about -- either way about what the Eleventh Circuit would do.

14   I feel comfortable that they will leave it to my discretion.

15           But you have put up a mountain of evidence.  And I

16   have let you with this most recent evidence also get more

17   specific evidence about the Lee Trust in so that they can see

18   that.

19           But, you know, basically also there is the strong

20   cautionary concern that a court should be mindful that prior

21   crime evidence has a significant potential for prejudicial

22   effect and therefore should not be allowed in unless really

23   necessary.

24           So as you well know, if the Government has a weaker

25   case, let it in.  If the Government has a strong case without

1   the extrinsic evidence, the prejudice will more likely outweigh

2   the marginal probative value.

3            And my assessment is -- given the strength of the

4   Government's case and the nature of the evidence introduced is

5   the Government does not need such evidence here and that

6   fairness dictates that I exclude it at this juncture.

7            I have considered this as we have heard all of the

8   evidence.  I wasn't sure before.  But, you know, you have had

9   an array of witnesses and a large volume of documentary

10  evidence and more to come.

11           So I'm just -- you know, because we have the time

12  today to address it and we talked about it, I just at this

13  juncture feel like that I can rule.  And it will be one less

14  thing to rule on.

15           I don't think anything is going to change about this.

16  Given what I see also from this witness, your last witness

17  yesterday, all of the other individual witnesses, you have just

18  really -- there is a whole array of strong evidence that you

19  have presented here.

20           And that is -- I don't think this is essential.  But

21  it does have a prejudicial impact that is unnecessary under

22  those circumstances.  So I'm going to exclude it.

23           MR. BROWN:  Thank you, Judge.

24           THE COURT:  To that extent, you know, I will modify

25  my prior ruling and to that limited degree, which is not really

1    the issue that you dealt with in the motion for -- for

2    reconsideration.  But I fully -- but I addressed it.  And so to

3    that extent, I modify my prior ruling.

4              MS. DURRETT:  Thank you, Your Honor.

5              MR. BROWN:  Thank you, Judge.

6              THE COURT:  All right.  So it sounds like we're going

7    to have a jam-packed day again.

8              MR. BROWN:  Yes.

9              THE COURT:  And -- okay.  We'll try to get you the

10   jury charges tonight so you can look at them.  But I don't know

11   precisely when.

12             All right.  Thank you, Counsel.

13             MR. BROWN:  Thank you, Judge.

14                  **(The proceedings were thereby adjourned at 5:04**

15                  **P.M.)**

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of
the United States District Court, for the Northern District of
Georgia, Atlanta Division, do hereby certify that the foregoing
242 pages constitute a true transcript of proceedings had
before the said Court, held in the City of Atlanta, Georgia, in
the matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the
5th day of January, 2022.




                              _____
                              SHANNON R. WELCH, RMR, CRR
                              OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT