The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
2                             ATLANTA DIVISION

3    UNITED STATES OF AMERICA,        :
                                      :
4    vs.                              :  DOCKET NUMBER
                                      :  1:17-CR-0224-1
5    ALLEN J. PENDERGRASS,            :
                                      :  ATLANTA, GEORGIA
6              DEFENDANT.             :  DECEMBER 2, 2021

7

8        TRANSCRIPT OF JURY TRIAL - VOLUME III OF IV PROCEEDINGS

9              BEFORE THE HONORABLE AMY TOTENBERG

10            UNITED STATES SENIOR DISTRICT JUDGE

11

12   APPEARANCES OF COUNSEL:

13        FOR THE GOVERNMENT:

14        JEFFREY A. BROWN
          TRACIA M. KING
15        UNITED STATES ATTORNEY'S OFFICE

16
          FOR THE DEFENDANT:
17
          SARALIENE DURRETT
18        SARALIENE SMITH DURRETT, LLC

19        SYDNEY R. STRICKLAND
          STRICKLAND WEBSTER, LLC
20

21
         MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED
22                        TRANSCRIPT PRODUCED BY:

23   OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
                                     2394 UNITED STATES COURTHOUSE
24                                   75 TED TURNER DRIVE, SOUTHWEST
                                     ATLANTA, GEORGIA  30303
25                                   (404) 215-1383
```

1          **I N D E X   T O   P R O C E E D I N G S**

2              **THE GOVERNMENT'S CASE (Continued)**

3          **WITNESS**                                    **PAGE**

4    TERRELL L. MCQUEEN

5          Voir Dire Examination
           By Mr. Brown                                39
6          Voir Dire Examination
           By Ms. Durrett                              40
7          Voir Dire Examination (Continued)
           By Mr. Brown                                42
8
     TERRELL L. MCQUEEN
9
           Direct Examination (Continued)
10         By Mr. Brown                                54
           Cross-Examination
11         By Ms. Durrett                              97
           Redirect Examination
12         By Mr. Brown                               170
           Recross-Examination
13         By Ms. Durrett                             171

14   SPECIAL AGENT WESLEY COOPER

15         Direct Examination
           By Mr. Brown                               182
16
     RULE 29 MOTION
17
       Argument
18       by Ms. Durrett                               211

19              **THE DEFENDANT'S CASE**
           **WITNESS**                                    **PAGE**
20
     JANE HOLMES
21
           Direct Examination
22         By Ms. Durrett                             223
           Voir Dire Examination
23         By Mr. Brown                               225

24                         * * *

25   CERTIFICATE                                       243

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1              P R O C E E D I N G S
 2    (Atlanta, Fulton County, Georgia; December 2, 2021.)
 3    THE GOVERNMENT'S CASE (Continued).
 4              THE COURT:  Good morning.
 5              MR. BROWN:  Good morning.
 6              THE COURT:  Have a seat.
 7              MR. BROWN:  Your Honor, could I raise one matter with
 8    you?
 9              THE COURT:  Yes.
10              MR. BROWN:  So I'm sure you saw the email from
11    Ms. Durrett relating to a woman and her friend who were in
12    court yesterday.
13              THE COURT:  Right.
14              MR. BROWN:  And I just want to disclose to the Court:
15    During our 3:00 break, when I was leaving, she kind of waved me
16    over and I was talking with her.  She mentioned that she was a
17    victim of a fraud or former girlfriend maybe of the defendant.
18              And she started crying.  She was visibly upset.  So I
19    took her out of the room, and I wanted to have her talk to the
20    agent.  So I brought her in the victim -- witness room, rather,
21    Judge.  And I asked the agent to talk with her and find out
22    what her complaints were about and calm her down.
23              But during my walk over there with her, she was
24    beginning to tremble.  She was very emotional.  She said I have
25    tried everything.  I sued him in civil court.  He won't show
```

1    up.  He keeps hiring different attorneys.  I'm just going to

2    have to kill myself.

3            I said, whoa, you are not going to kill yourself.

4    Calm down.  Let me have you talk to the agents.  Maybe they can

5    offer some help or direct you to state authorities that can

6    help you.

7            So that is all that I knew about it.  And then after

8    the end of the day, I heard additional information.  And

9    Ms. Durrett can fill you in on whatever she wants to, Judge.

10           THE COURT:  Thank you very much.

11           MS. DURRETT:  Your Honor, I was in this room during

12   that -- I think that part of the break.  I went out when the

13   Court released us for a break.  And then Mr. Pendergrass and I

14   came back into the courtroom together to look at something

15   about 20 after.  And I didn't know anything else about anything

16   that was happening until after court was released around --

17   whenever we left -- 5:00.

18           I went back into the office.  And Ms. Strickland

19   said, hey, this woman just approached me and said, did you know

20   that Mr. Pendergrass committed fraud against me?  She's out in

21   the hallway.  And then --

22           THE COURT:  I'm sorry.  This woman -- the woman who

23   approached her was the mother or the daughter?

24           MS. DURRETT:  I don't know, Your Honor.  I don't

25   know.

```
 1              THE COURT:  Or friend?

 2              MS. DURRETT:  All right.  And then at the same time,

 3   our paralegal was also in the room with us when Ms. Strickland

 4   was telling me that.

 5              THE COURT:  Slow down.

 6              MS. DURRETT:  And they both told me that during that

 7   break when I was not in the room they heard people yelling or

 8   heard that woman yelling.  I think -- Ms. Strickland can say

 9   what she saw.  But I think she --

10              THE COURT:  Slow down.

11              MS. DURRETT:  I'm sorry.  I think she walked by the

12   room and --

13              THE COURT:  Who did?

14              MS. DURRETT:  Ms. Strickland at the 3:00 break and

15   saw the woman and the woman was yelling.  And the paralegal and

16   our investigator say they heard profanities and the word

17   attorney and things like that and the door was open.

18              And that is all I know.

19              THE COURT:  And were there -- there was some mention

20   of -- were there any witnesses actually in the --

21              MS. DURRETT:  Your Honor, I'm going to let

22   Ms. Strickland talk.  I don't know.

23              THE COURT:  That's fine.

24              MS. STRICKLAND:  And I don't know the answer to that,

25   Your Honor.  The door was open.  I kind --
```

1          THE COURT:  The door of where the -- where the agents
2    were with her?

3          MS. STRICKLAND:  Yes, Your Honor.  So that door was
4    open.  And so I was standing by the entry over here.  And I
5    could hear her screaming.  And she was saying what Ms. Durrett
6    said and also screaming that she was a victim.

7          I don't know -- so I walked back by trying to, you
8    know, kind of see who it was.  I could see -- I didn't put it
9    together until she stopped me on the way out of the courtroom.

10          THE COURT:  And that was after court was through?

11          MS. STRICKLAND:  Yes, Your Honor.

12          And what she said to me at that point, I believe, was
13    actually, do you know your client is stealing a house from me?

14          So I don't know if there was anyone else in the
15    witness room or not.  I could just see her and the agent.  But
16    I couldn't see all the way in the room.

17          MS. DURRETT:  The client just wanted us to point out
18    that she was sitting in court.  I don't know how much of the
19    day or how many days.

20          THE COURT:  I gather that she had been sitting in the
21    court at least yesterday; is that right?

22          COURTROOM DEPUTY CLERK:  Yes.  Most of the day.

23          THE COURT:  Most of the day.

24          MR. BROWN:  Your Honor, my agents are here that were
25    speaking with her.  I spoke with Agent Rintoul.  He's a United

1   States Postal Inspection Agent.  He stated that they were

2   talking loud at the 3:00 break.  He did not describe her as,

3   you know, yelling or screaming or make anything particular but

4   she was very upset.  That is when I brought her in.  She was

5   really sobbing and shaking and crying.

6          Mr. Rintoul told me that after court broke and after

7   the jury was gone that is when she confronted the defendant

8   outside and made some statements to him.

9          But if you want to hear from him, you are more than

10  welcome.  But I just -- in full disclosure, he is able to tell

11  you more, Judge.

12          MS. DURRETT:  Your Honor, that is the first I have

13  heard that she confronted the defendant.  Mr. Pendergrass is

14  saying she was standing there and he did not talk to her.  I

15  had not heard that, that she confronted the defendant.

16          MR. BROWN:  I mean, I think we're getting verbiage

17  confused.  Confronted -- I think she was making statements in

18  his direction when she saw him.  I don't know if that is

19  defined as a confrontation, Judge.

20          THE COURT:  All right.  You were concerned,

21  Ms. Durrett, that the jury members may have heard.

22          Is there -- did you see any jury -- did any of you

23  see any jury members?

24          MS. DURRETT:  Well, I'll just note:  As far as my own

25  personal perspective, every day that we have been here when I

1  have come back and forth into the courtroom, sometimes I see

2  jurors waiting outside either by the elevator, by the

3  courtroom.  I see them walking down the hall.

4         Obviously we try not to have any interaction with

5  them.  But we do see them in the hallways and out by the

6  courtroom.

7         So if that person was out in those areas, certainly

8  they could have had contact.  I don't know that they did.

9         So that was my concern and particularly because --

10  well, now, one, that she came up and definitely addressed

11  Ms. Strickland about it.  And also now I'm hearing that she was

12  maybe saying things to my client.

13         It is possible she was saying things to the jury.

14  That was my concern.

15         THE COURT:  I mean, it is a delicate -- do you wish

16  me to ask anything -- I'm not talking about the jury now.  I'm

17  just talking about the agents.

18         Do you want me to ask anything of the agents?

19         MS. DURRETT:  Your Honor, I don't mind if you ask

20  them what happened.  I mean, the report that I have are the

21  words motherfucker, the words attorney, and screaming.  That is

22  what I --

23         THE COURT:  Well, let me start out with the agents

24  just simply --

25         MS. DURRETT:  That is what has been reported to me.

1          THE COURT:  -- to get a brief understanding from

2    them.

3          Let me just say before we get them:  I mean, the

4    thing about the jury -- and I do -- one has to be very delicate

5    because I don't want them to suggest -- put anything else that

6    is extraneous into their minds as to somebody being aggrieved

7    because that would be prejudicial to the defendant and would

8    upset the apple cart, too.

9          You know, it is going to be a careful thing.  We

10   have -- because when I learned of this, I was concerned not

11   just about the trial but about human safety.  And so we did

12   alert the Marshals Office.  And we had kind of heightened

13   protocols to ensure that these individuals who normally have a

14   right to attend the trial -- be in the house -- in the

15   courthouse and to attend are at least screened in case she gets

16   more upset and would bring a weapon and also would be escorted

17   up here.

18          But I mean, we obviously can't have a repeat of this.

19   It is extremely distracting.  So I don't know whether she will

20   appear.  They came a little bit late, I understand, you know,

21   not right at the start of the trial last time.

22          If she does appear, I know that Mr. Martin has

23   asked -- did you ask the Marshals Office to interview her?

24          COURTROOM DEPUTY CLERK:  No, ma'am, I did not.  Just

25   that -- to identify her at the entry point to make sure that

1    she was thoroughly screened and to escort her to the courtroom.

2            She caused no issue in the courtroom yesterday.

3    So --

4            THE COURT:  Yeah.  I think you would still need to go

5    out, frankly, and talk with her and just --

6            COURTROOM DEPUTY CLERK:  I will absolutely do that.

7            THE COURT:  -- make sure we didn't have any outburst

8    in the hallway and that -- because that is -- you know, having

9    any outburst in the hallway --

10           COURTROOM DEPUTY CLERK:  If they escort her up today,

11   I will definitely speak with her.

12           THE COURT:  Did you have something, Annie?

13           COURTROOM DEPUTY CLERK:  No.  That is something else.

14           But I did emphasize with the jury prior to starting

15   that if anybody should try to talk to them about anything that

16   they were to bring it to me immediately so I could notify the

17   judge.

18           I was with them yesterday when I released them.  And

19   I made myself available this morning.  No one has said a word

20   to me.

21           MS. DURRETT:  Okay.

22           MR. BROWN:  All right.

23           THE COURT:  All right.  Let me just hear from the

24   agents.

25           MR. BROWN:  Yes, Judge.

```
 1               THE COURT:  If we could get them one at a time
 2      though.
 3               MR. BROWN:  Okay.  Your Honor, this is Agent Shelton.
 4      He was present during both incidents yesterday afternoon.
 5               So do you want to swear him or just have him come up
 6      and talk to you?
 7               THE COURT:  He can just come up and speak.
 8               MR. BROWN:  You can come on and approach.  You can
 9      just stand there, take your mask off, and tell the Judge what
10      you saw and heard.
11               AGENT SHELTON:  Jeffrey, Jake, Shelton.
12               THE COURT:  I'm sorry.  How do you spell your last
13      name?
14               AGENT SHELTON:  S-H-E-L-T-O-N.
15               THE COURT:  Go ahead, Mr. Shelton.
16               AGENT SHELTON:  At the 3:00 break, she came into the
17      room, and I escorted Mr. McQueen back --
18               THE COURT:  A little louder, please.  Thank you.
19               AGENT SHELTON:  -- back outside the courtroom after
20      one or two minutes once she started talking to the agents that
21      were in the witness room.  So that one, I'm not sure what
22      happened in the room.  But I didn't hear anything standing
23      outside the courtroom.
24               But at the end of the day, we were in the room about
25      10 or 15 minutes after court had broken.  She was -- you know,
```

1   she wasn't yelling at that point.  She was upset.  It was

2   louder than a normal conversation.  But she wasn't yelling in

3   the hallway.  But I did hear her making the comments at the

4   direction of the defendant.

5           THE COURT:  And what were those comments?

6           AGENT SHELTON:  It was along, you took my home,

7   comments like that.

8           THE COURT:  Did you hear her swearing at any point

9   either at 3:00 -- in the 3:00 break or yelling or later on?

10          AGENT SHELTON:  I did not hear any swearing either

11  time.

12          THE COURT:  Did you hear her yelling at any time?

13          AGENT SHELTON:  Not yelling, no.

14          THE COURT:  You weren't in the room?

15          AGENT SHELTON:  I was not in the room at the

16  3:00 break, correct.  I was outside the courtroom with the

17  witness.

18          THE COURT:  All right.  Okay.  Thank you very much,

19  sir.

20          Were there any other questions you had?

21          MS. DURRETT:  No, Your Honor.

22          THE COURT:  All right.  Thank you.

23          MR. BROWN:  Do you want to hear from anyone else?

24          THE COURT:  I wanted to hear from each of them.

25          MR. BROWN:  Could you ask Agent Rintoul to come in,

1    please.

2              AGENT RINTOUL:  Good morning, Judge.

3              THE COURT:  Good morning.  Can you state your name

4    for the record?

5              AGENT RINTOUL:  Matt Rintoul.

6              THE COURT:  Thank you, Mr. Rintoul.  Would you be so

7    kind as to tell us where you were sitting at approximately

8    3:00.

9              AGENT RINTOUL:  Around 3:00 P.M., I was in the

10   witness waiting room seated at the table there as you walk in

11   on the right-hand side.

12             THE COURT:  And did you have any interaction with one

13   of the individuals attending the hearing?

14             AGENT RINTOUL:  We did.

15             THE COURT:  Tell us about that.

16             AGENT RINTOUL:  She came into the room and said that

17   she was a victim of Mr. Pendergrass and proceeded to try and

18   explain her situation to us.

19             THE COURT:  Was she upset at that time?

20             AGENT RINTOUL:  Pardon?

21             THE COURT:  Was she upset at that time?

22             AGENT RINTOUL:  She was emotional.  Yes.

23             THE COURT:  Can you kind of describe that to me?

24             AGENT RINTOUL:  Yeah.  She was emotional.  She was

25   shaking.  There were tears in her eyes.  She wasn't overly

1   loud.  She wasn't screaming or anything.  But her voice was

2   just a bit above regular conversational level.

3           And we spoke to her for a few minutes.  And the other

4   agent present gave her a card so that they could talk later at

5   another time not in this venue.

6           THE COURT:  Did she swear at all?

7           AGENT RINTOUL:  I don't recall hearing any swear

8   words, no, Judge.

9           THE COURT:  Did she leave you at that time?

10          AGENT RINTOUL:  She left shortly thereafter, yes, a

11  few minutes later.  And I believe she would -- she said she was

12  coming back out to the courtroom.

13          THE COURT:  Did you see her again later?

14          AGENT RINTOUL:  Yes.

15          THE COURT:  Tell me about the second occasion.

16          AGENT RINTOUL:  The second time would have been

17  perhaps between 5:00 or 5:20.  It was after jurors were -- had

18  gone.  And I guess Mr. Pendergrass was coming back towards

19  their prep room.

20          This lady -- her name is Ms. Brice.  This lady came

21  into the doorway of the witness prep.  And then I guess right

22  about the same time Mr. Pendergrass was coming, she confronted

23  him.  And, again, she wasn't overly loud.  Didn't threaten

24  anything -- any violence or anything.

25          But she said something to the effect that you -- I'm

1  going to get my house back, or you took my house from me.  And

2  I don't know exactly -- I don't recall exactly words.  I

3  couldn't really hear it that well.

4        But then I got up and told her she needed to try and

5  control her emotions and she didn't want to cause a problem

6  with the Marshals Service or anything going on with the trial,

7  that she needed to calm down.

8        THE COURT:  Her voice was louder though at that time

9  when you were calming her down or not?

10       AGENT RINTOUL:  It was about the same.  She wasn't

11  screaming.  She was controlled to the point where it was just a

12  little above regular conversational.

13       THE COURT:  Did you hear her swearing at that time?

14       AGENT RINTOUL:  No, ma'am, I didn't.

15       THE COURT:  Was there anyone with her on either of

16  those occasions?

17       AGENT RINTOUL:  On the second occasion, there was an

18  older lady, an older Black female.  I don't know her.  I don't

19  know her name.  No, ma'am.

20       THE COURT:  Okay.  And you got her name and it was

21  Ms. Brice?

22       AGENT RINTOUL:  Yes.

23       THE COURT:  Any other questions you want me to

24  pursue?

25       MS. DURRETT:  No, Your Honor.

```
1              THE COURT:  Thank you very much, sir.

2              MS. DURRETT:  Your Honor, I don't know if the Court

3    has other questions.  But certainly our paralegal was present,

4    and I think everyone -- I was not there.  But --

5              THE COURT:  Would you like your paralegal to tell

6    what happened?

7              MS. DURRETT:  Right.  Because otherwise I don't think

8    we would know about this if she wasn't yelling.

9              THE COURT:  All right.

10             MR. STAHEL:  Do I approach?

11             MS. DURRETT:  Yes.

12             MR. STAHEL:  Good morning.

13             THE COURT:  Good morning.  Do you want to share your

14   name with me again?

15             MR. STAHEL:  Sure.  My name is Stephen Stahel.  It is

16   S-T-E-P-H-E-N.  Last name Stahel, S-T-A-H-E-L.

17             Can I go ahead and say what happened?

18             THE COURT:  Yes.

19             MR. STAHEL:  So we broke at 3:00, whatnot.  We had --

20   Mr. Brown was presenting and said we need an afternoon break

21   and you said de facto 15 minutes, I believe.

22             So I approached -- walk around.  The attorney room

23   was open.  I see some people in there.  I mean, I recognized

24   Agent Rintoul was in there.  And then I go in the attorney room

25   because I was working on stuff, as we do, with our
```

1      investigator.

2            And we start hearing screaming.  The attorney room,

3      you know, is adjacent.  The walls may be kind of thin.  But it

4      was loud enough to where the investigator looked at me and was

5      like, what is going on?  Our door was closed.

6            THE COURT:  Your investigator?

7            MR. STAHEL:  Yes.  Our door was closed.  And it just

8      sounded like yelling.  I thought I heard Mr. Brown's voice.

9      But I could have been wrong.

10           I spoke with Sydney about it at 5:00.  She said she

11     saw a lady.  I never saw who was yelling.  I did hear those

12     words that were repeated, which I would rather not.

13           THE COURT:  That Ms. Durrett reported or that

14     Ms. Strickland reported?  The swear words?

15           MS. DURRETT:  You can say them.

16           MR. STAHEL:  Yeah.  Well, Ms. Strickland -- I think

17     her interaction was 5:00.  I might be wrong.

18           MS. STRICKLAND:  No.  My --

19           MR. STAHEL:  You had an early and a post interaction?

20           MS. STRICKLAND:  Yes, I had both.

21           THE COURT:  So what did you hear?  Just tell me.

22           MR. STAHEL:  Yeah.  What are you doing, motherfucker?

23           THE COURT:  Was this at 3:00 or 5:00?

24           MR. STAHEL:  3:00.  3:00.  At 5:00, I heard no

25     escalation of noise.  I didn't know Sydney had a confrontation.

1    And that was that.

2          And I went back in and I said --

3          THE COURT:  Well, so she said -- you heard -- what

4    are you doing, motherfucker?  And was that --

5          MR. STAHEL:  Sorry.  Go ahead.

6          THE COURT:  So explain what you heard exactly.

7          MR. STAHEL:  Yeah.  I just heard loud yelling.  I

8    definitely heard those words.  The investigator thought she

9    heard the word attorney.

10          Afterwards, I talked to defense counsel and said, you

11   know, someone was yelling very loudly in there.  I had concern.

12   Their door was open to the hallway the whole time.  There were

13   kind of people -- I thought people standing around when I came

14   back in.

15          But once I had left the attorney room and opened the

16   door, whatever had happened was over.

17          THE COURT:  Was anyone in the hallway at that time?

18          MR. STAHEL:  I did not see anybody.

19          THE COURT:  When you went into the --

20          MR. STAHEL:  There were people standing around, yeah.

21   Paralegals -- I mean, office staff on the 23rd floor.

22          THE COURT:  Was there anyone from the jury that you

23   could see?

24          MR. STAHEL:  I did not see any jury members.

25          THE COURT:  All right.  Thank you.

```
 1                MR. STAHEL:  Thank you.
 2                THE COURT:  You talked about the 5:00.  You said the
 3   sound was reduced at that time?
 4                MR. STAHEL:  I didn't hear any interaction at
 5   anything until Sydney came in at 5:00 after I was already in
 6   the attorney room and said the lady said something to me.  And
 7   that is when I said, oh.  That is when I put two and two
 8   together.
 9                Sydney said I think earlier it was the lady yelling.
10   I didn't know if it was a witness or somebody else.
11                THE COURT:  Okay.
12                MR. STAHEL:  So I have no knowledge of who.
13                THE COURT:  All right.  Thank you.
14                MR. STAHEL:  Thank you.
15                THE COURT:  Counsel, do you still want me to talk
16   with the jury?
17                MS. DURRETT:  I do, Your Honor.  And now I have a new
18   concern as well that now I just learned that as part of that
19   interaction at 3:00 Mr. Brown was escorting her through the
20   hall as she was upset.
21                And so yeah, I would ask you to question the jurors
22   individually.  And I don't know the right wording.  But there
23   was an incident that happened yesterday.  Do you have any
24   knowledge of that?  Did anyone contact you?
25                I mean --
```

```
 1              THE COURT:  That's fine.

 2              MS. DURRETT:  -- it can be very generic.

 3              THE COURT:  Mr. Brown, is that acceptable to you?

 4              MR. BROWN:  Your Honor, I'll leave it to the Court's

 5    discretion.

 6              THE COURT:  All right.  Very good.

 7              Mr. Martin, would you go back there and just say that

 8    there were circumstances that the Judge just wanted to talk to

 9    them individually about.

10              COURTROOM DEPUTY CLERK:  Okay.  Bring them one at a

11    time?

12              THE COURT:  Uh-huh (affirmative).

13              MR. BROWN:  Your Honor, I have a quick question.

14              You are not going to question them individually, are

15    you?

16              THE COURT:  That was my intention.

17              MR. BROWN:  I mean, that would take a while.  My

18    suggestion would be just to ask if anybody was approached or

19    anybody -- I think you could do that collectively.  And if

20    someone --

21              THE COURT:  Then we can follow up on it.

22              MS. DURRETT:  Your Honor, I object to that.  I would

23    like them to be brought in individually.  I know it is a pain.

24    I know no one likes it.

25              We spent six hours on a witness yesterday.  I know it
```

1     is a pain.  I think they need to be brought in individually.

2          THE COURT:  In an abundance of caution, I will do

3     that.  But I think it will be fast.

4          I mean, I just want to say:  The reason I don't want

5     to do it as a group is because I don't want to infect anyone

6     else and suggest to them that if somebody said yes, there

7     was -- then everybody else is going to be asking them about it.

8          MR. BROWN:  Okay.

9          MS. DURRETT:  And I also think it encourages them to

10    go back and talk about it.  Like, what was all that stuff we

11    were doing?

12         THE COURT:  Well, that's what I meant.

13         COURTROOM DEPUTY CLERK:  Ken brought up a good point.

14         Once we question the juror, instead of having them go

15    back and talk to everybody else, why don't we ask them the

16    question.  If they -- however they answer, then just have them

17    take a seat here until we get the entire jury in.

18         THE COURT:  No.  I mean, we don't want them to go

19    back.  Just find a different room for them to go to at that

20    time.  Because I don't want them listening to each other's

21    statements.

22         I mean, it is a perfectly good point because they

23    will be talking about it if they were to come back.  But they

24    will be talking about each other's statements if they come --

25    you know, what if we have to excuse one person?

1          We have no other room to put them in?

2          COURTROOM DEPUTY CLERK:  I don't know.  Outside of

3   where we have control, no.  But what I'm going to do is I'm

4   going to have them all come to this side.  And then when they

5   get through, I guess we'll put them on that side.

6          COURTROOM SECURITY OFFICER:  We could do that.

7          THE COURT:  Yeah.

8          COURTROOM DEPUTY CLERK:  I mean, we could separate

9   them by room in the back here.

10          THE COURT:  Yeah.  Or you could -- I don't know

11   whether the ceremonial courtroom is being used.

12          COURTROOM DEPUTY CLERK:  I don't have control of them

13   when they go that way though.  They are out in the hallways.

14          THE COURT:  All right.

15          **(There was a brief pause in the proceedings.)**

16          **(The juror entered the courtroom at 10:04 A.M.)**

17          THE COURT:  Good morning.  Have a seat.

18          Would you just state your name for the record so we

19   can make sure the questioning reflects who I'm talking to.

20          JUROR THORNTON:  Rydell Thornton.

21          THE COURT:  Good morning, Mr. Thornton.  An

22   unexpected circumstance occurred yesterday afternoon in the

23   area between the hallway and some of the rooms in the hallway

24   adjacent.

25          And I just wondered if you happened to hear anything

1    that was unusual or see anything unusual between -- in any of

2    these hallways.

3          Any raised voices or somebody being very upset or

4    anything else that was unusual?

5          JUROR THORNTON:  No, Your Honor.  I didn't notice

6    anything.  I didn't notice anything at all.

7          THE COURT:  All right.  Thank you very much.

8          Any concerns about follow-up?

9          I'm just sorry.  One second.

10          MS. DURRETT:  Just has anyone contacted?

11          THE COURT:  Has anyone contacted you at all?

12          JUROR THORNTON:  No, ma'am.

13          THE COURT:  Okay.  Thank you very much.

14          **(The juror exited the courtroom at 10:05 A.M.)**

15          **(The juror entered the courtroom at 10:05 A.M.)**

16          THE COURT:  Hello, how are you?

17          JUROR JONES:  Good morning.

18          THE COURT:  Good morning.  Would you just state your

19    name for the record for the transcript purposes.

20          PROSPECTIVE JUROR:  Sure.  My name is Gayl W. Jones.

21          THE COURT:  I just have a few questions.  An unusual

22    circumstance occurred yesterday afternoon between 3:00 and

23    approximately 5:00 or 5:15 when we let out of court.

24          And I just wanted to check whether you had heard any

25    raised voices or seen anyone yelling in the area outside of the

1    courtroom or just heard it.

2         JUROR JONES:  No, I have not.

3         THE COURT:  Has anyone contacted you?

4         JUROR JONES:  No.

5         THE COURT:  That's it.  Thank you very much.

6         JUROR JONES:  Sure.

7         **(The juror exited the courtroom at 10:07 A.M.)**

8         **(The juror entered the courtroom at 10:07 A.M.)**

9         THE COURT:  Just come a little further in so I can

10   see you, if you wouldn't mind.

11        JUROR CARLISLE:  Right here?

12        THE COURT:  Yes.  That's great.  Thank you very much.

13   Good morning.

14        JUROR CARLISLE:  Good morning.

15        THE COURT:  Would you state your name for the record

16   so that we can be on the transcript.

17        JUROR CARLISLE:  Jacqueline Carlisle.

18        THE COURT:  Ms. Carlisle, I just had a very few

19   questions for you.  An unusual, unexpected circumstance

20   occurred or arose yesterday between around 3:00 and

21   5:15 outside of the courtroom.  And I just wanted to determine

22   whether you heard any heightened voices or any yelling of any

23   type.

24        JUROR CARLISLE:  No, Judge.

25        THE COURT:  Okay.  And has anyone contacted you in

1    any manner from the public or otherwise in the last few

2    hours -- in the hours that day -- yesterday, in other words?

3               JUROR CARLISLE:  No, Judge.

4               THE COURT:  Okay.  Or, otherwise, has anyone

5    contacted you about this matter?

6               JUROR CARLISLE:  No.

7               THE COURT:  Thank you so much.  I appreciate it.

8                    **(The juror exited the courtroom at 10:08 A.M.)**

9                    **(The juror entered the courtroom at 10:09 A.M.)**

10              THE COURT:  Good morning.  Just move a little further

11   in so I can see you.

12              JUROR CURRY:  Good morning.

13              THE COURT:  Would you state your name for the record

14   in this -- for the transcript.  Thank you.

15              JUROR CURRY:  Adrienne Curry.

16              THE COURT:  Thank you.  Ms. Curry, I just have a few

17   questions.  Something unexpected arose yesterday afternoon

18   between approximately 3:00 and 5:15.  And I just wanted to

19   determine whether you had heard any raised voices or yelling

20   yesterday afternoon during the break or when you were leaving

21   the courthouse.

22              JUROR CURRY:  No.

23              THE COURT:  Great.  And has anyone contacted you at

24   all in connection with anything related to this matter?

25              JUROR CURRY:  No.

```
 1              THE COURT:  Excellent.  That is wonderful.  Thank you
 2    very much.
 3              JUROR CURRY:  You're welcome.
 4              (The juror exited the courtroom at 10:10 A.M.)
 5              (The juror entered the courtroom at 10:10 A.M.)
 6              THE COURT:  Mr. Cook?
 7              JUROR COOK:  Hello.
 8              THE COURT:  Hi.  I just had a few questions for you.
 9    Something unexpected arose yesterday between the break around
10    3:00 and 5:15 outside of the courtroom.  And I just wondered in
11    case you were outside at any of those times whether you heard
12    anything unusual or heightened voices or emotional voices.
13              JUROR COOK:  No.  I -- as far as I can remember, I
14    didn't leave or go in that area.
15              THE COURT:  And has anyone contacted you about
16    something that is in -- about this case in any way?
17              JUROR COOK:  They have not.
18              THE COURT:  Okay.  That is terrific.  Thanks so very
19    much.
20              (The juror exited the courtroom at 10:11 A.M.)
21              THE COURT:  I must admit it is very nice to see
22    people's faces and hear their voices like that a little closer.
23              (The juror entered the courtroom at 10:12 A.M.)
24              THE COURT:  Good morning.  Would you just state your
25    name for the record here for the reporter.
```

27

```
 1              JUROR MEDEPALLI:  Lalitha Medepalli.

 2              THE COURT:  Thank you so much.  I just have a few

 3    questions.  Something unusual happened here in the outside of

 4    the courtroom in the area behind -- outside there and going

 5    towards the women's room.  And it happened around -- between

 6    the break at 3:00 and 5:15 when you-all left the courtroom.

 7    And I wanted to ask if you heard anything unusual or any raised

 8    voices or emotional voices.

 9              JUROR MEDEPALLI:  No.

10              THE COURT:  And has anyone contacted you about

11    something -- anything relating to this matter?

12              JUROR MEDEPALLI:  No.

13              THE COURT:  This case?

14              JUROR MEDEPALLI:  No.

15              THE COURT:  Excellent.  That is terrific.  Thank you

16    so much.

17                      (The juror exited the courtroom at 10:13 A.M.)

18                      (The juror entered the courtroom at 10:13 A.M.)

19              THE COURT:  Good morning.  Would you just state your

20    name again for the record for the transcript here.

21              JUROR PHAM:  Yes.  My name is Jonathan Pham.

22              THE COURT:  Mr. Pham, nice to talk with you again.

23    Something unusual happened outside of the courtroom yesterday

24    afternoon between about 3:00 when we took the break and

25    5:15 when court had been adjourned.
```

```
 1            And I just wanted to find out whether you had heard
 2   anything.  Any heightened voices, loud voices or anything --
 3   anything like that yesterday afternoon?
 4            JUROR PHAM:  No, I didn't.
 5            THE COURT:  Okay.  And has anyone approached you
 6   about this case?
 7            JUROR PHAM:  No.
 8            THE COURT:  Excellent.  Thank you so very much.
 9            JUROR PHAM:  You're welcome.
10            (The juror exited the courtroom at 10:14 A.M.)
11            (The juror entered the courtroom at 10:14 A.M.)
12            THE COURT:  Good morning.
13            JUROR FAIREY:  Good morning.
14            THE COURT:  Would you go ahead and just share your
15   name again with the court reporter for the record --
16   transcript.
17            JUROR FAIREY:  Darren Fairey.  Last name Fairey,
18   F-A-I-R-E-Y.
19            THE COURT:  Thanks so very much.  Something unusual
20   happened outside of the courtroom yesterday between the break
21   at 3:00 and also when we all adjourned at 5:00, 5:15.  And I
22   just wanted to find out whether you had heard any heightened
23   voices, loud voices, or anything peculiar happening outside.
24            JUROR FAIREY:  I did not.
25            THE COURT:  Okay.  Has anyone contacted you about
```

1    this case?

2              JUROR FAIREY:  Nope.

3              THE COURT:  Thank you very much.

4                   **(The juror exited the courtroom at 10:15 A.M.)**

5                   **(The juror entered the courtroom at 10:15 A.M.)**

6              THE COURT:  Hello, Mr. Williams.  Would you just

7    state again your name for the record.

8              JUROR WILLIAMS:  Alvin William.

9              THE COURT:  Mr. Williams, something unusual or

10   unexpected occurred outside the courtroom yesterday between

11   the -- around the time of the break and when we adjourned.  And

12   I just wanted to find out if you heard anything unusual.

13             Heightened voices, yelling, or anything like that?

14             JUROR WILLIAMS:  No, ma'am.

15             THE COURT:  And has anyone contacted you about this

16   case?

