The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3   UNITED STATES OF AMERICA,       :
                                     :
 4   vs.                             :  DOCKET NUMBER
                                     :  1:17-CR-0224-1
 5   ALLEN J. PENDERGRASS,           :
                                     :  ATLANTA, GEORGIA
 6              DEFENDANT.           :  DECEMBER 3, 2021

 7

 8      TRANSCRIPT OF JURY TRIAL - VOLUME IV OF IV PROCEEDINGS

 9             BEFORE THE HONORABLE AMY TOTENBERG

10             UNITED STATES SENIOR DISTRICT JUDGE

11

12   APPEARANCES OF COUNSEL:

13        FOR THE GOVERNMENT:

14        JEFFREY A. BROWN
          TRACIA M. KING
15        UNITED STATES ATTORNEY'S OFFICE

16
          FOR THE DEFENDANT:
17
          SARALIENE DURRETT
18        SARALIENE SMITH DURRETT, LLC

19        SYDNEY R. STRICKLAND
          STRICKLAND WEBSTER, LLC
20

21
       MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED
22                    TRANSCRIPT PRODUCED BY:

23   OFFICIAL COURT REPORTER:       SHANNON R. WELCH, RMR, CRR
                                    2394 UNITED STATES COURTHOUSE
24                                  75 TED TURNER DRIVE, SOUTHWEST
                                    ATLANTA, GEORGIA  30303
25                                  (404) 215-1383
```

1                    **I N D E X   T O   P R O C E E D I N G S**

2                                    * * *

3
CHARGE CONFERENCE                                           3

4
CLOSING ARGUMENT

5
         by Mr. Brown                                      47
6        by Ms. Durrett                                    67
         by Mr. Brown                                      88

7
CHARGE

8
         by The Court                                      92

9
VERDICT                                                   118

10
POLLING OF THE JURY                                       120

11
CERTIFICATE                                               133
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2     **(Atlanta, Fulton County, Georgia; December 3, 2021.)**

3              THE COURT:  Okay.  Good morning, everybody.

4              So let me get everything out.  Only because it is

5     fresh, let me -- let's talk about the verdict form first.  And

6     then we'll go back and talk about the jury charge unless

7     somebody says that is backwards.

8              Let me just ask:  Did you have an opportunity to give

9     the Government the exhibits that you wanted to introduce

10    from --

11             MS. DURRETT:  Your Honor, last night we emailed the

12    Government and the Court and just said we're not going to have

13    any more evidence today.

14             THE COURT:  Okay.  I didn't realize that.

15             MS. DURRETT:  So we're done.

16             THE COURT:  I missed that.

17             MS. DURRETT:  Thank you.

18             THE COURT:  So you are going to close?  You're not

19    going to present --

20             MS. DURRETT:  That's correct, Your Honor.

21             THE COURT:  All right.  So we're proceeding directly?

22             MS. DURRETT:  Right.  We'll have a short motion

23    obviously and then -- yes.

24             THE COURT:  All right.  Very good.

25             All right.  In the early hours of the morning, the

1    Government sent a response to the defendant's revised proposed

2    verdict form.  I wondered if you had put it on the -- now had

3    put it on the docket.

4             MS. KING:  No, Your Honor.  We were just talking

5    about that.  We need to do that.

6             THE COURT:  Okay.  If you would file it on the

7    docket, that would be great.  Thank you so much.

8             Did you want to respond to the issues posed in the

9    letter sent to the Court?

10            MS. DURRETT:  Your Honor, I'm going to let

11   Ms. Strickland address it.

12            MS. STRICKLAND:  Sure, Your Honor.

13            Our verdict form -- we simply wanted it to reflect

14   the instruction on Page 10 of the draft instructions about

15   conjunctively charged counts.  That is going to require the

16   jury to unanimously agree on the means used.

17            And if we are requiring them to unanimously agree on

18   the means, we just believe it is appropriate for the verdict

19   form to reflect that.

20            THE COURT:  Did you want to respond to that, Counsel?

21            MS. KING:  Yes, Your Honor.

22            Your Honor, the Government believes that the Court's

23   instruction on the conjunctively charged counts is legally

24   sufficient.  The Eleventh Circuit and other courts have, you

25   know, consistently held that jurors are presumed to follow the

1    instructions of the court.  And the defendant's argument does

2    not address the other issues raised by the Government in its

3    letter brief to the Court.  It doesn't address the fact that

4    the way it is presented it is confusing, it is misleading.  And

5    we also believe, Your Honor, that it is not necessary because

6    the special verdict form is generally used in situations where

7    there are complex issues.

8              We don't have any of those here.  Usually used when

9    the juror needs to find some factor that may determine the

10   sentence in the case.  That is not an issue here.  And a

11   complex -- excuse me -- special verdict forms are also used

12   when there are multiple defendants on trial.  That is not the

13   issue here, Your Honor.

14             We don't believe that the defendant's response

15   addresses the concerns that the Government has raised in its

16   letter brief, and we would ask the Court to use the general

17   verdict form.

18             MS. STRICKLAND:  Your Honor, do you want me to

19   respond?

20             THE COURT:  Yes.

21             MS. STRICKLAND:  On our verdict form, I mean, we

22   simply used what is in the indictment.  So we don't think it is

23   confusing.  And, you know, it is not -- it is not a lot of

24   steps.  It is just guilty, not guilty, and then the means used,

25   which they are going to be required to find unanimously.  So we

1    think it is appropriate that that be reflected in the verdict

2    form.

3            But I will also say that we do have an objection to

4    using the Government's form.  It is not a general form.  And if

5    we are going to use -- if we're not going to use our proposed

6    verdict form, we think it would be appropriate for it to simply

7    say, as to Count 1, we, the jury, unanimously find guilty or

8    not guilty, without the extra verbiage in their verdict form.

9            MS. KING:  The Government has no objection using that

10   version of the general verdict form.

11           MS. STRICKLAND:  I would just say we do stand by our

12   verdict form, and we believe that it is appropriate and they

13   must be unanimous as to these means, and that should be in the

14   verdict form.

15           But as I said, alternatively, only if we're overruled

16   on that would we want to use a general verdict form.

17           MS. KING:  May I respond briefly --

18           THE COURT:  Yes.

19           MS. KING:  -- to her argument regarding the

20   misleading -- the fact that their verdict form is not

21   misleading?

22           Your Honor, the Government's position is that the

23   form is misleading.  Because as worded, it implies that they

24   must find that Mr. Pendergrass himself engaged in conduct that

25   is specifically alleged as the alternative means.  And that is

1    not what the law requires, given that the Government has

2    charged the defendant with aiding and abetting.

3          The only thing that is required for them to find is

4    that someone committed one of those alternative means.  But the

5    way the special verdict form is written, it is not clear.  And

6    we believe that this form will improperly imply that the

7    Government must prove the defendant committed one of these

8    alternative means in committing these violations of law.  And

9    that is not how he is charged in the indictment.

10          So the special verdict form is legally and factually

11   inconsistent with the way the case is charged and with the

12   evidence that came out at trial.

13          THE COURT:  Let's talk now about the -- did you want

14   to respond to that?

15          MS. STRICKLAND:  I'm sorry to keep going back and

16   forth, Your Honor.

17          THE COURT:  That's all right.

18          MS. STRICKLAND:  I just wanted to point out that on

19   our form it says we unanimously find that the following means

20   were used.  So it does not require that Allen Pendergrass used

21   these means.

22          THE COURT:  It says used the following -- it says

23   Allen Pendergrass used the following means or aided and abetted

24   in using the following means.

25          MS. STRICKLAND:  I'm sorry, Your Honor.  I think we

1    might have another version that the Court does not have.

2          Can I hand it --

3          THE COURT:  I am sorry.  You are right.

4          MS. DURRETT:  We have two copies.

5          THE COURT:  Right.  No.  I have got it.  I just

6    should have thrown the old one out.

7          MS. STRICKLAND:  I think the new one addresses that

8    issue.

9          THE COURT:  Right.  That's true.

10         MS. STRICKLAND:  Right.  And we don't believe that

11   the verdict form should have to say aiding and abetting in it.

12   The jury will be instructed on that.

13         THE COURT:  Tell me about your thoughts about if we

14   use the Government's verdict form what you want it to say.

15         MS. STRICKLAND:  If we're overruled on our verdict

16   form, Your Honor, we believe it should simply say -- I guess

17   there are two alternatives that we would suggest.

18         We would either say that it should just say, as to

19   Count 1 of the indictment, we, the jury, unanimously find Allen

20   Pendergrass guilty or not guilty -- or not guilty or guilty.

21   That is what we would prefer.

22         But, again, if we're overruled on that and Your Honor

23   is inclined to use the Government's version, we would object to

24   having the aiding and abetting in that instruction.  The jury

25   will be instructed on that, and it is basically putting the

```
1    Government's theory in the verdict form.

2          THE COURT:  All right.  Well, I understand why

3    defense counsel has proposed what you have.  But as even in a

4    civil case, I'm very reluctant to give anything that has almost

5    a special instruction because it is just -- then they have to

6    coordinate it with the the legal instructions I give.  And

7    there's lots of potential for confusion then.  And it is

8    confusing enough.

9          And so that is my general view is that anything that

10   is remarkable, anything that can be confusing will be

11   confusing.  But, of course, it is a highly technical area.

12         But I am happy to give the revised verdict as you

13   have proposed of the Government's verdict -- the revision that

14   you are suggesting as to that they are finding him guilty or

15   not guilty.

16         And the only reason I have been sort of intent on

17   saying not guilty first in all of these -- I realize it is not

18   necessarily norm in the courthouse -- is there is the

19   presumption of being not guilty.  And so I prefer to not have

20   the assumption be the first thing being guilty.

21         So we would change it that way.  And it would just be

22   the way you have proposed as to -- the revision as to the

23   Government's -- simplifying the Government's verdict.

24         MS. DURRETT:  Just say as to Count 1 --

25         THE COURT:  As to Count 1.
```

```
 1              MS. DURRETT:  -- not guilty or guilty and that is it?
 2              THE COURT:  Right.
 3              MS. DURRETT:  Not with all the extra language?
 4              THE COURT:  That's right.
 5              And that would be true for every one of these.  And
 6      so we will revise it that way.
 7              MS. DURRETT:  And, Your Honor, I know that the Court
 8      heard Ms. Strickland.  But we definitely believe that the jury
 9      -- not only are they required to find the means that were used
10      unanimously, but we believe it should be in the verdict form.
11              But we understand your ruling.
12              THE COURT:  Well, you have preserved it properly.
13              MS. DURRETT:  Thank you, Your Honor.
14              THE COURT:  Let's move on to the rest of the jury
15      instructions.
16              Parenthetically, Ms. Boring was very pleased to know
17      that she had been elevated to the level of the law clerks in
18      New York City -- the Southern District of New York, which
19      seemed to often control access to the court altogether in terms
20      of everything so that the letter that was addressed to her on
21      letterhead was just like a whole new level.
22              My former law clerk, Holly Cole, has been litigating
23      in the Southern District in front of Judge Rakoff.  She says it
24      is incredible that the law clerks have counsel -- have meetings
25      with them and say -- they kind of get control over what -- when
```

1   you get access, whether you are going to have a full -- be able

2   to file a brief, whether you are going to be filing a letter

3   brief, et cetera.

4           So, you know, Annie is now ascending.

5           But she was asleep at 1:30, so she couldn't grant

6   full access.  On the other hand, I wasn't asleep at 1:30.  So

7   anyway -- okay.

8           Okay.  I'm just trying to make sure I have the most

9   recent version of the jury instructions.  I'm just going to go

10  page by page.

11          Just typographical corrections -- I had one or two on

12  the ones we sent out.  Or objections or clarifications

13  requested, just ask.

14          So all right.  Page 1 of the jury instruction, any

15  issues?

16          MS. KING:  Not from the Government.

17          MS. DURRETT:  No, Your Honor.

18          THE COURT:  Page 2?

19          MS. KING:  No, Your Honor.

20          MS. DURRETT:  No, Your Honor.

21          THE COURT:  Page 3?

22          MS. KING:  No, Your Honor.

23          MS. DURRETT:  No, Your Honor.

24          THE COURT:  Page 4?

25          MS. KING:  No, Your Honor.

```
 1          MS. DURRETT:  We don't have a problem because we're
 2   going to have -- well, I guess Mr. Brown asked yesterday
 3   whether the stipulation was going back with the jurors.  That
 4   is our expectation.
 5          Because I think in our -- in our proposed
 6   instructions, we had listed the stipulation there.  And I know
 7   it is taken out in the Court's instruction.  But our
 8   expectation is that it will be back in the jury room with the
 9   jurors.
10          THE COURT:  It will be.
11          MS. DURRETT:  Thank you, Your Honor.  Then I have no
12   objection.
13          THE COURT:  Page 5?
14          MS. KING:  No objection -- no problem, no issues,
15   Your Honor.
16          MS. DURRETT:  No objection, Your Honor.
17          THE COURT:  Page 6?
18          MS. KING:  No objections, Your Honor.
19          MS. DURRETT:  No objection, Your Honor.
20          THE COURT:  As to Page 7, I don't think we've ever
21   had anything about impeachment of witness because of bad
22   reputation.
23          MS. DURRETT:  I don't think we have either, Your
24   Honor.
25          THE COURT:  Okay.  So I'm going to delete that,
```

```
 1    unless the Government objects.

 2              MR. BROWN:  No.  We want it removed, Judge.

 3              THE COURT:  All right.  So we'll remove that.

 4              Anything else on Page 7?

 5              MS. DURRETT:  No, Your Honor.

 6              THE COURT:  Anything else for you?

 7              MS. KING:  Not on Page 7, Your Honor.

 8              THE COURT:  Page 8?

 9              MS. KING:  Your Honor, we see where you have Glenwood

10    with the line.  I'm assuming it is because you --

11              THE COURT:  We couldn't -- we were having a brain gap

12    and decided we weren't going --

13              MS. KING:  Is it Glenridge?

14              LAW CLERK BORING:  Glenridge something.

15              MS. DURRETT:  We're also okay if it just follows -- I

16    added that in to try to make it more simple.  But maybe it made

17    it more complicated.

18              So if the Court -- I modified the regular

19    instruction.  If the Court wanted to use just the regular

20    instruction, that is fine.  But we -- I guess it is my modified

21    from 404(b).

22              So I think what we -- what we would propose is

23    saying, during the trial, you heard evidence of acts allegedly

24    done by the defendant and/or others.  These acts --

25              THE COURT:  And/or, right.
```

```
 1            MS. DURRETT:  And/or others.  These acts are not
 2   charged in the indictment.  If that simplifies matters.
 3            MS. KING:  That simplifies it.
 4            MS. DURRETT:  Sorry.  That was my complication.
 5            THE COURT:  So you heard evidence of acts allegedly
 6   done by the defendant and/or others.
 7            What is the end of this?  Just others, period?
 8            MS. DURRETT:  I think so.  These acts are not
 9   charged.
10            We do have maybe a suggestion.
11            MS. STRICKLAND:  Yes, Your Honor.  Just trying to
12   simplify what we're talking about for the jury, maybe it should
13   say, during the trial, you heard evidence of acts allegedly
14   done by the defendant and/or others that are not charged in the
15   indictment.
16            MS. KING:  I'm sorry.  Can you repeat that?
17            MS. STRICKLAND:  Acts done -- allegedly done by the
18   defendant and/or others that are not charged in the indictment.
19            MS. KING:  Okay.
20            THE COURT:  I agree.
21            There is something -- that are not charged in
22   these -- you have been provided this information because the
23   Government believes these acts are intrinsic to the charged
24   conduct.  I'm just going to add, I caution you that the
25   defendant is on trial only for the specific crimes charged in
```

```
1   the indictment and not based on any other acts -- is on trial

2   only for the specific -- and not based on any other acts.

3           Okay.  With that modification, let's move on to

4   Page 9.

5           MS. KING:  No objection.

6           MS. DURRETT:  No objection, Your Honor.

7           THE COURT:  Okay.  Page 10?

8           MS. KING:  Your Honor, given that the evidence in

9   this case shows that Mr. Pendergrass primarily aided and

10  abetted Mr. McQueen, the Government would like to propose that

11  under the introduction to defense instructions, the second

12  paragraph where it says Counts 1 through 5, we would like to

13  ask the Court to consider modifying that to say Counts 1

14  through 5 charged, that Mr. Pendergrass aided and abetted

15  Mr. McQueen in committing the offenses of mail fraud.

16          In other words, Your Honor, we would ask the Court to

17  drop the word "by."  And then where it says commit, we would

18  change it to, "in committing the offenses."  And then we would

19  make the similar changes where it says Counts 7 through 10,

20  Mr. -- or the Defendant Pendergrass, aided and abetted by

21  Mr. McQueen.  We would again ask the Court to drop the word

22  "by."

23          And then have the rest of -- right after Mr. McQueen,

24  have it read in committing the offenses of aggravated identity

25  theft.
```

```
 1              MS. STRICKLAND:  Your Honor, if we are going to make
 2    a change to that instruction, we would request that it just
 3    track the indictment and say, Allen Pendergrass and Terrell
 4    McQueen, aided and abetted by each other.
 5              MS. KING:  We would have no objection to that.
 6              THE COURT:  Let me, frankly, ask you a candid
 7    question.  That would seem to be -- how does that -- I realize
 8    it is clearer in terms of tracking the indictment.  I got that.
 9              On the other hand, I'm not sure how it really helps
10    your client, candidly.
11              MS. DURRETT:  Well, I think what we don't want is for
12    the Court to do what the Government is asking.
13              THE COURT:  Well, just as a matter of philosophy
14    or --
15              MS. DURRETT:  I just don't think that makes it any
16    clearer, and I think it makes it -- it doesn't track what the
17    indictment says.  And it makes it sound like -- again, it is
18    the same thing that Ms. Strickland was talking about in the
19    verdict form where it is letting the Government's theory in
20    there.
21              Their theory is that he aided and abetted Mr. McQueen
22    in a certain way.  So it doesn't track the indictment.  It puts
23    their theory into it.  And if the Court is inclined to do that,
24    we want the Court to track the indictment.  We like your
25    instruction.
```

