IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,        )<br>   Plaintiff,                                    )<br>                                                    )<br>V.                                                ) <br>                                                    )<br>                                                    )<br>ALLEN J. PENDERGRASS,           )<br>   Defendant.                                )<br>                                                    ) | CRIMINAL ACTION NO.<br><br>1:17-CR-00224-AT-CMS |

## MOTION FOR NEW TRIAL

COMES NOW, Defendant Allen J. Pendergrass, by and through undersigned counsel and moves the Court, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, for a new trial in the above captioned case. In support thereof, Mr. Pendergrass offers the following:

Rule 33 provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Cr. P. 33(a). For a timely filed motion for new trial, the Court "has very broad discretion in deciding whether there has been a miscarriage of justice." *United States v. Schlei*, 122 F.3d 944, 990-91 (11th Cir. 1997). In deciding whether to grant a new trial, this court "may weigh the evidence and consider the credibility of the witnesses." *Butcher v. United States*, 368 F.3d 1290, 1297 (11th Cir. 2004).

Mr. Pendergrass was unfairly prejudiced by the introduction of copious amounts of evidence of uncharged conduct that rendered the verdicts on the actual charges unreliable, such that the interests of justice require a new trial. Additionally, government counsel repeatedly vouched for the truthfulness of its witnesses in closing argument, which also contributed to the unfair trial. Mr. Pendergrass asks this Court to grant his request for a new trial.

I. The charged conduct

The indictment in this case charged Mr. Pendergrass with mail fraud (counts 1-5), money laundering conspiracy (count 6), and aggravated identity theft (counts 7-10). Doc. 1. The indictment alleged that Mr. Pendergrass and co-defendant Terrell McQueen devised a scheme to defraud the City of Atlanta by contacting the city and requesting lists of unclaimed funds, mailing correspondence and limited power of attorney forms with forged signatures fraudulently claiming that one of their companies was acting on behalf of owner of the unclaimed funds, and depositing the fraudulently obtained funds into banks accounts they controlled.

The indictment alleged 5 specific acts of mail fraud occurring on April 5, 2013 and May 13, 2013. Doc. 1 at 4. The money laundering conspiracy is alleged to have begun on a date unknown and continuing until April 2014. *Id.* at 5. The aggravated identity theft charges have corresponding victims and, therefore, track the dates outlined in counts 1-5 (April 5, 2013 and May 13, 2013).

Prior to trial, the government admitted that the "specific counts alleged in the Indictment involve incidents where co-defendant McQueen, not Defendant Pendergrass, signed and sent the forged documents." Doc. 71 at 3; Doc. 73 at 3. Recognizing that it would have a problem convicting Mr. Pendergrass based on the fact that the charged fraud was all committed by Mr. McQueen, the government sought to muddy the waters by admitting multiple additional acts to suggest that Mr. Pendergrass was a bad person and should be convicted despite the lack of evidence of his involvement with the specific charged acts.

II.   Pretrial motions

Prior to trial, the government filed a motion *in limine* seeking to admit five uncharged acts and one prior conviction. Docs. 71, 73. Those acts were related to checks in the names of Wiesman, Nowack, Curry, and Wilco, the Atlanta Quarterback Club, the Lee Family Trust, Holland and Knight, and Hemisphere, Inc. The government also sought to introduce a prior theft conviction from Fort Collins, Colorado related to an entity called Tousa Homes under Rule 404(b). Doc. 73 at 4.

The government argued that these alleged "other acts" would be offered as elements of and/or inextricably intertwined with crimes charged in the indictment. Doc. 73 at 3. The government argued that these other acts were "necessary to complete the story of the charged conduct." Doc. 71 a 3. Mr. Pendergrass argued that he was charged with five ***substantive*** counts of mail fraud, one count of money

3

laundering conspiracy, and four counts of aggravated identity theft. He argued that none of the alleged other acts are inextricably intertwined with the very specific allegations here, nor do they "complete the story" of these specific acts. Doc. 191 at 16.

The Court's issued an order allowing the evidence. Doc. 227. The Court found that these uncharged acts were admissible as intrinsic evidence because "the uncharged City of Atlanta offenses were 'linked in time and circumstances with the charged crime,' were part of the same scheme, and were inextricably intertwined." *Id.* at 8. As to the Lee Family Trust, the Court noted that the "bad act" involved an alleged attempt to defraud Harris County, Texas and not the City of Atlanta, but found that "it also occurred in the same time span as the charged conduct and involved the same scheme, including the use of similar documents," and was thus admissible. *Id.* Mr. Pendergrass maintained his objections, but asked the Court to reconsider its order specifically as to the Lee Family Trust based on newly produced evidence prior to trial. Doc. 235. The Court permitted the government to introduce the evidence.

### III. Trial Evidence

At trial, the government presented evidence of and repeatedly referenced these five uncharged acts during its case in chief and its closing argument. Of the seven witnesses who testified for the government, three were called only to testify as to

uncharged acts: Michael Cohen (Lee Family Trust), Melvin Waller (Quarterback Club), and Gordon Giffin (Hemisphere). The Holland and Knight act was discussed at least four different times during the three-day presentation of the government's case. *See* Doc. 264 at 82-89, 94-98, 99-102, 129-133. The Lee Family Trust evidence was even more pervasive, with the act being discussed at least five times *in addition to* the separate witness called to testify about that incident alone. *See* Doc. 264 at 89, 215-232; Doc. 265 at 63, 198-99, 208.

Additionally, the government presented evidence of two additional uncharged acts: The Glenridge Drive Group and Tousa Homes[1]. Doc. 264 at 75, 112. Co-defendant Terrell McQueen testified that funds from the Glenridge Drive Group were "fraudulently obtained" and that "it looked like Ms. [Diedra] Barber submitted for this one. So I believe he let her have this. So I didn't get any portion of this." Doc. 264 at 110. Defense counsel objected to Mr. McQueen testifying about his "belief" about what happened to the funds. The Court then noted, "The Glenridge Drive Group -- I don't see it being mentioned either in the indictment or in them identification of entity -- of transactions that were – that were intrinsic but collateral." Doc. 264 at 112. The government argued that it was intrinsic evidence. Defense counsel asked for a mistrial and reiterated that "[a]ll of this stuff is show

---

[1] The Court later determined that the Fort Collins, Colorado conviction based on the Tousa Homes transaction could not be admitted.

stuff so that they can try to convince the jury that Mr. Pendergrass is a bad person and that they can convict him on charges that they should not have charged the way they did and they regret now." Doc. 264 at 115.

The Court permitted the government to introduce the Glenridge Drive evidence. Doc. 264 at 116. The government later questioned Mr. McQueen about the Glenridge Drive Group again. Doc. 264 at 134. Mr. McQueen again testified that he believed Mr. Pendergrass forged the client's signature on the notarized form and that Mr. McQueen forged the notary signature. He testified that he believed Mr. Pendergrass "[gave] this to his girlfriend." Doc. 264 at 136.

As to Tousa Homes, Mr. McQueen testified that he assisted in forging documents related to this transaction but that he did not receive any proceeds from it. Doc. 264 at 198. On cross examination, he admitted that when he initially talked to agents in 2018, he said he was not involved in this transaction, but "after I had seen the document recently, I recognized that my handwriting was on the document. So then I went ahead and said that I was involved with it." Doc. 265 at 146.

  IV. <u>The other acts evidence was not necessary to the government's case and instead invited the jury to convict on uncharged conduct, and therefore a new trial is necessary.</u>

The government was allowed to pile on evidence of conduct that should not have been at issue in this case, likely leading the jury to believe that even if the specific acts in the indictment were not sufficiently proven, there was so much going

6

on that Mr. Pendergrass must have done *something* criminal. Indeed, the government made sure to touch on the "intrinsic act" evidence in closing. In fact, the discussion of the "intrinsic act" evidence took up as much time or much more time in the government's closing than did the actual charged conduct in the case. The government told the jury the following:

> **Hemisphere, Inc.**
>
> In addition to writing checks to himself and his partner in crime, he is writing checks to Hemisphere, Inc. You will have that bank record. That is the bank account that he controls himself and he puts recovery fees. There is no evidence he recovered any fees for Hemisphere, Inc. That is his bank account. That is an attempt to hide the fraud in plain sight.

Doc. 266 at 60.

> Let's talk about what the defendant's counsel didn't want to talk about. You are going to have evidence of Hemisphere, Inc. You heard from Mr. Gordon Giffin. If you look on the letter that was signed by Mr. Pendergrass in evidence, Exhibit Number 13, that was sent in October 2012 -- why does that matter?
>
> Mr. McQueen testified and the evidence established that Holland & Knight and the other fraud that Mr. Pendergrass and McQueen were doing happened after that date. Mr. McQueen testified, I was not working there doing asset recovery in October. It was later that year that I started. And if you look at the Holland & Knight letter, you look at all of the other letters that are sent, they are after this date. Well, why is that important? Because Mr. Pendergrass was doing this fraud long before or before Mr. McQueen stepped back into his life to work with him for the third time. Mr. Pendergrass opened an account, Hemisphere, Inc. He deposited the stolen check from the City of Atlanta that he had used -- that he obtained with that forged power of attorney that Mr. Giffin said, I did not sign. And he deposited it into an account

7

that he controlled. The same MO, which is modus operandi, the same way that all of the other charged counts were done.

Doc. 266 at 89.

### Lee Family Trust

We have not talked much about Lee Family Trust. But you heard from Michael Cohen. And he was honest. He came in here and said, listen, I can't identify the person who came in and shook my hand and said it was Allen Pendergrass. But I sent him an email. You have a copy of that email. Who is it sent to? Allen Pendergrass. The same email he used for his P.O. Box. The same email that is listed in other documents. The same email that he lists to get the answering service. You will see that same email because that is his email. There is no evidence that anyone else used that email. Zero. He ties Mr. Pendergrass right back into it. But more so than that, you will have the Lee Family Trust bank account. Who is controlling the money in this thing? Look at that account. Who signed that account? Mr. McQueen is not on that account. It is Mr. Pendergrass. And in that account is a check that was stolen from Harris County, Texas, in the amount of $5000 that Mr. McQueen sat up there and said, I got these checks for $168,000. Who do I give them to? I didn't want to make any moves without the boss, the man. He brings those $168,000 worth of checks to Mr. Pendergrass, and he deposits one of them into an account he opened. And he gives the rest to who? Mr. Cohen. Mr. Cohen said Mr. Pendergrass came in and gave me the checks, and I deposited them in my account. Similar scheme. Controlling the money. At the front of the fraud, Mr. Pendergrass. Find him guilty based on the evidence.

Doc. 266 at 91-92.

The admission of the "intrinsic act" evidence and the repeated references to it thus rendered the jury's verdict unreliable.

The Lee Family Trust evidence was especially prejudicial. The incident had little connection to the fraud alleged in the indictment and thus should not have been

admitted as intrinsic evidence. *See United States v. Veltmann*, 6 F.3d 1483, 1498 (11th Cir. 1993) (an uncharged act is admissible if it (1) arose out of the same transaction or series of transactions as the charged offense; (2) is necessary to complete the story of the crime; or (3) is inextricably intertwined with the evidence regarding the charged offense)[2]. The incident involved funds from Harris County, Texas, and therefore, the government could have easily told the "complete story" of the alleged fraud on the City of Atlanta without this evidence. While the government at times indicated that it needed to explain *every transaction* in Mr. Pendergrass's bank accounts, it certainly did not do so; making its contention that the Lee Family Trust evidence was necessary for this reason disingenuous.

Moreover, the alleged fraud involved in the Lee Family Trust incident was different than the conduct alleged in the indictment. It involved using an attorney, Mr. Cohen, in an attempt to obtain the Lee Family Trust funds, something that was not alleged in the procurement of the City of Atlanta Funds. It also involved much more money than any of the five acts alleged in the indictment. Further, the testimony of Michael Cohen did not specifically tie the defendant on trial with the

---

[2] The Third Circuit has held that evidence is intrinsic only if it directly proves the charged conduct, or if the uncharged acts performed contemporaneously with the charged crime facilitated the commission of the charged crime. *United States v. Green*, 617 F.3d 233, 248-49 (3d Cir. 2010) (en banc). The Seventh Circuit has also rejected the inextricably intertwined option. *United States v. Gorman*, 613 F.3d 711, 719 (7th Cir. 2010).

acts at issue. Mr. Cohen testified only that "a nice black man" gave him the checks related to the Lee Family Trust, but he did not identify Defendant Allen Pendergrass as the person who gave him the checks. Mr. Cohen did not know the name Terrell McQueen, but Mr. McQueen testified that he met with Mr. Cohen in person. Given the differences in the conduct, the substantial amount of money involved, and the limited evidence tying Defendant Pendergrass to these transactions this evidence was certainly more prejudicial than probative, and likely had an undue influence on the jury's verdict.

The evidence as to McQueen's Holland and Knight fraud was likewise problematic. McQueen admitted to perpetrating that fraud himself, and the only evidence that Mr. Pendergrass knew that the proceeds were from fraud was McQueen's testimony. In light of the fact that McQueen was testifying in hope of receiving a substantial benefit in this case—a sentence of less than two years, if any—and the myriad accounts of other fraud conducted by Mr. McQueen alone and multiple aliases employed by him, this Court should find that his testimony as to Mr. Pendergrass's involvement was unreliable. *See Butcher*, 368 F.3d 1290, 1297 (11th Cir. 2004). Because there was no reliable evidence connecting Mr. Pendergrass to McQueen's actions in the Holland and Knight matter, the evidence served only to confuse the issues to for the jury, and likely resulted in a prejudicial spillover effect. *See United States v. Wilkins*, 139 F.3d 603 (1998) (affirming the granting of a Rule

33 motion based on the potential spill-over effects from evidence relating to charges dismissed during trial for insufficient evidence). The evidence was especially prejudicial given the large amount of money involved compared to the smaller amounts at issue in the indictment.

In sum, the uncharged acts evidence in this case created a complete side-show that prevented the jury from focusing on what it was actually required to decide: whether Mr. Pendergrass committed the specific acts alleged in the indictment. The government called three different witnesses to testify solely about uncharged conduct, and it was brought up repeatedly with other witnesses. Two of the uncharged acts—the Lee Family Trust and Holland and Knight—involved sums much greater than those involved in the acts charged in the indictment. The presentation of this evidence and the repeated references to it invited the jury to convict Mr. Pendergrass based only on a finding that he must have done *something* wrong, even if he did not participate in the fraud alleged in the indictment. The admission of this evidence prevented Mr. Pendergrass from receiving a fair trial. The evidence was unduly prejudicial and it overshadowed the actual charges in the case. It should have been excluded. *See United States v. Troya*, 733 F.3d 1125, 1131-32 (11th Cir. 2013) ("All admissible evidence, whether intrinsic or extrinsic, must be weighed against Rule 403 prejudice.").

A new trial is warranted in this case.

> V. The Court should order a new trial because the government improperly vouched for witnesses during closing argument.

"'Attempts to bolster a witness by vouching for his credibility are normally improper and error.'" *Sims*, 719 F.2d at 377 (emphasis added) (*quoting United States v. Ellis*, 547 F.2d 863, 869 (5th Cir. 1977)). Such attempts are indeed improper if the jury could reasonably believe that the prosecutor indicated a personal belief in the witness' credibility. *Id.* A jury could reasonably believe the prosecutor's indications if the prosecutor either places the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity, or the prosecutor implicitly vouches for the witness' veracity by indicating that information not presented to the jury supports the testimony. *United States v. Eyster*, 948 F.2d 1196. The Eleventh Circuit has stated that it denounces "lawyers who give their personal opinion that "I believe the witness is telling the truth." *United States v. Newton*, 44 F.3d 913 (11th Cir. 1994) (*citing United States v. Young*, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).

Here, the government repeatedly argued that government witnesses had told the truth from the witness stand. It told the jury:

> The Court is going to instruct you you must base your decision on the evidence. Mr. -- ***as I testified or told you before, he testified truthfully.*** He said over and over and over again Mr. Pendergrass was the boss. He paid them. He sent the forged signatures and power of attorneys to Mr. Pendergrass. Mr. Fitchpatric had no reason to come here and lie on someone he described as a good person. He did not want to be here. ***He told you the truth about who was running the show, Mr. Pendergrass.***

12

Doc. 266 at 90.

> But you heard from Michael Cohen. ***And he was honest.***

Doc. 266 at 91.

> Now let's talk about Fitchpatric. And we brought him up here and I asked him, do you want to be here? He did not. He -- I heard him get choked up on at least two occasions. Now, what does that show you? Does it show you he got up here and lied about what Mr. Pendergrass told him to do? No. He didn't want to be here. He didn't want to testify against Mr. Pendergrass. I hope you heard that in his voice. But he did. ***And how do we know he did it truthfully?*** It is corroborated by who? Mr. McQueen. ***So you should consider his testimony credible.***
>
> . . .
>
> Look at the checks he received. $500 here. $300 there. Not 9000, not 10,000, not 60,000. Not the money that they received. ***But he was truthful.*** He didn't want to be here.

Doc. 266 at 64-65. The government improperly vouched for the witnesses in this case such that it appeared that the prosecutor was asserting his personal belief in their truthfulness. The government's decision to vouch for its witnesses as well as the inclusion of so much un-charged conduct combined to make this an unfair process for Mr. Pendergrass. He now asks this Court to exercise its discretion and grant his request for a new trial.

Respectfully submitted this 21st day of February 2022.

| s/SARALIENE S. DURRETT | /s/SYDNEY R. STRICKLAND |
|---|---|
| Saraliene S. Durrett | Sydney Rene Strickland |
| 1800 Peachtree Street, Suite 300 | Suite 510-203, 830 Glenwood Ave., S.E. |
| Atlanta, GA 30309 | Atlanta, GA 30316 |
| 404-433-0855 | 404-590-7967 |