UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) Case No. 1:17-cr-00224-AT-CMS | |
| | ) | |
| ALLEN J.  PENDERGRASS, | ) | |
| Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Mr. Pendergrass now submits this sentencing memorandum in support of his request for a sentence of time served plus twenty-four months on home confinement in lieu of any further custodial sentence.  Mr. Pendergrass' age, the overstatement of his criminal history, and his post-sentencing rehabilitation following his Colorado conviction support a departure or variance from the calculated guidelines. The requested sentence is sufficient but not greater than necessary to meet this Court's sentencing goals as outlined in 18 U.S.C. 3553(a).

## I.    MR. PENDERGRASS OBJECTS TO PROBATIONS' GUIDELINES.

The probation office calculated Mr. Pendergrass' guidelines as follows:

| Mail Fraud | Money Laundering | Agg ID |
|---|---|---|
| 7 (base offense level) | 23 | |
| +14 (799,182.33) | +2 (1956) | |
| +2 (sophisticated means) | +2 (sophisticated laundering) | |
| +2(authentication feature) | | |
| +4 (leader) | +4 (leader) | 24 months |
| 29         29, II = 97- 121 | 31         31, II = 121 -151 | consecutive |

Mr. Pendergrass filed objections to the loss amount and to the following enhancements: sophisticated means[1], use of authentication feature, and leadership role.  He also asserts that his criminal history is overstated because, had he been prosecuted at the time of his original arrest, he would have been a criminal history category I at the time of his sentencing.  Because the government was able to drag this process out for years and to prosecute him in multiple jurisdictions, his criminal history score is now II.

Should the Court sustain Mr. Pendergrass' objections, his total offense level would be 21. With a criminal history category II, his advisory guideline range would be 41-51 months plus 24 months.  If the Court were to grant a departure or variance to a lower criminal history category, his guideline range would be 37 -46 months plus 24 months.  *See* below:

| Mail Fraud | Money Laundering | Agg ID |
|---|---|---|
| 7 (base offense level)<br>+10 ($229,450.36)[2]<br>+2 (sophisticated means)<br>+0 (authentication feature)<br>+0 (leader)<br>19      19, II = 33-41 months<br>       19, I =  30-37 months | 17<br>+2 (1956)<br>+2 (sophisticated laundering)<br><br>+0 (leader)<br>21      21, II = 41-51 months<br>       21, I = 37 – 46 months | <br><br><br><br>24 months<br>consecutive |

---

[1]      The objection to sophisticated means is withdrawn.

[2]      The loss amount attributed to Mr. McQueen was limited to the checks outlined in counts one through five.  He was ordered to pay $137,386.37 in restitution, despite admitting involvement in multiple other transactions including those related to Toosa Homes, Holland and Knight, and Lee Family Trust.

**A.      This Court should use the actual loss amount of $229,450.36 in its guideline calculations.**

The loss amount of $229,450.36 is the appropriate loss amount here because it accounts for the actual loss related to the actual counts of conviction and relevant conduct. The intended loss amounts outlined by probation were not jointly undertaken by Mr. Pendergrass and Mr. McQueen and the amounts are too speculative to be relied upon for sentencing.

District courts stand in a unique position to evaluate the evidence relevant to a loss determination, which entitles their determinations to deference. *United States v. Bradley*, 644 F.3d 1213, 1290 (11th Cir. 2011); U.S.S.G. § 2B1.1, comment., n.2(C). The government must establish reliable and specific facts to support its loss amount by a preponderance of the evidence. *United States v. Bradley*, 644 F.3d at 1290 (11th Cir. 2011). The district court, in turn, may make factual findings related to the loss determination based on evidence heard during trial, undisputed statements in the presentence investigation report, or evidence presented during the sentencing hearing. *Id.* However, courts cannot "speculate about the existence of a fact that would result in a higher sentence." *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011).

The guidelines define "loss" as "the greater of actual or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A) (2016). "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

"Intended loss" is defined as "the pecuniary harm that **the defendant purposely** sought to inflict." *Id*. at n.3(A)(ii) (emphasis added). The limits of sentencing accountability are not coextensive with the scope of criminal liability." *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003). Under the guidelines, liability for the reasonably foreseeable acts of others is limited by the scope of the criminal activity the defendant agreed to jointly undertake. *United States v. Anor*, 2019 U.S. App. LEXIS 5679 (11th Cir. 2019) (unpublished), citing U.S.S.G. § 1B1.3, cmt. n.2. Therefore, "to determine a defendant's liability for the acts of others, the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant." *Hunter,* 323 F.3d at 1319 (quotation marks omitted). Once that individualized finding is made, the court can proceed to determine reasonable foreseeability. *Id*. at 1319.

The probation department has estimated the total loss amount in this case to be $799,182.33, while the restitution amount for Mr. Pendergrass is $229,450.36. PSR at ¶ 29. However, the actual loss amount for the counts of conviction is $137,386.37. Indeed, the Court determined that the appropriate amount of loss and restitution for Mr. McQueen was only the amounts specifically related to the substantive counts of conviction ($137,386.37). Doc. 275. Mr. Pendergrass asserts that, to be fair, this should be the correct loss amount for him as well, but he understands that relevant conduct rules require otherwise.

The intended loss amounts outlined by probation were not jointly undertaken by Mr. Pendergrass and Mr. McQueen and the amounts are too speculative to be relied upon for sentencing.

As noted in his objections to the PSR, Mr. Pendergrass asserts that Mr. McQueen was the driving force behind the Greg Hickman loss amount, the Holland and Knight loss amount, and the Lee Family Trust loss amount. According to the PSR, these three incidents alone result in an intended loss of $548,914. The actual loss associated with these entities, however, is $5,184.83.

The evidence shows that the $548,914 intended loss for these three entities was based on Mr. McQueen's intent. Mr. McQueen's claim that he only acted on the instructions of Mr. Pendergrass is not credible. Mr. McQueen's rogue actions were not foreseeable to Mr. Pendergrass and he should not be held accountable for this speculative intended loss amount.

Specifically, as to the Greg Hickman loss amount, Mr. McQueen admitted that *he* forged Mr. Hickman's signature on the related documents. Additionally, that conduct is not related to his mail fraud convictions. Finally, no checks were paid out in connection with Mr. Hickman.

The Holland and Knight check is not related to Mr. Pendergrass' substantive mail fraud convictions. Mr. McQueen opened bank accounts and forged documents to negotiate the Holland and Knight check while Mr. Pendergrass was

away on vacation.  He opened up a bank account in the name of Holland and Knight for which he was the only signer to try to collect this money.  He also requested a tax identification number for Holland and Knight so that he could open the bank account.  He cashed checks related to this entity at his own personal bank. He was found criminally responsible for this fraud in Clayton County and he made all restitution payments (to his bank) from his own bank account.

As to the Lee Family Trust, one check in the amount of $5184.83 was deposited into an account held by Mr. Pendergrass.  The additional checks were given to Michael Cohen by a "nice black man," who claimed to be Allen Pendergrass, but there was no evidence admitted at trial to confirm it was actually Allen Pendergrass.  These additional checks were not deposited in any account associated with Mr. Pendergrass.  They were not related to the substantive mail fraud convictions here.  Further, Terrell McQueen applied for a mailbox in name of Lee Family Trust in Florida with his own ID and credit card.  He admitted that he set up the phone line for the Lee Family Trust and that he was in charge of receiving calls coming into the Lee Family Trust phone number. He admitted to forging documents in the name of Gene Bloom related to the Lee Family Trust.

Mr. McQueen is the one who was attempting to defraud other entities, including by using the aliases Dusty Fager, Gene Bloom, and Chris Carter. It is clear that Mr. McQueen certainly intended to commit a lot of fraud, but the

probation department's calculation of loss based on what it estimates **Mr. Pendergrass' intentions were** is far too speculative to be used here. Therefore, this Court should rely on the actual loss in its guideline calculations.

### B.   No enhancement should apply for the use of an authentication feature allegedly used on an "identification document."

Pursuant to U.S.S.G. §2B1.1(b)(11)(A)(ii), a two-level enhancement applies if the offense involved the possession or use of any authentication feature. "Authentication feature" means any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified.   18 U.S.C. § 1028(d)(1).   The probation department justifies the application of the enhancement by noting:

> In order for this enhancement to apply, an "authentication feature" should be used on an "identification document."  A notary seal is a certification, symbol, and/or image.  An identification document is a document made or issued under the authority of the United States Government, a State, or a political subdivision of a state.  Here, the defendants place notary seals on power of attorney forms.  The power of attorney forms are governed by the State of Georgia, specifically O.C.G.A. § 10-6B-70.  The probation officer maintains the notary seal is an "authentication feature" (specifically a symbol), and therefore, the power of attorney form is an identification document.

PSR ¶ 39.  Mr. Pendergrass objects to the application of this enhancement because 1) the power of attorney forms at issue were not "identification documents," and 2) if the power of attorney forms were "identification documents," the application of the § 2B1.1(b)(11)(A)(ii) enhancement is barred by U.S.S.G. § 2B1.6.

### i.      The "authentication feature" enhancement should not be applied because the power of attorney forms were not "identification documents."

The probation officer has suggested that the notary seals were attached to "identification documents."   The term "identification document" means a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, a sponsoring entity of an event designated as a special event of national significance, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, *is of a type intended or commonly accepted for the purpose of identification of individuals*. 18 U.S.C. § 1028(d)(1) (emphasis added).  The definition includes documents that, when completed with information concerning a particular individual, are commonly accepted for identification - such as blank resident alien cards and Social Security cards.  *United States v. Singh*, 335 F.3d 1321 (11th Cir. 2003); *See also United States v. Nana*

*Ama Owusua*, 758 Fed. Appx. 718 (11th Cir. 2018) (passport is an identification document).

Defense counsel has found no cases suggesting that a power of attorney form is an identification document akin to a passport, social security card, or resident alien card.   One court has explicitly held that a similarly notarized document was not an "identification document."  *See Vanderbilt Mortg. & Fin., Inc. v. Flores*, 735 F. Supp. 2d 679 (S.D. Tex. 2010) ("The notary stamp also cannot be considered an "authentication feature" because it is not a symbol used on an "identification document," as that term is defined by statute. The Court has failed to find a single case to have applied Section 1028 to forgery of deeds or false notarization.").

Because the power of attorney forms at issue are not "identification documents," this Court should not apply the enhancement for the use of an authentication feature.

### ii.  The "authentication feature" enhancement should not be applied because any enhancements for the possession, use, and transfer of any means of identification is barred by U.S.S.G. § 2B1.6.

U.S.S.G. § 2B1.6 governs guideline sentencing for aggravated identity theft. The Commentary to the section states, in relevant part:

> If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying

> offense. A sentence under this guideline accounts for this factor for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). . . .

U.S.S.G. 1B1.6, n. 2. This means that when a defendant receives the two-year consecutive sentence on the identity theft count, 'her sentence for any underlying offense is not eligible for a 2-level increase for 'transfer, possession, or use' of false identification." *United States v. Cruz*, 713 F.3d 600, 607 (11th Cir. 2013) (addressing a prior version of the enhancement found at U.S. Sentencing Guidelines Manual § 2B1.1(b)(10) – now U.S. Sentencing Guidelines Manual § 2B1.1(b)(11)). The *Cruz* court noted that the prohibition outlined in the commentary to 2B1.6 applies to the relevant conduct pertaining to "***this factor***"— that is, "the transfer, possession, or use of a means of identification." *Id. See also United States v. Taylor*, 818 F.3d 671, 675 (11th Cir. 2016) (This "legal provision prohibits enhancements of offense levels when the enhancement ***relates to*** the "transfer, possession, or use" of a means of identification.) (Emphasis added). The probation officer asserts that the power of attorney forms at issue here are the type of documents ***intended or commonly accepted for the purpose of identification of individuals***. *See* 18 U.S.C. § 1028(d)(1) (defining identification document). Mr. Pendergrass' sentence for aggravated identity theft already encompasses any conduct related to such documents. Because Mr. Pendergrass is being sentenced

for aggravated identity theft, his sentence on the mail fraud counts should not be enhanced under U.S.S.G. §2B1.1(b)(11)(A)(ii).

**C.  Mr. Pendergrass should not receive the leadership enhancement.**

Under U.S.S.G. § 3B1.1(a), a four-level enhancement applies if (1) the defendant organized or led a criminal activity and (2) the criminal activity involved five or more participants or was otherwise extensive.  This enhancement should not apply here because 1) the offense did not involve five or more participants, 2) it was not otherwise extensive, and 3) when viewed in the light most favorable to the government, the evidence only suggests that Mr. Pendergrass and Mr. McQueen were partners.

Even if the trial testimony is accepted by this Court, the evidence does not support this enhancement.  There has been no evidence presented that Diedra Barber or Joseph Outland were involved in any fraud scheme so the alleged scheme did not involve five or more participants, nor was it extensive. Additionally, there was testimony at trial that Mr. Pendergrass and Mr. McQueen were "partners" that did everything together, including driving to work together every day, going to the bank together, and shopping for phones together. However, Mr. McQueen is the one who approached Mr. Pendergrass about going into business together – after he had been fired by Mr. Pendergrass's wife.  Mr. McQueen signed the lease for the office address, applied for the office mailbox and

phone system, and created all of the forged documents at issue.  Therefore, even if the trial testimony is to be believed, Mr. McQueen did not take orders or direction from Mr. Pendergrass.  Further, Mr. Fitchpatrick was not charged in connection with this case and Mr. Fitchpatrick did not identify any specific documents related to the charged crimes that he personally worked on or was familiar with.  Mr. Fitchpatrick was hired to work for Mr. Pendergrass' asset collection business.  After the government came to his house and promised not to prosecute him if he helped convict Mr. Pendergrass, he came to court and claimed that he took orders to create fraudulent documents from Allen Pendergrass.  Although Mr. Fitchpatrick made these claims, Mr. McQueen testified to numerous times when **_he_** would instruct Mr. Fitchpatrick in what to do.  Mr. McQueen also purchased Mr. Fitchpatrick's computer with his **_personal funds_** so Mr. Fitchpatrick could continue helping Mr. McQueen with the fraud scheme.  If the testimony is to be believed, all three men were participants in the scheme and, if anyone was the leader or supervisor, it was Mr. McQueen.

This enhancement should not apply.

## II.   A SENTENCE OF TIME SERVED PLUS TWO YEARS HOME CONFINEMENT IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO MEET THIS COURT'S SENTENCING GOALS.

Section 3553(a) provides that the district court must impose a sentence that is "sufficient, but not greater than necessary" to: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).  In addition, the court must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the guideline sentencing range; (4) any pertinent policy statements; (5) the need to avoid unwarranted sentencing disparities; and (6) the need to provide restitution to any victims. *Id*. § 3553(a)(1), (3)-(7).  Although the district court is required to consider all of the § 3553(a) factors, it "is permitted to attach great weight to one factor over others." *United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009) (quotation marks omitted).

These factors weigh in favor of the requested sentence.  While the nature and circumstance of the offense are serious, this is also a non-violent case for which Mr. Pendergrass has already served a significant amount of time.  The

timeline below illustrates how various prosecuting agencies extended the time he

spent in custody to ensure the maximum sentence for Mr. Pendergrass:

- Sept. 19, 2013   Arrest by joint state and federal task force for the conduct charged in this case - taken to Fulton County
- Oct. 9, 2013   Released on Fulton County pre-trial release with ankle monitor and 24-hour curfew
- Jan. 30, 2014   Ohio indictment (GWS conduct – Feb. 10 - Oct 1, 2012)
- March 6, 2014   Released on pre-trial supervision with travel restrictions to NDGA after bond hearing related to federal charges in Ohio (1:14-mj-00222-AJB, doc 4)
- April 3, 2014   Fulton pretrial terminated for lack of prosecution by DA
- May 2014   Fulton DA's Office and NDGA AUSA discuss case
- Jan. 26, 2015   Ohio guilty plea
- June 18, 2015   Sentenced Ohio (30 months incarceration/3 years supervised release)
- June 26, 2015   Plea/Sentence Colorado (30 months concurrent to Ohio)
- Nov. 13, 2015   NDGA probation was informed that he is eligible for halfway house/RRC 17-19 months prior to his Ohio release date
- Nov. 3, 2016   Denied placement in RRC due to Fulton County charges that "would be presented to the grand jury in 2017"
- June 27, 2017   Indictment in this federal case
- July 21, 2017   Initial appearance in the present case – in custody
- Aug. 9, 2017   Granted pretrial release with travel restrictions
- Nov 15, 2019   Fulton County District Attorney's Office notified this Court and defense counsel that its case had "mistakenly" be listed as open and that it had no files related to Mr. Pendergrass.

Although the crimes at issue are serious, the length of the delay between

arrest and sentencing has made this a particular difficult and stressful process for

Mr. Pendergrass.

**A.      The history and characteristics of the defendant**

At 65-years-old, Mr. Pendergrass stands before the Court to be punished for crimes committed roughly 10 years ago.  He has been held in limbo for much of that ten years as he waited to be prosecuted and punished for charges directly related to this case.  After his arrest by APD and USPIS, he sat in custody in Fulton County before he was permitted to post bond in a case directly related to the investigation at issue here.   He was then subject to pretrial release for six months in Fulton County, during which time he could not leave the Atlanta metro area without permission.  He had a 24-hour curfew, which meant he was restricted to his house most of the time.  He was subject to urine testing and he was required to wear an ankle monitor.  He was required to take classes as part of his pretrial release.   He has been on pretrial release in the present case since August 9, 2017.  Doc. 21.  He has reported to probation and been subject to the restrictions of this Court for five years.

In the last 9 years, he has completed a lengthy prison sentence, participated in numerous classes while in prison, taught classes to other inmates, received mental health counseling both inside and outside of prison, successfully participated in the RDAP program, and worked as a substance abuse counselor upon his release.  He has revived his relationship with his son and daughter and has begun to rebuild his life after serving a 30-month federal sentence.

After his release from prison, Mr. Pendergrass moved back in with his children and they have become a tremendous source of support for him. He continues to live with them to this day.  In 2017 and 2018, he participated in mental health counseling while on supervised release.  Between 2017 and 2019, he was employed at Healing Hearts Counseling Center, where he was able to share what he learned in the BOP RDAP program as he counseled addicts and others going through crisis.  He has been a member of Antioch Baptist Church for four years.  He has rebuilt a life that had fallen apart twelve years ago.

He stands before the Court after having lost his wife of almost thirty years to ovarian cancer in 2010.  Mr. Pendergrass was the sole caretaker for his wife for the eleven months of cancer treatment and hospice care that preceded her death.  Mr. Pendergrass took the death of his best friend and business partner very hard and he soon found his life spiraling out of control as he turned to drugs and alcohol to ease his depression.  During this post-2010 timeframe, multiple jurisdictions allege that he committed fraud in connection with the asset collection business that he and his wife had run successfully for more than ten years.  Mr. Pendergrass admits that he has made bad choices and numerous mistakes since 2010.  He admits he did things wrong. He admits he did illegal things during that time, but he finds it difficult to understand why he has been stuck in what seems like a never-ending cycle of paying for this conduct in one way or another for the last 9 years.

The letters of support provided show that Allen Pendergrass is no longer the person who ran Guishard, Wilburn, and Shorts back in 2012 and 2013. He is a deeply caring man with tremendous family and community support. Several of his letters of support are from friends who have known him more than 40 years. *See* attached. Those friends discuss the love Mr. Pendergrass had for his wife and how her death changed the trajectory of his life forever. These friends have stood by him and they continue to support him to this day. That says something about Allen. His supervisor from Healing Heart Counseling describes him as a respected and admired counselor who assisted those in need of help as they battle alcohol and drug addiction dependency. He has the ability to be a contributing and vibrant member of society. He is currently contributing and participating in a meaningful way in society. He has had this case hanging over his head and causing stress for almost a decade. He asks that he now be able to move forward with his life on home confinement.

**B.     The kinds of sentences available**

This court can impose home confinement to satisfy a term of imprisonment. As the Court knows, a conviction for aggravated identity theft requires a mandatory 24-month sentence, to be run consecutively to any sentence imposed on the underlying crime. 18 U.S.C. § 1028A(a)(1), (b)(2). However, this sentence may be served via home detention, as explained below.

17

The Sentencing Guidelines provide that home detention may be imposed "as a condition of probation or supervised release, but only as a substitute for imprisonment." U.S.S.G. § 5F1.2. In the "Schedule of Substitute Punishments," the Guidelines also provide that the court may be substitute "[o]ne day of home detention for one day of imprisonment." U.S.S.G. § 5C1.1(e)(3). The Eleventh Circuit does not appear to have specifically addressed whether the 24-month sentence required by § 1028A could be satisfied by home detention. However, it has issued at least two opinions suggesting that home detention could be used to meet a mandatory term of imprisonment. First, in an immigration case, the Eleventh Circuit held that:

> House arrest is given equal credit as imprisonment under the Sentencing Guidelines. The Board [of Immigration Appeals] reasonably concluded that house arrest, as a punitive measure that involves "a serious restriction of liberty," constitutes confinement and is a "term of imprisonment" under the Act.

*Herrera v. U.S. Att'y Gen.*, 811 F.3d 1298, 1301 (11th Cir. 2016); *see also Ilchuk v. Att'y Gen.*, 434 F.3d 618, 623 (3d Cir. 2006); *Roy v. United States*, 347 F. Supp. 3d 230, 240 (S.D.N.Y. 2018).

Second, in *United States v. Taylor*, 550 F. App'x 819, 821 (11th Cir. 2013), the Court adopted the holding of the Fifth Circuit in *United States v. Ferguson*, 369 F.3d 847, 852 (5th Cir. 2004). *Ferguson* held that, when the district court imposed a term of incarceration as well as a term of home detention that combined to

18

exceed the maximum statutory term of incarceration, the district court erred.  This

holding resulted from the fact that the Fifth Circuit treated the period of home

detention as a form of incarceration.  *Ferguson*, 369 F.3d at 851.  *Taylor* held the

same: "Home detention can be imposed as a condition of supervised release, as

long as the combined term of incarceration and home detention does not exceed the

maximum term of incarceration allowed."  *Taylor*, 550 F. App'x at 821 (citations

omitted).

Both of these cases suggest that the Court views home detention as a form of

imprisonment, pursuant to the Guideline provisions described above.  The First

Circuit recently explained why this is so:

> Home confinement is treated as a form of "custody" under federal
> law, *see* 18 U.S.C. § 3624(c)(2) (allowing placement in home
> confinement as "[p]rerelease custody"), and, indeed, "absconding
> from home confinement" can itself be a crime, *United States v. Ko*,
> 739 F.3d 558, 561 (10th Cir. 2014) (construing provision
> governing escape from federal custody, 18 U.S.C. § 751).
> Moreover, the Guidelines and federal statutes allow home
> confinement only as a substitute for incarceration. *See* 18 U.S.C. §
> 3583(e)(4) (stating that a court, when including a term of
> supervised release after imprisonment, may "order the defendant to
> remain at his place of residence during nonworking hours," but
> such an order "may be imposed only as an alternative to
> incarceration" (emphasis added) ); *id*. § 3563(b)(19) (stating that
> home confinement during nonworking hours may be imposed as a
> condition of a sentence of probation "only as an alternative to
> incarceration" (emphasis added)); U.S.S.G. § 5C1.1(e)(3) (stating,
> under the heading "Schedule of Substitute Punishments": "[o]ne
> day of home detention for one day of imprisonment"); U.S.S.G. §
> 5F1.2 ("Home detention may be imposed as a condition of
> probation or supervised release, but only as a substitute for

> imprisonment." (emphasis added)). Put simply, home confinement is a "unique" condition of release, permissible only as a stand-in for imprisonment. *United States v. Ferguson*, 369 F.3d 847, 851 (5th Cir. 2004) (per curiam).

*United States v. Lopez-Pastrana*, 889 F.3d 13, 18-19 (1st Cir. 2018); *see also United States v. Minor*, 440 F. App'x 479, 486 n.2 (6th Cir. 2011) (describing the significant restrictions required by home detention).

Courts across the country have concluded the same. *See, e.g.*, *United States v. Walker*, 918 F.3d 1134, 1150 (10th Cir. 2019) ("home confinement itself functions as an alternative to a period of incarceration in prison."); *United States v. Lewis*, 226 F. App'x 830, 830 (10th Cir. 2007) ("Because the term of home detention substitutes for an equal term of imprisonment, the total sentence imposed—ten months—is within the Guidelines range."); *United States v. Alvear*, 93 F. App'x 319, 320 (2d Cir. 2004) (holding that a required term of imprisonment[3] of 4 to 10 months was satisfied when the defendant received six months of home detention); *United States v. T.M.*, 330 F.3d 1235, 1242 (9th Cir. 2003) (holding that if the defendant understood that he would be sentenced to 24 months, a sentence of 24 months in custody plus a 180-day period of home confinement violated his plea agreement); *United States v. Leaphart*, 98 F.3d 41, 43 (2d Cir. 1996) (noting that because the magistrate judge had sentenced the

---

[3]   Like several of the cases cited here, Mr. Alvear was sentenced before *Booker*, *i.e.*, when the Guidelines were binding.  Therefore, the guideline ranges required mandatory prison sentences, except in limited situation.

defendant to the statutory maximum term of one year of imprisonment, she could not also subject him to home detention during his supervised release); *United States v. Hok Kwai Chau*, 101 F.3d 684, 1996 WL 266251, at *1 (2d Cir. 1996) (table) (where the guidelines range was 0-6 months, a sentence of five months in custody and five months on home detention was an upward departure); *United States v. Sykes*, 46 F.3d 869, 870 (8th Cir. 1995) (providing that the term of imprisonment could be satisfied by home detention); *United States v. Delloiacono*, 900 F.2d 481, 484 (1st Cir. 1990) ("Since November 1, 1989, 'home detention,' which also requires confinement, has been an authorized substitute for a term of imprisonment."); *United States v. Hernandez*, 2016 WL 316852, at *3 (S.D.N.Y. Jan. 26, 2016) (a required term of imprisonment could be satisfied by a term of home detention); *United States v. Givens*, 2006 WL 3390752, at *5 (D. Neb. Nov. 22, 2006) ("When home confinement is allowed, it substitutes for incarceration on a day-for-day basis."); *United States v. Montigue*, 357 F. Supp. 2d 939, 942-43 (E.D. Va. 2005) (sentencing the defendant to a mandatory minimum sentence that included a term of imprisonment to be served partially on home detention).

In addition to the applicable provisions of the Sentencing Guidelines, Mr. Pendergrass notes that the language of § 1028A strongly indicates that the term may be served via a term of home detention. Specifically, § 1028A(b)(1) provides that "a court shall not place on probation any person convicted of a violation of this

section." 18 U.S.C. § 1028A(b)(1).  Therefore, Congress expressly prohibited a defendant from being placed on probation, but did not prevent the Court from sentencing the defendant to home detention.  The implication is clear—if Congress had wanted to prohibit a defendant from being sentenced to home detention, it would have written the statute to exclude that possibility.  *See Cheng Fan Kwok v. INS*, 392 U.S. 206, 213 (1968) ("[I]f Congress had wanted to go that far, presumably it would have known how to say so.").

Moreover, § 1028A was enacted in 2004, long after the Guidelines were amended to allow a defendant to serve a term of imprisonment via home detention.  *See* Public Law 108-275, 118 STAT. 831.  Because Congress is presumed to be aware of the legal background in which it legislates, this strongly suggests that it did not intend to prevent a defendant from being sentenced to home imprisonment as form of imprisonment.  *See Harris v. Garner*, 216 F.3d 970, 974 (11th Cir. 2000) ("[W]e readily presume that Congress knows the settled legal definition of the words it uses, and uses them in the settled sense.").

For all of these reasons, Mr. Pendergrass submits that this Court can—and should—sentence him to time served with a consecutive term of twenty-four months home detention.

## C.    The guideline sentencing range

As noted above, Mr. Pendergrass objects to probations' guideline calculations.   He asks that the Court sustain his objections and calculate the guidelines as follows:

| Mail Fraud | Money Laundering | Agg ID |
|---|---|---|
| 7 (base offense level)<br>+10 ($229,450.36)<br>+2 (sophisticated means)<br>+0 (authentication feature)<br>+0 (leader)<br>19      19, II = 33-41 months<br>            19, I =  30-37 months | 17<br>+2 (1956)<br>+2 (sophisticated laundering)<br><br>+0 (leader)<br>21     21, II = 41-51 months<br>            21, I = 37 – 46 months | <br><br><br><br>24 months<br>consecutive |

## D.    Any pertinent policy statements

### i.    *This Court should consider Mr. Pendergrass' post-sentencing rehabilitation when determining the proper sentence.*

Prior to *Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229, 179 L. Ed. 2d 196 (2011), the Guidelines included a policy statement stating that post-sentencing rehabilitative efforts were not an appropriate basis for a downward departure when resentencing a defendant because, in relevant part, doing so would inequitably benefit only those who obtained the opportunity to be resentenced de novo, *see* U.S.S.G. § 5K2.19 (2004).  In *Pepper*, however, the Supreme Court held a district court may consider post-sentencing rehabilitation after an appellate court has vacated and remanded the defendant's initial sentence, noting evidence of post-

sentencing rehabilitation "may be highly relevant to several of the sentencing factors that Congress has specifically instructed district courts to consider." *Pepper*, 562 U.S. at 499-500. Consequently, the Guidelines removed the policy statement in § 5K2.19. *See* U.S.S.G. § 5K2.19, Amend. 768 (effective Nov. 1, 2012).  Courts have since recognized the Supreme Court left what consideration, if any, to give a defendant's post-sentencing rehabilitation to the district court's discretion. *United States v. Doyle*, 857 F.3d 1115, 1121 (11th Cir. 2017).

Mr. Pendergrass has already been sentenced to 30 months in custody on relevant conduct for this case. This Court should consider his post-sentencing rehabilitation when determining the appropriate sentence in this case.  Mr. Pendergrass was ordered to serve his Colorado sentence concurrent to his federal Ohio sentence.  During his time in BOP custody, Mr. Pendergrass took 22 classes. *See* his BOP record excerpt below:

| Course Description | Completion Date | Course Hours |
|---|---|---|
| INTRO TO ECONOMICS @ FLS | 05-03-2017 | 18 |
| PARENTING CLASS 2 @ FSL | 04-27-2017 | 18 |
| BUSINESS MANAGEMENT CLASS @FSL | 01-25-2017 | 18 |
| PARENTING CLASS 1 @ FSL | 01-13-2017 | 18 |
| ACE SPANISH 1 CLASS @ FSL | 10-05-2016 | 18 |
| SERVE SAFE CLASS @ FSL | 10-05-2016 | 40 |
| FSL JOB FAIR-RPP 2 | 09-30-2016 | 7 |
| RESUME WRITING RPP2 @ FSL | 09-15-2016 | 3 |
| KEEPING A JOB RPP2 @ FSL | 09-01-2016 | 3 |
| JOB SEARCHING TECH RPP2 @ FSL | 08-11-2016 | 3 |
| JOB APPLICATIONS RPP2 @ FSL | 07-28-2016 | 3 |
| INTERVIEW TECHNIQUES RPP2 @FSL | 07-14-2016 | 3 |
| REAL ESTATE 2 CLASS @ FSL | 06-29-2016 | 18 |
| FEDERAL BONDING RPP2 @ FSL | 06-23-2016 | 3 |
| DRESSING FOR SUCCESS RPP2 @FSL | 06-02-2016 | 3 |

| | | |
|---|---|---|
| CAREER CHOICES RPP2 @ FSL | 05-19-2016 | 3 |
| PHYSICAL TRAINING CLASS 1@ FSL | 11-24-2015 | 40 |
| RPP#5 RELEASE REQUIREMENTS | 08-19-2015 | 1 |
| RPP#2 DEPARTMENT OF LABOR | 08-19-2015 | 1 |
| RPP 3 FINANCE | 08-19-2015 | 1 |
| RPP#4 U. S. P. O. | 08-19-2015 | 1 |
| RPP#4 COMMUNITY CORRECTIONS | 08-19-2015 | 1 |
| RPP#1 AIDS AWARENESS | 08-06-2015 | 1 |

*See* attached BOP records.  Mr. Pendergrass also worked as a clerk in the law library and as an assistant instructor to other inmates while he was incarcerated. He completed the 12-month Residential Drug Abuse Program ("RDAP"), which entitled him to 12 months off his sentence.  Mr. Pendergrass did so well in custody that he was approved for half-way house placement 17-19 months before his sentence ended, but he was prevented from moving to the RRC due to the hold Fulton County allegedly had on him for a case that it never intended to prosecute. So rather that have an opportunity to ease back in to life on the outside, Mr.

Pendergrass remained in custody. He was then brought to Atlanta in custody to face the current charges. He began rebuilding his life here as he awaited trial. He is using the skills he learned in custody and during classes and counseling sessions on pretrial release to build a better life for himself. He asks this Court to consider his rehabilitation as it determines the appropriate sentence.

### ii. *This Court can consider Mr. Pendergrass' age in determining the appropriate sentence.*

U.S.S.G. 5H1.1 states that age may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

Mr. Pendergrass is a 65-year-old man. He has been on some form of custodial supervision for the last 8 years. He currently takes medication for hypertension and for memory loss. The United Sentencing Commission has conducted multiple studies about age and recidivism rates. The commission found that as age increases, recidivism decreases. *See* attached quick guide, *Recidivism and Federal Sentencing Policy*. It found a 16% recidivism rate for inmates over the age of 60. Mr. Pendergrass does not need further deterrence from future

crimes.  He does not need further punishment in this case.  As a 65-year-old man he is not a danger to the community. A period of home-confinement will be equally efficient as and less costly than incarceration in his case.

### iii.  This Court can consider whether Mr. Pendergrass' criminal history is overstated when determining the appropriate sentence.

The sentencing guidelines permit a departure when reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted. See U.S.S.G. 4A1.3(b)(1).  Had Mr. Pendergrass been charged in this case when he was actually arrested for the conduct at issue, he would have had no prior convictions at the time he was sentenced in this case.  Because the government chose to drag this case out for four years after his arrest, probation calculates that his is a criminal history II based on the Ohio conviction.  Criminal history category II overstates the seriousness of Mr. Pendergrass' criminal history because all of the alleged conduct for his Colorado case, his Ohio case, and this case occurred during the same difficult time in his life and it all arose out of the same asset collection businesses that he ran.  The government simply chose to break it up to exert the maximum possible punishment on Mr. Pendergrass.  He asks the Court to consider this as it determines his sentence.

### j.      The need to avoid unwarranted sentencing disparities

As noted above, the Court determined that Mr. McQueen should be held accountable for a restitution amount of $137,386.37. He was sentenced to ***45 days*** in custody with credit for 45 days served.  Mr. Pendergrass has already served more than 30 months in custody.  Mr. McQueen's sentence fails to consider the tremendous amount of separate fraud he admitted to committing, including the use of multiple aliases and additional fraud schemes.  Mr. McQueen sentence was measured in ***days***.  To sentence Mr. Pendergrass to custody for the term of ***years*** calculated by probation would create a serious sentencing disparity in this case.

### k.      The need to provide restitution to any victims

This Court is going to impose restitution in this case.  Mr. Pendergrass would like to be able to work to pay the restitution that he can pay.  His option for doing so will be severely limited during any period of incarceration.  He has already had to start over with his employment after exiting prison the first time; making him do so again will only delay the payment of restitution in this case.

For all of these reasons, a sentence of time served plus twenty-four months home confinement is sufficient but not greater than necessary to meet this Court's sentencing goals. Mr. Pendergrass has already served 30 months for relevant conduct in this case as well as a month at Fulton County and almost a month when he was brought to this Court in 2017.  His request is in line with cases with similar

loss amounts. *United States v. Estremera*, 321 F. App'x 818 (11th Cir. 2009) (15-month sentence for $155,000 in loss); *United States v. Dinnall*, 313 F. App'x 241 (11th Cir. 2009) (vacating and remanding a 51-month sentence where the amount of loss was over $800,000, but the district court erroneously applied the abuse-of-trust enhancement); *United States v. Benhamu*, 161 F. App'x 805, 807, 809 (11th Cir. 2005) (24-month sentence for over $1.5 million in loss, where half of the sentence was to be spent in a halfway house).  Based on all of the factors outlined in §3553(a), the requested sentence is sufficient but not greater than necessary to punish and deter this defendant from future criminal conduct.  It is also sufficient to protect the public and to reflect the seriousness of the offense.

**III.   SHOULD THE COURT SENTENCE MR. PENDERGRASS TO TIME IN CUSTODY, HE ASKS THIS COURT TO GRANT HIM BOND PENDING APPEAL.**

Pursuant to 18 U.S.C. § 3143(b), a defendant shall be released pending appeal if the judicial officer finds:

A.   by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) [own recognizance] or (c) [release on conditions] and

B.   that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in – a reversal, an order for a new trial, a non-custodial sentence, or a sentence less than the expected duration of the appeal.

Mr. Pendergrass meets these criteria. He has been on some form of supervision for the last 9 years, including the last 5 on federal pre-trial release. He has traveled outside the jurisdiction with permission of the court on several occasions and has always returned without incident. He is not going to flee. He is not posing a danger to the community. This is a non-violent offense and there is no suggestion that he is apt to do harm to anyone while on release. Bond is warranted here. *See United States v. Price*, 611 F. Supp 502, 593 (S.D. Fla. 1985), 773 F.2d 1526, 1527 (11th Cir. 1985) (affirming district court's decision to grant bond pending appeal because the defendant was released pre-trial, complied with all conditions, and was present at all court hearings).

Should Mr. Pendergrass be sentenced to time in custody, he intends to file an appeal related to multiple rulings of the court including the denial of his motion to dismiss this case on Speedy Trial grounds due to pre-indictment delay, the denial of his motion to dismiss the money laundering count, the denial of his motion to exclude the government's 404(b) evidence, and the denial of his request for a new trial. Mr. Pendergrass has waited almost 10 years to have this case completed, he intends to see it through to the appellate court. He believes his issues raise substantial questions that are likely to result in a reversal, an order for a new trial, a non-custodial sentence, or a sentence less than the expected duration of the appeal.

In *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1995), the Eleventh Circuit Court of Appeals addressed the interpretation of the phrase "substantial question" in the context of bond pending appeal. There, the district court had interpreted the relevant bail statute to mean that bail could only be granted on appeal if the court finds that its own rulings are like to be reversed on appeal. The appellate court held that this is in an incorrect interpretation of the statute. *Id.* at 900. Instead, the *Giancola* court adopted the Third Circuit Court of Appeals' interpretation of the statute, which defined a substantial question as "one which is either novel . . . has not been decided by controlling precedent, or . . . is fairly doubtful." *Id.* at 900 *citing United States v. Miller*, 753 F.2d 19 (3d Cir. 1985). "In short, a 'substantial question' is one of more substance that would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." *Id.* at 901. "Further," the Eleventh Circuit "observed," "there are no blanket categories for what questions do or do not constitute 'substantial' ones. Whether a question is 'substantial' must be determined on a case-by-case basis." *Id.* (footnote omitted). *See also United States v. Fernandez*, 905 F.2d 350 (11th Cir. 1990).

The *Price* district court relied upon prior definitions of the phrase "substantial question" given by Justice Douglas in *Herzog v. United States*, 99 L. Ed. 1299 (1955) (The phrase substantial question "obviously does not mean a

decision on the merits.") and by the Ninth Circuit Court of Appeals in *D'Aquino v. United States*, 180 F.2d 271, 272 (9th Cir. 1950) (the inquiry focuses on whether "responsible and conscientious counsel pose some problems that on this record are not free from doubt.") when determining that bond pending appeal was appropriate. 611 F. Supp at 593. *See also United States v. Hicks,* 611 F. Supp. 497, 499 (S.D. Fl. 1985) ("[I]in determining whether there is a substantial question, a court must keep in mind that it is not being asked to reverse its position on issues decided at trial, nor is it being asked to grant a new trial.  It must decide only that a significant issue exists that merits appellate review and that the issue is critical enough to the defendant's conviction that a contrary appellate ruling would warrant a reversal.").

Like the defendant in *Price*, Mr. Pendergrass has raised constitutional issues that warrant review by the appeals court.  For example, he asserts that his Fifth and Sixth Amendment rights were violated when the government used the Fulton County District Attorney's Office to drag this case out prior to the federal indictment to ensure that he received the maximum punishment in all districts.  He should be permitted to litigate this and other issues on appeal prior to serving any custodial sentence.

## IV.   CONCLUSION

Mr. Pendergrass has been punished in this case.  He has been rehabilitated in this case.  He is doing all the things that we hope a person will do to get his life back on track after prison.  Sending him back to prison again will only erase his progress and prevent him from being a productive and helpful member of society in his later years. He asks the Court to sentence him to time served plus twenty-four months on home confinement in lieu of any further custodial sentence.

Respectfully submitted this day 19th of August 2022.

/s/SARALIENE S. DURRETT
Saraliene S. Durrett
GA Bar No. 837897
1800 Peachtree Street
Suite 300
Atlanta, GA 30309
404-433-0855


/s/SYDNEY R. STRICKLAND
Sydney Rene Strickland
Strickland Webster, LLC
Suite 510-203
830 Glenwood Ave., S.E.
Atlanta, GA 30316
404-590-7967

Counsel for Mr. Pendergrass