The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3   UNITED STATES OF AMERICA,        :
                                     :
4   vs.                              :   DOCKET NUMBER
                                     :   1:17-CR-0224-1
5   ALLEN J. PENDERGRASS,            :
                                     :   ATLANTA, GEORGIA
6          DEFENDANT.                :   AUGUST 24, 2022

7

8          **TRANSCRIPT OF SENTENCING PROCEEDINGS**

9          **BEFORE THE HONORABLE AMY TOTENBERG**

10         **UNITED STATES SENIOR DISTRICT JUDGE**

11

12   APPEARANCES OF COUNSEL:

13        **FOR THE GOVERNMENT:**

14        TRACIA M. KING
          UNITED STATES ATTORNEY'S OFFICE
15

16        **FOR THE DEFENDANT:**

17        SARALIENE DURRETT
          SARALIENE SMITH DURRETT, LLC
18
          SYDNEY R. STRICKLAND
19        STRICKLAND WEBSTER, LLC

20

21
     *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*
22                *TRANSCRIPT PRODUCED BY:*

23   *OFFICIAL COURT REPORTER:*        *SHANNON R. WELCH, RMR, CRR*
                                       *2394 UNITED STATES COURTHOUSE*
24                                     *75 TED TURNER DRIVE, SOUTHWEST*
                                       *ATLANTA, GEORGIA  30303*
25                                     *(404) 215-1383*

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1       **P R O C E E D I N G S**

2       **(Atlanta, Fulton County, Georgia; August 24, 2022.)**

3               THE COURT:  Good afternoon.  Have a seat.  Afternoon,

4       Mr. Pendergrass.  And good afternoon, Counsel.

5               We are here for the sentencing in Mr. Pendergrass's

6       case.  That is United States of America v. Allen J.

7       Pendergrass, Case Number 4:20-CR-26-1.

8               Counsel, why don't you note your presence.

9               COURTROOM DEPUTY CLERK:  Sorry.  I wrote the wrong

10      case number on there.

11              THE COURT:  Excuse me.  17-CR-224-01.

12                      **(There was a brief pause in the proceedings.)**

13              THE COURT:  All right.  Ms. Durrett?

14              MS. DURRETT:  Good afternoon, Your Honor.  Saraliene

15      Durrett.  And with me is Sydney Strickland.  Thank you.

16              THE COURT:  All right.  Very good.

17              MS. KING:  Good afternoon, Your Honor.  Tracia King

18      for the United States.  And seated with me are Special Agents

19      Wesley Cooper with IRS and Special Agent Matt Rintoul with U.S.

20      Postal Inspection Service.

21              THE COURT:  And you are alone now without Mr. Brown?

22              MS. KING:  Yes.

23              THE COURT:  All right.  Mr. Pendergrass, have you had

24      an opportunity to review the presentence report here?

25              THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  And do you -- did you have an opportunity

2    to talk with your counsel about the report and any questions

3    you had about the report or concerns as well as about the

4    sentencing process altogether?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  All right.  I know that there are a lot

7    of different objections and issues here that are posed.  I

8    think there were a few that were taken -- though I want to just

9    sort of have -- that are -- don't any longer seem to be at

10   issue.

11         One was that the Government agreed that the

12   additional aggravating factor applied for sophisticated means

13   that in particular related to one of the characteristics should

14   not be applied.  That is as to the sophisticated money

15   laundering.

16         So is that -- I understand the basis for that and

17   believe it would be duplicative.  I agree with that.  And it

18   should -- so that finding as well as the aggravating factors

19   associated -- that will be deleted.

20         Also, the Government recommended an aggravating

21   factor for leadership of two as opposed to four, which is what

22   the probation officer had recommended.  And we'll just revisit

23   the whole question of role in the offense when we get to that.

24         But I just note that for the -- is there anything

25   else that was different?

1           MS. KING:  Not with respect to what the Government's
2    position is, Your Honor.

3           THE COURT:  Okay.

4           MS. KING:  Oh, Your Honor, I take that back.  To the
5    extent that the loss amount as calculated in the presentence
6    report, the Government is recommending a different loss amount.
7    And I guess we'll take that up when we get to that objection.

8           THE COURT:  Okay.  Very good.

9           Well, all of the -- while it is the Government's
10   burden to establish each of the aggravating factors here, I
11   think it will be more efficient for me to actually start with
12   the defense counsel.  And then we can always return to that.

13          Would you just articulate for me though just so I
14   know what I've got coming from you?  Because I was just
15   spending some amount of time on the loss amount, what is the
16   Government's again -- its position about the loss amount?

17          MS. KING:  So, Your Honor, given that the Court can
18   consider in finding the loss amount evidence presented at trial
19   as well as undisputed evidence in the PSR as well as any
20   evidence that is introduced at the sentencing hearing, the
21   Government is going to rely on the evidence that was presented
22   at trial.

23          Accordingly, it is the Government's position that the
24   loss amount will actually be less than what is listed in the
25   PSR because the evidence at trial did not include a

1  presentation of the claim for Kayrita Anderson in the amount of

2  $2944, Georgia State University in the amount of $26,000, and

3  Jennifer Jones in the amount of $5208.

4         Therefore that figure that is listed in Paragraph 29

5  of the PSR should be reduced accordingly by those figures under

6  the overall loss amount.  The restitution will accordingly be

7  reduced by the $2944 and the $5208.

8         THE COURT:  Okay.  All right.  Well, at least we know

9  what is coming.

10         MS. DURRETT:  Do you want me to come to the podium?

11         THE COURT:  Yes, please.

12         And I have read your sentencing memo.  But because I

13  was in trial until last night, I haven't given it the same

14  amount of attention I would have liked.  But I did sit through

15  the trial.

16         MS. DURRETT:  Thank you, Your Honor.  I'll just start

17  -- do you want me to start with the loss amount too?

18         THE COURT:  No.  I just wanted -- I think that is the

19  last item.  I would rather -- I just wanted to know the scope

20  of what we were dealing with when counsel said that.

21         So let's just begin with the start of your -- where

22  you are as to -- first of all, as to the calculation of the

23  guidelines, and then -- let's do that, and then I'll get them

24  to respond.  And then we'll deal with the other sentencing

25  factors.

1          And just for those of you who are present in the
2    audience here, the United States Sentencing Guidelines
3    establish various guidelines to assist judges in determining
4    what would -- in conditions via reasonable sentence and they
5    apply factors in assessing the nature of the crime or the
6    offense and then apply various additional aggravating factors
7    that expand the liability.  Makes the sentence longer.
8          We're going to go over each of those aggravating
9    factors that have been applied here.  Then in terms of the
10   actual sentence also after I have determined that -- what the
11   guidelines are under the sentencing guidelines, counsel have an
12   opportunity to address other sentencing factors as well,
13   including factors such as deterrence, the individual
14   characteristics and history of the defendant, parity in
15   sentencing with other individuals who commit similar crimes,
16   and deterrence also to the defendant as well as to others,
17   among other factors.
18         So -- but we'll be discussing that after we go
19   through all of this business of looking at the guidelines and
20   what aggravating factors the Court should properly apply or not
21   apply.
22         MS. DURRETT:  Thank you, Your Honor.
23         Our calculation of the guidelines is on Page 2 of our
24   sentencing memo.  There's a chart there.  Most notably, we
25   believe the loss amount, which I know we'll talk about later,

1  should be $229,450.36 based on the actual restitution that is

2  owed and the actual loss in this case.

3       We agree that the two-level enhancement for

4  sophisticated means should be applied but not for sophisticated

5  money laundering.  I think everyone is in agreement about that

6  now.

7       I did raise an objection about the use of the

8  authentication feature, and we also obviously objected to the

9  leadership role.

10       Would you like me to start going through with the

11  authentication feature first?

12       THE COURT:  Yes.  And I did -- I did look at the

13  cases that were cited.  I really -- I don't know how you get --

14  basically escape the Eleventh Circuit authority and the other

15  authority that the defendant -- that the Government has cited

16  here in this connection.

17       MS. DURRETT:  Well, Your Honor, in the cases that the

18  Government cited, I don't think anyone made a challenge under

19  the guideline Section 2B1.6, which we outlined in our motion.

20       And, specifically, if a defendant is convicted of

21  aggravated identity theft and also sentenced for -- sentenced

22  for aggravated identity theft and also sentenced for an

23  underlying crime, note two to 2B1.6 says, if a sentence under

24  this guideline is imposed in conjunction with a sentence for an

25  underlying offense, do not apply any specific offense

1    characteristic for the transfer, possession, or use of a means

2    of identification when determining the sentence for the

3    underlying offense.  That would be the mail fraud.

4         A sentence under this guideline accounts for this

5    factor for the underlying offense of conviction, including any

6    such enhancements that would apply based on conduct for which

7    the defendant is accountable under 1B1.3.  So --

8         THE COURT:  So you are saying the underlying offenses

9    here -- because I understood what it was saying about for the

10   aggravated identity theft.

11        But are you saying this extends further than that?

12        MS. DURRETT:  This particular section of the

13   guidelines specifically says, if you are sentencing someone to

14   aggravated identity theft and also for an underlying offense,

15   you don't apply those Section 2 enhancements, which are the

16   2B1.1 (11) I think, which is where the authentication feature

17   is located.

18        And that is the *Cruz* case, Your Honor, that I talked

19   about that I cited in my memo and I quoted it in my memo.  But

20   I did look up the Government's case.  I don't think those cases

21   are on point.  I don't think the Government addressed this

22   specific guideline section of 2B1.6.

23        THE COURT:  2B1.6 and which section are you --

24        MS. DURRETT:  It is note two to 2B1.6, Your Honor.

25   That is what I just read to you that says, if you're sentencing

1  someone for aggravated identity theft and the underlying crime,

2  you don't enhance the underlying crime for the transfer,

3  possession, or use of the means of identification.

4          And that *Cruz* case that I cited says that that means

5  it applies to the entire factor.  That is, the transfer,

6  possession, or use of a means of identification.  So anything

7  related to that we don't enhance on.

8          And so in this case, what you have is a mail fraud

9  scheme where the allegation is that Mr. Pendergrass and

10 Mr. McQueen sent out forged powers of attorney with a notary

11 stamp on them.  That is the mail fraud.  So it was the use of

12 the notary stamp in the mail fraud scheme that the probation

13 office and the Government wants you to enhance on.

14         Then he was also convicted for aggravated identity

15 theft for that same conduct.  And so in this case, the

16 guidelines govern and that *Cruz* case governs that says you

17 can't both sentence someone for aggravated identity theft and

18 also enhance them for the underlying conduct under 2B1.1 (11).

19         I'm making sure I have the right --

20         THE COURT:  Yeah.  I'm just going to pull up *Cruz*.

21         MS. DURRETT:  And in this case, I think there were

22 two separate arguments made here.  Probation made one argument

23 that the powers of attorney forms were what they call

24 identification documents.  And I think the case law tells us

25 that identification documents are typically akin to driver's

1  licenses or Social Security cards.  The Government made a

2  different argument, which was just the use of the signature on

3  the power of attorney form made it a means of identification.

4          And I think either one of those puts us under this

5  2B1.6 guideline.

6          THE COURT:  Okay.  Why don't we stop there and let

7  counsel respond to that.

8          MS. DURRETT:  Thank you, Your Honor.

9          THE COURT:  Let me look again at *Cruz*.

10         MS. KING:  Your Honor, may I approach?  I have some

11 courtesy cases that I would like to present to the Court that I

12 will make reference to in responding.

13         THE COURT:  All right.  Thank you.

14         If you would, give me a moment.

15         MS. KING:  I'm sorry, Your Honor?

16         THE COURT:  Just wait one moment.

17         MS. KING:  Oh, yes.

18             **(There was a brief pause in the proceedings.)**

19         THE COURT:  Okay.

20         MS. KING:  So, Your Honor, defense counsel's argument

21 is that the Court is prohibited or precluded from imposing this

22 particular enhancement, the authentication feature enhancement,

23 because of the provision under 2B1. -- 2B1.6.  Specifically she

24 argues that the Eleventh Circuit has not really addressed that

25 and that the Government's cases that were cited are

1   distinguishable because of that reason.

2        Your Honor, since filing the motion, the Government

3   has found a 2018 Eleventh Circuit case, which is one of the

4   cases that I have presented you with a courtesy copy of, *United*

5   *States v. James*.  In that case, the defendant pled guilty to

6   access device fraud and aggravated identity theft.  His

7   argument on appeal is the same as Mr. Pendergrass's, which is

8   the Court is prohibited from applying the enhancement under

9   2B1.1 (11)(a)(2) because of the provision that is under 2B1.6.

10        The Court of Appeals found that the district court

11   properly applied the enhancement even though the defendant was

12   convicted of aggravated identity theft and Section 2B1.6

13   applied.  In that case, the defendant used a hologram feature

14   on a fraudulent driver's license.  The hologram feature was the

15   authentication feature, and obviously the fraudulent driver's

16   license was the identification document.

17        The Court, in finding that the enhancement applies,

18   basically focused on the relevant conduct that is -- that

19   underlies the application of 2B1.6.  The Court found that not

20   all relevant conduct is precluded under 2B1.6.  What the courts

21   focused on was the fact that 2B1.6 is narrowly focused on the

22   relevant conduct that deals with the actual transfer,

23   possession, or use of an identification document or as in this

24   case a means of identification.  Whereas, the conduct at issue

25   under 2B1.1 (b)(11)(A)(2) focuses on the use of an -- of an

1    authentication feature -- use of an authentication feature on

2    such document.

3            Because you have that distinction in the conduct that

4    is at play, the use of an authentication feature on the

5    document itself opposed to the use of the authentication

6    feature as the means of identification or identification

7    document that was used, possessed, or transferred, you are

8    dealing with two separate conduct -- relevant conduct.

9            And according to the Eleventh Circuit, the district

10   court is not precluded from applying the enhancement in that

11   situation.  And that is precisely the situation we have here.

12   We have the enhancement that was applied because of an

13   authentication feature that was used on a means of

14   identification and not an authentication feature that was used

15   as a means of identification.  So based on Eleventh Circuit

16   case law, Your Honor, the Government submits that the

17   enhancement applies.

18           The Government also provided the Court with a copy of

19   a 2013 case, which is *United States v. Cruz*, cite --

20           THE COURT:  I have it in front of me.

21           MS. KING:  Okay.

22           THE COURT:  And that is what the -- that is what

23   defense counsel was speaking about.

24           MS. KING:  And so, Your Honor, I would argue that

25   despite defense counsel's argument that case actually talks

1   about the conduct at issue being narrowly focused to the actual

2   transfer, possession, or use of a means of identification

3   contrary to defense counsel's argument.

4        The Government therefore urges that the probation

5   office did properly apply the enhancement in this case.

6        MS. DURRETT:  One moment, Your Honor.

7        **(There was a brief pause in the proceedings.)**

8        MS. DURRETT:  Your Honor, I know the facts of *James*

9   because I was involved in that case.  It involved a driver's

10  license with a hologram on it.  And so the Court determined

11  that that entire piece of the driver's license was one

12  document.

13        In this case, what we have is a power of attorney

14  with a notary --

15        THE COURT:  Just go a little slower.

16        MS. DURRETT:  Okay.  We have a power of attorney with

17  a notary stamp on it, Your Honor.  Without the notary stamp,

18  the power of attorney form itself has no force.  It is nothing.

19  You cannot commit the crime that is alleged to have been

20  committed here without the notary stamp on the power of

21  attorney form.  That is the mail fraud.

22        So the idea that you can say, well, it is a

23  separate -- completely separate thing, this is one thing over

24  here, the document itself, and the notary stamp is something

25  completely separate over here, it is different conduct,

1    therefore he should be enhanced, is not the case here.  Because

2    what you have is a document that has no force until it is

3    notarized.

4           The driver's license -- there are lots of driver's

5    licenses without authentication features.  This is different

6    than that.  The Court in *Cruz* tells us if we're talking about

7    the same conduct involving the transfer, possession, or use of

8    that identification document or means of identification you

9    don't apply the enhancement.

10          So I don't think you can say that the document itself

11   is a separate means of identification or identification

12   document.  It doesn't -- you can't commit the crime here unless

13   the document is notarized, at least as the Government alleged

14   it.  So I don't think you can separate the two.

15          THE COURT:  Because I haven't -- and I can just pause

16   on this and read it more fully on *James*.

17          But since you know the facts of *James* and I see that

18   you are on the case as defense counsel, what are you saying

19   actually occurred in *James* in contrast to this so that -- I

20   mean, I'm looking, of course, at *Cruz* also here.

21          MS. DURRETT:  James -- my memory is that he had --

22   they were using driver's license, as in making driver's

23   licenses.  And he had -- one driver's license that he was

24   alleged to have possessed had a hologram on it.  And the Court

25   said, I'm going to enhance you based on that hologram because I

1    think that is an authentication feature on the driver's

2    license.

3            And I made the argument no, I don't think you can do

4    that.  The Court disagreed with me.  But I think -- well, first

5    that opinion is unpublished in *James*.  And *Cruz* is a published

6    opinion.

7            But *Cruz* tells us if you are talking -- I feel silly

8    to keep saying it.  We're talking about the exact same conduct.

9    You can't commit the mail fraud here unless the document is

10   notarized.  They are sending in a notarized power of attorney

11   to commit the crime.

12           THE COURT:  That is why I asked you what are they

13   doing by contrast in *James*.  But I'll just read it.  That is

14   all right.  I'll just read it at this point.

15           MS. DURRETT:  Okay.

16           **(There was a brief pause in the proceedings.)**

17           THE COURT:  If I understand *James*, which I may not,

18   there's some distinction that the Court is making between --

19   that the means of identification does not include

20   authentication features.

21           What is that all about, from your perspective?

22           MS. DURRETT:  Well, there is a statute, 18 U.S.C.

23   1028(a) that gives the definitions.  And there is a means of

24   identification.

25           So my reading of the case law and the cases that I

1   cited are a means of identification is akin to a driver's

2   license or a Social Security card.  And in this case, that

3   driver's license had a hologram.  But not every state has a

4   hologram on their driver's license.

5         So it was something in addition to what he had

6   possessed.  Okay?  In this case, the -- well, probation calls

7   it an identification document.  The Government calls it a means

8   of identification.

9         Either way, they are both talking about the power of

10  attorney form that is used here.  The power of attorney form

11  here is not a power of attorney form until it is notarized.

12  The driver's license can be a driver's license without the

13  authentication feature.  But part and parcel of the use of the

14  power of attorney form is that it has to be notarized.

15         THE COURT:  So it is the authentication?

16         MS. DURRETT:  Yeah.  It is the same conduct.  And I

17  know the Court is looking at *James*.  But I will point the Court

18  back to --

19         THE COURT:  I'm looking at them both.  Just

20  because -- because in *Cruz*, the enhancements, the court notes,

21  were premised on relevant conduct related to device-making

22  equipment.

23         MS. DURRETT:  Right.  So when you get --

24         THE COURT:  And the enhancements were not based on

25  the transfer, possession, or use of a means of identification.

1          MS. DURRETT:  Right.

2          THE COURT:  Therefore the district court was not

3    precluded from applying the aggravating factor based on the use

4    of the device-making equipment.

5          MS. DURRETT:  Right.  And I'm probably where you are

6    in the case.  But I'm at star 16 -- between star 16 and star 17

7    at the bottom of the printed Page 5.  It says, but the relevant

8    conduct referred to in the second sentence of 2B1.6 does not

9    stand alone encompassing the entire universe of potential

10   relevant conduct.  Instead, it is dependent on and narrowed by

11   the first clause referring to this factor.  Read properly, the

12   two interdependent clauses of the second sentence provide that

13   a sentence under 2B1.6 does not account for all relevant

14   conduct but rather only that relevant conduct pertaining to

15   this factor, that is, the transfer, possession, or use of the

16   means of identification.

17         And I would -- I am arguing to the Court that that

18   means of identification is the power of attorney form.

19         THE COURT:  And the fact that it is false?

20         MS. DURRETT:  But it can't be used to commit a crime

21   until it is notarized.  It does not become the power of

22   attorney form until it is notarized.

23         THE COURT:  Okay.  Well, I'm going to just take that

24   under advisement.  And let's move on so that I can look at this

25   one more time before ruling.

1          MS. DURRETT:  Thank you, Your Honor.

2          THE COURT:  All right.  What is the next one here?

3          MS. DURRETT:  The leadership role, I think.

4          THE COURT:  Right.

5          MS. DURRETT:  Okay.  Your Honor, the testimony at

6   trial from Mr. Fitchpatric was that Mr. Pendergrass and

7   Mr. McQueen were partners.  And that is on Docket 263 at 190.

8   He was asked, what is your understanding of the nature and

9   relationship between Mr. McQueen and Mr. Pendergrass?  They

10  were partners.

11         THE COURT:  Who is -- who are you saying?

12         MS. DURRETT:  I'm sorry.  This is Mr. Fitchpatric.

13  They were partners.  Why do you describe them as partners?

14  Because they were always together.  And then he talks about how

15  they went on vacation.

16         THE COURT:  Wasn't Mr. Fitchpatric more -- still a

17  subordinate?

18         MS. DURRETT:  I'm sorry?

19         THE COURT:  Wasn't he a subordinate of both of

20  theirs?

21         MS. DURRETT:  Mr. Fitchpatric?

22         THE COURT:  Right.

23         MS. DURRETT:  Well, Your Honor, he was hired on to

24  work at the asset collection business.  And he -- although he

25  came in and tried to suggest that he was directed to do things

1    by Mr. Pendergrass, when Mr. McQueen got up there, he admitted

2    that he was the one directing Mr. Fitchpatric.  He bought Mr.

3    Fitchpatric --

4            THE COURT:  All right.  I'm just saying he was -- in

5    terms of his responsibility, he was -- he is telling you -- us

6    what his perspective is as an employee of the company?

7            MS. DURRETT:  Yes.

8            THE COURT:  Okay.

9            MS. DURRETT:  That's right, Your Honor.

10            I mean, I think that that is an accurate perspective.

11   Mr. McQueen is the one that approached Mr. Pendergrass about

12   creating an asset collection company.  He is the one whose name

13   is on the lease.  He signed up for the phone for the company.

14   He is the one who, you know, creates all the fraudulent

15   documents and admits that.  And the Government admitted that.

16   All five counts charged in this indictment were forged and sent

17   by Mr. McQueen.  He is taking the lead on these things.

18            So I admit that Mr. Fitchpatric testified that they

19   are partners.  But I think the evidence suggests that

20   Mr. McQueen was the leader in this case.

21            So I don't think the Government is any longer

22   contesting that this was otherwise extensive or a five-person

23   operation.

24            But I also think -- I don't believe there is evidence

25   that Ms. Barber was involved in this.  There was testimony that

1    she was Mr. Pendergrass's girlfriend at the time and they went

2    on vacations together.

3             But I don't think the Government has shown that he is

4    a leader, either a two-point leader or a four-point leader.

5             THE COURT:  Ms. King?

6             MS. KING:  So first off, Your Honor, as Your Honor

7    correctly noted, the Government is not opposing the defendant's

8    specific objection to the four-level enhancement.  But we are

9    contending that a two-level enhancement for role -- leadership

10   role does apply.

11            And the guidelines define a leader for purposes of

12   the enhancement as a defendant who was an organizer, leader,

13   manager, or supervisor in any criminal activity.  And that

14   factors the Courts can consider or should consider in

15   determining whether or not the leadership enhancement applies

16   includes the exercise of decision-making authority, the nature

17   of the participation in the commission of the offense, the

18   recruitment of accomplices, the right to a larger share of

19   fruits of the crime, the degree of participation in planning

20   and organizing the offense, the nature and scope of the illegal

21   activity, and the degree of control and authority exercised

22   over the others.

23            As Ms. Durrett just indicated, Mr. Fitchpatric was an

24   employee of Mr. Pendergrass's but so was Mr. McQueen.  They

25   were both under the supervision and direction of

1   Mr. Pendergrass.

2          Mr. Fitchpatric and Mr. McQueen indicated with

3   respect to the fraudulent documents that they would receive

4   directions from Mr. Pendergrass.  Mr. Fitchpatric specifically

5   received instruction with regard to the lifting and pasting of

6   signatures and notary seals on to fraudulent documents.

7   Whereas, Mr. McQueen testified that he and Mr. Pendergrass

8   worked more extensively in the commission of the fraud scheme.

9          Mr. McQueen testified that all requests for unclaimed

10  funds had to be discussed with Mr. Pendergrass prior to their

11  submission to government entities.  That is found at

12  Document 264 at 154.

13         Mr. Pendergrass purchased burner phones to obtain

14  phone numbers that would not be traced back to the group.  That

15  is found at Document 265 at 62.  Mr. Pendergrass opened a P.O.

16  Box of which he had sole control over that was used for the

17  fraudulent receipt of the checks that they solicited.  And that

18  is found at Document 265 at 62.

19         And then we also presented into evidence the actual

20  application for the P.O. Box that was used.  It was identified

21  on the request for the funds, and it was where the funds were

22  received.

23         Mr. McQueen testified that Mr. Pendergrass kept track

24  of all the checks coming into the businesses and the letters

25  going out.  That is at Document 264 at 139.  Fraudulently

1    obtained funds were deposited into bank accounts that

2    Mr. Pendergrass controlled.  That is also at Mr. McQueen's

3    testimony at Document 264 and -- Document 264, Page 106 and

4    again at Page 232.

5            But in addition to his testimony with regards to

6    those bank documents, the Government introduced into evidence

7    actual exhibits.  For example, Government's Exhibit Number 20

8    were the bank records from Wells Fargo in the name of the

9    company -- one of the companies that was used to solicit --

10   fraudulently solicit unclaimed funds.  Mr. Pendergrass is

11   listed as the sole signer on the account.

12           Mr. Pendergrass also opened up bank accounts in the

13   names of other entities.  And I believe those Government --

14   those are found at Government's Exhibits 24 and 26.

15           Mr. Pendergrass also spoke about how -- excuse me --

16   Mr. McQueen also spoke about how Mr. Pendergrass paid him

17   33 percent of the funds that were fraudulently obtained.  And

18   Mr. Pendergrass kept the rest of the money, thereby keeping a

19   larger portion of the funds.  And that is also at Document 264

20   at Pages 80 through 81 and 93.

21           The evidence thus establishes that Mr. Pendergrass

22   did organize.  He led, managed, supervised at least two

23   individuals.  And that the additional evidence, which includes

24   the testimony and exhibits admitted at trial, support the

25   application of a two-level enhancement.

1          THE COURT:  I'm going to sustain the application of

2     the two-level aggravating factor.  I think that the evidence as

3     described by Ms. King as a whole -- there might be parts of it

4     that I disagree with.  But as a whole, that he basically had

5     helped to groom Mr. McQueen as well.  And while Mr. McQueen may

6     at some point have gone out on his own -- his own lark, which

7     is something we have to deal with in terms of assessing the

8     evidence on loss, I think that he was still ultimately

9     functioning in a business that was Mr. Pendergrass's and he

10    assumed considerable responsibility.  But they were not equal.

11          And Mr. Pendergrass -- ultimately, it was his

12    business, and he operated it and had sort of developed these

13    particular schemes.  It wasn't just when Mr. McQueen came in.

14    And that is kind of the environment he walked into in terms of

15    the business environment and operations.  I don't think they

16    were coequals there.

17          But that didn't -- but there was some very unique

18    ways in which the business was operated.  And that is why the

19    loss situation is much more complicated than I think has been

20    presented.

21          But I'm going to sustain the aggravating factor of

22    two.

23          MS. DURRETT:  Thank you, Your Honor.  We object.

24    Thank you.

25          THE COURT:  Just one moment.

1          **(There was a brief pause in the proceedings.)**

2          MS. DURRETT:  Your Honor, I think the next thing

3    would be the loss amount.  I don't think there are other

4    enhancement objections that we made.

5          THE COURT:  All right.

6          I'm going to say one other thing to you-all just for

7    the future.  To me, when a defendant receives an aggravating

8    factor, it is an aggravating factor in their sentencing.  I

9    mean, it makes things worse.  It does not enhance it, even

10   though I realize that is the common knowledge.  To me, I just

11   think it is gobbledygook to be thinking about that a sentence

12   is potentially enhanced and made better and more beautiful

13   because -- which is the normal description of enhancement.

14         So I just -- you know, you'll use whatever is

15   appropriate in whatever courtroom.  But to me, that is what --

16   these are aggravating factors.

17         MS. DURRETT:  Thank you, Your Honor.

18          **(There was a brief pause in the proceedings.)**

19         THE COURT:  Okay.  Again, I think it probably would

20   be more efficient if I let defense counsel begin on the loss

21   amount.

22         MS. DURRETT:  On the loss?  Thank you, Your Honor.

23         Your Honor, we are requesting that the Court use the

24   actual loss amount, which is the restitution that is ordered in

25   the PSR as the loss amount in this case.  We believe that the

1    intended loss that is outlined in the PSR is too speculative

2    for this Court to rely on, particularly because almost all of

3    that conduct comes from the mouth of Mr. McQueen and there is

4    no corroborating evidence.  He suggests that Mr. Pendergrass

5    was the one who told him to do Holland & Knight when all

6    evidence suggests that that was Mr. McQueen who did that.  He

7    opened two separate bank accounts to commit that fraud.  He

8    opened a bank account in the name of Holland & Knight for which

9    he was the only signer.

10             THE COURT:  All right.  It really would be helpful

11   for me if you talk a little slower.

12             MS. DURRETT:  Sorry, Your Honor.

13             THE COURT:  That's all right.

14             MS. DURRETT:  I think all evidence points to the fact

15   that Mr. McQueen was out on his own doing all kinds of fraud.

16   He admitted to using at least three aliases in his life.  He

17   admitted to other fraud not alleged here, including something

18   called the Pensacola Ice Penguins that he was trying to defraud

19   separate and apart from this case.

20             I understand that the jury convicted Mr. Pendergrass

21   related to Counts 1 through 5 in this case.  But the idea that

22   you have to accept Mr. McQueen's uncorroborated testimony about

23   Mr. Pendergrass's intended loss, I think, should be rejected.

24             You can accept the jury's loss amount and the jury's

25   findings without having to credit Mr. McQueen's claims that he

1      was only acting at the direction of Mr. Pendergrass.

2              I think he testified that, for instance, on the Greg

3      Hickman loss amount he was the one who forged those signatures.

4      I think we found forged signatures on his computer of Greg

5      Hickman, Greg Hickman, Greg Hickman, and he admitted that that

6      was in his own handwriting.  He was the one doing the forging.

7              THE COURT:  Let's just go through each of them

8      separately.  Okay.

9              MS. DURRETT:  Okay.

10             THE COURT:  Just slow down.

11             MS. DURRETT:  Let me grab the PSR.  The loss amount

12     is on Page 9 of the PSR, Your Honor.  And I believe the first

13     five amounts listed are the amounts listed that were testified

14     to as to the counts of conviction.

15             THE COURT:  Okay.

16             MS. DURRETT:  The other counts are counts on which

17     Mr. McQueen testified that he did these things at the direction

18     of Mr. Pendergrass.  And we are suggesting that the testimony

19     of Mr. McQueen does not have to be credited as to those counts

20     that are not charged in the indictment.

21             Particularly, we have objected to the loss amount for

22     Holland & Knight, which is $359,665.85; to the loss amount for

23     the Lee Family Trust, which is $173,720.98; Michael Burandt,

24     $4367; and Greg Hickman, because there was specific testimony

25     that these things were done either by Mr. McQueen or in the

1    case of Mr. Burandt that was a legitimate check.  As far as

2    Greg Hickman loss, the amount was $15,529.97.

3            We understand that the Court can hold Mr. Pendergrass

4    accountable for relevant conduct.  And that is why we have

5    suggested that the appropriate amount is the restitution

6    related to this case.  But we don't believe that Mr. McQueen

7    was credible in his claims that Mr. Pendergrass was involved in

8    the Holland & Knight transactions or that there was some

9    attempt to take more than $5184 from the Lee Family Trust or

10   that Mr. --

11           THE COURT:  Let's just talk --

12           MS. DURRETT:  I'm sorry.

13           THE COURT:  -- as to the Lee Family Trust.  I think I

14   feel very comfortable with knowing the facts around Holland &

15   Knight because we talked about it at length.

16           The Lee Family Trust is -- what is the difference

17   between this?  Why do we have such a huge difference between

18   the 173,000-odd --

19           MS. DURRETT:  Your Honor, there was a $5184.83 check

20   that was deposited into an account that was opened by

21   Mr. Pendergrass.  And then there was this other idea floated by

22   Mr. McQueen that there were other checks that were to be cashed

23   in the amount of 500,000 -- $548,914.

24           Now, we did hear from an attorney, Mr. Cohen, who

25   testified that a nice Black man came in and met with him in his

1    office and gave him these checks.  He was not able to identify

2    Mr. Pendergrass.  And then we heard testimony from Mr. McQueen

3    that he, Mr. McQueen, personally met with Mr. Cohen.

4           So I think that Mr. McQueen may have had some

5    dealings with Mr. Cohen about trying to cash these additional

6    checks.  But I don't think that there is evidence in the record

7    to suggest that Mr. Pendergrass was intending to cash an

8    additional half million dollars in checks related to the Lee

9    Family Trust.

10          THE COURT:  All right.

11          MS. DURRETT:  I have talked about Greg Hickman, which

12   Mr. McQueen admitted that he did all the forgeries related to

13   that.

14          But, Your Honor, we believe --

15          THE COURT:  Where was that money -- was there any

16   amount of money deposited at all?

17          MS. DURRETT:  No, Your Honor.  No.

18          And I'll note that Greg Hickman and the Lee Family

19   Trust obviously are not related to anything related to the City

20   of Atlanta scheme as it was charged.  Those things were said to

21   have occurred out of Harris County, Texas.

22          So, again, we believe that the testimony about those

23   intended losses is too speculative for the Court to rely on to

24   increase Mr. Pendergrass's sentence.  So we would ask that you

25   sentence him based on the actual restitution.

1          THE COURT:  You also checked off Michael Burandt, but

2   he was in the City of Atlanta?

3          MS. DURRETT:  Yes.  Your Honor, Michael Burandt

4   started out as a legitimate check in this case.  He contacted

5   Asset Financial Recovery for the return of lost funds.

6          I don't believe that check was paid out.  Mr.

7   Pendergrass agrees that he should pay any restitution related

8   to that.  But it was a legitimate inquiry from a customer and

9   not something that was -- he was not reached out to by

10  Mr. Pendergrass.

11         THE COURT:  So you don't actually object to that

12  amount, the $4367?

13         MS. DURRETT:  That is right, Your Honor.

14         THE COURT:  All right.  And what about the other ones

15  that are here starting at Atlanta Quarterback Club going up to

16  Mr. Hickman on Page 9 of the presentence report?

17         MS. DURRETT:  Well, Your Honor, when we had testimony

18  from someone from the Atlanta -- we had testimony from someone

19  from the Atlanta Quarterback Club, and I was able to show

20  through Mr. McQueen that he created false documents related to

21  the Atlanta Quarterback Club.  I think a false business license

22  and applied for -- I don't know if that was -- I think it was

23  Atlanta Quarterback Club that he applied for the tax ID for.

24  So Mr. McQueen admitted that he was involved in that fraud.

25         THE COURT:  So essentially here as to these -- this

1   group of ones, the restitution amount and the loss amount are

2   the same; is that right?

3          MS. DURRETT:  Yeah, Your Honor.  That is right, Your

4   Honor.

5          And I think that our claim is that Mr. Pendergrass

6   should not be held accountable for those things because it is

7   too speculative.  But if the Court is determining that an

8   amount must be found based on the -- what we would call

9   relevant conduct, the only reliable source of information for

10  that is the actual loss.

11         So I understand the Court may be inclined to say,

12  well, these were all part of City of Atlanta checks.  And we

13  understand that.  But the idea that there was also this

14  intended loss related to those other entities, I don't think

15  the Court can rely on that.  I think if the Court --

16         THE COURT:  I'm just confused.  I'm sorry.  I'm

17  looking at everything -- Mr. Bone -- I'm sorry.

18         Starting at Atlanta Quarterback, Glenridge Drive,

19  Weissman Nowack Law Firm, Hemisphere, Inc., Kayrita Anderson,

20  and Lydia Walker.  And all of those seem to be that the

21  restitution amounts and the loss amounts are the same.

22         And you are telling me that that is too speculative?

23         MS. DURRETT:  No, Your Honor.  I'm sorry if I was

24  unclear.  We believe that if the Court is going to try to

25  determine a loss amount based on relevant conduct the

1   appropriate amount is the actual restitution amount.

2          So that would include checks where the check amount

3   is the same as the restitution amount.

4          THE COURT:  All right.  So your real objections here

5   are simply from the group that we discussed from Mr. Hickman --

6   Mr. Burandt really is pretty clear -- the Lee Family Trust and

7   Holland & Knight?

8          MS. DURRETT:  Yes, Your Honor.  Anything where we

9   don't actually have evidence that a check was paid to

10  Mr. Pendergrass or Mr. McQueen and they split the profits I

11  think is too speculative.

12         So we would ask you to rely on the actual restitution

13  amount.  And I will note I noted in my sentencing memorandum

14  that Mr. McQueen was held accountable only for the checks in

15  the indictment.

16         Now, certainly we would agree that that is the

17  appropriate amount for us.  But I also understand that relevant

18  conduct is a consideration for the Court.

19         And if there are shown to be checks that were

20  deposited in relation to Asset Financial Recovery, we agree

21  with that restitution amount being used as the loss amount.

22         THE COURT:  All right.

23         MS. KING:  So, Your Honor, since one of the things

24  the Court can take into consideration are exhibits that was

25  introduced at trial, I have a courtesy copy of trial exhibits

```
 1   that were admitted.
 2            THE COURT:  All right.
 3            MS. KING:  I've already provided defense counsel with
 4   a copy.
 5            And I am -- in light of Ms. Durrett's argument, I am
 6   unfortunately a little bit confused because she is contending
 7   that the loss amount should be the restitution amount that is
 8   calculated in Paragraph 29.  But the restitution amount that is
 9   calculated in Paragraph 29 includes the actual loss amount for
10   Lee Family Trust, Mr. Burandt.  Mr. Hickman, there was no funds
11   paid.  And for Holland & Knight, there were no funds paid.
12            So the real, I guess, difference between the
13   restitution amount and the loss amount is the fact that there
14   is intended loss for the Lee Family Trust in the amount of
15   $173,720 of which Mr. Pendergrass is being held accountable for
16   just $5000.  And then of the Holland & Knight, there is an
17   intended loss of over $300,000, of which there is no actual
18   restitution amount being offered.
19            So my hesitation, Your Honor, is -- well, I'll just
20   explain this.  First of all, to the extent that Ms. Durrett
21   argues that the Court should limit the loss amount to the
22   actual amount, as Your Honor is aware, the guidelines provide
23   that loss is calculated -- loss is based on the greater of
24   actual or intended loss.
25            And I understand that her argument specifically with
```

1   certain instances that are listed in the chart found at

2   Paragraph 29 of the PSR is that the Court should not rely on

3   the intended loss amount because the testimony regarding

4   Mr. Pendergrass's involvement was too speculative.  That should

5   be rejected.

6           So again, Your Honor, my confusion is:  With respect

7   to -- when Your Honor asked like with respect to like the

8   Actors Guild, the Atlanta Quarterback Club, Glenridge Drive,

9   Weissman, Hemisphere, on one hand, she's arguing that the loss

10  amount should not count, but then she is asking the Court to

11  impose the restitution amount for those entities.

12          THE COURT:  If I'm not going to agree with her just

13  to do the ones that are already -- she understands that I can

14  get to --

15          MS. KING:  So just concentrate on her four?

16          THE COURT:  No.  I mean, as I understood what

17  Ms. Durrett said was, of course, she would like to have her

18  client treated the same way as Mr. McQueen and only be held

19  responsible for those items -- the top items.  But she also

20  understands what the law is and that he could be potentially

21  responsible for some of these other items in which there

22  actually is a restitution amount listed, and such as Atlanta

23  Quarterback, the Glenridge Drive Group, et cetera.

24          But that everything -- those there is nothing

25  speculative about, if I understand.  So that she's --

1    understanding what the principle of law is, she understands

2    that her client could potentially be -- that could be awarded.

3    But her problem is some of the ones lower down that are in her

4    judgment totally speculative and therefore not appropriate.

5         MS. KING:  So I guess, Your Honor, what I'm trying to

6    determine is whether I am -- whether I need to just focus on

7    the four that she specifically identified, the Holland &

8    Knight, the Lee Family Trust, the Michael Burandt, and the Greg

9    Hickman.  Or do I need to go through the entire chart with the

10   exception of the counts of the indictment?

11        Based on her argument, I'm a little --

12        THE COURT:  I think you need to go through the ones

13   you talked about, GSU and Tousa --

14        MS. KING:  Go through all of them?

15        THE COURT:  -- are off; right?  Or Georgia State

16   University, I thought you had -- that wasn't an issue and there

17   was one other.  Was it Tousa Homes?

18        MS. KING:  Yeah.  The Kayrita Anderson, we are not --

19   we're asking the Court not to include that one.  We're asking

20   the Court not to include Georgia State University.

21        THE COURT:  Okay.

22        MS. KING:  And we're asking the Court not to include

23   Jennifer Jones because there was no testimony or document

24   submitted at trial regarding those.

25        THE COURT:  All right.  But Tousa Homes is in?

35

```
 1                MS. KING:  Tousa Homes is in.
 2                THE COURT:  All right.
 3                MS. KING:  So you want me to go through starting with
 4    the Atlanta Quarterback Club?
 5                THE COURT:  No.  I think we should just talk about --
 6                MS. KING:  The four that she specifically addressed?
 7                THE COURT:  -- the ones that she challenges as
 8    opposed to the others because I don't think that --
 9                MS. KING:  She's really --
10                THE COURT:  I don't think -- Ms. Durrett doesn't like
11    it, but it is not that -- she recognizes the principle of law
12    that is applicable.
13                MS. DURRETT:  That is correct, Your Honor.  You said
14    it better than I did.  But that's correct.
15                MS. KING:  So the four she vigorously challenged was
16    the Holland & Knight, the Lee Family Trust, the Michael
17    Burandt, and the Greg Hickman?
18                THE COURT:  Right.  Correct.
19                MS. KING:  Got it.  Now I have my marching
20    instructions.
21                THE COURT:  All right.
22                MS. KING:  So, Your Honor, one of the -- let's start
23    with the Lee Family Trust, Your Honor.
24                THE COURT:  Okay.
25                MS. KING:  And what I did -- Your Honor, I put the
```

1    documents, the Government's exhibits, in the order in which

2    they are listed in the chart.

3            THE COURT:  Okay.  So I don't need to start at the

4    top?

5            MS. KING:  No.  That should be the second to the last

6    one, Your Honor.

7            THE COURT:  Okay.

8            MS. KING:  All right.  So with respect to the Lee

9    Family Trust, Michael Cohen, who was an attorney, testified

10   that he met with Mr. Pendergrass who presented a business plan

11   to data mine from counties unclaimed funds with the intent of

12   notifying individuals about those funds and how to collect

13   them.  That is at Document 264 at 35 through 37.

14           He testified that Mr. Pendergrass asked him to write

15   letters to potential people who had unclaimed funds, to deposit

16   checks and to disburse the funds, which is also at Document 264

17   at Pages 37 through 38.

18           THE COURT:  All right.  Just one second.

19           MS. KING:  Excuse me?

20           THE COURT:  I'm just trying to make sure I've got --

21   I'm at the right spot here on your documents.

22           MS. KING:  So this is the trial transcript I'm

23   referring to.  Okay.  But I am about to -- yeah, I'm referring

24   to the trial transcript.  I will be addressing Document 9

25   momentarily.

```
 1              MS. DURRETT:  Document 9?

 2              MS. KING:  Yes.  Well, it is Government's Exhibit 9,

 3    which is the second to the last one in your pile.

 4              MS. DURRETT:  Okay.  Thanks.

 5              THE COURT:  Okay.

 6              MS. KING:  There are staples there in the top,

 7    Saraliene, to help you get to it faster.  Okay.

 8              MS. DURRETT:  Thank you.

 9              MS. KING:  Okay.  And so the -- one of the evidence

10    presented at trial was Government's Exhibit Number 9.  It

11    contains copies of letters that were submitted to Harris County

12    requesting the unclaimed funds.

13              If you go to the documents starting with Bates stamp

14    box 4 at 002719, it would be close to the back of that package

15    of documents.  Government's Exhibit 9, while you are getting to

16    it, is a document that was retrieved during the execution of

17    the search warrant at Mr. Pendergrass's business.

18              Mr. McQueen testified that Mr. Pendergrass kept a

19    file of all of the claims that they submitted to government

20    entities, both claims seeking funds legitimately and claims

21    that they requested fraudulently with the intent of keeping the

22    funds for themselves.

23              If you start with the document --

24              THE COURT:  Can you give me the Bates number?  I got

25    box 4, for instance, 002 -- 002728.  That is relatively back at
```

```
 1    the bottom.  Then there is --

 2            MS. KING:  So if you -- starting -- yeah.  The Bates

 3    stamp numbers are in order.  So if you -- oh, you asked me to

 4    give you the number again?

 5            THE COURT:  The Bates number.

 6            MS. KING:  It is box 4, 002719.

 7            THE COURT:  Okay.

 8            MS. KING:  Do you see it, Your Honor?  It is going to

 9    be closer to the back of the package.

10            THE COURT:  I have it.

11            MS. KING:  So part of the documents that were

12    recovered from the business were copies of the letters that

13    were submitted to Harris County seeking various checks.  So the

14    document that is Bates stamped 2719 requested checks in the

15    amount of $21,952.11.

16            On the next page is a separate request to Harris

17    County seeking funds -- unclaimed funds in the amount of

18    $25,592.97.  The next page contains another request submitted

19    to Harris County seeking funds in the amount of $58,021.30.

20            And the next page is yet another letter seeking

21    unclaimed funds in the amount of $62,969.77.

22            And the final -- the following page -- excuse me --

23    seeks funds in the amount of $5184.83.  This amount is the one

24    that was ultimately deposited into a bank account that

25    Mr. Pendergrass opened himself under the name of Lee Family
```

1    Trust.

2         Your Honor, I also have a second set of documents.

3    And, Your Honor, I just handed you a stack of additional

4    Government's exhibits that were introduced at trial.  Those are

5    extractions from bank records that were introduced into

6    evidence during trial of this matter.

7         The last document in the package, Government's

8    Exhibit 26 -- I'm sorry.  Not 26.  My apologies.  My apologies.

9         So, Your Honor, I inadvertently left out Government's

10   Exhibit 25, which is the trial exhibit for the bank records, in

11   which it shows that Mr. Pendergrass is the sole signer on an

12   account that was opened in the name of Lee Family Trust.

13        Now, going back to the testimony, Mr. Cohen testified

14   that -- that Mr. Pendergrass eventually gave him five checks

15   that were received from Harris County.  And if Your Honor will

16   note that based on the request, there were six requests here.

17   We know that one was deposited into an account opened by

18   Mr. McQueen and that the -- and he indicated that the checks

19   total approximately $160,000.

20        If you add up the request for unclaimed funds

21   excluding the $5000, that amount totals approximately $163,000.

22   Mr. McQueen testified that he worked with Mr. Pendergrass on

23   this scheme.  Although he did acknowledge he met with

24   Mr. Cohen, he also acknowledged that he met with Mr. Cohen with

25   Mr. Pendergrass and that this was a scheme that they worked

1   together.

2          And based on the testimony and the exhibits, we

3   believe that this is relevant conduct that is attributable to

4   him.  And therefore this loss amount should be included in the

5   calculation.

6          Give me a moment to shift gears, Your Honor.

7          So, Your Honor, the next one I'll address is the

8   Holland & Knight.  And with respect to some of -- one of the

9   trial exhibits that was introduced, I refer the Court to

10  Government's Exhibit Number 12, which should be the last one in

11  the stack of documents that was recovered from Mr.

12  Pendergrass's business.

13         Now, with respect to that claim, Mr. McQueen

14  testified that he and Mr. Pendergrass worked on this one

15  fraudulently to obtain the unclaimed funds that were owed to

16  Holland & Knight.

17         Now, Mr. McQueen did admit that upon receipt of the

18  funds he did open a bank account and deposit the funds into a

19  bank account.  But he also testified that he paid a portion of

20  the proceeds to Mr. Pendergrass.

21         THE COURT:  How much did he say he paid to

22  Mr. Pendergrass?

23         MS. KING:  I'm sorry?

24         THE COURT:  Did he indicate how much he paid to

25  Mr. Pendergrass?

1          MS. KING:  If, Your Honor -- during -- I guess when

2     you are considering the one objection, I do have the trial

3     transcripts with me.  I did not write it down in my notes.  But

4     I can look it up and find out for you.

5          THE COURT:  That's fine.

6          MS. KING:  Okay.  But he -- so he -- Mr. McQueen also

7     testified that in addition to working this together with

8     respect to the company named Attorney Recovery System that he

9     and Mr. Pendergrass went on the internet and actually found a

10    company by this name -- by the name of Attorney Recovery

11    Systems with an S.  And what they did was they dropped the S so

12    that they would have a company that was a soundalike to one

13    that actually existed.

14         Mr. McQueen testified that Mr. Pendergrass provided

15    the signature of Mr. Cohen's name listed near the notary seal,

16    which is on Page 2 of Government's Exhibit Number 12.  He wrote

17    the name Stephen.  He provided the signature for Stephen Cohen.

18         THE COURT:  Where am I going to find that?

19         MS. KING:  Government's Exhibit 12, the second page.

20    And it is going to be the very last.  If your package is still

21    in order, it is the very last document.

22         THE COURT:  Okay.  The reason I had some problem is

23    this jumps from Exhibit -- Government's Exhibit 11 --

24         MS. KING:  Yeah.

25         THE COURT:  -- to Government's Exhibit 36.  So I'm

```
 1    not exactly sure where --
 2              MS. KING:  So --
 3              THE COURT:  -- the order is.
 4              MS. KING:  Yeah.  Your Honor, as I indicated, I put
 5    this in the order of how they are listed in Paragraph 29
 6    because I thought I was going to have to go through them.  So
 7    it should be the very last document.
 8              THE COURT:  That is fine.  All right.  That is fine.
 9              MS. KING:  So they are not going to be --
10              THE COURT:  All right.
11              MS. KING:  So Mr. McQueen testified that
12    Mr. Pendergrass provided the signature that is on Page 2, which
13    is the power of attorney.  Mr. McQueen acknowledged that he did
14    sign all other places to -- and they did this to make the
15    deposit -- to make -- excuse me -- make the documents appear
16    more legitimate.
17              And as I indicated, he also testified that he paid a
18    part of the proceeds to Mr. Pendergrass.  But again, Your
19    Honor, I would need to go back and look at the transcript to
20    see if I can identify the specific amount paid.
21              THE COURT:  Well, is there something that reflects
22    that the actual transmission of this -- these funds to
23    Mr. Pendergrass?  Because I mean, I know that the testimony --
24    this was sort of a hotly contested issue about the Holland &
25    Knight matters.
```

1    Was there an actual transfer of funds that was

2    deposited?

3    MS. KING:  So there is not going to be a transfer of

4    funds by way of a check.  I believe -- and again, Your Honor, I

5    want to qualify this that I definitely need to double-check the

6    transcript.  But I believe this was a transfer that involved

7    cash and it did not involve a check.  But I, again, need to

8    double-check the transcript.

9    THE COURT:  All right.

10   MS. KING:  So the next one is Michael Burandt.

11   Michael Burandt would be -- the trial exhibit is going to be --

12   give me one second -- Government's Exhibit 39, which would be

13   in the pack of records obtained from Mr. Pendergrass's --

14   Government's Exhibit 39, which is contained in the pack of

15   records from Mr. Pendergrass's business.

16   And that is going to be the document directly above

17   the Lee Family Trust.  It should be third from the bottom.  And

18   I will also be referring to Government's Exhibit 20, which is a

19   bank statement.

20   And while you are turning to that, are you ready for

21   me to proceed, Your Honor?

22   THE COURT:  Just simply can you tell me what the

23   box --

24   MS. KING:  The exhibit number?

25   THE COURT:  Not the exhibit number.  What you have on

1    the bottom right-hand corner so I can find this.

2            MS. KING:  Yes.  Okay.

3            So it is going to be box 4, and the first page of it

4    is box 4, 002039.

5            THE COURT:  Why don't you just show me -- try to

6    identify -- I mean, I know it made sense to you.  But it is

7    very difficult with the way it is done for me to really find

8    it.

9            So if you just -- I'm going to give this to

10   Mr. Martin.  And you can find it and just put a sticky --

11           MS. KING:  I'll hand you mine, if I can take your

12   copy back.

13           THE COURT:  That is fine.  Thank you.

14           MS. KING:  All right.  So, now, with that one, when

15   Mr. McQueen testified that this one actually was executed --

16   was different from the way the other schemes were executed.

17   Mr. McQueen testified that Michael Burandt actually started out

18   as a legitimate request, meaning that Mr. Burandt was actually

19   mailed the package that Mr. McQueen spoke about that they would

20   send to individuals who are owed funds from the City of Atlanta

21   soliciting them as customers to collect the funds on their

22   behalf.

23           Mr. Burandt accepted that solicitation and actually

24   signed the power of attorney that is provided in the

25   Government's exhibit.  And I believe he also included a copy of

1    his driver's license or identification document.  The way --

2    where things turned on this one is that once the city paid the

3    funds Mr. Pendergrass deposited the check on behalf of

4    Mr. Burandt into the Wells Fargo Bank account.  And it is at

5    Government's Exhibit 20, which I provided to the Court.

6            And you have that, Your Honor?

7            THE COURT:  Yes.

8            MS. KING:  And the very last page of the packet shows

9    where the check issued to Mr. Burandt was deposited into the

10   bank account on which Mr. Pendergrass was the sole signatory on

11   the account.

12           Mr. McQueen explained that what happened is after the

13   funds were deposited Mr. Pendergrass never paid the funds to

14   Mr. Burandt and he instead kept the funds.  And so that is how

15   that ends up on this loss amount list.

16           And then with respect to Mr. Hickman --

17           THE COURT:  Why don't I give you this back?  Then you

18   can give me your Hickman one.

19           MS. KING:  Okay.

20           Okay.  And for this one, Your Honor, the Government

21   will, you know, acknowledge that the testimony on this is

22   slight.  Mr. McQueen testified that this was one of the

23   fraudulent claims that he and Mr. Pendergrass worked together.

24   And that testimony is at Document 264 at 209.  He -- and the

25   Government's Exhibit -- trial Exhibit 38 shows that claim was,

1  in fact, submitted to -- excuse me, Your Honor.

2         The claim was submitted to Harris County in the

3  amount of 11,482.  It is signed by a Larry Pendergrass.  Mr. --

4  but the Government will acknowledge that Mr. McQueen did not

5  provide further testimony with respect to the submission of

6  this document.

7         The Government contends that it is relevant conduct

8  because it is consistent with how the claim with the Lee Family

9  Trust was executed and the request for the funds was, in fact,

10  made.  And we believe that that amount should -- should --

11         THE COURT:  You have two different amounts listed

12  here on the second page.  They both --

13         MS. KING:  There are two separate requests, Your

14  Honor.  There are two separate requests.  And so -- and so that

15  is the difference, Your Honor.

16         But, again, the Government acknowledges that the

17  testimony on that is slight.  But that is the trial exhibit

18  that was introduced with respect to that claim as well as the

19  testimony that was included.  And we just argue that it should

20  be included in the intended loss calculations because it is

21  relevant conduct in this case that qualifies for inclusion.

22         THE COURT:  So was the check mailed or not?

23         MS. KING:  No check was mailed.  No funds were

24  received.

25         But with respect to how the claim is similar to the

1    unclaimed funds -- other unclaimed funds in this case,

2    Mr. Hickman's was submitted at or near the same time as the

3    other claims that are charged in the indictment.

4              THE COURT:  What was the testimony as to who dealt

5    with any of these folks from Harris County?

6              MS. KING:  That is what I just acknowledged, Your

7    Honor, that the testimony with respect to that was scant.  And

8    the testimony that I just described, Your Honor, is the sum

9    total of the testimony.

10             So -- so the Government is acknowledging that the

11   testimony is scant on that one.  And so that is --

12             THE COURT:  That is it?

13             If you want to perfect the record, I don't know

14   whether you want to put the whole package in or you want to put

15   in your exhibits so that -- instead because that is a lot of

16   other documents as well.

17             MS. KING:  So I can do that, Your Honor.  These are

18   already part of the record since they are trial exhibits.  I

19   believe they are under document -- in the record as

20   Document 258.  All of these trial exhibits are there.

21             THE COURT:  That's fine.  All right.  That's fine.

22   Now that -- if it is all under Document 258, that is fine.

23             MS. KING:  And yes.  So, Your Honor, I have actually

24   printed the exhibit list, and they are all there.

25             MS. DURRETT:  Any objection we made at trial we would

1    make the same objection about these exhibits.

2            THE COURT:  All right.  Is there anything else,

3    Ms. Durrett, that you wanted to respond as to this?

4            MS. DURRETT:  There is, Your Honor.

5            Your Honor, I don't know if you still have the

6    exhibits in front of you.  I'm looking at Exhibit Number 12.

7            THE COURT:  No.  I just -- I think I just gave them

8    back to her.

9            MS. DURRETT:  It is Exhibit Number 12.  It is the

10   letter regarding Holland & Knight.  And I can show it to the

11   Court too.

12           The testimony at trial is that Terrell McQueen signed

13   this letter because he is the one that claimed he was Gene

14   Bloom.  So all of the documents that are signed by Gene Bloom,

15   that was Mr. McQueen.  He admitted that that was one of his

16   aliases.

17           So when you look at the Holland & Knight letter,

18   Exhibit 12, that is signed --

19           THE COURT:  Can I just get back that exhibit?

20           MS. KING:  I'm sorry.  I didn't hear you, Your Honor.

21           THE COURT:  Can I just get back that exhibit, the

22   Number 12?

23           MS. KING:  Oh, yes.  Okay.  Thank you.

24           MS. DURRETT:  Your Honor, I'm also going to talk

25   about Exhibit 9, 38, and 39.

1          THE COURT:  Okay.

2          MS. KING:  You said 9, 39, and 12?

3          MS. DURRETT:  And 38.

4          MS. KING:  Oh, and 38.

5          MS. DURRETT:  If I have it right.

6          MS. KING:  Huh?

7          MS. DURRETT:  I said if I have it right.

8          MS. KING:  Do you have it correct?

9          MS. DURRETT:  Yes, I do.

10          THE COURT:  All right.

11          MS. DURRETT:  Thank you, Your Honor.

12          When I'm looking at Exhibit Number 12, which is the

13    letter regarding Holland & Knight, the testimony at trial was

14    that Mr. McQueen -- he testified that he signed this with his

15    name because he was admitting that he is Gene Bloom, that he

16    was using the alias Gene Bloom to mail out letters.

17          And then I think the Government said that he

18    testified that Mr. Pendergrass signed here on the power of

19    attorney.  But I think the testimony was that Mr. McQueen

20    actually said I signed that when he is talking about who signed

21    it.

22          He then stated I think that Mr. Pendergrass filled in

23    the name at the bottom.  I will just notify the Court that

24    prior to trial Mr. Pendergrass had admitted that on all of the

25    five charged counts he signed and sent all of those documents.

 1    He did not make any claim that Mr. Pendergrass signed any of

 2    those documents.

 3            So when he appears at trial, he wants to make it seem

 4    like Mr. Pendergrass is more involved.  So he says, oh, yeah,

 5    I'm Gene Bloom, and I did sign these, but Mr. Pendergrass is

 6    the one who printed the name.  I will submit to the Court that

 7    based on the evidence that the Court has that is not a credible

 8    claim.

 9            THE COURT:  Can you slow down?

10            I will just say you said I will just notify the Court

11    that prior to trial Mr. Pendergrass had admitted.

12            MS. DURRETT:  I'm sorry.  Mr. McQueen.

13            THE COURT:  So you are saying that it was Mr. McQueen

14    had admitted that on all of the five charged counts he signed

15    and sent out all of the documents?

16            MS. DURRETT:  That's right, Your Honor.

17            THE COURT:  And -- slow down.  And is that -- was

18    that -- were those in statements that the -- that the

19    Government took from him --

20            MS. DURRETT:  That's correct, Your Honor.

21            THE COURT:  -- and then provided to you?

22            MS. DURRETT:  That is right, Your Honor.  Then we had

23    a stipulation at trial that went to the jury that Mr. McQueen

24    signed and sent all of those documents.

25            THE COURT:  All right.

1          MS. DURRETT:  And so what I will submit to the Court

2     is that it is aberrant to have this document where Mr. McQueen

3     would testify, oh, I did all the signatures, but

4     Mr. Pendergrass printed something on it, and he did that

5     because he wanted to claim that he was working with

6     Mr. Pendergrass on this.

7          But if you look at Exhibit Number 12, he is Gene

8     Bloom.  He signed as Gene Bloom.  He admitted he signed as

9     Mr. Cohen on the Holland & Knight documents.

10          When you look at the Document Number 9 -- and I'm

11     talking about in the bottom right-hand corner it says box 4,

12     002719.  This is --

13          THE COURT:  I'm sorry.  Box 4 -- on my 9 --

14     Government's Exhibit 9 --

15          MS. DURRETT:  It is box 4, 2719.

16          THE COURT:  Y'all have got me -- my Government's

17     Exhibit 9 says on the bottom of it box 2, 000968.

18          MS. DURRETT:  That is the right exhibit, Your Honor.

19     You're going to have to dig through -- about halfway through to

20     the bottom and look at the bottom where it says box 4, 2719.

21          THE COURT:  Okay.  I'm there.

22          MS. DURRETT:  Okay.  And this is the Lee Family

23     Trust.  These are the Lee Family Trust documents.  If you look

24     down in the left-hand corner, there is that Gene Bloom

25     signature.  That is Mr. McQueen.  He testified that he used

1    multiple aliases in his life.  And one of his aliases is Gene

2    Bloom.

3              So when you look at the Lee Family Trust documents,

4    Gene Bloom, Gene Bloom, Gene Bloom.  And I know the Government

5    talked about the check that was actually deposited.  That is at

6    box 4, 2723, a few pages back.

7              THE COURT:  Okay.

8              MS. DURRETT:  That is the one check that went into

9    the account, which we agreed that should be part of the

10   restitution because there is a check showing that some amount

11   was paid.

12             The other checks -- Mr. Cohen testified -- the

13   Government stood in front of the Court and said that Mr. Cohen

14   testified that Mr. Pendergrass met with him and Mr. Pendergrass

15   provided documents to him.

16             That is not what Mr. Cohen testified.  He said he met

17   with a Black man.  He could not identify that Black man.  The

18   person gave him four checks.  He did not have any

19   identification or knowledge of who that person was.

20             We then heard testimony from Mr. McQueen that he met

21   with Mr. Cohen.  No one talked about a third person being

22   there.  Mr. McQueen met with Mr. Cohen and gave him the checks.

23   He is Gene Bloom.

24             So the idea that Mr. Pendergrass should be

25   accountable for whatever Mr. McQueen was intending to do

1    related to those checks I don't think is valid in this case.

2    And that is as far as the Lee Family Trust, Your Honor.

3              I'll also note Mr. Pendergrass admitted that he set

4    up the voice mail account and monitored the voice mail account

5    for the Lee Family Trust.  We actually had a voice mail that we

6    played that was delivered to us a few days or weeks before

7    trial that was provided by Mr. McQueen that said, oh, wait,

8    here is the voice mail from the box I was monitoring when

9    people were calling in to the Lee Family Trust because I was

10   monitoring that box.  He is the one who did all of the

11   documents.  He is the one who formed Attorney Recovery System,

12   which is the header on these documents.

13             So I think to hold Mr. Pendergrass accountable for

14   Mr. McQueen's intended frauds is not -- intended loss is not

15   appropriate in this case.

16             I think the Court --

17             THE COURT:  But it is not speculative, is it?  I

18   mean, that was your biggest concern I thought was -- and it

19   doesn't appear speculative when they have identified the

20   different sorts of individuals who had signed up and that there

21   might be funds in their name.

22             MS. DURRETT:  Right, Your Honor.  But these documents

23   related to the Lee Family Trust and Holland & Knight, they are

24   only --

25             THE COURT:  I'm not talking about Holland & Knight.

1    I'm talking about -- one at a time.

2              MS. DURRETT:  Are you talking about the Lee Family

3    Trust?

4              THE COURT:  I'm just talking about the Lee Family

5    Trust.

6              MS. DURRETT:  Okay.  Thank you, Your Honor.

7              I will note that Mr. McQueen is the only person who

8    testified to using an alias.  He is the one who is out here

9    using the alias contacting Harris County, contacting Mr. Cohen,

10   trying to get these checks.

11             The idea that we can know what was going to happen as

12   far as those checks, I don't think the Court knows that.  I

13   mean, Mr. McQueen had a clear intent.  There is no doubt about

14   it.  He testified to that.

15             I don't think -- and I noted this in my memo.  I

16   don't think you can then say, well, that is Mr. Pendergrass's

17   loss because of what Mr. McQueen wanted to do.  I think we have

18   to have more evidence than that that Mr. --

19             THE COURT:  And, Ms. King, was there -- I gather

20   that -- was there any amount of loss and restitution charged to

21   Mr. McQueen in connection with this particular -- the events

22   surrounding Lee Family Trust?

23             MS. KING:  So I do not believe so.  But I would need

24   to go back and look at the presentence report, Your Honor, in

25   order to definitively answer that.

1          MS. DURRETT:  And, Your Honor, I'll just note that we

2    added up the checks in the indictment.  It is the $137,000 that

3    is charged in the indictment that Mr. McQueen was ordered to

4    pay.  And when you look at his judgment in the case, the only

5    victim that is listed there is the City of Atlanta.  So there

6    is no one else listed as a victim in his judgment.

7          The same is true for Mr. Hickman, Your Honor.  The

8    Government was talking about Exhibit 38, which is the letter to

9    Harris County regarding Mr. Hickman.  Again, it is signed by

10   someone named Larry Pendergrass.

11         I will note for the Court that the only person in

12   this case who testified to using an alias is Mr. McQueen.  And

13   he used at least three of them we know about.  So I don't think

14   we can say, oh, well, this definitely has a relationship to

15   Mr. Pendergrass.

16         Mr. McQueen signed these documents.  He admitted it.

17   We found documents on his computer of him practicing the Greg

18   Hickman signature.  This is Mr. McQueen.

19         So -- and I will also note, Your Honor, we did talk

20   with Mr. McQueen at trial about the asset collection business.

21   And he said Mr. Pendergrass was trying to teach me the asset

22   collection business and he told me it is a numbers game, send

23   out letters, send out letters, and eventually you'll get

24   someone to write back, and we'll have -- you can do legitimate

25   asset collection.  That is what Mr. Pendergrass was trying to

1  teach him.

2        Now, Mr. McQueen did some other things.  But I think

3  that the idea that just sending out the letter could be

4  evidence that someone is trying to steal the money -- I don't

5  think that is borne out by the record, Your Honor.

6        We would ask that you use the restitution amount as

7  the actual loss amount.

8        MS. KING:  Your Honor, may I just briefly respond?

9        THE COURT:  Yes.

10        MS. KING:  So with respect to the Lee Family Trust

11  matter, Your Honor, Ms. Durrett points out that Mr. McQueen is

12  the person who did all of these things with respect to setting

13  up the phones and signing documents.

14        However, Mr. Cohen testified that he met with a

15  person who introduced himself as Mr. Pendergrass.  And I would

16  also point out that it is only Mr. Pendergrass who opened up a

17  bank account in the name of Lee Family Trust and deposited a

18  check issued to Lee Family Trust into that account.  And he is

19  the sole signatory on that account.  So, Your Honor, the

20  evidence overall establishes that Mr. Pendergrass was involved

21  with respect to that particular claim for unclaimed funds.

22        And then the only other matter that I'm going to

23  briefly address is the one with respect to Michael Burandt.

24  Again, Ms. Durrett talks about how Mr. McQueen did most of the

25  document -- handling of the documents associated with that

1   particular account.  But, again, when the check came in, the

2   check was deposited into a bank account by Mr. Pendergrass.

3   That is one of the -- the times where we actually captured

4   Mr. Pendergrass on video depositing the checks.  He and

5   Mr. McQueen were there together depositing checks.  And there

6   was an exhibit of that, Government's Exhibit Number 19.

7          Government's Exhibit Number 20 shows that the check

8   did go into the account of which -- or on which, I should say,

9   Mr. Pendergrass is the sole signatory.  And the testimony was

10  that the funds were never paid.

11         So Mr. Pendergrass, even if he did not necessarily

12  prepare all of the documentation, he was sufficiently involved

13  for that to be included with respect to the intended loss

14  amount.

15         THE COURT:  All right.  Well, let's take a break of

16  about five minutes, and then we'll continue.

17         COURTROOM SECURITY OFFICER:  All rise.

18             **(A brief break was taken at 4:22 PM.)**

19         THE COURT:  Just a few more questions, and we'll be

20  able to go on.  This is really about the losses.

21         Ms. Durrett, was there anything else to point out to

22  me regarding --

23         MS. DURRETT:  No, Your Honor.

24         THE COURT:  Let me finish -- as to the testimony

25  given as to Mr. McQueen's involvement in the Holland & Knight

1    matter when the defendant was out of town or anything else?

2            MS. DURRETT:  That's right, Your Honor.  I mean, the

3    testimony at trial was that Mr. Pendergrass had asked

4    Mr. McQueen to try to get that account.  Mr. McQueen tried

5    legitimately to get that account.  He failed.  And then he

6    decided to commit fraud.  Mr. Pendergrass was on vacation

7    during that time was the testimony and that Mr. McQueen was

8    held accountable for that fraud in Clayton County.  So I think

9    he is responsible for that.

10           THE COURT:  Well, I think that the -- while

11   Mr. McQueen wasn't an employee of the defendant here,

12   Mr. Pendergrass, that as to the Holland & Knight matter, my

13   assessment of the evidence and the testimony given in the -- in

14   my assessment of Mr. McQueen's -- where he was credible and

15   where he was not credible, I would say that he would have been

16   solely responsible for the Holland & Knight deal.  He deposited

17   the money into his own bank account.  He was held responsible

18   for that by Clayton County law enforcement authorities.  And --

19   and there was some amount of legitimate and some amount of

20   illegitimate work that was done through Mr. Pendergrass's firm.

21           But in this case, I mean, the evidence was that he

22   was -- that Mr. Pendergrass was out of town when all of this

23   transpired.  And on this particular one, he was -- Mr. McQueen

24   was out on his own.  And it would be improper to hold

25   Mr. Pendergrass responsible for that dimension of the loss.

1            As to the -- I'm just looking at the page number

2    here -- the Lee Family Trust, when we were closing up, I had

3    asked for information regarding which funds were deposited

4    actually into the defendant's account.  And there was -- and as

5    I understand it, $5184.83 was deposited into the company -- the

6    Asset Recovery bank account as to the Lee Family Trust.

7            Is that right or not?

8            MS. KING:  It was deposited into an account that

9    Mr. Pendergrass opened up in the name of Lee Family Trust.  It

10   was not deposited into an Asset Recovery account.

11           THE COURT:  And just to sort of make sure, is that --

12   is there a dispute or not as to that it is, in fact,

13   Mr. Pendergrass who opened up that account?

14           MS. DURRETT:  I think we disputed that at trial, Your

15   Honor.  I don't think there is a dispute that that check was

16   cashed.

17           THE COURT:  Right.

18           MS. KING:  But, Your Honor, the trial exhibit did

19   include the opening statement that included the signature card

20   of the account, which is consistent with the signature of Mr.

21   Pendergrass's account on all of the other bank accounts.

22           THE COURT:  But as I understand it, Mr. McQueen was

23   not held responsible for any portion of that loss on the

24   173,000-odd-dollars; is that right?

25           MS. KING:  That's correct.  Because all but the $5000

```
 1   was returned by Mr. Cohen to Harris County.  And the $5000 did
 2   go into the account that only Mr. Pendergrass controlled.  But
 3   Mr. McQueen was not held accountable for any portion of that
 4   $5000.
 5            THE COURT:  Well, it just -- the thing is it seems
 6   all the evidence here points to Mr. McQueen as having been the
 7   vital person involved in the Lee Family Trust matter and
 8   raising -- arranging it.  I think that it is perfectly proper
 9   to hold Mr. McQueen responsible for the $5184.83.  I don't
10   really think we have any evidence that the man -- the Black man
11   that the representative met with was, in fact, Mr. --
12   Mr. McQueen because this is the one where he -- that
13   Mr. McQueen had arranged all of the documentation and signed
14   it.
15            Is that right?
16            MS. DURRETT:  That is right, Your Honor.  Gene Bloom.
17            THE COURT:  Gene Bloom.  And so it looked like it and
18   he acknowledged.  And so it is really his fingerprints all over
19   it.
20            And while I understand the appropriateness of
21   generally speaking under the guidelines, under the law that we
22   are going to apply a loss amount that is not actually
23   experienced but was the projected amount, it just seems under
24   the circumstances neither rational nor fair at this juncture if
25   Mr. McQueen arranged it all and it simply gets deposited
```

1   into -- this amount.  But he is the one who is negotiating the

2   whole thing and signing other people's signatures and also is

3   not going to be held -- and is not being held responsible for

4   the loss amount.  I am -- I just think it is not correct then

5   to hold the defendant responsible for the loss amount from the

6   Lee Family Trust, other than the $5184.83.

7           Anything involving the City of Atlanta, I'm going to

8   say that Mr. -- here otherwise, which is the Mr. Burandt one, I

9   think it is appropriate to hold the defendant responsible for

10  the restitution amount.  But that is the same as the loss

11  amount.

12          As to Mr. Hickman -- I have a lot of things -- just

13  remind me.  Mr. Hickman was in a different circumstance

14  obviously than the Lee Family Trust.

15          Who was he -- who was his primary contact?

16          MS. DURRETT:  It was Mr. McQueen, Your Honor.  There

17  was testimony that he had practiced signing that Greg Hickman

18  signature.

19          THE COURT:  And there was no money actually taken

20  from Mr. Hickman in the end?

21          MS. KING:  There is no restitution.

22          THE COURT:  And he was not held responsible --

23  Mr. McQueen? -- for any portion of the $15,529?

24          MS. KING:  No, there was no restitution.

25          THE COURT:  I'm not -- for the same reason I have

```
1    discussed before, I'm not going to include that amount in the
2    restitution amount and the same reason that he was really not
3    the one doing that deal and they had a fair amount of activity
4    where they were both freelancing on their own.  And the
5    indication in the evidence was that this one was Mr. McQueen's.
6         So the loss amount and restitution amounts are
7    equivalent for Georgia Municipal Association, Long Weinberg,
8    Johnson Coleman, James Bone, Actor's Express.  And those are
9    all attributable to the defendant here.
10        The same is true as Actor's Express -- we just went
11   through that -- Atlanta Quarterback Club, Glenridge Drive
12   Group, Weissman Nowack, and Hemisphere all being done with the
13   City of Atlanta.  And the City of Atlanta was definitely within
14   the defendant's territory.
15        And I -- even though the defendant obviously also
16   worked with his co-defendant in these transactions, I think
17   they are ones that he obviously knew about or more obviously if
18   we were applying the preponderance of the evidence standard.
19   So I think the loss amounts can properly include all of those,
20   plus Ms. Walker.  We're excluding Kayrita Anderson, as I
21   understand it, and Tousa Homes.
22             MS. DURRETT:  And --
23             THE COURT:  And Jennifer Jones.
24             MS. DURRETT:  Yeah.  Jennifer Jones, Kayrita
25   Anderson, and Georgia State University.  Not Tousa Homes.
```

```
 1              THE COURT:  And Georgia State University.

 2              MS. KING:  I was about to say Tousa Homes is

 3    included.

 4              THE COURT:  Is included.  All right.

 5              I don't know what that amount is at this juncture.

 6              MS. KING:  I'll calculate it.

 7              THE COURT:  Mr. Moody, when we are through this,

 8    I'm going to start hearing from any witnesses and maybe you

 9    could recalculate the guidelines.

10              PROBATION OFFICER:  Yes, Judge.

11              THE COURT:  Because I'm a little confused by the

12    chart as well at this point.

13              PROBATION OFFICER:  Yes.  I understand.

14              THE COURT:  Let me just tell you:  For that

15    purpose -- for those purposes, I'm going to overrule the

16    objection of the defendant to the application of the additional

17    two-level aggravating factor.

18              I think this is not a wonderfully written guideline.

19    And I'm hoping that the Commission, now that it is fully

20    constituted, will give it greater clarity.

21              But I think the thing is that this is closer to the

22    situation in James.  And really there is not that much

23    difference at one level between James and Cruz in some ways.

24    The addition of the power of attorney that is signed makes --

25    it basically makes this an authentication feature, not just
```

1    simply a means of identification, and that you are relying on
2    the power of attorney dimension of verification of the -- and
3    it is not simply a means of identification.

4           But I think there is an awfully close connection
5    between means of identification and authentication feature I
6    will acknowledge, which is why we have gone in circles.

7           And I will apply the two levels based on that.  But I
8    think it is a really close call.

9           MS. DURRETT:  Thank you, Your Honor.

10          THE COURT:  So I think I have resolved everything I
11   can.  Now, it is on you.

12          Have you finished your addition on the loss amount?

13          MS. KING:  I did.  But I got a number that was
14   drastically different from what probation has -- so I -- I will
15   defer to what probation has.

16          PROBATION OFFICER:  Your Honor, do you want me to --
17   I guess, just to spell this out, so I started with what the
18   Government said, took away the Georgia State.  I guess at the
19   beginning, the Government was taking away the Georgia State,
20   the Jennifer Jones, and there was another figure --

21          THE COURT:  Kayrita.

22          PROBATION OFFICER:  Kayrita.  Ms. Anderson.  And so
23   that loss amount is $765,030.33.

24          And then take away Holland & Knight.  Take off Lee
25   Family Trust.  But I subtract -- I think you said the 5000

```
 1    restitution applies for that.
 2              THE COURT:  Right.
 3              PROBATION OFFICER:  Okay.  So I subtracted that and
 4    came up with 168,536.15.  And then take off Greg Hickman, which
 5    is $15,529.97.
 6              Is there another one we took off?
 7              THE COURT:  I don't think so.
 8              PROBATION OFFICER:  The figure I came up with was
 9    $221,298.36.
10              Is that what y'all have?
11              MS. DURRETT:  That is what we had, Your Honor.  We
12    have $221,298.36.
13              THE COURT:  Is that what you had?
14              PROBATION OFFICER:  Yes.
15              THE COURT:  All right.
16              PROBATION OFFICER:  Your Honor, that would be a
17    ten-level enhancement for that.
18              THE COURT:  It would be a ten-level?
19              PROBATION OFFICER:  Yes.
20              THE COURT:  Okay.  Given all that, could you just go
21    ahead and tell us what the total is and where we are at.
22              PROBATION OFFICER:  Yes, Judge.  So for the base
23    offense level, we have a seven.  We have a plus ten for greater
24    than 150,000 but less than 250,000.  Plus two for the
25    enhancement.  That is the enhancement for sophisticated means.
```

1    Plus two for the authentication feature.  Plus two for role.

2    So that comes up to a total of 23.

3              Then for the money laundering, base offense level of

4    23.  And there is a plus two for being convicted under 1956.

5    So that is a total of 25.

6              THE COURT:  And that is the aggravated identity?

7              PROBATION OFFICER:  Let me -- I'll backtrack.  So my

8    base offense level is 23.  Plus two.  We took off the

9    sophisticated means for that.  Plus two for role.  So that is

10   25 -- 27 for that.

11             Is that what y'all have?

12             THE COURT:  I'm sorry.  I simply -- you had a total

13   of 23.  Then you added two for aggravated --

14             PROBATION OFFICER:  So for the money laundering, base

15   offense level is 23.  There is a plus two for being convicted

16   under 1956.

17             THE COURT:  Right.  And then --

18             PROBATION OFFICER:  We took off the sophisticated

19   means.  So there is a plus two for role.  So 23, 2 is 25.  Then

20   for the role, total would be 27.

21             THE COURT:  But you already had the role when you got

22   to 23.

23             Have you double-counted the role?

24             PROBATION OFFICER:  So the role would go under the

25   group one and the group two.  Right?  So there's the two sets

1    of calculations.

2              THE COURT:  So you have applied the role twice?

3              PROBATION OFFICER:  Yes.

4              MS. DURRETT:  No.

5              THE COURT:  Well, that's what he is saying.  That is

6    why I want to understand the application of the role twice.

7              MS. DURRETT:  You don't.  You don't apply the role

8    twice.

9              MS. KING:  You do because you are doing it based on

10   the individual convictions.  And then -- and I think the

11   probation officer is going to explain the group with the

12   highest --

13             PROBATION OFFICER:  Offense level.

14             MS. KING:  -- with the highest offense level will

15   apply, which will effectively knock out the second one.

16             MS. DURRETT:  But you don't do the base level offense

17   for money laundering based on the higher offense for the

18   underlying crime.  You do it based on the base level plus the

19   Section 2 enhancements.

20             MS. KING:  But the role in the offense is a chapter

21   three enhancement that does apply.

22             MS. DURRETT:  Right.  But you don't apply it twice.

23   So that is all I'm saying is that if the Court is going to

24   apply it it should be applied.  But it should not be applied

25   for mail fraud and then additionally applied for money

1    laundering.

2          THE COURT:  All right.  I'm going to -- I want to

3    make sure that the family members who are here or friends who

4    are here who want to testify and who might need to leave at

5    some point that they get to make their remarks.  And I am

6    cognizant we have a small child here too.

7          MS. DURRETT:  Thank you, Your Honor.  I appreciate

8    that.  Mr. Pendergrass does have quite a few people here to

9    support him, including his daughter and his son and some family

10   and friends.

11         But we do have one speaker.  Mr. Dwayne Lee would

12   like to come and speak if he could.

13         Mr. Lee?

14         MR. LEE:  Your Honor, I have known Allen for 46

15   years.  And I know him to be a loving and just man.  I have

16   witnessed the birth of his two children.  I am the godfather of

17   his daughter Ashley.  And I spent a lot of time with Allen in

18   2008 when his wife passed.

19         And I see -- I saw him change.  They had been

20   together since before I met him.  And I know that he went

21   through a dark period of time.  And I'm not using that as

22   justification because I own several drug treatment centers in

23   Ohio.  And I see people every day who have done things that

24   maybe they shouldn't have done.  Right?  But I believe in

25   redemption.

1          And since Allen got out last time, he worked for me.

2   He did some consulting.  He did -- he flew back and forth.  And

3   if -- I don't know what the outcome is going to be.  If the

4   Court finds favor in his petition for leniency, I would

5   certainly employ him again for as long as I can.

6          He's a pretty bright guy.  Sometimes maybe too

7   bright.  But just like I said, just a wonderful man.  He is

8   humble.  And I love him.  My wife loves him.  My son loves him.

9   And things happen.

10          Thank you.

11          THE COURT:  Thank you very much for your remarks.

12          MS. DURRETT:  We don't have other speakers, Your

13   Honor.

14          THE COURT:  All right.  Then let's go back to the

15   numbers.  Are we any -- go ahead.

16          PROBATION OFFICER:  Okay.  Your Honor, in

17   Section 2S1.1, commentary note 2C says application of chapter

18   three adjustments notwithstanding Section 1B1.5C Subsection --

19          THE COURT:  Don't go too fast for -- both -- all of

20   us here have been in a trial going on and on.  So we are

21   needing everyone to go slower.

22          PROBATION OFFICER:  Yes, Your Honor.

23          THE COURT:  You're at 2S1.3?

24          PROBATION OFFICER:  1.1.

25          THE COURT:  1.1.

```
 1              PROBATION OFFICER:  Commentary note 2C.  Not
 2    withstanding Section 1B1.5C, in cases in which Subsection A1
 3    applies, application of any chapter three adjustments shall be
 4    determined based on the offense covered by this guideline,
 5    i.e., laundering of criminally derived funds and not on the
 6    underlying offense from which the laundered funds were derived.
 7              How I read that is the chapter three enhancement
 8    would apply.
 9              MS. DURRETT:  Your Honor, we're not disputing that it
10    applies.  We just don't want it applied twice.
11              So when you calculate the money laundering offense,
12    you should have seven for the base level offense, ten for the
13    loss amount, two for sophisticated means, two for
14    authentication feature, and two for leadership.
15              When you then take the base level offense over into
16    the money laundering, you lose two of those points.  You can
17    add them back in.  But they don't -- you don't take the full
18    total offense level from mail fraud and increase it.
19              I don't know if I'm making sense.  But that is the
20    way it works.
21              MS. KING:  Your Honor, I would argue that
22    Ms. Durrett's position is inconsistent with what the guidelines
23    require.  The guidelines specifically provide that the offense
24    that is specifically covered under 2S1.1 is entitled to the
25    application of chapter three enhancements.
```

1          There's nothing in 2S1.1 that talks about the

2     carryover of enhancements that apply to the underlying offense

3     level.  That is calculated separately.  And the way that the

4     Court is going to avoid the double-counting is when the

5     groups -- when you get to the merger issue, what is going to

6     happen is the offense with the highest offense -- excuse me --

7     yes, the offense with the highest offense level would

8     ultimately control.

9          So you will not have that double-counting that you

10    are speaking about.  But Your Honor is obligated to correctly

11    calculate the guidelines for purposes of being able to get to

12    that ultimate offense level.

13         And it is the Government's position that what the

14    probation officer has done is correct and that the issue that

15    Ms. Durrett is worried about is going to work itself out when

16    the probation officer explains the grouping.

17         THE COURT:  All right.  Go ahead and explain the

18    grouping then at this point.

19         PROBATION OFFICER:  Yes, Your Honor.  So the higher

20    of the two offense levels applies here.  So that would be -- 27

21    is the highest offense level.  And that has -- with a criminal

22    history category II, that has a guideline range of 78 to 97

23    months, plus 24 months' consecutive.  Total custody range would

24    be 102 to 121 months.  A fine guideline range would be $12,500

25    to $125,000.  Supervised release is one to three years on

1    Counts 1 through 6 and one year on Counts 7 through 10.

2            MS. DURRETT:  Your Honor, I'm sorry to jump in here.

3    Even if you look in the PSR report that the probation officer

4    wrote, on Page 15 at Paragraph 44, it says the base level

5    offense is the offense level for the underlying offense from

6    which the laundered funds were derived.

7            And when you look at chapter 2B1.1, the base level

8    offense is the seven plus the loss amount.  So I don't -- it

9    says -- it says not including chapter three and chapter four

10   adjustments.

11           So if you look at the PSR, Page 15, Paragraph 44, it

12   says that the base level offense does not include the chapter

13   three and chapter four adjustments.  So we're talking about --

14   the base level offense for money laundering does not include

15   those prior chapter three adjustments.

16           MS. KING:  And I would submit that what that means is

17   your starting point for calculating the offense level is what

18   she is representing, not that the chapter three enhancements

19   don't ever apply as the commentary note indicates.

20           MS. DURRETT:  And I agree with that statement.  That

21   they apply when you are in money laundering, but you don't

22   double-count them, which is what may be happening here.  So --

23           MS. KING:  Okay.  I'm sorry.  I didn't mean to cut

24   you off.

25           MS. DURRETT:  That's okay.

1        MS. KING:  To the extent that she's arguing that the

2    offense level is consuming this enhancement, that is incorrect

3    because under 2S1.1 you start with a seven and then -- I'm

4    sorry.

5        So under 2S1.1, you start with the -- give me one

6    second, Your Honor.  I lost my place.

7        MS. DURRETT:  Your Honor, we may be able to, you

8    know, short-cut this by just saying we think the base level

9    offense for money laundering is 21 and then we go from there.

10       And I don't know if I'm disagreeing with other people

11   about that.  But then we would add two levels for 1956

12   conviction and two levels for leadership.  That is our

13   calculation.

14       THE COURT:  Right.  That gets you to 25.

15       MS. DURRETT:  Yes.

16       THE COURT:  And -- go ahead.

17       PROBATION OFFICER:  Your Honor, the 23 for money

18   laundering includes the base offense level of 7 -- actually I

19   think that -- now that I think about it, that changes due to

20   the loss amount being changed.

21       MS. KING:  That's correct.  That loss amount -- I

22   think that is what is throwing us.  That offense level under

23   money laundering should change.  So that has to be -- I think

24   that is what the issue is.

25       PROBATION OFFICER:  Yes.  Yes, Judge.  It would be --

1    21 would be the starting point.

2          MS. KING:  Yes.  The Government agrees.

3          THE COURT:  All right.  So could you walk me through

4    this again.

5          PROBATION OFFICER:  Do you want me to start over?

6          THE COURT:  Yes.

7          PROBATION OFFICER:  Start with just the money

8    laundering count?

9          THE COURT:  Sure.

10          PROBATION OFFICER:  The base offense level would be a

11    21.  Then there would be a plus two.  That would be plus two

12    for being convicted under 1956.  There would be a plus two for

13    role.  So the total adjusted offense level would be 25.  The

14    custody guideline range would be 63 to 78 months.  And the plus

15    24 months' consecutive, which would be 87 to 102 months.  The

16    fine guideline range would be 10,000 to 100,000.

17          THE COURT:  Does that include everything?  We don't

18    have anything else?  So have you summarized what everyone

19    agrees is the ultimate calculation in this case?

20          PROBATION OFFICER:  Yes, Your Honor.

21          THE COURT:  Do you agree?

22          MS. DURRETT:  Yes, Your Honor.

23          MS. KING:  I agree, Your Honor.

24          THE COURT:  All right.

25          I'm going to simply adopt what was already just

1   stated, especially since you-all agree and we had such

2   difficulty.  But I think it was well worth the time to go over

3   it again and again and again.  All right.

4          So what is the Government recommending as a sentence

5   in light of that?

6          MS. KING:  So in light of the guideline calculations,

7   Your Honor, the Government is recommending a guideline

8   sentence.  The Government's sentence memorandum indicated a

9   97-month sentence, but the Government is actually asking the

10  Court to consider a low end guideline sentence in this case.

11         We believe that that sentence is a reasonable

12  sentence after considering the 3553(a) factors.  It accurately

13  reflects the seriousness of the offense, and it provides for

14  just punishment in this case.  And it also provides for

15  adequate deterrence not only for Mr. Pendergrass but for others

16  who may be similarly situated who comes after him or who may be

17  contemplating becoming similarly situated who comes after him.

18         Now, one of the things that defense counsel is asking

19  for is for a sentence of time served with two years of home

20  confinement.  The Government would ask the Court not to adopt

21  that sentencing recommendation.  The Government submits that

22  that is an unreasonable sentence in light of this case.

23         First of all, the Government would point to that what

24  the defense counsel is arguing for is a substantial departure

25  from the guidelines.  In order to get to a time served

1    sentence, the Court would have to -- and this argument is

2    really based on what the Government is assuming the defense

3    argument is going to be in part based on the sentencing

4    memorandum, which is that the defense counsel wants the Court

5    to do a combination of things.  One, to take into consideration

6    the time that he served on the Ohio sentence.  Plus, do an

7    additional either variance or departure to eventually work the

8    sentence down to that where the Court would consider a time

9    served sentence for Mr. Pendergrass.

10          Number 1, I would note that the conduct for which he

11    was sentenced in Ohio is separate and distinct conduct.

12    Whereas, this conduct involved fraud related to unclaimed funds

13    that were submitted to various government entities on behalf of

14    individuals who were owed funds but who did not consent to

15    Mr. Pendergrass or Mr. McQueen requesting these funds on their

16    behalf.  Whereas, the incident in Ohio involved the allegation

17    of Mr. McQueen -- excuse me -- Mr. Pendergrass opening up an

18    account and depositing treasury checks that were stolen from

19    the mail.

20          The other reason why the Government would submit that

21    such a sentence that is going to be requested is unreasonable

22    is that this fraud scheme, in addition to the prior conviction

23    which occurred around 2012 -- and as the trial testimony

24    established, this offense covered from the latter part of 2012

25    into 2013.  So you have over a one-year period of time,

probably a little bit more than one-and-a-half-year period of time in which Mr. McQueen was involved in distinct fraud schemes that resulted in nearly a million dollars in loss.  And that, Your Honor, is not worthy of a time served sentence.

And to the extent that Mr. Pendergrass argues that he should really receive a sentence similar to Mr. McQueen, I would ask the Court to keep in mind that Mr. Pendergrass and Mr. McQueen are not similarly situated in this case.

Now, the thing that Ms. Durrett is going to harp on is that the majority of the evidence showed that Mr. McQueen was heavily involved in many of the fraud schemes.  But the evidence established that Mr. Pendergrass was Mr. McQueen's employer.  So he worked under Mr. Pendergrass.

Mr. McQueen accepted responsibility and got the consideration for that.  Mr. Pendergrass did not.  Mr. McQueen worked under the supervision for Mr. Pendergrass who provided resources that were used to commit the fraud.  And Mr. McQueen testified that he was only paid 33 percent of the fraud proceeds.  Whereas, Mr. Pendergrass kept the remaining amounts. So he actually netted the larger proceeds that resulted from these unclaimed fraud schemes.

And one of the other arguments that Ms. Durrett is raising is that the Court should impose a sentence of home confinement.  I believe she is arguing that the Court is authorized to do so under the guidelines.  And there is some

1   additional cases that she cites for the proposition where home

2   confinement was -- was ordered in place of a sentence of

3   prison.

4        I would ask the Court to consider the fact that that

5   is contrary to what Section 1028(a) provides statutorily.  And

6   it is also contrary to what the guidelines provide.  Under

7   chapter five of the guidelines, specifically Section 5C1.1,

8   which talks about the various sentences that can be imposed at

9   different zones within the guidelines, I do note that under

10  Subsection F it indicates that a sentence within zone D must be

11  satisfied by a term of imprisonment and that the guidelines

12  provide for a term of imprisonment when an offense level

13  otherwise fall in zones A or B.

14       Here as the probation officer calculated, the offense

15  level that applies here falls in zone D, which, as the

16  probation officer just advised, is an offense level 27.

17       We would urge the Court to not rely on the guidelines

18  as the basis for imposing a sentence of home confinement

19  because we believe that would be contrary again to 5C1.1,

20  Subsection F.

21       Additionally, I would also ask the Court to consider

22  the fact that what Ms. Durrett is asking is also contrary to

23  the statute itself.  Ms. Durrett in her sentencing --

24       THE COURT:  I want to just sort of -- in terms of the

25  time, I want to just say that I'm going to -- I want to allow

1    Ms. Durrett to make her record, but I am not inclined to just

2    give no time so -- at all.  So that is -- but I will allow her

3    to make her record.

4         And then if you want to respond to it, it might be

5    more efficient that way.  All right?

6         MS. KING:  Thank you.

7         THE COURT:  Thank you.

8         MS. DURRETT:  Thank you, Your Honor.

9         Your Honor, I just want to make a few points.  I know

10   that you have read my sentencing memorandum.  But one of the

11   things the Government keeps talking about is the Ohio

12   conviction.  Mr. Pendergrass was sentenced in Colorado for the

13   Tousa Homes conduct that is relevant conduct here.  And that is

14   what we are asking this Court to consider as time served, that

15   that he served a sentence for relevant conduct in this case.

16   And he served 30 months on that as a result of the Government's

17   actions in this case.

18        And I think we've laid out pretty clearly how the

19   events played out.  If you look at the timeline on Page 14 of

20   our sentencing memorandum, he was arrested by U.S. Postal

21   Service officials and state officials in September of 2013.

22   And we briefed this with the magistrate court quite fully.

23        But at that time, there were reports created by the

24   officers who arrested him saying that they wanted this to go

25   federal because it was a multi-jurisdictional arrest in their

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1     mind.

2           So at that time, it was intended to be a federal

3     case.  They arrested Mr. Pendergrass and took him to Fulton

4     County.  They held him there for about a month.  He got

5     released.  He had to have an ankle monitor and a 24-hour

6     curfew.  No charges came.  Eventually he was released by Fulton

7     County because the Fulton County DA's office was clearly not

8     prosecuting him and had no intent of prosecuting him.

9           They got a notice from their pretrial release staff

10    telling them they were going to release him because he had not

11    been prosecuted on April the 3rd, 2014.  Shortly thereafter,

12    there were emails between the Fulton County DA's office and

13    AUSA Jeff Brown about this case and about a meeting to discuss

14    this case.  No charges came.  Then --

15          THE COURT:  I'm sorry.  I've just -- I need to talk

16    to -- to my clerk for a moment.

17          **(There was a brief pause in the proceedings.)**

18          THE COURT:  I'm sorry.

19          MS. DURRETT:  That's okay.  I was just talking about

20    the evolution of this case, Your Honor.

21          So in April of 2014, Fulton County declined -- or

22    Fulton County pretrial releases him because there is no

23    prosecution.  Fulton County DA's office meets with AUSA Jeff

24    Brown.  No charges result.  In the interim, he pleads guilty in

25    Ohio and is sentenced to 30 months' incarceration based on

1    conduct related to Guishard Wilburn & Shorts, which is his

2    asset recovery business.  He then pleads guilty in Colorado for

3    the Tousa Homes incident, which is relevant conduct in this

4    case; was talked about at trial in this case and is in the loss

5    amount chart in the case.

6            That sentence then is ordered to be served concurrent

7    to Ohio.  While he is serving that 30-month term of

8    imprisonment, FCI Jesup notified the probation office in this

9    district that he will be eligible for halfway house release or

10   RCC release 17 to 19 months prior to his release date.  No

11   response comes.

12           He is denied placement at the RCC due to Fulton

13   County charges in November of 2016.  So he had the opportunity

14   because of his good behavior and the classes he was taking --

15   completing the RDAP program and other classes, he had the

16   opportunity for early release.  That was denied because Fulton

17   County District Attorney employees contacted the Bureau of

18   Prisons and said that they were going to be presenting a case

19   to the grand jury in 2017.  So they maintained their hold on

20   Mr. Pendergrass so that he could not be released from custody.

21           He was then indicted in this case not in Fulton

22   County, but here in federal court.  And he was brought here in

23   custody to make his initial appearance.  He was then granted

24   pretrial release, which he has been on since that time.  He has

25   been subject to travel restrictions to the Northern District of

1   Georgia for that entire five years.  He has been subject to

2   drug testing.  He has been subject to required classes,

3   including mental health and substance abuse treatment.

4          And they were -- as we began litigating this case, I

5   subpoenaed documents from the Fulton County District Attorney's

6   office.  And they notified me and the magistrate court that

7   they had mistakenly listed his case as open and that they had

8   no files related to Mr. Pendergrass.

9          So as a result of whether that was truly a mistake or

10  it was maliciously done, Mr. Pendergrass missed out on the

11  opportunity for early release in his Colorado case.  And he was

12  required to do a lot of programming related to that.

13         So I would assert, Your Honor, that the motivations

14  for sentencing as far as deterrence, education,

15  rehabilitation -- those issues have been addressed as a result

16  of Mr. Pendergrass's Colorado sentence.  He took 22 separate

17  classes while he was in custody at Jesup.  He became an

18  assistant instructor for those classes.

19         He completed the RDAP program, which is the intensive

20  residential drug program in the Bureau of Prisons.  He worked

21  as a library clerk in the prison system.  He had no discipline

22  reports or any other issues, which is what ultimately granted

23  him that opportunity for early release.

24         In short, he did everything we would want someone to

25  do who was in custody to show that they were going to change

 1   their ways.  When he got out of custody -- when he got out of

 2   custody, he again was subject to drug testing, restrictions,

 3   house arrest.  In Fulton County, he was on 24-hour curfew at

 4   his house.  Then he was on pretrial release here with

 5   restrictions, including reporting to probation for the last

 6   five years.

 7           So for the last nine years, he has been in some form

 8   of supervision by the court.  He has either been in custody, or

 9   he has been supervised by the probation department either here

10   or in Fulton County or both.

11           He has participated in the programs we would want him

12   to participate in.  And after release, he became a substance

13   abuse counselor to help other people.  So he was employed

14   helping Mr. Lee who just spoke at the Healing Hearts Counseling

15   Center where he counseled other addicts and people who were

16   going through crisis to help them get through that.

17           He has the particular knowledge and ability to help

18   people in that situation.  Because after the loss of his wife,

19   the death of his wife 12 years ago, he turned to alcohol and

20   drugs.  And he has become a different person as a result of

21   this whole process and the sentence that he served in Colorado.

22           And I think that he is not the person today that he

23   was 12 years ago, and I think the Court is entitled to consider

24   that not only in consideration of the departures that I cited

25   but in consideration of the 3553(a) factors, Your Honor.  I

1    think this Court has the ability to do a variance -- to grant a

2    variance or departure based on post sentencing rehabilitation

3    for relevant conduct in this case.

4         And I think when the Court considers all of that

5    together, the appropriate sentence for Mr. Pendergrass -- and I

6    know the Court has stated some skepticism about this -- is time

7    served.  He served 30 months in prison, and now we're asking

8    for two years on home confinement, Your Honor.

9         I understand what the Government argued about

10   guideline Section 5C1.1 and the application of probation for

11   someone in zone D.  We're not asking for probation.  We're

12   asking for home confinement.

13        And the cases that I cited in my brief on Page 20 are

14   multiple cases where courts have held that home confinement is

15   incarceration.  And in cases where courts have imposed

16   incarceration on a person and then imposed home confinement,

17   the Court has found error and said you can't double incarcerate

18   someone.  So home confinement is incarceration.

19        We are not asking for probation.  We are asking for

20   incarceration -- home confinement as punishment for

21   Mr. Pendergrass.

22        I know the Court has read the sentencing memo.  I

23   know the Court understands our arguments.  But I do hope that

24   when the Court is considering the appropriate sentence in this

25   case it considers not only the history of the case and how he

1    got here but Mr. Pendergrass's history and how he got here.

2        He came all the way through from that arrest in 2017,

3    served his prison sentence, completed all of the classes that

4    we would want a person to complete, and has done the things we

5    would want someone to do once they were released from prison,

6    Your Honor.  This person does not need more rehabilitation in

7    the prison system.  He does not need more deterrence from

8    committing future crimes.

9        And so when the Court thinks about what the sentence

10   is that is sufficient but not greater than necessary for this

11   particular defendant, I think the answer to that is two years

12   on home confinement.

13       Thank you.

14       THE COURT:  Yes.

15       MS. KING:  So very briefly, Your Honor, Ms. Durrett

16   indicated that the cases that she cite indicate that a sentence

17   of home confinement is incarceration.  But I would like to cite

18   the Court to the case of *U.S. v. Mangaroo*, M-A-N-G-A-R-O-O,

19   cite 504 F.3d 1350.  It is an Eleventh Circuit, 2007 case.

20       That case dealt with a statute that is similar to

21   1028(a), specifically 924(c).  Like 1028(a), as you know 924(c)

22   provides for a mandatory term of imprisonment.  And it also

23   like 1028(a) provides that the sentence may not be probated.

24       Now, although in this case the court did, in fact,

25   issue a sentence of probation, which is definitely improper, I

86

1   do want to point the Court to a comment that the Eleventh

2   Circuit made, which I believe is relevant here.  And in

3   addition to finding that probation is an impermissible sentence

4   under that -- under 924(c), the court additionally said that

5   quote, in any event, a sentence of home confinement is not

6   incarceration.

7        And so I know that Your Honor has already indicated

8   that she is not inclined to issue a sentence that does not

9   include a period of incarceration.  So I will not belabor the

10  point.

11       The only other thing that I ask for is if the Court

12  is in its discretion considering a departure or a variance

13  based on some of the time that was served in another district

14  for which Ms. Durrett assumes that he would have received

15  concurrent time if he had been prosecuted simultaneously here

16  the Government will ask that the Court not vary or depart below

17  the sentence that was imposed in the other district.

18       We believe that such a departure, Number 1, is a very

19  large departure and that a departure within that 30-month range

20  would sufficiently address all of the other factors under

21  3553(a) that Ms. Durrett argues.

22       THE COURT:  What do you mean by that?  That departure

23  within 30-month range would sufficiently --

24       MS. KING:  -- address her concerns with respect to

25  her other 3553(a) factors.  The Government is not contending

1    that a 30-month departure is appropriate in this case.  But

2    we're just saying that if the Court is inclined to do some

3    departure because of the other sentence we are -- we are

4    arguing that a departure greater than what he previously served

5    would be -- would amount to an unreasonable sentence and that

6    that departure would subsume her other concerns under 3553(a).

7         But the Government's position is that the Court

8    should impose a low end guideline sentence for the reasons

9    previously stated.

10        THE COURT:  All right.

11        I'm going to take five minutes to think about your

12   arguments, and I'll be right back then.

13        COURTROOM SECURITY OFFICER:  All rise.

14        **(A brief break was taken at 5:38 PM.)**

15        THE COURT:  I would say that one of the -- this case

16   has been difficult obviously for all of us to parse in terms of

17   just the technical requirements of calculating the guidelines

18   and moving on from there.

19        But the -- and the bigger picture here is that it

20   is -- the case is in a very peculiar kind of historical

21   posture.  On one hand, these were very serious offenses.  And

22   it was part of a whole spate of fraudulent conduct that

23   Mr. Pendergrass engaged in after the death of his wife.

24        And it appears to have all happened -- I mean, I

25   don't know the exact beginning date of it -- but the year, two

1    years after that up through the time of 2013.  Because the

2    Ohio, Colorado, Georgia events had all occurred in that time

3    period.

4           And there is no discussion in the PSR of the

5    defendant having a drug or alcohol problem.  But, of course, he

6    doesn't have one currently.  So it doesn't reflect that.  But

7    the death of a long-time partner, abuse of drugs all are a good

8    formula for aberrational conduct.  On the other hand, it was

9    sustained conduct.

10          And clearly Mr. Pendergrass was mature enough,

11   accomplished enough, and had family who loved him still,

12   daughters who were dedicated to him, good friends who have

13   written here who were there to support him.  And this really

14   wild and wholly unacceptable conduct is almost bizarre other

15   than for greed and maybe to feed a habit also.

16          And then to inculcate these practices in other young

17   people who you recruited basically as employees was also so

18   poisonous.  So I have to treat this seriously.  And I have seen

19   these people.  I mean, even if Mr. McQueen has his own

20   responsibility to bear here or the other gentleman who did the

21   designs for -- to make things look real, they still were sucked

22   into this.  And it obviously had a truly terrible impact on

23   Mr. McQueen's life ultimately.

24          So I don't lightly treat any of that.  It is

25   extremely disturbing.  At the same time, I have a man in front

1   of me who is 65, who will be 66 in the beginning of December.

2   And there is probably nothing potentially as destructive for

3   somebody's health as being in prison, especially the older you

4   are and mortality.

5          Additionally, I think that there is a good point made

6   by Ms. Durrett on his behalf that 2013 is a long time ago.  And

7   this is not a case where he was convicted and then did a

8   sentence, came out, and then engaged in more misconduct

9   despite -- so it is kind of a very strange posture.  Because

10  when somebody has been convicted and then comes out and engages

11  in further conduct, you really have to consider that in a whole

12  different light when you are reviewing the sentence.

13         So he has been -- he was punished and apparently to a

14  large extent rehabilitated when he was in Ohio.  And he did the

15  full sentence without being -- getting the halfway house

16  because of this screw-up with the Fulton County court or

17  prosecution's office but -- and then, which she doesn't mention

18  here, here are some other bizarre things that have caused the

19  delay.

20         And I know that counsel for the defendant believes

21  there were some potential other nefarious things.  But putting

22  aside anything that might be -- from defendant's perspective

23  nefarious, the reality is I tried to hold a trial in this case

24  a number of years ago -- I can't remember when I appointed

25  you -- but at least two, maybe three years ago and his

1   long-time counsel then had become ill -- extremely ill,

2   unfortunately lacked the judgment to just say I'm too ill to

3   represent you.  And so I'm having a pretrial order --

4   conference -- I mean, we're having a pretrial conference.  And

5   he is totally unprepared, hasn't responded to any of the

6   pending motions, hasn't properly filed objections.  It is a

7   mess.  And it is clear he is not capable of representing the

8   defendant.

9        And so, you know, I wasn't going to allow that to

10  happen to have wholly inadequate counsel.  And I knew it wasn't

11  going to happen because I had at that point experience with

12  counsel, that he was -- both he and his wife were in very

13  serious medical circumstances.

14        So then we -- I appoint Ms. Durrett or the magistrate

15  judge does -- I don't know which one of us did -- so that he

16  could have adequate counsel.  Then basically many things got

17  re-litigated, basically motions got litigated, all those normal

18  things that you do to get ready for trial.

19        And then, of course, that we get to COVID.  And so no

20  trials can be held until we had a trial.  We were one of the

21  early people having trials.  So this attenuation gets longer

22  and longer and makes the sense of what are the -- what are we

23  accomplishing here and what are the -- what are we trying to --

24  what is an adequate sanction for this conduct that was very

25  serious and at the same time one that is not greater than

1    necessary under these very peculiar circumstances.

2           Because, you know, I absolutely understand that from

3    the testimony of his old friend who runs these drug clinics

4    that -- that the defendant comes out, is in a position to help,

5    does help, is effective, could help again, but you know -- but

6    we're going back to square one.

7           So I really tried to balance that in my thinking.

8    But, you know, this was basically fraud that affected the

9    public, the functioning of our -- the way we operate in terms

10   of reclaimed funds and individuals.  And it can't just be

11   minimized.  There is a 24-month mandatory sentence that I,

12   first of all, am not prepared to release the defendant from.

13   And then the question is what to do after that.

14          And considering also what the sentence was in the

15   other matter, considering the fact that Mr. McQueen also will

16   not have to serve any time -- but there are special

17   circumstances involving him.  He did cooperate.  He was a very

18   important witness to the Government.  And they are in different

19   circumstances.

20          So with that in mind, I'm going to impose a total

21   sentence of 46 months, with the first 24 months to be imposed

22   in connection with Count 7 through 10, all of them, Count 7

23   through 10, to be served concurrently to each other and

24   consecutively to Counts 1 through 6 and 22 months on Counts 1

25   through 6 for a total term of 46 months.

1          I will recommend to the Bureau of Prisons in strong

2     terms in light of the defendant's age and particular

3     circumstances that he be released to home confinement for the

4     last 18 months of his sentence.

5          In making this assessment, I strongly considered the

6     guidelines and all of the discussion.  I have considered also

7     the defendant's age, the seriousness of the offenses, but the

8     age of the offenses and the sequence of events that I have just

9     described and sequence of the litigation.  This is not a

10    situation at this juncture that Mr. Pendergrass was himself

11    responsible just individually for the delay in the case.  It

12    was far more complicated.

13         I have considered -- I don't think that the -- I

14    think that the -- let me just put it this way:  The sentence is

15    absolutely sufficient but not greater than necessary to achieve

16    the punishment purposes of the statute, as well as the

17    deterrence and protection of the public, which, of course,

18    people can do fraud at any age.  It is not -- it doesn't

19    require you to move around and to be capable of being young and

20    spry.

21         And I also find though that there are individual

22    circumstances here, some of which I have mentioned, but also,

23    as I have said, the age.  And at this time, where we still are

24    getting COVID floating around in every single variant possible

25    and we don't have vaccines very reliably in the prisons that

1    are going to necessarily be the newest vaccines available and

2    concerning the defendant's age, I cannot in good conscience

3    considering all of the sentencing criteria determine that any

4    greater sentence is necessary or appropriate.  I think the

5    sentence is sufficient but not greater than necessary.

6              I will not impose a fine and cost of incarceration.

7    And I will waive that.

8              Is there a forfeiture order of any variety?

9              MS. KING:  No, Your Honor.

10             THE COURT:  All right.  And what is the -- at this

11   point, what is the restitution amount in total?

12             MS. KING:  The restitution amount, Your Honor, is the

13   loss amount that we calculated.  And my apologies.  I did not

14   write that amount down.

15             PROBATION OFFICER:  It is 200,000 -- I'm sorry --

16   $221,298.36.

17             THE COURT:  The restitution will be $221,298.36.  The

18   special assessment is $1000.  That will be due immediately.

19             The defendant will be -- must pay restitution in the

20   amount of $5000 in the next four years.

21             MS. DURRETT:  I'm sorry, Your Honor.  I missed what

22   you said about the $5000.

23             THE COURT:  I said he will have -- basically what I'm

24   trying to -- going to do is I'm going to waive any payments of

25   restitution other than $5000 so that when he is released he

1   will be -- most of the -- he will be responsible for payment of

2   restitution.

3        There will need to be an audit of the amount due on a

4   monthly basis.  I will set it at this point at $150 a month.

5   But it may have to go up.  It may have to go down depending on

6   his circumstances.  The $5000 needs to be paid so that there

7   is -- in the next -- in equal amounts so that it is --

8   basically every ten months he should be paying $1000.  No

9   amounts beyond the 5000 will be due until after he is released

10   though.

11        And we don't get to that point -- I've just said

12   every ten months.  So that amount may not end up being paid in

13   that time frame.  So I have to do the math.  I think we would

14   have to say that that is going to be in equal amounts every ten

15   months.  Whatever it is, it is basically $1000 every ten months

16   until he is released, whatever that amount is.

17        I will recommend that the defendant be designated to

18   a facility as close to Atlanta as possible but one that is

19   capable of safely housing him at this time.  And I recommend

20   that he be designated to the Maxwell facility in Alabama as the

21   closest one that would be able to safely house him.

22        So any balance that remains, which there will be, on

23   the financial -- your financial obligations under this court

24   order shall commence other than what I have told you as to the

25   specified 60 days after release from imprisonment.

1          And at this juncture, it will be payable at a rate of

2    no less than 150 monthly to the U.S. District Court Clerk.  And

3    it shall be distributed to the victims as noted in this

4    judgment.

5          I find that you do not have the ability to pay the

6    interest on any restitution owed, and I will waive that.

7          Upon release from imprisonment -- what was the term

8    of -- the lowest term of supervised release?

9          PROBATION OFFICER:  It is one year on the aggravated

10   identity theft counts and one to three years on Counts 1

11   through 5.

12         THE COURT:  I will place you under supervised release

13   for a period of 18 months.  And you shall report in person to

14   the nearest probation office within 72 hours of your release.

15         You must not commit another federal, state, or local

16   crime.  You must not unlawfully -- use an unlawful controlled

17   substance, and you must refrain from the use of any controlled

18   substance.  You must cooperate in the collection of your DNA as

19   directed by the probation officer.  And you must make

20   restitution in accordance with the provisions I have

21   identified.

22         You will be required to submit to an audit of your

23   financial documents at the request of your probation officer,

24   and you must make any requested financial information available

25   to your probation officer.

1          You must not incur any credit charges or open

2    additional lines of credit without the approval of a probation

3    officer.  And you must submit your property, home, residence,

4    vehicle, computers, cell phones, car -- make it available to

5    search if there is reasonable suspicion on the part of the

6    probation officer that you have violated the law or violated

7    the terms of your supervised release.  And you would -- in

8    those circumstances, you would be required to permit

9    confiscation or disposal of any material considered to be

10   contraband.

11         You must participate -- you would be required, I

12   think, to again subject yourself to an audit, which I have

13   already gone over.

14         And I'm just going to modify one provision here.  I

15   spoke of home confinement, that you will be authorized to be

16   employed or to volunteer during that time.  And if you decide

17   you want to work with your friend in Ohio, the Court would

18   recommend a transfer of the jurisdiction so that you could do

19   that.

20         I want to say that you have the right to appeal.  You

21   have 14 days to file the appeal.  And if your attorney is not

22   willing or able to do so and you would wish her to do so, you

23   could ask me to appoint another attorney for you or you could

24   write to the Clerk of the Court indicating your desire to

25   appeal.

1              The important thing is you only have 14 days to

2    effectuate basically the timeline requirement.

3              Is there anything that I have not addressed in the

4    sentence given the hour that I should have addressed?

5              MS. KING:  Not from the Government.

6              MS. DURRETT:  Your Honor, I would just note our

7    objection to the procedural and substantive unreasonableness.

8              PROBATION OFFICER:  He can voluntary surrender,

9    Judge?

10             THE COURT:  He can voluntarily surrender.

11             How much time would you like?

12             MS. DURRETT:  Your Honor, I did ask in the memo if he

13   could have bond pending appeal because we do intend to appeal,

14   especially the Fifth and Sixth Amendment issues regarding the

15   delay in the case.  So we would ask that he be granted a bond

16   pending appeal.

17             MS. KING:  And, Your Honor, the Government would

18   object because under 18 U.S.C. 3143(b) the Court is only

19   authorized to release the defendant if the Court makes this

20   three-prong cumulative finding:  One, that there is clear and

21   convincing evidence that he is not likely to flee or pose a

22   danger to -- a danger to the safety of any other persons or the

23   community and the appeal is not for a purpose of delay; and

24   raises a substantial question of law or fact likely to result

25   in reversal and order for a new trial; a sentence that does not

1  include a term of imprisonment or a reduced sentence to a term

2  of imprisonment less than the total time already served plus --

3  already served plus the expected duration of the appeal

4  process.

5          The Government contends that he does not satisfy that

6  third prong, and therefore the Court should order him detained.

7          THE COURT:  Well, I don't think I'm required to make

8  that determination today.  And it is ten after 6:00.  I'm going

9  to say for now the defendant has 60 days to report.  You can

10  file a motion, and I'll basically make it 75 days -- excuse

11  me -- because I still have to rule on it thinking about it.

12          So I'll give him -- then you can file a motion, and I

13  will rule on it.

14          How much time do you need to file that motion?

15          MS. DURRETT:  30 days.

16          THE COURT:  Will you be able to respond within 20

17  days --

18          MS. KING:  Yes, Your Honor.

19          THE COURT:  -- of that?

20          Okay.  All right.  I can't give anyone extensions

21  with that because then I won't have enough time myself.  I

22  obviously will extend time if I'm not prepared to issue a

23  ruling.

24          MS. DURRETT:  Thank you, Your Honor.

25          THE COURT:  Anything else we should address?

1          MS. KING:  Yes, Your Honor.  The Government just

2    wanted to put on the record its objection to the sentence as

3    procedurally and substantively unreasonable.

4          THE COURT:  Okay.  Very good.  Now that I've done

5    something unreasonable in everyone's minds, that's great.

6          Have a very good evening.

7          MS. DURRETT:  Thank you, Your Honor.

8                    **(The proceedings were thereby concluded at 6:14**

9                    **PM.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6       I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   99 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12       In testimony whereof, I hereunto set my hand on this, the

13   27th day of October, 2022.

14

15

16

17                              _____
                                SHANNON R. WELCH, RMR, CRR
18                              OFFICIAL COURT REPORTER
                                UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT