[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13018

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ALLEN J. PENDERGRASS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cr-00224-AT-CMS-1

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER, Circuit Judges.

PER CURIAM:

Defendant Allen Pendergrass appeals his conviction for participating in a scheme to steal unclaimed property belonging to others. Pendergrass, along with co-defendant Terrell McQueen, contacted the City of Atlanta and other city and county governments and requested lists of unclaimed funds being held by those entities. They then mailed fraudulent documents to the entities, falsely representing that they were acting on behalf of the owners to recover the funds. After a trial, a jury found Pendergrass guilty of aiding and abetting bank fraud, conspiracy to commit money laundering, and aiding and abetting identity theft. At the sentencing hearing, the district court imposed a sentence of 46 months' imprisonment.

On appeal, Pendergrass challenges his convictions and sentence on multiple grounds. As to his convictions, he argues, among other things, that his Fifth and Sixth Amendment rights were violated because of the government's delay in indicting him and that there was insufficient evidence to support some of his convictions for aiding and abetting aggravated identity theft. As to his sentence, he says that the district court erred in applying an enhancement for fraud involving an authentication feature and in failing to give him an opportunity to allocute at sentencing.

After careful review, and having heard oral argument, we affirm Pendergrass's convictions because no Fifth or Sixth

Amendment violation occurred and there was sufficient evidence to support his convictions for aggravated identity theft. As to his sentence, we conclude that the district court did not abuse its discretion when it applied an enhancement for fraud. The district court did, however, commit plain error when it failed to afford Pendergrass an opportunity to allocute at the sentencing hearing. Accordingly, we affirm in part and vacate in part. We remand for resentencing after he has been given an opportunity to allocute.

## I.    BACKGROUND

### A.    Pendergrass's Fraudulent Scheme and Initial Arrest

Pendergrass's fraudulent scheme began when he and McQueen discussed teaming up to run an asset recovery business in Atlanta. Pendergrass had submitted an open records request to the City of Atlanta and received a "holder's list" identifying individuals and companies who had unclaimed funds that the city government was holding. He and McQueen planned to find contact information for the individuals or companies and try to convince them to hire the two of them to recover the funds. Pendergrass and McQueen would keep a percentage of the money recovered.

The initial plan was legal. But when it proved unsuccessful, Pendergrass and McQueen turned to fraud. They submitted fraudulent documents to claim funds on behalf of the individuals and companies appearing on the holder's list, even though they were not authorized to act on the holders' behalf. The co-conspirators would keep the recovered funds for themselves.

At first, they had trouble successfully implementing their fraudulent scheme. After they fooled the City of Atlanta into mailing them a $359,000 check made out to Holland & Knight "LLLP," they managed to convince a PNC bank branch employee to open a checking account in McQueen's name, "d/b/a Holland & Knight." Doc. 264 at 95–96.[1] But the check never cleared. The next time—when a Texas county mailed them $160,000 in checks made out to the Lee Family Trust—they adjusted their approach by hiring an escrow agent to hold the funds instead of trying to deposit them directly. But the escrow agent got suspicious, figured out that Pendergrass and McQueen were not actually working for the Lee Family Trust, and contacted the Trust's attorney.

As they continued to refine their approach, they learned that the City of Atlanta would issue checks in the name of an asset recovery company instead of the holder to whom the funds belonged. And so, in early 2013 Pendergrass opened a bank account in the name of a nonexistent company, "Asset Financial Recovery Inc.," and the fraudulent activities charged in this case began in earnest. Pendergrass and McQueen sent letters on Asset Financial letterhead to the City of Atlanta requesting funds owed to Asset Financial's purported clients. With each letter, they attached fraudulent power-of-attorney forms. The forms, which authorized Asset Financial to act on a purported client's behalf, appeared to be signed by an employee of the client and notarized. But no client had signed the document, nor had it been notarized. Rather, the

---

[1] "Doc." refers to the district court's docket entries.

signature was forged, often by Pendergrass. The notary stamp on the document also was forged, often by Pendergrass's subordinate, Eric Fitchpatric, who acted at Pendergrass's direction. Pendergrass and McQueen directed their scheme mainly at victims who were owed money by the City of Atlanta, but they also sought funds from the City of Fort Collins, Colorado, on behalf of a purported client called Tousa Homes.

Eventually, a representative of one of Pendergrass and McQueen's purported clients learned that her signature had been forged and funds had been stolen. She reported the theft to the City of Atlanta. Atlanta police traced Asset Financial's post office box to Pendergrass. Officers also obtained video showing Pendergrass cashing one of the checks he had received from the City of Atlanta.

In late 2013, Atlanta police obtained warrants to search Asset Financial's office and to arrest Pendergrass and McQueen on state charges. A team including Atlanta police officers and United States postal inspectors executed the warrants. The postal inspectors were involved because the United States Postal Inspection Service was investigating Pendergrass for another fraudulent scheme that involved the use of Asset Financial's post office box. After the search warrant was executed, all computers, documents, and other evidence that had been seized were turned over to the United States Postal Inspection Service.

After his arrest, Pendergrass initially was held in a local jail. After about two weeks, he was released on pretrial supervised release. The supervision ended in early 2014 based on a standing

6                          Opinion of the Court                        22-13018

Fulton County Superior Court order dictating that supervision ends after four months if no indictment is returned.

After Pendergrass was released from the local jail, he was indicted in the Southern District of Ohio on charges of bank fraud arising from an unrelated scheme in which allegedly he cashed 51 treasury checks and stole over $500,000. And while that case was ongoing, he was arrested for theft in Fort Collins, Colorado, in connection with the Tousa Homes fraud. He pleaded guilty in both cases.

Before he was sentenced in the Ohio federal court case, a probation officer prepared a presentence investigation report ("PSR"). The PSR listed Pendergrass's criminal history. It noted that he had been arrested in 2013 in Atlanta for "Theft by Taking . . . and Forgery." Doc. 79-2 at 22. It noted, "These charges are currently pending." *Id*. The district court in the Ohio federal case sentenced him to 30 months' imprisonment. The state court in the Colorado case also sentenced him to 30 months' imprisonment, to run concurrently to his Ohio federal sentence.

## B.    Pendergrass's 2017 Federal Indictment and Trial

In 2017, Pendergrass had almost finished serving his concurrent sentences. Before he was released from prison, a grand jury in the Northern District of Georgia indicted him. The grand jury charged him with five counts of aiding and abetting bank fraud (Counts One through Five), one count of conspiracy to commit money laundering (Count Six), and four counts of aiding and abetting aggravated identity theft (Counts Seven through Ten).

Before trial, Pendergrass moved to dismiss the indictment. He asserted that the delay in indicting him violated his Fifth and Sixth Amendment rights. To support his argument, he pointed to documents showing that the U.S. Attorney's Office in the Northern District of Georgia had met with both Atlanta police and federal law enforcement to discuss their respective investigations of him as early as 2014, yet he was not indicted until 2017. But he struggled to obtain records to build his argument. When his attorney subpoenaed records about him from Fulton County's District Attorney, she was told that the office had no records. When she later tried to subpoena records from the Atlanta Police Department, she was told that the city had turned over all its paper records to the U.S. Attorney and that the police were unable to retrieve emails due to a cyberattack. Ultimately, the district court denied the motion to dismiss.

At trial, the government presented evidence from witnesses including Douglas Ricks, the Atlanta officer who investigated the scheme; several victims; McQueen; and Fitchpatric. The evidence primarily concerned the crimes charged in the indictment, but the government also sought to introduce other evidence of Pendergrass's bad acts—his convictions in Ohio and Colorado, as well as evidence of his similar-but-uncharged fraudulent acts against Holland & Knight and the Lee Family Trust, among others. The district court prohibited the government from presenting evidence about the Ohio conviction but allowed it to introduce the other evidence with a limiting instruction. The court's limiting instruction specified that the evidence was "intrinsic to the charged

conduct" and necessary "to complete the story of the crimes" charged but was *not* evidence of "the crimes actually charged" and should therefore be understood and assessed accordingly. Doc. 264 at 65–66.

McQueen and Fitchpatric offered detailed testimony about the criminal scheme. They had both been involved in the scheme but opted to cooperate with the government—McQueen because of a plea deal and Fitchpatric as part of an agreement not to be charged at all. McQueen testified that he and Pendergrass "always worked together." *Id.* at 93. He explained that it had been Pendergrass's idea to involve an escrow agent for the Lee Family Trust fraud attempt. Fitchpatric testified that Pendergrass directed him to prepare fraudulent notary documents. He described sending documents back and forth with Pendergrass for alteration and review. He said that Pendergrass had him alter at least 20 documents.

Pendergrass's primary defense at trial was that he had not knowingly taken part in the fraud. According to Pendergrass, he believed that McQueen had been submitting legitimate claim requests. He maintained that McQueen acted alone and made up the story of Pendergrass's involvement.

The jury convicted Pendergrass on all counts.

## C.    Pendergrass's Sentencing

Before sentencing, a probation officer prepared a PSR. In the PSR, the probation officer determined that a two-level enhancement applied because Pendergrass's offense involved the use of an authentication feature. *See* U.S. Sent'g Guidelines Manual

§ 2B1.1(b)(11)(A)(ii). Pendergrass objected to the enhancement, but the district court concluded that the sentencing enhancement applied.

At sentencing, the district court found that the relevant loss amount was approximately $221,000. Based on this loss amount and after applying several enhancements, including the enhancement for using an authentication feature, the district court determined that Pendergrass's total offense level was 25. Given this offense level and his category II criminal history score, the district court calculated his guidelines range as 63 to 78 months. The district court also noted that Pendergrass was subject to a 24-month mandatory sentence for the aggravated identity theft counts.

After weighing the 18 U.S.C. § 3553(a) sentencing factors,[2] the district court sentenced Pendergrass to a total term of 46

---

[2] Under § 3553(a), the district court must impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of the statute. 18 U.S.C. § 3553(a). These purposes include the need to: reflect the seriousness of the offense; promote respect for the law; provide just punishment; deter criminal conduct; protect the public from the defendant's future criminal conduct; and effectively provide the defendant with educational or vocational training, medical care, or other correctional treatment. *Id.* § 3553(a)(2). The court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. *Id.* § 3553(a)(1), (3)–(7).

months' imprisonment. The district court imposed this sentence without giving him an opportunity to address the court.[3]

## II.    STANDARDS OF REVIEW

"We review constitutional questions *de novo*." *United States v. Castillo*, 899 F.3d 1208, 1212 (11th Cir. 2018).

"We review a district court's legal conclusions regarding the Sentencing Guidelines *de novo* . . . . Questions of statutory or Guidelines interpretation [also] receive *de novo* review." *United States v. Taylor*, 818 F.3d 671, 673–74 (11th Cir. 2016) (emphasis added) (internal quotation marks omitted).

## III.    DISCUSSION

On appeal, we focus on Pendergrass's constitutional speedy-trial challenges, his arguments about the sufficiency of the evidence supporting his convictions, and his challenges to his sentence. First, we examine the constitutional challenges—namely, his contention that both his Fifth Amendment due process right and his Sixth Amendment right to a speedy trial were violated because he took part in the charged fraudulent scheme in 2013 but was not indicted until 2017. Second, we consider his argument that the government failed to introduce sufficient evidence for two of his four counts of aiding and abetting aggravated identity theft. Third, we focus on his two sentencing challenges—that the district court erroneously applied a two-level enhancement for use of an authentication

---

[3] After Pendergrass filed notice of his appeal, the district court allowed him to remain on bond while this appeal was pending.

feature to his conduct involving fake notary seals and that the district court committed plain error when it gave him no opportunity to allocute before sentencing.

## A.    Constitutional Challenges

Although the government secured an indictment within the limitations period for each charged crime, Pendergrass argues that the government's delay in indicting him violated his Fifth Amendment right to due process and his Sixth Amendment right to a speedy trial. We address each issue in turn.

### 1.    Fifth Amendment Right to Due Process

Pendergrass was arrested in Atlanta in late 2013. His pretrial supervised release ended four months later, in early 2014, with no indictment. He was not indicted in Georgia until 2017. He claims that this delay violated his Fifth Amendment right to due process.

To establish a constitutional due process violation based on a delay in indictment, a defendant must show: (1) "actual prejudice . . . from the delay" and (2) "that the delay resulted from a deliberate design by the government to gain a tactical advantage." *United States v. Thomas*, 62 F.3d 1332, 1339 (11th Cir. 1995). We do not reach the second requirement because Pendergrass failed to demonstrate evidence of actual prejudice.

Pendergrass argues that he was prejudiced because, "[a]lthough he was arrested in 2013, . . . when he was released from pre-trial supervision in Fulton County [in 2014] . . . it did not appear the county was going to prosecute him." Appellant's Br. 34. In

effect, he argues that he was given a false sense of security because "he was not on notice of any prosecution." *Id.* But he ignores that there were signs indicating that he could face criminal charges arising from his Atlanta arrest. For example, his 2015 PSR in his Southern District of Ohio case included a criminal history section that listed his Fulton County Superior Court charges as "pending." This document should have put Pendergrass on notice that he could still face charges in Georgia.

Pendergrass nevertheless says that he was prejudiced because of the order of events. He argues that by the time he was tried in the Northern District of Georgia, the government could introduce evidence of his convictions in Ohio and Colorado, as well as similar-but-uncharged "bad acts" involving the Lee Family Trust fraud in Texas and Holland & Knight in Georgia, as evidence of guilt in this case. But there is no prejudice from the other acts evidence for constitutional purposes. The delay may have meant that this trial took place only after Pendergrass had been convicted of the additional crimes, but the district court judge prevented the introduction of evidence of his Ohio and Colorado convictions. And though the district court did allow evidence of the other frauds, that evidence would have been available to the government even without a delay. For example, Harris County, Texas investigators knew about the Lee Family Trust incident in 2013. The Holland & Knight check was deposited at a PNC Bank branch in early 2013, and the City of Atlanta was in contact with Holland & Knight shortly thereafter. Yet Pendergrass was not arrested until late 2013

and his pretrial release did not occur until early 2014. Thus, Pendergrass's timing-based argument lacks merit.[4]

Pendergrass also argues that he was prejudiced because the delay impaired his ability to collect evidence. He says he "currently suffers from memory loss and now takes medicine to enhance his memory" and he therefore believes that the delay unjustly exacerbated his "inability to recall specific events related to this case." Doc. 101 at 5. He also points to "the destruction of a swath of City of Atlanta records resulting from third party hacking of City of Atlanta data systems" that occurred between his initial arrest and eventual prosecution. Doc. 177 at 4.

We have previously held that, to establish that a delay prejudicially impaired the defendant's ability to collect evidence, the

---

[4] Pendergrass raises these incidents in an evidentiary challenge as well, arguing that the district court abused its discretion when it allowed the government to introduce evidence about these other frauds. We disagree. The district court properly concluded that this evidence was intrinsic and thus admissible. *See United States v. Shabazz*, 887 F.3d 1204, 1216 (11th Cir. 2018) (evidence is admissible as intrinsic if it arises "out of the same transaction or series of transactions as the charged offenses," is "necessary to complete the story of the crime," or is "inextricably intertwined with the evidence regarding the charged offenses"); *see also United States v. Muscatell*, 42 F.3d 627, 630 (11th Cir. 1995) (evidence is intrinsic when it "involv[es] the same principal actors, in the same roles, employing the same *modus operandi*"). Furthermore, the district court gave a limiting instruction about the narrow purpose for which the jury could consider the evidence to mitigate the risk of unfair prejudice. And we also cannot say the district court abused its discretion in determining that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403.

defendant may not simply "speculat[e]" that he would have uncovered favorable evidence. *United States v. Reme*, 738 F.2d 1156, 1164 (11th Cir. 1984). Rather, we expect him to "name any specific potential witnesses who might have aided his defense," identify what their testimony would have been, and describe how it would have been material to his defense. *Id.* at 1163–64. We have rejected prejudice assertions based solely on a defendant's faulty memory. *Cf., e.g., United States v. Corbin*, 734 F.2d 643, 648 (11th Cir. 1984) (rejecting a due process challenge based only on "[f]aded memories" over the passage of time). So too have we rejected prejudice arguments based on lost evidence when they were raised without any added showing that the loss "impaired [the defendant's] ability to provide a meaningful defense." *United States v. Solomon*, 686 F.2d 863, 872 (11th Cir. 1982) (holding that there was no due process violation where allegedly exculpatory records were destroyed in a motel fire).

Pendergrass has not established that the delay prejudicially affected his ability to collect evidence. He introduced no specific evidence about his medication or how his defense would have been aided if he had a better memory, and he made nothing more than cursory allegations that the loss of records made it difficult to fully investigate his defense.[5] *See Corbin*, 734 F.2d at 647–48 (concluding

---

[5] In *Solomon*, the defendant asserted that the records destroyed in the fire "would have shown how little merchandise he bought from Collum, how much he paid, and how the price compared with what he paid legitimate vendors." *Solomon*, 686 F.2d at 872. He also argued that the destroyed records

22-13018            Opinion of the Court            15

there was no prejudice where defendants pointed to witnesses' faded memories and listed other dead witnesses' names without any further indication of what the substance of their testimony would have been). We thus conclude that Pendergrass failed to demonstrate prejudice and, because he has not done so, we decline to address his arguments that the delay resulted from a deliberate design by the government to gain a tactical advantage.

Pendergrass's fallback position is that the district court should have held an evidentiary hearing before denying his motion. He relies on *Gravitt v. United States*, 523 F.2d 1211, 1214 (5th Cir. 1975), in which the court held that a 16-month delay necessitated an evidentiary hearing. Pendergrass's arguments based on *Gravitt* are unavailing, however, and the district court did not err in denying Pendergrass's motion to dismiss without an evidentiary hearing.

It is true that our predecessor court concluded that Gravitt's case needed to be remanded for an evidentiary hearing. But Pendergrass invokes *Gravitt* for his Fifth Amendment arguments; we based our conclusions in that case on Gravitt's Sixth Amendment rights. *Gravitt*, 523 F.2d at 1214. Nothing in our opinion addressed a defendant's entitlement to an evidentiary hearing on a Fifth Amendment delayed-indictment claim. And for reasons we explain

---

"would have shown when and how he first met Collum." *Id.* The defendant's allegations regarding lost records were far more specific than Pendergrass's, yet he failed to establish prejudice nonetheless.

below in Section III.A.2, *Gravitt* does not support his Sixth Amendment challenge either. *See infra* note 8.

*Gravitt* aside, we agree with the district court that Pendergrass is not entitled to an evidentiary hearing without "any specific and concrete evidence" as to prejudice. Doc. 177 at 4. To obtain an evidentiary hearing on pre-indictment delay, Pendergrass must make at least a prima facie showing of actual prejudice as well as deliberate design by the government to gain a tactical advantage over him. *See United States v. Farias*, 836 F.3d 1315, 1325 (11th Cir. 2016) (analogizing to similar prima facie standards for obtaining evidentiary hearings on selective prosecution and improper disclosure claims). Pendergrass's argument that he cannot make that showing without an evidentiary hearing simply begs the question, as does arguing that only with additional subpoenas will he be able to obtain more evidence.

We therefore conclude that Pendergrass's Fifth Amendment due process right was not violated.

2.      Sixth Amendment Right to a Speedy Trial

The Sixth Amendment guarantees a criminal defendant a speedy trial. The Supreme Court has held that the Sixth Amendment's protection is triggered only when a person is accused by the federal government through "formal indictment or information" or the "actual restraints imposed by arrest and holding to answer a criminal charge." *United States v. Marion*, 404 U.S. 307, 320, 325 (1971). Here, Pendergrass argues that his Sixth Amendment rights were violated by the delay of roughly four years between when he

22-13018                 Opinion of the Court                          17

was first arrested and when he eventually stood trial. But this argument fails at the outset because his 2013 arrest was effected by Atlanta police, not federal officers. For Sixth Amendment purposes, he was not accused by the federal government until he was indicted, which occurred only one month before he was arraigned and two months before he was given a bond.

Pendergrass disputes his speedy-trial-clock start date, arguing two alternatives: either his 2013 arrest was, in fact, a federal arrest or we should recognize a ruse exception to treat his criminal proceedings as having been initiated with that arrest. We reject both arguments; we tackle each in turn below.

First, Pendergrass's 2013 arrest by Atlanta police officers was not a federal arrest because he was not arrested by federal authorities, taken before a federal magistrate, or charged with a federal crime in Georgia. Certainly, the federal government was involved: Federal agents were present at the arrest, assisted in executing the search warrant, received all the electronic evidence obtained in the search, communicated with the Fulton County District Attorney's office about the case, and ultimately took over the investigation in 2014. But, under our precedent, none of these factors is sufficient to start the speedy-trial clock. We have held that even when federal authorities were highly involved in the defendant's initial arrest—as was the case here—the clock did not start until after the federal indictment. *United States v. Bell*, 833 F.2d 272, 277 (11th Cir. 1987). We have also recognized that the clock for a defendant who was the subject of a joint state and federal investigation—like

Pendergrass—started not when the federal government "took control" of the case, but rather when it arrested him on federal charges. *United States v. Russo*, 796 F.2d 1443, 1450–51 (11th Cir. 1986).

Second, Pendergrass points out that some circuits have recognized a "ruse exception" through which a speedy-trial clock may start—even without a federal arrest or indictment—when there is evidence of collusion between state and federal authorities. *E.g.*, *United States v. Cepeda-Luna*, 989 F.2d 353, 357 (9th Cir. 1993). But the burden is placed "on the detainee to establish that the primary or exclusive purpose of the [nonfederal] civil detention was [a ruse] to hold [the detainee] for future prosecution." *United States v. Drummond*, 240 F.3d 1333, 1336 (11th Cir. 2001).[6]

To begin with, this Court "has not previously applied the ruse exception in this context."[7] Appellant's Br. 37. But even if we were to entertain the ruse exception here, the circumstances

---

[6] We have been unable to locate any case law suggesting that the ruse exception applies to Sixth Amendment claims; rather, it appears to be invoked only under the Speedy Trial Act. Pendergrass does not make any argument under the Speedy Trial Act. But when a case involves action by both federal and state governments, the analysis for both Sixth Amendment and Speedy Trial Act claims examines *when* the federal speedy-trial clock starts. And the ruse exception speaks directly to that question. Thus, for purposes of determining when the clock started in this case, we look to Sixth Amendment and Speedy Trial Act case law interchangeably.

[7] The only context in which this Court has recognized the ruse exception is federal immigration detention cases. *See, e.g.*, *Drummond*, 240 F.3d at 1336 (holding that routine immigration detention incident to deportation could trigger the speedy-trial clock if used as a ruse).

Pendergrass advances to show collusion between the federal and state governments simply are not enough. He says that federal agents were "involved in the case at the time of . . . arrest, evidence was turned over to federal authorities, state investigators acknowledged that the case was going to be indicted by federal authorities, and . . . no state case charges were ever lodged." *Id.* at 36. Facts like these have not triggered the ruse exception in cases from other circuits. *See, e.g.*, *United States v. Iaquinta*, 674 F.2d 260, 268 (4th Cir. 1982) (holding that the actions of federal officers present and assisting with arrest and obtaining search warrants were insufficient to trigger the Speedy Trial Act's time limit); *United States v. Johnson*, 65 F.4th 932, 938 (7th Cir. 2023) ("[S]tate and federal prosecutors consult and cooperate with one another all the time. Routine consultations and decisions by one to defer to the other . . . fall far short of what might be needed to invoke the possible exception."); *United States v. Mearis*, 36 F.4th 649, 654 (5th Cir. 2022) (holding that emails between federal and state prosecutors regarding their respective charges were not evidence of collusion); *United States v. Clark*, 754 F.3d 401, 405 (7th Cir. 2014) ("If an agency relationship were present this might be a closer point . . . .").[8]

Because Pendergrass's 2013 arrest was neither a federal arrest nor an arrest occasioned by collusion sufficient to invoke a ruse

---

[8] Some of the cases discussed here do not refer explicitly to a "ruse exception"—including *Clark*, which both Pendergrass and the government cite. Nevertheless, cases that do not use the term "ruse" use analogous language like "substantial federal presence," *Iaquinta*, 674 F.2d at 266–67, or "impermissible collusion," *Mearis*, 36 F.4th at 654, and all cases engage in similar analyses.

exception, we adopt Pendergrass's 2017 federal indictment date as the pertinent one for his Sixth Amendment challenge. He was indicted, arraigned, and released on bond within the span of a few months in 2017 and, as the government notes, "does not complain of any post-indictment delays that might involve speedy trial rights." Appellee's Br. 44. The several-month period is also far shorter than the one-year "presumptively prejudicial" threshold that the Supreme Court has suggested should trigger further inquiry under the Sixth Amendment. *See Doggett v. United States*, 505 U.S. 647, 651–52, 652 n.1 (1992) (holding that one-year delays are "presumptively prejudicial," thus triggering a court's consideration of other factors).

We thus conclude that Pendergrass's Sixth Amendment right to a speedy trial has not been violated.[9]

## B.    Sufficiency of the Evidence Challenge

Pendergrass argues that the government failed to introduce sufficient evidence to show that he aided or abetted McQueen in

---

[9] Above, we addressed and rejected Pendergrass's request for an evidentiary hearing in part because he incorrectly invoked *Gravitt*, a Sixth Amendment case, as his primary support for his Fifth Amendment argument. *See supra* Section III.A.1. *Gravitt* would not help his Sixth Amendment argument, either. In *Gravitt*, the district court's speedy-trial-clock calculations failed to include the date when a federal complaint was filed, and so an evidentiary hearing was necessary for the court to determine the relevant date and corresponding calculations. *Gravitt*, 523 F.2d at 1214–15. But because it is undisputed here that the government did not file any criminal complaint or indictment until 2017, this case is not like *Gravitt*.

two of the four counts of aggravated identity theft—Counts Seven and Eight. He says that the only evidence in the record about these two charges was McQueen's testimony that he, not Pendergrass, prepared the corresponding documents and paperwork requesting money from the City of Atlanta. We find no merit in this challenge.

A challenge to the sufficiency of the evidence requires us to examine "whether the evidence, when viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the fact-finder, would enable the trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. Monroe*, 866 F.2d 1357, 1365 (11th Cir. 1989). We may reverse a conviction for insufficient evidence only if there is "no reasonable construction of the evidence" from which the jury could have convicted the defendant. *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005).

A reasonable jury could have convicted Pendergrass on the two aggravated identity theft counts in question based on McQueen's and Fitchpatric's trial testimony. McQueen testified that, for each fraud, both he and Pendergrass signed the fake signatures on the power-of-attorney forms so that each party's handwriting would look different. He testified that he and Pendergrass "would discuss everything before [they] submitted" false claims. Doc. 264 at 155. And Fitchpatric testified that he acted at Pendergrass's direction when he prepared the notary seals on the false documents. He said that he always gave his finished work to Pendergrass, not McQueen. From this testimony, a reasonable jury could

have found that Pendergrass played a role in submitting the fraudulent documents on which Counts Seven and Eight were based and therefore aided and abetted those identity thefts.

Pendergrass points to other parts of McQueen's testimony where McQueen suggested that he had worked alone on the two instances of fraud charged in Counts Seven and Eight. But it is not enough for him to show that there was conflicting evidence about whether he aided and abetted the identity theft underlying these charges. Construing the evidence in the government's favor, as we must, we conclude that there was sufficient evidence from which a reasonable jury could find Pendergrass guilty of the crimes charged in Counts Seven and Eight.

## C.    Sentencing Challenges

### 1.    Enhancement for Use of an Authentication Feature

Pendergrass argues that the district court erred at sentencing when it applied a two-level enhancement for use of an authentication feature. We disagree.

Under the Sentencing Guidelines, a two-level enhancement applies when the defendant's offense involved "the possession or use of any . . . authentication feature." U.S.S.G. § 2B1.1(b)(11)(A)(ii). Commentary to the Guidelines explains that the term "authentication feature" is defined by 18 U.S.C. § 1028(d)(1). Section 1028(d)(1) defines an authentication feature as "any hologram, watermark, certification . . . or other feature . . . used by the issuing authority on an identification document, document-making implement, or means of identification to determine

if the document is counterfeit, altered, or otherwise falsified." 18 U.S.C. § 1028(d)(1). A person who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person" is subject to an additional two-year consecutive sentence. 18 U.S.C. § 1028A(a)(1). Taken together, the two provisions could present a risk of double counting: For example, the same instance of illegal activity could simultaneously involve the use of a watermark on an identification document, triggering § 2B1.1(b)(11)'s enhancement, *and* the use of a "means of identification of another person," triggering § 1028A(a)(1)'s two-year consecutive sentence.

We have previously addressed how to avoid this potential double-counting problem. *See Taylor*, 818 F.3d at 675. In *Taylor*, we explained that the Guidelines' commentary resolved the overlap issue and ensured that a defendant is not "doubly penalized for the same conduct." *Id.*; *see also* U.S.S.G. § 2B1.6(a) cmt. 2 (stating that if a sentence under § 1028A "is imposed in conjunction with a sentence for an underlying offense," then no "specific offense characteristic for the transfer, possession, or use of a means of identification" should be applied "when determining the sentence for the underlying offense"). But we also recognized that § 1028A and § 2B1.1(b)(11) were not co-extensive in scope, and thus an enhancement under § 2B1.1(b)(11) was appropriate "when a defendant's criminal activity involved conduct that is separate from or in addition to the simple transfer, possession, or use of [a] means of identification." *Taylor*, 818 F.3d at 676.

To assess whether there is a double-counting problem here, we look at whether the conduct giving rise to the enhancement for possession or use of an authentication feature was separate from or in addition to Pendergrass's transfer, possession, or use of a means of authentication. Here, Pendergrass and McQueen mailed power-of-attorney forms containing names and forged signatures of victims. They also used notary seals on those forms. Under *Taylor*, Pendergrass's "simple transfer, possession, or use of [a] means of identification" was his use of the victims' names and signatures on the forms. And his "criminal activity involv[ing] conduct that is separate from or in addition to" that use was his illicit placement of "authentication features"—fake notary seals—on those same forms. *See id.* at 676. In other words, the enhancement arose from conduct that was in addition to the use of the means of identification.

Pendergrass disagrees, arguing that the authentication feature (the notary seal) became "indivisible" from the power-of-attorney forms containing the means of identification (the names and forged signatures of victims). It is true that the two appeared on the same form and are related in that the notary witnesses the signature. But there is good reason to consider the two as separate. The signature's purpose is to affirm that the person granting the power of attorney has in fact agreed to transfer authority. The notarization's purpose is to verify the document's authenticity. The government might reasonably seek to punish more harshly a defendant who both forges a person's signature and falsifies a notary seal to create the appearance of legitimacy.

Our precedent tracks such reasoning in similar circumstances with respect to adjacent guideline subsections. *Taylor*, discussing § 2B1.1(b)(11)(B)(i)'s similar enhancement for producing unauthorized access cards, notes that "[b]y including an enhancement for production," the Sentencing Commission intended that "a defendant who creates the means . . . to engage in criminal activity should not enjoy the same punishment as the individual who simply uses an already-existing item to engage in criminal activity." *Id.* at 677. Likewise, *United States v. Cruz*, 713 F.3d 600, 605–608 (11th Cir. 2013), discussed § 2B1.1(b)(10)(A)(i)'s similar enhancement for possessing device-making equipment and found it reasonable to separate the defendants' use of a credit card skimmer to create fake credit cards from the subsequent use of those fake cards with other people's account numbers on them.[10] Therefore, we affirm the district court's application of the enhancement here.

2.    Allocution

Lastly, Pendergrass argues that the district court plainly erred by failing to give him an opportunity to allocute at sentencing. The government agrees that there was plain error but specifies

---

[10] This Court reached the same conclusion, using the same reasoning, in a more analogous but unpublished opinion in *United States v. James*, 744 F. App'x 664 (11th Cir. 2018) (unpublished). There, the defendant presented a fake driver's license that included another person's name, the defendant's picture, and a hologram. *Id.* at 666–67. The defendant argued that the hologram was indivisible from the license, but we pointed out that identity theft via the use of another's name on a license was separate from the use of a hologram to fraudulently lend legitimacy to that license. *Id.* at 667.

that he is "entitled to an opportunity to allocute and have the court resentence him" *without* any opportunity to "file new objections to the PSR, file a new sentencing memorandum, or reassert or reargue any of his objections to the PSR." Appellee's Br. 69–70. We agree that the district court committed plain error. And we agree with the government that Pendergrass is entitled to an opportunity to allocute but not to an entirely new sentencing proceeding.

To establish plain error, a defendant must show that "(1) there was error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010) (internal quotation marks omitted); *see also* Fed. R. Crim. P. 52(b). An error is plain if it is "clear" or "obvious." *United States v. Olano*, 507 U.S. 725, 734 (1993).

We previously have held that because Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) "specifically requires the district court to offer the defendant the opportunity to allocute, the court's failure to do so was a 'clear' or 'obvious' error." *United States v. Prouty*, 303 F.3d 1249, 1252 (11th Cir. 2002). Here, because the district court never asked Pendergrass whether he wished to speak, it committed plain error.

This error affected Pendergrass's substantial rights. A failure to afford allocution affects a defendant's substantial rights, thereby prejudicing him, when the "possibility of a lower sentence exist[s]." *Id.* Such is the case here, when "Pendergrass could have advocated

for a further downward variance." Appellant's Br. 61. And we have recognized that "[b]ecause allocution plays a central role in the sentencing process, the denial of this right is not the sort of isolated error that does not impact the fairness, integrity or public reputation of judicial proceedings." *Prouty*, 303 F.3d at 1253 (alterations adopted) (internal quotation marks omitted).

The only remaining question is what Pendergrass is entitled to on remand. Our precedent dictates that, like other defendants who were not afforded an opportunity to allocute, Pendergrass "is entitled to an opportunity to allocute and have the court resentence him after he says what he wishes to say to the judge," but he is "not entitled to an entirely new resentencing—he may not reassert or reargue any of his objections to the PSR, file new objections to the PSR, or file a new sentencing memorandum." *United States v. George*, 872 F.3d 1197, 1209 (11th Cir. 2017) (internal quotation marks omitted).

## IV.   CONCLUSION

For the above reasons, we affirm the district court on all of Pendergrass's challenges except allocution. We vacate his sentence and remand for resentencing so that he may allocute.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 13, 2025

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  22-13018-HH
Case Style:  USA v. Allen Pendergrass
District Court Docket No:  1:17-cr-00224-AT-CMS-1

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered
today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP
41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir.
R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning
petitions for rehearing. Among other things, **a petition for rehearing must include a
Certificate of Interested Persons**. See 11th Cir. R. 40-3.

Costs
No costs are taxed.

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the
Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39
and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any
objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation via the eVoucher system no later than 45 days after issuance of the mandate or
the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or
cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher
system.

<u>Clerk's Office Phone Numbers</u>
General Information:      404-335-6100      Attorney Admissions:           404-335-6122
Case Administration:     404-335-6135      Capital Cases:                 404-335-6200
CM/ECF Help Desk:      404-335-6125      Cases Set for Oral Argument: 404-335-6141

OPIN-1 Ntc of Issuance of Opinion