17             JUROR WILLIAMS:  No, ma'am.

18             THE COURT:  Excellent.  Thank you so very much.

19                   **(The juror exited the courtroom at 10:16 A.M.)**

20                   **(The juror entered the courtroom at 10:17 A.M.)**

21             THE COURT:  Just take it down a little further.  So

22   this will be very quick.  I just want to make sure we can hear

23   you.

24             JUROR SADHU:  Okay.

25             THE COURT:  Good morning.  Would you just state your

1    name for the record again so we have it in the transcript.

2            JUROR SADHU:  Saritha Sadhu.

3            THE COURT:  Ms. Sadhu, I wanted to ask you this:  We

4    had something somewhat unusual happen outside the courtroom

5    between about 3:00 when we took the break and 5:15 when

6    everyone left.  And I just wanted to find out if you had heard

7    any loud voices, heightened voices, or something unusual

8    happening outside?

9            JUROR SADHU:  No.

10           THE COURT:  Okay.  Has anyone contacted you about

11   this case?

12           JUROR SADHU:  No.

13           THE COURT:  Great.  Thank you so very much.

14           JUROR SADHU:  Thank you.

15           **(The juror exited the courtroom at 10:17 A.M.)**

16           **(The juror entered the courtroom at 10:18 A.M.)**

17           THE COURT:  Good morning, Mr. Bragg.  Would you just

18   state your name again for the record for the transcript.

19           JUROR BRAGG:  Samuel Bragg.

20           THE COURT:  Mr. Bragg, something unexpected happened

21   outside of the courtroom yesterday between about 3:00 when we

22   took the break and also 5:15 when we -- jurors left.  And I

23   wanted to find out if you had heard any heightened voices,

24   anything unusual, or loud voices in that time period.

25           JUROR BRAGG:  Let me think.  Nothing caught my

1  attention.

2         THE COURT:  Okay.  And has anyone contacted you about

3  this case?

4         JUROR BRAGG:  No.

5         THE COURT:  Great.  Thank you so very much.  I

6  appreciate it.

7                  **(The juror exited the courtroom at 10:19 A.M.)**

8                  **(The juror entered the courtroom at 10:19 A.M.)**

9         THE COURT:  Good morning.  Would you just go ahead

10  and again state your name for the record.

11         JUROR DELEA:  Maryann Delea.

12         THE COURT:  Ms. Delea, did anything unusual

13  whatsoever occur that you recall outside of the courtroom

14  between 3:00 and 5:15 when you -- like at the time of the break

15  or when you left the courtroom?

16         JUROR DELEA:  Not that I'm aware of.

17         THE COURT:  Did you hear any heightened voices or --

18         JUROR DELEA:  No.

19         THE COURT:  And has anyone contacted you about this

20  case?

21         JUROR DELEA:  No.

22         THE COURT:  Great.  Thank you so very much.

23                  **(The juror exited the courtroom at 10:19 A.M.)**

24                  **(The juror entered the courtroom at 10:20 A.M.)**

25         THE COURT:  Mr. Allen, good morning.  Would you just

1    state your name again for the record for the transcript.

2            JUROR ALLEN:  My name is Akin Allen.

3            THE COURT:  Thank you.  I just wanted to know -- ask

4    you about this.  We had a somewhat unusual event occur outside

5    of the courtroom around the time of the break and also after

6    you-all had been excused at 5:00ish.  And I wondered if you had

7    heard any heightened voices or loud voices at that time, either

8    when you were on break or when you left the court.

9            JUROR ALLEN:  I didn't, no.

10           THE COURT:  You did not hear anything?

11           JUROR ALLEN:  No.

12           THE COURT:  And has anyone contacted you about this

13   case?

14           JUROR ALLEN:  No, ma'am.

15           THE COURT:  Wonderful.  Thank you so very much.

16                   **(The juror exited the courtroom at 10:21 A.M.)**

17                   **(The juror entered the courtroom at 10:21 A.M.)**

18           THE COURT:  Mr. Owens, hi.  Good morning.  Would you

19   just state your name for the record again for the transcript.

20   Thank you.

21           JUROR OWENS:  Johnny Owens III.

22           THE COURT:  Okay.  Mr. Owens, something just

23   unexpected happened outside of the courtroom yesterday around

24   the time of the break -- in the 3:00 break and after.  And I'm

25   just wondering whether you heard anything like heightened

1   voices or emotional voices at that -- either when you were on

2   break or when you left the courthouse after you were through

3   with the proceeding yesterday.

4            JUROR OWENS:  No, I haven't.

5            THE COURT:  And has anyone contacted you about this

6   case?

7            JUROR OWENS:  No.

8            THE COURT:  Thank you so very much.  I appreciate it.

9            **(The juror exited the courtroom at 10:22 A.M.)**

10           THE COURT:  Well, that is good news.

11           MS. DURRETT:  Thank you, Your Honor.

12           MR. BROWN:  Your Honor, I'm going to call

13  Mr. McQueen, or do you want to wait until you call the jury

14  out?

15           THE COURT:  You can call Mr. McQueen up.

16           MS. DURRETT:  Your Honor, the Government has told me

17  they are going to offer an exhibit.  I don't know if it is

18  through this witness.  But I know we're going to have some

19  discussion about it.

20           THE COURT:  All right.  Which exhibit so we can deal

21  with it now?

22           MR. BROWN:  It is another notebook, Judge.  It is an

23  original notebook.  This is a notebook that contains several of

24  the information that has already been admitted at the trial,

25  Your Honor.  It is just original copies that were actually

 1   contained within the notebook of the charge.  So you have

 2   Georgia Municipal Association --

 3            THE COURT:  Are there any pages that are stuffed in?

 4   I mean, I realize you've got things in the folder.

 5            Can I see it?

 6            MR. BROWN:  Sure.

 7            THE COURT:  What is the objection?

 8            MS. DURRETT:  Your Honor, I guess I don't have an

 9   objection if they are admitting the original of documents.  It

10   is the problem that they are saying it is collected in this

11   binder that says GWS on the side 05 and the idea that somehow

12   someone put that together.

13            I guess we need to look at the inventory again.

14            THE COURT:  Have you looked at the inventory?

15            MS. DURRETT:  I haven't.  I don't know if the

16   Government has looked at the inventory.

17            THE COURT:  Could the witness just wait outside the

18   door for a second.

19            MR. BROWN:  My fault.  Second time I did that.  Sorry

20   about that.

21            THE COURT:  That's all right.

22            MR. BROWN:  So my response, Judge, is that is an

23   original notebook that was contained within the evidence.  It

24   is provided in discovery.  Ms. Durrett had an opportunity to --

25   came and looked at all the notebooks that were there.  It is

1    relevant to the case.  It has documents that have already been

2    admitted relating to three of the charged counts in the

3    indictment.  And it also includes some of the other evidence

4    that has already come in relating to Michael Burandt, Lydia

5    Walker.

6          And it is relevant, Your Honor, because, one, it

7    includes the original actual mailing from the City of Atlanta.

8    Two or three them have it in the back.

9          Two, there has been testimony from Mr. McQueen that

10   he is aware of how these -- the stuff was stored in these

11   folders.  They are prepared by Mr. Pendergrass.  And if he can

12   lay the proper foundation, it should come in.

13         You don't need to look at a evidence list.  If he can

14   look at this and say yes, I recall this, how do you recall it?

15   If I can lay that foundation, Your Honor, it is relevant and it

16   should come in.

17         MS. DURRETT:  Your Honor, as with the other notebook,

18   the problem is all of the folders are loose in this one.  So

19   there is nothing that we can show that this is actually in its

20   original condition, that it was prepared this way.

21         THE COURT:  Well, if you want to examine the witness

22   beforehand.  The other one I had greater concerns about.  It

23   had something on the front and handwriting.  I didn't know

24   whether that was going to be used in some other way.  It had

25   stuff stuffed in it over here in the pockets, which made me

1  think, well, something -- materials could be loose and agents

2  could have still stuck them in.  This is --

3          MS. DURRETT:  Your Honor, every --

4          THE COURT:  -- all organized in a different way.  I

5  don't know what the word -- what this copy scanned by SISC

6  (phonetic) in lieu of original means.  And I would ask the --

7          MR. BROWN:  And I can testify, Your Honor.  That is

8  what -- it is individually scanned, each of those pages.  And

9  they put that on the front to let you know that this has been

10 scanned.  I can take that out.  That is just letting you know

11 that has been scanned by -- when it was turned over to the

12 United States Postal Inspection Service, they scanned each one

13 of those.

14         THE COURT:  But it is right on the document itself.

15         MR. BROWN:  No, it is not.  If you take the front

16 page off, Judge, the original is right under it.  So if you --

17         THE COURT:  Oh, I see.

18         MR. BROWN:  It is the original right there.

19         So they slide it in the front and say we scanned it.

20 We scanned it, just so you know it has been scanned.

21         MS. DURRETT:  Your Honor, that is further proof that

22 the document -- that the notebook has been manipulated by

23 someone, that items have been removed and put back into the

24 notebook.  They are all loose pages.

25         MR. BROWN:  Your Honor, if he can lay a proper

1    foundation, it can come in.  It doesn't matter if it has been

2    scanned or not.

3          MS. DURRETT:  And I also think it is cumulative.  If

4    they are saying these exhibits have already been admitted,

5    there is no reason to present them in a notebook that says GWS

6    on the side.

7          MR. BROWN:  That is the original evidence.  The best

8    evidence rule is always the original evidence, Your Honor.

9    This is the original evidence.

10         This is the best evidence, Your Honor.  It has the

11   original mailings on the back.  If you flip to the last page of

12   several of those, you will see the original mailing from the

13   City of Atlanta.

14         I have to prove that.  This is the original evidence.

15         MS. DURRETT:  So is Mr. McQueen going to be able to

16   go through and say yes, this is exactly what the notebook

17   looked like --

18         THE COURT:  Why don't we have him in and go ahead and

19   do that and quickly do it.  I'm not going to spend a lot of

20   time on it.  But I do think we need to get the scanned --

21   ultimately just pull out everything that said scanned but --

22   all right?  And --

23         MR. BROWN:  So --

24         THE COURT:  So Mr. McQueen can come in now.

25         MS. DURRETT:  For the record, I think he pulled out

1    eight or ten pages there.

2            MR. BROWN:  You can count them and let the record

3    show.

4            THE COURT:  Morning, Mr. McQueen.  I just want to

5    remind you that you are still under oath.

6            How many pages were taken out?

7            MS. DURRETT:  It is 11, Your Honor.

8            THE COURT:  11 pages that indicate that the materials

9    had been scanned by the United States Postal Service?

10           MS. DURRETT:  I assume that is what that is and then

11   just further evidence that someone has been manipulating the

12   notebook by taking things in and out.

13           THE COURT:  Well, that is your -- they have scanned

14   it.  I don't -- I don't know that that means manipulation but

15   that they have --

16           MS. DURRETT:  I used manipulation just in the sense

17   that someone touched the notebook and did something to it.

18           THE COURT:  Okay.

19           MR. BROWN:  Your Honor, could I just go through this?

20           THE COURT:  Yes.

21       Whereupon,

22                       TERRELL L. MCQUEEN,

23       after having been previously duly sworn, testified as

24   follows:

25                       VOIR DIRE EXAMINATION

1    BY MR. BROWN:

2    **Q.**   Mr. McQueen, I'm going to hand you what has been marked as

3    Government's Exhibit Number 45.

4        Take a look at it.  Flip through it.  Look through the

5    pages, and I'm going to ask you a few questions about it.

6    **A.**   (The witness complies.)  Okay.

7    **Q.**   Do you recognize that folder and the documents contained

8    therein -- I mean, that binder and the documents contained

9    therein?

10   **A.**   Yes.

11   **Q.**   How do you recognize that?

12   **A.**   This is Mr. Pendergrass's folder where he would organize

13   the checks that came in.

14           THE COURT:  He would what?  It is Mr. Pendergrass's

15   folder that he would what?

16           THE WITNESS:  Organize what checks would come in once

17   they were paid.

18   **Q.**   **(BY MR. BROWN)**  And does that folder -- that binder itself

19   and the documents contained therein a fair and accurate -- are

20   they the original documents -- many of them -- of that -- that

21   you guys sent out and received back from the City of Atlanta?

22   **A.**   It looks to be some original check -- check copies in

23   here.

24   **Q.**   Does there appear to be any alterations or deletions or

25   changes to the documents contained in the white binder?

1    **A.**    Not to my knowledge, no.

2           MR. BROWN:  I think that is a sufficient foundation,

3    Your Honor.

4           THE COURT:  Do you want to ask some questions?

5           MS. DURRETT:  Yes, please.

6                         VOIR DIRE EXAMINATION

7    BY MS. DURRETT:

8    **Q.**   Mr. McQueen, can I take the notebook from you for a

9    minute?

10        So this is where Mr. Pendergrass would store his checks

11   that had been paid?

12   **A.**   Yes, ma'am.

13   **Q.**   And he only stored 11 of those?

14   **A.**   No.  Any checks that would come in from any letters that

15   were sent out that were paid.

16   **Q.**   Would be put in this binder?

17   **A.**   That binder and other -- there was a whole -- there was an

18   entire shelving of binders.

19   **Q.**   And -- but this one just happens to have all the ones

20   relevant to our case in it?

21   **A.**   Yes.

22   **Q.**   Okay.  And did you maintain the binder?  Did you put

23   documents into it and take documents out of it?

24   **A.**   I don't remember.

25   **Q.**   Okay.  And when was the last time you saw this binder?

1   **A.**   2013.

2   **Q.**   What does it say on it?

3   **A.**   I can't -- I can't see it right now.  So I don't know.

4   **Q.**   The binder that you remember, what does the binder that

5   you remember say on it?

6   **A.**   What does it say on it?

7   **Q.**   Uh-huh (affirmative).

8   **A.**   It was just a blank white binder.

9   **Q.**   Okay.  And when was the last time you saw this binder?

10          MR. BROWN:  Asked and answered, Judge.

11  **Q.**   **(BY MS. DURRETT)**  Do you know where the binder has been

12  for the last eight years?

13  **A.**   No.

14          MS. DURRETT:  Okay.  Your Honor, I don't think he has

15  laid a foundation for this specific binder.  He certainly

16  didn't put items into it or out of it.  There are a bunch of

17  loose pages.

18          THE COURT:  All right.  Let's not have argument right

19  now.

20          Okay.  Because I have a few questions to ask.  But if

21  you want to follow up with him.

22          MR. BROWN:  I just want to show the witness what has

23  already been admitted into evidence, Your Honor.  It is

24  Exhibit 18, Page 45, I believe, Judge.

25                  VOIR DIRE EXAMINATION (Continued)

```
1   BY MR. BROWN:

2   Q.    Mr. McQueen, do you recognize that photograph?

3   A.    Yes, I do.

4   Q.    What is that?

5   A.    That is the shelving of the white binders.

6   Q.    Okay.  And if you look on that, do you actually see the

7   binder that has GWS 05 on the actual front of the binder?  You

8   can see it on the --

9   A.    I can't make it out on here.  I can't see it that --

10  Q.    You may need glasses like me.

11  A.    Yeah.

12            THE COURT:  He has some.

13            THE WITNESS:  These -- so I just had surgery on my

14  eyes.  I have got retinopathy.

15            So these were the glasses when I was blind for the

16  last two -- well, one and a half years.  So --

17  Q.    (BY MR. BROWN)  Can you make that out?

18  A.    I can see the GWS there.  Okay.

19  Q.    That's all I was asking.

20        Is this the bookshelf that you testified on cross about

21  Mr. Pendergrass keeping the binders of checks that were paid or

22  accounts that were paid on?

23  A.    Yes.

24  Q.    And during your time working for Mr. Pendergrass, would

25  you observe him creating these kind of binders and putting
```

43

1   information inside of it?

2   **A.**   Yes, I would.

3   **Q.**   And are many of the actual letters in here letters in

4   which you signed and sent out as a part of working for

5   Mr. Pendergrass?

6   **A.**   Yes.

7   **Q.**   And do they have your original signature on at least one

8   of them here?

9           THE COURT:  Don't take it out.

10          MR. BROWN:  Too late, Judge.

11  **Q.**   **(BY MR. BROWN)**   Is that actually an original signature of

12  the original document you signed?

13  **A.**   Yes.  Yes.

14          MR. BROWN:  Your Honor, so I think he has laid a --

15          THE COURT:  I don't want any argument.

16          Mr. McQueen, how often did you look at these -- this

17  specific book?

18          THE WITNESS:  I don't remember.

19          THE COURT:  Did you maintain it or Mr. Pendergrass

20  maintained it and created this book?

21          THE WITNESS:  So Mr. Pendergrass maintained that

22  folder.  I don't think it was in the main office.  I think it

23  was in the second office.

24          THE COURT:  What was the second office?

25          THE WITNESS:  It was a back office.

44

```
 1              THE COURT:  Okay.  So was it in the area that he had
 2    the picture of?  Is that the back office, or was it -- in other
 3    words, you were shown by Government counsel a whole series of
 4    notebooks.
 5              Is that where it was kept, or was it kept in a
 6    separate office with some other notebooks?
 7              THE WITNESS:  No.  So there were only two offices.
 8              THE COURT:  Right.
 9              THE WITNESS:  We worked all in the front office, and
10    then there was a back office.
11              THE COURT:  All right.  And so when you say this was
12    in a separate office, is this the back office that you did not
13    work in?
14              THE WITNESS:  That's correct.
15              THE COURT:  All right.  And is that where -- but you
16    worked on a desk that was adjacent to Mr. Pendergrass's office
17    in the front office?
18              THE WITNESS:  The desk -- yeah.  We were -- there
19    were three or four desks in the front office, and we were at
20    those desks.
21              THE COURT:  Did anyone have an office in the back --
22    the back office where this was stored?
23              THE WITNESS:  So that office was supposed -- somebody
24    was supposed to work in that office.  But no.
25              THE COURT:  Okay.  So going back to this, were these
```

45

```
1    materials that were primarily maintained and accessed by

2    Mr. Pendergrass?

3              THE WITNESS:  Yes.  That's correct.

4              THE COURT:  And when would you look at it?  When

5    would you have access -- basically have any occasion to look at

6    it or access them?

7              THE WITNESS:  I had access to them because they were

8    in the office.  But I don't remember filing any of them.

9              THE COURT:  Do you remember actually reviewing any --

10             THE WITNESS:  I don't remember reviewing any of them.

11   I know there were -- Mr. Pendergrass had a routine of making

12   copies of everything when they came into the office and then

13   filing them away.

14             THE COURT:  But you weren't yourself familiar with

15   how each of them was organized?

16             THE WITNESS:  I knew the process of the folders.

17             THE COURT:  That the folders were maintained?

18             THE WITNESS:  Yes.

19             THE COURT:  I mean, I guess what I'm asking is:  Do

20   you have actual specific personal familiarity with this

21   folder -- with this notebook?

22             THE WITNESS:  I don't remember the words on the

23   notebook.  I just remember there being notebooks.

24             THE COURT:  All right.  Generally speaking?

25             THE WITNESS:  Yes.
```

```
 1              THE COURT:  Thank you.  Now you can make any argument
 2     you want.
 3              MR. BROWN:  So my argument is I believe he has made a
 4     sufficient foundation.
 5              MS. DURRETT:  Your Honor --
 6              MR. BROWN:  Could I finish?
 7              MS. DURRETT:  Could I just ask if the witness can be
 8     excused for this?
 9              THE COURT:  Yes, he can be excused for this.
10              Just stay outside the courtroom.  If you would sit on
11     the bench because we'll be ready for you in a minute.
12              THE WITNESS:  Okay.
13              (The witness exited the courtroom.)
14              THE COURT:  Is it on the inventory or not also?
15              MS. DURRETT:  We admitted the inventory, Your Honor.
16     I think it is 22G, but I don't have it in front of me, but I
17     could grab it.  22C.
18              We didn't admit the inventory, Your Honor.  I'm
19     sorry.  We admitted the list of computers.  Sorry about that.
20              MR. BROWN:  That was just computers.
21              Your Honor, can I talk now or should we wait?
22              THE COURT:  No.  You can talk now.
23              MR. BROWN:  So we have a photograph of this specific
24     binder.  This witness testified about seeing the defendant
25     prepare these kind of filings.  The process -- he is familiar
```

1    with the process of making copies.  And he testified yesterday

2    that he would put -- Mr. Pendergrass would put these -- the

3    documents in these kind of folders.  He specifically testified

4    about that.  There is a photograph during the search scene

5    showing this particular binder.

6              THE COURT:  It shows the outside of it?

7              MR. BROWN:  Yes.  It just shows the back.  It says

8    GWS 05.  You can see it in the photograph, Your Honor.

9              What she's arguing goes to the weight.  She can cross

10   him on it but not the admissibility, Your Honor.  He has laid

11   the foundation.  The Government should be able to put in

12   evidence that would help prove its case.  This is relevant.

13   This is the original documents, Your Honor.  And she can cross

14   him for 20 minutes on this, Judge.

15             THE COURT:  I guess my question only is:  Why isn't

16   it sufficient for you to cross -- to have him identify any of

17   the documents, discuss the documents -- why since he is not

18   familiar with the organization of them and you are seeming to

19   try to -- and clearly has -- was not the one organizing them,

20   why should that be -- he be able -- the jury be able to take

21   note of the organization when he has no knowledge of that?

22             MR. BROWN:  He testified about the organization.  He

23   testified about the knowledge, the process.  He witnessed the

24   process of there are -- if you look at this, there are probably

25   20 or 30 binders.  I'm not bringing them all in, Judge.

1          The one that I'm seeking to bring in is the one that
2    has the specific counts in the indictment, the original
3    mailings from this.  I have to prove that these checks were
4    mailed.  The copies are one thing.  But you know the best
5    evidence rule says the best evidence should come in, Your
6    Honor.
7          THE COURT:  Yes.  But I don't know that they were
8    organized this way.
9          MR. BROWN:  Your Honor, he testified to that.
10         THE COURT:  No, he did not testify as to the
11   organization in any fashion.
12         MR. BROWN:  I don't want to cut you off.
13         Are you finished, Judge?
14         THE COURT:  Yes.
15         MR. BROWN:  He testified about the process.  He is in
16   the office.  The office is less than from me to you.  They
17   worked every day in the office.  He said I remember these
18   documents.  Many of these are original documents.  I am
19   familiar with the process of how Mr. Pendergrass --
20         THE COURT:  But you are not answering my question.
21         Why can't you just simply for each of these things
22   present him with the documents?
23         MR. BROWN:  Because what I want to show, Judge, is
24   the -- how it was organized and how it was stored in the
25   office.

1          So he has testified Mr. Pendergrass organized them in

2    these folders.  He testified that he saw him do that.  I want

3    the jury to see the actual folder to see how it was organized

4    and to see the original stubs from the City of Atlanta that

5    have the mailing certificate on it to show that these checks

6    were mailed to meet my element of the offense.

7          THE COURT:  Okay.  It is -- let me hear about the

8    inventory.

9          MS. DURRETT:  Okay.  I'm looking at the inventory,

10   Your Honor.  And I would have looked yesterday if I had known

11   this was going to come up.  So I'm sorry it is taking me a

12   second.

13         Okay.  It says blue notebook with Georgia Tax

14   Commission, white notebook with City of Atlanta papers, City of

15   Atlanta papers, white notebook with City of Atlanta papers, PNC

16   account deposit slips.  And that is it.

17         So they showed us a photo of -- I don't know how

18   many -- 30 notebooks.  This has two white notebooks and a blue

19   notebook listed and no other notebooks.  None of it says GWS

20   05, which is what this notebook says on the side.  Mr. McQueen

21   didn't know what it said on the side.  He said it is just a

22   white notebook.

23         THE COURT:  Okay.  All right.  Any of the documents

24   in there you can introduce.  I'm not going to allow the

25   notebook under these circumstances when he is not the one

1   organizing it.

2           If you want to ask him about the exterior of it to

3   say was this a notebook, that is fine.  GW5, that is if he

4   recognizes that.  But, you know, the whole organization of it

5   is not something he is familiar with.  He didn't maintain it.

6   And I think that is not proper.

7           But any of the documents he is likely to be able to

8   identify.  But you are wanting to do it because of the

9   organization of it, which he is not familiar with it and cannot

10  testify that it was -- this was exactly the way it was.  And

11  there is some import that you are obviously trying to

12  communicate to the jury via the whole way it is organized.

13          Under these circumstances, I'm not going to allow

14  that.  But anything that is in it that you want him to identify

15  and go through it, you are welcome to do.

16          MS. KING:  Could we have a moment, Your Honor?

17          THE COURT:  Yes.

18          MR. BROWN:  All right, Judge.

19          THE COURT:  Okay.  Can we proceed then?

20          MR. BROWN:  Yes.

21          I want to make sure I'm clear before I bring the jury

22  in and I somehow violated what your ruling is on this

23  particular piece of evidence.

24          So can I ask you three or four questions?

25          THE COURT:  You can ask me questions.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1          MR. BROWN:  Thank you, Judge.  So I hear you about

2    the folder itself.  And can I show him this notebook, have him

3    open it up, look at it, and remove -- and flip through it and

4    if we need to remove -- I think that is making it more tedious

5    and more time-consuming.  But I want to have the originals in

6    evidence.

7          So will defense counsel just stipulate to the

8    originals coming into evidence?

9          MS. DURRETT:  I object to it coming in that way.  If

10   he wants to take the papers out and show them to the witness,

11   that is fine with me.  I object to it coming out of that

12   notebook.

13         THE COURT:  All right.  You can show him the notebook

14   as a whole, and you can ask him whether this was the -- did

15   many of the notebooks have -- basically were they -- because he

16   has seen notebooks.  He can't tell you about this particular

17   notebook.

18         Did they often have containers like the ones that you

19   are going to show him?  But then you are going to take all the

20   documents out.  You're not going to sort of -- separately, not

21   in front of him.  But they are all simply going to be on your

22   table.  Take all the documents out and just go through them.

23         MS. DURRETT:  Your Honor, I object to him showing the

24   notebook.  I mean, what is the -- I mean, I can show a notebook

25   and say, have you ever seen a white notebook before?  I object

1    to the --

2              THE COURT:  He can show him the photograph and say,

3    is this like one of the notebooks?

4              MS. DURRETT:  Your Honor, but he is trying to imply

5    to the jury that these documents --

6              THE COURT:  I think I have done as much -- he is --

7    you are not going to be taking out the documents here from the

8    notebook as organized.  You are just simply going to put them

9    on --

10             MR. BROWN:  I can show him the notebook.  But I'm not

11   going to take it out in front of the jury.

12             THE COURT:  That's right.

13             MR. BROWN:  He can look at the notebook, and then I

14   can take it back from him, and I can show him the original

15   evidence?

16             THE COURT:  Right.  That's right.

17             MS. DURRETT:  And I object to him showing the jury

18   the GWS on the side or showing that to the witness because the

19   witness did not identify that.  He said that is a white

20   notebook.

21             THE COURT:  That is what he is going to do.  I mean,

22   if he says yes, you can cross-examine on the GWS.  I don't

23   recall that.  All right?

24             MR. BROWN:  One last thing, Judge.  For time, if the

25   defense counsel would just stipulate the originals can come in,

```
1    I don't need to go through and hand him 20 original

2    certificates, Judge.  If they --

3              MS. DURRETT:  I would like the witness to

4    authenticate them.

5              MR. BROWN:  The copies are already in evidence -- the

6    exact copies of this.  Can you -- I mean --

7              THE COURT:  Why would he have to use -- get -- why

8    are you objecting to the authentication of documents that are

9    already in the evidence?

10             MS. DURRETT:  Because I got the notebook this morning

11   about five minutes before we started talking about it.  I don't

12   know all of the contents.

13             And so I want to hear what the witness has to say

14   about them.  If I had known yesterday, I would have looked at

15   this.

16             MR. BROWN:  Your Honor, this is just the original.

17   I'm only going to do the counts in the indictment.  These are

18   the original mailings, Judge.  There are already copies in

19   evidence.

20             I just want the best evidence, the originals, to come

21   in.  I don't think I need to spend 20 minutes with this witness

22   on --

23             THE COURT:  How many documents are we talking about?

24             MS. DURRETT:  Pull out five documents and let's do it

25   but don't have it come from the notebook.
```

```
 1            MR. BROWN:  All right.  I think I'm clear on your
 2   ruling, Judge.  It is one, two, three, four, five.
 3            THE COURT:  All right.  Take the documents out and
 4   let's just get it done.
 5            MS. DURRETT:  Thank you, Your Honor.
 6            MR. BROWN:  I'm ready, Judge.  Can we just call the
 7   witness?
 8            THE COURT:  Yes.  Go ahead.
 9            MR. BROWN:  Judge, are we bringing the jury in?
10            THE COURT:  Yes.
11            (The jury entered the courtroom at 10:52 A.M.)
12            THE COURT:  Ladies and gentlemen, thank you again for
13   your patience.  We had an expected detour this morning.  And
14   once again, I have to apologize for the detour and delays in
15   proceeding with the trial.
16            But we are ready to go at this juncture.  Thank you.
17         Whereupon,
18                    TERRELL L. MCQUEEN,
19         after having been previously duly sworn, testified as
20   follows:
21                 DIRECT EXAMINATION (Continued)
22   BY MR. BROWN:
23   Q.   Mr. McQueen, you are still under oath.
24        We left off yesterday talking about the Lee Family Trust.
25   And I want to direct your attention now to how the office was
```

1    organized when you worked with Mr. Pendergrass.

2         And I want to show you what has already been admitted into

3    evidence as Defense Exhibit Number 33.

4         While that is coming up, are you familiar with the layout

5    of the office when you worked there with Mr. Pendergrass?

6    **A.**   Yes, I am.

7    **Q.**   So this has already been admitted as Defense

8    Exhibit Number 33.

9         Can you use this diagram to describe the layout of the

10   office and where you worked versus others in the office?

11   **A.**   Yes, I can.

12   **Q.**   All right.  First, start off with yourself.  Where was

13   your office or desk, rather, in the office?

14        Can you just put a little dot next to it?

15   **A.**   (The witness complies.)

16   **Q.**   Where did Mr. Pendergrass sit?

17   **A.**   (The witness complies.)

18   **Q.**   And approximately how far away is that?  Five feet,

19   ten feet?  Or can you give an approximation here so the jury

20   can see?

21        When you are sitting at your desk, how far are you from

22   Mr. Pendergrass approximately?

23   **A.**   Maybe five feet.

24   **Q.**   So would it be where that jury thing starts?  Tell me

25   where would it be.  Rough approximation.

1   **A.**   Where she is right here.

2   **Q.**   All right.  Okay.  So that is five, six feet, maybe

3   eight feet; is that fair?

4   **A.**   Yes.

5   **Q.**   And is this where you sat and worked on the computer as

6   relating to the asset recovery business?

7   **A.**   Yes.

8   **Q.**   Now, we talked about a lot of documents yesterday relating

9   to documents that you forged, documents that Mr. Pendergrass

10   forged.

11   Where were these forgeries taking place?  Was it there in

12   the office?

13   **A.**   Yes, they were.

14   **Q.**   So I don't want to walk through all of them.  But just can

15   you give the jurors by using this where would you be when you

16   actually would be there signing one portion of the document and

17   Mr. Pendergrass would sign the other?  Can you show us or point

18   to it where it would occur?

19   **A.**   So it would -- for instance, every time that we worked on

20   a document that we wanted to take the money from, one person

21   would do the research, one person would -- we had to make it

22   believable.  So one person would do the research on the company

23   to see if that person could be contacted.  Another person --

24           MS. DURRETT:  Your Honor, this is nonresponsive.

25           MR. BROWN:  He is just explaining, Your Honor, how

1    they did their process.  I can ask another question if you

2    would like.

3            THE COURT:  Okay.  Go ahead and ask another question.

4    **Q.    (BY MR. BROWN)**  So you are explaining the actual process

5    of researching a particular account; is that correct?

6    **A.**    Yes.

7    **Q.**    Can you talk through explicitly relating to signing a

8    particular document?  And if that would take place in your

9    office, where would it take place, if you recall?

10   **A.**    It would take place in the office.  So I would talk with

11   Mr. Fitchpatric about lifting the seal and the signature.  And

12   then we would email or get up to look at what signatures or

13   seals that we were going to use between me --

14   **Q.**    Let me stop you there.  You said we would email.

15           Who would email, and what would you guys be emailing?

16   **A.**    We would email -- so whether it was a business or if it

17   was an individual, we would email particular seals or

18   signatures back and forth between each other.

19   **Q.**    When you say seals, you are talking about the notary seals

20   that were fraudulently placed on the documents?

21   **A.**    That's correct.

22   **Q.**    So how was the business funded when you were working

23   there?  Who paid the bills?

24   **A.**    Mr. Pendergrass paid the bills.

25   **Q.**    Who paid -- who paid the lease -- the rent for the lease

1    on that office space?

2    **A.**   Mr. Pendergrass did.

3    **Q.**   Why didn't you pay that?

4    **A.**   That wasn't my business or my building.

5    **Q.**   I want to show you what has been marked as Government's

6    Exhibit Number 31.  Take a look at that document and let me

7    know if you recognize it.

8    **A.**   (The witness complies.)  Yeah.

9    **Q.**   How do you recognize that?

10   **A.**   So you showed me where my signature was on where this

11   document is.

12   **Q.**   Okay.  But do you recognize the document itself -- the

13   lease agreement that you are holding?

14   **A.**   Yes.

15   **Q.**   All right.  And is that a copy of a lease agreement for

16   the space in College Park where you were working with

17   Mr. Pendergrass?

18   **A.**   Yes, it is.

19          MR. BROWN:  All right.  Your Honor, at this time the

20   Government would tender Exhibit Number 31, I believe, into

21   evidence, Judge.

22          MS. DURRETT:  Your Honor, I have no objection.

23          THE COURT:  It is admitted.

24   **A.**   It has the same -- you know, that's the same --

25   **Q.**   **(BY MR. BROWN)**   I'm publishing what has been already

1   admitted as Exhibit Number 31.

2       We just left off your questioning talking about -- I asked

3   you who paid for the office space.

4       Do you recall that?

5   **A.**   Yes.

6   **Q.**   And you testified that Mr. Pendergrass paid; correct?

7   **A.**   That's correct.

8   **Q.**   And this is the office space, 4854 Old National Highway,

9   Suite 161; is that correct?

10  **A.**   Yes.

11  **Q.**   What is the date of that, and whose signature is there on

12  that page?  This is Page --

13  **A.**   So it is March 1st, 2011, and that is my signature.

14  **Q.**   Now, does that say March 1st?  You said March 1st; is that

15  right?

16  **A.**   Yes.

17  **Q.**   All right.  And whose photo identification is copied here?

18  **A.**   That is my ID.

19  **Q.**   So if Mr. Pendergrass is the boss, why did you sign the

20  lease agreement?

21  **A.**   I don't remember why I signed that lease agreement.

22  **Q.**   But your signature is on here; correct?

23  **A.**   That's correct.

24  **Q.**   All right.  Going back to Defense Exhibit Number 33, who

25  paid for the lights for this office building?

1    **A.**    Mr. Pendergrass.

2    **Q.**    Who bought the computers that were used in the business?

3    **A.**    Those were Mr. Pendergrass's computers.  Although the --

4    my laptop was purchased by my personal account when I was at

5    Clark Atlanta University in 2011.  And Mr. Fitchpatric's Apple

6    computer I purchased after we received the funds from Holland &

7    Knight or a portion of the funds.

8    **Q.**    So you used the funds from Holland & Knight that was

9    fraudulently obtained; correct?

10   **A.**    Yes.

11   **Q.**    And you used that to purchase Mr. Fitchpatric's computer?

12   **A.**    That's correct.

13   **Q.**    What did Mr. Fitchpatric do with the computer?

14   **A.**    That was the computer he used to do work in the office to

15   lift the seals or signatures.

16   **Q.**    So to help you and Mr. Pendergrass steal the money?

17   **A.**    That's correct.

18   **Q.**    And along with using those funds to purchase a computer,

19   were the funds from the fraud used to pay the bills around the

20   office?

21          MS. DURRETT:  Objection, Your Honor.  He doesn't

22   know.  He said he didn't pay it.

23   **A.**    I don't know.  But to my knowledge, it would have came out

24   of the account.  But I didn't pay the bills around the office.

25   **Q.**    **(BY MR. BROWN)**  Let's just start with you.

1      Do you know how you were paid?

2  **A.**   By Mr. Pendergrass.

3  **Q.**   Where did the money come from that you were paid with?

4  **A.**   From the money we took or the deals I closed.

5           THE COURT:  Or what?

6           THE WITNESS:  The money that we took.

7           THE COURT:  Or?

8           THE WITNESS:  Or the deals that I closed.

9           THE COURT:  The legitimate deals that you closed?

10          THE WITNESS:  Yes, the legitimate deals.

11 **Q.**   **(BY MR. BROWN)**   If you can, what percentage of money you

12 received was legitimate versus money that was stolen?  Was it

13 10 percent legitimate?  Was it 20 percent legitimate, if you

14 can?

15          MS. DURRETT:  Your Honor, I'm going to object to

16 leading.

17          THE COURT:  I don't think it was leading.

18 **Q.**   **(BY MR. BROWN)**   Go ahead.

19 **A.**   I mean, my math may be off.  But maybe ten percent.

20 **Q.**   So ten percent what?

21 **A.**   Ten percent of it legitimately being collected as the rest

22 of it being fraudulent.

23          THE COURT:  Of your salary?

24          THE WITNESS:  Yes.

25 **Q.**   **(BY MR. BROWN)**   So 90 percent of your salary was from

1    stolen money; is that fair?

2    **A.**    Yeah.  I wasn't on a salary.  But yes.

3    **Q.**    I mean -- sorry.  The money you received?

4    **A.**    Yes.

5    **Q.**    Okay.  You testified yesterday that you and Mr.

6    Pendergrass went to Walmart and purchased cell phones; is that

7    correct?

8    **A.**    That's correct.

9    **Q.**    Who purchased those cell phones?

10   **A.**    Me and Mr. Pendergrass.

11   **Q.**    Where was the money used to purchase those cell phones --

12   where did you get that money from?

13   **A.**    It was usually cash pulled out of the ATM so it wouldn't

14   be traceable.

15   **Q.**    You testified that you were on commission but the other

16   employees were paid hourly.  Do you recall that?

17         How was Mr. Fitchpatric paid?

18   **A.**    I don't know.

19   **Q.**    Did Mr. Fitchpatric receive a commission or a split of the

20   stolen funds?

21   **A.**    I don't know.

22   **Q.**    Who paid for the email account

23   tmcqueen@assetfinancialrecovery?

24   **A.**    Mr. Pendergrass.

25   **Q.**    I'm showing you what has been marked as -- admitted as

1    Number 44.  You testified yesterday that you opened this

2    virtual office for the Lee Family Trust.

3         Do you recall that testimony?

4    **A.**   Yes.

5    **Q.**   This was not free; correct?

6    **A.**   No, sir.

7    **Q.**   Who paid for this?  Do you recall?

8         If you don't recall, you don't recall.

9    **A.**   I believe I paid for it.  But I don't recall unless --

10   unless -- I need to see the document.  I thought I saw the

11   documents before.  But --

12   **Q.**   This is for a P.O. Box associated with that -- the mail

13   service associated with the Lee Family Trust.

14        Do you recall that?

15   **A.**   Yes.

16   **Q.**   Is this your signature at the bottom?

17   **A.**   Yes.

18   **Q.**   All right.  Were they giving this away, or did you have to

19   pay for this?

20   **A.**   No.  So it just -- I may have set it up, and then I may

21   have used Mr. Pendergrass's card to pay for it.

22   **Q.**   Okay.  Was that money from the business that was used to

23   set this up to pay for it?

24   **A.**   It was just money on a business -- it could have been one

25   of -- some other business.

```
 1              MS. DURRETT:  I'm going to object at this point.  He
 2    doesn't know evidently how it was paid for.
 3              THE COURT:  Do you know how it was paid for or not?
 4              THE WITNESS:  No.  I don't remember.
 5              THE COURT:  All right.  Well, then let's move on.
 6    Q.   (BY MR. BROWN)  You testified yesterday also that you sent
 7    -- how did you get these lists from these various places --
 8    government agencies?  How did you find out, hey, they have
 9    money?  How did you obtain those lists?
10    A.   So Mr. Pendergrass showed me a document he had where there
11    was some legal words in there to obtain the list.  It was
12    called a Freedom of Information Act.
13    Q.   Did you send off requests to receive documents pursuant to
14    the Freedom of Information Act?
15    A.   Yes.
16    Q.   Did others in the office send off requests to receive
17    documents using the Freedom of Information Act?
18    A.   To my knowledge, just me and Mr. Pendergrass.  I did most
19    of the work in the beginning.
20    Q.   Did you have to pay for the lists, or were they free?
21    A.   Some lists were free.  Some you had to pay for.
22    Q.   For the ones you had to pay for, who paid for the lists?
23    A.   I paid for those lists.
24    Q.   Where did you get the money to pay for the list?
25    A.   Just out of my personal checking account.
```

1  **Q.**   At the time you were working for Mr. Pendergrass, what was

2  your source of income as it relates -- what was your primary

3  source of income?

4  **A.**   I was on FMLA from Clark Atlanta.  I received -- and that

5  was it.

6  **Q.**   Did you receive money from Mr. Pendergrass for working

7  there?  The commissions?

8  **A.**   Yes.

9  **Q.**   Was that a portion of your income?

10 **A.**   Yes.

11 **Q.**   Was that a part of the money you used to help you get

12 lists and those kind of items to help you facilitate the

13 business?

14 **A.**   Yes.

15 **Q.**   Let me show you what has been marked as Defense

16 Exhibits 35, 36, and 37.  Take a look at those.  I'm going to

17 ask you some questions.

18 **A.**   (The witness complies.)

19 **Q.**   Okay.  Do you recognize those documents?

20 **A.**   Yes.

21 **Q.**   How do you recognize them?

22 **A.**   These are requests made to the City of Atlanta and to

23 Linda Guy for an Excel spreadsheet.

24 **Q.**   What about the last page with the handwriting on it?  Do

25 you recognize that?

1    **A.**   Yes.

2    **Q.**   Whose handwriting is that?

3    **A.**   That is my handwriting.

4    **Q.**   Can you hand it back to me?

5    **A.**   Yes.

6           MR. BROWN:  The Government would move to admit

7    Defendant's 35, 36, 37.

8           MS. DURRETT:  It is defendant's exhibits.

9           MR. BROWN:  That's what I said.

10           MS. DURRETT:  I'm sorry.  No objection, Your Honor.

11           THE COURT:  They are admitted.

12   **Q.**   **(BY MR. BROWN)**  Explain for the jury what we're looking at

13   here, Mr. McQueen.

14   **A.**   Yes.  It is a request to receive electronic listing of

15   uncashed checks from the City of Atlanta.

16   **Q.**   And did you often email the City of Atlanta related to

17   receiving lists and/or following up on receiving checks?

18   **A.**   Yes.

19   **Q.**   I'm showing you Defense Exhibit Number 36.  What is this?

20   **A.**   It looks like a follow-up email.

21   **Q.**   Okay.  Did you have contact with Ms. Guy with the City of

22   Atlanta?

23   **A.**   By email.  I normally talked with Ms. Booker.

24   **Q.**   All right.  Did you speak on the phone with Ms. Booker?

25   **A.**   Yes.

1    **Q.**    And why were you communicating with Ms. Booker?

2    **A.**    Because she was the one who was issuing the checks or

3    she -- it went through her department.

4    **Q.**    All right.  Then Defense Exhibit Number 37, what is this?

5    Can you make -- I don't understand.  Can you explain -- let me

6    get it clear again.  Hold on.

7         What is this writing?  What is this about?

8    **A.**    It is just some notes on when I was trying to learn how to

9    sell.

10   **Q.**    Who taught you how to sell relating to this asset recovery

11   business?

12   **A.**    So Mr. Pendergrass tried to teach me how to sell.  But I

13   had to kind of teach myself.

14   **Q.**    What do you mean he tried to teach you?

15   **A.**    So Mr. Pendergrass tried to give me examples of what to

16   say to potential clients on how to convince them to allow us to

17   collect on their behalf.  And it wasn't working, and so I took

18   notes down on what people were saying and just trying to think

19   of ways to be more reputable or get more trust.

20   **Q.**    Now, you testified earlier that approximately ten percent

21   of the money you earned was legitimate; is that fair?

22   **A.**    Yes.

23   **Q.**    Was that enough?  Was that enough for you to keep this

24   business going?  Ten percent?

25   **A.**    No, it wasn't.

1    **Q.**    Why not?

2    **A.**    It just wasn't.  To look at all of the numbers on the

3    list, you are thinking, okay, you have a great opportunity to

4    try to close all of these deals.  But in reality, after calling

5    all of the people and after emailing and sending letters out,

6    the percentages weren't that high.

7    **Q.**    Did you discuss this with Mr. Pendergrass?  The problem

8    that you are not able to close these accounts legitimately?

9    Was there discussions about this?

10   **A.**    Yes.

11   **Q.**    What were those discussions?  What were you talking about

12   to say we can't close enough accounts?  What do we do?

13   Describe that.

14   **A.**    So Mr. Pendergrass's words to me were it is a numbers

15   game.

16   **Q.**    What does that mean?

17   **A.**    It means eventually if you send out enough letters that --

18   if you send out enough letters the legitimate way that you

19   would get at least two or three people that would sign up, like

20   Mr. Burandt.

21   **Q.**    Did that work while you were there?

22   **A.**    No, it did not work.

23   **Q.**    So when it didn't work, what did you decide to do?

24   **A.**    We decided to take the money.

25   **Q.**    Now, you said we decided.  Who is we?

1  **A.**    Me and Mr. Pendergrass.

2  **Q.**    Well, how did you decide?  Was there a discussion about

3  this?  How did you decide to go from legitimately operating a

4  business to stealing thousands of dollars?

5  **A.**    So the -- I hate to go back to the 16,000.  But that was a

6  topic of discussion.

7       And when the Lee Family Trust did not work, we didn't --

8  we were thinking of ways to get the money sooner.  That was a

9  conversation.

10 **Q.**    Is it fair to say you put a lot of thought in how to steal

11 this money?

12 **A.**    Yeah.  Because you had to make it look legitimate.

13 **Q.**    So let's talk about -- let's transition towards the end

14 and talk about when you were arrested by the Atlanta Police

15 Department and the search warrant was executed.

16      Do you remember that?

17 **A.**    Yes.

18 **Q.**    Were you in the office that day when the investigators

19 came?

20 **A.**    Yes, I was.

21 **Q.**    Who do you recall being in the office with you that day?

22 **A.**    Me and Mr. Fitchpatric were in the office.  I don't

23 remember the rest of the people that were in the office.

24 **Q.**    Okay.  So describe that day.  What was going on when the

25 police were coming in and executing the search warrant?

1    Describe what is going on.

2    **A.**   It was just a normal day.  We were waiting for

3    Mr. Pendergrass to actually come into the office.

4        I remember somebody coming into the office to look into

5    the office, and I thought it was a homeless man that came into

6    the office because he kind of peeked his head into the office,

7    looked both ways, and then he closed the doors.  I was like,

8    who is that?  That is kind of odd.  That hasn't happened.

9        Then we just went around -- it was just a normal day.  We

10   were just really talking, waiting for Mr. Pendergrass to come

11   into the office.

12   **Q.**   I want to show you what has already been admitted into

13   evidence as Government's Exhibit 18, Page 60.

14       What are we looking at here?

15   **A.**   A picture of myself.

16   **Q.**   Where was that picture taken?

17   **A.**   That looks like I was in the back office.

18   **Q.**   Okay.  Is this during the -- when you were arrested by the

19   Atlanta Police Department?

20   **A.**   Yes.

21   **Q.**   This is the day that the office was searched; is that

22   correct?

23   **A.**   That's correct.

24   **Q.**   Do you recognize -- this is also Exhibit Number 18 -- who

25   is depicted in that photograph?

1    **A.**    Yeah.  It looks like Mr. Fitchpatric, and it looks like

2    Joey.

3    **Q.**    What did Joey do in the office?

4    **A.**    He would have been doing the same things as

5    Mr. Fitchpatric.  Although I did not work with Joey directly.

6    So turning PDF Excel spreadsheets to -- into Excel

7    spreadsheets.

8    **Q.**    Okay.  I'm showing you what has been marked as

9    Exhibit 18-12.

10        Do you recognize who is depicted in that photograph?

11   **A.**    Yes.  It is Mr. Pendergrass.

12   **Q.**    Do you recognize when that photograph was taken?

13   **A.**    When it was taken?

14   **Q.**    Yeah.

15   **A.**    Yes.  September 19, 2013.

16   **Q.**    Is this the date that you were arrested?

17   **A.**    Yes, it was.

18   **Q.**    So Mr. Pendergrass was in the office?

19   **A.**    Yes, he was.

20   **Q.**    Was Ms. Barber present?  Do you remember?

21   **A.**    I don't recall.  I don't remember.

22   **Q.**    I want to show you what has been -- it has already been

23   admitted into the evidence as Government's Exhibit 18, Page 24.

24        Are you able to tell from this photograph whose desk this

25   is?

1  **A.**   That is Mr. Pendergrass's desk.

2  **Q.**   How do you know that?

3  **A.**   I see the copier.  I see his computer.

4  **Q.**   Do you see that white binder on the top there?

5  **A.**   Yes.

6  **Q.**   All right.  Were there binders like this around the

7  office?

8  **A.**   Yes.  There would have been.

9  **Q.**   And what were those binders used for?

10  **A.**   Those binders were the information on holders.

11  **Q.**   Okay.

12  **A.**   So it could have been some binders had information on

13  checks that were paid out.  Those binders also could have been

14  information on -- information about the holder.

15       I don't know what specific information but just --

16  **Q.**   I'm going to show you what has already been admitted into

17  evidence as 18-45 -- Page 45 -- Exhibit Number 18-45.

18       What are we looking at here, Mr. McQueen?

19  **A.**   The picture of the folders on the shelf.

20  **Q.**   So describe a little bit.  How was this organized?  I

21  mean, who did all this organization?

22       It looks like a lot of work was done here.  Were you a

23  part of this?

24  **A.**   No.  Those folders were taken -- or the way the boxes are

25  set up was from Mr. Pendergrass's -- his stuff -- that was all

1   his stuff, his organization.

2   **Q.**   Did you file documents as part of your responsibilities

3   with the office?

4   **A.**   I don't remember.

5   **Q.**   Did you prepare notebooks?

6   **A.**   No.

7   **Q.**   Why not?

8   **A.**   That wasn't my responsibility.

9   **Q.**   Whose responsibility was that?

10  **A.**   I wasn't organized like that to file those documents.  So

11  it wasn't important to me to put those in the folders.

12  **Q.**   All right.  So who did you observe in the office filing

13  documents and making things organized?

14  **A.**   That was Mr. Pendergrass.

15  **Q.**   Did you see him doing it with your own eyes?

16  **A.**   Yes.

17  **Q.**   Were you present when it was done?

18  **A.**   Yes.

19  **Q.**   Were you surprised by the -- your arrest on September 19,

20  2013?

21  **A.**   No.

22  **Q.**   Why not?

23  **A.**   Because I knew that the City of Atlanta was asking

24  questions about us.  I just didn't know when they were -- I

25  didn't know when they were coming.

1   **Q.**   Did you discuss your concerns with Mr. Pendergrass?

2   **A.**   Yes, I did.

3   **Q.**   What was his response, if any?

4   **A.**   He had a calm response.  He didn't really think that they

5   were -- that it was -- that they were really investigating us

6   or anything like that.  And so I was trying to urge

7   Mr. Pendergrass to move offices into a Fayetteville office, a

8   much nicer office.  But he wouldn't listen to me.

9   **Q.**   And did you want to move to put some distance between

10   yourself and that office where this fraud was going on?

11   **A.**   Yes, I did.

12   **Q.**   So you were arrested by the Atlanta Police Department; is

13   that correct?

14   **A.**   That's correct.

15   **Q.**   Did you talk with Mr. Pendergrass after you were released

16   from the Atlanta Police Department custody?

17   **A.**   Yes.

18   **Q.**   Did you talk about the arrest and the charges and what is

19   going on?

20   **A.**   We really didn't talk about the arrest.  There were some

21   other deals -- there was a legitimate deal that came in around

22   November that he was urging me to close.  It was already

23   closed.  It was a company out of Ohio.

24       And with everything going on, I was really scared at the

25   time.  And so I told him that they could just keep the money.

**Q.**   So let me stop you there.

**A.**   Okay.

**Q.**   So after you get arrested by the Atlanta Police Department, do you stay in contact with Mr. Pendergrass and do more deals?

**A.**   Later down the road, yes.

**Q.**   More illegal fraudulent deals?

**A.**   Yes.

**Q.**   Why would you do that after you have already been arrested?

**A.**   I don't know why.

**Q.**   Could it be the money?

**A.**   No.  Because I wasn't trying to go for anything big.  I had already took -- took care of SunTrust in the end of June. And so I was really trying to stay under the radar.

But, you know, things were tight, and that is what I -- yeah, I ended up doing it.

**Q.**   So you said things were tight?

**A.**   Yes.

**Q.**   I'm assuming you don't mean this kind of tight?  You mean money was tight; is that correct?

**A.**   Money was tight.  I wasn't working any more.  My separation with the City of -- not City of Atlanta but Clark Atlanta ended in 2000 -- March of 2013.  And so --

**Q.**   So let me stop you.

1    **A.**    Okay.

2    **Q.**    You needed money; correct?

3    **A.**    Yes.

4    **Q.**    Thank you.  What deals did you do with Mr. Pendergrass

5    after you were arrested by the Atlanta Police Department?

6    **A.**    So there was a -- Mr. Pendergrass contacted me and said

7    that there was another holder that was paying out in two weeks.

8    And so that holder was in Florida.  And so --

9    **Q.**    Let me stop you.  Do you recall the name of this account?

10   **A.**    I believe it was Escambia County.

11   **Q.**    Let me show you what has been marked as Government's

12   Exhibit 40 -- Exhibit Number 40.  Take a look at that.

13   **A.**    Yes, I'm familiar with it.

14   **Q.**    Do you recognize that document?

15   **A.**    Yes.

16   **Q.**    How are you familiar with that document?

17   **A.**    This is a document I submitted under another name.

18   **Q.**    Does that appear to be a true and accurate copy of

19   documents you been submitted or kept as relates to that

20   account?

21   **A.**    Yes.

22   **Q.**    Are there any changes, alterations, or deletions that you

23   can see to those documents?

24   **A.**    No.

25          MR. BROWN:  At this time, the Government would move

1    to admit Exhibit Number 40 into evidence, Judge.

2              THE COURT:  Was this defendant's exhibit or your

3    exhibit?

4              MR. BROWN:  My exhibit, Judge.  Government's exhibit,

5    Judge.  Number 40.

6              MS. DURRETT:  No objection.

7              THE COURT:  All right.  It is admitted.

8    **Q.   (BY MR. BROWN)**  So you mentioned Escambia County -- is

9    that correct? -- when I questioned you about additional deals?

10   **A.**   Yes.

11   **Q.**   Is this something you sent to Escambia County?

12   **A.**   Yes.

13   **Q.**   And was the payee name Pensacola Ice Pilots?

14   **A.**   Yes.

15   **Q.**   What name did you use?

16   **A.**   I used Chris -- so I created another company called

17   Recovery Capital.

18   **Q.**   So let me stop you.  You created that company; correct?

19   **A.**   I did create that company.

20   **Q.**   How was Mr. Pendergrass involved in this deal, if at all?

21   **A.**   He did the research on the deal.  I didn't even -- I

22   didn't know about Escambia County or how quickly they paid.

23        And so I was getting information from him on what was --

24   what was available in Escambia County and how quickly they were

25   paying.

1   Q.   So you were arrested on September 13, 2013; correct?

2   A.   Yes.

3   Q.   So we are several months later.  We're in February 2014,

4   and this is another fraudulent attempt to steal money; correct?

5   A.   Yes.

6   Q.   So I'm -- this is all fraudulent; correct?

7   A.   Yes.

8   Q.   And did you sign this Chris Carter?

9   A.   I did, yes.

10   Q.   Did anyone else sign this document?

11   A.   No.

12   Q.   So this is your writing on these documents?

13   A.   I sent it to Mr. Fitchpatric.

14   Q.   To do what?

15   A.   To lift -- to put the signatures on.

16   Q.   Okay.  So these signatures here are actually lifted

17   signatures?

18   A.   Yes.

19   Q.   Did you receive the money?

20   A.   Yes, I did.

21   Q.   What did you do with the money, if anything?

22   A.   I opened up an account at BB&T under a d/b/a account.

23   Q.   Okay.

24         MR. BROWN:  The Government would move to admit

25   Exhibit Number 41 into evidence.

```
 1              THE COURT:  Any objections?

 2              MS. DURRETT:  No, Your Honor.

 3              THE COURT:  41 is admitted.

 4    Q.   (BY MR. BROWN)  Mr. Pendergrass, you testified that you

 5    opened up an account.

 6         Is this the account you opened to deposit that money that

 7    you stole from Escambia County?

 8    A.   Do you mean Mr. McQueen?

 9    Q.   Sorry about that.

10         Mr. McQueen, can you look at the screen and verify that is

11    the account that you opened?

12    A.   Yes, it is.

13    Q.   That is your signature there opening the account?

14    A.   Yes, it is.

15    Q.   Did you deposit the fraudulent funds or stolen money into

16    that account?

17    A.   I did.

18    Q.   Did you provide any funds to Mr. Pendergrass out of this

19    account?

20    A.   Yes.  Yes, I did.  So not out of this account.

21    Q.   How did you provide funds to Mr. Pendergrass?

22    A.   So I had a -- a -- what is it?  A lawsuit with Clark

23    Atlanta that I got paid from.  And I paid him money cash out of

24    my personal account.

25    Q.   Do you recall how much you paid Mr. Pendergrass?
```

**A.**   I don't remember how much I paid him.

**Q.**   So let's talk about why you are here today.

        So you were charged by a federal indictment for your
involvement in this case; correct?

**A.**   That's correct.

**Q.**   You were charged with Mr. Pendergrass?

**A.**   Yes.

**Q.**   All right.  Do you recall when you were indicted?

**A.**   In June 2017.

**Q.**   After you were indicted in this case, did you speak with
Mr. Pendergrass about the indictment?

**A.**   No.

**Q.**   Why not?

**A.**   I hadn't spoken to Mr. Pendergrass in four years.  2014
was the last time I talked to Mr. Pendergrass.

**Q.**   How did your relationship end with Mr. Pendergrass?

**A.**   One of the last deals we were working on together with me
and Mr. Pendergrass went south and --

**Q.**   Let me stop you there.  You said went south?

**A.**   Yeah.

**Q.**   What happened?

**A.**   The bank account closed.  And I was just tired of it.

**Q.**   Which bank account is this, and what is the name of the
deal?  Do you remember?

**A.**   I opened a bank up through -- I got some information from

1    Mr. Pendergrass's database.  And I opened up a bank account

2    under the name Nationwide Mutual.  It was Nationwide Mutual

3    Capital or something like that.

4    **Q.**   And was that a legitimate deal, or was that another

5    fraudulent deal?

6    **A.**   No.  So it was a fraudulent deal.

7    **Q.**   And who was involved in that deal?

8    **A.**   It was me and Mr. Pendergrass.

9    **Q.**   How was Mr. Pendergrass involved in that deal?

10   **A.**   So the gentleman whose name I used, his name was Dusty

11   Fager.  I got that information from -- from Mr. Pendergrass.

12   It was in his old -- it was a customer in his old database.

13   **Q.**   Now, did you have -- how did you get this information from

14   Mr. Pendergrass?  Did he email it to you?  Did you guys meet?

15   How were you communicating with him even after you were

16   arrested?  How did you get the information from him?

17   **A.**   It was either by email or -- because you could log on

18   anywhere.  It was either, you know, by email or at his house.

19   **Q.**   Speaking of his house, at the time you were working with

20   Mr. Pendergrass, did you go to his house often?

21   **A.**   Yes.

22   **Q.**   Did you guys go out to dinner a lot?

23   **A.**   Yes, we did.

24   **Q.**   What about lunch in the office?  Did you go out to lunch?

25   **A.**   Yes, we did.

1    **Q.**   So during this time, how would you describe your

2    relationship with Mr. Pendergrass when you were working?

3    Before it all blows up at the end, are you friends?  Describe

4    the relationship.

5    **A.**   We are friends or associates -- very close associates.

6    **Q.**   Do you hang out after work?

7    **A.**   Occasionally, yes.

8    **Q.**   We already established you went on vacation; correct?

9    **A.**   Yes.

10   **Q.**   Did you go on other vacations besides Costa Rica?

11   **A.**   Yeah.  We went to Rio.

12   **Q.**   Rio?

13   **A.**   Yes.

14   **Q.**   When did you go to Rio?

15   **A.**   We went to Rio in May.

16   **Q.**   May of 2013?

17   **A.**   Yes.

18   **Q.**   Who did you go with to Rio?

19   **A.**   So I went to Rio by myself and met with Mr. Pendergrass.

20   **Q.**   Did anybody else from the office come along?

21   **A.**   No.

22   **Q.**   Who paid for your trip?

23   **A.**   I paid for my trip.

24   **Q.**   Who paid for Mr. Pendergrass's trip?

25   **A.**   Mr. Pendergrass.

1          MS. DURRETT:  I object, Your Honor.  I mean, how does

2    he know who paid for Mr. Pendergrass's trip?

3          MR. BROWN:  I'll withdraw the question.

4    **Q.   (BY MR. BROWN)**  Do you know who paid for Mr. Pendergrass's

5    trip?

6    **A.**   Mr. Pendergrass paid for Mr. Pendergrass's trip.

7    **Q.**   Where did you get the money to go to Rio in May of 2013?

8    **A.**   I received the money from the Long Weinberg & Wheeler

9    26,000-dollar check that came in.

10   **Q.**   Okay.  So that was the stolen money; correct?

11   **A.**   That's correct.

12   **Q.**   How long did you stay in Rio?

13   **A.**   A week or -- yeah.

14   **Q.**   I took a detour.  But getting back to Dusty Fager.

15   **A.**   Yes.

16   **Q.**   You were telling us how your relationship ended with Mr.

17   Pendergrass.

18        Did you get any money from a government agency in the

19   Dusty Fager deal?

20   **A.**   Yes.  And I deposited that money into an ATM.

21   **Q.**   All right.  And what happened?  You said -- what happened

22   with the account or what happened with the money?

23   **A.**   So I don't know all the behind the scenes what happened.

24   I opened up a business account under that name, and then I was

25   using his name, and then the account closed.

84

1    Q.   All right.  You were using whose name?

2    A.   I was using Dusty Fager.

3    Q.   So did you steal someone's identity to use that name?

4    A.   Yes.

5    Q.   All right.  So Dusty Fager is a real person?

6    A.   Dusty Fager is a real person out of Washington.

7    Q.   And was Mr. Pendergrass involved in this Dusty Fager deal?

8    A.   Yes.  Because I didn't know who Dusty Fager was.  So I

9    needed -- I didn't want to use my name for the account.  And so

10   I wanted to distance myself with it.

11   Q.   All right.  So how was Mr. Pendergrass involved, if at

12   all?  What did he do?

13   A.   He gave me the information for Dusty Fager in order for me

14   to open the account.

15   Q.   How were you able to open a bank account in someone else's

16   name?

17   A.   You can open it online as long as you have their ID and

18   their social.

19   Q.   Where did you get Dusty Fager's ID?

20   A.   I got Dusty Fager's ID from Mr. Pendergrass's old

21   database.

22   Q.   So are there scanned images of IDs in the database?

23   A.   Yes.

24   Q.   Did you manipulate that ID to make it for, you know, that

25   time period or change anything on it to present to the bank?

1   **A.**   No.  It was already -- it was already -- everything on it

2   was fine.

3   **Q.**   All right.  What was the -- was there any arrangement

4   between you and Mr. Pendergrass about the money or proceeds

5   from this fraud?

6   **A.**   I don't remember what the split would have been.  I would

7   have paid him once --

8        MS. DURRETT:  Your Honor, I object to "I would have."

9   Any speculation I object to.

10       THE COURT:  Sustained.

11  **Q.**   **(BY MR. BROWN)**  Did you pay Mr. Pendergrass?

12  **A.**   Not on that deal.

13  **Q.**   Why not?

14  **A.**   The money was taken away.

15  **Q.**   By who?

16  **A.**   The bank or the customer.  I believe the customer had a

17  Bank of America account, to my knowledge.  And so I believe he

18  closed it, and so I didn't have access to it any more.

19  **Q.**   I want to show you what has been marked and admitted into

20  evidence as Exhibit Number -- Number 13.

21       Are you familiar with Hemisphere, Inc.?

22  **A.**   Yes.  That was one of the names on that list.

23  **Q.**   Okay.  Were you involved in this deal?

24  **A.**   No.

25  **Q.**   Why not?

1    **A.**   That was before I started with Mr. Pendergrass.

2    **Q.**   All right.  Well, the date on this is October 31st, 2012.

3    Do you see that?

4    **A.**   Yes.

5    **Q.**   Now --

6           MS. DURRETT:  Your Honor, he just said he wasn't

7    involved.  So I'm not sure what kind of questions we're getting

8    into.  He said he wasn't involved and it was before he started.

9           MR. BROWN:  He said he was familiar with the name

10   but -- he was familiar with the deal, but he was not involved

11   in the deal, Judge.

12          If he doesn't know, he doesn't know.  But I'm still

13   able to question him about exhibits already in evidence, Judge.

14          THE COURT:  All right.

15   **Q.**   **(BY MR. BROWN)**  Whose signature is at the bottom?

16   **A.**   It is Mr. Pendergrass's signature.

17   **Q.**   Did you sign any portion of this document?  Do you see

18   your handwriting?

19   **A.**   No, I do not.

20   **Q.**   Now, before I was interrupted, you were talking about the

21   date October 31st, 2012.

22          Did you testify to this jury that you were not involved or

23   working with Mr. Pendergrass at that time?

24   **A.**   We would have been talking at this time.

25   **Q.**   Can you explain for the jury a lease you signed in 2011

1  and not working there in October 2012?  Can you square that?

2  Because it doesn't make sense to me.

3  **A.**    Yeah.  I was working at Clark Atlanta during that time.  I

4  did some bookkeeping work for Mr. Pendergrass at a retail store

5  he had opened in Jonesboro or Riverdale, Georgia.

6       I don't know how my -- I don't remember signing that

7  document.  Maybe as a favor or something.  But I don't -- I

8  didn't -- I didn't realize he had a smaller office until I

9  started working with him in 2012.

10      He went from a very, very nice office when I first met him

11 in 2006 in Fayetteville that was two offices combined together

12 to we're in 2012 and now we're in College Park and it is a much

13 smaller establishment.

14 **Q.**    When did you stop working for Clark Atlanta?  Do you know

15 the date or the month and the year?

16 **A.**    March 2013.  That was my separation date.

17 **Q.**    All right.  So October 31st, 2012, is certainly before

18 that date; correct?

19 **A.**    Yes.

20 **Q.**    All right.  You testified you were still doing some

21 bookkeeping work or other work for Mr. Pendergrass during this

22 time frame -- is that correct? -- during 2010, 2011?

23 **A.**    I just remember 2010.  I don't remember doing any work in

24 2011.  I know we were in contact with each other.

25 **Q.**    How were you in contact with each other?

**A.**   Just occasionally getting together for drinks or at his house.  I remember I owed him some money, and I ended up paying him back, and I ended up inviting him to my -- I had a wedding in 2011 -- June 25th, 2011.  I invited him, and I remember him showing up.  I was surprised that he did show up.  But he showed up.

**Q.**   Okay.  So I left off before I switched gears relating to the indictment in this case -- correct? -- about you being indicted in June of 2017?  Do you recall that?

**A.**   Yes.

**Q.**   After your indictment and arrest in this case, did you ultimately decide to plead guilty?

**A.**   Yes, I did.

**Q.**   Why did you plead guilty?

**A.**   I pled guilty because I was guilty and this case had been lingering on a long time and I was ready to move forward with it.

**Q.**   I want to show you what has been marked as Government's Exhibit Number 33.  Take a look at that document.

**A.**   (The witness complies.)  I have looked at it.

**Q.**   What is the document?

**A.**   It is the plea agreement that I signed.

**Q.**   All right.  What did you plead guilty to?  What count did you plead guilty to?

**A.**   I pled guilty to Count 8, which was an aggravated identity

1    theft.

2    **Q.**    So in that indictment, you are charged with ten counts; is

3    that correct?

4         You don't have the indictment.  But do you recall being

5    charged with ten counts?

6    **A.**    Yes.

7    **Q.**    And you pled guilty to how many?

8    **A.**    One.

9    **Q.**    One.  So you got a benefit, did you not?

10   **A.**    I did.

11   **Q.**    And how much time are you facing on that count you pled

12   guilty to?

13   **A.**    Mandatory minimum of 24 months.

14   **Q.**    So that is two years; correct?

15   **A.**    That's correct.

16   **Q.**    But you want to serve less than that, don't you?

17   **A.**    Yes, I do.

18   **Q.**    So why are you testifying in court today against

19   Mr. Pendergrass?

20   **A.**    One, I want to get the truth out and also to get a

21   benefit.

22   **Q.**    You said you want to get the truth out?

23   **A.**    The truth of my -- my truth out, my side of the story to

24   everything, and also to get a benefit so I don't have to serve

25   two years in jail.

1   Q.   Have you testified truthfully to this jury about your

2   involvement in this case?  Have you?

3   A.   Yes, I have.

4   Q.   How about Mr. Pendergrass's involvement in this case?

5   A.   Yes, I have.

6   Q.   But you also said you want -- you want to serve less than

7   two years; correct?

8   A.   Yes.

9   Q.   Well, how does that happen?  How do you get less than two

10  years?

11  A.   You have to cooperate.

12  Q.   Is that part of the reason why you are here testifying

13  today?

14  A.   Yes.

15  Q.   Now, in preparation for this trial, you met with me;

16  correct?

17  A.   Yes.

18  Q.   Have we met on Zoom?

19  A.   Yes.

20  Q.   Have we met several times in preparing for your testimony

21  today?

22  A.   Yes.  We met several times.

23  Q.   Have you reviewed documents in this case to refresh your

24  memory about what happened in 2013?

25  A.   Yes.

1   Q.   And you are represented by an attorney; correct?

2   A.   Yes.

3   Q.   He is in the courtroom today?

4   A.   Yes, he is.

5   Q.   Have you been asked by me or anyone else about how you

6   should testify or told?

7   A.   No.

8   Q.   To the best of your memory, have you made up any lies or

9   deceived the jury in your testimony?

10  A.   No, I have not.

11  Q.   I want to show you one last exhibit, Exhibit Number 46.

12       While we're waiting on that, Mr. McQueen, you have not

13  been charged with all the fraud you committed while working

14  with Mr. Pendergrass; is that correct?

15  A.   That's correct.

16  Q.   You weren't charged by my office relating to Pensacola Ice

17  Pilots, were you?

18  A.   No.

19  Q.   You weren't charged relating to Holland & Knight, were

20  you?

21  A.   No.

22  Q.   Mr. McQueen, I'm going to show you what has been marked as

23  Government's Exhibit 46.

24       Take a look at that and tell me if you recognize it.

25  A.   Okay.

```
1    Q.    Do you recognize the documents contained in Government's

2    Exhibit 46?

3    A.    Yes.

4    Q.    What are they?

5    A.    They are copies of the original checks from the City of

6    Atlanta for Georgia Municipal Association, James Bone,

7    trustee --

8              MS. DURRETT:  Your Honor, I object.  I don't think it

9    has been admitted.  I do have an objection.  The Government

10   counsel knows that.

11             THE COURT:  All right.  I don't need you to read the

12   whole thing.

13             Are you familiar with it?

14             THE WITNESS:  Yes.

15             THE COURT:  And your objection is what?

16             MS. DURRETT:  My objection is that there is something

17   missing.  It is two perforated forms together.  I don't know

18   what else is in the middle.  But that is my objection.

19             THE COURT:  Let me just see the check.  If you could

20   just retrieve it for me.  Because I'm missing the -- I must

21   have left in my office the other set of --

22             Are you saying something is missing here?

23             MS. DURRETT:  I don't know if there is.  And I don't

24   know how those --

25             THE COURT:  Well, he can identify -- I don't have to
```

1   let it in.  I mean, that's -- and I'll instruct the jury

2   accordingly.

3           MS. DURRETT:  Thank you.

4   **Q.   (BY MR. BROWN)**  So I think, Mr. McQueen, you have already

5   established these are original copies of mailings from the City

6   of Atlanta; is that correct?

7   **A.**   Yes.

8   **Q.**   Do they appear to be actually the originals themselves?

9   **A.**   Yes.

10          MR. BROWN:  The Government would move to admit --

11  **Q.   (BY MR. BROWN)**  And these relate to checks that you

12  received or the business received when you worked for Mr.

13  Pendergrass; is that correct?

14  **A.**   Yes, they were.

15  **Q.**   Do there appear to be any changes or alterations or

16  deletions to the actual exhibits contained in 46?

17  **A.**   No.

18          MR. BROWN:  The Government would move to admit 46

19  into evidence, Judge.

20          MS. DURRETT:  We object the same objection, Your

21  Honor.  Thank you.

22          THE COURT:  All right.  I'll allow it in.

23          MR. BROWN:  Thank you, Judge.

24          MS. DURRETT:  Thank you.

25  **Q.   (BY MR. BROWN)**  Mr. McQueen, you testified these were the

1    actual originals of the check stub for Georgia Municipal

2    Association.

3         Do you see that at the bottom?

4    **A.**   Yes.

5    **Q.**   And I think you testified yesterday that these were

6    actually mailed to P.O. Box 1809 in Fayetteville, Georgia?  Do

7    you see that?

8    **A.**   Yes.

9    **Q.**   And that was the P.O. Box controlled by Mr. Pendergrass;

10   correct?

11   **A.**   That's correct.

12   **Q.**   And did you take the check out and put this on the paper

13   here and organize it?

14   **A.**   I don't remember.

15   **Q.**   Would you have done that as a part of your job?

16   **A.**   No.

17            MR. BROWN:  That's all I have for these exhibits,

18   Judge.

19            THE COURT:  Are you through with this witness?

20            MR. BROWN:  One second, Judge.

21            **(There was a brief pause in the proceedings.)**

22            MR. BROWN:  That's all I have for this witness,

23   Judge.

24            THE COURT:  All right.  I think it would make sense

25   to stop at this point for lunch.  And I would ask everyone in

1  the -- who are sitting in the courtroom other than the jury to

2  stay put for now.  Let the jury quickly move on to having

3  lunch.  And we'll see you at 1:00.  All right.

4                COURTROOM SECURITY OFFICER:  All rise.

5                **(The jury exited the courtroom at 11:53 A.M.)**

6                THE COURT:  Have a seat.  Everyone can have a seat.

7  We'll just wait for a minute or two.

8                I know you gave me those later exhibits.  But somehow

9  I must have taken them into my office.

10               MR. BROWN:  A lot have been floating around, Judge.

11               THE COURT:  I looked and looked.

12               MR. BROWN:  If you need another copy, we can get you

13  one.

14               THE COURT:  Okay.  Thank you.  Thank you very much.

15               **(There was a brief pause in the proceedings.)**

16               THE COURT:  All right.  Everyone is excused from the

17  courtroom.  Thank you very much.

18               I want to say to anyone who is an observer please

19  don't approach anyone who is involved with this case, whether

20  it be a witness or a defendant or a juror at this juncture.

21  Thank you.

22               **(A lunch break was taken.)**

23               MS. DURRETT:  Your Honor, I have one issue.  I intend

24  to try to admit a CD of a voice recording that Mr. McQueen

25  provided to the Government about a week ago and the Government

1   provided to me.  It is a -- it was recorded on the Lee Family

2   Trust voice mail.  And Mr. McQueen evidently had access to that

3   and sent it to us about a week ago.  And I would like him to

4   verify that was a voice mail that he sent to us.

5           MR. BROWN:  Your Honor, I'm not going to object to

6   the admission of that exhibit.  Let it come in.

7           THE COURT:  Great.  Should we get Mr. McQueen?

8           MR. BROWN:  Yes.

9           MS. DURRETT:  I'm going to start with the

10  stipulation, Your Honor.

11          THE COURT:  Okay.

12          Let's get the jury back.

13              **(The jury entered the courtroom at 1:12 P.M.)**

14          THE COURT:  I just want to remind you that you are

15  still under oath.  We're now going to proceed with

16  cross-examination.

17          MS. DURRETT:  Thank you, Your Honor.  I'm going to

18  move to admit Defendant's Exhibit 32, which is a stipulation

19  between the parties.

20          MR. BROWN:  Your Honor, is that just going to be

21  read?  That is not going back as substantive evidence?

22          THE COURT:  Well, typically, stipulations typically

23  are.  But we can discuss --

24          MR. BROWN:  Okay.  We can discuss this.

25          THE COURT:  -- this later.

| | |
|---|---|
| 1 | But go ahead and read it. |
| 2 | MS. DURRETT:  And I can publish it? |
| 3 | THE COURT:  Yes. |
| 4 | MS. DURRETT:  Thank you, Your Honor. |
| 5 | The parties have stipulated that the Government in |
| 6 | requesting that certain evidence be admitted in this case |
| 7 | previously represented in court documents that the specific |
| 8 | counts alleged in the indictment involve incidents where |
| 9 | Co-defendant McQueen, not Defendant Pendergrass, signed and |
| 10 | sent the alleged forged documents at issue in the charges |
| 11 | against Pendergrass. |
| 12 | CROSS-EXAMINATION |
| 13 | BY MS. DURRETT: |
| 14 | Q.   Good afternoon, Mr. McQueen. |
| 15 | A.   Good afternoon. |
| 16 | THE COURT:  Do you want us to turn this off, or are |
| 17 | you going to be using it? |
| 18 | MS. DURRETT:  I might use it.  It is easier for me. |
| 19 | Is that okay? |
| 20 | THE COURT:  Yes. |
| 21 | Q.   (BY MS. DURRETT)  My name is Saraliene Durrett, and I |
| 22 | represent Mr. Pendergrass in this case.  Okay? |
| 23 | A.   Okay. |
| 24 | Q.   I have a few questions for you.  If there's anything that |
| 25 | I say that you don't understand or you can't hear, just let me |

1   know.

2   **A.**   Okay.

3   **Q.**   Okay.  So I want to start kind of by talking about your

4   history with Mr. McQueen or with Mr. Pendergrass.

5       I think you told us that you started working for him in

6   2006?

7   **A.**   That's correct.

8   **Q.**   Okay.  Now, that was new information to me.  I previously

9   had been given a statement that you had made to the Government,

10  and that wasn't included in there.

11      Was that something you had previously told the Government?

12  **A.**   That I was working with him?

13  **Q.**   In 2006.

14  **A.**   I don't -- I don't remember when we -- if I would have had

15  that conversation.  So when we first met in 2018, I told them

16  everything.

17  **Q.**   Okay.  So that is a good -- great place for us to start.

18      Are you talking about your meeting on February 7, 2018?

19  **A.**   Yes.

20  **Q.**   Okay.  How many meetings have you had with either the

21  prosecutors in this case or the Government agents or police

22  officers?

23  **A.**   Just three.

24  **Q.**   Just three meetings.  When did those happen?

25  **A.**   No.  I'm sorry.  Four.  Four.  The 2018 meeting.  And then

1    we had a meeting -- I believe there was a trial date set in

2    2019.  I'm not -- I don't remember the date.

3    **Q.**   Okay.

4    **A.**   But I reported to the courthouse, and we met via video.

5    And then just recently.

6    **Q.**   Okay.  So that is three.

7    **A.**   Okay.

8    **Q.**   Did you have a different -- another one?

9    **A.**   We had recently -- we had one in August because we thought

10   that -- I guess -- I guess we thought that the trial was going

11   to happen in August of this year.

12   **Q.**   Okay.

13   **A.**   Then we met in November -- we had a video conference in

14   November.

15   **Q.**   So let me make sure I have it right.

16        You met in February of 2018; right?

17   **A.**   Yes.

18   **Q.**   Okay.  And then in 2019, you met sometime.  Do you

19   remember what month that was?

20   **A.**   It was right -- we were getting ready because there was a

21   trial date and I believe Mr. Pendergrass fired his attorney.

22   **Q.**   Okay.  Did you come to the courthouse and meet with these

23   prosecutors, or who did you meet with in 2019?

24   **A.**   No.  It was a courthouse in Fort Worth because that is

25   where I live, in Fort Worth.  And so we were getting ready for

1    trial prep.  So it was a trial prep meeting.

2    **Q.**    And is that what you are saying you did on a video

3    conference?

4    **A.**    Yes.

5    **Q.**    So you conferenced in with Mr. Brown or someone from his

6    office?

7    **A.**    Yes.

8    **Q.**    And you were not physically here?  You were in Fort Worth?

9    **A.**    Yes.

10   **Q.**    Okay.  I've got it now.

11        All right.  And then in August of 2020, just a few months

12   ago, did you physically meet or did you do another video?

13   **A.**    It was a video.

14   **Q.**    And then in November, which is -- well, we're in December

15   now.

16        But in November, how many times did you meet?

17   **A.**    We met twice.

18   **Q.**    Okay.  So two times in November.  Were those video

19   conferences?

20   **A.**    They were video conferences.

21   **Q.**    Both video conferences?

22   **A.**    Yes.

23   **Q.**    Okay.  And then when you came here to get ready for this

24   trial this week or even last week, did you meet with the

25   Government again?

1   **A.**   We were in his office, yeah, when I got -- when I came

2   here Tuesday, I was told to report to his office.

3   **Q.**   So you met with him and talked about the case?

4   **A.**   Yes.

5   **Q.**   Okay.  So that sounds like one, two, three, four, five,

6   six meetings with the Government?

7   **A.**   Okay.

8   **Q.**   Does that sound right?

9   **A.**   Yes.

10  **Q.**   Any other ones?

11  **A.**   Not that I recall.

12  **Q.**   That is with this prosecutor?

13  **A.**   Yes.

14  **Q.**   So what I have are notes from your February -- from

15  February 2018 meeting.  Okay?

16  **A.**   Okay.

17  **Q.**   I'm going to kind of be working off that.

18  **A.**   Okay.

19  **Q.**   So, like I said, in the 2018 meeting, it doesn't appear

20  that you mentioned working with Mr. Pendergrass in 2006.

21          Do you know --

22              MR. BROWN:  Objection, Your Honor.  She's testifying.

23  These are not questions.

24              THE COURT:  She is -- he is on cross-examination.

25              Go ahead.

1   **Q.   (BY MS. DURRETT)**   Do you know when you first told the

2   prosecutors that you worked with Mr. McQueen -- or

3   Mr. Pendergrass in 2006?

4   **A.**   I don't remember the specific date.

5   **Q.**   Okay.  Now, it sound like from your testimony yesterday

6   you worked with him in 2006 and that was at the business that

7   he had with his wife?

8   **A.**   That was with Guishard Wilburn & Shorts.

9   **Q.**   And that was an asset recovery business?

10  **A.**   That is correct.

11  **Q.**   Okay.  And I think everybody kind of already knows the

12  deal.

13       But it is a business where you contact people who might

14  be -- have lost or unclaimed funds out there?

15  **A.**   That's correct.

16  **Q.**   And that was the only business that they had; right?  That

17  is the business they were doing?

18  **A.**   Yeah.  There were two sides of the business.  But yes.

19  The different types of funds, but yes.

20  **Q.**   What do you mean by that?

21  **A.**   So there was a warrant side and a surplus side.  The

22  surplus dealt with real estate.  And the warrant side dealt

23  with uncashed checks.

24  **Q.**   So all of it was to reach out to people who may not know

25  they were missing money and see if you could collect it for a

1    portion of the money?

2    **A.**   That's correct.

3    **Q.**   Okay.  And I think you told us that you got fired from

4    that job?

5    **A.**   Yes.  Yes.

6    **Q.**   Okay.  And you got fired because they wanted you --

7    according to your testimony, because they wanted you to do

8    sales and you didn't like doing that?

9    **A.**   That's correct.  I was in accounting.  I got hired on to

10   do bookkeeping work.  And that is what I thought that I would

11   be doing there.  I didn't think that I had to assist with

12   doing -- calling folks and trying to convince them that they

13   had funds available.

14   **Q.**   How long did you work there in 2006?

15   **A.**   It was from December until January or February.

16   **Q.**   Okay.  So then you got fired, and that was --

17   Mr. Pendergrass's wife fired you?

18   **A.**   Yes.

19   **Q.**   And because she didn't like the way you were --

20   **A.**   They decided that it wasn't going to work out.  That is

21   what I was told.

22   **Q.**   Okay.  Now, I was a little confused on the timeline as far

23   as when you were working at Clark Atlanta.

24   **A.**   From 2007 -- May of 2007, I started as a temporary staff

25   accountant.  And I worked up until March 2013.

1   **Q.**   Okay.  And so it sounds like there was some overlap with

2   your work at Clark Atlanta then kind of coming back into the

3   picture with Mr. Pendergrass?

4   **A.**   He had a business -- a retail business where he sold

5   second-hand phones in Jonesboro.  And I did some inventory.  I

6   don't know how many times I did some inventory for that

7   business.

8   **Q.**   And how did you get back with him?  I mean, you got fired.

9   You said you were mad at him.  How did you come back to be

10  working for him?

11  **A.**   We saw each other at a clothing store.  And I asked him

12  how he was doing.  And we kind of caught up and then exchanged

13  the information from there.

14  **Q.**   Okay.  Did he ask you -- I know you have talked a lot

15  about fraud.

16      Did he ask you to do anything illegal at the retail store?

17  **A.**   No.

18  **Q.**   So that was in 2010?

19  **A.**   Yes.

20  **Q.**   Okay.  And how long did you do that work?

21  **A.**   Just a couple of months.  It didn't work out because the

22  individual who he had running the store -- they kept having

23  arguments about how stuff was supposed to be priced.  And he

24  didn't really trust him.  So I wasn't trying to stick around

25  for their arguments.  So I left it alone.

1    **Q.**    Okay.  You quit?

2    **A.**    I quit.  Yeah.  I left it.

3    **Q.**    You continued working at Clark Atlanta?

4    **A.**    Yes.

5    **Q.**    Okay.  And then at some point, you were fired from Clark

6    Atlanta?

7    **A.**    No.  I had the FMLA from Clark Atlanta.

8    **Q.**    Okay.  But you hired a law firm to sue Clark Atlanta

9    because you were fired from them; right?

10   **A.**    No.  I had a torn rotator cuff, and so I had a Workman's

11   Comp.

12   **Q.**    Okay.  Well, I know what you told the Government in

13   February 2018 was that you were on leave from Clark Atlanta;

14   right?

15   **A.**    Yes.  It was the FMLA.

16   **Q.**    Do you remember filling out a Workers' Compensation form

17   for the law firm Gary Martin Hays & Associates?

18   **A.**    Yes.  That is the firm who represented me.

19   **Q.**    Okay.  And I'm going to mark this as Defendant's

20   Exhibit 38.  I'm just marking it for identification purposes,

21   sir, so I can show it to you and ask you if you recognize it.

22   **A.**    Yes.

23   **Q.**    Okay.  Is that the Workers' Compensation application that

24   you filled out for the law firm of Gary Martin Hays &

25   Associates?

1   **A.**   Yes.

2   **Q.**   That was because you wanted to sue Clark Atlanta?

3   **A.**   Yeah.  I tore my rotator cuff there moving some boxes

4   around.

5   **Q.**   Now, again, when you met with the Government in 2018, you

6   told them that you were on leave from Clark Atlanta when you

7   worked for Mr. Pendergrass; right?

8   **A.**   Yes.

9   **Q.**   Okay.  If you look at Page 4 of the document that I just

10  showed you, now, doesn't it say there that you were fired and

11  that they sent you a letter of separation?

12       Do you have a Page 4?

13  **A.**   No.

14  **Q.**   It might have been miscopied.  Let me give you -- well,

15  what I want you to do -- since they may be different, I want

16  you to compare them and tell me if they are the same or if

17  this -- I want to make sure you recognize the document you're

18  talking about.

19           MR. BROWN:  Ms. Durrett, do you have a copy for

20  counsel for the Government?

21  **Q.**   **(BY MS. DURRETT)**  Do you see Page 4, sir?

22  **A.**   Yes.  So there is a front and a back page.

23  **Q.**   Yeah.  At the bottom, it says Page 4 of 7?

24  **A.**   Yes.

25  **Q.**   Do you see at the bottom where it says, are you still

1    employed, and you answered -- what did you answer?

2    **A.**   It said no.

3    **Q.**   And then it says if no -- and it gives you some choices

4    about what to circle.

5        What did you circle?

6    **A.**   I said fired.

7    **Q.**   Okay.  And then the next thing, there is a line that lets

8    you give some comments.

9        What comments did you write?  I'm still at the bottom of

10   Page 4.

11   **A.**   Sent me a letter of separation.

12   **Q.**   Right.

13   **A.**   That letter of separation was in 2013.

14   **Q.**   Okay.  And we can talk about that.

15       But in this document, you said you were fired; correct?

16   **A.**   Yeah.  But I left, and I filed FMLA.  And then the

17   separation was actually -- I wasn't fired or let go until 2013.

18   So I was -- I still could have returned to Clark Atlanta.  So I

19   don't know why I would have circled fired here.

20   **Q.**   Okay.  And I'll take those back.

21       But when you met with the Government, you told him you

22   were on leave from Clark Atlanta; right?

23   **A.**   Yes.

24   **Q.**   Okay.  So you were doing some work -- well, I don't know

25   what was happening exactly with Clark Atlanta.

1    But when we move back into the year 2011, you and Mr.

2   Pendergrass are back in contact with each other?

3   **A.**   It was 2010.  We were -- it was very brief in 2011.

4   **Q.**   Okay.  But in 2011, that's when you signed the lease for

5   that Old National Highway office; right?

6   **A.**   It has my signature, but I don't remember signing it.

7   **Q.**   Okay.  Well, let me ask you this:  Were you in contact

8   with Mr. Pendergrass about working asset recovery in 2011?

9   **A.**   No, I was not.

10  **Q.**   Okay.  Is it your testimony here today that you believe

11  the lease is forged?

12  **A.**   I don't believe it is forged.  I may have done a favor for

13  him.  But I don't remember.  But on the -- the lessor on that

14  lease paper is Mr. Pendergrass's box.  And the gentleman -- I

15  met that gentleman one time he was -- he was at the office.  So

16  I remember that gentleman's name there.

17  **Q.**   Okay.  And I think this is Government's Exhibit 31 that

18  has already been admitted.  And this is the one -- I'm just

19  going to show it to you here.  This is the one we're talking

20  about here.

21      This commercial lease; is that right, sir?

22  **A.**   Yes.

23  **Q.**   And then there's the last page.  I'm happy to give you the

24  whole document if you need to be refreshed there.

25      But that is your signature there; right?

1  **A.**   Yes.   That is my signature.   I just don't remember signing

2  that -- this paper.

3  **Q.**   Then above it, it says tenant, Asset Financial Recovery,

4  Inc.?

5  **A.**   Yes.

6  **Q.**   Okay.   So the lease gets signed in 2011.

7       And tell me again when you remember actually starting to

8  work back with Mr. Pendergrass.

9  **A.**   It would have been in December of 2012.

10  **Q.**   Okay.

11  **A.**   Or November, December 2012.   But the end of November.

12  **Q.**   2012?

13  **A.**   Yes.

14  **Q.**   And I think you talked about when you first came back on

15  you were, like, contacting people to get lists of unclaimed

16  funds?

17  **A.**   Not initially.   The -- initially I was working with --

18  there was a primary list that I was working from that he said

19  he had.

20  **Q.**   Did you do what is called skip tracing?

21  **A.**   For that list, yes.

22  **Q.**   What does that mean?

23  **A.**   Skip tracing means locating individuals or businesses.

24  **Q.**   And at what point did you move from skip tracing into --

25  and I don't know how you would characterize it -- sales or

```
 1   contacting clients?
 2   A.   So we didn't have anybody at the office to do the main
 3   skip tracing.  And the skip tracing methods that we had early
 4   on weren't as effective for individuals as they were for
 5   businesses.
 6   Q.   Okay.  At what point did you move from doing skip tracing
 7   to contacting clients?
 8   A.   I don't remember.
 9   Q.   Okay.  And I think we talked about the fact that you
10   were -- you were the person who would send emails to the City
11   of Atlanta.  I think one was admitted where you wrote to the
12   City of Atlanta to ask for a list of unclaimed funds.
13   A.   Yes.
14   Q.   And I want to -- I don't remember exactly, but I think
15   yesterday when you testified you made it sound like that was an
16   exclusive list; that people weren't able to have access to that
17   list.
18   A.   No.  The -- so the -- when I wrote the City of Atlanta or
19   Mr. Pendergrass told me how to get the list, that is when I
20   wrote the City of Atlanta.  He had already had the main list
21   that we looked at yesterday.
22   Q.   Okay.  And I guess my question to you is:  That is not an
23   exclusive list?  That is something you could get with the
24   Freedom of Information Act request?
25   A.   No.  The list he had -- Mr. Pendergrass claimed that no
```

1    one else had that list.

2    **Q.**   Okay.  And what was on that list?  Well, tell me what was

3    exclusive about it.

4    **A.**   It just was a list that nobody -- other skip -- other

5    people who were in that line of business did not have.

6    **Q.**   Okay.  The line of business is asset collection?

7    **A.**   That's correct.

8    **Q.**   And -- but the list you wrote about here in your email to

9    the City of Atlanta, these were defendant's exhibits that the

10   Government admitted, 35 and 36 -- these emails you requested

11   the list through the Freedom of Information Act; correct?

12   **A.**   Yes.  These would have been an updated list.

13   **Q.**   So those are nonexclusive?

14   **A.**   That's correct.

15   **Q.**   All right.  And it just so happens that those are -- the

16   City of Atlanta lists -- those are the subject of some of the

17   counts here in this case; right?

18   **A.**   I don't believe they are.

19   **Q.**   You don't think that the City of Atlanta is involved in

20   the counts in this case?

21   **A.**   Can you rephrase the question?

22   **Q.**   Sure.  The list that you got from the City of Atlanta that

23   had unclaimed funds, those are part of this case; right?

24   **A.**   As part of the money that was taken or the --

25   **Q.**   The list.

1  **A.**   Yes.   There's two lists.   There is an old list and a new

2  list.   The old list has the stuff that is -- that is forged.

3  Nothing on the new list was -- was forged.

4  **Q.**   What happened with the new list?

5  **A.**   The new list was being worked.

6  **Q.**   By who?

7  **A.**   By me and Mr. Pendergrass -- or me.   I was the main person

8  working that new list.

9  **Q.**   Was it being worked legitimately?

10 **A.**   Yes.

11 **Q.**   Okay.   And when I say legitimately, what I mean is:

12 Someone was trying to collect the funds for a client so the

13 money could be paid out to the client?

14 **A.**   Yes.   That's correct.

15 **Q.**   All right.   I mean, I know you talked about you and

16 Mr. Pendergrass having -- would you consider yourselves having

17 a close relationship?

18 **A.**   We had a pretty close relationship, yeah.

19 **Q.**   Okay.   And I think you talked about his wife who had

20 worked at Guishard Wilburn & Shorts with him?

21 **A.**   Yes.

22 **Q.**   So you knew that she died of cancer in 2009?

23 **A.**   I did, yes.

24 **Q.**   Were you in contact with him during that time?

25 **A.**   So when I met him at the store -- I told you we had a

1  mutual meeting -- well, we just saw each other.  He told me his

2  wife passed away.  And then we kind of kept in touch from

3  there.

4  **Q.**   And it was after that that you had a discussion about

5  trying -- I think you said trying to get a business up and

6  running like he used to have?

7  **A.**   Yes.  That is when I met him again in 2012.

8  **Q.**   Okay.  The Government has covered quite a few of the

9  questions that I wanted to ask, so I'm trying to cut it down

10 for you.

11     Okay?

12 **A.**   Okay.  No problem.

13 **Q.**   We did talk a little bit about the map of the office.  And

14 this was a map that was created by the officers who came in and

15 arrested you; right?

16 **A.**   Yes.

17 **Q.**   Okay.  And that is Defendant's Exhibit 33, and you talked

18 a little bit about this map before.

19     But what I wanted to find out is you're desk D; right?

20 **A.**   Yes.

21 **Q.**   Okay.  And then I think what you are telling us is that

22 Mr. Pendergrass worked in here with you?

23 **A.**   Yes.  At desk B.

24 **Q.**   And so nobody worked in here in desk G?  Is that what you

25 are saying?

1  **A.**   G is a door.

2  **Q.**   I'm sorry.  Desk G2.

3  **A.**   Yeah.  No one was back there.

4  **Q.**   So just an empty room?

5  **A.**   It wasn't empty.  There were old desks back there.  He

6  ended up -- Mr. Pendergrass ended up buying newer desks later

7  on.  But no one worked in the back.

8  **Q.**   He bought a newer desk so he could work on the newer desk

9  back there; right?

10  **A.**   So he could work on the newer desk?

11  **Q.**   Yeah.

12  **A.**   No.

13  **Q.**   Why did he buy the newer desk?

14  **A.**   So we were going to -- we were -- the term trying to be

15  legit was frequently going back where we knew we needed to

16  submit some legitimate claims.

17  **Q.**   Sir, what does that have to do with the desk?  The desk is

18  what I'm asking you about.

19      He bought a new desk.  He put it in that back room so he

20  could work at that new desk in the back room.

21  **A.**   No.

22  **Q.**   Okay.  And I think you talked a little bit about -- I

23  don't need to belabor the point.  I know we had a long day

24  yesterday.

25      But there were actual clients that you worked on that got

1  paid money while you were there; correct?

2  **A.**   Yes.

3  **Q.**   Okay.  You talked about the Fryer law firm and Roshaunta

4  Laster; right?

5  **A.**   Yes.

6  **Q.**   And then you talked about Michael Burandt being a

7  legitimate client; correct?

8  **A.**   Yes, sir.

9  **Q.**   Legitimate application for funds?

10 **A.**   Yes.

11 **Q.**   Okay.  So people were attempting to collect money for

12 legitimate clients?

13 **A.**   Yes.  Yes.

14 **Q.**   Okay.  And have you ever testified in this case before,

15 sir?

16 **A.**   No.

17 **Q.**   Okay.  Now, I'm going to talk to you -- I know the

18 Government briefly talked to you about your plea agreement.

19 And I'm going to talk to you about that too.

20      So this is Defendant's 12A.  I think you told the

21 Government that you pleaded guilty back in July of 2018?

22 **A.**   Yes.

23 **Q.**   Right?  You pleaded guilty to one count of aggravated

24 identity theft; is that right?

25 **A.**   Yes.

1   Q.   But that is not all you were charged with; right?

2   A.   That's correct.

3   Q.   Okay.  So let's talk a little bit about that if I can find

4   your indictment.

5                    **(There was a brief pause in the proceedings.)**

6   Q.   **(BY MS. DURRETT)**  Okay.  So you were charged with five

7   counts of mail fraud; right?

8   A.   Yes.

9   Q.   And you were charged -- and you were charged with a money

10   laundering conspiracy?  Is that what you are looking at up

11   there, sir?

12   A.   Yes.

13   Q.   Do you have the indictment with you?

14   A.   No.  This is just the guilty plea.  I don't have the

15   indictment.

16   Q.   Hold on.  I'm going to grab you a copy.  I know I have it

17   marked.  Just a second.

18                    **(There was a brief pause in the proceedings.)**

19   Q.   **(BY MS. DURRETT)**  It is Defendant's Exhibit 18.  I'm going

20   to show it to you.  Okay?

21        So you are charged with five counts of mail fraud, one

22   count of money laundering conspiracy; right?

23   A.   Okay.

24   Q.   And then four separate counts of aggravated identity

25   theft; right?

1   **A.**   Yes.

2   **Q.**   Okay.  And I know that you understood -- well, I think you

3   talked about how you might be facing two years in prison as a

4   result of the plea; right?

5   **A.**   Yes.

6   **Q.**   Okay.  But you understood at the time that you took your

7   plea that each of the mail fraud counts carry a penalty of 20

8   years; right?

9   **A.**   My attorney might have mentioned that.  I don't remember

10  per se.

11  **Q.**   He might have mentioned that it is 20 years on Count 1, up

12  to 20 years on Count 2, up to 20 years on Count 3, up to 20

13  years on Count 4, and up to 20 years on Count 5?  They might

14  have mentioned that to you?

15  **A.**   Yes.

16  **Q.**   Did they also mention to you that it is up to 20 years on

17  Count 6, the money laundering conspiracy?

18  **A.**   I don't remember.

19  **Q.**   Well, did you talk with your attorney about it?

20  **A.**   Yes.

21  **Q.**   Okay.  So -- well, is it your testimony that you didn't

22  know you faced a penalty of up to 20 years on Count 6?

23  **A.**   No.  We went over this together.  She explained everything

24  to me.

25  **Q.**   Okay.  So you knew it was up to 20 years on each of the

1   first five; right?

2   **A.**   Yes.

3   **Q.**   Up to 20 on Count 6; right?

4   **A.**   Yes.

5   **Q.**   Okay.  And when I say up to 20, I mean 20 years; right?

6   **A.**   Yes.

7   **Q.**   And then on the last four counts, it is two years each;

8   right?

9   **A.**   Yes.

10  **Q.**   And those can be stacked on top of each other; right?  It

11  could be eight years for each of those; right?  Or they could

12  be run together?  It could be two years for all; right?

13  **A.**   Yes.

14  **Q.**   But no matter what happens with those, if you are

15  sentenced on those aggravated identity thefts, it is

16  consecutive to the other stuff; right?

17  **A.**   Yes.

18  **Q.**   So if you had gotten 20 years on Count 1 and you were

19  convicted on an agg ID, it would have to be on top of that; is

20  that right?

21  **A.**   Okay.  Yes.

22  **Q.**   You understood that?

23  **A.**   Yes, I understand.

24  **Q.**   So I mean, I'm not -- you're the accountant; right?  So

25  I'm just going to try to add it up.

1    **A.**   I used to be the accountant.

2    **Q.**   20, 40, 60, 80, 100, 120, 128 years.  Does that sound

3    right?

4    **A.**   Yeah.

5    **Q.**   Up to 128 years?

6    **A.**   Yes.

7    **Q.**   But what you did was you worked out a deal where if you

8    came in here and testified against Mr. Pendergrass that your

9    maximum sentence is two years; is that right?

10   **A.**   That is what the deal was, yes.

11   **Q.**   That is what the deal is, yeah.

12        So let's talk a little bit about what the deal entails.

13   Okay?

14        Okay.  So did you say you had the plea agreement up

15   there -- that you had the plea agreement with you?

16   **A.**   Yes.

17   **Q.**   Okay.  And I have marked that as Defendant's Exhibit 12A.

18        Is that the one you have?

19   **A.**   I have Exhibit 33.

20   **Q.**   Okay.  That might be the Government's.  So I'm going to

21   give you -- let me get 12A -- the copy of 12A just to make sure

22   we're talking about the same document.  Okay?

23   **A.**   Okay.  No problem.

24   **Q.**   I'll grab you another one because I just want to make sure

25   we're talking about the same thing.  I'm going to hand it to

1   you.  My guess is it is the same as the one you are looking at

2   up there.  But I just want you to flip through it and just make

3   sure you recognize it.

4   **A.**   Yes, this is.

5   **Q.**   How do you recognize it?

6   **A.**   Yeah.  This is the plea agreement that I signed.

7   **Q.**   It is because -- is it because you signed on Page 18

8   and -- it is because you signed on Page 18?

9   **A.**   Yes.  That is my signature.

10          MS. DURRETT:  Your Honor, I would move to admit

11   Defendant's Exhibit 12A.

12          MR. BROWN:  No objection, Judge.

13          THE COURT:  It is admitted.

14   **Q.   (BY MS. DURRETT)**  Okay.  I'll put it up here so we can all

15   look at it and talk about it.

16          So here is the first page of it.  It just says that you

17   are pleading guilty to Count 8; right?

18   **A.**   Yes.

19   **Q.**   One of the aggravated identity theft counts?

20          I'm not going to make you look at the whole thing.  But I

21   do want to talk about a few of the things.

22          First one is:  On the bottom of Page 4, that is part of

23   the agreement where the Government agrees that they are going

24   to dismiss all the other counts against you; correct?

25   **A.**   Yes.

1  **Q.**   Then I'm talking about the middle of Page 5.  And this is

2  the part where the Government says they are not going to bring

3  any additional charges against you; right?

4  **A.**   Yes.

5  **Q.**   And then I'm going to get to Page 7.  This is where things

6  start to get really interesting because it is talking about

7  your cooperation in this case; right?

8  **A.**   Yes.

9  **Q.**   Okay.  And I think you talked a little bit about this

10 yesterday about what it means to cooperate; right?  To come in

11 and testify against Mr. Pendergrass?

12 **A.**   Yes.

13 **Q.**   Okay.  Okay.  And you -- as part of this agreement, you

14 are required to produce all records, written, recorded,

15 anything that is in your custody and control; right?

16 **A.**   Yes.

17 **Q.**   Have you done that?

18 **A.**   Yes.

19 **Q.**   All emails that you would have had -- any emails between

20 you and Mr. Pendergrass or anything else, have you produced

21 those?

22 **A.**   Yeah.  I gave them to my attorney, and I believe she gave

23 them to Jeff.

24 **Q.**   Okay.  All right.  Then on Page 8, it says you need to

25 make yourself available for interviews at your own expense with

1   the Government; correct?

2   **A.**   Yes.

3   **Q.**   And it mentions bond.  But you were out on pretrial

4   release; right?

5   **A.**   I was.

6   **Q.**   You weren't in custody?

7   **A.**   No.  Briefly.  But no.

8   **Q.**   So all those times you have talked about, those meetings

9   with the Government, you have been out on release; right?

10  **A.**   Yes.

11  **Q.**   Then it talks about you are going to be meeting with the

12  Government and it says you should respond truthfully.

13       Do you see that?

14  **A.**   What page are you on?

15  **Q.**   I'm sorry.  I'm on Page 8.

16  **A.**   Yeah.

17  **Q.**   Then it says you are also going to, when called upon by

18  the Government in connection with any investigation, testify at

19  a grand jury, trial, or other judicial proceeding; right?

20  **A.**   Yes.

21  **Q.**   And then at the very bottom, there is a paragraph that

22  says, the defendant understands that the Government alone will

23  determine what forms of cooperation to request from the

24  defendant; right?

25  **A.**   Yes.

1   Q.   So we're talking about the Government -- really in your

2   case it is these prosecutors; right?

3   A.   Yes.

4   Q.   And then if you go to Page 9, this is the part where they

5   talk about during any meetings that you have with them if you

6   reveal new and additional crimes to them, as long as they are

7   not crimes of violence, they are not going to use that to

8   enhance your sentence or to bring other charges against you;

9   right?

10  A.   Yes.

11  Q.   So what that means is if you go into a meeting with the

12  Government and you tell them, hey, I committed additional fraud

13  that you didn't know about they are not going to charge you;

14  right?

15  A.   Yes.

16  Q.   And they are not going to tell the judge about it to try

17  to increase your sentence; right?

18  A.   Right.

19  Q.   Okay.  Okay.  Then in the middle of that paragraph, it

20  also says however -- however, if the Government determines that

21  the defendant has not been completely truthful and candid in

22  his cooperation he could be subject to penalties of perjury and

23  false statements; right?

24  A.   Yes.

25  Q.   So they are going to be looking -- right? -- and determine

1    if they want to charge you with another crime?

2    **A.**    Yes.  If I'm not truthful, yes.

3    **Q.**    Okay.  Page 10 -- now, this is the part where it gets

4    interesting -- even more interesting because you've told us

5    that you think your penalty in this case is a mandatory minimum

6    of two years; correct?

7    **A.**    Yes.

8    **Q.**    That is what the statute -- that is what the law written

9    by Congress says; right?

10   **A.**    Yes.

11   **Q.**    That if someone is convicted of aggravated identity theft,

12   they should serve two years flat for that one count; right?

13   **A.**    That's correct.

14   **Q.**    Consecutive to anything else?

15   **A.**    That's correct.

16   **Q.**    But there is also another statute, and it is written in

17   here.  It is 18 U.S.C. 3553(e).

18        Do you see that?

19   **A.**    Yes, I see it.

20   **Q.**    That is the one that lets the Government decide if you

21   have provided what they call substantial assistance.  And if

22   they think you have substantially assisted in their

23   prosecution, they could ask the judge to give you a lower

24   sentence.

25        Isn't that right?

1  **A.**   Yes.

2  **Q.**   Now, if that does not happen, if these prosecutors don't

3  file that motion, the judge has no power to give you a lower

4  sentence.

5       Isn't that right?

6  **A.**   I understand that.  Yes.

7  **Q.**   That's right.  So they hold the power there?

8  **A.**   They do.

9  **Q.**   Then in the middle of that paragraph, it says, the

10  defendant understands that the determination as to whether the

11  defendant has provided substantial assistance rests solely with

12  the Government.  Good faith efforts by the defendant that do

13  not substantially assist in the investigation or prosecution of

14  another person who has committed a crime will not result in

15  either a motion for a downward departure or a Rule 35.

16       What do you understand that to mean?

17  **A.**   That means if they are not satisfied with my testimony or

18  if I renege on my story then they could not grant the motion.

19  **Q.**   Well, it also means more than that; right?  It says, if

20  you don't substantially assist in the prosecution of another

21  person -- and here they mean Mr. Pendergrass; right?

22       If you don't substantially assist them in that

23  prosecution, they are not going to ask for a lower sentence

24  than two years; right?

25  **A.**   Yeah.  So yeah.  I don't understand what you just said.

```
 1    But I understand it in my terms.
 2    Q.   I'm here on Page 10, and it is right here.  It starts with
 3    good faith.  Good faith efforts by the defendant that do not
 4    substantially assist in the investigation or prosecution of
 5    another person who has committed a crime will not result in a
 6    motion for a downward departure or a Rule 35 motion.
 7         So -- go ahead.
 8    A.   Yeah.  Yes.
 9    Q.   So that means if you don't substantially assist in the
10    prosecution of Mr. Pendergrass they are not going to ask the
11    judge to give you a sentence lower than two years; right?
12    A.   Right.
13    Q.   Okay.  Now, I'm going to go back to the indictment.
14         Do you still have the indictment up there?
15    A.   Yes.
16    Q.   Okay.  So I want to look at -- I'm going to look at -- I
17    think it is the second page of the indictment that has -- that
18    has the counts in this case.
19         Do you see that where it lists Counts 1 through 5?
20    A.   The second page?
21    Q.   I think -- well, I don't -- I had to give my copy back.
22         But let me take a look.  It is the page that has a little
23    chart.
24    A.   Okay.
25    Q.   It has a little chart, and it lists out the five counts.
```

1        Do you see that?

2   **A.**   Yes.

3   **Q.**   Okay.  And those are the counts that both you and

4   Mr. Pendergrass were charged with; right?

5   **A.**   Yes.

6   **Q.**   Okay.  You have testified quite a bit about those counts

7   yesterday, about what you signed and where you signed and all

8   that.

9        Remember that?

10  **A.**   Yes.

11  **Q.**   Okay.  What I want to focus on right now at least is the

12  amount of money that is listed there.

13       Okay.  So Count 1 is a check for $8000; right?

14  **A.**   Yes.

15  **Q.**   Count 2 is a check for $76,636.28; right?

16  **A.**   Yes.

17  **Q.**   Count 3 is a check for $26,874.42; right?

18  **A.**   Yes.

19  **Q.**   Count 4 is a check for $14,875.67; right?

20  **A.**   Yes.

21  **Q.**   And Count 5 is a check for $11,000?

22  **A.**   Yes.

23  **Q.**   Okay.  I am not an accountant.

24       Can you ball park that for me?  How much do you think that

25  is?

1    **A.**   114.

2    **Q.**   114.  And so what I want to talk about is what the

3    restitution amount is that you agreed to pay in this case.

4         Was it $114,000?

5    **A.**   No.  It is 137.

6    **Q.**   That represents the money from all of the counts -- all

7    the checks in Count 5; is that right?

8    **A.**   I never added it up.  So I don't know.  I don't know what

9    it represents.  I just know it is a restitution amount.

10   **Q.**   You have agreed to pay the money for all of the accounts

11   in Counts 1 -- all the checks in Counts 1 through 5?

12   **A.**   I agreed to the plea agreement.  So that is what I agreed

13   to.

14   **Q.**   Do you remember agreeing to a restitution amount?

15   **A.**   Yes.  It was within the plea agreement.

16   **Q.**   Okay.  So let's go back.  Do you see where it is in your

17   plea agreement, sir?

18        You can look through it.  You can take a second to look

19   through it.  I think if you look at Page 11 --

20   **A.**   It is not in this one.  It is in another one.

21   **Q.**   In your plea agreement?

22   **A.**   It is not on this -- oh.  Yes.

23   **Q.**   So you look down there, and it says the City of Atlanta

24   Finance Department is owed $137,386; correct?

25   **A.**   Yes.

1    **Q.**    And you are going to agree to pay that?

2    **A.**    Yes.  That is what I agree to pay.

3    **Q.**    Okay.  So I think what we learned here is that it is the

4    Government that is going to be able to make a recommendation

5    for lower than two years; right?

6    **A.**    Yes.

7    **Q.**    And even if they don't do that, then the judge won't have

8    the ability to give you less; right?

9    **A.**    That's correct.

10   **Q.**    Now, you and I don't have any agreement; right?

11   **A.**    No.

12   **Q.**    I don't have the ability to offer you something; right?

13   **A.**    No.

14   **Q.**    That would be improper if I tried to offer you something

15   for your testimony; right?

16   **A.**    Yes.  You represent Mr. Pendergrass.

17   **Q.**    Right.  It would be improper for me to do that?

18   **A.**    Yes.

19   **Q.**    Okay.  I want to go -- we have already talked about how

20   many times you have met with the Government.

21          Now, one of the things that was interesting to me is last

22   week it was reported to me or in the last couple of weeks that

23   you actually lied to the Government during one of your recent

24   meetings -- right? -- about whether you were on disability or

25   not?

1    **A.**    Yes.

2    **Q.**    Okay.  And that happened in a meeting.  The Government

3    asked you whether you were on disability and you said no?

4    **A.**    Yeah.  It wasn't in the meeting.  It was just general talk

5    before the meeting.

6    **Q.**    Okay.  It was not a truthful statement; right?

7    **A.**    No, it wasn't.

8    **Q.**    Okay.  And then later because of that you and your

9    attorney came back and said, hey, we misrepresented something;

10   correct?

11   **A.**    I wanted to be truthful with him --

12   **Q.**    Okay.

13   **A.**    -- about that.  So I made that determination to talk to my

14   attorney to let him know that I had -- to tell the truth about

15   that.

16   **Q.**    Okay.  I want to spend some time talking about the other

17   businesses that you had -- okay? -- and the other things that

18   you were involved in.

19        I think we spent a fair amount of time talking about

20   Holland & Knight.  But I'm not sure the details of that have

21   been made clear.  Okay?

22        So I want to talk a little bit about that.  Because you

23   did talk about it in the first meeting that you had with the

24   Government in February; right?  February of 2018?  Do you

25   remember that?

1    **A.**    Yes.

2    **Q.**    So what you told the Government back then was that Mr. --

3    you had started working with Mr. Pendergrass and he was going

4    to go on vacation.

5         Do you remember telling them that?

6    **A.**    Yes.

7    **Q.**    And --

8    **A.**    Yes.

9    **Q.**    Before he left on vacation, he said, if you are able to

10   land the Holland & Knight account, I will give you $150,000.

11        Do you remember that?

12   **A.**    Yes.

13   **Q.**    Okay.  That is what you told the Government?

14   **A.**    Yeah.

15   **Q.**    And they had a really large outstanding unclaimed fund;

16   right?

17   **A.**    Yes.

18   **Q.**    $359,000?

19   **A.**    Yes.

20   **Q.**    And you really wanted that money; right?

21   **A.**    I wanted to try to collect it, yes.

22   **Q.**    Okay.  Well, I mean, you talked about how you were given

23   that client from Allen and you were trying to legitimately

24   collect it; correct?

25   **A.**    Yes.

1   Q.   And that was before he went on vacation?

2   A.   Yes.

3   Q.   Okay.  And then when you figured out, hey, I'm not going

4   to be able to collect this money, you decided to forge some

5   documents to try to get the check; isn't that right?

6   A.   No.

7   Q.   Okay.  Well, sir, let me just have a look here.  Do I have

8   a clean copy for you?

9        My understanding is that you said you created -- you

10  composed a letter with a power of attorney, which was

11  photoshopped and submitted to the City of Atlanta, and then you

12  waited for the check to be mailed; is that right?

13  A.   Yes.

14  Q.   Okay.  And then I know you talked a lot about this

15  yesterday.  And it is, you know, a little confusing.

16       When the check came, it was in the name of Holland &

17  Knight; right?

18  A.   Yes.

19  Q.   Okay.  And that presented a problem for you; correct?

20  A.   The check you mean?

21  Q.   It did present a problem because you couldn't deposit it?

22  A.   So can you repeat the question?

23  Q.   Yeah.  You could not deposit the check because it was

24  written to the law firm of Holland & Knight; correct?

25  A.   The check said Holland & Knight LLLP.

1    Q.   So -- okay.  So what you did was you went and opened a

2    bank account in the name of Terrell McQueen doing business as

3    Holland & Knight; is that right?

4    A.   No.

5    Q.   Tell me what you did.

6    A.   So me and Mr. Pendergrass after we obtained the check from

7    the -- mailman at the post office, we -- once I seen the check

8    and it had the LLLP on there, I knew that I wasn't going to be

9    able to deposit it into the account without having some

10   trouble.

11        And so we were -- me and Mr. Pendergrass were thinking of

12   ways of how we could deposit it into the account without having

13   any trouble.

14   Q.   Okay.  And then this is the one where you said the check

15   didn't come and you contacted the City of Atlanta to find out

16   what was going on; right?

17   A.   Yes.

18   Q.   And that the post office box where the check was sent had

19   an insufficient address; right?

20   A.   Yes.

21   Q.   Because you had provided an insufficient address?

22   A.   No.  The City of Atlanta had stated that they could not

23   put the number on the check.

24   Q.   Okay.

25   A.   So it was whatever the box number was -- it was 200 or

1   that virtual address.  They said that that couldn't be listed

2   on the check.  So that is why it was returned.

3   **Q.**   Okay.  Mr. McQueen, I'm going to show you this document,

4   which is only marked for identification purposes, which is

5   Defendant's Exhibit 12.

6        Take a look and see if you recognize it.

7   **A.**   Yes.

8   **Q.**   Okay.  I want to focus you in on Page 2 -- 1, 2, 3, 4 --

9   the fourth full paragraph when it says when the check never

10  arrived.  Do you see that?

11  **A.**   Yes.

12  **Q.**   Okay.  Can you read that for us?

13  **A.**   When the check never arrived, McQueen contacted Teresa

14  Booker with Atlanta who said the check was sent to a P.O. Box.

15  McQueen went to the specific post office where the box was

16  located; learned that the address he had provided was

17  insufficient; and was able to receive the check from the postal

18  employee.

19  **Q.**   Okay.  So you provided an insufficient post office box

20  address, and then you were able to go to that address and

21  retrieve the check; correct?

22  **A.**   No.

23  **Q.**   So this information that is included in here in these

24  notes from the agent is incorrect?

25  **A.**   So --

1   **Q.**   Sir, which one is correct?

2   **A.**   It is not -- that paragraph is incorrect, or they didn't

3   capture everything that I said.

4   **Q.**   Okay.  Is that true for things like you were -- you were

5   on leave from the City of Atlanta?  Was that correctly captured

6   by the agents, or did you just forget to put in that you were

7   fired?

8   **A.**   I wasn't fired.  And I didn't work for the City of

9   Atlanta.

10  **Q.**   I mean, Clark Atlanta.

11  **A.**   Clark Atlanta, yes.

12  **Q.**   But this one, they just got it wrong about the Holland &

13  Knight check?

14  **A.**   Yeah.  So we went to -- drove up to the post office to see

15  about that check once I called Ms. Booker.  I was the one

16  directly in contact with Ms. Booker.

17  **Q.**   Okay.  Ms. Booker is someone who works at the City of

18  Atlanta; is that right?

19  **A.**   That's correct.

20  **Q.**   And I think you talked yesterday a little bit about how

21  you had a special relationship with her.

22      What does that mean?

23  **A.**   It just means I was talking to her on a regular basis.

24  **Q.**   Like about checks?

25  **A.**   Yes.  And -- yes.

1    Q.    Okay.  So -- now, I'm still confused about this.  So you

2    are saying you did not open a bank account in the name of

3    Holland & Knight?

4    A.    I did open a bank account.  I said that.

5    Q.    You did?

6    A.    Yes.  I said that yesterday.

7    Q.    And you deposited the check into that account?

8    A.    Yes, I did.

9    Q.    And then to further negotiate that check, you opened a new

10   account at SunTrust Bank?

11   A.    That SunTrust Bank was -- it was an existing account I

12   already had.

13   Q.    Okay.  I think the Government might have admitted that.

14   I'll look for it just to make sure because I want to talk about

15   that check.

16        Okay.  So you deposited it into a SunTrust Bank account

17   that you controlled; right?

18   A.    So I deposited a check I wrote to myself for $40,000 into

19   a SunTrust Bank account.

20   Q.    And you signed that check Holland & Knight TM or

21   something?

22   A.    Yes.

23   Q.    I'm going to show you what has been marked as Defendant's

24   Exhibit 9C.  You'll have to forgive me if you have already

25   talked about this one.

1      What is that document?

2  **A.**   So this is a receipt that you get from the Department of

3  Revenue when you apply for an EIN number.

4  **Q.**   Okay.  And is that something that you did?

5  **A.**   That is something that I was told to do by

6  Mr. Pendergrass.

7           MS. DURRETT:  Okay.  Your Honor, I would move for the

8  admission of Defendant's 9C.

9           THE COURT:  Any objections?

10          MR. BROWN:  No objection.

11          THE COURT:  It is admitted.

12          MS. DURRETT:  Thank you, Your Honor.

13  **Q.   (BY MS. DURRETT)**  Okay.  So this isn't real, is it?  Did

14  you actually apply for an EIN number?

15  **A.**   Say that -- repeat the question, please.

16  **Q.**   Did you actually apply for an EIN number, or is this a

17  forged document?

18  **A.**   It is real.

19  **Q.**   It is a real document.  So you applied for an EIN number

20  in the name of Holland & Knight?

21  **A.**   Yes.  Mr. Pendergrass showed me how to apply for an EIN

22  number because I did not know how to apply for an EIN number.

23  And then I followed those instructions.

24          THE COURT:  Can you just state what EIN means?

25          THE WITNESS:  Yes.  It is an employer identification

138

1   number.

2   **Q.   (BY MS. DURRETT)**   So you submitted a letter to the

3   Department of the Treasury for an employee identification

4   number for the law firm of Holland & Knight?

5   **A.**   No.  I didn't submit a letter.  You can just go online to

6   the IRS.gov, and then there is a process of actually getting an

7   EIN number.  They just ask you a series of questions.

8   **Q.**   Do you get it immediately, or do you have to wait to get

9   it in the mail?

10   **A.**   You can get it faxed to you, or you can get it

11   immediately.

12   **Q.**   Was this one faxed to you, or did you get it immediately?

13   **A.**   I don't remember.

14   **Q.**   Did you work at Holland & Knight?

15   **A.**   No.

16   **Q.**   Okay.  And that address that is on there, 8364 Dewayne

17   Lane, what is that?

18   **A.**   That was my home address at the time.

19   **Q.**   You used your home address?

20   **A.**   Yes.

21   **Q.**   And then I think you said you used this document to get a

22   SunTrust Bank account; right?

23   **A.**   A PNC -- this document or another document.

24   **Q.**   Yeah.  I'm sorry.  You used that to get the PNC Bank

25   account; right?

1    **A.**    That's correct.

2    **Q.**    What date are we looking at there?

3    **A.**    It is December 21st, 2012.

4            MS. DURRETT:  I'm going to mark this -- I think the

5    Government has already admitted it.

6    **Q.    (BY MS. DURRETT)**  I'm going to show it to you, and I'm

7    going to mark it as Defendant's Exhibit Number 39.  I'm going

8    to ask if you recognize it.

9    **A.**    Yes.

10   **Q.**    Okay.  And how do you recognize it?

11   **A.**    This is from my personal bank account at SunTrust.

12           MS. DURRETT:  And I'm going to move for the admission

13   of Exhibit 39.

14           MR. BROWN:  No objection, Judge.

15           THE COURT:  It is admitted.

16           MS. DURRETT:  Thank you, Your Honor.

17   **Q.    (BY MS. DURRETT)**  Is this the account that you deposited

18   the $40,000 into?

19   **A.**    Yes.

20   **Q.**    Okay.  Now, I think you just told me -- let's go back and

21   refresh here -- you got the EIN sometime around December 21st,

22   2012; right?

23   **A.**    Yes.

24   **Q.**    And I think you told me that you had an existing SunTrust

25   account; right?  That you didn't open it up just for that

1   purpose?

2   **A.**   Right.  Yes.

3   **Q.**   Okay.  So -- and this is Defendant's Exhibit 39.

4        What day was it opened?

5   **A.**   1/17 -- but this is not the -- my account was already --

6   that is 1/17/2013.

7   **Q.**   Okay.  So this -- well, this SunTrust account you opened

8   in January of 2013?

9   **A.**   Yeah.  But I had an existing -- can I see that document

10  again?

11  **Q.**   Sure.

12  **A.**   Yes.  So this is just a signature card.  It is not

13  actually saying that I opened the account.

14  **Q.**   What do you think date opened means?

15  **A.**   I don't know in this instance.

16  **Q.**   Okay.  That is fair enough.

17  **A.**   But as far as signature, it says signature cards.

18  **Q.**   Right.  That shows who can sign on the account; right?

19  **A.**   Right.

20  **Q.**   And can I -- let me know when you are finished.

21  **A.**   Okay.  Yeah.

22  **Q.**   Are you finished, sir?

23  **A.**   Yes.

24  **Q.**   Okay.  Great.

25  **A.**   So if --

1   **Q.**   I'll ask you a question, sir.

2   **A.**   Okay.

3   **Q.**   So I'm looking at the exhibit we just talked about,

4   Exhibit 39.  And I'm going to show you a second page, which is

5   an account statement; right?

6        Do you recognize that as the second page of that document

7   we were talking about?

8   **A.**   Yes.

9   **Q.**   The first page was what you were talking about, the

10  signature card; right?

11  **A.**   Right.

12  **Q.**   So now we're on the second page.  Then it talks about --

13  do you see right there where it says beginning balance?

14  **A.**   Yes.

15  **Q.**   What was the beginning balance?

16  **A.**   It says it was zero.

17  **Q.**   And then it shows here -- what happened on January 17?

18  **A.**   That there was a deposit of 40,000.

19  **Q.**   So this was the account, sir, that you deposited the money

20  in; right?

21  **A.**   Yes.

22  **Q.**   Okay.  Now, things got really confusing yesterday when --

23  for me at least when you were talking about having to pay

24  $16,000 back; right?  I think we even had some questions about

25  how to clarify.

1    **A.**    Yes.

2    **Q.**    Okay.  You got a check for $359,000 in the name of Holland

3    & Knight; correct?

4    **A.**    Yes.

5    **Q.**    You deposited that into a PNC Bank account in the name of

6    Holland & Knight?

7    **A.**    Yes.

8    **Q.**    And that was a bank account you applied for?

9    **A.**    Yes.

10   **Q.**    Okay.  You then took -- wrote a check for $40,000 and

11   deposited it into your SunTrust account?

12   **A.**    Yes.

13   **Q.**    Correct?  And then I think you told us you took out 10,000

14   in cash?

15   **A.**    Yes.

16   **Q.**    Correct?  And you said you gave some to Mr. Pendergrass;

17   right?  $3000?

18   **A.**    Yes.  Yes.

19   **Q.**    And then things got real strange.  You said you wrote him

20   a check also for $25,000 or --

21   **A.**    It was in the 20s to the -- it was a bank out in

22   Fayetteville.

23   **Q.**    From this account?

24   **A.**    No.  From the PNC.

25   **Q.**    Okay.  And -- okay.  So you -- so now we started out with

1    $359,000; right?

2         You took out 40, and then you also took out another 25?

3    **A.**    Yes.

4    **Q.**    Okay.  Ultimately you owed Holland & Knight 16; is that

5    right?

6    **A.**    I owed SunTrust 16.

7    **Q.**    I'm sorry.  SunTrust.

8         Why is there a discrepancy in the amount?

9    **A.**    So SunTrust because of the existing relationship that I

10   had, they ended up cashing the 40,000-dollar check the next

11   day.  I told Mr. Pendergrass after he got upset with me because

12   I moved without his knowledge --

13   **Q.**    Sir, the question for you is:  Why is there a discrepancy

14   between the amount of money you said you took out and the

15   amount you owed?

16   **A.**    Because there was some other expenditures.

17   **Q.**    Okay.  You started with 359.  You took out 40, plus then

18   another 25.

19   **A.**    So the 359 got reversed from PNC.  So the 40 -- so there

20   was 40 at SunTrust.  SunTrust reversed the 40.  So there was a

21   balance.  There was $10,000 taken out.  And then there were

22   other expenditures made by the debit card.  So those other

23   expenditures and plus the 10,000 equal the 16,000.

24   **Q.**    I got it.  So you took out 10,000, and then you spent

25   6000?

1    **A.**    Yes.

2    **Q.**    And that is what you owed back?

3    **A.**    Yes.

4    **Q.**    Okay.  There was actually an investigation -- right? -- by

5    SunTrust?

6    **A.**    Yes.

7    **Q.**    They reported it to Clayton County, and you had a Clayton

8    County court case?

9    **A.**    Yes.

10   **Q.**    But you ended up not having any charges in that case, or

11   at least the case was dismissed when you paid the restitution?

12   **A.**    That's correct.

13   **Q.**    And you were the defendant in that case; right?

14   **A.**    Yes.

15   **Q.**    Now, I'm going to show you what has been marked as

16   Defendant's Exhibit 9B and see if you recognize that.

17   **A.**    Yes.

18   **Q.**    Okay.  How do you recognize it?

19   **A.**    This is a letter that me and Mr. Pendergrass -- hold on.

20          MR. BROWN:  Ms. Durrett, can I see a copy of that

21   document?  What exhibit number is that?

22          THE WITNESS:  It is 9B.

23   **A.**    It looks like a previous letter.

24   **Q.**    **(BY MS. DURRETT)**  Okay.  But you recognize it?

25   **A.**    I didn't remember it.  But it looks like a previous -- it

1   is not the letter that we sent to the City of Atlanta.

2   **Q.**   Okay.  Well, how do you recognize it?

3   **A.**   So it is a previous -- it just looks like a previous

4   letter.

5   **Q.**   Is it a letter from Holland & Knight?

6   **A.**   Yeah, it looks like it.

7   **Q.**   Okay.  Do you remember working on that letter?

8   **A.**   Yes.  With Mr. Pendergrass, I do.

9   **Q.**   You do remember working on this letter?

10  **A.**   No.  I didn't work on that letter.  There was another

11  letter.  That letter is not the letter we sent to the City of

12  Atlanta.

13  **Q.**   Right.  Do you remember writing a letter from Holland &

14  Knight to Mr. Pendergrass?

15  **A.**   No.

16  **Q.**   Okay.  Now I'm going to show you what has been marked as

17  Defendant's Exhibit 9A and ask you if you recognize that.

18  **A.**   No, I don't recognize this.

19  **Q.**   Okay.  So then -- I think we talked -- we looked at the

20  checks yesterday that were used -- the check that was used to

21  pay back the restitution; right?

22  **A.**   Yes.

23  **Q.**   And that was a check that you paid out of your own

24  personal account; right?

25  **A.**   Yes.

1    **Q.**    Okay.  That was an account that was solely in your name?

2    **A.**    Yes.

3    **Q.**    Okay.  What is Citadel Business Solutions?

4    **A.**    It was a company that I came up with in 2010 or '9.  I

5    don't remember the year.

6    **Q.**    Okay.  And what was that company?

7    **A.**    It was just supposed to be a company that I was supposed

8    to do bookkeeping with.

9    **Q.**    Was that your own personal company?

10   **A.**    Yeah.

11   **Q.**    Okay.  Did you do bookkeeping with it?  I mean, did you

12   have a business?

13   **A.**    I started the business.  I don't believe I followed

14   through with it.  I maybe did one thing for Mr. Pendergrass

15   during that time.  But I don't remember doing anything else.

16   **Q.**    Okay.  I'm trying to speed up here so we are not here all

17   day.

18       I think yesterday you talked a little bit about a place

19   called Tousa Homes and some funds that came from there.

20       Do you remember that?

21   **A.**    Yes.  Tousa Homes.

22   **Q.**    I think yesterday you said you had some involvement in

23   that case?

24   **A.**    That's correct.  Well, some involvement.  Not in the case.

25   I had some involvement in creating the documentation.

1   **Q.**   Okay.  Do you still have that exhibit back up there where

2   the agents made notes about your interview back in February of

3   2018?  It might be 39.

4        Do you see what I'm talking about?

5   **A.**   What am I looking for again?

6   **Q.**   It is the summary of your meeting in 2018.

7        Do you remember in 2018 when you met with the agents and

8   the prosecutors in this case -- oh, here it is.

9        Do you remember in 2018 when you met with the agents and

10  prosecutors in this case you said you were aware of it but you

11  were not involved in it?

12  **A.**   Yes.

13  **Q.**   Okay.  But yesterday you told us you actually did create

14  documents for that?

15  **A.**   So after I had seen the document recently, I recognized

16  that my handwriting was on the document.  So then I went ahead

17  and said that I was involved with it.

18  **Q.**   So you denied being involved in 2018, but now you are

19  admitting that you did?

20  **A.**   So I didn't remember at the time.  But once I saw my

21  handwriting on the document, I didn't deny it.

22  **Q.**   When did you see your handwriting on the document?

23  **A.**   Recently.

24  **Q.**   Okay.  So not in the 2018 meeting or the video conferences

25  or anything but like within the last two weeks?

1    **A.**    Yes.

2    **Q.**    They showed you a document and you said, oh, yeah, that's

3    my handwriting on that?

4    **A.**    Yeah.  That is my handwriting, right.  Yes.

5    **Q.**    Okay.  Who is Chris Carter?

6    **A.**    An individual I worked under.  After everything kind of

7    exploded with Asset Financial Recovery, I used another name.

8    **Q.**    Oh, I thought you were saying you were employed by that

9    individual.

10        That is not what you are saying; right?

11   **A.**    No.

12   **Q.**    You are saying that you used that name as your own name to

13   do things?

14   **A.**    Yes.  Because -- yes.

15   **Q.**    Okay.  Including opening bank accounts?

16   **A.**    No, I didn't -- no.

17   **Q.**    Okay.  That was Dusty Fager?  You used Dusty Fager to open

18   bank accounts?

19   **A.**    I only opened one account with Dusty Fager.

20   **Q.**    You used the name Dusty Fager to open a bank account?

21   **A.**    A bank account, yes.

22   **Q.**    And you used the name Chris Carter to contact other

23   people; correct?

24   **A.**    Yes.

25   **Q.**    To write letters and things?

1   **A.**   Yes.

2   **Q.**   Okay.  And then Gene Bloom was also a name that you used;

3   right?

4   **A.**   Yes.

5   **Q.**   That is a name you would sign on letters; correct?

6   **A.**   Yes.

7   **Q.**   Just like you used Chris Carter?

8   **A.**   No, not the same.

9   **Q.**   Well, tell me the difference.  What would you use Chris

10   Carter for, and what would you use Gene Bloom for?

11   **A.**   I actually acted -- so I spoke to people as Chris Carter.

12   I closed deals as Chris Carter.  Because after -- Chris Carter

13   was created because I didn't want to use Terrell McQueen after

14   everything had happened with Asset Financial Recovery.

15   **Q.**   Okay.  So you just walked around in daily life as Chris

16   Carter?

17   **A.**   Yes.

18   **Q.**   Okay.  I think the Government talked to you a little bit

19   about Dusty Fager, and I'm going to ask you about that too.

20   I'm going to show you what has been marked as Defendant's

21   Exhibit 25 and see if you recognize that.

22   **A.**   Yes.  Yes, I do.

23   **Q.**   How do you recognize it?

24   **A.**   This is the account that I opened.

25   MS. DURRETT:  Okay.  I would move for the admission

1   of Defendant's Exhibit 25.

2           MR. BROWN:  No objection, Judge.

3           THE COURT:  It is admitted.

4   **Q.   (BY MS. DURRETT)**  I'm just going to show you the front

5   page here first.  This is what we're talking about.

6        Tell us what we're looking at.  This is a Bank of America

7   application to open a bank account signed by Dusty Fager;

8   right?

9   **A.**   Yes.

10  **Q.**   And actually a man named Dusty Fager didn't sign this;

11  right?

12  **A.**   That's correct.

13  **Q.**   You signed this?

14  **A.**   I did.

15  **Q.**   What is the name of the business?

16  **A.**   Nationwide Mutual Capital.

17  **Q.**   Nationwide Mutual Capital wasn't really a real business,

18  was it?

19  **A.**   It was a company out in Ohio, I believe.

20  **Q.**   I'm sorry.  For you, it wasn't really a real business, was

21  it?  You didn't work at a place called Nationwide Mutual

22  Capital; right?

23  **A.**   No.

24  **Q.**   You just adopted that name when you opened the bank

25  account; right?

1   **A.**   Yes.

2   **Q.**   Okay.  And then the second page just shows that you are

3   the only signer on the account; right?

4   **A.**   Yes.

5   **Q.**   You have control over that account?

6   **A.**   Yes.

7   **Q.**   All right.  And you would deposit checks into this

8   separate account?

9   **A.**   Just, you know, there was one deposit that was made --

10   that check that was made.

11   **Q.**   Okay.  And this was in May of 2014?

12   **A.**   Yes.

13   **Q.**   And that was after you were arrested; right?

14   **A.**   Yes.

15   **Q.**   Okay.  So you were arrested back in September of 2013;

16   correct?

17   **A.**   Yes.

18   **Q.**   And then May of 2014, you are back to using fake names;

19   right?

20   **A.**   Yes.

21   **Q.**   Okay.  What is Pensacola Ice Pilots?

22   **A.**   It was a company out in Florida -- a defunct company.

23   **Q.**   Okay.  And how did you come to learn about it?

24   **A.**   Through Mr. Pendergrass.

25   **Q.**   Okay.  Now, I know you talked about this a little bit.

1       You -- at least in your report back in 2018, you said

2   Mr. Pendergrass said, hey, you can try to collect on this;

3   isn't that right?

4   **A.**   Not on -- you mean collect on it or submit a -- clarify

5   what do you mean by collect on it.

6   **Q.**   Well, I think you were trying to suggest that

7   Mr. Pendergrass told you to do something nefarious regarding

8   this account yesterday, I think; right?

9   **A.**   Yes.  Because he had already did the research on it, and

10  so that is why I knew about it.

11  **Q.**   He did the research meaning he knew there were outstanding

12  funds for this account; right?

13  **A.**   He knew that there were outstanding funds, and he knew

14  that the company was no longer in existence.

15  **Q.**   So you took on -- let me explain.  You paid him some money

16  for that information; right?

17  **A.**   Yes.

18  **Q.**   For the name of that -- for that account information?

19  **A.**   For that information, yes.

20  **Q.**   Okay.  And then you took it upon yourself to write the

21  letter to Escambia County, Florida, to try to collect those

22  funds; right?

23  **A.**   Yes.

24  **Q.**   Okay.  And you did collect the funds; right?

25  **A.**   Yes.

1   Q.   Okay.  And you actually opened a bank account in the name

2   of Pensacola Ice Pilots; right?

3   A.   Yes.

4   Q.   And who is Latrinee Davis?

5   A.   That is my wife.

6   Q.   Was she ever on any of these accounts with you?

7   A.   I don't recall.

8   Q.   Okay.  I am going to come back to that because I don't

9   have the document right at my hand.

10        Let's talk a little bit about the Lee Family Trust

11  because that is the other thing that you talked about yesterday

12  or earlier today; right?

13  A.   I believe it was yesterday, yes.

14  Q.   I think you talked about how you are the one that set up

15  the voice mail for that account; right?

16  A.   Yes.

17  Q.   Okay.  You are the one that set up the email for that

18  account; right?

19  A.   So when I got the virtual address, I believe all of those

20  things were included.

21  Q.   So you were the one who got a virtual address for the Lee

22  Family Trust; right?

23  A.   Yes.

24  Q.   Okay.  And what do you mean by virtual address?

25  A.   It is an address that you could -- it is an address that

1  can be listed online.  It is like a P.O. address.  But it has a

2  street name or a highway name.

3  **Q.**   Okay.  So I'm going to show you what has been marked as

4  Defendant's Exhibit 21 and ask if you recognize these

5  documents.

6  **A.**   Yes, I do.

7  **Q.**   How do you recognize them?

8  **A.**   So once you sign up for a virtual address, this is what --

9  this is the receipts and everything that they give you for

10  setting up the address.

11         MS. DURRETT:  Okay.  Your Honor, I'm going to ask to

12  admit Defendant's Exhibit 21.

13         MR. BROWN:  No objection, Judge.

14         THE COURT:  It is admitted.

15         MS. DURRETT:  Thank you, Your Honor.

16  **Q.**   **(BY MS. DURRETT)**  I'll take it back when you are ready.

17  **A.**   Okay.  But it is only -- it is these three pages.  These

18  are unrelated to setting up the address.

19  **Q.**   Okay.  Look at those first three pages.

20         Do you also recognize those?

21  **A.**   Yes.  So this one is saying that --

22  **Q.**   Don't show it to the jury yet.

23  **A.**   Okay.  Yes, I recognize them.

24  **Q.**   Okay.  How do you recognize them?  Do you have personal

25  knowledge of those documents?

1    **A.**   Yes.

2              MS. DURRETT:  Again, I would move to admit 21.

3              THE COURT:  It has been admitted.

4              MS. DURRETT:  Thank you, Your Honor.

5    **Q.**   **(BY MS. DURRETT)**  I just didn't want you talking about it

6    unless --

7    **A.**   Okay.

8    **Q.**   I'm sorry.  I'm going to also -- did you also look at --

9    let me make sure -- 21C?

10             MR. BROWN:  Could I just look at that?  I don't have

11   that in my book.

12             That has already been admitted as a Government's

13   exhibit.

14             MS. DURRETT:  All right.  Thank you.

15             THE COURT:  This is fine.  I don't have the third

16   page either.  But this is fine.

17   **Q.**   **(BY MS. DURRETT)**  When you talked about doing an Opus

18   Virtual Offices, this is what you are talking about; right?

19   **A.**   Yes.

20   **Q.**   Did you just do this online?

21   **A.**   Yes.  You can set it up online.

22   **Q.**   So you set it up with the name the Lee Family Trust;

23   right?

24   **A.**   Yes.

25   **Q.**   Does it automatically just give you a phone number, or do

1    you give it the phone number you want?

2    **A.**    They automatically give you everything.

3    **Q.**    Then it has some information about faxes will be forwarded

4    to Terrell at Attorney Recovery System?

5    **A.**    Yes.

6    **Q.**    And then it gives an extension for Terrell McQueen; right?

7    **A.**    Yes.

8    **Q.**    And a mailing address; is that right?

9    **A.**    Yes.

10   **Q.**    Okay.  And so the other documents that I provided to you,

11   which were 21 and -- 21A and 21B --

12             MS. DURRETT:  If I haven't moved for the admission of

13   21A and B, I will do so now.

14             MR. BROWN:  Your Honor, could I just see A?  I think

15   I have B.

16             No objection, Judge.

17   **Q.    (BY MS. DURRETT)**  Yes.  The other documents that I just

18   showed you were documents that you through your attorney and

19   through the Government provided to us recently; right?

20   **A.**    Yes.

21   **Q.**    Okay.  And those are emails related to the Lee Family

22   Trust?

23   **A.**    Yes.

24   **Q.**    Is that right?  Okay.  So the first one, who is that email

25   coming to?

1    **A.**    That is the email with my name on it.

2    **Q.**    So you are receiving this email about the Lee Family

3    Trust; right?

4    **A.**    Just about the account being past due.

5    **Q.**    It is related to this office that you created; right?

6    **A.**    Yes.

7    **Q.**    Okay.  And that is just telling you the account is past

8    due; right?

9    **A.**    Yes.

10   **Q.**    Okay.  The next one is -- I'm going to go with 21B.

11   Again, this is something you provided to us.

12        And, again, it shows coming from that Opus office address

13   to your email; right?

14   **A.**    Yes.

15   **Q.**    And what is it talking about?

16   **A.**    So this is the voice mail that a friend of

17   Mr. Pendergrass's or an ex-girlfriend had called the City of

18   Harris County or the Harris County Tax Collector requesting to

19   cancel the checks that were given to Mr. Cohen.

20   **Q.**    Okay.  And so you are the person who is receiving these

21   voice mails; right?

22   **A.**    No.  I forwarded that voice mail.

23   **Q.**    Okay.  Sir, it came in -- when you say you forwarded it,

24   the voice mail came to you; correct?

25   **A.**    Yes.

1    **Q.**   Because you set up the virtual office; correct?

2    **A.**   Yes.

3            MS. DURRETT:  Your Honor, I would move -- we talked

4    about this previously -- to admit Defendant's Exhibit 10.

5            Is it 10?

6            MR. BROWN:  If that is the audio recording we heard

7    earlier, no objection, Judge.

8            MS. DURRETT:  Thank you, Your Honor.

9            THE COURT:  Okay.  It is admitted.

10           MS. DURRETT:  We're going to try to play it if we

11   can.

12                   **(The audiotaped recording was played for the**

13                   **jury.)**

14   **Q.   (BY MS. DURRETT)**  So that is a voice mail from someone in

15   Harris County, Texas, calling about checks that were requested

16   to be issued in the name of the Lee Family Trust?

17   **A.**   Yes.

18   **Q.**   Correct?  And that voice mail came to you because you set

19   up the office account; correct?

20   **A.**   Yes.

21   **Q.**   Okay.  And then the last one related to that is again

22   something that you recently provided to us.

23           And who is the email from?

24   **A.**   I don't see it.

25           MS. DURRETT:  Sorry.  Harry, can we switch it?

1    **Q.    (BY MS. DURRETT)**  Who is it from?

2    **A.**   From me.

3    **Q.**   To?

4    **A.**   Mr. Pendergrass.

5    **Q.**   So you are forwarding something to him; correct?

6    **A.**   Yes.

7    **Q.**   Okay.  If you look up a little bit, it shows what you are

8    forwarding; right?

9    **A.**   Yes.

10   **Q.**   And it says demand payment PDF?

11   **A.**   Yes.

12   **Q.**   Then there is an attachment; right?

13   **A.**   Yes.

14   **Q.**   And this is a letter to the Northside Law Center; correct?

15   **A.**   Yes.

16   **Q.**   And Northside Law Center, we're going to be familiar with

17   that because we heard from Attorney Michael Cohen about that;

18   right?

19   **A.**   Yes.

20   **Q.**   That was his business; right?

21   **A.**   Yes.

22   **Q.**   Okay.  And so it is a letter to him, and it is signed down

23   there at the bottom; right?

24   **A.**   Yes.

25   **Q.**   Okay.  And this is a letter -- this signed copy of this

```
 1   letter that you forwarded to Mr. Pendergrass; right?

 2   A.   Yes.

 3   Q.   Okay.  Now, at the time you came and started working for

 4   Mr. Pendergrass or with Mr. Pendergrass, I think you talked

 5   about how you were kind of really in need of some money; right?

 6   Having some financial difficulties?

 7   A.   When I first met him, no.

 8   Q.   You weren't?

 9   A.   No.

10   Q.   Because you were on leave from Clark Atlanta?

11   A.   Yes.

12   Q.   But as time went on, it sounds like you were having

13   financial difficulty?

14   A.   Yes.

15   Q.   Because you really wanted that $16,000; right?

16   A.   Yes.

17   Q.   And one of the reasons that you talked about yesterday for

18   really needing that money, wanting that money is because you

19   didn't want to go to jail; right?

20   A.   Right.

21   Q.   That was kind of primary in the things you were talking

22   about yesterday; right?

23   A.   Yes.

24   Q.   How to get that money so you didn't have to go to jail;

25   right?
```

1    **A.**    That's correct.

2    **Q.**    And in this case, you are back in that situation again --

3    right? -- where you are needing to do something so you don't go

4    back to jail; right?

5    **A.**    It was -- so that situation happened before any of the

6    trouble happened.  So I hadn't been to jail or gotten in

7    trouble or did anything before that.

8    **Q.**    I'm sorry.  I'll rephrase.

9        So at that point when you took that money from the Holland

10   & Knight law firm and Clayton County opened an investigation

11   into you, you did not want to go to jail; right?

12   **A.**    Right.

13   **Q.**    Okay.  And we're in the same situation here today because

14   you don't want to go to jail; right?

15   **A.**    No, I don't.

16   **Q.**    Right.  So that's why you entered into the cooperation

17   agreement?

18   **A.**    That is correct.

19            MS. DURRETT:  Okay.  Just a minute.  If I could just

20   have one moment, Your Honor.

21            **(There was a brief pause in the proceedings.)**

22   **Q.**    **(BY MS. DURRETT)**  When you were using the name Chris

23   Carter, that was when you were operating the Recovery Capital

24   company; right?

25   **A.**    Yes.

1   **Q.**   Okay.  So you had Attorney Recovery Systems; right?

2   **A.**   Yes.

3   **Q.**   Recovery Capital Company; right?

4   **A.**   Yes.

5   **Q.**   Nationwide Mutual Capital; right?

6   **A.**   Yes.

7   **Q.**   Citadel Business Solutions?

8   **A.**   That wasn't involved in this.

9   **Q.**   It was prior?

10  **A.**   Yes.

11  **Q.**   I know.  We talked to you about your desk.

12         You were in desk D in the office; right?  Do you need to

13  see the map again?

14  **A.**   Yes.

15  **Q.**   Okay.  Were you in desk D?

16  **A.**   D, yes.

17  **Q.**   And you talked a little about your computer yesterday.

18  Your computer was a MacBook Pro; right?

19  **A.**   Yes.

20  **Q.**   You talked about how you purchased a computer for Eric

21  Fitchpatric; right?

22  **A.**   Yes.

23  **Q.**   That was also a MacBook Pro?

24  **A.**   Yes.  It was a larger.  I think it was a 22-inch.

25  **Q.**   Okay.  And so the Nationwide Capital scheme, you actually

163

1    recovered some money as a result of that; right?

2    **A.**    Yes.

3    **Q.**    Okay.  And so tell us about that.

4    **A.**    So it was another deal that I learned about.  I didn't do

5    any research on it.  I got it from Mr. Pendergrass and the list

6    because I didn't make that listing request.

7    **Q.**    So what you are talking about when you say you got it from

8    Mr. Pendergrass -- there is a database; right?  And you talked

9    about this earlier?  How you would go into the database and

10   take things out of that database; right?

11   **A.**    No.

12   **Q.**    Well, you told us earlier that you took names out of the

13   database; right?  Remember you said that person was a real

14   person and I took the name out of the database?

15   **A.**    Yes.  So it wasn't I.  We did it as a team.  It wasn't

16   ever an I.

17   **Q.**    Sir, you opened Nationwide Mutual Capital by yourself;

18   right?

19   **A.**    I opened it -- the bank account by myself.  I wasn't going

20   to split the money by myself.

21   **Q.**    Okay.

22   **A.**    I didn't do the research by myself.  I didn't even do the

23   research for that company.

24   **Q.**    Okay.  When you are saying do the research, what you are

25   talking about is getting the list of unclaimed funds; right?

1    **A.**    No.   When I say do the research, meaning find out

2    information about that company, who is in the company, whether

3    it is still available, whether it is out of business, and so

4    forth.

5    **Q.**    And so part of that is:  Once you have that information,

6    then you call the companies; right?  I mean, you talked about

7    having -- trying to call companies to find out if they wanted

8    to get their unclaimed funds.  And you called Freddie Ashley --

9                    **(There was a brief pause in the proceedings.)**

10   **Q.**    **(BY MS. DURRETT)**  Part of that, after you do the research,

11   you get the list.  You call the companies to find out if they

12   want to have their funds collected?

13   **A.**    That's correct.

14   **Q.**    And you did that with Freddie Ashley; right?

15   **A.**    Yes.

16   **Q.**    And he came in here and testified, right, that you had

17   tried to call him?

18   **A.**    Yes.

19   **Q.**    Because Allen had given you a list to try to collect from;

20   right?

21   **A.**    Yes.  I was working off that list.

22   **Q.**    Same thing with Holland & Knight?  That was a company you

23   were supposed to try to collect from; right?

24   **A.**    Yes.

25                    MS. DURRETT:  Okay.  I was looking for something that

1   the Government has already admitted as Defendant's Exhibit-- I

2   guess it is Defendant's Exhibit 13.

3         MS. STRICKLAND:   Government 41.

4   **Q.   (BY MS. DURRETT)**   It is also Government's 41.   This is the

5   bank account information for the Pensacola Ice Pilots.

6         Do you remember talking about that?

7   **A.**   Yes.

8   **Q.**   And I'm going to try to find Government's 41 so you know

9   what I'm talking about.   I'm going to hand this to you so you

10  can take a look at it.   It is already admitted.

11        But flip through and remember what it is.

12  **A.**   Okay.   Yeah.   I opened this account.

13  **Q.**   Okay.   What is that address?   That 8272 Blackfoot Trail?

14  **A.**   That was another residence of mine.

15  **Q.**   Okay.

16  **A.**   I lived -- that I lived at at the time.

17  **Q.**   You used your own address for that?

18  **A.**   Yes.

19  **Q.**   Okay.   And then I want to make sure that the rest of the

20  information is in there.

21        Can I look at it?

22  **A.**   Yes.

23  **Q.**   I just want to make sure that the government's exhibit is

24  the same as mine so I can ask you some questions.

25        Okay.   Yeah.   It is the last part of the exhibit that I

1  want to talk to you about.

2       Okay.  So this is a check.  You were telling us earlier

3  about Escambia County, Florida; right?

4  **A.**   Yes.

5  **Q.**   This is a check that you got from them in the name of

6  Pensacola Ice Pilots, care of the Recovery Capital Group;

7  right?

8  **A.**   Yes.

9  **Q.**   And that is a check that you then deposited into this

10  account that you opened in the name of the Pensacola Ice

11  Pilots?

12  **A.**   That's correct.

13  **Q.**   And then there is this check.  Someone is putting money

14  into the Pensacola Ice Pilots account.

15       Who is that person?

16  **A.**   I can't see -- I don't know.

17  **Q.**   Do you recognize that?

18  **A.**   Just putting money into it?  You need to -- I can't see

19  what it is.  Yeah.  So I see it.

20  **Q.**   I'm sorry?

21  **A.**   Yes, I see it.

22  **Q.**   Who is that person?

23  **A.**   So that is my wife.

24  **Q.**   And is that your home address or one of your addresses?

25  **A.**   Yes.

1  Q.    Okay.  So this is a check you contacted Escambia, Florida,

2  about; right?  You did contact them about a check; right?

3  A.    Yes.

4  Q.    Then you opened a bank account in the name of that

5  recipient; right?

6  A.    Yes.

7  Q.    Okay.  And then your wife is putting money into that

8  account as well; right?

9  A.    No.  She just gave me -- I borrowed $100 from her.

10  Q.    So you were using the Pensacola Ice Pilots account like

11  your own personal account; right?

12  A.    Yes.

13  Q.    Okay.  Mr. McQueen, I know you have admitted a lot of

14  fraud in the last couple of days and a lot of schemes to try to

15  steal money, as the Government would put it.

16        But you know that you're not going to be charged for any

17  of that; right?

18  A.    Yes.

19  Q.    Because the Government has promised you that they won't;

20  right?

21  A.    Yes.

22  Q.    Okay.  And I don't want to belabor the point because there

23  are so many different acts that you did.  But I don't know if I

24  have asked you yet about the Atlanta Quarterback Club.

25        Have I asked you about that yet?

1   **A.**   No, you have not.

2   **Q.**   Now, that was an account where you also created a business

3   license; right?

4   **A.**   I don't remember if I did or if I didn't.

5   **Q.**   Okay.

6   **A.**   But I did open the account.

7   **Q.**   You did open the bank account for that?

8   **A.**   Yes, I did.

9   **Q.**   And were you then the signer on that bank account?

10  **A.**   Yes.

11  **Q.**   And to open a bank account, would you need a business

12  license?

13  **A.**   Yes.  Yeah.  Yes, you would.

14  **Q.**   So I'm going to show you what has been marked as

15  Defendant's Exhibit 7C and 7D.  I think the Government may have

16  asked you about it.  But I just wanted to double-check.

17  **A.**   Yeah.

18  **Q.**   I'm sorry?  You recognize that?

19  **A.**   Yes.

20  **Q.**   How do you recognize it?

21  **A.**   So yeah, I did go to the IRS website and create a d/b/a

22  name for it.  And then I had sent this to Mr. Fitchpatric to

23  alter -- to write in their d/b/a Atlanta Quarterback Club.

24  **Q.**   Okay.  Can I grab those from you?

25  **A.**   Yeah.

```
 1              MS. DURRETT:  Your Honor, I would move to admit
 2    Defendant's Exhibit 7C and 7D.
 3              MR. BROWN:  No objection, Judge.
 4              THE COURT:  They are admitted.
 5    Q.   (BY MS. DURRETT)  Again, I hate to have to ask.  But is
 6    this a real document or a forged document?
 7    A.   That is real -- a real document.
 8    Q.   Okay.  So you went on the Department of Treasury website,
 9    and you applied for it.
10         How did you get it?
11    A.   You just go on their website and follow the steps.
12    Q.   And then the second document, 7D, that is the one that you
13    said Mr. Fitchpatric forged; right?
14    A.   Yes.
15    Q.   Okay.  What is the -- well, first, what is this?
16    A.   So it is a copy of the business license if you open up in
17    Clayton County.
18    Q.   Okay.  But it is not a real business license; right?
19    A.   The document is a real business license.  But it has been
20    altered.
21    Q.   Okay.  And then who is -- what is the business name?
22    A.   Atlanta Quarterback Club.
23    Q.   And what else does it say there?
24    A.   Terrell McQueen.
25    Q.   Whose address is that?
```

1    **A.**    That is my address.

2              MS. DURRETT:   That's all the questions I have for

3    you, sir.

4              THE COURT:   Okay.

5              MR. BROWN:   Your Honor, I just have like three or

6    four questions.

7              THE COURT:   Okay.   Then we'll take a break.

8                          REDIRECT EXAMINATION

9    BY MR. BROWN:

10   **Q.**    Mr. McQueen, who is going to decide your sentence in this

11   case?

12   **A.**    The judge.

13   **Q.**    This judge, Judge Totenberg?

14   **A.**    Yes.

15   **Q.**    Okay.   Defense counsel played an audio recording.   Whose

16   voice was that?

17   **A.**    That was a representative from an employee from Harris

18   County.

19   **Q.**    Okay.   Who was speaking on the recording?   Who was -- was

20   there someone that you know that was making -- appearing as

21   Susan Camille Lee on the recording?

22             MS. DURRETT:   Objection, Your Honor.   That is not

23   what the recording is.

24   **Q.**    **(BY MR. BROWN)**   What was that recording?

25   **A.**    That recording was from Harris County asking about the Lee

1   Family Trust.

2   **Q.**   Okay.

3   **A.**   Reissuance of the Lee Family Trust checks.

4   **Q.**   All right.  And you talked a little bit about getting

5   lists from Mr. Pendergrass.  You said Mr. Pendergrass did

6   research.

7        Is that correct?

8   **A.**   Yes.

9   **Q.**   And what was -- what do you mean he did research?  What

10  did he do?

11  **A.**   So research just means going -- finding all the

12  information you can find or skip tracing about a company.  So

13  whether a company is still available or if it is defunct or who

14  are the owners or the individual.  That sort of stuff.

15  **Q.**   Okay.

16           MR. BROWN:  That's all I have, Judge.

17           MS. DURRETT:  Your Honor, could I just do a very

18  quick two question recross?

19           THE COURT:  Yes.

20                      RECROSS-EXAMINATION

21  BY MS. DURRETT:

22  **Q.**   Mr. McQueen, even if this judge wanted to give you more

23  than two years in prison, she cannot do that; isn't that right?

24  **A.**   If they file the motion, yes.

25  **Q.**   I'm sorry.  No.  If she wanted to give you more than two

172

1    years in prison, she can't do that; isn't that right?

2    **A.**    As I understand it, yes.

3    **Q.**    You understand that I'm correct?

4    **A.**    Yes.

5    **Q.**    Right.  So your sentence is two years max; isn't that

6    right?

7    **A.**    That's correct.

8    **Q.**    Unless these people come to her and tell her that you

9    substantially assisted them in prosecuting him; isn't that

10   right?

11   **A.**    For my assistance and testifying.

12   **Q.**    If they say you substantially assisted them, then they

13   will ask her or they could ask her to give you less than two

14   years?

15   **A.**    Yes.

16           MS. DURRETT:  Thank you.

17           MR. BROWN:  That's all I have for this witness,

18   Judge.

19           MS. DURRETT:  Thank you, Your Honor.

20           THE COURT:  Great.  Mr. McQueen, at this juncture, it

21   appears that you are excused.  But I don't want to reach any

22   judgments since obviously somebody could still recall you.

23           MR. BROWN:  Your Honor, sorry to interrupt.  I just

24   want to say I may recall him.  So I don't want to have him be

25   excused.

1          THE COURT:  That is what I was getting prepared for,
2     that you might end up being recalled.
3          So please do not discuss your testimony with anyone
4     whatsoever.  And don't sit in on these proceedings either.
5          All right?
6          THE WITNESS:  Yes, Your Honor.
7          THE COURT:  Thank you very much.  All right.  Let's
8     take a 15-minute break.
9               **(The jury exited the courtroom at 3:01 P.M.)**
10         MS. DURRETT:  I just know we're going to have some
11    objections on the bank records.
12         THE COURT:  All right.  What are the bank record
13    objections?
14         MS. DURRETT:  The Synovus bank records have hearsay
15    within hearsay because they have got some documents about
16    Secretary of State information.  And then the B of A Bank
17    records have --
18         THE COURT:  Can we deal with one at a time?
19         MS. DURRETT:  Yeah.
20         THE COURT:  Because my lamebrain might not --
21         MS. DURRETT:  That is the first one is that they have
22    hearsay within hearsay.  It is just two pages, I think.
23         THE COURT:  What is the number?
24         MR. BROWN:  I think she's talking about Exhibit 26 --
25    Government's Exhibit 26, Judge.  She's referring to Page 16 of

1    that exhibit.

2              MS. DURRETT:  It is 16 and 17.

3              THE COURT:  These start at 31.

4              I'm sorry.  They start where?

5              MR. BROWN:  Her objections relate to Pages 16 and 17,

6    Judge, of Exhibit Number 26.

7              THE COURT:  What is hearsay on 16?

8              MS. DURRETT:  Well, Your Honor, this is a bank

9    record.  And these are not -- this information that is in

10   this -- on this page is not created by the bank.  I assume the

11   Government is trying to offer it for the truth of the matter

12   asserted.  It is not a bank record.

13             THE COURT:  What is it from?  I realize it is

14   articles of incorporation.  But was it -- I mean, it might be

15   part of the records that were given to them.  It doesn't mean

16   it is true.

17             MR. BROWN:  That's correct, Judge.  The reason the

18   Government's response -- if you want me to respond, I can or --

19   but my response, Your Honor, is this is a document that was

20   submitted by Mr. Pendergrass when he opened this account.  It

21   is a bank record.  And it is a part of the records that were

22   certified by the bank, and they require this.

23             He could not open the account but for having this.

24   Therefore it is a record of the bank that they require.  And

25   the Government would ask they be included within the records,

1    Your Honor.

2           MS. DURRETT:  Your Honor, this is exactly the type of

3    document that we filed a notice of intent to object to because

4    it is -- as we cited the rule and the commentary to the rule,

5    there can be a business record that also has hearsay included

6    in it.

7           And so the certification may satisfy the first level

8    of hearsay, which is the business record issue.  But the

9    certification does not satisfy the second level of hearsay.

10          And believe me, they are trying to offer this

11   document for the truth of the matter asserted.  So it is

12   hearsay within hearsay.

13          And it is directly on point in the commentary that we

14   cited to the Court when we filed our motion prior to trial.

15          MR. BROWN:  Your Honor, the Government is offering

16   this as not for the truth of the matter.  I'm not saying that

17   is true or not.  We're offering it to show that this is a

18   document that was submitted to allow this defendant to open

19   this account.

20          So therefore I'm not -- the Government is not

21   offering it for the truth, that it is in fact true.  We know he

22   is not the -- we know he is not the incorporator of this

23   company.

24          We are offering this to show this was a record that

25   the bank required for him to open this account.  And therefore

1   it is a record that -- we're not offering it for the truth,

2   Judge.

3           MS. DURRETT:  But, Your Honor, there is no witness to

4   testify about that.  There is no bank person who is going to

5   come in and say, we require someone to provide an articles of

6   incorporation when we have them open a bank account.

7           He is trying to create testimony about it.  But there

8   is no witness who is going to testify to that.

9           THE COURT:  I don't -- I don't think -- I mean, I

10  think he could introduce it without having us jump to the

11  conclusion that they required it.  I mean, we don't know what

12  they required.  But that it was submitted to them is a reality.

13          It is not -- I mean, I will instruct the jury that it

14  does not mean that it is offered for the truth of the matter if

15  you -- I'm happy to do that.

16          But I mean, I think we had this discussion also.  I

17  mean, you know, if you have a medical record, people -- and

18  somebody puts down that they weigh 125 pounds but when they, in

19  fact, weigh 185 pounds in their screening, it doesn't mean that

20  that is -- you know, we're accepting that as true.  It is part

21  of their medical record.

22          MS. DURRETT:  Right, Your Honor.  But there is an

23  hearsay exception for that explicit comment, which is:  If you

24  are making a statement for treatment -- for medical treatment

25  and that is -- I don't mean to belabor the point.  We filed a

1  separate motion right before trial where we cited the rule and

2  we cited the commentary, which gives your example.

3          The commentary says, for instance, you could have a

4  medical record where someone writes in medical information.

5  The initial level of hearsay is satisfied by the business

6  record.  But the statement about, I weigh 100 pounds, has to be

7  satisfied by its own exception, which is a statement made for

8  medical treatment.

9          We don't have that here.  The Government is trying to

10  create something.  And you bet your bottom dollar, we're going

11  to see this document in closing argument as substantive

12  evidence.

13          THE COURT:  Okay.  I'm going to spend another -- if

14  that is also, I'm going to talk to my law clerk for a minute

15  more and take -- and take a moment.

16          When do you need to get to this document?  Is this

17  the first thing you are going to do?

18          MR. BROWN:  This witness, Judge.

19          THE COURT:  Okay.

20          **(There was a brief pause in the proceedings.)**

21          THE COURT:  I don't think my view changes here.  I

22  went back to look at what you had submitted, which, by the way,

23  as a practice point, when you file something that is called

24  notice, it doesn't come up with a flag.  So --

25          MS. DURRETT:  Sorry.

1          THE COURT:  -- either do it as a motion or not or

2     write to the Court that you filed a notice or a memorandum of

3     authority.  Because it just doesn't come up that way.

4          MS. DURRETT:  Okay.

5          THE COURT:  But Subsection C of -- the Subdivision C

6     that the annotations indicate the following to the -- to the

7     rule, the definition follows along familiar lines including

8     only statements offered to prove the truth of the matter

9     asserted.  If the significance of an offered statement lies

10    solely in the fact that it was made, no issue is raised as to

11    the truth of anything asserted and the statement is not

12    hearsay.

13          The effect is to exclude from hearsay the entire

14    category of verbal acts and verbal parts of an act, in which a

15    statement itself affects the legal rights of the parties or is

16    a circumstance bearing on conduct affecting their rights.  And

17    then they give the example of letters of complaint.

18          Can you give me the other page?

19          Then I'm looking at your memorandum and on Page 3 and

20    quotation from the *United States v. Christ*, statements made by

21    third parties in an otherwise admissible business record cannot

22    properly be admitted for their truth unless they can be shown

23    independently to fall within a recognized hearsay exception.

24          But the Government here says they are not offering it

25    for its truth; they are offering it for another purpose.  So it

1    is not double hearsay.  If they were offering it for its truth,

2    that would be something else.

3         And consequently any information provided by an

4    outsider to the business preparing the record must itself fall

5    within a hearsay exception to be admissible.  And I think what

6    you are arguing is, well, therefore it can't come into the

7    record because -- but they are not trying to establish it as

8    true, just simply that it was received.

9         MS. DURRETT:  Your Honor, I will be quite shocked if

10   we don't hear about this in closing argument as being a true

11   document.  But --

12        THE COURT:  Well, I don't think the Government

13   contends this is true.  They are just saying it was submitted

14   and part of the -- I mean, this was in the record.  They are

15   not saying it is true.  If they did, that would be something

16   else.

17        Let's get away from medical records, which may have

18   misled us.  But let's say -- *General Motors* says we didn't --

19   they submitted information to the Government or some other

20   entity and they say we haven't been polluting or we have

21   been -- or our cars are perfect and there are no emissions.  It

22   wouldn't necessarily be true.  But that is what -- it would

23   be -- I mean, it is -- somebody coming to basically go after GM

24   would say yeah, and this is what -- they made a

25   misrepresentation to us as to what they did.

1          MS. DURRETT:  Thank you, Your Honor.  We would just

2     ask for a limiting instruction then, that the jury being told

3     that it is not being offered for the truth of the matter.

4          THE COURT:  Okay.

5          MR. BROWN:  And, Your Honor, I would just say one

6     thing.  It is also -- if you need to get a hearsay exception,

7     Your Honor, 801(d)(2), this is a statement by a party opponent.

8     This is a business account created by Allen Pendergrass.  He

9     submitted his driver's license to open this account.  He

10    submitted this document.

11         So to the extent there needs to be a hearsay

12    exception, we have one.  This is a statement by a party

13    opponent under 801(d)(2).  So it comes in that way.

14         So if -- there is no limiting instruction needed.  It

15    is a statement submitted by him.  It is actually -- so that

16    is -- that is the exception, if we need one, Your Honor.

17         MS. DURRETT:  Your Honor, the document is not a

18    statement of Mr. Pendergrass.  I don't even understand that

19    argument, Your Honor.  It says articles of incorporation at the

20    top.  I mean --

21         THE COURT:  All right.  Well, I will give them a

22    limiting instruction.  But -- but it is what we have just said.

23    It is not being offered for the -- the Government is not

24    offering it for the truth of the matter.  They are offering it

25    in order to show these are records.

```
 1              MS. DURRETT:  And we're going to notify the jury?
 2              THE COURT:  Yes.
 3              MS. DURRETT:  All right.  And then I did have other
 4   objections on the --
 5              THE COURT:  What are the other ones?
 6              MS. DURRETT:  That he -- like three of the pages from
 7   the Bank of America records, I think, reference something that
 8   is not related to this case.  And so I notified him about that.
 9              Let me tell you --
10              THE COURT:  Is that also within Exhibit 26?
11              MS. DURRETT:  I think it is Exhibit 24.
12              Is that right?
13              MR. BROWN:  She marked 24, Page 80, Judge, on the
14   exhibit.  So I don't know if she has issues with that one.
15              MS. DURRETT:  Right.  81 and 82.  But it is three
16   pages.
17              THE COURT:  81?
18              MS. DURRETT:  Yes, Your Honor.  80, 81, and 82.
19              THE COURT:  And you think these do not relate to this
20   case?
21              MS. DURRETT:  I do.
22              MR. BROWN:  Judge, we don't need those pages.  We can
23   take them out and move on.
24              MS. DURRETT:  Thank you.
25              THE COURT:  Anything else?
```

| | |
|---|---|
| 1 | MS. DURRETT:  No, Your Honor. |
| 2 | THE COURT:  All right.  Let's get the jury back. |
| 3 | **(The jury entered the courtroom at 3:46 P.M.)** |
| 4 | MR. BROWN:  Your Honor, the Government calls Agent |
| 5 | Wesley Cooper. |
| 6 | COURTROOM DEPUTY CLERK:  Please stand and raise your |
| 7 | right hand. |
| 8 | **(Witness sworn)** |
| 9 | COURTROOM DEPUTY CLERK:  Please have a seat.  Loudly |
| 10 | and clearly state your name and spell your last name for the |
| 11 | record. |
| 12 | THE WITNESS:  Wesley Cooper.  It is C-O-O-P-E-R. |
| 13 | Whereupon, |
| 14 | SPECIAL AGENT WESLEY COOPER, |
| 15 | after having been first duly sworn, testified as follows: |
| 16 | DIRECT EXAMINATION |
| 17 | BY MR. BROWN: |
| 18 | **Q.**   Agent Cooper, I think they are going to ask you to put a |
| 19 | Glad bag back over the microphone.  You can take your mask off. |
| 20 | **A.**   Okay. |
| 21 | **Q.**   Where are you currently employed? |
| 22 | **A.**   I'm employed with the Internal Revenue Service Criminal |
| 23 | Investigation. |
| 24 | **Q.**   How long have you been so employed? |
| 25 | **A.**   For 20 years. |

1   **Q.**   Do you have any previous law enforcement experience?

2   **A.**   I do not.

3   **Q.**   And what is your current title?

4   **A.**   I'm special agent investigator or federal law enforcement

5   officer.

6   **Q.**   And with which agency?

7   **A.**   The Internal Revenue Service.

8   **Q.**   All right.  And what was your role during the course of

9   this investigation of Allen Pendergrass and Mr. McQueen?

10  **A.**   Investigated Titles 18 United States Code 1956, the money

11  laundering violations.

12  **Q.**   And as part of your investigation, have you reviewed bank

13  records and summary charts of bank records in this case?

14  **A.**   Yes, I did.

15  **Q.**   In addition to that, did you also interview witnesses and

16  victims in the case?

17  **A.**   Yes, I did.

18  **Q.**   And did you or other agents -- what other agency assisted

19  you with this case?  What other federal law enforcement agency

20  assisted you with the investigation?

21  **A.**   The United States Postal Service.

22  **Q.**   As a part of your investigation and the Government's

23  investigation in this case, did you investigate or interview

24  Lou Comer?  Lou Comer?  Did you interview Lou Comer?

25  **A.**   Yes.

1   **Q.**   Who is Lou Comer?

2   **A.**   I would have to refer to the record.  I don't remember

3   exactly.

4          MS. DURRETT:  Your Honor, I'm going to object to

5   hearsay at this point.

6          MR. BROWN:  I didn't ask for any hearsay from this

7   witness, Judge.  I am merely asking about his activities.  I

8   didn't ask him what Ms. Comer told him.  I'm just asking about

9   the fact that he spoke with her.

10          THE COURT:  All right.  Proceed.

11  **Q.   (BY MR. BROWN)**  Did agents also interview Sidney F.

12  Wheeler?

13  **A.**   Yes.  Agents did, yes.

14          MS. DURRETT:  Okay.  I don't believe he has personal

15  knowledge.  He wasn't involved in these interviews.

16          THE COURT:  Well, do you know that -- as a matter of

17  your own personal knowledge, who interviewed -- what interviews

18  were conducted by what agents?

19          THE WITNESS:  Agents of the United States Postal

20  Service, Internal Revenue Service Criminal Investigation.

21          THE COURT:  That wasn't my question.

22          Why don't you try to clarify.

23          MR. BROWN:  Yes.

24  **Q.   (BY MR. BROWN)**  Did law enforcement agents interview

25  Sidney F. Wheeler during the course of this investigation?

1   **A.**   Yes.

2   **Q.**   Is Mr. Wheeler still alive?

3   **A.**   Not to my understanding.

4   **Q.**   Were bank records subpoenaed related to Asset Financial

5   Recovery and other companies associated with Allen

6   Pendergrass's businesses?

7   **A.**   What about those records?  I'm sorry.

8   **Q.**   The question was:  Did investigators subpoena bank

9   records --

10  **A.**   Yes.

11  **Q.**   -- associated with Asset Financial Recovery --

12  **A.**   Yes.

13  **Q.**   -- and other businesses associated with Allen Pendergrass?

14  **A.**   Yes.

15  **Q.**   And why were bank records subpoenaed in this case?

16  **A.**   There was a financial nexus to the investigation for the

17  review of, I guess, bank transactions as associated to Asset

18  Financial Recovery.

19  **Q.**   Could we publish what has already been admitted into

20  evidence as Exhibit Number 20.

21       What are we looking at here, Agent Cooper?

22  **A.**   This is a business account application for Wells Fargo

23  Bank.

24  **Q.**   And which company -- what is the customer name of this

25  account located at the bottom where it says customer name?

1   **A.**   It is Asset Financial Recovery, Inc.

2   **Q.**   And below that, what is customer two name?

3   **A.**   Allen Pendergrass.

4   **Q.**   And what is Allen Pendergrass's relationship to the

5   account right next to his name?

6   **A.**   He is the signer.

7   **Q.**   Can we go to Page 3 of this exhibit, please?

8   Based on -- who opened the account?

9   **A.**   Allen Pendergrass.

10   **Q.**   And were there documents or identifications submitted

11   relating to the opening of the account?

12   **A.**   Yes.

13   **Q.**   Have you reviewed checks -- in the course of your

14   investigation, have you reviewed checks written on this

15   account?  It is account ending in 3556.

16   **A.**   Yes, I have.

17   **Q.**   In whose name are the checks written on this account?

18   **A.**   Allen Pendergrass.

19   **Q.**   Now, was a summary exhibit created relating to the review

20   of this particular account?

21   **A.**   Yes.

22   **Q.**   I'll show you what has been marked as Government's

23   Exhibit 21.

24   Agent Cooper, have you reviewed this summary chart

25   previously?

1  A.    Yes, I have.

2  Q.    And have you also had a chance to review approximately how

3  many pages of bank records there are in this case for this

4  particular account?

5  A.    For this particular account, it was, I think, over 75 or

6  76 pages.

7  Q.    Did you actually review this chart and compare it for

8  accuracy relating to the actual transactions listed in the bank

9  account ending in 3556?

10  A.    Yes, I did.

11  Q.    And does the summary chart show the accurate tracking of

12  the deposit from disbursements in this bank account ending in

13  3556?

14  A.    Yes.

15        MR. BROWN:  Your Honor, at this time, the Government

16  would move to admit Exhibit Number 21 into evidence.

17        MS. DURRETT:  No objection, Your Honor.

18        THE COURT:  It is admitted.

19        MR. BROWN:  Permission to publish Page 1 of 21,

20  Judge.

21        THE COURT:  Granted.

22        MR. BROWN:  Thank you.

23  Q.    (BY MR. BROWN)  All right.  Can you just -- the jurors can

24  read.  But just what are we looking at here?

25        It says source of deposit.  What does that mean?  And what

1    is this summary chart capturing as it relates to deposits into

2    this account?

3    **A.**   It captures transactions or deposits that were made into

4    the account over a period of time.

5    **Q.**   So at the top when it says $163,571, are those deposits

6    from the City of Atlanta that were deposited into this account?

7    **A.**   Yes.

8    **Q.**   And the total for the year tracked of May 8, 2013, to

9    May 31st, 2014, was a total of $201,343.28 deposited into this

10   account?

11   **A.**   Yes.

12   **Q.**   Could we go to Page 2.

13          MR. BROWN:  Harry, can I clear the screen or can you

14   clear it for me?  Thanks.

15   **Q.**   **(BY MR. BROWN)**  And at the top, what is this chart

16   reflecting?

17   **A.**   This chart reflects disbursements or debits or payments

18   out of the account.

19   **Q.**   So at the top, it shows that $35,137 was paid to

20   Mr. McQueen; is that correct?

21   **A.**   Yes.

22   **Q.**   And it looks like 6000 -- $6003 were paid to Deidre

23   Barber?

24   **A.**   Yes.

25   **Q.**   And it also lists about $9000 in cash withdrawals?

1   **A.**   Yes.

2   **Q.**   Then where it says 9500, 9500 next to Hemisphere, is that

3   checks that were paid out to Hemisphere, Inc., bank account?

4   **A.**   Yes.

5   **Q.**   Do you see an entry about $2000 paid to an Eric

6   Fitchpatric?

7   **A.**   Yes.

8   **Q.**   $1300 to a Hotel Dunn Inn.  Do you see that?

9   **A.**   Yes.

10  **Q.**   $900 paid to a Nathan Pendergrass.  Do you see that?

11  **A.**   Yes.

12  **Q.**   If we could just go to Page-- are there several pages

13  related to actually disbursements from this account?

14  **A.**   Yes.

15  **Q.**   Starting from the greatest amount of money paid out to the

16  least; is that correct?

17  **A.**   Yes.

18  **Q.**   In addition as part of your investigation, did you examine

19  this account to determine if money was paid out to James Bone?

20  **A.**   I did, yes.

21  **Q.**   Were there any payments to James Bone?

22  **A.**   No.

23  **Q.**   Lou Comer or Georgia Municipal Association?

24  **A.**   No.

25  **Q.**   Sonia Johnson or the law firm associated with Ms. Johnson?

```
 1    A.    No.

 2    Q.    Any money paid to Fredrick Ashley or Actor's Express?

 3    A.    No.

 4          MR. BROWN:  Could we publish -- could we go to

 5    Exhibit Number 20, Page 66, please.

 6          Harry, can you clear that screen for me?

 7          COURTROOM DEPUTY CLERK:  Yes.

 8    Q.    (BY MR. BROWN)  Agent Cooper, as part of your

 9    investigation, did you examine the checks that were actually

10    written on this account?

11    A.    Yes, I did.

12    Q.    So what has already been published is a check payable to

13    the Oklahoma County Treasurer's Office.

14          Do you see that?

15    A.    Yes.

16    Q.    During the course of your investigation, did you observe a

17    number of checks that were paid out to various state and county

18    government agencies?

19    A.    Yes.

20    Q.    Is it safe to say there were more than 15 checks that were

21    paid out to state and county government agencies?

22    A.    Yes.

23          MR. BROWN:  Could we publish Exhibit -- I mean,

24    Page 175 of this exhibit, please.  Can we just enlarge the top

25    half, please?
```

1   **Q.   (BY MR. BROWN)**   So what are we looking at here, Agent

2   Cooper?

3   **A.**   This is a statement showing deposits and withdrawals for

4   the month of June.

5          MR. BROWN:   Could we just enlarge the bottom half,

6   please.

7   **Q.   (BY MR. BROWN)**   So, for example, do you see the entry on

8   June 17 for a debit card purchase on June 13 at Hotel Dunn Inn

9   in San Jose?

10  **A.**   Yes.

11  **Q.**   And I think you testified earlier about the actual summary

12  chart captures the total number of payments made to the Hotel

13  Dunn; correct?

14  **A.**   Yes.

15         MR. BROWN:   Could we go to Page 118 of this exhibit,

16  please.

17  **Q.   (BY MR. BROWN)**   If we go to -- what are we looking at

18  here, Agent Cooper?

19  **A.**   This is a deposit slip -- it says deposit ticket referred

20  to as a deposit slip.  But it is a deposit made to a Wells

21  Fargo branch on May 15, 2013.

22  **Q.**   Let's switch gears.  I want to show you what has been

23  marked as Exhibit Number 22.

24         MR. BROWN:   Could we just pull up -- I think 22 is

25  already in evidence.  Could we pull up 22, please.

1    **Q.    (BY MR. BROWN)**   What are we looking at here, Agent Cooper?

2    **A.**    This is a signature card for Bank of America for a

3    business bank account.

4    **Q.**    And as a part of your investigation, did you review

5    deposits and withdrawals from this account as well?

6    **A.**    Yes, I did.

7    **Q.**    Let's publish Page 27 of this exhibit, please.

8         What are we looking at here, Agent Cooper?

9    **A.**    This is a deposit item.  It is a check from the City of

10   Atlanta paid to the order of Asset Financial Recovery, Inc.,

11   care of Roshaunta Laster in the amount of $5250 -- yeah,

12   $5,250.

13   **Q.**    Could we publish Page 35 of this exhibit.

14        What are we looking at here, Mr. Cooper?

15   **A.**    This is a check.

16   **Q.**    Does it say that it is payable to Hemisphere, Inc.?

17   **A.**    Yes, it is.

18   **Q.**    Does it say for legal work --

19   **A.**    Yes, it does.

20   **Q.**    -- in the memo line?

21        During the course of your investigation, did you also

22   review a bank account in the name of Hemisphere, Inc.?

23   **A.**    Yes, I did.

24   **Q.**    I'm not going to go through all the transactions here.

25   But if we can kind of summarize it and speed things up, during

1    the course of your review, did you find -- did you see checks

2    payable to Terrell McQueen out of this bank account?

3    **A.**   Yes.

4    **Q.**   Are there checks payable to Allen Pendergrass out of this

5    bank account?

6    **A.**   Yes.

7         MR. BROWN:  Let's just pull up one check.  Can we

8    pull up Page 38 of this exhibit, please?

9    **Q.   (BY MR. BROWN)**   Is this a check that was written to an

10   Allen Pendergrass on April 25th, 2013?

11   **A.**   Yes.

12   **Q.**   In the memo line, it says C-O-M-M.  Do you see that?

13   **A.**   Yes, I do.

14        MR. BROWN:  Let's pull up Page 45 of this exhibit

15   please.

16   **Q.   (BY MR. BROWN)**   Does it also show payable to an Allen

17   Pendergrass?

18   **A.**   Yes.

19   **Q.**   On April 5th, 2013?

20   **A.**   April 25th.

21   **Q.**   April 25th.  I'm sorry.

22   **A.**   Yes.

23   **Q.**   And also the memo line says commission?

24   **A.**   Yes.

25   **Q.**   In addition to payments to Mr. McQueen and

1    Mr. Pendergrass, did you see payments for personal expenses

2    like gas and food paid out of this account as well?

3    **A.**   Yes.

4    **Q.**   Did you also find some business expenses that were paid

5    out of this account?

6    **A.**   Yes.

7         MR. BROWN:  Could we pull up 22 -- I mean Page 9 of

8    this exhibit, please, and could we just highlight the top half.

9         That's fine.

10   **Q.   (BY MR. BROWN)**  Agent Cooper, do we see a 100-dollar

11   payment for postage stamps at postagestamps.com?

12   **A.**   Yes.

13   **Q.**   Do you also see some purchases related to what is called

14   answering service?

15   **A.**   Yes.  There's two there.

16   **Q.**   Let's go to Exhibit Number 24.

17        MR. BROWN:  Your Honor, the Government at this time

18   would move to admit Government's Exhibit 24 into evidence.

19        MS. DURRETT:  And that is subject to our previous

20   discussion.

21        THE COURT:  This is the bank records we discussed

22   earlier?

23        MR. BROWN:  Yes, Judge.  And I removed the pages that

24   she had concerns about on this one.

25        THE COURT:  Okay.  All right.  Well --

```
 1                    MR. BROWN:  If we could publish --
 2                    THE COURT:  It is admitted.  I'll give the limiting
 3   instruction later on.
 4                    MR. BROWN:  Okay.  Actually, this is not that record.
 5                    THE COURT:  Oh, that is what I was asking.
 6                    MR. BROWN:  Not this one.  Just one more account and
 7   we'll get to that one, Judge.
 8                    Could we just publish Page 1 of 24, please.
 9   Q.    (BY MR. BROWN)  What are we looking at here, Agent Cooper?
10   A.    This is a signature card Bank of America for a business
11   account.
12                    MR. BROWN:  And could we just highlight the top just
13   so we can see the name of the account, please, Mary.
14   Q.    (BY MR. BROWN)  So is this an account that is titled d/b/a
15   Guishard Wilburn & Shorts, Allen Pendergrass, sole proprietor?
16   A.    Yes.
17                    MR. BROWN:  Could we just go to the bottom, please,
18   and highlight the bottom half of this page, please.
19   Q.    (BY MR. BROWN)  And who is the owner of this account as
20   listed on this document?
21   A.    Allen Pendergrass.
22   Q.    And was this account or at least did Mr. Allen Pendergrass
23   open this account on April 17th?
24   A.    Yes.
25                    MR. BROWN:  Could we go to the second page of this
```

1    exhibit, please.

2            THE COURT:  April 17?  Is that when that is?

3            THE WITNESS:  It is May 17.

4            MR. BROWN:  May 17.  5/17, Judge.

5            THE COURT:  Yes.  Otherwise known as May.

6            MR. BROWN:  Did I say April?

7            THE COURT:  Uh-huh (affirmative).

8            MR. BROWN:  Oh, wow.

9            THE COURT:  Yes.

10           MR. BROWN:  Let me slow down and turn my brain on a

11   little higher.

12           Could you highlight the top half.  Thank you.

13   **Q.   (BY MR. BROWN)**  Agent Cooper, do we see the name Allen

14   Pendergrass and it has a driver's license and a check card that

15   was presented when this account was opened?

16   **A.**   Yes.

17           MR. BROWN:  And let's just go to Page 72 of this

18   exhibit, please.

19           MS. JOHNSON:  72?

20           MR. BROWN:  Yes, Page 72.

21   **Q.   (BY MR. BROWN)**  So is this a check that is written to

22   Guishard Wilburn & Shorts in the amount of $1150.11?

23   **A.**   Yes.

24   **Q.**   And do you see that in the memo line it says for legal

25   work?

1   A.   Yes.

2   Q.   And is this written -- this check from an account with a

3   check from Hemisphere, Inc., at the top?

4   A.   Yes.

5   Q.   Without going through every expense, let's just -- during

6   your review of this account, did you find payments to Allen

7   Pendergrass?

8   A.   Yes.

9   Q.   Did you also find payments to Mr. Terrell McQueen?

10  A.   Yes.

11  Q.   In addition, did you find -- did you see business expenses

12  that were in this account?

13  A.   Yes.

14          MR. BROWN:  All right.  Can we just publish Page 29

15  of this exhibit, please?  Can we just enlarge kind of -- yeah.

16  That is fine.  Thanks.

17  Q.   **(BY MR. BROWN)**  All right.  So on this account, do we see

18  at the top about a little over $4000 in cash withdrawals?  Do

19  you see that?

20  A.   Yes.

21  Q.   Do you also see a payment for AnswerAmerica?

22  A.   Yes.

23  Q.   And do you also see where it says September 20, 2013, a

24  payment to Virtual Offices in Boca Raton, Florida, in the

25  amount of $109?

**A.** Yes.

**Q.** And then below that a payment related to RingCentral, Inc., or a check card purchase RingCentral, Inc.?

**A.** Yes.

MR. BROWN: Your Honor, at this time, the Government would move to admit Exhibit Number 25 into evidence.

MS. DURRETT: I'm sorry, Your Honor. No objection.

THE COURT: All right. Admitted.

MR. BROWN: Could we publish Exhibit Number 25, please. Just Page 1, Mary, please.

Could we just highlight the top half -- that little portion there.

**Q.** **(BY MR. BROWN)** Agent Cooper, is this account for the Lee Family Trust and Allen Pendergrass listed as a trustee?

**A.** Yes.

MR. BROWN: Could we highlight the bottom half, Mary, please.

**Q.** **(BY MR. BROWN)** Does this date on this -- does it look to appear to be February 8, 2013?

**A.** Yes.

MR. BROWN: Let's go to Exhibit -- Page 66 of this exhibit, please. Could we just enlarge this, please -- just the top. Just the check.

**Q.** **(BY MR. BROWN)** Agent Cooper, is this the check in the amount of $5184 that was deposited into the account?

1    **A.**    Yes.

2    **Q.**    It appears to be from the Tax Assessor's Office in Harris

3    County, Texas?  Do you see that?

4    **A.**    Yes.

5    **Q.**    The jurors will have this whole record back with them.  So

6    I'm not going to go through every entry.

7         But have you reviewed the entries in this account?  So the

8    deposits and withdrawals from this account?

9    **A.**    Yes.

10   **Q.**    And based on your review, did you see checks or deposits

11   related to Terrell McQueen?

12   **A.**    You said deposits to --

13   **Q.**    Yeah.  Payments to Terrell McQueen.

14   **A.**    Yes.

15            MR. BROWN:  Let's publish 75 of this exhibit, please.

16   Page 75 of this Exhibit 25.  Could we just highlight the top

17   half.

18   **Q.**    **(BY MR. BROWN)**  So is this a check in the amount of $1000

19   paid out of this account to Mr. Terrell McQueen?  Do you see

20   that?

21   **A.**    Yes.

22   **Q.**    And do you also see payments or checks out of this account

23   to Eric Fitchpatric and Deidre Barber?

24   **A.**    Yes.

25   **Q.**    And were there also payments to Allen Pendergrass?

1    **A.**   Yes.

2          MR. BROWN:  Can we publish Exhibit 77 -- Page 77 of

3    this exhibit, please?  Can you enlarge it?

4    **Q.    (BY MR. BROWN)**  Is this a check paid to the order of Allen

5    Pendergrass in the amount of $1250?

6    **A.**   Yes, it is.

7          MR. BROWN:  Let's also publish Page 90 of this

8    exhibit, please.

9    **Q.    (BY MR. BROWN)**  Is this another check payable to Allen

10   Pendergrass from this account?

11   **A.**   Yes.

12         MR. BROWN:  Now, Your Honor, at this time, the

13   Government would move to admit 26 into evidence.  And this is

14   the exhibit that, Your Honor, defense counsel wanted you to

15   make some announcement about, Judge.

16         MS. DURRETT:  And we understand the previous ruling,

17   but we do have an objection.

18         THE COURT:  All right.  Why don't you introduce it

19   and ask him what it is.  And then I'll go from there.

20         MR. BROWN:  Okay.

21   **Q.    (BY MR. BROWN)**  I'm going to hand you what has been marked

22   as Government's Exhibit 26.  Just take a look at it.

23         What is that, Agent Cooper?

24   **A.**   Bank records from Bank of North Georgia.

25   **Q.**   And during the course of your investigation, have you had

1    a chance to review those bank records?

2    **A.**    Yes.

3    **Q.**    And is that exhibit true and accurate copies of the

4    records received from the Bank of North Georgia?

5    **A.**    Yes.

6    **Q.**    For Hemisphere, Inc., bank account?

7    **A.**    Yes.

8              MR. BROWN:  Your Honor, the Government would move to

9    admit 26 into evidence.

10             THE COURT:  All right.  Exhibit 26 is admitted.

11             Ladies and gentlemen, to the extent that there are

12   records in there that contain statements or information

13   provided by individuals or entities that are other than the

14   bank itself, you can't consider that as true.  It would be

15   hearsay -- what is called hearsay.

16             But it is allowed to be introduced to you not for the

17   truth of the matter of what is in those records but simply for

18   the fact that it was maintained in the regular course of the

19   records that were collected for that account by the bank.

20             MR. BROWN:  Your Honor, would it be more clear if I

21   just put up the actual exhibit page that you are referring to

22   when you made that statement?

23             THE COURT:  Do you have any objection to that?

24             MS. DURRETT:  I do, Your Honor.  I would just like

25   the instruction.

1          THE COURT:  All right.  We'll just leave it at that.

2          MR. BROWN:  Your Honor, can we publish it based on

3     that?  Can we publish the actual --

4          THE COURT:  You can publish the -- whatever you are

5     going to publish.

6          MR. BROWN:  Could we publish Exhibit 26, Page 18,

7     please.  Could we just highlight -- yeah.  That is fine right

8     there.  All the way to the side.  Thanks.

9     **Q.   (BY MR. BROWN)**  So what are we looking at here, Agent

10    Cooper?

11    **A.**   It is a signature card for this account.

12    **Q.**   So is the business account named Hemisphere, Inc.?

13    **A.**   Yes.

14    **Q.**   And is the name of the person that is the signer when they

15    opened the account Allen Pendergrass?

16    **A.**   Yes.

17    **Q.**   And I think you already testified you reviewed the checks

18    written on this account as well as the deposits made into this

19    account; is that correct?

20    **A.**   Yes.

21         MR. BROWN:  Can we publish Page 14, please?  Just

22    highlight the top half.

23    **Q.   (BY MR. BROWN)**  So does this page indicate that Allen

24    Pendergrass is the authorized signer on this account and a

25    signature by that name?

1   **A.**   Yes.

2          MR. BROWN:  Could we publish Page 16 of this exhibit,

3   please.

4   **Q.   (BY MR. BROWN)**  What are we looking at here, Agent Cooper?

5   **A.**   These articles of incorporation for Georgia profit

6   corporation.

7   **Q.**   Do these articles indicate that the registered agent is an

8   individual named Gordon Giffin?

9   **A.**   Yes.

10  **Q.**   And the name and address of the incorporator is Allen

11  Pendergrass?

12  **A.**   Yes.

13  **Q.**   Is there a date down there November 19, 2012?  Do you see

14  that?

15  **A.**   Yes, I do.

16         MR. BROWN:  All right.  Could we go to the next page,

17  Page 17, of the exhibit, please.

18  **Q.   (BY MR. BROWN)**  And the billing information for Allen

19  Pendergrass, P.O. Box 1809.

20         Do you see that?

21  **A.**   Yes.

22  **Q.**   And there is -- does it purport that it was paid for with

23  a Visa credit card or a credit card from Visa?

24  **A.**   Yes.

25  **Q.**   And does the top indicate that this is from the Georgia

1    Secretary of State's office?

2    **A.**   Yes.

3           MR. BROWN:  So out of this account, can we pull up

4    Page 27, please?

5    **Q.   (BY MR. BROWN)**  As a part of your investigation, Agent

6    Cooper, did you review the checks out of this account as well?

7    **A.**   Yes.

8           MR. BROWN:  Could we publish Page 2 of this exhibit,

9    please.  And can we just -- the top -- like the midway down --

10   yeah, right there.  All the way down.  All the way across and

11   all the way down, enlarge that, please.  Thank you.

12   **Q.   (BY MR. BROWN)**  Do we see payments out of this account to

13   Allen Pendergrass for $3500?

14   **A.**   Yes.

15   **Q.**   For $800?

16   **A.**   Yes.

17   **Q.**   And a check made to a Terrell McQueen in the amount of

18   $1000?

19   **A.**   Yes.

20   **Q.**   All right.  And based on your review, are there other

21   checks written out of this account to Allen Pendergrass as

22   well?

23   **A.**   Yes.

24   **Q.**   Are there checks written to --

25           MR. BROWN:  Page 5 of this exhibit, please.  Can you

1   just do the top two checks all the way across, please?

2   **Q.   (BY MR. BROWN)**   Is there a check here payable to a Joseph

3   Outland in the amount of $150?

4   **A.**   Yes.

5   **Q.**   Do you also see a check paid to Asset Financial Recovery

6   in the amount of $500?

7   **A.**   Yes.

8          MR. BROWN:   And could we go to Page 7 of this

9   exhibit, please.   Can we -- can you just enlarge the bottom two

10  checks, please?

11  **Q.   (BY MR. BROWN)**   Agent Cooper, does this reflect deposits

12  made into this account, one from an account -- check from the

13  City of Atlanta paid to the order of Hemisphere, Inc., for

14  22,000-some-odd dollars?

15  **A.**   Yes.

16  **Q.**   So just in summary, you work with the IRS; correct?

17  **A.**   Yes.

18  **Q.**   So the main part of your job is to do tax investigations?

19  **A.**   Yes.

20  **Q.**   Was this case for you related to taxes at all?

21  **A.**   No.

22  **Q.**   So why was the IRS even involved in this -- in this

23  particular case?

24  **A.**   Well, in addition to tax violations, we also investigate

25  money laundering and Bank Secrecy Act violations as well.

**Q.**   So what is money laundering?

**A.**   Specified unlawful activity or an unlawful -- a

violation -- monies transacted or deposited into financial

institutions with said I guess --

MS. DURRETT:  Your Honor, I'll object to the witness

giving the legal instruction to the jury.

THE COURT:  I'll sustain that.

MR. BROWN:  I wasn't asking for a legal definition.

THE COURT:  I know.  But it wasn't clear, and it

could be confusing.  So I'm not going to allow it.

MR. BROWN:  Okay.  Thank you, Judge.

THE COURT:  So please disregard what the witness just

stated.  Thank you.

**Q.   (BY MR. BROWN)**   I wanted to show you what has been marked

as Government's Exhibit Number 23.

Do you recognize that document?

**A.**   Yes.

**Q.**   What is that document?

**A.**   This is an analysis of deposits into Bank of America

checking account ending 4620 in the name of Asset Financial

Recovery for the period of March 22nd, 2013, through May 31st,

2013.

**Q.**   Okay.  And did you look at the bank records related to

that account and that summary chart that you are holding in

your hand?

1    **A.**   Yes, I did.

2    **Q.**   And did you verify that the disbursements and the actual

3    deposits in that bank account were consistent with what is

4    reflected in the summary document you are holding?

5    **A.**   Yes.

6    **Q.**   And were they an accurate accounting of the actual

7    deposits and payments reflected in that summary chart?

8    **A.**   Yes, it was.

9            MR. BROWN:  The Government would move to admit

10   Exhibit 23 into evidence, Judge.

11           MS. DURRETT:  No objection, Your Honor.

12           THE COURT:  It is admitted.

13           MR. BROWN:  Permission to publish, Judge?

14           THE COURT:  Granted.

15           MR. BROWN:  Page 1 of the Exhibit Number 23, please.

16   **Q.    (BY MR. BROWN)**   So, Agent Cooper, we have already spoken

17   about this account.

18        So does this summary chart reflect approximately $35,000

19   in deposits into the Asset Financial Recovery account ending in

20   4620 with Bank of America?

21   **A.**   The 35,000 was deposits from the City of Atlanta.

22   **Q.**   Right.  From the City of Atlanta.

23        And total deposits in the amount of approximately $37,196?

24   **A.**   Yes.

25           MR. BROWN:  Could we go to Page 2 of this exhibit,

1   please.

2   **Q.**   **(BY MR. BROWN)**  And do you see at the top the payee is

3   listed as -- that received about $9000 was Terrell McQueen; is

4   that correct?

5   **A.**   Yes.

6   **Q.**   And do you also see in that summary payments to Allen

7   Pendergrass?

8   **A.**   Yes.

9   **Q.**   Roshaunta Redmond?

10   **A.**   Yes.

11   **Q.**   Eric Fitchpatric?

12   **A.**   Yes.

13   **Q.**   Money that was sent to the -- paid out to the Harris

14   County Tax Assessor's Office -- do you see that? -- in the

15   amount of $200?

16   **A.**   Yes.

17   **Q.**   Stamps, $150, do you see that?

18   **A.**   Yes.

19   **Q.**   And I'm not going to go through the rest of the pages.

20   But does it just delineate all the actual disbursements out of

21   that accounts are reflected from your review of the bank

22   records?

23   **A.**   Yes.

24        MR. BROWN:  Just one second, Judge.  I think I'm

25   wrapping up.

| | |
|---|---|
| 1 | **(There was a brief pause in the proceedings.)** |
| 2 | MR. BROWN:  That's all I have, Judge.  Thank you. |
| 3 | MS. DURRETT:  I have no questions of this witness, |
| 4 | Judge. |
| 5 | THE COURT:  Okay.  May this witness be excused? |
| 6 | MR. BROWN:  Yes. |
| 7 | THE COURT:  Thank you.  Thank you very much, sir. |
| 8 | Are you resting? |
| 9 | MR. BROWN:  Just I just want to double-check with |
| 10 | your deputy to make sure that I have all the exhibits in.  But |
| 11 | yes, the Government will rest. |
| 12 | THE COURT:  All right.  Ladies and gentlemen, we |
| 13 | still have more witnesses for the day.  And I'm trying to |
| 14 | finish so we are able to move forward tomorrow for your |
| 15 | consideration of the case and argument.  And I don't know how |
| 16 | long these witnesses will be. |
| 17 | So I hate to ask you to leave the courtroom again. |
| 18 | But I think it would be fastest if we do that. |
| 19 | **(The jury exited the courtroom at 4:27 P.M.)** |
| 20 | MR. BROWN:  Saraliene, I want to admit 25 in.  I |
| 21 | think we only admitted two pages yesterday.  She said she would |
| 22 | not object to 25. |
| 23 | THE COURT:  Can you just say it -- |
| 24 | MS. DURRETT:  No objection. |
| 25 | THE COURT:  You have no objection? |

```
1              MS. DURRETT:  I have no objection.  I know that is
2    shocking.
3              THE COURT:  To Government Exhibit 25?
4              MS. DURRETT:  I'm sorry?
5              THE COURT:  Two pages from Exhibit 20 -- is it the
6    whole exhibit?
7              MR. BROWN:  The whole 25.
8              THE COURT:  All right.  Fine.
9              COURTROOM DEPUTY CLERK:  So are we going to have a 25
10   and 25A?  Or are we going to put those two pages back in and
11   have one 25?
12             MR. BROWN:  25.
13             THE COURT:  A single 25.  Not 125.
14             COURTROOM DEPUTY CLERK:  The two pages of 25 should
15   be in that stack right there.  They are in order.  If you would
16   try to keep them that way, I would certainly appreciate it.
17                  (There was a brief pause in the proceedings.)
18             THE COURT:  You have got everything in?
19             MR. BROWN:  Yes.
20             THE COURT:  Do you want to make -- I mean, I want to
21   just technically at least have you be able to preserve your
22   making a motion at this time.
23             MS. DURRETT:  I do, Your Honor.
24             THE COURT:  I mean, you can reserve argument for
25   later on too but make the bare bones of what you want to do.
```

1          MS. DURRETT:  Thank you, Your Honor.

2          We would move for a judgment of acquittal in this

3     case, Your Honor.  As to Counts 1 through 5, in particular

4     Counts 1 through -- 1 through 3, I think Mr. McQueen testified

5     that there was no involvement by Allen Pendergrass on any of

6     those documents.  So he talked -- he walked us through the

7     documents and said, here is where I signed, here is where

8     someone else, here is -- I don't know who signed.  So he wasn't

9     able to identify that Allen Pendergrass had helped in any of

10    those first three counts.

11          Then -- and I know the Court knows the instructions

12    but a defendant aids and abets a person if the defendant

13    intentionally joins with a person to commit a crime.  The

14    defendant is criminally responsible for the acts of another if

15    the defendant aids and abets the other person.

16          THE COURT:  You are going awfully fast for my -- for

17    the end of the day for both my ears and for the court

18    reporter's fingers.

19          MS. DURRETT:  I'm sorry.  Thank you.

20          And, Your Honor, I just don't think -- I know the

21    Government in its opening said Mr. Pendergrass is charged with

22    aiding and abetting this mail fraud.  I don't even think that

23    they have even shown that he aided and abetted those first

24    three counts.

25          Because, you know, the jury is entitled to believe

1  Mr. McQueen if they want to.  He talked about Counts 4 and 5

2  and his belief that Mr. Pendergrass was involved.  But he did

3  not identify Mr. Pendergrass as being involved in Counts 1

4  through 3 specifically.

5           As 2, the money laundering, Your Honor, I think the

6  issue there -- if that is going to carry over, I think they are

7  going to have to show that Mr. McQueen or that Mr. Pendergrass

8  knew that the proceeds in the bank account were proceeds of

9  fraudulent activity.  And I don't think they have shown that.

10          And, again, I'll point the Court to the bill of

11  particulars that the Government filed.  And I think they should

12  be bound by those particular acts that they listed in the bill

13  of particulars.  And I don't think that they have shown that

14  that money has been deposited and then used to further the

15  fraudulent activity as outlined in Counts 1 through 5.

16          I would also say that Mr. McQueen specifically

17  testified as to the second item outlined in their bill of

18  particulars, the check to Michael Burandt.  He specifically

19  testified that that was not a fraudulent check.

20          And so that was one of the items that the Government

21  specifically outlined in its bill of particulars.  I think it

22  should be held to that.  And I don't think they have shown that

23  those transactions outlined in the bill of particulars were

24  deposited and then used to further the mail fraud scheme as

25  outlined in Counts 1 through 5.

1            Then I also have a couple of cases that talk about

2   how the Government must demonstrate that the financial

3   transaction was conducted or attempted with the intent to

4   promote the carrying on of the specified unlawful activity.

5   And one of the cases is *United States v. Calderon*.  It is 169

6   F.3d 718.  That is a case where the Eleventh Circuit reversed

7   the money laundering conviction because there was no evidence

8   indicating how the money was to be spent.

9            Other circuits have developed a line of cases

10  standing for the proposition that a defendant may not be

11  convicted of promoting -- promotion money laundering where the

12  proceeds of some relatively minor fraudulent transactions are

13  used to pay the operating expenses of an otherwise legitimate

14  business.

15           Also I'll point the Court to --

16           THE COURT:  Is there something you want to cite me to

17  in that connection?

18           MS. DURRETT:  Well, Your Honor, I think the issue --

19  well, once again, they have outlined --

20           THE COURT:  No.  I just meant -- you said other

21  circuits.  You can send it to me.

22           MS. DURRETT:  That is from *Calderon*.  I'm sorry, Your

23  Honor.

24           THE COURT:  That's from *Calderon*?

25           MS. DURRETT:  Yes.

 1          And the other case is *United States v. Miles*.  It is

 2     360 F.3d 472 from the Fifth Circuit.  And in that case, they

 3     said, on the other end of the factual spectrum, however, are

 4     cases where a defendant -- are cases where the business as a

 5     whole is illegitimate.  And then you have this issue where the

 6     expenditures are promoting money laundering.

 7          But we don't have that circumstance here because

 8     everyone has testified that there is a legitimate business

 9     underlying this.  Mr. McQueen talked about how he was trained

10     to do the legitimate business and told it is a numbers game.

11     He was not successful at that legitimate business, and he

12     decided to commit fraud.

13          But I think there is ample testimony in this case

14     that there was a legitimate business here.  And so any argument

15     that any expenses that came out of the account must support a

16     promotional money laundering conviction is incorrect.  Because

17     I don't think the case law supports that when the business is

18     legitimate.

19          As far as Counts 7 through 10 go, again, we're moving

20     for a judgment of acquittal at least as to Count 7 and 8.  Lou

21     Comer and Sonia Toson are the victims there -- the named

22     victims.

23          Again, Mr. McQueen testified specifically about

24     Counts 1 through 5 and the activities related to that.  And he

25     explicitly did not talk about Mr. Pendergrass being involved in

1    the fraudulent documents related to Lou Comer or the fraudulent

2    documents related to Sonia Toson.  So I think at a minimum,

3    Counts 7 and 8 should be dismissed or we should get a judgment

4    of acquittal.

5         And then, again, we would argue that there is no

6    evidence that Mr. Pendergrass was a knowing participant in

7    Mr. McQueen's fraudulent scheme.  And therefore it has to be --

8    the possession or transfer or use of another person's means of

9    identification has to be, one, without lawful authority and,

10   two, in connection with that mail fraud.

11        We don't think Mr. Pendergrass knowingly possessed,

12   transferred, or used another person's identification without

13   lawful authority in connection with those counts.  And I don't

14   think the Government has shown that.

15        Thank you.

16        THE COURT:  Okay.  Are you moving -- I know you in

17   particular focused my attention on these counts.  But you are

18   moving for a dismissal of everything --

19        MS. DURRETT:  Yes, I am, Your Honor.

20        THE COURT:  -- for clarity?

21        Well, I'll take this under advisement.

22        MS. DURRETT:  Thank you, Your Honor.

23        THE COURT:  The Government has rested --

24        MR. BROWN:  Yes, Judge.

25        THE COURT:  -- just to confirm again?

```
 1              All right.  How long do you think your next witness
 2    will be?
 3              MS. DURRETT:  I think it will be very short, Your
 4    Honor.  It is our investigator.
 5              THE COURT:  All right.
 6              MS. DURRETT:  And in the spirit of notifying the
 7    Court, I understand the Government may have an objection to one
 8    of the exhibits that I want to offer.
 9              THE COURT:  What one is that, just so we can address
10    that?
11              MR. BROWN:  Yes, Judge.  Why don't you tell us what
12    the exhibit is, and I'll make --
13              MS. DURRETT:  Your Honor, it is -- the Government
14    provided to me in discovery a copy of the nine computers that
15    were seized from Mr. Pendergrass's office.
16              THE COURT:  Yeah.
17              MS. DURRETT:  We have copied one of those computers.
18    It is computer Number 24.  That was Mr. McQueen's computer, and
19    we would like to admit that through our investigator.
20              She's reviewed the documents.  She has reviewed the
21    discovery disc.  She was there when they copied this specific
22    computer to this Exhibit Number 34.  And she's reviewed it and
23    is familiar with it.
24              THE COURT:  What is the objection?
25              MR. BROWN:  The objection is that the investigator
```

1   cannot lay a proper foundation to admit the review of the

2   computer and contents.  I don't -- I reviewed this disc.  I

3   think she gave it to me yesterday before.

4            There are thousands of pages on here.  I stopped at

5   about 15,000 pages of documents.  There's probably more.

6   Probably 30 or more.  I saw 8000 files in one.  I clicked on

7   some of those files.  And there are multiple pages in the

8   files.

9            So a conservative estimate is at least 10,000 pages,

10  possibly more, Your Honor.

11           THE COURT:  All right.  Why don't we see what she --

12  how she -- how you are going to have her --

13           MS. DURRETT:  Thank you, Your Honor.  And I'll just

14  note it is just like the cell phone.  It is like they produce a

15  cell phone to us in discovery.  We have someone look at it, and

16  we can have someone come in and testify about .

17           MR. BROWN:  The problem is their expert, Your Honor,

18  did not examine the computer and can't testify about that

19  this -- what is on the contents of this disc came from the

20  computers that were seized during the search warrant.  She

21  can't do it because she didn't do it.

22           What is usually done in these cases is they hire a

23  computer expert who images the computers that we make available

24  to them.  And then they do their own analysis.  They didn't do

25  that.

1        Or they could subpoena the Government's expert who

2   did the analysis and go through that way.  But they did

3   neither.  So they cannot use an expert who just gets the

4   Government's discovery.  There's thousands of files on here.

5   She cannot lay the foundation to admit any of those files.

6        THE COURT:  Well, let me see what she does.

7        MS. DURRETT:  And she's not an expert, Your Honor.

8   She's an investigator.  We got it from the Government.  There

9   is a chain of custody in all their documents about how it came

10  about.

11       MR. BROWN:  And I don't know that the contents on

12  here are the same thing that we gave them, Your Honor.  There

13  is no way I can even close to make that --

14       THE COURT:  When did you give it to him?

15       MS. DURRETT:  Yesterday.

16       THE COURT:  Okay.  All right.

17       MS. DURRETT:  Your Honor --

18       THE COURT:  Let me ask you this:  Is there another --

19  any other witnesses that you plan to call?

20       MS. DURRETT:  No.

21       THE COURT:  Then -- so the person who -- was this the

22  person who was waiting here?

23       MS. DURRETT:  Yes.

24       THE COURT:  Okay.  Is her testimony just simply going

25  to be, here it is; I mean, I did this?  Or is she going to talk

```
1    about specific records on it?
2         MS. DURRETT:  No.  I mean, she can -- if we could
3    admit it, she won't talk about the records on it.  That is
4    fine.
5         THE COURT:  Otherwise, you want her to talk about the
6    records on it?  I mean, I'm just trying to understand.
7         MS. DURRETT:  Yeah.  I mean, I think she can talk
8    about her investigation and what she has done in this case and
9    what she has learned in this case, just like an officer would
10   come in and do that.
11        THE COURT:  Well --
12        MR. BROWN:  And I would also say, Your Honor, I have
13   looked at a couple -- maybe I looked at 50 or 60 pages.  There
14   is hearsay within these documents.
15        So it is just -- it is improper.  She can't lay a
16   foundation.  I mean, we can put her up here, and I can
17   cross-examine her on that.  She can't lay a foundation.  I'll
18   voir dire when she offers her.
19        But I'm just -- even what she has proffered, Your
20   Honor, she cannot lay the foundation to admit thousands of
21   pages of documents.  She can't.
22        MS. DURRETT:  I can't understand how he can say that.
23   He gave us this disc in discovery.  My investigator reviewed
24   the discovery disc that we were provided.  She was there when a
25   copy was made of that computer from their discovery disc.  She
```

1    reviewed both discs.  It is what they say -- it is what she

2    says it is.

3            I don't understand how that is not a proper

4    foundation.

5            THE COURT:  All right.  Why don't you have -- do you

6    want to voir dire her in front of the jury for purposes of

7    how -- of speed?  Because I'm just trying to let them out too.

8            Or do you want to -- or do you desire to do this

9    outside the presence of the jury?

10           MR. BROWN:  That's the Court's decision.  Whatever

11   you want to do.  I'll voir dire, Your Honor.

12           MS. DURRETT:  We're fine with the jury.

13           THE COURT:  Let's have the jury here, and then I'll

14   decide upon it later, since she's not testifying about it.

15           I mean, if I don't allow it in, are you going to call

16   her back tomorrow and have her testify about something in

17   particular?

18           MS. DURRETT:  Maybe, yeah.

19           THE COURT:  Okay.  That's all right.

20           MS. DURRETT:  You want her to come in now, or do you

21   want her to wait?

22           THE COURT:  She can come in now.  I think you should

23   announce before we begin with her that you have rested though.

24           MR. BROWN:  Yes, Judge.

25           THE COURT:  All right.

1          **(There was a brief pause in the proceedings.)**

2          THE COURT:  Harry, would you stop them for one

3   second.

4          So are you going to want to do the jury charge

5   tomorrow morning?  Because I could come -- have them come in a

6   little bit later.

7          I don't know whether you are really prepared to talk

8   about it today.  That is why I want to know.

9          MS. DURRETT:  I would love to do it today.  I would

10  like to keep on going.

11          THE COURT:  All right.

12          MS. KING:  Your Honor, I would like it if we could do

13  it in the morning.

14          THE COURT:  Have you had a chance to review it?

15          MS. KING:  Exactly, Your Honor.  We received it

16  pretty late yesterday.

17          MS. DURRETT:  I just feel like we've been here a long

18  time and we're hoping to move forward.

19          THE COURT:  We're going to move forward.

20          Why don't we start at 9:00 tomorrow morning on the

21  jury charge?

22          The thing is I know you had filed a theory of the

23  defense that you have under seal.  And they at least have to

24  see that tonight.  But I wanted to make a few comments to you

25  about it, once we're through here.

```
 1              MS. DURRETT:  Thank you, Your Honor.
 2                   (The jury entered the courtroom at 4:51 P.M.)
 3              THE COURT:  Have a seat.
 4              MR. BROWN:  Your Honor, the Government rests.
 5              THE COURT:  Okay.
 6              MS. DURRETT:  Your Honor, the defense would call Jane
 7    Holmes.
 8              THE COURT:  Okay.
 9              Before Ms. Holmes is sworn in, let me just stand
10    there for a second.  Ladies and gentlemen, I'm just having a
11    nosebleed, which happens during trials somehow to me.  But
12    so -- please ignore me, other than when I speak.
13              I'm sorry.  But I'm trying to move things forward
14    rather than going back to chambers and dealing with it for ten
15    minutes.  And that would take that at least.  So we're going
16    just to go this way, and you'll have to put up with this.
17              COURTROOM DEPUTY CLERK:  Have you called her?
18    THE DEFENDANT'S CASE.
19              MS. DURRETT:  I call Jane Holmes, yes.
20              COURTROOM DEPUTY CLERK:  If you would please raise
21    your right hand.
22                        (Witness sworn)
23              COURTROOM DEPUTY CLERK:  Have a seat.  If you can
24    remove your mask.
25              Loudly and clearly state your name and spell your
```

1    last name for the record, please.

2              THE WITNESS:  My name is Jane Holmes, H-O-L-M-E-S.

3         Whereupon,

4                           JANE HOLMES,

5         after having been first duly sworn, testified as follows:

6                        DIRECT EXAMINATION

7    BY MS. DURRETT:

8    **Q.**   Jane, what do you do for a living?

9    **A.**   I'm a private investigator.

10   **Q.**   And how long have you been doing that?

11   **A.**   For about 13 years.

12   **Q.**   And what kind of cases do you usually work on?

13   **A.**   I would say 80 percent are criminal defense cases, and the

14   other 20 is civil.

15   **Q.**   Okay.  And did I ask you to help us with some of the

16   issues in this case?

17   **A.**   You did.

18   **Q.**   Okay.  And can you tell us what you have been doing as far

19   as helping the defense?

20   **A.**   Reviewing discovery.  Locating and interviewing witnesses.

21   **Q.**   Okay.  Did you have a chance to look through -- we just

22   talked about -- when you looked at some of the discovery in

23   this case; right?

24   **A.**   I did.

25   **Q.**   In particular, did you have a chance to look through a

1  disc that we received in discovery that contained copies of

2  nine computers?

3  **A.**   Yes.

4  **Q.**   Okay.  And what is your understanding of where we got that

5  disc?

6  **A.**   We obtained the disc from the Government is my

7  understanding.  And it had all the computers downloaded on to

8  this disc.

9  **Q.**   And if I approach, could I show you.

10  **A.**   Sure.

11  **Q.**   Do you recognize that disc?

12  **A.**   Yes, I do.

13  **Q.**   And how do you recognize it?

14  **A.**   I reviewed this in your office.  We had a meeting in your

15  office.

16  **Q.**   Is that the disc with the nine computers copied?

17  **A.**   Yes, ma'am.

18  **Q.**   Okay.  And then in addition to that, did you also make a

19  copy of part of that disc?

20  **A.**   Yes, we did.

21  **Q.**   Okay.  Who helped you make it?

22  **A.**   Your paralegal, Steve.

23  **Q.**   And I'm going to approach with exhibit -- Defense Exhibit

24  Number 34 --

25  **A.**   Uh-huh (affirmative).

1    **Q.**    -- and ask you if you recognize that.

2    **A.**    Yes, I do.

3    **Q.**    How do you recognize it?

4    **A.**    I signed that disc.

5    **Q.**    Okay.  And what is the disc?

6    **A.**    The disc is the contents of Q4, which was computer

7    Number 4, that was seized by the Government.

8            MS. DURRETT:  Your Honor, I would move for the

9    admission of Defense Exhibit 34.

10           MR. BROWN:  Objection, Your Honor.  I would like to

11   voir dire the witness.

12           THE COURT:  Okay.  Go ahead.

13                      VOIR DIRE EXAMINATION

14   BY MR. BROWN:

15   **Q.**    Good afternoon.  What was your name again?

16   **A.**    Jane Holmes.

17   **Q.**    Jane, what is your background or training?

18           THE COURT:  Why don't we call her Ms. Holmes?

19   Everyone else has gotten called by their last name.

20           MR. BROWN:  Yes.

21   **Q.**    **(BY MR. BROWN)**  Ms. Holmes?

22   **A.**    Yes, sir.

23   **Q.**    What is your educational background?

24   **A.**    I have a bachelor of business administration in

25   management, and I have a pre-licensing course for private

226

1   investigations.  I have an associate in science degree and

2   continuing education in what I do for a living.

3   **Q.**   Do you have any computer training?

4   **A.**   I do not.

5   **Q.**   So you testified on direct examination that you reviewed

6   the contents of a disc that has my name, J. Brown, forensic

7   laboratory service findings?

8   **A.**   That was the disc provided by the Government?  I believe,

9   yes.

10  **Q.**   All right.  So did you -- you said you believe.  So that

11  leads me to believe you are not really sure?

12  **A.**   No.  I'm looking at the disc that you have.  I believe

13  that is the same disc that the Government provided.

14  **Q.**   How do you know that is the disc you reviewed?

15  **A.**   Because we had a meeting in Ms. Durrett's office, and this

16  was put into the computer, and we copied that other disc.

17  **Q.**   How did you do that?

18  **A.**   I didn't do it myself.  Mr. Stahel did it.

19  **Q.**   So Mr. Stahel copied it from the disc?

20  **A.**   With me there, yes.

21  **Q.**   So what did he do?

22  **A.**   He put it in his laptop.  Or he had to actually -- what do

23  you call this?  The secondary drive that plugs into his laptop,

24  copied it, and put the new disc in is my understanding.

25  **Q.**   So you didn't do the copying yourself; correct?

**A.**    I did not.

**Q.**    Did you examine the computer which the contents of this disc allegedly came from?

**A.**    Which disc do you mean?  The Government's disc?

**Q.**    Yes.

**A.**    Did I examine the computer?

**Q.**    Yes.

**A.**    I did not.

**Q.**    All right.  So can you testify to this jury that the computers that were seized in evidence in this case -- the contents of those computers are on these discs?

**A.**    I did not put those contents on that disc.  So I can't say.

**Q.**    So you can't say that, in fact, the contents from the computers are contained on this disc; is that correct?

**A.**    I don't -- I did not examine the computer that the contents came from, nor did I copy the contents from that computer to that disc.

**Q.**    Correct.  So then you cannot state on the record that the computers that were seized in this case are -- the contents of those computers are on this disc; is that correct?

**A.**    I understand there is nine computers seized.  And there's --

**Q.**    How many of those nine computers did you physically review?

1   **A.**   None.

2        I mean, you mean the disc or the actual computer?

3   **Q.**   The actual computer.

4   **A.**   I didn't -- I don't have access to those computers.

5   **Q.**   Did you ask for access to the computers?

6   **A.**   I did not.

7   **Q.**   Why not?

8   **A.**   I mean -- I'm just --

9   **Q.**   No.  But you are testifying in front of the jury that this

10  disc contains evidence from computers; is that correct?  That

11  is what your testimony was on direct examination?

12  **A.**   Well, that disc wasn't provided to me by the Government.

13  My understanding is the Government provided that disc to the

14  defense attorneys.

15  **Q.**   I don't want to keep dancing around here.  Your

16  understanding -- do you know for sure that the contents

17  contained on this disc came from computers seized in this case?

18  **A.**   I do not have firsthand knowledge.

19  **Q.**   So the answer is no; correct?

20  **A.**   Correct.

21  **Q.**   And you haven't looked at any of the computers allegedly

22  seized in this case; is that correct?

23  **A.**   The physical computers I have not.

24  **Q.**   You have not looked -- downloaded any information on those

25  computers in this case; is that correct?

1  **A.**   I have not.

2  **Q.**   Now, the disc that you signed, what did you do with this

3  disc?  Have you examined the contents of this disc?

4  **A.**   I did.

5  **Q.**   What is on the disc?

6  **A.**   It is the contents from Q4 computer.

7  **Q.**   What is Q4?  Have you examined Q4 computer?

8  **A.**   Q4 computer -- no, I did not examine the actual hardware

9  Q4.

10 **Q.**   I'm sorry.  I don't want to interrupt you.  You finish.

11 Then I'll go.

12      Are you finished answering?

13 **A.**   Yes.

14 **Q.**   All right.  What kind of computer is Q4?

15 **A.**   It is a MacBook Pro.

16 **Q.**   What color is the computer?

17 **A.**   I haven't seen the computer.

18 **Q.**   Have you seen a picture of the computer?

19 **A.**   No.

20      MR. BROWN:  All right.  Your Honor, I don't think

21 this witness has a sufficient knowledge --

22      THE COURT:  Go ahead.

23      MR. BROWN:  I don't think this witness has sufficient

24 knowledge to lay the foundation for the admission of this

25 exhibit, Your Honor.  So I would ask you to exclude the

1    exhibit, Your Honor.

2            THE COURT:  Maybe we should not have done this all in

3    front of the jury.  But it is not exactly fair because the

4    Government routinely in discovery creates these discs as part

5    of the formal discovery process to give to the opposing party.

6    Then to say, oh, this is not really anything necessarily is not

7    exactly fair.

8            I'm not sure where this testimony is going and

9    anything else.  But that doesn't seem to me exactly fair or

10   appropriate.

11           MR. BROWN:  Your Honor, if we're talking about

12   fairness -- do you want to continue this conversation in front

13   of the jury?

14           THE COURT:  No.  I'm not going to continue it in

15   front of the jury.  That's why I'm saying I can't rule right

16   now.  We will have to discuss it more.

17           MR. BROWN:  Thank you, Judge.

18           THE COURT:  I'm going to let the jury go home.  I'm

19   going to meet with counsel tomorrow morning starting at

20   9:00 about these last tag things.  I understand there will not

21   be another witness at least as of now.

22           If there is, there is probably only one more

23   witness -- are you thinking that you're going to still call

24   somebody in rebuttal?

25           MR. BROWN:  It depends on what the defense's case is,

1    Judge.  At this time, I can't answer that question.

2         THE COURT:  All right.  Anyway, I expect that we're

3    going to conclude tomorrow morning the evidence.  And I don't

4    know when, depending on what happens there.  And at least by

5    late in the morning that we will be able to, you know, get the

6    last witness in, if we have the witness or witnesses.  And we

7    will proceed from there to have oral closing arguments.  And

8    then I will give you the instructions on the law.

9         So I can't tell you precisely when we're going --

10   you'll get to begin deliberations.  I assume you'll be able

11   to -- it will be at a reasonable hour.  So you will have enough

12   hours at least to get seriously into this process.

13        I don't want you sitting around more than you have

14   already had to sit around.  I would say -- I am not 100 percent

15   sure when we're going to be ready for you.  You have seen that

16   before.

17        But at least I think if you come in at 10:30, I won't

18   be dragging you in here ridiculously early.  So be here at

19   10:30.  And hopefully we'll be ready for you.

20        Okay.  Thank you.

21             **(The jury exited the courtroom at 5:02 P.M.)**

22        THE COURT:  Okay.  May the witness step out?

23        MS. DURRETT:  Yes.

24        THE COURT:  I mean, you may be needed tomorrow.  I

25   don't know what is going to happen.

1           MS. DURRETT:  She is not needed any further tonight;

2    correct?

3           THE COURT:  No, I don't think so.  But why don't you

4    hold her here for a few minutes in case I have some questions.

5           **(The witness exited the courtroom.)**

6           THE COURT:  All right.  I understand she -- you know,

7    that your desire -- what you were about to go into is that

8    Ms. Durrett should have given you the CD before.

9           Is that right?

10          MR. BROWN:  Well, yes.  That is one of the points,

11   Judge.  But what -- I mean, Your Honor knows where I'm going

12   with this.  We've had computer evidence in many criminal

13   trials, and you know how computer evidence is introduced.

14          You can't give me a disc with 10- or 15-, 20,000

15   files on it, 30- or 40,000 pages.

16          And then what is the jury going to do with that?

17   What is in there?

18          So Ms. Durrett knows how to -- if she wanted to get

19   this evidence in, she could have hired a computer expert or she

20   could have got it through the witnesses that came in.  But it

21   is just improper to have an investigator who didn't even do the

22   copying to somehow say that this is the same disc.

23          I cannot even say that it is the same contents of

24   what I gave them in discovery.  I can't do that because there's

25   20- or 30,000 pages on here, Judge.

1          It is not fair.  It is not legal.  The foundation has

2     not been made.  And she knows how to do that if she really

3     wanted it in.  And I think it should be excluded.

4          I don't really think it is even a close call, Judge.

5     I really don't know.

6          MS. DURRETT:  Well, Your Honor, I mean, I don't know

7     if he is suggesting that I forged his disc that says his name

8     on it with all nine computers on it.  But he gave us these

9     computers.

10         I'll just note that you don't need any special

11    knowledge at all -- my, you know, 80-year-old mother can put

12    this into a computer, and it comes up, and you read the files.

13    There is nothing about this disc that requires any special

14    knowledge.  You don't have to do anything.

15         And I know I've had this issue in other cases where

16    you have cell phone data -- right? -- where you say, look, you

17    need an expert for some of this cell phone data.  But then the

18    Government always comes back and says, no, we don't need an

19    expert because it is right there.  When you put the disc in,

20    you can see the GPS file on the photographs.  Judge, we don't

21    need an expert because you just load it and open it.

22         THE COURT:  Well, how are you expecting the jury to

23    deal with this?  I guess -- I mean, you're not going to have

24    her testifying about the documents that she has on this.  And I

25    gather that -- but I don't know what the volume of the

1   documents are or what is on that.

2           And I don't know -- you know, it is sort of -- it is

3   also like when I talked about something else, you know, we're

4   throwing paint, we're throwing mud at the wall.  I mean, you

5   know, this is everything.  You know, if we're concerned about

6   having the jury look at only relevant evidence, I don't know

7   what is evidently here.

8           How do I assess that?

9           MS. DURRETT:  Well, Your Honor, it is Terrell

10  McQueen's computer, Your Honor.  Everything about it is

11  relevant.

12          THE COURT:  How do I judge that?  I mean, I

13  understand that maybe two-thirds of it is, maybe three-fourths

14  of it is.  But just because it is -- I mean, if we did that to

15  your client's computer, you would be, frankly, going -- I think

16  not finding that acceptable, that we would prove him -- try

17  to -- that -- if the Government tried to prove his guilt by

18  basically taking all of his computers and saying ipso facto

19  that is proof of guilt --

20          MS. DURRETT:  Well, I think we're in a really

21  interesting situation, Your Honor, because they took nine

22  computers from his office and they haven't tried to admit

23  anything from those computers and they gave me this disc.

24          So it is a strange set of facts, isn't it, that I'm

25  the only one trying to admit evidence from the computers?  So I

1    think that it is a problem.  They gave it to me and said here

2    is the --

3              THE COURT:  Right.  They gave it to you so that you

4    would have everything that might be either incriminating or

5    exculpatory or irrelevant.  But now you are asking me to admit

6    a -- I mean, I'm not going to go tonight and look at it.  You

7    know -- well, maybe you do or maybe you don't know that I'm

8    pretty particular.  I mean, I have gone with every objection.

9    I have looked at everything.  Even things I thought I knew, I

10   went back to make sure I understood.

11             You know, I don't have any arrogance about any of

12   this.  So I always try to get you-all to educate me as much as

13   possible.

14             But I don't understand here -- I do think it is --

15   you know, I don't have any questions that you-all properly

16   copied something.  That is not really the issue for me.

17             My issue is how do I give them this disc that has an

18   unknown number of documents and you who have been so particular

19   about, you know, basically the Government stuffing things into

20   their documents that might have some hearsay at every point

21   and, you know, properly a great counsel in representing your

22   client in that way.

23             I don't have any way of doing that here.

24             MS. DURRETT:  Your Honor, I'm happy -- if you want me

25   to have her go through and admit exhibits from this disc and

1    say, I pulled these off that disc, I'm happy to do that.  And I

2    can use the Government's disc for that.

3            I mean, if that is an easier way to do it, I'll use

4    the Government's disc.

5            THE COURT:  Well, I think it would make more sense

6    for you to -- if what you need to do here -- that there are

7    documents that you think are relevant, then I think you need to

8    pull them off and basically tell the Government which ones you

9    are pulling so that they know.

10            MS. DURRETT:  Okay.

11            THE COURT:  But this is sort of like just a data

12   dump --

13            MS. DURRETT:  Your Honor, it is not a data dump when

14   they gave me the disc.

15            THE COURT:  No.  All right.  I'm not going to

16   entertain that.  I mean, it is just simply -- they gave it to

17   you for discovery.  And that is just the bottom line.

18            But I don't want to impair your defense.  So if

19   you -- if you pull down what you-all want, then you need to

20   flag them for counsel so they know what is going to -- even if

21   it is 9:00 or 10:00 at night.

22            And you-all be ready to -- so that they know and they

23   can have looked at it and be prepared.

24            MS. DURRETT:  Thank you, Your Honor.

25            THE COURT:  All right.

1        MR. BROWN:  Judge, I just want to clarify.  You asked

2   Ms. Durrett to print the documents out so we can get a copy of

3   what she alleges should be admitted because --

4        THE COURT:  Well, if you have your copy, then she

5   could tell you what -- are they -- I mean, I don't know --

6        MR. BROWN:  There are 8000 files.

7        THE COURT:  Are there 8000 files on that though?

8   Because they only took -- I don't know whether there are 8000

9   files --

10        MR. BROWN:  I looked at the disc she gave me, Judge.

11   I looked at it last night.  It is over 8000 files, thousands of

12   pages.

13        THE COURT:  Well, then you need to tell him.

14        MS. DURRETT:  That is fine, Your Honor.  I'll print

15   them out.  I'll send them to them.  That's fine.

16        MR. BROWN:  Thank you, Judge.

17        MS. DURRETT:  Thank you.

18        THE COURT:  Okay.  I think that terms of -- just to

19   move things along, I looked at the parties' respective verdict

20   forms.  I just don't think I could give the -- use the

21   defendant's verdict form because it is too complex.  And it

22   would just be prone to people making mistakes and arguing about

23   is it this, is it that under each one of those things.

24        And I just -- that has not been my experience that

25   that is a clean way of proceeding.  So I am just going -- I'm

 1   going to go look at the Government's again to see if there is

 2   something.

 3            But focus in on the Government's verdict form because

 4   I don't think I can use yours as a foundation.

 5            MS. DURRETT:  Thank you, Your Honor.  I think one of

 6   the issues is the Government asked for the conjunctive

 7   instruction appropriately so, saying if there is an indictment

 8   that charges something in the conjunctive, then you have to

 9   unanimously decide how the statute was violated.

10            So if the Court is going to use the Government's

11   verdict form, I would ask that it be modified in some way so

12   that the jury has to show which form of the conjunctive they

13   unanimously agreed on on each of those charges.

14            THE COURT:  Okay.  Then I think you should do -- I

15   mean, do you have a Word version of their verdict form?

16            MS. DURRETT:  I don't think so.

17            THE COURT:  I have just asked for a Word form.  If

18   you see -- I know it is a lot to do tomorrow night -- tonight

19   but send it to them, and you can do a proposal and send it out.

20            But that is why I wanted to raise it because I felt

21   like I couldn't use yours.  Theirs was a better at least

22   beginning point.  And then you can propose --

23            MS. DURRETT:  Thank you, Your Honor.

24            THE COURT:  Are you going to insist that we wait

25   until you have provided these documents until there is -- your

1    proposed theory of the defense charge is unsealed?

2            Because it would certainly make things easier if we

3    unsealed it tonight.

4            MS. DURRETT:  Well, Your Honor, we did ask that it be

5    sealed until the close of evidence.  And so I'm going to stand

6    by that.

7            THE COURT:  All right.  Well, let me just tell you

8    now, having looked at it in advance so I knew what was coming,

9    I think it is -- one of you needs to look with fresh eyes at it

10   because it seems at points conclusory rather -- I mean, it

11   could be argumentative.  But this is conclusory almost like I'm

12   directing that this is what -- the Government hasn't

13   established this or that.

14           You contend something.  I rewrote one of them just --

15   which was not a perfect rewriting of it and wasn't -- and I'm

16   not going to do more until I see a better version of this.  But

17   it seemed to me having more of it as not -- you know, I know

18   you wrote on the top contends and then you had a bunch of

19   conclusory findings as if I was making findings of fact or

20   conclusions of law but -- which is still not the way a jury

21   charge would read.

22           So look at it again.  I know you're an experienced --

23   all are experienced criminal defense lawyers.  I looked at a

24   bunch of the -- again of other cases with theory of defense

25   just looking what they were doing.

1          And I have used theory of the defense charges.  But

2    this seemed to me a little on the far end of that.

3          MS. DURRETT:  Thank you, Your Honor.

4          THE COURT:  Okay.  So when you get it, you know,

5    obviously I want to see it as soon as I can once you -- so in

6    advance.  But this is -- that is another little piece of time

7    for tomorrow.

8          I don't know that we'll be through at 10:30.  I just

9    didn't want to risk somebody not being here on time.  I can't

10   imagine it, knowing how slow I am.  Not you-all.  You-all talk

11   fast.  All right.  Are snippy and snappy.  And I'm just

12   deliberative and slow.

13         But all right.  Anything else?  Have you looked at

14   your exhibits just so that you can be sure that you have got

15   all your exhibits?

16         MS. DURRETT:  I think so.  I think Mr. Stahel checked

17   them.

18         THE COURT:  All right.

19         MS. DURRETT:  Your Honor, could I raise one more

20   issue about the instructions?

21         So we looked at it.  We were looking at the evidence

22   of intrinsic acts.  I think the evidence has shown that these

23   intrinsic acts are alleged against Mr. Pendergrass and others.

24   So we would ask that that "and others" be added to that.

25         So the first line would say, during the trial, you

1   heard evidence of acts allegedly done by the defendant and

2   others.

3            THE COURT:  Okay.

4            MS. DURRETT:  Thank you.

5            THE COURT:  We'll look at the rest of it to see if

6   there is someplace else that that falls apart.

7            How much time were you going to ask for for closing

8   arguments?

9            MR. BROWN:  45 minutes maybe, Judge.

10           MS. DURRETT:  That seems long to me.

11           30?

12           THE COURT:  Okay.  Well, let's say 40.  45 minutes is

13   a lot.  We'll say --

14           MR. BROWN:  We won't use all that time, Judge.  You

15   never know.

16           THE COURT:  I know.  I know.  It is a lot though.

17   And, remember, no one is -- no one in our culture any longer is

18   used to hearing oration for that long.  We're not in Castro's

19   Cuba where speeches can go on for three hours.  Or they used

20   to.  Maybe not any longer.

21           Okay.  Mr. Martin, anything you need?  Anything more

22   that I have missed?

23           COURTROOM DEPUTY CLERK:  No.

24           THE COURT:  I'll see you at 9:00.

25                       **(The proceedings were thereby adjourned at 5:16**

1          **P.M.)**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3  UNITED STATES OF AMERICA

 4  NORTHERN DISTRICT OF GEORGIA

 5

 6       I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7  the United States District Court, for the Northern District of

 8  Georgia, Atlanta Division, do hereby certify that the foregoing

 9  242 pages constitute a true transcript of proceedings had

10  before the said Court, held in the City of Atlanta, Georgia, in

11  the matter therein stated.

12       In testimony whereof, I hereunto set my hand on this, the

13  10th day of January, 2022.

14

15

16

17                       _____
                         SHANNON R. WELCH, RMR, CRR
18                       OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```