```
1              THE COURT:  We'll just track the indictment then.
2              MS. KING:  Okay.
3              THE COURT:  Anything else on Page 10?
4              MS. KING:  Not from the Government.
5              MS. DURRETT:  No, Your Honor.
6              THE COURT:  Anything on Page 11?
7              MS. KING:  Not from the Government.
8              MS. DURRETT:  No, Your Honor.
9              THE COURT:  Anything on Page 12?
10             MS. KING:  Not from the Government.
11             MS. DURRETT:  No, Your Honor.
12             THE COURT:  Anything on Page 13?
13             MS. KING:  Not from the Government.
14             MS. DURRETT:  No, Your Honor.
15             THE COURT:  Anything on 14?
16             MS. KING:  Not from the Government.
17             MS. DURRETT:  No, Your Honor.
18             THE COURT:  Other than anything typographic, anything
19    on 15?
20             I think there was something on 15 on Paragraph 4
21    under -- Subparagraph 4 at the end, Mr. Pendergrass was
22    involved in the financial transaction with the intent to
23    promote -- we had something or?  I'm just trying to read my
24    handwriting here.
25             I guess we had thought about was to promote or carry
```

1  on that specific unlawful activity.  But as promote has a very

2  special meaning, maybe we just stick with -- it was the

3  promote -- the carrying on that was -- but the carrying on is

4  in the standard charge, I think.  But I want to make sure.

5          LAW CLERK BORING:  Yes, that is standard.

6          THE COURT:  The standard charge says intent to carry

7  on that specified unlawful activity, i.e., the alleged mail

8  fraud?

9          LAW CLERK BORING:  Yes.

10          THE COURT:  Are there any objections?

11          MS. KING:  I didn't hear.

12          THE COURT:  That's fine.  I mean, it is -- do you

13  have any objections to -- I was just trying to decode the

14  alternative we had thought about.

15          But do you have any objections to the way it is

16  written?  Do you want any of the language to be changed?

17          MS. KING:  The Government has no objection.

18          MS. DURRETT:  Your Honor, I don't think so, no.

19          THE COURT:  Page 16?

20          MS. KING:  Your Honor, the Government objects to the

21  inclusion of the definition of interstate or foreign commerce.

22  That is not an element of the version of 1956(a) that is

23  charged in the conspiracy count.

24          MS. DURRETT:  I didn't hear the first part of your

25  sentence.

1          MS. KING:  I want to delete the definition of

2    interstate and foreign commerce.  That is not an element of the

3    offense.

4          MS. DURRETT:  That is fine, Your Honor.

5          THE COURT:  All right.

6          17?

7          MS. KING:  I just have a question.  I want to make

8    sure I'm reading this correctly.

9          The very last paragraph of Page 17, the second

10   sentence reads, and if you decide that a particular defendant,

11   such as Mr. McQueen -- my question is:  Since it starts off

12   with a particular defendant, should that be Mr. Pendergrass?

13         THE COURT:  Well, the way I viewed it -- I mean, I

14   considered that question.  But the point in my mind was:  If

15   you found Mr. McQueen essentially off on his own doing

16   something, then Mr. Pendergrass is not guilty.  That was what I

17   was trying to get at.

18         Not that if -- I mean, I thought it was -- that would

19   make it more clear because of the fact that -- under the

20   evidence presented.

21         LAW CLERK BORING:  We could say, and if you decide

22   that the other alleged conspirator, instead of defendant.

23         MS. DURRETT:  Can it just say if you decide that

24   Mr. McQueen was a member of some other conspiracy?

25         THE COURT:  Yeah.  If you decide that -- and if you

```
 1   decide that Mr. McQueen was a member of some other conspiracy
 2   and just say, then you must find Mr. Pendergrass not guilty?
 3            MS. DURRETT:  I'm sorry, Your Honor?
 4            THE COURT:  Are you saying:  If you decide that
 5   Mr. McQueen was a member of some other conspiracy, then you
 6   must find Mr. Pendergrass not guilty; is that --
 7            MS. DURRETT:  Can we include not the one charged?
 8            THE COURT:  Not the one charged, then you must find
 9   Mr. Pendergrass not guilty of the conspiracy to commit money
10   laundering charged in Count 6?
11            MS. DURRETT:  Yes.
12            MS. KING:  I'm sorry.  Could you repeat that one more
13   time.
14            THE COURT:  And if you find that Mr. McQueen was a
15   member of some other conspiracy not the one charged, then you
16   must find Mr. Pendergrass not guilty of the conspiracy to
17   commit money laundering charged in Count 6.
18            MS. KING:  Yeah.  That's fine.
19            THE COURT:  Anything else on Page 17?
20            MS. DURRETT:  No, Your Honor.
21            THE COURT:  Page 18, other than anything that is
22   typographic?
23            MS. KING:  No, Your Honor.
24            THE COURT:  Anything for counsel?
25            MS. DURRETT:  No, Your Honor.
```

```
1              THE COURT:  Anything on 19?
2              MS. KING:  No, Your Honor.
3              MS. DURRETT:  No, Your Honor.
4              THE COURT:  We'll just put aside talking about the
5    defense charge here.
6              Anything on 20?
7              MS. KING:  No, Your Honor.
8              MS. DURRETT:  No, Your Honor.
9              THE COURT:  Anything on 21?
10             MS. DURRETT:  No, Your Honor.
11             MS. KING:  No, Your Honor.
12             THE COURT:  All right.  So let's talk about the
13   theory of defense charge, now that I have put everything aside.
14             Okay.  Do you have that in front of you?
15             MS. KING:  The theory of defense?
16             THE COURT:  Yes.
17             MS. KING:  Yes, Your Honor.
18             THE COURT:  Obviously we would not include all the
19   footnotes.
20             MS. DURRETT:  I'm sorry?
21             THE COURT:  Obviously I would not include all the
22   footnotes.
23             MS. DURRETT:  Right, Your Honor.
24             THE COURT:  That was for me, I realize.
25             MS. DURRETT:  And I provided them to the Government
```

1    last night.

2            THE COURT:  Right.  I understand that.

3            MS. DURRETT:  Thank you.

4            THE COURT:  Ms. King, do you want to -- are you

5    prepared to address the proposed charge as to Counts 1 through

6    5 of the theory of defense?

7            MS. KING:  Your Honor, the Government's concern about

8    the proposed theory of defense is that it is argumentative.  It

9    is basically getting the Court to endorse the factual theory of

10   the case and not just proposing a legal theory, such as statute

11   of limitations and what have you.

12           And, Your Honor, the Government is just really

13   concerned about the fact that it is just really argumentative.

14   The Government's position is it is argumentative.  It is not

15   proposing a legal theory.  It is -- it is proposing its factual

16   argument to the jury.  And it is getting the Court to endorse

17   its factual argument as to why the jury should acquit

18   Mr. Pendergrass.

19           THE COURT:  Does the defense counsel want to respond?

20           MS. DURRETT:  Well, Your Honor, I mean, I just think

21   we are entitled to provide it if it is supported by the

22   evidence.  I think it is supported by the evidence here.  I

23   don't -- I don't think the purpose of the theory of defense is

24   to just have us state some sort of legal theory.

25           Believe me, if the statute of limitations applies, I

1    want you to instruct them about the statute of limitations.

2    But I think -- I don't think that is the purpose.

3         I think the purpose is for us to be able to say, here

4    is our theory of the case.  And I think the case law says we're

5    entitled to do that.  And we can't do that in some sort of

6    antiseptic statement about the law.  I don't think that that is

7    what -- the purpose of it is for -- the purpose is.

8         THE COURT:  Well, I think it is somewhere between

9    what you are both saying.  I mean, it is an opportunity for the

10   defendant to state why under the law it believes that it is

11   entitled that -- something that they should find.

12        It is a little bit -- you know, I think what I was

13   trying to say before was it is a little argumentative.  But

14   that is sort of also, I realize, the nature of what often comes

15   in on a theory of defense.

16        But I'm just trying to think about any other -- is

17   there any -- in the cases that you have referenced -- and I

18   looked at a number of them.  I looked, of course, at Don

19   Samuel's book beforehand when I was getting back to you.

20        Is there any case in particular that you would

21   suggest that I look at that sort of has something comparable?

22   It is very -- it is difficult because, you know, a lot of the

23   cases, of course, are ones where the court refused to give them

24   and then they get reversed.

25        That is my concern.  I don't want to get reversed

```
 1    here.  So I want to give something -- allow you to give
 2    something.  I'm still -- and the problem we had because you
 3    want it under seal is I really couldn't talk about it without
 4    ex parte conversation before now.  So that is one of the
 5    reasons why I wanted to be sure to have enough time.
 6             Is there anything here that you -- any other cases
 7    that you think are kind of close enough about where the
 8    proposal was one they say, hey, you should have given it?
 9             MS. DURRETT:  Your Honor, I don't have a specific
10    example.  I'm sorry about that.  I mean, I think the problem is
11    it is a nuanced issue.  Right?  It is something that happens in
12    each case that is different from one to the other.  What we
13    know is that we are entitled to do it.  I think that there's
14    some leeway here about how it can be done.
15             But I don't find that our instructions are
16    particularly argumentative.  We did write that the defendant
17    contends.  And we did, you know, try to clean it the best way
18    that we could.  But I think it is consistent with the case law
19    that says we're entitled to do it if it is supported by the
20    evidence.
21             MS. KING:  Your Honor, I object to the fact that she
22    is saying the defendant contends that because the Government --
23    contends that because the Government has not shown
24    Mr. Pendergrass did -- that is straight argument.  That is
25    straight argument.
```

```
 1              I mean, if we can come up with someway where it is

 2     more a finessed legal presentation of his theory and less

 3     argument -- you know, but the way it is written, it is

 4     argumentative.

 5              THE COURT:  Okay.  Well, I tell you -- I mean, I can

 6     see Ms. Strickland is working away there on something.

 7              MS. DURRETT:  She's telling me that maybe I filed the

 8     wrong instruction because we did edit it last night.  I sent it

 9     to you.  So maybe we're reading and she's reading from -- I

10     don't know -- my incorrect instruction.  But we did edit it and

11     sent it to your law clerk.  So I hope we're all looking at the

12     same thing.  That may be my fault.

13              MS. KING:  I mean, so it sounds like I might not have

14     the right version.

15              THE COURT:  Well, we're talking about the one that

16     has just one paragraph for Counts 1 through 5; right?  We're

17     going to have to add S to Count 1 through 5.

18              MS. STRICKLAND:  Yes.  Your Honor, I think the change

19     that we made that is not here specifically addresses Ms. King's

20     concern.  And it would instead say as to Counts 1 through 5 the

21     defendant contends that the Government has not shown that

22     Mr. Pendergrass knew about Mr. McQueen's specific acts of fraud

23     before they occurred, and therefore it has not shown that

24     Mr. Pendergrass had the intent to defraud.

25              MS. KING:  So, Your Honor, I don't have that version
```

1    of their theory of defense.  So I'm not prepared to address the

2    rest of it.

3              THE COURT:  Why don't we just send it again.  And I'm

4    going to look at it.  I want to -- my thought is to go look at

5    some more cases still.

6              Is there anything else that was a difference in --

7    like as to Count 6 that you know of?

8              MS. STRICKLAND:  I mean, I think we had them all kind

9    of tracking Count 1 like that.  The defendant contends that

10   this did not happen.

11             THE COURT:  Why don't you send that out right now.

12             You have it already?

13             LAW CLERK BORING:  The one that I have included --

14   the one that I have included the because at the beginning.

15             THE COURT:  The defendant contends that because the

16   Government?

17             LAW CLERK BORING:  Which I understand is not the most

18   current version now.

19             THE COURT:  All right.  Why don't you send us that

20   and -- the new one.  We'll print it for everybody, even though

21   you will have it on your computer.  And look at it.

22             I'm going to again look at one or two other cases and

23   see whether I can find anything else while you are looking at

24   it.  And then that will also allow Ms. Boring to finish up

25   corrections of everything else.

1        MS. KING:  Then, Your Honor, just so I'm clear on

2   Page 20, we're just going to come back and address Page 20 in

3   conjunction with the discussion on the theory of defense?

4        THE COURT:  On Page 20, we would have the theory of

5   defense inserted there.

6        MS. KING:  Because I have objections to another part

7   that is on Page 20.

8        THE COURT:  All right.  Go ahead.

9        MS. KING:  So my objection is the paragraph that

10  reads -- let me take my mask off.

11        My objection is to the paragraph that reads, but an

12  honest belief that a business venture would ultimately succeed

13  does not constitute good faith if the defendant intended to

14  deceive others by making representations that the defendant

15  knew to be false or fraudulent.

16        The phrase "by making representations the defendant

17  knew to be false and fraudulent" is the part that I object to

18  because that is not factually consistent with the evidence in

19  this case.  There is no evidence that Mr. Pendergrass made

20  these representations.  And that portion of the charge is, in

21  essence, directing this jury to acquit Mr. Pendergrass because

22  they will not find that he made any direct representations that

23  he knew to be false or fraudulent.

24        The evidence is that Mr. McQueen made the false --

25  presented the false representations in the charged counts.  So

1    the Government would recommend that that portion of the charge

2    ends right after the words "deceive others."  But a period

3    right there after the word "others."

4                MS. DURRETT:  And we're looking right now, Your

5    Honor.  I thought that was the pattern.  I don't know.  I'm

6    looking.

7                It is the pattern instruction, Your Honor.  So we

8    would ask that the Court give the pattern instruction.

9                MS. KING:  The pattern instructions can be modified

10   too.

11               THE COURT:  Of course.

12               What if it said deceive others by making or promoting

13   representations that the defendant knew to be false or

14   fraudulent?

15               MS. DURRETT:  Can you repeat the last part?

16               THE COURT:  Intended to deceive others by making or

17   promoting representations the defendant knew to be false or

18   fraudulent.

19               MS. DURRETT:  Your Honor, we're asking -- I would

20   just ask that you give the pattern.  I object to that language,

21   and I ask that you give the pattern.

22               MS. KING:  And again, Your Honor, the pattern charge

23   is inconsistent with the facts of this case, particularly since

24   Mr. Pendergrass is charged with aiding and abetting

25   Mr. McQueen.

1           And that instruction, as it stands, will basically

2    direct this jury to acquit Mr. Pendergrass based on this good

3    faith defense jury charge.

4           MS. DURRETT:  Your Honor, as the Court I know is

5    aware, they will be instructed on aiding and abetting elsewhere

6    in the instruction.  So --

7           MS. KING:  But this sentence directly contradicts the

8    aiding and abetting instruction.

9           THE COURT:  All right.  Well, Ms. Durrett, I would

10   suggest you think about something else -- some modification you

11   could live with of the standard charge.  I mean, I do that --

12   we all do that all the time.

13          And you can do that while I'm trying to make sense

14   of -- you have sent out the revised --

15          MS. DURRETT:  We are.  We are working on it, Your

16   Honor.  I realize I don't have the right thing on my computer.

17   So we're working on it.  I'm sorry about that.

18          THE COURT:  That is all right.  I prefer then just

19   because of the time to go back and look at one or two more

20   cases on the theory of defense.

21          You'll send us that.  Meanwhile, you will also -- one

22   of you will keep on looking at this language.

23          Is there anything else on 20 that you would like to

24   see changed?

25          MS. KING:  That's it from the Government.

```
 1              THE COURT:  Anything on 21?

 2              MS. KING:  No, not from the Government.

 3              MS. DURRETT:  Not from the defense, Your Honor.

 4              THE COURT:  Okay.  All right.  Similarly, Ms. King,

 5   you look at Page 20, and you try to think about something else

 6   you could live with other than just deleting that last phrase.

 7   All right?

 8              MS. KING:  Okay.

 9              MS. DURRETT:  Your Honor, promoting is fine with us.

10   If it says the defendant intended to deceive others by making

11   or promoting representations the defendant knew to be false or

12   fraudulent.

13              THE COURT:  Ms. King?

14              MS. KING:  Could I have just one second, Your Honor?

15              THE COURT:  Sure.  Of course you can.

16              MS. KING:  I'm okay with that, Your Honor.

17              THE COURT:  Okay.  Great.

18              Got it?

19              LAW CLERK BORING:  Yes.

20              THE COURT:  Okay.

21              MS. DURRETT:  We're going to send it now.

22              THE COURT:  We're going to use the indictment as

23   currently written; right?

24              MS. DURRETT:  Yes, Your Honor.

25              THE COURT:  All right.
```

1        MS. STRICKLAND:  Your Honor, I just sent the new

2   defense proposed instruction.  And I just replied all to

3   Ms. King's email from this morning.  Hopefully everyone has it

4   now.

5        THE COURT:  Great.  Thank you.

6        **(A brief break was taken at 10:07 A.M.)**

7        THE COURT:  Counsel, are you ready to discuss what I

8   distributed?

9        MS. DURRETT:  We are ready, Your Honor.  We like what

10  you distributed.  And the only thing that we noted, which is

11  I'm sure my error, on the Number 1 for aggravated identity

12  theft --

13       THE COURT:  I'm sorry.  Are we talking about the main

14  charge?

15       MS. DURRETT:  I'm sorry.  I thought you were talking

16  about the theory of defense.

17       THE COURT:  No.  I was talking about the theory of

18  defense.

19       MS. DURRETT:  That is what I was talking about.  So

20  we noticed that on Number 1 under aggravated identity theft I

21  think that first Number 1 also applies to the mail fraud.  So

22  we were wondering if you could just say that up at the front

23  instead.  The sentence that says a conviction -- a conviction

24  on these counts cannot be based on the finding that defendant

25  was simply present at the scene of a crime, knew about it, or

 1    was a spectator.

 2          THE COURT:  You want that same paragraph at the end

 3    of the money laundering conspiracy?  Is that what you are

 4    saying?

 5          MS. DURRETT:  We were wondering if you could just put

 6    it at the front of all the instructions.

 7          THE COURT:  Oh, okay.  Sure.

 8          MS. DURRETT:  Okay.  Thank you, Your Honor.

 9          THE COURT:  Do you want to make any objections?

10          MS. KING:  Yes, Your Honor.

11          So, Your Honor, the Government objects to this

12    proposed form for two reasons.  We believe that -- let me just

13    go through it.  I think it would be easier.

14          With respect to Counts 1 through 5, the first part of

15    the proposed instruction or proposed theory of defense that

16    says the defendant contends that the Government has not shown

17    Mr. Pendergrass --

18          THE COURT:  It doesn't read that way now.

19          MS. KING:  Huh?

20          THE COURT:  It doesn't read that way now.  We just

21    gave you a proposed revision.

22          MS. KING:  Okay.  It is still the same argument.  So

23    the first part that says that the defendant contends

24    Mr. Pendergrass did not know about Mr. McQueen's specific acts

25    of fraud before they occurred, we have concerns with that

1    because, Your Honor, that is putting a factual matter before

2    the jury that was not presented at trial.

3            In the *United States v. Silverman*, cite 745 F.2d

4    1386, which is an Eleventh Circuit 1984 case, the appellate

5    court stated that even though a defendant is entitled to a

6    separate instruction specifically charging the jury on his

7    theory of defense calling a proposed instruction a theory of

8    defense, however, does not automatically force a court to give

9    it.  A court need not grant a requested instruction that does

10   not concern issues properly before the jury or would tend to

11   confuse it.

12           Your Honor, the way this is worded there is no

13   evidence that Mr. Pendergrass did not know.  And so we are

14   essentially presenting a factual matter that never came out at

15   trial.  And then the same thing --

16           THE COURT:  All right.  Let me just stop right there.

17           MS. DURRETT:  Your Honor, I think what we would say

18   is that when Mr. McQueen was testifying I talked to him about

19   his own statement that this whole thing started because

20   Mr. Pendergrass went on vacation and said, hey, if you land

21   this big account, I'll give you more money.  Then he decided,

22   oh, I can't do it that way, I've got to start doing fraud.

23   That he got the legitimate list from Mr. -- he learned how to

24   get the legitimate list to Mr. Pendergrass, to write for the

25   Freedom of Information Act request.  And then he took it upon

 1    himself to commit fraud.  And I think there is evidence of

 2    that.

 3             THE COURT:  I think that is sufficient.  So let's

 4    move on.

 5             MS. KING:  May I have just one moment?

 6             THE COURT:  Yes.

 7             MS. KING:  I apologize.

 8             THE COURT:  We have a lot of versions.  I have

 9    version control misery.

10             MS. KING:  Your Honor, the first sentence in, I

11    guess, Subparagraph 2 under -- as to Count 6, is that

12    essentially the same sentence in Subsection 1?

13             I'm trying to see the distinction.

14             THE COURT:  I'm sorry.  You are talking about in

15    Paragraph 1 under Count 6?

16             MS. KING:  Yeah.  Is that sentence essentially the

17    same sentence that starts Subparagraph 2?  I'm trying to

18    determine what the distinction is.

19             MS. DURRETT:  We can take out that first sentence,

20    Your Honor.

21             THE COURT:  Okay.  Of which one?

22             MS. DURRETT:  Of Paragraph 2 under Count 6.

23             THE COURT:  All right.

24             MS. KING:  So we take out the therefore as well;

25    right?  So it will start with --

```
 1              MS. DURRETT:  No.  I think it starts with therefore.
 2    Right?
 3              THE COURT:  Well, if you don't have a first sentence,
 4    then it is not therefore.
 5              MS. DURRETT:  Well, I think -- so how it reads is the
 6    first paragraph says, the defendant contends that
 7    Mr. Pendergrass did not know that the checks related to the
 8    scheme outlined in Counts 1 through 5 were proceeds of fraud
 9    rather than the product of lawful asset collection efforts.
10    Therefore defendant contends that the Government cannot show --
11              THE COURT:  So you are not going to have a 2?  You're
12    just going to simply have it flow?
13              MS. DURRETT:  That would be fine, Your Honor.
14              THE COURT:  All right.
15              MS. KING:  Okay.  I see what you are saying.  Okay.
16              So, Your Honor, that second sentence, the defendant
17    contends that the Government cannot show Mr. Pendergrass
18    knowingly conducted, that is a factual argument and that is a
19    factual decision that the jury should decide.
20              So the Government would recommend deleting that
21    second sentence and leaving in the third sentence with respect
22    to the money laundering conspiracy.
23              That second sentence is not asserting a legal theory
24    of defense.  It is making a factual argument.
25              THE COURT:  The strange thing is that, you know,
```

1    there are decisions of the Eleventh Circuit that says that if

2    you don't basically identify the facts in connection with

3    this -- what the theory is it can be difficult.

4              But what is your position?

5              MS. STRICKLAND:  We believe that the factual part of

6    it is appropriate as a theory of defense instruction.  Our only

7    alteration would be that instead of the Government cannot show

8    it should be the Government has not shown.

9              We do have an example of a case where there was a

10   specific very factual theory of defense instruction.

11             THE COURT:  Which one is that?

12             MS. STRICKLAND:  It is *United States v. Keller*.  It

13   is 1:16-CR-67, and that was before Judge Jones.

14             THE COURT:  1:16-CR?  What is CR?

15             Oh, you're talking about the docket number.

16             MS. KING:  I was thinking the same thing, Judge.

17             THE COURT:  All right.  16-CR -- in this district,

18   16-CR --

19             MS. STRICKLAND:  Yes.  67.

20             MS. KING:  The case is *U.S. v. Keller*?

21             MS. STRICKLAND:  *Keller*.  And the document with the

22   defense instruction that was given -- I went and looked at the

23   transcript to make sure it was given -- is Document 502.

24             MS. KING:  Would Your Honor give the Government an

25   opportunity to look that up?

```
 1              THE COURT:  Yes.

 2              MS. KING:  My only other objection -- I don't have

 3      any objections to the aggravated identity theft -- let me

 4      double-check.

 5              (There was a brief pause in the proceedings.)

 6              MS. KING:  All right.  So I would -- Your Honor, I

 7      do -- I do have an objection.  Where it says the Government has

 8      failed to prove beyond a reasonable doubt, I delete to that

 9      part.  I think it is sufficient if the defendant says that the

10      defendant contends that he did not intentionally associate with

11      or participate in possessing or using a means of

12      identification.

13              Then to get into has failed to prove beyond a

14      reasonable doubt again is getting into argument.  That is

15      very -- that is extremely argumentative, Your Honor.  And I

16      move to at least strike that portion of it.

17              THE COURT:  I don't know.  Beyond a reasonable doubt

18      is the standard.

19              MS. KING:  But Your Honor will separately charge that

20      as well.

21              THE COURT:  I understand that.  This is the theory of

22      the defense.  I mean, I'm going to go look at the one case.  I

23      feel comfortable with the revisions we have made.

24              MS. KING:  Your Honor, I do have one other request.

25              THE COURT:  Yes.  Go ahead.
```

1          MS. KING:  Because of how this theory of defense is

2    written, the Government is concerned that the jury will take

3    this and will assume that they must -- must make these findings

4    in evaluating the facts of this case.

5          So the Government would respectfully ask the Court to

6    consider after reading the theory of defense an instruction or

7    a limiting instruction reminding the jury that they are the

8    ones who will decide the issues of this case and just making it

9    clear that even though this is their theory of the defense they

10   are still the ones who ultimately decides the facts of this

11   case.

12         MS. DURRETT:  I think the jury is also already

13   instructed about that, how they are the deciders of fact.  And

14   I don't think that would be necessary.  In *Keller*, the Court

15   didn't give an instruction like that.  But I just think it is

16   already included in the Court's instruction.

17         THE COURT:  I mean, my intent is simply to say that

18   this is -- have an introductory line that says this is the

19   defendant's -- I am also giving you now what the defendant's

20   theory of the case is.  This is -- and independent theory of

21   the case.  And that is what it is.

22         And that is -- I mean, that is the normal way it is

23   done.  And I don't think -- they are always argumentative to

24   some extent because it is their theory of the case.

25         MS. STRICKLAND:  Your Honor, would you rather have

39

```
1    the docket number and the page of the transcript to see it

2    there?

3            THE COURT:  Wherever it is.

4            MS. STRICKLAND:  It was filed at Document --

5            THE COURT:  At 502?

6            MS. STRICKLAND:  502.  The transcript where it is

7    given is Document 546.

8            THE COURT:  Oh, I'm on the wrong -- it is document --

9    it is 16-CR -- I must have gotten something wrong.

10           LAW CLERK BORING:  I sent it to you, Judge.

11           THE COURT:  Okay.  Thank you.

12           LAW CLERK BORING:  What page of the transcript?

13           MS. STRICKLAND:  The transcript, Document 546, and it

14   starts at the bottom of Page 23.

15           MS. KING:  Your Honor, I don't have a way of seeing

16   that.

17           THE COURT:  Well, Ms. Boring will send it to you

18   right now.  Just simply the --

19           MS. KING:  I no longer have internet connection.

20           THE COURT:  That's all right.  Ms. Boring is going to

21   send her -- you don't have it right this moment?

22           MS. KING:  I've seen it, Your Honor.  Thank you.

23           THE COURT:  Okay.  I think I'm comfortable with the

24   way we have revised it, and I'm going to include it in the

25   charge, and I'm going to explain that this is the defendant's
```

```
 1   theory of the defense.  I think that is appropriate and fair.
 2           Okay?
 3           MS. STRICKLAND:  Thank you, Your Honor.
 4           MS. KING:  Thank you, Your Honor.
 5           THE COURT:  Were there any other corrections?  Did
 6   you want to see a final version before we start jury argument?
 7           MS. KING:  Yes, Your Honor.
 8           THE COURT:  All right.  Okay.
 9           Would you let the jury know it will be a little bit
10   longer but we are almost there.
11           COURTROOM SECURITY OFFICER:  Yes, ma'am.
12           MS. DURRETT:  Your Honor, are we going to instruct
13   before we do closing or after?
14           THE COURT:  After.
15                   (There was a brief pause in the proceedings.)
16           THE COURT:  I think, Annie, on Page 19 it should
17   read, I now read for you the defendant's theory of defense in
18   this case.
19           Ms. Strickland, were you asking for on Page 19 of
20   the -- were you asking for the statement a conviction on the
21   counts charged not be based -- to be in each of the
22   instructions or just once above?
23           MS. STRICKLAND:  How it is here is how we wanted it.
24           THE COURT:  Okay.  That is fine.
25                   (There was a brief pause in the proceedings.)
```

```
 1            THE COURT:  Just for ease, Ms. Durrett, when you

 2   close, I think you should just right then just simply say I'm

 3   going to reassert my motion so you can preserve it then.  But

 4   then you don't -- for the reasons I have already argued.

 5            MS. DURRETT:  That's fine, Your Honor.  That's fine.

 6   I just want to say that I thought about it a little bit more

 7   last night.  And I made a record about Counts 1 through 3.  And

 8   I want to also include Count 4.

 9            I know I made a general motion.  But as to Count 4, I

10   think there is also no evidence of Mr. Pendergrass's

11   involvement.

12            THE COURT:  You can state that in public.  That is

13   fine.

14            MS. DURRETT:  Thank you, Your Honor.

15            THE COURT:  We should begin pretty soon so that we

16   get these folks to lunch.

17            MS. DURRETT:  So I still have to rest; right?  I mean

18   --

19            THE COURT:  That is right.  Do you need any more time

20   to look at the instructions or the jury verdict?

21            MS. DURRETT:  No, Your Honor.

22            THE COURT:  Does anyone need to go to the bathroom

23   other than me?

24            MS. KING:  Yes.

25            THE COURT:  All right.  Let's do that and then get
```

1      the folks in if that is -- if you are all ready.

2                    MR. BROWN:  Yes, Judge.

3                    **(A brief break was taken at 11:08 A.M.)**

4                    THE COURT:  Are we ready?  Counsel, are we ready to

5      proceed?  You have all the documents you need from me?

6                    MS. KING:  Yes.

7                    THE COURT:  Are there any exceptions that have not

8      been noted on the record at this point that you want to make

9      about the jury charge verdict or anything else?

10                   MS. KING:  Not for the Government.

11                   MS. DURRETT:  No, Your Honor.

12                   THE COURT:  Well, good luck, folks, in connection

13     with this process.

14                   MR. BROWN:  Your Honor, I just want to make sure.

15                   Has the Court ruled on defense counsel's motion for

16     judgment of acquittal?

17                   MS. DURRETT:  I haven't rested.

18                   THE COURT:  She hasn't --

19                   MS. DURRETT:  Then I'll just say I'm going to renew

20     my motion --

21                   THE COURT:  Right.

22                   MS. DURRETT:  -- generally and then more specifically

23     as to Count 4.  I'll just say that.

24                   THE COURT:  That's right.

25                   Just one second.  I am going to say I do plan to deny

1  it but simply deny it because I think that a reasonable jury

2  could under -- given the evidence presented find the defendant

3  guilty of all of the charges.  A reasonable jury could do

4  otherwise as well.  But that is essentially what the ruling is.

5          But I do think we have to give you an opportunity for

6  appellate purposes and all other purposes and to renew it later

7  on.

8          MS. DURRETT:  Thank you, Your Honor.

9          THE COURT:  You know what?  Could you ask him to hold

10  back for a second, Harry.

11          COURTROOM DEPUTY CLERK:  Yes.

12          THE COURT:  I want to make sure before you rest that

13  you -- that I talk to Mr. Pendergrass and make sure that he

14  understands what his rights are to testify.

15          I know your counsel is very diligent and has gone

16  over this with you.  But for the record, I want you to

17  understand that you have a constitutional right to testify and

18  to present evidence on your own behalf and that is your

19  absolute right.

20          And if you did testify, that would be fine with the

21  Court and acceptable, and I give you -- I want to make sure

22  that you understand this is your absolute right.

23          On the other hand, if you choose not to testify, that

24  is your absolute right.  And I will advise the jury of that as

25  well that you -- that you have no obligation to testify, that

```
 1    it is your constitutional right not to testify, and that the
 2    jury may not make any adverse inferences against you because
 3    you did not testify or present evidence.
 4              Do you understand that?
 5              THE DEFENDANT:  Yes, Your Honor.
 6              THE COURT:  And have you had the opportunity to
 7    discuss that with your counsel?
 8              THE DEFENDANT:  Yes, I have.
 9              THE COURT:  All right.  Then have you decided that
10    you will not testify or --
11              THE DEFENDANT:  Yes.
12              THE COURT:  -- or that you wish to testify?
13              THE DEFENDANT:  That's correct.
14              THE COURT:  That you will not testify?
15              THE DEFENDANT:  Yes.
16              THE COURT:  All right.  Thank you.  All right.
17              (The jury entered the courtroom at 11:19 A.M.)
18              THE COURT:  Excuse me just one second.
19              Good morning.  All right.  As you know, the
20    Government closed its case yesterday.
21              And now let me ask Ms. Durrett on behalf of the
22    defendant whether you intend to present any evidence.
23              MS. DURRETT:  Your Honor, we're not going to present
24    any further evidence, and we would rest at this point.
25              Then I do have a motion, Your Honor.  I know I have
```

1    previously put it on the record.  I would renew that motion

2    generally and then in addition to that specifically as to

3    Count 4.

4              THE COURT:  The same motion as to Count 4?

5              MS. DURRETT:  Yes, Your Honor.  Thank you.

6              THE COURT:  All right.  And for the reasons I have

7    referenced before, I think I'm going to determine to deny the

8    motion at this juncture.

9              MS. DURRETT:  Thank you, Your Honor.

10             THE COURT:  All right.  Counsel, have you had an

11   opportunity to confirm that you have all of the evidence in?

12             MS. DURRETT:  We have, Your Honor.

13             MR. BROWN:  Yes, Your Honor.

14             THE COURT:  Thank you very much.  Counsel, I'm just

15   simply going to give a few directions to the jury as to our

16   plans for this morning.

17             We are intending to have closing argument from

18   counsel.  And then you will hear directions on the law from me,

19   which is called a jury charge.  And then we will release you to

20   go have lunch.

21             You can -- it is up to you to decide whether or not

22   you are going to confer over lunch.  If you confer over lunch,

23   then you need to bring everything back into the -- your lunch

24   to the jury room.

25             Many times people do this just so they can begin the

1   discussions.  Many times they don't.  They just want to have a

2   real break.

3           I have given up to 40 minutes for each side to make

4   their arguments.  Because the Government bears a heavy burden

5   of proof in a criminal case, which I discussed with you at the

6   beginning, the Government both gets to go before -- first and

7   also do a rebuttal.  So, in other words, the Government's

8   counsel will present a portion of their argument in the

9   beginning.  Then counsel for the defendant will respond to that

10  and attempt to rebut it.  And then whatever is left of the 40

11  minutes that the Government didn't use, they get to use.  So if

12  they use 30 minutes in their first part, they will use 10

13  minutes at the end.

14          If it looks like you-all are not comfortable at any

15  point -- I won't stop at any time in the middle of argument.

16  But if we need to take a five-minute break for somebody to go

17  to the bathroom or something like that, then we'll do that

18  between all of that.

19          Typically I like to try to go all the way through

20  argument and then give you a five-minute break then.  And then

21  I will give you the jury charge, which takes approximately 20

22  minutes to read to you.

23          I want to tell you in advance that I will be giving

24  you copies of the jury charge for every juror.  And that will

25  be given once we have concluded the presentation so you are not

```
1    going to have it in front of you.

2              But you -- on the other hand, you don't have to write

3    notes about it unless there is something that you really want

4    to check.  And, of course, you are welcome to do that.

5              When we are through, then you -- and I'll go over

6    this again.  But when we are through, then you will retire to

7    the jury room and decide, first of all, on who is going to be

8    the jury foreperson.

9              But probably you may decide first, depending on what

10   the hour is, let us just go to lunch and we'll decide that

11   later.  All right?  Because you may not have enough time.

12             The cafeteria closes at 1:30.  So that is my -- I

13   want to make sure you get lunch.

14             All right.  Who is going to be speaking?

15             MR. BROWN:  I am, Your Honor.

16             THE COURT:  Okay, Mr. Brown.  Very good.

17                         CLOSING ARGUMENT

18             MR. BROWN:  Follow the money.  You've heard the

19   evidence in this case.  You have heard a lot about documents.

20   You have heard from witnesses.  Follow the money.  Why?

21   Because Mr. Pendergrass did.  Not only did he follow the money;

22   he controlled the money.  You will have the evidence with you.

23   But this is Mr. Pendergrass and Mr. McQueen controlling and

24   following the money.

25             In any fraud case, the money is important.  How else
```

can you follow the money and how else will Mr. Pendergrass
control the money?  The P.O. Box.  Every single check that was
fraudulently obtained from the City of Atlanta charged in
Counts 1 through 5 in the indictment went through the P.O. Box
controlled by Mr. Pendergrass.

There is no other evidence that he did not control
it.  He opened the application.  And you will see the mailing
labels from the City of Atlanta where these checks were mailed
to the P.O. Box.  And he has records of the mailings in his
files, which were provided to you -- copies of most of them but
also some original documents as well in the office.  Follow the
money.

How else did he control and follow the money?  The
two bank accounts in which the fraudulent funds related to the
City of Atlanta that were deposited were controlled by who?
Exhibit Number 20 for Counts 2 through 5, Mr. Pendergrass was
the sole signer of the account.  You have bank accounts.  You
know what that means.  You look at all the checks.  He signed
them all.

Count 1 relates to the check from the law firm that
should have gone to the law firm instead of Mr. Pendergrass and
Mr. McQueen.  That is in account ending in 4620.  And you heard
from Mr. McQueen.  He sat on the stand and said, I recall
distinctly going to the bank with Mr. Pendergrass, myself, and
Ms. Barber.  We dressed up.  We wanted to appear like we were a

1  real business.  That account was controlled by Mr. Pendergrass

2  as well, while the other two were signers.  Look at the checks.

3  You'll have the checks back there.  They are signed by

4  Mr. Pendergrass.  The stolen money was controlled by

5  Mr. Pendergrass.

6          The indictment -- you are going to have a copy of the

7  indictment back with you.  The first five counts of the

8  indictment charge mail fraud.  And you are going to hear a lot

9  about what the law is on that.

10         But a simple explanation relates to mailing something

11 and using fraudulent representations and causing either you

12 mailing it or causing someone else to mail something by using

13 fraud.

14         You heard the evidence in this case about the fraud,

15 the forged power of attorney, the forged notaries.  That is

16 fraud.  That is material.  That is important.  Without those

17 forgeries, without those notaries, they wouldn't have got the

18 checks.  They wouldn't be able to steal the money.

19         And how did they get it?  They caused the City of

20 Atlanta to mail those checks to, once again, Mr. Pendergrass.

21 That is a mailing using fraud to induce others to mail.

22         Count 6 of the indictment is conspiracy to commit

23 money laundering.  Money laundering relates to in this case

24 promoting the fraud.  You heard from Mr. McQueen, and you have

25 the bank records that show that the fraudulent funds came into

1    accounts controlled by Mr. Pendergrass, and they used that
2    money to pay commissions and salaries to buy telephones that
3    were used for business cards and those numbers and answering
4    service.  You will see those charges.  This is the virtual
5    office that Mr. McQueen testified about.  You will see the
6    charges for that virtual office down in Florida, for answering
7    services -- all a part of the fraud to steal money from not
8    only the City of Atlanta but other government agencies as well
9    across the country.
10          And then finally you're going to have four counts of
11   aggravated identity theft.  And that relates to using the name
12   and signature of many of the victims you saw sitting on the
13   witness stand and said, I had no idea that I even had money
14   from the City of Atlanta, one; but, two, I gave nobody the
15   authority to steal my signature and steal money that should
16   have come to me or my business.
17          Now, I violated the cardinal rule of PowerPoint
18   presentations by this slide.  But I think it is important.
19   Aiding and abetting.  You are going to be instructed by this
20   Court and you will have a copy of an instruction like this.
21   And I think it is very important for you to realize how this
22   case was charged.
23          It is charged with a theory of aiding and abetting.
24   And I'll read some of the highlights from this.  And then I
25   want to give you an example that I think illustrates this

1    theory of how the case was charged.

2           It is possible to prove the defendant guilty of a

3    crime even without evidence that the defendant personally

4    performed every act charged.  Ordinarily any act a person can

5    do may be done by directing another or an agent, or it may be

6    done by acting with or under the direction of others.

7           The evidence you heard in this case is that

8    Mr. Pendergrass and Mr. McQueen acted together.  And I'll go

9    through some more of that evidence.  But that was the evidence

10   that has been unrebutted.  There is no evidence to suggest they

11   did not act together.  Because not only do you have the

12   testimony of Mr. McQueen, Mr. Fitchpatric, you also have the

13   documents.  And the documents speak so loudly in this case.

14   They show them working together.  Costa Rica.  They are even

15   partying together -- Rio -- with these fraudulent funds.  They

16   are together.  Even the photographs I opened with, they are

17   together.  So this is what this instruction is telling you.

18          So anytime people are joined together, they can be

19   charged with that crime, even if they didn't do all the acts

20   together.  And I think that is important.  And I'm going to

21   walk you through that.

22          So I'm not going to read all of this.  But I do want

23   to give you an illustration I think brings this point home.  It

24   is kind of apropos.  This past Thanksgiving I got a chance to

25   see my 96-year-old grandmother.  And she has a memory like a

1   steel trap.  She reminded me of a story that happened when I

2   was eight years old.  And I'm quite older than eight years old

3   now.

4           I have a twin brother.  We're both at my

5   grandmother's house.  And the lady next door had a pear tree.

6   The pears actually -- we didn't know -- they taste terrible.

7   My grandmother told us specifically, do not go over that fence

8   and bother those pears.  She does not want anybody in her yard.

9   You boys understand me?  Yes, Grandma; yes, Grandma.

10          My twin brother is more daring than I.  He said, you

11  know what?  Let's go get those pears.  They are falling on the

12  ground.  Who is going to care if we take a few pears and eat

13  them?  I said, I'm not going across there.  He said, listen,

14  you don't go across the fence.  Stay right here and be a

15  lookout.  If you see somebody, make a noise, do something.

16          My brother hops the fence.  He is getting pears.  And

17  I'm looking out.  Behind me is my grandmother looking out the

18  window watching me look out for him and him getting pears.  She

19  comes out and says, boys, what did I tell y'all?  Get over

20  here.  I said, Grandma, I didn't do anything.  I didn't touch

21  any pears, Grandma.  She said, you are just as guilty as he is

22  because you were working with him, you were helping him.  So

23  you are going to get a butt-beating just like him.

24          Now, she didn't beat us.  But that story illustrates

25  aiding and abetting.  I can absolve myself of responsibility of

```
 1   helping my brother steal those pears by saying I didn't touch
 2   the pears or I didn't sign this particular document.  Why?
 3   Because we were working together.
 4          Count 6 charges a conspiracy -- a money laundering
 5   conspiracy to promote this fraud.  What is required?  An
 6   agreement to commit an unlawful act, here money laundering, by
 7   two or more people, Mr. McQueen, Mr. Pendergrass, and others.
 8          You heard from Mr. Fitchpatric.  He admitted on the
 9   stand that, yes, I did it, I knew it was wrong.  To knowingly
10   and willfully -- but what is not required?
11          We don't have to come in here with a formal agreement
12   signed by Mr. Pendergrass and Mr. McQueen agreeing that they
13   are going to promote this business by stealing money.  That is
14   not required.
15          Even success in committing an act.  But in this case,
16   they had success.  They did receive money.
17          Acknowledge every detail.  I don't have to get up
18   here and show you that Mr. Pendergrass knew every single detail
19   in order for him to be charged and found guilty of the
20   conspiracy.
21          Mail fraud.  I'm not going to read all this.  But I
22   want to highlight a few points, what the elements are the
23   Government has to prove.  Because I'm going to talk about our
24   burden.  And it is an important burden.  And the Government
25   always stands by that burden.  It is the law.
```

1          The Government has to prove this case beyond a

2   reasonable doubt.  We'll talk about that.  But the defendant --

3   one, in order for Mr. Pendergrass to be shown guilty of this

4   crime, we have to show that he knowingly devised and

5   participated in the scheme to defraud someone by using false or

6   fraudulent pretenses, representations, or promises.

7          But there is evidence of that.  He was participating

8   with Mr. McQueen, whether he was the boss or they were

9   partners.  There is no evidence to suggest that they were not

10  working together.

11         The false or fraudulent pretenses.  In this case, the

12  false or fraudulent pretenses are the forged signatures

13  indicating they had the power and the authority to act on

14  behalf of the victims.  They didn't.  That is -- and it is

15  important.  It wasn't a trivial fact.  It was the key fact they

16  needed.

17         With the intent to defraud.  They were intending to

18  defraud the City of Atlanta to get this money.  Say, hey, City,

19  we have the authority from these folks to get their money back.

20  We want to get it for them.  They didn't tell the city they

21  were going to steal the money and keep it for ourselves.

22         And the defendant used the United States Postal

23  Service by mailing or causing to be mailed.  In this case, they

24  did both.  The evidence is that they mailed these things to the

25  City of Atlanta.  But how I charged it in the indictment is the

1    city -- they caused the city to mail those checks.  That's the

2    mailing.  You will see on the evidence, which the defendant

3    conveniently kept for us so when the agents came and searched

4    his office you actually see the postage mailing meter and the

5    date that it was actually mailed to the defendant's P.O. Box.

6    So there is no doubt that it was mailed, satisfying an element

7    of this offense.

8            And I have an example here.  This relates to Johnson

9    Coleman & Stephenson, LLC.  You see at the top April 5th.  We

10   know it was in 2013 because it is right there on the check.

11   And Mr. McQueen told you, yeah, 2013 is when I got these

12   checks.  This is one of the checks that was deposited into an

13   account controlled by the defendant.

14           Money laundering.  I talked a little bit about that.

15   Knowingly conducted or tried to conduct a financial

16   transaction.  You will hear the transactions in this case

17   involved depositing the checks.  There are many financial

18   transactions that occurred.  Depositing checks.  Writing

19   checks.  And you will have that evidence, so you can look at it

20   and see it for yourself.

21           The defendant knew that the money or property

22   involved in the transaction were the proceeds of some kind of

23   unlawful activity.  I suspect defense counsel will get up and

24   say, Mr. Pendergrass was just duped.  He didn't know those

25   checks that came to his mailbox were proceeds of fraud.  He

1    believed that they were just legitimate checks.

2            But that doesn't make sense.  And you know why?

3    Because you will look at the evidence and see he never paid

4    anybody out of that account.  So he is a business person that

5    had this kind of business for years.  He knows how it is

6    operated.  It is not complex.  You get the money in, and you

7    rightfully pay the majority -- over 75 percent to the rightful

8    owner.

9            He didn't do that.  He went to Rio.  He went to Costa

10   Rica.  Look at the expenses.  There are personal expenses.

11   This money was spent.  And he shared the majority of it with

12   who?  His partner, Mr. McQueen.

13           Three, that money was received from the mail fraud --

14   from the mailing based on fraud and involved a financial

15   transaction with the intent to promote the carrying on of that

16   specified unlawful activity.  Paying for the virtual office.

17   Paying the employees.  Paying for what was necessary to

18   continue this fraud.

19           Mr. McQueen testified that during his time there when

20   this fraud was occurring -- he said only 90 -- only ten percent

21   may have been legitimate.  And I suspect that is a little

22   generous when you get the bank records and see.  You have heard

23   evidence of two legitimate recoveries, a Roshaunta Redmond and

24   the Fryer law firm.  That is it.  That is it.

25           You can look at the checks, and you will see those

```
1    are the only two people or companies that received money.

2    Everybody else did not.  There is no evidence that they did.

3              So testimony or exhibits.  Stolen funds used to

4    promote the fraud.  Exhibit Number 20, Exhibit Number 22.

5    Those are the two bank accounts in which all of the checks from

6    this particular charged counts were deposited.  Pendergrass and

7    McQueen purchased cell phones to use and the business cards.  I

8    list specifically here in Exhibit 20 the virtual office and the

9    answering services that were used that they paid for out of the

10   fraud money.

11             And the big fraud expenditure -- he paid

12   Mr. Fitchpatric.  You will see checks to Mr. Fitchpatric.  You

13   heard from Mr. Fitchpatric.  What was his job?  Lift notary

14   seals and signatures.  And Mr. McQueen corroborates that

15   because he shows you those actual notary seals and the

16   signatures that were lifted.

17             Aggravated identity theft.  The defendant knowingly

18   transferred, possessed, or used another person's means of

19   identification in the indictment.  That means of identification

20   is the name and signature.

21             You have the evidence to show that their name and

22   signature was used.  And how was it used?  Without lawful

23   authority.  No authority to use that name and signature.

24             During and relation to mail fraud as charged in the

25   indictment.  So we charged aggravated identity theft counts
```

1  relating to not all but four of the mail fraud charges in

2  Counts 1 through 5.  And, once again, it has to be during and

3  in relation to -- I think I put that twice.  But during and in

4  relation to the mail fraud as charged.  And that is in evidence

5  in this case.

6           So evidence of guilt?  I'll run through this quickly,

7  but I think it is important as it relates to what evidence you

8  can use to convict this defendant.  I'm going to talk about the

9  testimony of Mr. McQueen and Fitchpatric.  But I would argue to

10 you that if you just look at the documents that don't talk

11 back, that you can rely on, that are credible, there is

12 sufficient evidence to convict them using those documents

13 alone.

14          But that is not all we have.  You say, Mr. Brown, why

15 can you just look at the documents?  Because in this case the

16 money and who controlled the money tells the story.  Why?  Mr.

17 Pendergrass -- the big P.O. Box we talked about.  The signature

18 on the actual Wells Fargo account.  The deposits into the

19 account.  He is on camera making the deposit.

20          None of these exhibits -- none of this evidence is

21 subject to being rebutted.  They can't get up there and argue.

22 There is no argument that someone else was using that account.

23 He opened the account himself.  He is right there depositing

24 the checks.

25          Evidence of guilt?  Did not write checks to the

1   rightful owners.  Exhibit Number 20 shows what was done with

2   that money.  He paid himself the most, of course; Mr. McQueen,

3   the second most; and then Ms. Barber, Fitchpatric -- all those

4   used that helped him perpetrate this fraud.

5           And if you look at the Exhibit Number 20, it is kind

6   of telling.  $106,000 is deposited in June.  Within eight days,

7   over $68,000 of that money is spent for himself for Costa Rica,

8   for other folks that were involved in the fraud scheme.  And

9   you will not see a check to anybody that should have got the

10  money.

11          So right there that tells you if he is running a

12  legitimate business he would have paid the people the money on

13  the checks that he deposited.  But he was not running a

14  legitimate business.

15          This is an example of how Mr. Pendergrass with his

16  signature that is very distinctive -- look at his signature.

17  You will see it on the P.O. Box application.  You will see it

18  on the bank signing cards.  He has a very nice signature.  I

19  don't have a signature that nice.  It is distinctive, and you

20  will see it.

21          You will see it.  And you will see here he writes a

22  check to himself for $9000.  And, of course, he gives his

23  partner in crime, Mr. McQueen, $9000 within days after the

24  stolen money is deposited into the account.  And I didn't put

25  all of the checks up there.  But you will have them to

1    consider.

2           In addition to writing checks to himself and his

3    partner in crime, he is writing checks to Hemisphere, Inc.   You

4    will have that bank record.   That is the bank account that he

5    controls himself and he puts recovery fees.   There is no

6    evidence he recovered any fees for Hemisphere, Inc.   That is

7    his bank account.   That is an attempt to hide the fraud in

8    plain sight.

9           And they also put Attorney Recovery System, and he

10   puts Mr. -- that is Mr. McQueen's address right there -- his

11   home address.   And he puts asset recovery expense.

12          But in addition to the documents, which I think speak

13   for themselves, you heard from victims in this case.   This case

14   is about victims as well.   They defrauded Mr. Bone.   You saw

15   him come in here in a wheelchair.   He had to come down and

16   testify that he had no idea people were using his name and his

17   signature to steal money.

18          Ms. Toson testified.   Mr. Wheeler did not.   He is

19   deceased.   And you are going to get a specific instruction on

20   aggravated identity theft.   The Government must show the person

21   was real or that they knew the person was real but not that

22   they are still alive.   That wouldn't be fair; right?   So he is

23   deceased.   He did not testify.   But his signature was used

24   without his authority.   How do we know that?   Well, Mr. McQueen

25   told us so.

1          Lou Comer, she did not testify.  She is a real

2    person.  The agent testified that they spoke with her during

3    the course of the investigation.  Mr. McQueen testified, I

4    looked her up online.  I knew who she was.

5          And the whole point of this fraud is they wouldn't

6    use fake people because the money was held in the name of real

7    people or businesses associated with a person.  So that is why

8    they knew -- everybody they are using or trying to defraud or

9    put themselves -- you know, forge signatures on are people that

10   they know are real because these real people were owed real

11   money.

12         But you also heard from Melvin Waller.  Now, his

13   particular -- the fraud related to his count, the fraud related

14   to his money that was stolen from his company, Atlanta

15   Quarterback Club, was not charged in the indictment.

16         But what?  Why did the Government bring that in?  It

17   shows the course of conduct and the same kind of activity that

18   they used under their Asset Financial Recovery was used with

19   Guishard Wilburn & Shorts.  You'll see Mr. McQueen -- on the

20   front page, Mr. McQueen says, yes, that is my signature.  I had

21   signed that, and I sent that to the city.

22         At the same time, Mr. Pendergrass is signing

23   documents under Guishard Wilburn & Shorts and signing his name

24   on those documents and committing fraud with that company.  But

25   Mr. McQueen tells you, we're working together.  Why did they do

 1    that?  Well, to make it appear that it was two separate

 2    companies.

 3            Of course, they used the same P.O. Box or didn't

 4    think it all the way through.  But if you look at both of those

 5    documents, you have them in evidence.  They all go to who?

 6    P.O. Box 1809 controlled by the defendant.  You heard from Mr.

 7    Giffin, Hemisphere, as well.

 8            So let's talk about the testimony of Mr. McQueen.

 9    What I tell every jury that I come before as it relates to a

10    cooperating co-defendant:  If you can't corroborate what he is

11    saying -- lawyers use the word corroborate.  You guys use that

12    in your -- you may not use that word.  But you use that -- what

13    that means.  It is just a backup.

14            You meet someone for the first time you don't know

15    and they tell you something, do you automatically believe

16    everything they say?  You look for a backup, something to

17    corroborate what they are saying.

18            So you don't know Mr. McQueen.  So I'm not asking you

19    to come in here and believe him -- everything he says wholesale

20    because that is not reasonable.  That is not something you

21    would do in your own personal affairs.  What I ask you to do

22    is:  If he says something and it is corroborated by someone

23    else, the documents in the case, the photographs in the case,

24    you should consider that credible.  And that is the same way

25    I'm sure how you would operate in your own personal affairs.

1          If someone tells you something, then they show you a

2    document that corroborates it or you hear of a reference that

3    says, yeah, he does good work, then that is corroborating what

4    they are telling you and you are more likely to believe it.

5          That is all the Government would ask you to do with

6    Mr. McQueen's testimony.  But what did he tell you?  He

7    admitted his role.  And more so than that, if you listen to his

8    testimony, this is an individual who was close friends with

9    Mr. Pendergrass for years.  Mr. Pendergrass hired him not once,

10   not twice, but three times.

11         And what my grandmother also used to tell me is birds

12   of a feather flock together.  What does that mean?  That does

13   not mean -- that means he knew Mr. McQueen, and he hired him

14   three times.  They worked together.

15         And his testimony is corroborated by the evidence and

16   other witnesses.  You have the documents.  When he tells you, I

17   was paid out of the fraud proceeds, you have the checks that

18   show that.  When he tells you that Mr. Pendergrass controlled

19   the accounts, you have the bank records that corroborate that.

20   When he tells you that Mr. McQueen -- Mr. Pendergrass and I

21   used Eric Fitchpatric to photoshop documents to perpetrate this

22   fraud, you have Eric Fitchpatric to corroborate that.  That is

23   corroborated.

24         And he also identified Mr. Pendergrass's signature on

25   several of the forged POA documents in this case.  And if you

1  look at those signatures and the handwriting compared to the

2  others, it is corroborated.

3          What about Eric Fitchpatric?  Well, first before we

4  go to Eric Fitchpatric, let's look at Mr. McQueen.  Does he

5  have a benefit to get by testifying?  Absolutely.  That is how

6  the system works.  He has a benefit.  He pled guilty.  And he

7  is telling the truth about his involvement and the involvement

8  of the ringleader, the boss who hired folks, paid folks, paid

9  for the rent, paid for the lights, ran the business.  So he has

10  a benefit.

11          Does that mean that he got up here and lied to you?

12  No.  Why?  Because we talked about corroboration.  So if you

13  can't corroborate what he said, throw it out.  But if you can

14  corroborate it and it is reasonable in light of the totality of

15  this fraud, you should consider it.  You should consider it

16  credible.

17          Now let's talk about Fitchpatric.  And we brought him

18  up here and I asked him, do you want to be here?  He did not.

19  He -- I heard him get choked up on at least two occasions.

20          Now, what does that show you?  Does it show you he

21  got up here and lied about what Mr. Pendergrass told him to do?

22  No.  He didn't want to be here.  He didn't want to testify

23  against Mr. Pendergrass.  I hope you heard that in his voice.

24          But he did.  And how do we know he did it truthfully?

25  It is corroborated by who?  Mr. McQueen.  So you should

1    consider his testimony credible.  And the defense may get up

2    and argue, well, he wasn't charged and that's why -- no, he

3    wasn't charged because he is a minor bit player in an operation

4    run by Mr. Pendergrass and Mr. McQueen.

5          Look at the checks he received.  $500 here.  $300

6    there.  Not 9000, not 10,000, not 60,000.  Not the money that

7    they received.  But he was truthful.  He didn't want to be

8    here.  He even said something, if you recall his testimony.  He

9    said Mr. Pendergrass is a good -- he is a good guy.  I said,

10   why are you upset?  Because he is a good man.

11         And you are not here to decide whether he is good or

12   bad or otherwise.  What you are charged with doing is to find

13   whether he is guilty based on the evidence.  This is not a good

14   or bad court.  This is not a court of public opinion.  This is

15   a court based on evidence and law.

16         Reasonable doubt?  We talked about it a little bit

17   before, and it is important.  The Government's burden is heavy.

18   It is the Government's burden to prove a case beyond a

19   reasonable doubt.  That is the way this system was built.  And

20   it is the bedrock of this criminal justice system.

21         But the Government does not have to prove the

22   defendant's guilt beyond all possible doubt.  The Government's

23   proof has to exclude any reasonable doubt concerning the

24   defendant's guilt.  And I would argue to you that based on the

25   evidence in this case, both the witness testimony, the

1    documentary evidence, that the Government has met its burden of

2    proving the defendant's guilt beyond a reasonable doubt.

3                    So what is the defense going to argue?  I don't know

4    what they are going to argue to you.  But I suspect it will be

5    one of these things or a variation or more.  It was all

6    Mr. McQueen.  He orchestrated this fraud scheme all by himself

7    and fooled poor Mr. Pendergrass.  Does that make sense based on

8    the evidence?  No, it doesn't.

9                    Mr. Pendergrass -- Mr. McQueen got up there and told

10   you how close the office was, from that jury -- the witness

11   stand to the jury box.  They are all in a room -- small room

12   for months committing this fraud, mailing out thousands of

13   requests, doing multiple photoshop stuff.  They are talking

14   about it.

15                   So the defense would have you believe in that small

16   office over almost a year that Mr. McQueen fooled -- no,

17   Mr. McQueen and Mr. Fitchpatric fooled the defendant.  Is that

18   reasonable?  Is there any evidence of that?  There is not.

19                   And the physical documents, the money shows you he

20   wasn't fooled at all.  They are also going to argue McQueen

21   signed the letters -- Mr. McQueen signed the letters saying the

22   forged documents from the City of Atlanta, Counts 1 through 5.

23   So therefore McQueen did it all by himself.  Mr. Pendergrass

24   should be found not guilty.

25                   That is not true.  That is not the evidence in the

1    case, Number 1.  Number 2, we talked about aiding and abetting.

2    I couldn't just -- my brother was -- I was just as guilty as my

3    brother.  I couldn't absolve my responsibility because I didn't

4    touch the pears.

5            Neither can Mr. Pendergrass absolve his

6    responsibility by arguing I didn't sign this particular letter.

7    That is not what the evidence -- the law says, and that is not

8    supported by the evidence.

9            They are also going to argue to you, well, you

10   shouldn't consider the other uncharged conduct.  That is not

11   the law.  So I'm going to reserve -- I'm going to come back

12   before you after defense counsel makes their argument.  But I

13   want you to -- based on the evidence in this case, not what I

14   tell you, not what the defense counsel tells you -- I want you

15   to make your decision of finding the defendant guilty on all

16   counts in the indictment based only on the evidence.

17           Thank you.

18                      CLOSING ARGUMENT

19           MS. DURRETT:  Hi, we're going to take just a second

20   to see if we can get our slides going.

21           So I wanted to raise this first with you.  It says

22   federal prosecutors when they rise in court represent the

23   people of the United States.  But so do defense lawyers.  We

24   just do it one at a time.

25           And I'm telling you that because it has been my honor

1    to represent Mr. Pendergrass in this case, to come before you

2    and be his advocate and to fight for him and to make sure that

3    you understand the evidence that has been presented in this

4    case.  It has been my honor to do that.

5           And it is a little bit difficult for me to talk about

6    it because I get a little bit excited and emotional when I'm

7    thinking about the Bill of Rights, when I'm thinking about

8    something that we heard about in this case.  The idea that

9    there is a document that is attached to our Constitution that

10   is meant to protect us, the citizens of the United States, from

11   Government overreach.  Right?  That is the document that talks

12   -- Fourth Amendment, we aren't subject to unreasonable searches

13   and seizures; Fifth Amendment, we have a right not to testify

14   against ourselves; Sixth Amendment, we have a right to an

15   attorney for our defense; we have a right to a trial by a jury

16   of our peers.  And those are lofty and important concepts.  And

17   I take my responsibility related to those concepts very

18   seriously.

19          Just like everyone in this courtroom, I have a

20   responsibility and duty to do my job.  The prosecutor has a

21   responsibility.  The Judge has a responsibility.  And you have

22   a responsibility.  And all that we will ask of you, the

23   prosecution and the defense, is that you fairly review the

24   evidence and interpret the evidence in light of the

25   instructions that the Judge is going to give you.

1          Just a second.

2              **(There was a brief pause in the proceedings.)**

3          MS. DURRETT:  And after having heard many of you talk

4     during the voir dire in this case, I know that you are going to

5     take that responsibility seriously.  I trust that you are going

6     to do that when you have the evidence back with you in the jury

7     room.

8          I want to talk with you a little bit about the roles

9     of the prosecutor and the defense.  So you heard a little bit

10    about this when Mr. McQueen was testifying.  We both have rules

11    here in the courtroom.  Right?

12         But what you heard was that I am not permitted to

13    make deals with people who testify in court.  I am not

14    permitted as a defense attorney to offer a benefit to get

15    someone to come into court and testify against a person.

16         These two prosecutors, they are legally permitted to

17    do that.  They are legally permitted to sign a contract with a

18    person and have them come into court and testify to

19    substantially assist in their prosecution of a person.

20         And in this case, they did that with Mr. McQueen.

21    You heard all about it.  And what their agreement with him says

22    is:  Even though you have admitted all sorts of fraud here and

23    even though you face a sentence of up to 128 years in prison --

24    and yes, you heard me say that right.  You heard it yesterday,

25    and you heard it today.  It is 128 years' imprisonment he was

1    facing.  Okay.

2           So the prosecution says, look, if you come in and you

3    testify -- because it has to be substantial.  Remember, the

4    instruction said it can't just be your good faith effort.  It

5    has to be substantial assistance.  If you come in and testify

6    against Allen Pendergrass and we determine that that

7    substantially assisted us in prosecuting him, we might ask the

8    Court to give you less than two years in prison.  Right?

9           And if they decide we don't want to do that, lucky

10   Mr. McQueen has already locked in his deal so that even if the

11   judge wanted to give him more than two years in prison she

12   can't.  And the reason for that is his deal with these people.

13   Okay.  They hold the power here.  He admitted that.  He told

14   you that.

15          So it is perfectly acceptable for you to consider his

16   motivations and his bias and his reasoning for coming into

17   court and saying the things he did.  And the reason I think it

18   is important is we heard a lot of evidence about fraud.  And

19   all of that evidence was tied to Mr. McQueen.  Right?

20          But to make sure he got his substantial assistance,

21   he kept saying me and Mr. Pendergrass, me and Mr. Pendergrass.

22   He did that the first day.  Okay.  And the whole first day I

23   kept having that song Me and Bobby McGee running through my

24   head because that is all he kept saying.

25          The second day he started to forget that that is what

1    he was supposed to be doing.  And he started slipping into,

2    well, I did open the bank account.  I did sign that document.

3    I did that.  And then he would come back and say, well, it was

4    me and Mr. Pendergrass.  So you are allowed to consider all of

5    those things when you are determining whether he was credible

6    on the stand.

7           Now, I thought it was fascinating that the Government

8    thinks you can corroborate his testimony with that of Mr.

9    Fitchpatric.  Right?  He said, put those two together, and you

10   have got a reliable witness there.  Right?

11          The problem is we heard from Mr. Fitchpatric he had a

12   very fuzzy memory about what he did in reference to

13   Mr. McQueen.  Right?  When I asked him, I don't really

14   remember.  He didn't really seem to know what anyone in that

15   office did.  Right?  He was like, I don't know.  I was hired to

16   do websites.  That is all I really remember.  And I definitely

17   did not do work for Mr. McQueen.  I took all of my instructions

18   from Allen Pendergrass.  Right?

19          Well, then Mr. McQueen comes in, and he repeatedly

20   tells you how he instructed Mr. Fitchpatric to lift notaries

21   and to sign documents.  So even their testimonies don't line up

22   together.  So I would tell you take caution when you are

23   listening to the Government if they tell you that you can put

24   those two together.

25          Now, I'm going to talk with you a little bit about

1    the specific counts in the indictment.  I think he is going to

2    pull them up.  I'm not going to go through them -- all the

3    instructions because I know the Government just instructed you

4    on mail fraud.  And I know the Court is going to instruct you.

5         But, you know, what we have to show here is that

6    Mr. Pendergrass was a knowing participant here, that he

7    knowingly either assisted or aided and abetted Mr. McQueen in

8    this.

9         And I think what the testimony revealed was that

10   Mr. Pendergrass had a legitimate asset collection business.  He

11   ran that business with his wife until her death in 2009.  He

12   knew Mr. McQueen on and off.  Mr. McQueen testified that he

13   approached Mr. Pendergrass sometime later.  He was fuzzy on the

14   dates.  2011, 2012.  Somehow his name gets on the lease for the

15   new business.

16        And very quickly into 2012, he is told, look, if you

17   can land this legitimate very large account -- it is called

18   Holland & Knight -- Mr. Pendergrass tells him, I'll give you

19   $150,000.  That is more than the 33 percent that he was -- that

20   he had agreed upon on those accounts with Mr. Pendergrass.

21        So Mr. Pendergrass goes on vacation.  Mr. McQueen

22   tries to land that account, determines that he cannot land it,

23   and just forges the documents.  You heard all of the evidence

24   about that.

25        He forges a business license.  He applies for a bank

account.  He gets the check and deposits it in a bank account
called Holland -- Terrell McQueen doing business as Holland &
Knight.  He then takes money from that account and puts it in
his own personal account.  Then he withdraws some of that money
and starts spending it.  Right?

         He eventually gets called by the Clayton County
police.  He is called into court.  And he is ordered to pay
restitution.  Now, he says, oh, but I only did that because
Mr. Pendergrass told me.

         If you look at the bank records that are provided
here, you will see he paid the SunTrust restitution.  It was a
16,000-dollar check out of his own personal account.  There is
no ties to Mr. Pendergrass with that.  But he wants you to
think somehow Mr. Pendergrass was directing that.

         I tell you about that not because it is charged in
the indictment but because that is the start.  That is the
start of Mr. McQueen's realization that I can just get this
money for free.  Mr. Pendergrass has told me it is just a
numbers game for legitimate asset collection.  Send out as many
letters as you can.  He told you that yesterday.  Allen
Pendergrass tried to teach me to be a salesperson.  It is a
numbers game.  Send out the letters.  Maybe you will get some
people back.  Right?

         Mr. McQueen admitted to you he hated doing sales in
2006.  He was not good at doing sales in 2012 and 2013.  And he

1    realized there was a way to get easy money.  And, man, did he

2    go for it.

3           So he continued to request these Freedom of

4    Information Act lists of people who were owed money.  And that

5    is part of Mr. Pendergrass's legitimate business that he had

6    been doing for years.  Mr. McQueen collects the lists.  He

7    forges the letters.  He forges the documents that go with them;

8    sends them to the City of Atlanta to his close connections that

9    he said at the City of Atlanta; collects the checks; gives them

10   to Mr. Pendergrass; and collects his 33 percent.  That is what

11   his -- that is what his game was.

12          And he said, I really needed that money.  Right?  I

13   mean, you heard him so many times talk about how much he needed

14   the money.  So he went for the easy route.  And I think you'll

15   just see that as the evidence.  You have heard that from the

16   evidence.

17          But I do want to talk to you about the specific

18   counts.  If we can go -- okay.  Now, you heard from my

19   colleague, Ms. Strickland, at the beginning of this case about

20   how there might be some shiny things that the Government is

21   going to wave in front of your face.  Right?  The shiny things

22   are all of that conduct that they talked about that is not

23   charged here in this indictment.  These instances that are

24   listed here -- you'll see them in your indictment when you get

25   it -- they are the basis of nine of the ten counts in the

1    indictment.  Okay?  Nine of the ten charges here involve these

2    transactions.  Okay?

3            Now, you remember Mr. Pendergrass told us he agreed

4    that he is going to pay the restitution for all of those

5    counts.  Right?  He said, I'm going to pay all $137,000 of

6    that, but I don't have to plead to those things.  Right?

7            So what we wanted to make sure you understood because

8    we talked about it in the case is that there is a stipulation

9    between the parties in this case.  It was read to you by me,

10   and it was shown to you.  And you are going to be able to take

11   it back with you into the jury room.

12           And I'm going to read it to you again, and I'm going

13   to explain what it means.  So a stipulation is an agreement.

14   So we have come to an agreement with the Government about

15   something that you can take back and you can take as the truth

16   in this case.  You will be instructed by the Judge that you can

17   accept this as true.

18           The stipulation says:  In this case, the parties have

19   entered into an agreement as to certain facts.  That is, they

20   have agreed that certain things are true.  These agreements are

21   referenced to as a stipulation of fact.  A stipulation of fact

22   that the parties have agreed to is evidence, and you may have

23   it with you in your deliberations.  You should accept the

24   stipulation as true without the need for further evidence of

25   the facts stated.

1          And then the next slide is the stipulation.  It says,

2    the Government, these prosecutors, in requesting that certain

3    evidence be admitted in this case previously represented in

4    court documents that the specific counts alleged in the

5    indictment involve instances where Co-defendant McQueen, not

6    Defendant Pendergrass, signed and sent the alleged forged

7    documents at issue in the charges against Mr. Pendergrass.

8          What does that mean?  It means that these prosecutors

9    told this judge that those counts listed in the indictment --

10   those nine of ten counts I'm talking about -- they were

11   signed -- the forged documents were signed and sent by

12   Mr. McQueen, not Mr. Pendergrass.

13         Okay?  If you have questions about that, I urge you

14   to read that stipulation again when you have it back with you

15   in the room.  When you are looking at what the actual charges

16   in this case are, not the white noise, not the shiny objects,

17   but what the actual charges are, I want you to refer to that

18   stipulation to see if it matches up with what the Government is

19   telling you.

20         Okay.  The Government talked a little bit about

21   aiding and abetting.  And, again, you are going to get

22   instructions from the Judge.  So you don't have to remember

23   this or write this down.  But I want to just put it in your

24   mind.

25         If you look at -- Mr. Pendergrass is charged in

```
1     Counts 1 through 5 and 7 through 10 as aiding and abetting
2     Mr. McQueen.  Okay.  At the very bottom of this instruction, it
3     tells you, but finding that a defendant is criminally
4     responsible for the acts of another person requires proof that
5     the defendant intentionally associated with or participated in
6     the crime.  Not just proof that the defendant was simply
7     present at the scene of the crime or knew about it.
8              In other words, you must find beyond a reasonable
9     doubt that Mr. Pendergrass was a willful participant and not
10    merely a knowing spectator.
11             I think that when you consider the evidence in this
12    case and you consider this instruction, you will determine that
13    he cannot be found guilty on these counts.
14             The next count to consider is the money laundering
15    conspiracy.  And this is Count 6.  Again, you are going to be
16    instructed here.  But what I -- a conspiracy, if the Government
17    didn't tell you, is an agreement to do something illegal.
18    Okay.  So that is the short of it.
19             Okay.  You are going to be instructed by the Judge.
20    But you are going to have to determine did Mr. Pendergrass make
21    an agreement with Mr. McQueen to launder money.  That is it.
22    It is not -- he is not charged with conspiracy anywhere else in
23    this indictment.  It is only Count 6.  Did they have an
24    agreement to launder money?
25             And the Government has talked a lot about stealing
```

1    money and things like that.  This is not a theft case.  This is

2    a fraud case.  Who committed the fraud, and who committed the

3    money laundering?

4           Okay.  The next slide tells you a little bit more.

5           Again, in terms of the conspiracy, simply being

6    present at the scene of an event or merely associating with

7    certain people and discussing common goals or interests does

8    not establish proof of a conspiracy.

9           Also, a person who does not know about a conspiracy

10   but happens to act in a way that advances some purpose of one

11   does not automatically become a conspirator -- a

12   co-conspirator.

13          So when the Government is telling you, but

14   Mr. Pendergrass provided the lists, he used the lists from

15   Mr. Pendergrass, Mr. Pendergrass cashed the checks, you have to

16   find that he knew that Terrell McQueen had committed that fraud

17   and that he was depositing proceeds of the fraud.

18          There has been no evidence of that.  There has been

19   no evidence that he knew that.  So I think when you consider

20   the instructions, you will determine he can't be found guilty

21   of money laundering conspiracy.

22          The next slide is a little bit more about money

23   laundering.  Just in case -- and these instructions will be

24   given to you.  But to know that the money or property involved

25   in the transaction came from some kind of unlawful activity is

1    to know that the money or property came from an activity that

2    is a felony under state, federal, or foreign law.  And in this

3    case, the alleged unlawful activity is the mail fraud charged

4    in Counts 1 through 5.

5         So remember how I told you those charges I put up on

6    the screen are the basis for nine of the ten counts?  Guess

7    what?  They are also the underlying basis for the money

8    laundering conspiracy.  Okay.  So the five counts that are up

9    there, they are charged as mail fraud in 1 through 5.  They are

10   charged as aggravated identity theft in 7 through 10.

11        Count 6 is predicated on those counts.  If you find

12   that Mr. Pendergrass was not a knowing participant in mail

13   fraud, you can't find him guilty of money laundering conspiracy

14   because he had to be laundering the proceeds of the fraud.  He

15   had to knowingly do that.  And I don't think you can find that

16   based on the evidence we have heard.

17        I know the Government talked to you about the

18   instructions.  So I'll move past to -- and I do want to talk

19   about the one that starts with the term "with."  It is the next

20   one.  Again, this is still talking about money laundering

21   conspiracy.  And you are going to have to find that

22   Mr. Pendergrass committed transactions, made deposits or wrote

23   checks -- did some sort of financial transaction with the

24   intent to promote that carrying on of that mail fraud.

25        So you have to find that he deposited the checks or

1   wrote the checks or used the money from the account to promote

2   Mr. McQueen's mail fraud.  You can't find that he did that

3   because there is no evidence that he knew about Mr. McQueen's

4   mail fraud.  So you'll see those instructions when you get back

5   there.

6          Aggravated identity theft.  Again, when you are back

7   with the indictment, you will be able to see that Counts 1

8   through 5 correspond with Count 7 through 10.  That the victims

9   named in Count 7 through 10 are the same people listed in those

10   first five counts.  Okay.  So you will be able to see the mail

11   fraud is the basis for everything here.

12          The next one is the theory of defense.  The Court is

13   going to instruct you on something called the theory of

14   defense.  This is the theory that we get to put forward so that

15   you understand what Mr. Pendergrass thinks about the evidence

16   in this case, what we think the evidence shows.

17          The theory of defense says a conviction on the counts

18   charged in this case cannot be based on the finding that the

19   defendant was simply present at the scene of the crime, knew

20   about it, or was a spectator.

21          Now, remember you already heard that instruction.

22   Right?  That is a whole separate instruction that the Judge is

23   going to give you.

24          The next part is our theory.  As to Counts 1 through

25   5, the defendant contends that Mr. Pendergrass did not know

1    about Mr. McQueen's specific acts of fraud before they

2    occurred.  And therefore the Government has not shown that

3    Mr. Pendergrass possessed the legally required intent to

4    defraud with respect to the offenses charged in Counts 1

5    through 5.

6          The theory of defense as to Count 6, money

7    laundering, it says -- same instruction at the top.  The

8    defendant contends that Mr. Pendergrass did not know that the

9    checks related to the schemes outlined in Count 1 through 5

10   were proceeds of fraud rather than the product of lawful asset

11   collection efforts.

12         Remember he had that asset collection business;

13   right?  Therefore the defendant contends that the Government

14   has not shown that Mr. Pendergrass knowingly conducted

15   financial transactions with the proceeds of that fraud.

16         For the same reason, the defendant contends that

17   Mr. Pendergrass did not knowingly conduct any financial

18   transactions with the intent to promote the carrying on of the

19   fraudulent scheme.  And we think this theory matches up with

20   the evidence that you heard in this case.

21         The theory of defense as to aggravated identity

22   theft -- remember that is the use of someone's -- the

23   possession, transfer, or use of someone's personal identifying

24   information in the course of the fraudulent activity --

25   right? -- in relation to that fraudulent activity.

```
1              The defendant contends that the Government has failed

2    to prove beyond a reasonable doubt that the defendant

3    intentionally associated with or participated in transferring,

4    possessing, or using the means of identifications outlined

5    here.  And, again, we think that matches up with the evidence.

6              Now, when we started this case, my colleague,

7    Ms. Strickland, talked to you.  And she said we have a lot of

8    questions about the investigation in this case.  We have a lot

9    of questions about the prosecution.  And we think when you get

10   back there in the jury room you're going to have a lot of

11   questions too.  And we don't really have a lot of answers for

12   you.

13             So some of the questions that we have:  What happened

14   to all those computers?  That is one of the first ones; right?

15   They seized nine computers from the office where Mr. McQueen

16   and Mr. Pendergrass were working.  Right?  You have heard

17   testimony about that.  A lot of people talked about it.

18             Mr. McQueen testified that he used a MacBook Pro that

19   he personally bought.  He testified that he personally bought a

20   MacBook Pro for Eric Fitchpatric.  All of those computers were

21   seized.  All of them were seized by the Government.

22             None of that information was presented to you by the

23   Government.  What happened to the computers?  What happened to

24   all of that evidence of fraud that is on those computers?  What

25   happened to all of the databases that they say they used?
```

1    Where are the emails from those computers?  That is one of our

2    questions.

3              The next question --

4              THE COURT:  Slow down a little bit.  All right?

5              MS. DURRETT:  I'm sorry.

6              THE COURT:  You have enough time.  So slow down a

7    little.  Thank you.

8              MS. DURRETT:  So one of the things the Government

9    talked to us about was they asked Mr. McQueen did

10   Mr. Pendergrass keep notebooks of information in the office.

11   And the answer was, oh, yes, absolutely he did.  And they

12   pointed to some things.

13             My question is:  Who keeps meticulous records of

14   their fraudulent transactions?  I don't think people do.  But

15   who keeps records of their business transactions?  People who

16   are running a legitimate business.

17             Mr. McQueen testified all of these notebooks contain

18   the evidence that Mr. Pendergrass kept of the checks, of the

19   letters he would write, to collect assets.  So there is the

20   evidence.  I don't think that it would be a normal course of a

21   fraudulent scheme for someone to collect and keep all of their

22   fraudulent documents.  Okay.

23             So who collects meticulous records?  Legitimate

24   business people do.

25             The next slide.

1          Who has their employees clock in?  A person who is

2    running a legitimate business.  And, again, you heard testimony

3    Mr. Pendergrass -- sometimes he was a grumpy boss.  Remember?

4    He yelled at people and didn't like the way things went.  But

5    he had a time clock there with recent time sheets -- remember

6    they were arrested in September.  And the time sheets came from

7    August -- where people were clocking in and writing down their

8    hours.

9          Even Mr. McQueen and Mr. Fitchpatric told us that

10   people were running skip traces.  They were searching these

11   lists to find where people had unclaimed funds.  So they were

12   legitimate employees working in the business.

13         The next one.  Now, this one, I think, was supposed

14   to be an aha moment for the Government -- right? -- where you

15   were supposed to say, there is Mr. Pendergrass in the bank.

16   Well, he is a legitimate business person, and he went to the

17   bank and deposited checks.

18         Now, what we wanted to make sure you understood was

19   he did not walk into the bank and trade the check for money.

20   He did not cash the check and leave the bank and spend that

21   money.  He deposited the check into his business bank account.

22   He did it in broad daylight.  He signed his own name to the

23   documents.  There is nothing here that is suggesting fraud on

24   behalf of Mr. Pendergrass.

25         The next one.  Okay.  Now, here's some more questions

1   we have.  Who opens his bank accounts -- and I say plural --

2   bank accounts online?  Who makes his deposits and withdraws

3   through the ATM so he doesn't have to go into the bank and be

4   on video; right?  Who uses multiple aliases?  Gene Bloom, Dusty

5   Fager, Chris Carter.  Remember, he told us, for a while, I was

6   just walking around telling people I was Chris Carter.  I would

7   conduct my business as Chris Carter.

8          Who buys the computer for the person who forges all

9   the notary documents?  Remember, he said, I bought Eric

10  Fitchpatric a MacBook Pro.  And the Government tried to suggest

11  that that came from Mr. Pendergrass's money.  Remember that?

12  The Government said, who bought that computer?  And Mr. McQueen

13  said, I bought it with my own money.  Right?  So who creates

14  all the fraudulent business licenses?  It is Mr. McQueen.

15         All right.  The next one.  Now, this one I love

16  because it shows at least some of the signatures that

17  Mr. McQueen admitted to using.  Right?  He came in here, and he

18  testified, oh, that is me.  I'm Chris Carter, up in the top.

19  I'm also Dusty Fager that I used to open a bank account.  I'm

20  also Greg Hickman that I forged on some other documents that

21  could be sent out in this case.  I also took the time to

22  create -- to apply for several EIN numbers, employee

23  identification numbers, in the name of businesses I didn't own

24  or run.  And then I also created fraudulent business licenses

25  that I could use to open bank accounts.

1          That was Mr. McQueen who did that.  Now, he wanted to

2     suggest that that was all at the instruction of Allen

3     Pendergrass.  But there was no evidence of that.  Remember, his

4     motivation for testifying is to say, look at all the bad things

5     I did, but I want to make sure I get less than two years.  And

6     the only way to do that is to say Mr. Pendergrass also did it.

7          The next one.  Okay.  This is where he told us about

8     that initial transaction.  Remember how he talked about the

9     Holland & Knight check?  He forges a document, and he sends it

10    off in the name of Gene Bloom.  He also -- in addition to that

11    document, he signs the letter in the name of Steve Cohen, an

12    attorney at Holland & Knight.  He signs that letter, and he

13    admitted that to us.

14          He then created the fraudulent business license, and

15    this is one of my favorite things that happened in this case.

16    He opens a bank account in the name of Terrell McQueen doing

17    business as Holland & Knight.  And look how he signs the check.

18    He writes Holland & Knight TM on the check.  That is all from a

19    fake bank account that he made up, a bank account that he made

20    up so he could deposit fraudulent funds.

21          The next one.  The Government admitted this example

22    of Mr. McQueen's handwriting.  Right?  So they put it up there.

23    And he said, oh, that is my handwriting.  I write inspirational

24    notes to myself during the workday.

25          So one of the things I think is interesting is it is

1   going to give you a chance to really look at his handwriting

2   and all of these writing samples that we have of him.  The

3   Government seems to suggest that Mr. McQueen and

4   Mr. Pendergrass or Mr. Fitchpatric could forge notary

5   documents, could lift seals, sign signatures.

6          But apparently the Government wants you to believe

7   that the only signature in the entire world that Mr. McQueen

8   and Mr. Fitchpatric can't sign or don't know how to forge is

9   Mr. Pendergrass's signature.  Right?  Because they put up all

10  the documents and they say, who signed this?  Oh, that is Mr.

11  Pendergrass.  Who signed this?  Oh, that is Mr. Pendergrass.

12         Remember, the Government just told you how

13  distinctive it is.  What you heard from the fraudy fraudsters

14  who testified is that they could lift signatures, they could

15  copy signatures.  You also saw them practicing writing

16  signatures.

17         So the suggestion that every single document that you

18  have seen in this case was somehow signed by Allen

19  Pendergrass -- it just isn't true.  It isn't borne out by the

20  evidence.

21         Then you remember these guys.  Mr. Fitchpatric, the

22  forger.  Now, he is -- the Government tried to suggest that the

23  only reason Allen Pendergrass had him around is because he was

24  forging things.  But you remember that he said Allen hired him

25  to do websites.  Right?  He was supposed to come on board.  He

1    was supposed to make websites.  He did a website for Asset

2    Financial Recovery.  And then we hear all this testimony about

3    how McQueen buys a computer for him.  McQueen gives him

4    assignments about lifting notaries and forging documents.  They

5    worked together -- these two.  They worked together.  I don't

6    think they are credible witnesses.

7         Okay.  Now, the Government talked to you about how

8    they were going to take their burden to prove their case beyond

9    a reasonable doubt very seriously.  I know you will also take

10   it seriously.  When you leave this place in a week or two and

11   people are asking you, hey, did you find that guy innocent or

12   guilty, what happened in that case, I hope that you will

13   correctly tell them this wasn't a case where I was asked to

14   find if someone is innocent or guilty.  It was a case where I

15   was asked to determine did the Government attorneys prove their

16   charges beyond a reasonable doubt.  Did they present enough

17   evidence to me to get me over that burden to say they proved

18   what they charged beyond a reasonable doubt?

19        And I would submit to you the answer is no --

20   resoundingly no in this case.  So I think when you get back in

21   the jury room and you start your deliberations, you will return

22   a verdict of not guilty on all counts.

23        Thank you.

24                    CLOSING ARGUMENT

25        MR. BROWN:  As I told you before, your responsibility

1    is to decide this case based on the evidence, not based on

2    sympathy or prejudice against either party.

3            Let's talk about what the defendant's counsel didn't

4    want to talk about.  You are going to have evidence of

5    Hemisphere, Inc.  You heard from Mr. Gordon Giffin.  If you

6    look on the letter that was signed by Mr. Pendergrass in

7    evidence, Exhibit Number 13, that was sent in October 2012 --

8    why does that matter?

9            Mr. McQueen testified and the evidence established

10   that Holland & Knight and the other fraud that Mr. Pendergrass

11   and McQueen were doing happened after that date.  Mr. McQueen

12   testified, I was not working there doing asset recovery in

13   October.  It was later that year that I started.

14           And if you look at the Holland & Knight letter, you

15   look at all of the other letters that are sent, they are after

16   this date.  Well, why is that important?  Because Mr.

17   Pendergrass was doing this fraud long before or before

18   Mr. McQueen stepped back into his life to work with him for the

19   third time.

20           Mr. Pendergrass opened an account, Hemisphere, Inc.

21   He deposited the stolen check from the City of Atlanta that he

22   had used -- that he obtained with that forged power of attorney

23   that Mr. Giffin said, I did not sign.  And he deposited it into

24   an account that he controlled.  The same MO, which is modus

25   operandi, the same way that all of the other charged counts

1    were done.  A cover letter that either Mr. McQueen or

2    Mr. Pendergrass signed.  A forged power of attorney and a

3    lifted notary and a bank account to deposit the fraudulent

4    funds.

5            And, once again, who is running the show?  Who is in

6    charge?  Mr. Pendergrass.

7            The defense theory of the case is just their theory.

8    But there is no evidence for their theory.  The Court is going

9    to instruct you you must base your decision on the evidence.

10   Mr. -- as I testified or told you before, he testified

11   truthfully.  He said over and over and over again

12   Mr. Pendergrass was the boss.  He paid them.  He sent the

13   forged signatures and power of attorneys to Mr. Pendergrass.

14   Mr. Fitchpatric had no reason to come here and lie on someone

15   he described as a good person.  He did not want to be here.  He

16   told you the truth about who was running the show,

17   Mr. Pendergrass.

18           The stipulation of the parties.  McQueen testified

19   that he did sign the cover letters.  That is not in dispute.

20   But what the evidence showed is that Mr. Pendergrass and

21   Mr. McQueen were working together on all of the five counts

22   charged in Counts 1 through 5, the money laundering and the agg

23   ID.

24           And the reason why you know they are working together

25   is not just because he said it but because the evidence shows

it.  These fraudulent funds are deposited into an account or accounts controlled by Mr. Pendergrass.  Who controls the money?  Mr. Pendergrass.

Atlanta Quarterback Club.  We already talked about Hemisphere.  We have not talked much about Lee Family Trust. But you heard from Michael Cohen.  And he was honest.  He came in here and said, listen, I can't identify the person who came in and shook my hand and said it was Allen Pendergrass.  But I sent him an email.  You have a copy of that email.  Who is it sent to?  Allen Pendergrass.  The same email he used for his P.O. Box.  The same email that is listed in other documents. The same email that he lists to get the answering service.  You will see that same email because that is his email.  There is no evidence that anyone else used that email.  Zero.  He ties Mr. Pendergrass right back into it.

But more so than that, you will have the Lee Family Trust bank account.  Who is controlling the money in this thing?  Look at that account.  Who signed that account? Mr. McQueen is not on that account.  It is Mr. Pendergrass. And in that account is a check that was stolen from Harris County, Texas, in the amount of $5000 that Mr. McQueen sat up there and said, I got these checks for $168,000.  Who do I give them to?

I didn't want to make any moves without the boss, the man.  He brings those $168,000 worth of checks to

1    Mr. Pendergrass, and he deposits one of them into an account he

2    opened.  And he gives the rest to who?  Mr. Cohen.  Mr. Cohen

3    said Mr. Pendergrass came in and gave me the checks, and I

4    deposited them in my account.  Similar scheme.  Controlling the

5    money.  At the front of the fraud, Mr. Pendergrass.

6              Find him guilty based on the evidence.

7              So I want to thank you for your attention to this

8    trial.  It has been a long week.  I know you guys didn't expect

9    to spend your whole week here.  But I want you to base your

10   decision in this case not on what I am telling you but based on

11   the evidence and hold Mr. Pendergrass responsible for his

12   actions in Counts 1 through 5, Count 6 and Count 7 through 10.

13             Thank you.

14             THE COURT:  Does anyone need to use the restroom

15   before I provide you with the Court's instructions?  Does

16   anyone need to stand up and just breathe for a second?

17                          CHARGE

18             THE COURT:  Ladies and gentlemen, everyone has

19   thanked you.  And I have before.  But I do know it takes a

20   great deal of patience and more attention than we normally have

21   to do in just sitting and listening without talking ourselves

22   or typing on a computer at the same time or writing notes and

23   about something else.

24             And I just -- I know that we all greatly appreciate

25   this, and you have taken your oath very seriously, and you have

1    also put up with a lot during the course of the week of hurry

2    up and wait.  So I want to thank you again.

3           It is my duty now to instruct you on the rules of law

4    that you must follow and apply in deciding this case.  When

5    closing argument is completed, which it has been, you will go

6    to the jury room and begin your discussions.  And we call those

7    deliberations.

8           It will be your duty to decide whether the Government

9    has proven beyond a reasonable doubt the specific facts

10   necessary to find that the defendant, Mr. Allen Pendergrass, is

11   guilty of each individual crime charged in the indictment.

12          Your decision must be made based only on the evidence

13   presented during the trial.  You must not be influenced in any

14   way by either sympathy or prejudice against the defendant or

15   the Government.

16          You must follow the law as I explain it, even if you

17   do not agree with the law.  And you must follow all my

18   instructions as a whole.  You must not single out or disregard

19   any of the Court's instructions on the law.

20          The indictment or formal charge against

21   Mr. Pendergrass is not evidence of guilt.  The law presumes

22   that every defendant is innocent.  Defendant Pendergrass does

23   not have to prove his innocence or produce any evidence at all.

24   A defendant does not have to testify.  And as here, the

25   defendant chose not to testify.  You cannot consider that in

1    any way while making your decision or making any inferences

2    based on his decision to testify -- not to testify.  So it is

3    just not to be considered at all.

4         The Government must prove guilt beyond a reasonable

5    doubt as to each individual offense charged.  So if the

6    Government fails to do so as to any count or charge, you must

7    find Mr. Pendergrass not guilty on that specific count or

8    charge.  It is very important that you are just -- you are

9    doing this count by count separately.

10        The Government's burden of proof is heavy.  But it

11   does not have to prove a defendant's guilt beyond all possible

12   doubt.  The Government's proof only has to exclude any

13   reasonable doubt concerning the defendant's guilt.

14        A reasonable doubt is a real doubt based on your

15   reason and common sense after you have carefully and

16   impartially considered all of the evidence in this case.  Proof

17   beyond a reasonable doubt is proof so convincing that you would

18   be willing to rely and act on it without hesitation in the most

19   important of your own affairs.

20        If you are convinced that Mr. Pendergrass has been

21   proven guilty beyond a reasonable doubt on specific -- a

22   specific criminal offense charged, say so.  If you are not

23   convinced of that, say so.

24        As I said before, you must consider only the evidence

25   that I have admitted in the case.  Evidence includes the

testimony of witnesses, stipulations, and the exhibits

admitted.  But anything the lawyers say is not evidence and is

not binding on you.

You should not assume from anything that I have said

that I have any opinion about any factual issue in this case.

Except for my instructions to you on the law or directions as

to consideration of evidence, you should disregard anything I

may have said during the trial in arriving at your own decision

about the facts.  Your own recollection and interpretation of

the evidence is what matters.

In considering the evidence, you may use reasoning

and common sense to make deductions and reach conclusions.  You

should not be concerned about whether the evidence is direct or

circumstantial.  Direct evidence is the testimony of a person

who asserts that he or she has actual knowledge of a fact, such

as an eyewitness.  Circumstantial evidence is proof of a chain

of facts and circumstances that tend to prove or disprove a

fact.  There is no legal difference in the weight you may give

to either direct or circumstantial evidence.

In this case, the parties have entered into an

agreement as to certain facts.  That is, they have agreed that

certain things are true.  These agreements are referred to as

stipulations of fact.  A stipulation of fact that the parties

have agreed to is evidence, and you may have it with you during

your deliberations and will have it.  You should accept the

1  stipulation as true without the need for further evidence of
2  the facts stated.
3          The Government must prove beyond a reasonable doubt
4  that the defendant, Allen Pendergrass, was the person who
5  committed each charged crime at issue here.  If a witness
6  identifies a defendant as the person who committed the crime,
7  you must decide whether the witness is telling the truth.  But
8  even if you believe the witness is telling the truth, you must
9  still decide how accurate or reliable the identification is.
10         I suggest that you ask yourself questions, such as:
11 Did the witness have an adequate opportunity to observe the
12 person at the time the crime was committed?  How much time did
13 the witness have to observe the person?  How close was the
14 witness?  Did anything affect the witness' ability to see or
15 hear?  Did the witness know or see or hear the person at an
16 earlier time?  Are there circumstances, such as the passage of
17 time or brain injury, that might affect the witness'
18 recollection or ability to accurately testify regarding what
19 the witness saw or currently sees?
20         You may also consider the circumstances surrounding
21 the identification of the defendant such as the circumstances
22 and context in which the defendant was presented to the witness
23 for identification and the length of time between the crime and
24 the identification of the defendant.  And you must consider the
25 credibility and self-interest of witnesses that I will discuss

1    in a moment.

2           After examining all of the evidence, if you have a

3    reasonable doubt that Mr. Pendergrass was the person who

4    committed the crime, you must find him not guilty.  When I say

5    you must consider all of the evidence, I do not mean that you

6    must accept all of the evidence as true or accurate.  You

7    should decide whether you believe what each witness had to say

8    and how important that testimony was.  In making that decision,

9    you may believe or disbelieve any witness in whole or part or

10   you cannot believe them at all.

11          The number of witnesses testifying concerning a

12   particular point does not necessarily matter.  To decide

13   whether you believe any witness, I suggest that you ask

14   yourself a few questions.  Did the defendant impress you as one

15   who was telling the truth?  Did the witness have any particular

16   reason not to tell the truth?  Did the witness have a personal

17   interest in the outcome of the case?  Did the witness seem to

18   have a good memory?  Did the witness have the opportunity and

19   ability to accurately observe the things he or she testified

20   about?  Did the witness appear to understand the questions

21   clearly and answer them directly?  Did the witness' testimony

22   differ from other testimony or other evidence?  What was the

23   witness' manner when testifying?  You may also consider any

24   other factors that bear on the believability of a witness'

25   testimony.

1          You should also ask yourself whether there was

2     evidence that a witness testified falsely about an important

3     fact and ask whether there was evidence that at some other time

4     a witness said or did something or did not do -- say or do

5     something that was different from the testimony the witness

6     gave during the trial.

7          To decide whether you believe a witness, you may

8     consider the fact that the witness has been convicted of a

9     felony or a crime involving dishonesty or a false statement.

10    But keep in mind that a simple mistake does not mean a witness

11    was not telling the truth as he or she remembers it.  People

12    naturally tend to forget some things or remember them

13    inaccurately.

14          So if a witness misstated something, you must decide

15    whether it was because of an innocent lapse in memory or an

16    intentional deception.  The significance of your decision may

17    depend on whether the misstatement is about an important fact

18    or about an unimportant detail.

19          Now, you must consider some witnesses' testimony with

20    more caution than others.  In this case, the Government has

21    made a plea agreement with Mr. Pendergrass's co-defendant,

22    Terrell McQueen, in exchange for Mr. McQueen's testimony.  Such

23    plea bargaining, as it is called, provide for the possibility

24    of a lesser sentence than the co-defendants would normally

25    face.

1            Plea bargaining is lawful and proper, and the rules

2    of this Court expressly provide for it.  But a witness who

3    hopes to gain more favorable treatment may have a reason to

4    make a false statement in order to strike a good bargain with

5    the Government.  So while a witness of that kind may be

6    entirely truthful when testifying, you should consider the

7    testimony with more caution than the testimony of other

8    witnesses.  And the fact that a witness has pled guilty to an

9    offense is not evidence of the guilt of any other person.

10           During the trial, you heard evidence of acts

11   allegedly done by the defendant and/or others that are not

12   charged in the indictment.  In other words, they are not the

13   offenses that you are going to be dealing with as to finding

14   Mr. Pendergrass guilty or not guilty.

15           You have been provided this information because the

16   Government believes these acts are intrinsic to the charged

17   conduct.  That is, that they are necessary to complete the

18   story of the charged crimes.  I caution you that the defendant

19   is on trial only for the specific crimes charged in the

20   indictment and not based on any other acts.  You are here to

21   determine from the evidence in this case whether the defendant

22   is guilty or not guilty only of the specific crimes charged in

23   the indictment.

24       You will see that the indictment charges that some crimes

25   were committed on or about a certain date.  The Government does

 1    not have to prove that the offenses occurred on those exact

 2    dates.   The Government only has to prove beyond a reasonable

 3    doubt that the crimes were committed on dates reasonably close

 4    to the dates alleged.

 5        The word knowingly means that an act was done voluntarily

 6    and intentionally and not because of a mistake or by accident.

 7    The word willfully means that the act was committed voluntarily

 8    and purposefully with the intent to do something the law

 9    forbids, that is, with a bad purpose to disobey or disregard

10    the law.

11        While a person may have acted with the intent to do

12    something the law forbids before you can find -- let me just

13    start that again.

14        While a person may have acted with the intent to do

15    something the law forbids, before you can find that person

16    acted willfully, the person need not be aware of the specific

17    law or rule that his conduct may be violating.

18        Each of the ten counts of the indictment charges a

19    separate crime.   You must consider each crime and the evidence

20    relating to it separately.   If you find Mr. Pendergrass guilty

21    or not guilty of one crime, that must not affect your verdict

22    or review for any other alleged crime.   You must independently

23    evaluate each charge and determine for each one based on the

24    evidence presented for that specific charge whether Defendant

25    Pendergrass is guilty or not guilty.

1        I caution that you Mr. Pendergrass is on trial for only

2    the specific crimes charged in the indictment.  You are here to

3    determine from the evidence in this case whether

4    Mr. Pendergrass is guilty or not guilty of one or more of those

5    specific crimes.

6        You must never consider punishment in any way to decide

7    whether the defendant is guilty.  If you find Mr. Pendergrass

8    guilty, the punishment is for me as the judge alone to decide

9    later.

10       Now I'm going to talk to you about the specific offenses

11   charged -- the law relating to them.  The indictment charges

12   ten separate crimes called counts against Mr. Pendergrass.

13   Each count has a number.  And you will be given a copy of the

14   indictment to refer to during your deliberations.

15       Now, I wonder could you put the indictment up there so we

16   can -- they can see that.

17       Thank you, Mr. Martin.  If we could just go down.  All

18   right.

19            COURTROOM DEPUTY CLERK:  It acts like it is trying to

20   do it, but it won't.

21            THE COURT:  That's fine.

22            COURTROOM DEPUTY CLERK:  I'm sorry, Judge.

23            THE COURT:  That's all right.

24            Mr. Martin, would you just go ahead and just take

25   count -- Page 6, for instance, of the indictment and just walk

1    in front of the jury.  I realize they are not going to be able

2    to read it.  But just sort of so they can see how this is laid

3    out, Mr. Martin.

4             Thank you.

5             This is just a sample page.  We will give you one

6    copy of this when you go there.  And you can all pass it

7    around.  Maybe we should make a few more copies because we

8    haven't been able to see it.  So you can all have a copy while

9    you are back there.

10            Can you pull it up?

11            MR. STAHEL:  I have it up if he switches the thing.

12            THE COURT:  All right.

13            COURTROOM DEPUTY CLERK:  Perfect.

14            MR. STAHEL:  Page 6, Count 7; right?

15            THE COURT:  Will you be able to pull up the verdict

16   form later on for me, sir?  We'll send it to you.

17            Annie, can you send them the verdict form?  Thank

18   you.

19            MR. STAHEL:  I'm sorry, Your Honor.  It is not -- it

20   is on my screen but not --

21            THE COURT:  All right.  That is fine.  I think we'll

22   just proceed.  We're going to have more of an issue,

23   Mr. Martin, about -- we need to try to get the verdict form up

24   though when we -- for when I get to that point.

25            I don't know.  Maybe Ms. Boring can send it to the

1    Government, and they can pull it up.

2          In any event, each -- you will see each count charged

3    separately, and you will also see that the Government has an

4    introduction and alleges some facts.  It is not a lot.  It is

5    just simply sort of a summary of what they are charging here.

6          And the indictment charges ten separate crimes, as I

7    said.  They are called counts.  And you will -- a copy will go

8    back -- a few copies, under the circumstances, will go back so

9    that you can share them as you want.

10          Counts 1 through 5 charge that Mr. Pendergrass and

11   Mr. McQueen, aided and abetted by each other, committed the

12   offenses of mail fraud.  Count 6 charges that Mr. Pendergrass

13   conspired with Mr. McQueen to engage in money laundering.

14   Count 7 through 10 charge that Defendant Pendergrass and

15   Mr. McQueen, aided and abetted by each other, committed the

16   offenses of aggravated identity theft.  I will explain the

17   different counts in a moment.

18          Now, sometimes a statute identifies alternative ways

19   in which an offense may be proven and demonstrated.  Sometimes

20   the indictment uses the word "and" and in reference to these

21   all -- and it is done in reference to these alternative means.

22   If only one of the alternatives is proved beyond a reasonable

23   doubt for a specific offense, that is sufficient for conviction

24   on that specific offense.  However, you must all agree

25   unanimously regarding what that specific alternative is.

1          Counts 1 through 5 and 7 through 10 of the indictment

2     charge that Mr. Pendergrass and another individual,

3     Mr. McQueen, aided and abetted one another in committing the

4     acts of mail fraud and aggravated identity theft.  It is

5     possible to prove a defendant guilty of a crime even without

6     evidence that the defendant personally performed every act

7     charged.

8          Ordinarily, any act a person can do may be done by

9     directing another person or agent, or it may be done by acting

10    with or under the direction of others.  A defendant aids and

11    abets a person if the defendant intentionally joins with the

12    person to commit a crime.  A defendant is criminally

13    responsible for the acts of another person if the defendant

14    aids and abets the other person.  A defendant is also

15    responsible if the defendant willfully directs or authorizes

16    the acts of an agent, employee, or other associate.

17         But finding that a defendant is criminally

18    responsible for the acts of another person requires proof that

19    the defendant intentionally associated with or participated in

20    the crime; not just proof that the defendant was simply present

21    at the scene of a crime or knew about it.

22         In other words, you must find beyond a reasonable

23    doubt that Mr. Pendergrass was a willful participant and not

24    merely a knowing spectator.

25         Now we're going to talk specifically about mail

1    fraud.  It is a federal crime to use the United States mail in

2    carrying out a scheme to defraud someone.  Mr. Pendergrass can

3    be found guilty of this crime only if all of the following

4    facts are proved beyond a reasonable doubt.

5              First, that Mr. Pendergrass knowingly devised or

6    knowingly participated in a scheme to defraud someone by using

7    false or fraudulent pretenses, representations, or promises.

8              Second, that the false or fraudulent pretenses,

9    representations, or promises were about a material fact.

10             Third, that Mr. Pendergrass intended to defraud

11   someone.

12             And, fourth, that Mr. Pendergrass used the United

13   States Postal Service by mailing or by causing to be mailed

14   something meant to help carry out the scheme to defraud.

15             And that is what has to be proven as to each of the

16   incidents that are identified in the indictment.

17             A scheme to defraud means any plan or course of

18   action intended to deceive or cheat someone out of money or

19   property using false or fraudulent pretenses, representations,

20   or promises.

21             A statement or representation is false or fraudulent

22   if it is about a material fact, it is made with intent to

23   defraud, and the speaker either knows it is untrue or makes it

24   with reckless indifference to the truth.  It may be false or

25   fraudulent if it is made with the intent to defraud and is a

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1   half truth or effectively conceals a material fact.  A material
2   fact is an important fact that a reasonable person would use to
3   decide whether to do or not do something.
4          A fact is material if it has the capacity or a
5   natural tendency to influence a person's decision.  It does not
6   matter whether the decision-maker actually relied on the
7   statement or knew or should have known that the statement was
8   false.
9          To act with intent to defraud means to act knowingly
10  and with the specific intent to use false or fraudulent
11  pretenses, representations, or promises to cause loss or
12  injury.  Proving intent to deceive alone without the intent to
13  cause loss or injury is not sufficient to prove intent to
14  defraud.
15         The Government does not have to prove all of the
16  details about the precise nature and purpose of the scheme or
17  that the material mailed itself was false or fraudulent.  It
18  does not have to prove that the use of the mail was intended as
19  the specific or exclusive means carrying out the fraud or that
20  Mr. Pendergrass did the actual mailing.
21         It does not even have to prove that anyone was
22  actually defrauded.  To cause the mail to be used is to do an
23  act knowing that the use of the mail will usually follow in the
24  ordinary course of business or where the use can reasonably be
25  foreseen.

1          In the indictment, each separate use of the mail as

2    part of the scheme to defraud is a separate crime.  You must

3    separately consider the evidence against defendant in

4    connection with each separate alleged mail fraud.

5          The Government must prove beyond a reasonable doubt

6    each separate charge, and you are not authorized to find the

7    defendant guilty of one charge simply because you have or may

8    find defendant guilty of any other offense charged.

9          Now, Count 6 deals with money laundering, and it is a

10   conspiracy charge.  It is a federal crime to conspire to engage

11   in money laundering or transactions involving the proceeds of a

12   specified unlawful activity that violates Title 18 United

13   States Code Section 1956, which I will discuss in a moment.

14         A conspiracy is an agreement by two or more persons

15   to commit an unlawful act.  In other words, it is a kind of

16   partnership for criminal purposes.  Every member of the

17   conspiracy becomes the agent or partner of every other member.

18   If two or more persons are not involved in the alleged offense

19   conduct, a conspiracy charge cannot be established.

20         The Government does not have to prove that those who

21   are members of the conspiracy made any kind of formal

22   agreement.  The heart of the conspiracy is the making of the

23   unlawful plan itself.  So the Government does not have to prove

24   that the conspirators succeeded in carrying out the plan.

25         The defendant can be found guilty of this crime only

1    if all of the following facts are proved beyond a reasonable

2    doubt:  First, that two or more people agreed to try to

3    accomplish a common and unlawful plan to violate 18 U.S.C.

4    Section 1956 that I will explain below; and, secondly, that

5    Defendant Pendergrass knew about the plan's unlawful purpose

6    and voluntarily joined in it.

7            A person may be a conspirator even without knowing

8    all of the details of the unlawful plan or the names and

9    identities of all of the other alleged conspirators.  If

10   Mr. Pendergrass played only a minor part in the plan but had a

11   general understanding of the unlawful purpose of the plan and

12   voluntarily joined in the plan on at least one occasion, that

13   is sufficient for you to find him guilty.

14           But simply being present at the scene of an event or

15   merely associating with certain people and discussing common

16   goals and interests does not establish proof of a conspiracy.

17   Also, a person who does not know about a conspiracy but happens

18   to act in a way that advances some purpose of one does not

19   automatically become a conspirator.

20           Under Title 18 United States Code Section 1956, it is

21   a federal crime to knowingly engage in certain kinds of

22   financial transactions commonly known as money laundering.

23           Mr. Pendergrass can be found guilty of this crime

24   only if all of the following are proved beyond a reasonable

25   doubt:  That he knowingly conducted or tried to conduct a

1  financial transaction; that Mr. Pendergrass knew that the money

2  or property involved in the transaction were the proceeds of

3  some kind of unlawful activity; that the money or property did

4  come from an unlawful activity, specifically the mail fraud

5  alleged in Counts 1 through 5 of the indictment; and that

6  Mr. -- fourth, that Mr. Pendergrass was involved in the

7  financial transactions with the intent to promote the carrying

8  on of that specific or specified unlawful activity, i.e., the

9  alleged mail fraud -- specific mail fraud.

10         Now, I just want to give you a few definitions.  To

11  conduct a transaction here means to start or finish a

12  transaction or to participate in a transaction at any point.  A

13  transaction means a purchase, sale, loan, promise, gift,

14  transfer, delivery, or other disposition of money or property.

15         A transaction with a financial institution also

16  includes a deposit, withdrawal, transfer between accounts,

17  exchange of currency, or purchase of any stock, bond,

18  certificate of deposit, or other monetary instrument.

19         To know that the money or property involved in this

20  transaction came from some kind of unlawful activity is to know

21  that the money or property came from the activity that is a

22  felony under state, federal, or foreign law.  In this case, the

23  alleged unlawful activity is the mail fraud charge outlined in

24  Counts 1 through 5 of the indictment.

25         The term proceeds means any property derived from or

 1    obtained or retained directly or indirectly through some form

 2    of unlawful activity, including the gross receipts of activity.

 3    And the term specified unlawful activity means the alleged mail

 4    fraud listed in Counts 1 through 5 of the indictment.

 5         The term with the intent to promote the carrying on

 6    of a specified unlawful activity means that the defendant must

 7    have conducted or attempted to conduct the financial

 8    transaction for the purpose of making easier or helping to

 9    bring about the specified unlawful activity, i.e., the alleged

10    mail fraud.

11         As I have instructed you, in connection with the

12    money laundering conspiracy charge in this case, you must

13    decide whether the single overall conspiracy charged in the

14    indictment existed between two or more conspirators.  If not --

15    if you don't have two conspirators, then you must find the

16    defendant not guilty of that charge.

17         In determining whether the conspiracy alleged in the

18    indictment existed, you are cautioned that proof of several

19    separate conspiracies is not proof of the single overall

20    conspiracy charged in the indictment unless one of the several

21    conspiracies proved is the single overall charged conspiracy.

22         If you decide that a single conspiracy did exist,

23    then you must decide who the conspirators were.  And if you

24    decide that Mr. McQueen was a member of some other conspiracy,

25    not the one charged, then you must find Mr. Pendergrass not

1   guilty of the conspiracy to commit money laundering charged in

2   Count 6.

3           So to find that Mr. Pendergrass is guilty, you must

4   all unanimously agree that Mr. Pendergrass was a member of the

5   conspiracy charged and that the single conspiracy included two

6   or more individuals.

7           I'm going to move on now to talking about aggravated

8   identity theft in Count 7 through 10.  It is a federal crime to

9   commit aggravated identity theft.

10          Mr. Pendergrass can be found guilty of aggravated

11  identity theft only if all of the following facts are proved

12  beyond a reasonable doubt:  First, that Mr. Pendergrass

13  knowingly transferred, possessed, or used another person's

14  means of identification; second, that he did this without

15  lawful authority; and, third, that during and in relation --

16  this occurred during and in relation to mail fraud as alleged

17  in Counts 1, 2, 4, and 5 of the indictment.

18          The means of identification is any name or number

19  used alone or together with any other information to identify a

20  specific person, including a name, Social Security number, date

21  of birth, officially issued driver's license or identification

22  number, alien registration number, passport number, employer or

23  taxpayer identification number, or electronic identification

24  number or routing code.  It can also include a fingerprint,

25  voice print, or other biometric data.

1          The Government must prove that Mr. Pendergrass knew

2     that the means of identification, in fact, belonged to another

3     actual person, living or dead, and not a fictitious person.

4     The Government must prove that Mr. Pendergrass knowingly

5     transferred, possessed, or used another person's identity

6     without lawful authority.

7          The Government does not have to prove that Mr.

8     Pendergrass stole the means of identification.  But the

9     Government is required to prove that Mr. Pendergrass

10    transferred, possessed, or used the other person's means of

11    identification for an unlawful or illegitimate purpose.

12         The Government also must prove that the means of

13    identification were possessed during and in relation to the

14    crime alleged in the indictment here, the mail fraud claims.

15    The phrase "during and in relation to" means that there must be

16    a firm connection between the defendant, the means of

17    identification, and the specific crimes in the indictment.  The

18    means of identification must have helped with some important

19    function or purpose of the crimes and not simply have been

20    there accidentally or coincidentally.  The means of

21    identification at least must facilitate or have the potential

22    of facilitating the crimes alleged in the indictment.

23         You must separately consider the evidence against

24    defendant in connection with each separate aggravated identity

25    theft charge.

1            The Government must prove beyond a reasonable doubt

2       each separate charge.  You are not authorized to find the

3       defendant guilty of one charge simply because you have or may

4       find defendant guilty of any other offense charged.

5            I want to tell you that good faith is a complete

6       defense to a charge that requires intent to defraud.  A

7       defendant is not required to prove good faith.  The Government

8       must prove intent to defraud beyond a reasonable doubt.  An

9       honestly held opinion or an honestly formed belief can be --

10      cannot be fraudulent intent, even if the opinion or belief is

11      mistaken.

12           Similarly, evidence of a mistake in judgment and

13      error in management or carelessness cannot establish fraudulent

14      intent.  But an honest belief that a business venture would

15      ultimately succeed does not constitute good faith if the

16      defendant intended to deceive others by making or promoting

17      representations the defendant knew to be false or fraudulent.

18           Now I'm going to talk to you about what is called the

19      theory of defense.  And that is what it is in this case.

20           Ladies and gentlemen, I'm going to read you the

21      defendant's theory of defense in this case.  First of all, a

22      conviction on the counts charged in this case cannot be based

23      on a finding that defendant was simply present at the scene of

24      a crime, knew about it, or was a spectator.

25           As to Counts 1 through 5, the mail fraud counts, the

defendant contends that Mr. Pendergrass did not know about

Mr. McQueen's specific acts of fraud before they occurred.  And

therefore the Government has not shown that Mr. Pendergrass

possessed the legally required intent to defraud with respect

to the offenses charged in Counts 1 through 5.

As to Count 6, money laundering conspiracy, the

defendant contends that Mr. Pendergrass did not know that the

checks related to the scheme outlined in Counts 1 through 5

were proceeds of fraud rather than the product of lawful asset

collection efforts.  Therefore the defendant contends that the

Government has not shown that Mr. Pendergrass knowingly

conducted financial transactions with the proceeds of that

fraud.

For the same reasons, the defendant also contends

that Mr. Pendergrass did not knowingly conduct any financial

transactions with the intent to promote the carrying on of that

fraudulent mail scheme.

As to Count 7 to 10, the aggravated identity theft

charge, the defendant contends that the Government has failed

to prove beyond a reasonable doubt that the defendant

intentionally associated with or participated in transferring,

possessing, or using the means of identification of SJ, Count

7; LC, Count 8; JB, Count 9; or FA on Count 10.  Those are the

initials of the individuals.

Your verdict, whether guilty or not guilty, must be

1    unanimous.  In other words, you must all agree.  Your

2    deliberations are secret, and you will never have to explain

3    your verdict to anyone if you choose not to.  Each of you must

4    decide the case for yourself but only after fully considering

5    the evidence with the other jurors.  So you must discuss the

6    case with one another and try to reach an agreement.

7         While you are discussing the case, do not hesitate to

8    reexamine your own opinion and change your mind if you become

9    convinced that you were wrong.  But do not give up your honest

10   beliefs just because others think differently or because you

11   simply want to get the case over with.  And I know it is a

12   Friday, and that might be a good motivation.

13        But, you know, this is very serious.  It affects

14   somebody's life and the justice system.  So, again, do not give

15   up your honest beliefs just because others think differently or

16   because you simply want to get the case over with.  You have to

17   just really do this right.  And if you have to come back on

18   Monday, so be it.  If you are to stay late on Friday night, so

19   be it too.

20        Remember that in a very real way you are the judges,

21   judges of the facts.  Your only interest is to seek the truth

22   from the evidence in this case.

23        You've been permitted to take notes during the trial.

24   Some of you have taken advantage of that opportunity.  You must

25   use your notes only as a memory aid during deliberations.  You

1    must not give your notes priority over your independent

2    recollection of the evidence.  And you must not allow yourself

3    to be unduly influenced by the notes of other jurors.

4            I emphasize that notes are not entitled to any

5    greater weight than your memories or impressions about the

6    testimony.  When you get to the jury room and you begin your

7    process -- and I would say you need to do that, frankly, after

8    lunch because the cafeteria on this day closes at 1:30.  So

9    don't do this until you come back with your lunches.

10           When you get back though, choose a foreperson.  And

11   the foreperson will direct your deliberations, will speak for

12   you in the court.  And if you have any questions whatsoever or

13   needs during the course of your deliberations, the jury

14   foreperson will write a note that will be given to me.  Then I

15   will typically ask counsel to come in and talk with me outside

16   your presence about the note and send you back a note.

17           Now, sometimes this takes longer than we would like

18   because people are in different spots.  But that is the way it

19   is handled.  Don't at any time tell me how you are divided in

20   any vote, how many people are thinking -- leaning one way or

21   the other way.

22           You'll have the verdict form as well as all of the

23   evidence with you that has been admitted in the jury room.

24   When you have all agreed on the verdict, your foreperson must

25   fill in the form, sign it and date it, and carry it in this --

1    back into this room with all of you present.  And you'll all
2    return at that time to the courtroom.
3            Again, if you want to communicate with me at any
4    time, please write down the message or question and give it to
5    the Marshal.  The Marshal will provide it to me.  And I will
6    usually respond in writing.  But often I also will bring you
7    back and respond orally in the courtroom.
8            I wish you good luck.  And, again, you are now going
9    to this last stage of the deliberations, but don't talk about
10   anything while you are in movement down there.  You have got no
11   conversation about the case unless everybody in the jury is
12   present.  That is the only thing that is allowed.
13           Good luck to you.  Thank you.  Don't dawdle.  I know
14   you won't.  Get lunch.
15           And have you been able to call down there or write
16   them?
17           COURTROOM DEPUTY CLERK:  No.  It is still open right
18   now.
19           THE COURT:  It is still open.  We'll call just to
20   make sure.
21           Go ahead.  You don't have to go back to the jury room
22   if you don't want to.  You can go directly.  If you have
23   whatever money -- this is what the -- you've been -- we'll
24   reimburse you for the lunch for today.
25           Is that right?

```
 1              COURTROOM DEPUTY CLERK:  Yes.  What are we going to
 2    do about alternates?  Just do -- do them all?
 3              THE COURT:  Just do them all, yeah.
 4              COURTROOM SECURITY OFFICER:  All rise.
 5                   (The jury exited the courtroom at 1:20 P.M.)
 6              THE COURT:  You know, there are some typos that I'm
 7    wondering whether we want to deal with.
 8                   (The jury began deliberations.)
 9              THE COURT:  Is there anything we need to deal with
10    before the --
11              MR. BROWN:  Not from the Government.
12              MS. DURRETT:  No, Your Honor.
13              THE COURT:  All right.
14                   (The jury entered the courtroom at 6:44 P.M.)
15              THE COURT:  Have a seat.
16              Well, I see that the foreperson is sitting close to
17    me.  But would you -- so, sir, would you go ahead and stand up
18    at this time.
19              Are you indeed the foreperson?
20              THE FOREPERSON:  I am.
21              THE COURT:  Very good.  Thank you very much.
22              If you would hand the verdict to the officer and
23    then -- thank you.  You can have a seat.
24              Remind me of your name, sir.
25              THE FOREPERSON:  Sam Bragg.
```

```
1              THE COURT:  Has the jury unanimously agreed on the

2   verdict?

3              THE FOREPERSON:  Yes, ma'am.

4              THE COURT:  Okay.  Members of the jury -- thank you,

5   Mr. Bragg -- I'm going to read the jury -- jury's verdict now

6   aloud.  And I want you to listen, even though I know you have

7   been working on this for a considerable amount of time and

8   because I want to make sure it is indeed your verdict.  Though

9   Mr. Bragg has assured me that it is.

10             And then I want to tell you that the counsel have the

11  right to ask for what is called poll the jury, which is to ask

12  you-all to individually affirm that it is indeed your verdict

13  individually and whether or not there is any pressure on you

14  one way or the other.

15             So the jury verdict now is going to be published.

16  The verdict reads:

17             As to Count 1 of the indictment, we, the jury,

18  unanimously find the defendant, Allen Pendergrass, guilty.

19             As to Count 2 of the indictment, we, the jury,

20  unanimously find the defendant, Allen Pendergrass, guilty.

21             As to Count 3 of the indictment, we, the jury,

22  unanimously find the defendant, Allen Pendergrass, guilty.

23             As to Count 4 of the indictment, we, the jury,

24  unanimously find the defendant, Allen Pendergrass, guilty.

25             As to Count 5 of the indictment, we, the jury,
```

```
 1   unanimously find the defendant, Allen Pendergrass, guilty.

 2           As to Count 6 of the indictment, we, the jury,

 3   unanimously find the defendant, Allen Pendergrass, guilty.

 4           As to Count 7 of the indictment, we, the jury,

 5   unanimously find the defendant, Allen Pendergrass, guilty.

 6           As to Count 8 of the indictment, we, the jury,

 7   unanimously find the defendant, Allen Pendergrass, guilty.

 8           As to Count 9 of the indictment, we, the jury,

 9   unanimously find the defendant, Allen Pendergrass, guilty.

10           And as to Count 10 of the indictment, we, the jury,

11   unanimously find the defendant, Allen Pendergrass, guilty.

12           So say we all, signed and dated at the United States

13   Courthouse, Atlanta, Georgia, this 3rd day of December, 2021,

14   with the foreperson's signature, Samuel Bragg.

15           Counsel, do you wish to poll the jury?

16           MS. DURRETT:  I do, Your Honor.

17           COURTROOM DEPUTY CLERK:  When I call your name,

18   please rise.

19           Mr. Thornton, was the verdict as published your

20   verdict?

21           JUROR THORNTON:  Yes.

22           COURTROOM DEPUTY CLERK:  Did you enter the verdict

23   freely and voluntarily based on the law and the evidence?

24           JUROR THORNTON:  Yes.

25           COURTROOM DEPUTY CLERK:  Is this still your verdict?
```

```
1                    JUROR THORNTON:  Yes.
2                    COURTROOM DEPUTY CLERK:  Thank you.
3                    Mr. Jones, was the verdict as published your verdict?
4                    JUROR JONES:  It was.
5                    COURTROOM DEPUTY CLERK:  Did you enter into this
6    verdict freely and voluntarily based upon the evidence and the
7    law?
8                    JUROR JONES:  I did.
9                    COURTROOM DEPUTY CLERK:  Is this still your verdict?
10                   JUROR JONES:  It is.
11                   COURTROOM DEPUTY CLERK:  Ms. Carlisle, was the
12   verdict as published your verdict?
13                   JUROR CARLISLE:  Yes.
14                   COURTROOM DEPUTY CLERK:  Did you enter into this
15   verdict freely and voluntarily based upon the law and the
16   evidence?
17                   JUROR CARLISLE:  Yes.
18                   COURTROOM DEPUTY CLERK:  Is this still your verdict?
19                   JUROR CARLISLE:  Yes.
20                   COURTROOM DEPUTY CLERK:  Thank you.
21                   Ms. Curry, was the verdict as published your verdict?
22                   JUROR CURRY:  Yes.
23                   COURTROOM DEPUTY CLERK:  Did you enter into this
24   verdict freely and voluntarily based upon the evidence and the
25   law?
```

```
1              JUROR CURRY:  Yes.
2              COURTROOM DEPUTY CLERK:  Is this still your verdict?
3              JUROR CURRY:  Yes.
4              COURTROOM DEPUTY CLERK:  Thank you.
5          Mr. Cook, was the verdict as published your verdict?
6              JUROR COOK:  Yes.
7              COURTROOM DEPUTY CLERK:  Did you enter into this
8    verdict freely and voluntarily based upon the evidence and the
9    law?
10             JUROR COOK:  Yes.
11             COURTROOM DEPUTY CLERK:  Is this still your verdict?
12             JUROR COOK:  Yes.
13             COURTROOM DEPUTY CLERK:  Thank you.
14         Ms. Medepalli, was the verdict as published your
15   verdict?
16             JUROR MEDEPALLI:  Yes.
17             COURTROOM DEPUTY CLERK:  Did you enter into this
18   verdict freely and voluntarily based upon the evidence and the
19   law?
20             JUROR MEDEPALLI:  Yes.
21             COURTROOM DEPUTY CLERK:  Is this still your verdict?
22             JUROR MEDEPALLI:  Yes.
23             COURTROOM DEPUTY CLERK:  Thank you.
24         Mr. Pham, was the verdict as published your verdict?
25             JUROR PHAM:  Yes.
```

```
1              COURTROOM DEPUTY CLERK:  Did you enter into this
2    verdict freely and voluntarily based upon the evidence and the
3    law?
4              JUROR PHAM:  Yes.
5              COURTROOM DEPUTY CLERK:  Is this still your verdict?
6              JUROR PHAM:  Yes.
7              COURTROOM DEPUTY CLERK:  Mr. Fairey, was the verdict
8    as published your verdict?
9              JUROR FAIREY:  Yes.
10             COURTROOM DEPUTY CLERK:  Did you enter into this
11   verdict freely and voluntarily based upon the evidence and the
12   law?
13             JUROR FAIREY:  I did.
14             COURTROOM DEPUTY CLERK:  Is this still your verdict?
15             JUROR FAIREY:  Yes, sir.
16             COURTROOM DEPUTY CLERK:  Mr. Williams, was the
17   verdict as published your verdict?
18             JUROR WILLIAMS:  Yes.
19             COURTROOM DEPUTY CLERK:  Did you enter into this
20   verdict freely and voluntarily based upon the evidence and the
21   law?
22             JUROR WILLIAMS:  Yes.
23             COURTROOM DEPUTY CLERK:  Is this still your verdict?
24             JUROR WILLIAMS:  Yes.
25             COURTROOM DEPUTY CLERK:  Ms. Sadhu, was the verdict
```

```
 1     as published your verdict?

 2              JUROR SADHU:  Yes.

 3              COURTROOM DEPUTY CLERK:  Did you enter into this

 4     verdict freely and voluntarily based upon the evidence and the

 5     law?

 6              JUROR SADHU:  Yes.

 7              COURTROOM DEPUTY CLERK:  Is this still your verdict?

 8              JUROR SADHU:  Yes.

 9              COURTROOM DEPUTY CLERK:  Mr. Bragg, was the verdict

10     as published your verdict?

11              THE FOREPERSON:  Yes.

12              COURTROOM DEPUTY CLERK:  Did you enter into this

13     verdict freely and voluntarily based upon the evidence and the

14     law?

15              THE FOREPERSON:  Yes.

16              COURTROOM DEPUTY CLERK:  Is this still your verdict?

17              THE FOREPERSON:  Yes.

18              COURTROOM DEPUTY CLERK:  Ms. Delea, was the verdict

19     as published your verdict?

20              JUROR DELEA:  Yes.

21              COURTROOM DEPUTY CLERK:  Did you enter into this

22     verdict freely and voluntarily based upon the evidence and the

23     law?

24              JUROR DELEA:  Yes.

25              COURTROOM DEPUTY CLERK:  Is this still your verdict?
```

```
1              JUROR DELEA:  Yes.

2              COURTROOM DEPUTY CLERK:  Thank you.

3              THE COURT:  All right.  Again, ladies and gentlemen,

4   thank you so very much.  I know it is late.  But if any of you

5   wish to meet with me, I always like to talk with juries for at

6   least for a few minutes before you leave.  I'm not going to be

7   very long here.

8              So if any of you who are willing to chat with me

9   would stay in the jury room.  And if you need to leave for

10  whatever reason, that is fine as well.  Don't feel obligated

11  either.

12             If at any time somebody -- counsel wish to speak to

13  you, that is up to you whether you -- totally up to you to say

14  yes, no, or whatever.  You have no obligation one way or the

15  other.

16             Lawyers sometimes like to talk to jury members so

17  that they can understand their assessment of the case and what

18  went right, what went wrong, what was understandable to you,

19  and what was strange.

20             So I want to, again, thank you for your service.  I

21  know you worked hard today, and you again were very patient and

22  attentive throughout the proceedings.  And we are very grateful

23  for your service.

24             So if you do leave and don't meet me there, be sure

25  you bring your -- be sure not to take your papers with you.
```

1   And also Mr. Martin is going to want to talk with you, I think

2   briefly, about -- to wrap up as well in terms of any payment.

3          Or have you done that?  Is there anything in terms

4   of -- that they need to do in terms of the jury services?

5          COURTROOM DEPUTY CLERK:  Just call back in on Monday.

6          THE COURT:  You are not going to be called.  Don't

7   worry.  But just call back in if you need to leave or have any

8   other questions.

9          So I'm going to briefly talk with counsel not more

10  than about two or three minutes.  And then I at least hopefully

11  will get to see a few of you.

12         Thank you so much.

13              **(The jury exited the courtroom at 6:55 P.M.)**

14         THE COURT:  Have a seat.

15         Mr. Martin, do we have a scheduled date for

16  sentencing?

17         COURTROOM DEPUTY CLERK:  Sentencing is set for

18  March 10, 2022, at 2:30 P.M.

19         THE COURT:  Counsel, whether that date sticks or we

20  end up moving something else to another time, I would like to

21  have a sentencing memorandum at least three workdays before the

22  sentencing.

23         Is there anything else that we need to deal with?

24         MR. BROWN:  Yes, Your Honor.  The Government would

25  ask you to take the defendant into custody.

1          As you know, under 18 U.S.C. 3143, you have to make a

2    finding now since he has been convicted of these offenses that

3    there is clear and convincing evidence that he is not a risk of

4    flight and he is not a danger to the community.

5          The Government has learned since the defendant's

6    indictment in this case that there are several investigations

7    relating to activities with him involving fraud.  I can show

8    you just a recent investigative report by Fox 5 news involving

9    this defendant.  He has pending civil lawsuits against him

10   relating to allegations of fraud.  I believe he is a danger to

11   the community and will continue to commit fraud.  He has a long

12   history of fraud.  He has a federal conviction in Ohio, Your

13   Honor, and I believe he is a danger and needs to be taken into

14   custody at this time.

15        MS. DURRETT:  Your Honor, Fox 5 news the last time I

16   checked is not an investigative agency.  It is not a police

17   agency.  It is certainly a hit job that we talked to the Court

18   about prior to this case.

19        There is a woman who showed up in court here who made

20   a ruckus who is unhappy with Mr. Pendergrass and she has sued

21   him.  He is -- has a lawyer.  And they have a civil proceeding

22   going on.  She contacted Fox 5 news.  And they created a big

23   hullabaloo and video about Mr. Pendergrass.

24        There is nothing about that that suggests he is a

25   flight risk.  He has been on pretrial release now for -- I

128

```
1    don't know -- eight years or something this case has pending.
2    He hasn't done anything else.  And I think this is a complete
3    hit job by this woman who is unhappy and who is suing him.  And
4    that process should be working through the civil court system.
5            I think he has -- I don't -- I have not heard the
6    Government say that there is another violation -- a different
7    violation of his pretrial release.  I think he has done fine on
8    pretrial release.  It is a nonviolent crime, as the Court
9    knows.
10           I will also point out the resurgence now of COVID-19.
11   There is the Omicron variant now that is spreading quickly.
12   Mr. Pendergrass is about to turn 65 -- tomorrow he turns 65.
13   And so certainly he would be in one of the more vulnerable
14   populations if he was taken into custody.
15           And I think this Court is well aware that there have
16   been some issues with how things has been handled at RAD as far
17   as taking care of inmates and the COVID-19 situation.  And my
18   guess is that is going to explode again if we're now having
19   this Omicron variant.
20           So I would ask the Court to keep him out on pretrial
21   release.  If the Court feels that additional precautions need
22   be taken, the Court could impose house arrest or a curfew or
23   something like that.  But he has been doing what the Court has
24   wanted him to do while this case was working its way through
25   for the last eight or nine years.
```

```
 1              THE COURT:  And what is the bond at this -- in this
 2    case?
 3              MS. DURRETT:  Your Honor, I don't know.
 4              THE COURT:  I saw there was a 50,000 --
 5                   (A discussion ensued off the record between the
 6                   defendant and defense counsel.)
 7              MS. DURRETT:  I don't know, Your Honor.
 8              THE COURT:  It wasn't checked off as a signature
 9    bond.  I just was -- that is why I was wondering.
10              THE DEFENDANT:  No, I did not put money up.
11              THE COURT:  Whether he put up the money or -- it said
12    it wasn't a cash bond.  But I was not clear what -- it said it
13    was a non --
14              MS. DURRETT:  It has been a while, Your Honor.  He
15    may not remember.
16              THE COURT:  -- security bond.  It is just not
17    something that is -- that classification of it I was not
18    familiar with.
19              MS. DURRETT:  Mr. Pendergrass says he doesn't
20    remember hiring a bondsman or putting money up.
21              THE COURT:  No, he didn't.  I'm clear about that.
22              MS. DURRETT:  Thank you.
23              THE COURT:  All right.  I am -- I am concerned, and I
24    would like to give some -- you know, it is not that it is late
25    at night.  But it is 7:00 P.M., and we -- I am -- at least
```

```
 1    until I get some chance to think about it this weekend, I am

 2    going to impose a home confinement bond and and -- I mean, home

 3    confinement requirement and modify the bond terms that way.

 4            You know, probation does not in particular like to

 5    have at this moment if it is not necessary a -- any type of

 6    physical monitoring device because of a variety of issues with

 7    this.

 8            But I need to talk to probation.  And so I'm going to

 9    at this -- at least -- I don't have anyone from probation here

10    anyway at this point.

11            So I'm going to impose home -- a requirement of home

12    confinement, which really means -- for this weekend it means

13    basically stay put, frankly.  I'm not going to put any

14    exceptions to it unless you have a medical emergency.  And I

15    realize that could be possible.  You are my age and people have

16    heart attacks.  So I understand that.

17            But other than that, you are to stay put in the

18    house.  And I have some time on Monday.  We can revisit this

19    then.  But I would like to talk to probation about it and --

20    about an ankle monitor because it is a serious situation.

21            And I just have to warn you:  Don't break that bond.

22    Because then I'll have no choice.  And it is not just a

23    question of -- that you don't want to go to prison earlier but

24    you will -- your whole security status will change if you

25    breach this requirement of home confinement until -- and it
```

```
 1    will stay at home confinement until I modify it.
 2             Do you understand that?
 3             THE DEFENDANT:  Yes, sir.
 4             MS. DURRETT:  Your Honor, I'll just state that I may
 5    be out of town for the few days next week.  But Ms. Strickland
 6    has told me if there is a hearing she will be present and
 7    certainly I will be in contact with her.
 8             THE COURT:  All right.  And I know she does great
 9    work too.
10             All right.  All counsel here represented their
11    clients with great devotion and intellectual skill.  The
12    clients are lucky.  I'm sure that the -- that is not the view
13    of the defendant at this point.  But I think you got -- you did
14    receive first class representation.  And I think all of us saw
15    that, as did the Government.
16             And so I will -- Mr. Martin will be in touch not
17    Monday morning because I know he has another appointment.  And
18    I want to, as I said, talk to probation.
19             So, counsel, I am -- is your client living with his
20    daughter still because that --
21             THE DEFENDANT:  Yes, Your Honor.
22             THE COURT:  So I want you to talk with his daughter
23    also so that she understands completely.
24             MS. DURRETT:  Okay.
25             THE COURT:  And I'm sure you are exhausted as it is
```

```
 1    so that you will need the rest.  But I'm going to ponder this.
 2    I can't tell you we're going to be ready Monday afternoon.  But
 3    if I am, then we'll make arrangements.
 4              And you have a right, of course, to be here when I
 5    announce what -- if there is a modification.  But you're not
 6    required to be.
 7              Does your daughter work?
 8              THE DEFENDANT:  Yes.
 9              THE COURT:  All right.  And is she able to come down
10    here with you, if necessary?
11              THE DEFENDANT:  Yes, Your Honor.
12              THE COURT:  On Monday you think?
13              THE DEFENDANT:  Uh-huh (affirmative).
14              THE COURT:  Okay.  Very good.  We'll be in touch
15    whether it is Monday or for Tuesday.
16              MS. DURRETT:  Thank you, Your Honor.
17              THE COURT:  Thank you, Counsel.
18              MS. DURRETT:  Thank you, Your Honor.
19              MR. BROWN:  Thank you.
20                        (The proceedings were thereby concluded at 7:04
21                        P.M.)
22
23
24
25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1                    C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6       I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   132 pages constitute a true transcript of proceedings had

10   before the said Court, held in the City of Atlanta, Georgia, in

11   the matter therein stated.

12       In testimony whereof, I hereunto set my hand on this, the

13   11th day of January, 2022.

14

15

16

17                        _____
                          SHANNON R. WELCH, RMR, CRR
18                        OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT